**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| APEX GROUP CAPITAL ADVISORS LLC F/K/A SANDSPOINT CAPITAL ADVISORS LLC, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:25-cv-08892 |
| RELATED FUND MANAGEMENT, LLC; JAMES KRAUS; LUCAS BELINKIE; PRESTON CALLEN; WILLIAM C. CHANEY; and RYAN HOPE, | § § § § § | |
| Defendants. | § § | |

## PLAINTIFF'S OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION ................................................................................................................. 1

II. PLEADING STANDARD ................................................................................................... 2

III. THE COURT SHOULD DENY DEFENDANTS' MOTIONS TO DISMISS ........................ 3

    A. Apex Properly Pleads its Misappropriation of Trade Secrets Claims (Counts One and Two) ........................................................................................................................ 3

        1. Apex Adequately Pleads the Existence of a Trade Secret.......................................... 3

        2. Apex Adequately Alleges Misappropriation of Its Trade Secrets .............................. 7

        3. Apex Sufficiently Alleges Harm Resulting From Trade Secret Misappropriation ...... 9

    B. Apex Sufficiently Pleads a Claim Against the Former Employees for Breach of their Employment Agreements (Count Three) ................................................................... 10

        1. The Restrictive Covenants' Breadth Does Not Warrant Dismissal............................11

        2. The Former Employees' Argument About "Goodwill" Is Wrong.............................. 12

        3. Apex's Allegations of Breach Are Sufficient ........................................................... 13

    C. Apex Sufficiently Pleads a Claim Against the Former Employees for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Four) ................................... 15

    D. Apex Sufficiently Pleads a Claim for Tortious Interference with Contract (Count Five) ........................................................................................................................... 17

        1. Apex Alleges the Existence of a Valid Agreement .................................................. 18

        2. Apex Plausibly Alleges the Related Defendants' Knowledge of the Employment Agreements ........................................................................................................... 18

        3. Apex Adequately Alleges that the Related Defendants Induced a Breach of the Employment Agreements ...................................................................................... 20

    E. Apex Sufficiently Pleads a Breach of Contract Claim Against Related (Count Six) ....... 22

    F. Apex Sufficiently Pleads that Related Breached the Implied Covenant of Good Faith and Fair Dealing (Count Seven) ............................................................................. 23

    G. Apex Adequately Pleads a Claim for Breach of Fiduciary Duty (Count Eight).............. 25

    H. Apex Adequately Pleads a Claim for Unjust Enrichment (Count Nine) ......................... 27

        1. The Unjust Enrichment Claim Is Not Duplicative.................................................... 27

        2. Apex's Allegations Are Sufficiently Specific ......................................................... 29

        3. Apex's Alleged Damages Are Not Duplicative ....................................................... 30

    I. Apex Adequately Pleads a Claim for Civil Conspiracy (Count Ten) .............................. 31

    J. TUTSA Preemption Does Not Apply ........................................................................... 35

IV. INJUNCTIVE RELIEF REMAINS APPROPRIATE ......................................................... 36

V.  ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE .................................................. 36

CONCLUSION............................................................................................................. 37

## **<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

<u>Cases</u>

*37 E. 50th St. Corp. v. Rest. Grp. Mgmt. Servs., LLC,*
  68 N.Y.S.3d 424 (App. Div. 1st Dep't 2017) .......................................................................26

*255 Butler Assoc. LLC v. 255 Butler, LLC,*
  2021 N.Y. Misc. 6548 (Sup. Ct. 2021) .........................................................................15, 23

*AA Medical P.C. v. Almansoori,*
  2023 WL 7688688 (E.D.N.Y. Oct. 4, 2023)...................................................................6, 8

*Abacus Fed. Sav. Bank v. Lim,*
  75 A.D.3d 472 (1st Dep't 2010) ...............................................................................31

*AdiPar Ltd. v. PLD Int'l Corp.,*
  2002 WL 31740622 (S.D.N.Y. 2002).............................................................................2

*Aira Jewels LLC v. Mondrian Collection, LLC,*
  2024 WL 1255798 (S.D.N.Y. March 25, 2024) ..................................................................6

*Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n,*
  328 F. Supp. 3d 141 (S.D.N.Y. 2018)......................................................................26

*Aquavit Pharmaceuticals, Inc. v. U-Bio Med, Inc.,*
  2020 WL 4504737 (S.D.N.Y. 2020).......................................................................28, 30

*Art Cap. Group, LLC v. Carlyle Inv. Mgmt. LLC,*
  151 A.D.3d 604 (1st Dep't 2017) ...............................................................................14

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................................2

*Auto Expo Ent. Inc. v. Elyuahou,*
  2025 WL 2637493 (E.D.N.Y. Sept. 12, 2025) ..................................................................6

*Banco Espirito Santo de Investimento, S.A. v. Citibank., N.A.,*
  2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) ...............................................................26

*BDO Seidman v. Hirshberg,*
  93 N.Y.2d 382 (N.Y. 1999) ...............................................................................11, 13

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................................................2

*Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*
  259 F. Supp. 3d 16 (N.D.N.Y. 2017).........................................................................24

*Berkovits v. Berkovits*,
190 A.D.3d 911 (2nd Dept. 2021) ..............................................................25

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
666 F. Supp. 3d 328 (S.D.N.Y. 2023)...........................................................3

*Block v. First Blood Assocs.*,
988 F.2d 344 (2d Cir. 1993)........................................................................36

*Caliber Home Loans, Inc. v. Cove*,
2025 WL 71983 (N.D. Tex. Jan. 10, 2025) ..........................................35, 36

*Casey v. Citibank*,
915 F. Supp. 2d 255 (N.D.N.Y. 2013)........................................................29

*Chrysler Capital Corp. v. Century Power Corp.*,
778 F. Supp. 1260 (S.D.N.Y. 1991)...........................................................30

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.*,
70 N.Y.2d 382 (N.Y. 1987) .......................................................................28

*Congel v. Malfitano*,
31 N.Y.3d 272 (N.Y. 2018) .......................................................................13

*Cont'l Indus. Grp., Inc. v. Altunkilic*,
788 F. App'x 37 (2d Cir. 2019) ...................................................................6

*Cotiviti, Inc. v. Deagle*,
501 F. Supp. 3d 243 (S.D.N.Y. 2020).........................................................14

*Cruz v. Local 32BJ*,
762 F. Supp. 3d 286 (S.D.N.Y. 2025).........................................................37

*Data Device Corp. v. W.G. Holt, Inc.*,
2020 WL 7024312 (E.D.N.Y. Nov. 30, 2020)...............................................8

*DDR Const. Servs., Inc. v. Siemens Indus., Inc.*,
770 F. Supp. 2d 627 (S.D.N.Y. 2011).........................................................33

*Doe v. New York University*,
2021 WL 1226384 (S.D.N.Y. March 31, 2021) ............................................2

*Dorset Indus., Inc. v. Unified Grocers, Inc.*,
893 F. Supp. 2d 395 (E.D.N.Y. 2012) ..................................................15, 17

*EFG Bank AG v. AXA Equitable Life Ins. Co.*,
309 F. Supp. 3d 89 (S.D.N.Y. 2018)...........................................................24

*El Paso Disposal, LP v. Ecube Labs Co.*,
 755 F. Supp. 3d 692 (W.D. Tex. 2025)....................................................................9

*Elsevier Inc. v. Dr. Evidence, LLC*,
 2018 WL 557906 (S.D.N.Y. Jan. 23, 2018) ............................................................6

*Fometal S.R.L. v. Keili Trading LLC*,
 2024 WL 307976 (S.D.N.Y. Jan. 26, 2024) ......................................................33, 34

*Glob. Network Commc'ns, Inc. v. City of New York*,
 458 F.3d 150 (2d Cir. 2006).....................................................................................2

*GMH Capital Partners v. Fitts*,
 2025 WL 950674 (S.D.N.Y. March 28, 2025) .........................................................6

*Hoffman v. L&M*,
 774 F. Supp. 2d 826 (N.D. Tex. 2011) ...................................................................21

*Hosp. Auth. of Rockdale County v. GS Capital Partners V Fund, L.P.*,
 2011 WL 182066 (S.D.N.Y. Jan. 20, 2011) ......................................................16, 23

*Int'l Bus. Machines Corp. v. Papermaster*,
 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008)........................................................11

*Jack in the Box Inc. v. San-Tex Rests., Inc.*,
 2021 WL 148058 (W.D. Tex. Jan. 14, 2021) .........................................................33

*Johnson v. Clearview*,
 2024 WL 2274267 (S.D.N.Y. 2024)......................................................................28

*Knudsen v. Quebecor Printing (U.S.A.) Inc.*,
 792 F. Supp. 234 (S.D.N.Y. 1992) ........................................................................28

*Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*,
 802 F. Supp. 3d 701 (2025) ...................................................................................16

*LMEG Wireless, LLC v. Faro*,
 190 A.D.3d 716 (2nd Dep't 2021) ....................................................................10, 22

*Louis Capital Markets, L.P. v. REFCO Grp. Ltd., LLC*,
 801 N.Y.S.2d 490 (Sup. Ct. 2005)........................................................................25

*Mahoney v. Sony Music Ent.*,
 2013 WL 491526 (S.D.N.Y. Feb. 11, 2013)............................................................3

*Maltbie's Garage Co., Inc. v. General Motors LLC*,
 2021 WL 4972738 (N.D.N.Y. Oct. 26, 2021) ........................................................23

*Manbro Energy Corp. v. Chaterjee Advisors, LLC*,
2021 WL 2037552 (S.D.N.Y. 2021) ...................................................................21

*Nat'l City Comm. Cap. Co., LLC v. Global Golf, Inc.*,
2009 WL 1437620 (E.D.N.Y. May 20, 2009) ......................................................29

*New York Botanical Garden v. Allied World Assur. Co. Inc.*,
206 A.D. 3d 474 (1st Dep't 2022) ......................................................................24

*New York Univ. v. Continental Ins. Co.*,
87 N.Y.S.2d 308 (1995) ......................................................................................27

*Newman & Schwartz v. Asplundh Tree Expert Co.*,
102 F.3d 660 (2d Cir. 1996)................................................................................27

*Northern Shipping Funds I, LLC v. Icon Capital Corp.*,
921 F. Supp. 2d 94 (S.D.N.Y. 2013).....................................................................27

*NRD GP LLC v. Centiva Cap., LP*,
2025 WL 2782804 (S.D.N.Y. Sept. 30, 2025)...................................................4, 6

*Oakwood Laby's LLC v. Thanoo*,
999 F.3d 892 (3d Cir. 2021)..............................................................................8, 9

*Onyx Renewable Partners L.P. v. Kao*,
2023 WL 405019 (S.D.N.Y. Jan. 25, 2023) ..........................................................4

*Philips N. Am. LLC v. Image Tech. Consulting, LLC*,
2022 WL 17168372 (N.D. Tex. Nov. 21, 2022)...................................................35

*Poole v. AXA Equitable Life Insurance Co.*,
2020 WL 10050562 (N.D. Tex. Apr. 29, 2020) ...................................................21

*Randolph Equities, LLC v. Carbon Capital, Inc.*,
2007 WL 914234 (S.D.N.Y. Mar. 26, 2007) .......................................................28

*Regel v. Campbell Soup Co.*,
2025 WL 2733840 (S.D.N.Y. Sept. 25, 2025).....................................................27

*Rochester Drug Coop.,v. Biogen Idec U.S. Corp.*,
130 F. Supp. 3d 764 (W.D.N.Y. 2015) ...............................................................21

*Ronzani v. Sanofi S.A.*,
899 F.2d 195 (2d Cir. 1990)...............................................................................36

*Rose v. Different Twist Pretzel, Inc.*,
123 A.D.3d 897 (2nd Dep't 2014) ......................................................................18

*Saggio v. Select Portfolio Servicing, Inc.*,
   2015 WL 6760132 (E.D.N.Y. Nov. 5, 2015)................................................................16, 17

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*,
   754 F. Supp. 37 (S.D.N.Y. 1991) ....................................................................................28

*Spartan Cap. Sec., LLC v. Sports Field Hldgs., Inc.*,
   2021 WL 665031 (S.D.N.Y. Feb. 19, 2021)................................................................27, 34

*Speedmark Transp., Inc. v. Mui*,
   778 F. Supp. 2d 439 (S.D.N.Y. 2011)...............................................................................14

*SVT, LLC v. Seaside Vill. Townhome Ass'n*,
   2021 WL 2800463 (Tex. App—Houston [14th Dist.] 2021)................................................30

*Swartz v. Swartz*,
   145 A.D.3d 818 (2d Dep't 2016) ......................................................................................33

*TileBar v. Glazzio Tiles*,
   723 F. Supp. 3d 164 (E.D.N.Y. 2024) ..........................................................................20, 21

*Transcience Corp. v. Big Time Toys, LLC*,
   50 F. Supp. 3d 441 (S.D.N.Y. 2014)..................................................................................22

*Twister B.V. v. Newton Research Partners, LP*,
   364 S.W.3d 428 (Tex. App.—Dallas 2012)........................................................................3, 9

*Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*,
   43 F. Supp. 3d 236 (S.D.N.Y. 2014).................................................................................26

*Vogel v. TakeOne Network Corp.*,
   2023 WL 5276857 (S.D.N.Y. Aug. 16, 2023).....................................................................30

*Walker v. Beaumont Indep. Sch. Dist.*,
   2017 WL 11639369 (E.D. Tex. May 1, 2017).....................................................................33

*Webster Bank, N.A. v. Watson*,
   2025 WL 2732826 (S.D.N.Y. Sept. 25, 2025).....................................................................28

<u>Statutes and Codes</u>

United States Code
   Title 18, section 1836(b)(3)(A).........................................................................................36

Texas Civil Practice & Remedies Code
   Section 65.011...................................................................................................................36
   Section 134A.002(6) ...........................................................................................................4

Rules and Regulations

Federal Rules of Civil Procedure

Rule 8(a)(2)....................................................................................................................2
Rule 15(a)....................................................................................................................36

Plaintiff Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex") provides this Omnibus Opposition to the Motions to Dismiss Apex's First Amended Complaint ("Complaint") filed by Defendants Related Fund Management LLC and James Kraus (together, the "Related Defendants") and Lucas Belinkie, Preston Callen, William C. Chaney, and Ryan Hope (together, the "Former Employees").

## I.    INTRODUCTION

Defendants' largely repetitive Motions to Dismiss are unavailing for multiple independent reasons. For the most part, Defendants do not dispute that Apex has alleged every element of each claim alleged. Nor do Defendants attempt to tackle the 125 paragraphs of detailed factual allegations set forth in the Complaint. Instead, Defendants invoke arguments that largely avoid those allegations—including contentions that Apex's claims are "duplicative" and "conclusory." Defendants also repeatedly ask the Court to credit their own, extraneous evidence and suppositions instead of focusing on the well-pleaded allegations at issue. And Defendants misstate or overstate the law, even when their own cases belie their arguments.

A fair reading of the Complaint under the plausibility standards of Federal Rule of Civil Procedure Rule 8 should leave no doubt that Apex has stated viable claims against Defendants. As the Complaint alleges in painstaking detail, Apex completed a costly acquisition of SandsPoint Capital Advisors LLC in mid-2024, paid the Former Employees hefty retention bonuses to stay with the company, and diverted substantial resources to Related's account, only to learn that its employees, its client, and the client's core relationship manager were scheming to move to a direct competitor in the same market and to steal proprietary trade secrets in the process. The Complaint puts all Defendants on fair notice of the claims against them, and it provides ample detail to support those claims. The Court should deny Defendants' Motions to Dismiss.

Page 1

## II.    PLEADING STANDARD

To overcome Defendants' motions to dismiss, the Complaint need only allege "a short and plain statement" of each claim showing Apex's entitlement to relief.  Fed. R. Civ. P. 8(a)(2).  As Defendants acknowledge, at this stage, dismissal is inappropriate so long as the Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citations omitted) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  A claim is plausible if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "Even after *Twombly* and *Iqbal*, the Court's role in deciding a motion to dismiss 'is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might be offered in support thereof.'" *Mahoney v. Sony Music Ent*., 2013 WL 491526, at *5 (S.D.N.Y. Feb. 11, 2013).[1]

Apex's Complaint easily meets federal pleading standards.  The Complaint contains 29 pages of detailed factual allegations outlining the factual basis for every claim and each Defendant's role in causing the harm alleged.  While Defendants repeatedly argue that Apex does not have any *evidence* to support its allegations, that is not required at the motion to dismiss stage. *See* Related MTD, Dkt. 98 at 8, 13–15, 23, 25–26; Callen MTD, Dkt. 101 at 1, 12, 16, 22; Hope MTD, Dkt. 103 at 7, 10, 12, 17, 19–20, 25; Chaney MTD, Dkt. 106 at 8, 13, 18, 21, 25; Belinkie

---

[1] All Defendants cite evidence not referenced in the Complaint, which is impermissible.  A court may consider evidence submitted by defendants on a motion to dismiss only where the evidence is "integral to plaintiff['s] claim." *Doe v. New York University*, 2021 WL 1226384, at *10–15 (S.D.N.Y. March 31, 2021).  And a court's power to take judicial notice is likewise limited. *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (court may take judicial notice of litigation filings but not for the truth of the matters asserted therein); *AdiPar Ltd. v. PLD Int'l Corp.*, 2002 WL 31740622, at *15 (S.D.N.Y. 2002) (court may only take judicial notice of records not subject to reasonable dispute).  Applying these principles, the Court may not consider the Defendants' affidavits, including Dockets 14-1, 14-7, 14-10.  Nor should the court consider prior litigation filings cited by Defendants for the truth of the matters asserted therein, including Dockets 1 and 23–24 in *Apex Group Capital Advisors LLC v IQEQ US Mgmt. Co., LLC*, 3:25-cv-00260-e (N.D. Tex.) and Dockets 99–99.4 in this case.

MTD, Dkt. 108 at 7, 8, 13, 17–18, 20, 25.  Nor is Apex's Complaint unduly "conclusory," as Defendants repeatedly posit.  As this Court has recognized, "legal conclusions can provide the framework of a complaint," so long as those conclusions are "supported by factual allegations." *Mahoney*, 2013 WL 491526 at *5 (quoting *Iqbal,* 556 U.S. at 679).  Any conclusions drawn by Apex find support in the surrounding factual allegations, which this Court must accept as true.  At bottom, Apex's allegations are plausible and sufficient to put Defendants on notice of the claims and harms alleged.

## III.    THE COURT SHOULD DENY DEFENDANTS' MOTIONS TO DISMISS

### A.    Apex Properly Pleads its Misappropriation of Trade Secrets Claims (Counts One and Two)

Apex sufficiently states claims for misappropriation of trade secrets against the Former Employees under both the federal Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA").  To state a claim under DTSA, a plaintiff must allege unconsented use of a trade secret by "(i) one who used improper means to acquire the trade secret or (ii) at the time of disclosure, knew or had reason to know the trade secret was acquired through improper means." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384, 389 (S.D.N.Y. 2023).  To state a claim under TUTSA, a plaintiff must allege (1) the existence of a trade secret, (2) that was misappropriated, and (3) and used without authorization. *Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 437 (Tex. App.—Dallas 2012).  Apex's Complaint sufficiently pleads each of these required elements.

### 1.    Apex Adequately Pleads the Existence of a Trade Secret

At the outset, Apex's Complaint adequately alleges the existence of a trade secret.  DTSA defines "trade secret" broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information," so long as the owner has taken reasonable

measures to keep the information secret and it derives independent economic value from not being generally known. *NRD GP LLC v. Centiva Cap., LP*, 2025 WL 2782804, at *2 (S.D.N.Y. Sept. 30, 2025). TUTSA similarly defines a trade secret as any information which derives independent economic value from being not generally known or readily ascertainable through proper means. TEX. CIV. PRAC. & REM. CODE 134A.002(6). Notably, "[t]he question of whether proprietary information qualifies as a trade secret is ordinarily a question of fact not resolvable on a motion to dismiss." *Onyx Renewable Partners L.P. v. Kao*, 2023 WL 405019, at *2 (S.D.N.Y. Jan. 25, 2023); *accord NRD GP LLC*, 2025 WL 2782804, at *3. Moreover, while courts typically employ a six-factor test to determine whether information constitutes a trade secret,[2] a plaintiff need not plead every element of that test to survive a motion to dismiss. *NRD GP LLC*, 2025 WL 2782804, at *3. Nor does a plaintiff need to plead its trade secrets with such specificity as to reveal their content. *NRG GP LLC*, 2025 WL 2782804, at *3 ("Obviously, a plaintiff must describe its trade secrets in a categorical fashion to some degree, lest it reveal the very information it seeks to protect."). "Generality proves fatal only where the allegations fail to provide any details sufficient to define the trade secrets at issue . . . ." *Id.*

Against this backdrop, the Former Employees insist that Apex has alleged only "general categories" of information, which is insufficient. *See* Callen MTD at 9–11; Hope MTD at 13–15; Chaney MTD at 14–15; Belinkie MTD at 14–15. But Apex's allegations go far beyond "generalities." For example, the Complaint alleges:

---

[2] Those factors include "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort and money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *NRD GP LLC*, 2025 WL 2782804, at *3 n.4 (internal quotations and citations omitted) (cleaned up).

- Apex "uses a licensed database in connection with proprietary spreadsheets that generate specific, customized reports for each individual client." Compl. at ¶ 15.

- The company has developed "client-specific, customized reports over a period of years," based on its specialized "understanding of each client's needs and specifications." In the case of Related, these customized reports and spreadsheets were developed "over the course of a nine-year contractual relationship." *Id.*

- Apex's proprietary database contains trade secret information that "is not easily accessible or replicable by others in the marketplace," including among other things, accounting and auditing processes, strategic plans, and pricing data. *Id.* at ¶ 71.

- The Former Employees nonetheless obtained unauthorized access to many of the highly sensitive trade secrets housed on Apex's proprietary, secure systems, including:

  o Apex's proprietary and confidential work processes for servicing clients. *Id.* at ¶ 77.

  o Files containing highly confidential valuation processes, including the company's valuation methodology for and process for preparing client updates. *Id.* at ¶ 84.

  o Files describing Apex's step-by-step methodology for performing asset management tasks. *Id.*

  o Files containing Apex's revenue projection methodology. *Id.*

  o Excel spreadsheets containing Apex's detailed financial analyses regarding client lines of credit. *Id.* at ¶ 92.

  o Excel spreadsheets detailing Apex's financial analyses for particular clients and including (among other highly sensitive information) names of investors and wiring instructions (including account and routing numbers). *Id.*

  o Excel files containing Apex's confidential analyses of client investments. *Id.* at ¶ 94.

  o Documents containing highly confidential banking and financial information about Apex Capital's clients. *Id.* at ¶ 103.

In most instances, Apex details the information stolen by the Former Employees by file name and type and also describes in detail what each Former Employee took from its proprietary systems. *See, e.g.*, Compl. at ¶¶ 76–77, 84, 86, 92–93, 103.

Page 5

Courts "routinely" find information like this should be afforded trade secret protection.  *See Cont'l Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 40 (2d Cir. 2019) (citing several cases holding confidential data related to pricing, cost systems, and methods are protected by trade secret law); *see also NRD GP LLC*, 2025 WL 2782804, at *2–3 (denying motion to dismiss complaint where plaintiff identified five categories of information that were sufficient "to inform [defendant] of what it [wa]s alleged to have misappropriated").

And Apex Capital's allegations are a far cry from those deemed insufficient in the cases cited by the Former Employees.  In *Elsevier*, unlike here, the plaintiff **only** listed "extraordinarily general categories" of information.  *Elsevier v. Dr. Evidence, LLC* 2018 WL 557906, at *5.  And the plaintiff failed to allege the value or secrecy factors.  *Id.* at *6 n.2.  Moreover, even the *Elsevier* court does not eschew general descriptions; it merely says that the plaintiff must give the defendants enough information to understand what trade secrets were taken.  The Complaint does that, and the Former Employees' protestations to the contrary are meritless.[3]

Nor do the Former Employees meaningfully dispute that Apex undertakes significant efforts to keep its trade secrets a secret or that the trade secrets identified have economic value because they are secret.  At most, the Former Employees deceptively cherry-pick generic allegations from the Complaint to argue that all 13,000 Apex Group employees have access to the

---

[3] The other cases cited by the Former Employees likewise are distinguishable.  Much like *Elsevier,* in *AA Medical P.C. v. Almansoori*, 2023 WL 7688688, at *10–11 (E.D.N.Y. Oct. 4, 2023) and *Aira Jewels LLC v. Mondrian Collection, LLC*, 2024 WL 1255798, at *4 (S.D.N.Y. March 25, 2024), the plaintiffs simply listed general categories of documents, such as "patient files," without any other descriptors.  In *Auto Expo Ent. Inc. v. Elyuahou*, 2025 WL 2637493, at * 12 (E.D.N.Y. Sept. 12, 2025), the plaintiff's allegation of a trade secret amounted to a single, non-descriptive sentence.  Finally, in *GMH Capital Partners v. Fitts*, 2025 WL 950674, at *8 (S.D.N.Y. March 28, 2025), the plaintiff failed to explain why the categories of information were trade secrets.

alleged trade secrets.  *See, e.g.*, Belinkie MTD at 17.[4]  But the allegations of the Complaint say

precisely the opposite.  Specifically, the Complaint alleges that:

- Apex "limits employee access to its confidential and trade secret information to what is reasonably needed to perform their duties on behalf of Apex Capital."  Compl. at ¶ 20;

- Apex "requires employees who have access to Apex Capital's confidential information and trade secrets to sign agreements mandating that they maintain in confidence all of Apex Capital's confidential and trade secret information."  *Id.*

- Further, "to protect its considerable investment in developing its confidential and trade secret information," Apex has other safeguards in place to protect the information.  The company "utilizes password-protected, secure, cloud-based systems, networks, and computers" to store and maintain its trade secrets, and "limits access to its secure systems to employees and other authorized individuals," who are required to "abide by written policies and procedures regarding data management, information security, and content access standards."  *Id.* at ¶ 18.

- The company also "has stringent controls in place to preserve the confidentiality of information about those funds contained in its database, as is required under relevant securities laws and client confidentiality agreements."  *Id.* at ¶ 72.

- Apex precludes third parties, including clients, from accessing its proprietary database, which it acquired at great expense.  *Id.* at ¶ 58.

Although the Former Employees argue that Apex has not alleged its trade secrets have

value, the Complaint also belies that argument.  Apex alleges that it made significant investment

into developing the trade secrets, the trade secrets are valuable because they create a competitive

advantage for Apex, and the trade secrets generate business goodwill for the company.  Compl. at

¶¶ 18, 21.  That is sufficient.

### 2.    Apex Adequately Alleges Misappropriation of Its Trade Secrets

The Former Employees next argue that the Complaint fails to allege the Former

Employees' use of the trade secrets.  This argument fails twice over.

---

[4] The cited paragraph of the Complaint merely explains that Apex is part of a larger company called Apex Group, Ltd., which has 13,000 employees globally.  *See* Compl. at ¶ 14.  Nothing in that paragraph even addresses the trade secrets at issue, much less alleges that all 13,000 employees have access to those trade secrets.

First, the argument misstates the law.  As the Former Employees' own case law makes clear, misappropriation occurs whenever there is an improper acquisition, disclosure, *or* use of a trade secret.  *AA Medical P.C. v. Almansoori*, 2023 WL 7688688, at *9 (E.D.N.Y.  Oct. 4, 2023) (quoting *Oakwood Laby's LLC v. Thanoo*, 999 F.3d 892, 908–09 (3d Cir. 2021)) (cited in Belinkie MTD at 15).  In other words, "use" is not the only test for misappropriation.  Moreover, courts recognize that, at the motion to dismiss stage, before fulsome discovery, the plaintiff's knowledge of the defendant's use of the trade secrets may be limited.  *See, e.g.*, *Data Device Corp. v. W.G. Holt, Inc.*, 2020 WL 7024312, at *4 (E.D.N.Y. Nov. 30, 2020).  It is therefore inappropriate to dismiss a misappropriation claim where there is a reasonable inference of the defendant's use.  *Id.* at *4–5.

But more importantly, the Complaint contains paragraphs of allegations that the Former Employees improperly acquired, disclosed, and/or used Apex's trade secrets.  Specifically, Apex alleges that the Former Employees improperly downloaded and thereby acquired scores of Apex trade secrets on the eve of their departures and that the downloading activity was neither "business as usual" nor authorized by Apex.  *See* Compl. at ¶¶ 78, 87, 92, 104.  Apex also alleges that the Former Employees improperly moved Apex's trade secrets to external devices that were not company issued.  For example, Apex alleges that Belinkie downloaded the company's trade secrets while simultaneously using his personal Gmail account and while accessing external web browsers and drives.  *Id.* at ¶ 75.  Chaney likewise downloaded trade secret files from his work computer while simultaneously accessing his personal email.  *Id.* at ¶ 83.  Hope connected a USB device and accessed an external computer while downloading Apex's trade secrets.  *Id.* at ¶ 105.  And Callen accessed an unknown computer from the internal network while downloading the company's trade

secrets. *Id.* at ¶ 105. These allegations are more than sufficient to meet the legal definition of "misappropriation."

In addition, the Complaint alleges at least one instance where the Former Employees sent Apex's trade secrets to their new employer, IQ-EQ, and that the employees had no legitimate reason to download the information immediately before their departure. *See id.* at ¶¶ 78, 86, 87, 93, 105. Indeed, the Complaint alleges that these files had no utility for the Former Employees personally; thus, "[t]here is no conceivable reason" for the Former Employees' to take Apex's trade secrets "but to use them in [their] new role[s] at IQ-EQ." *See id.* at ¶¶ 78, 87, 93, 105.

The Former Employees' argument about "use" should be rejected.

### 3.    Apex Sufficiently Alleges Harm Resulting From Trade Secret Misappropriation

Finally, the Former Employees allege that Apex has not alleged damages arising from trade secret misappropriation, warranting dismissal. This argument also fails. Under either DTSA or TUTSA, a plaintiff need not allege specific damages flowing from the misappropriation, because harm is presumed when a trade secret is misappropriated. Thus, as set forth above, a plaintiff need only allege it possessed a trade secret and that the defendant misappropriated it without authorization. *El Paso Disposal, LP v. Ecube Labs Co.*, 755 F. Supp. 3d 692, 712 (W.D. Tex. 2025); *Twister B.V.*, 364 S.W3d at 438. The harm to the plaintiff arises from depreciation of the economic value of the trade secret when secrecy is lost or it is disclosed to a competitor. *Oakwood Labs, LLC v. Thanoo*, 999 F.3d 892, 913 (3rd Cir. 2021). Therefore, Apex's allegations of the existence and misappropriation of its trade secret are sufficient to allege harm.

In any event, Apex *has* alleged harm resulting from the trade secret misappropriation. *See* Compl. at ¶¶ 134–35, 143–44. A plaintiff need not itemize its damages in the complaint. *Canino v. Barclays Bank, PLC*, 1998 WL 7219, at *7 (S.D.N.Y. Jan. 7, 1998) ("Except where the damages

sought are unusual for the type of claim in question, a plaintiff need not itemize his damages in his complaint.").   Apex's trade secret allegations are sufficient.

**B.      Apex Sufficiently Pleads a Claim Against the Former Employees for Breach of their Employment Agreements (Count Three)**

Apex likewise states a claim against the Former Employees for breach of their Employment Agreements.   To plead a breach of contract, a plaintiff must allege (1) the existence of a contract, (2) the plaintiff's performance, (3) the defendant's breach, and (4) resulting damages.   *LMEG Wireless, LLC v. Faro*, 190 A.D.3d 716, 718 (2nd Dep't 2021).

Apex adequately pleads each of these elements.   First, the Complaint alleges—and the Former Employees do not dispute—the existence of valid Employment Agreements between the Former Employees and Apex.   Compl. at ¶¶ 27–51, 146–47.   Second, Apex alleges—and again, the Former Employees do not dispute—Apex's performance under the Employment Agreements. *Id.* at ¶ 80.   Third, the Complaint alleges that the Former Employees breached the Employment Agreements by violating the non-competition, non-solicitation, and confidentiality/ non-disclosure provisions of those agreements.   *Id.* at ¶¶ 149–153.   The Former Employees do not dispute that Apex has alleged a breach of the non-competition clause.   And finally, there is no dispute that Apex alleges damages proximately caused by the Former Employees' breach.   *See id.* at ¶¶ 156–57.

Unable to refute that Apex's Complaint adequately states a claim for breach of contract, the Former Employees argue that the Court should dismiss the claim because the restrictive covenants in the agreements are unenforceable and because Apex fails to allege breach of the solicitation and confidentiality/non-disclosure provisions with the requisite specificity.   These arguments are unavailing.

### 1.    The Restrictive Covenants' Breadth Does Not Warrant Dismissal

First, the Former Employees argue that the restrictive covenants are unenforceable because of their broad geographic scope.  *See* Callen MTD at 13–14; Hope MTD at ¶¶ 9–11; Chaney MTD at 10–11; Belikie MTD at 9–12.  Notably, the employees do not dispute that they immediately went to work at a *direct competitor* of Apex in the *same geographic market* working for the *very same client*—in clear violation of their Employment Agreements, as Apex has alleged.  And their argument about geographic scope is both incomplete and wrong.  A broad restrictive covenant is not unenforceable simply because of its breadth.  *See Int'l Bus. Machines Corp. v. Papermaster*, 2008 WL 4974508, at *11 (S.D.N.Y. Nov. 21, 2008) (enforcing non-compete with unlimited geographic scope because IBM's business was global in nature).  Instead, courts "focus[] on the particular facts and circumstances" and consider a restraint of competition reasonable if it: (1) is no greater than is required for the protection of the employer's legitimate interest; (2) does not impose undue hardships on the employee; and (3) is not injurious to the public.  *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 389–90 (N.Y. 1999).  Moreover, even in the case of an overbroad restrictive covenant, the New York Court of Appeals has "reject[ed] a per se rule that invalidates entirely any overbroad employee agreement not to compete."  *Id.* at 394.  Rather, New York law allows a court "to enforce the covenant to the extent necessary to protect [the employer's]

legitimate interest." *Id.* Application of these principles demonstrates that the restrictive covenants at issue may be enforced, such that dismissal is inappropriate.

What is more, Apex's Complaint does not seek to enforce the restrictive covenants *everywhere in the world*, or even at all given the lapse of time.[5]  Instead, the Complaint narrowly claims that the Former Employees' work for a direct competitor in the same market for the same client breached the non-compete provision and that their solicitation of other Apex employees to work for that same direct competitor breached the non-solicitation provision.  Because Apex's allegations of breach do not require the Court to enforce the restrictive covenants beyond the bounds of what is acceptable, the allegations state a claim.[6]

## 2.    The Former Employees' Argument About "Goodwill" Is Wrong

The Former Employees next confusingly argue that the restrictive covenants are unenforceable because Apex has no goodwill with Related.  *See* Callen MTD at 14-15; Hope MTD at 11-12; Chaney MTD at 11-12; Belinkie MTD at. 11–12.  Specifically, the Former Employees contend that, because Related terminated its contract with Apex, Apex no longer had any goodwill to protect by enforcing its restrictive covenants against the Former Employees.  *Id*.  This factually inaccurate argument makes no sense.

When the Former Employees breached the restrictive covenants, *Related was still a client of Apex*.  *See* Compl. at ¶¶ 115–120.  And Apex still had goodwill *with Related* to protect.  But more importantly, "goodwill" is not a concept tethered to a particular customer or business line in

---

[5] As the Former Employees correctly contend, the restrictive covenants at issue constrained the employees for a period of one year after their departure from Apex.  For that reason, Apex's Complaint sought enforcement of the restrictive covenants consistent with the time-period set forth in the relevant provisions of the Employment Agreements.  *See* Compl. at 46 (Prayer for Relief).  Because that time-period has now expired, there is nothing left for this Court to enforce.  But that does not change that the Former Employees *breached* the restrictive covenants.

[6] Indeed, all that would be required to narrow the scope of the restrictive covenants is to strike references to the term "affiliates" in the covenants and limit enforcement to "the Company"—*i.e.*, Apex Group Capital Advisors LLC.

any company. Rather, "goodwill" is an intangible asset representing a company's strong reputation, brand, customer loyalty, and other non-physical factors that make it more valuable than the sum of its tangible assets. *Congel v. Malfitano*, 31 N.Y.3d 272, 292–93 (N.Y. 2018). And every company, including Apex, has goodwill to protect.

The Former Employees also cite *BDO Seidman*, for the unremarkable and inapposite proposition that restrictive covenants should not extend to the personal clients of an employee. But Related was not a personal client of any Former Employee, as the Complaint makes clear. Related was a client that Apex acquired by virtue of a costly two-step acquisition in 2022 and 2024. Compl. at ¶ 23. And Related remained a client of Apex after that acquisition, as is memorialized by the Master Services Agreement ("MSA") executed by Related and Apex. *Id.* at ¶ 52. The Former Employees' argument to the contrary is wrong.

### 3.    Apex's Allegations of Breach Are Sufficient

Lastly, the Former Employees argue that the Complaint insufficiently alleges a breach of the solicitation and confidentiality/non-disclosure provisions. *See* Callen MTD at 16–17; Hope MTD at 12–13, 19–20; Chaney MTD at 13, 20–21; Belinkie MTD at 12–13, 20. Specifically, the employees argue that Apex fails to identify any employee they solicited and fails to allege that they "took" or "used" any confidential information. *See id.* These arguments are meritless.[7]

First, Apex's Complaint alleges that the Former Employees coordinated their departures, that each left in quick succession, that they reported their departures in identical language, and that they misrepresented future plans. Compl. at ¶¶ 79, 80–82, 88–89, 97–98. Apex further alleges

---

[7] The Former Employees also argue that they had a constitutional right to change employers (implying that their departures were not the result of solicitation but individual choice), but that argument makes no difference. In the face of plausible allegations of solicitation, the Court cannot at the dismissal phase make a contrary determination of fact (untethered to the Complaint) about *why* any individual Former Employee left its employment with Apex. And as set forth above, the Court may not consider the Former Employees' affidavits in deciding their Motions to Dismiss.

that Belinkie was the ringleader, "solicit[ing] other employees of Apex Capital to terminate their employment with Apex Capital in favor of IQ-EQ as well." *Id.* at ¶¶ 109, 153. And if that were not enough, Apex alleges that "the Former Employees worked together to recruit additional Apex Capital employees," including "11 more Apex Capital employees from the Related Service team [who] resigned from Apex Capital," at least one of which, Karri Neal, "is now employed by IQ-EQ." *Id.* at ¶¶ 109–10. These allegations provide plenty of specifics.

In fact, the pleadings in this case are much like those in *Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 443 (S.D.N.Y. 2011), where the court found that the plaintiff's claim for breach of a non-solicitation agreement met the plausibility standard. In *Speedmark*, as here, the plaintiff alleged that employees from two offices resigned within days of each other. In *Speedmark*, as here, the plaintiff alleged that the departing employees went to work at a competing business. And in *Speedmark*, as here, the plaintiff alleged that the employees solicited others with whom they had worked. Notably, in *Speedmark*, the latter allegation was made on "information and belief." Nonetheless, these allegations were sufficient to defeat dismissal. *Id.* at 443; *see also CPM, Inc. v. Deagle*, 501 F. Supp. 3d 243, 260 (S.D.N.Y. 2020) (breach of a non-solicitation agreement sufficient where plaintiff alleged that one former employee solicited four others).[8]

Second, the Former Employees' argue that the Complaint fails to allege breach of the confidentiality/non-disclosure provisions because Apex does not allege what the employees disclosed or that Apex was harmed by the disclosure. This argument is nonsense. As set forth above, the Complaint is replete with allegations about the employees' theft and use of Apex's trade

---

[8] The Former Employees cite *Art Cap. Group, LLC v. Carlyle Inv. Mgmt. LLC*, 151 A.D.3d 604, 605 (1st Dep't 2017), but in that case, the court dismissed the non-solicitation claim because the plaintiff did not identify *any* party that was solicited by the defendant. *Id.*

secrets (and by extension, its confidential information).  *See* Section III.A.2, *supra*.  But regardless, Apex need not allege "use" to state a claim for breach, because the Employment Agreements expressly precluded the employees from "tak[ing]" any of the company's confidential information, regardless of use.  *See* Compl. at ¶¶ 29, 35, 41, 47.  And the Former Employees' suggestion that Apex has not alleged harm from the breach is wrong, as explained above.  *See id.* at ¶¶ 156–57.

### C.    Apex Sufficiently Pleads a Claim Against the Former Employees for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Four)

Apex also states a claim against the Former Employees for breach of the implied covenant of good faith and fair dealing.  To state a claim for breach of the implied covenant, a plaintiff must allege that (1) the defendant owed a duty of good faith and fair dealing, (2) the defendant breached that duty, and (3) resulting harm.  *255 Butler Assoc. LLC v. 255 Butler, LLC*, 2021 N.Y. Misc. 6548, at *4–5 (Sup. Ct. 2021).  New York law implies in every contract a covenant of good faith and fair dealing, which precludes either party from "destroying or injuring" the other party's right to receive the benefits of the agreement.  *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012).  Applying these standards, Apex has alleged a plausible claim.

First, there is no dispute that Apex alleged that the Former Employees owed Apex a duty of good faith and fair dealing under their Employment Agreements.  Compl. at ¶¶ 25–50, 159.  Nor do the Former Employees dispute that Apex adequately pleaded a breach of that duty.  *See id.* at ¶ 160.  And the Complaint alleges damages proximately caused by the breach.  *See id.* at ¶¶ 161–62.

Nonetheless, the Former Employees identically argue that the Court should dismiss Apex's claim for breach of the implied covenant because the claim is duplicative of Apex breach of contract claim.  *See* Callen MTD at 17–18; Hope MTD at 21–22; Chaney MTD at 21; Belinkie MTD at 21.  But a plaintiff "may bring two breach of contract claims, one based on breach of the express terms and the other based on breach of the implied duty, as long as they are supported by

factually distinct allegations." *Hosp. Auth. of Rockdale County v. GS Capital Partners V Fund, L.P.,* 2011 WL 182066, at *4 (S.D.N.Y. Jan. 20, 2011).  And where, as here, "there is a dispute over the existence, scope, or *enforceability* of the putative contract," the plaintiff may plead a breach of the implied covenant of good faith and fair dealing "in the alternative to a claim for breach of contract." *Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 802 F. Supp. 3d 701, 715 (2025); *see also Saggio v. Select Portfolio Servicing, Inc.*, 2015 WL 6760132, at *5–6 (E.D.N.Y. 2015 Nov. 5, 2015) (denying motion to dismiss breach of implied covenant claim where defendants disputed the existence or scope of agreement at issue).  Applying these principles, Apex's claim for breach of the implied covenant easily passes muster.

First, Apex alleges distinct facts to support its claim for breach of the implied covenant. Apex's breach of contract claim alleges that the Former Employees breached the non-competition, non-solicitation, and confidentiality/non-disclosure provisions of their agreements.  Apex's breach of implied covenant claim alleges that, in addition, the Former Employees:

- "coordinat[ed] the mass exodus of the employees supporting Related" (whether or not they did so in violation of the solicitation provisions); and

- "conspire[d] with Related to move its business to Apex Capital's direct competitor, IQ-EQ."

Complaint at ¶ 160.  Apex also alleges that the Former Employees took these actions in secrecy so that they could extract sizeable retention bonuses from the company before their exits.  *See id.* at ¶¶ 23, 68.  Nothing in the Employment Agreements required candid disclosure from the Former Employees, nor did the agreements prohibit solicitation of Apex's clients.  But the Former Employees' actions compromised the benefits that Apex expected to receive under the Employment Agreements, including the employees' continued work on important client accounts,

Page 16

their loyalty to the company, and their discretion. That is the essence of a cognizable breach of implied covenant of good faith and fair dealing claim.

Second, to the extent Apex's breach of implied covenant claim is based on facts similar to its breach of contract claim, that is permissible because the Former Employees dispute the enforceability of the restrictive covenants in their Employment Agreements. *See* Callen MTD at 13–15; Hope MTD at 9–12; Chaney MTD at 9–12; Belinkie MTD at 9–12. In other words, the Former Employees contend that Apex cannot state a claim for breach of contract because the restrictive covenants are not enforceable, but they also argue that the breach of implied covenant claim is duplicative and should be dismissed. They cannot have it both ways. And that is precisely why the courts allow a plaintiff to plead breach of express and implied covenant claims in the alternative. *Saggio*, 2015 WL 6760132, at *5–6.

Finally and at a minimum, the Complaint's allegations present "issues of fact inappropriate for resolution at this stage." *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 410 (E.D.N.Y. 2012). As *Dorset* explains, an implied covenant claim requires the court to examine the contract's express terms and also the parties' "course of performance" and "course of dealing," such that a determination of breach of the covenant "necessarily depends upon the facts of the particular case" and is "ordinarily a question of fact." *Id.* at 406 (denying dismissal of implied covenant claim).

Apex properly states a claim for breach of the implied covenant of good faith and fair dealing, and the dismissal is unwarranted.

### D.    Apex Sufficiently Pleads a Claim for Tortious Interference with Contract (Count Five)

Apex also states a cognizable claim against the Related Defendants for tortious interference with the Employment Agreements. To plead tortious interference, a plaintiff must allege (1) the

existence of a valid contract, (2) the defendant's knowledge of the contract, (3) the defendant's improper efforts to procure a breach, and (4) resulting damages. *Rose v. Different Twist Pretzel, Inc.*, 123 A.D.3d 897, 898 (2nd Dep't 2014).  The Complaint adequately pleads all of these elements.

### 1.    Apex Alleges the Existence of a Valid Agreement

First, there is no dispute that Apex has alleged the existence of valid Employment Agreements between the company and its Former Employees.  *See* Compl. at ¶¶ 27–51, 164. Nonetheless, like the Former Employees, the Related Defendants argue that particular provisions of those otherwise valid contracts—i.e., the non-competition and non-solicitation provisions—are not enforceable, dooming the first element of a claim for tortious interference.  Related MTD, Dkt. 98 at 11–13.  The Related Defendants' enforceability argument is wrong for all the reasons set forth above.  *See* Section III.B.1, *supra*.  But the argument is also irrelevant, because there is no dispute that the balance of the Employment Agreements—including the confidentiality/non-disclosure provisions—are enforceable.  And Apex has alleged that the Related Defendants interfered with those portions of the agreements too.  Thus, Apex has sufficiently pleaded the first element of its tortious interference claim.

### 2.    Apex Plausibly Alleges the Related Defendants' Knowledge of the Employment Agreements

The Related Defendants next argue that Apex has not sufficiently alleged that they were aware of the Employment Agreements.  But as the Related Defendants acknowledge, the Complaint says precisely that: "the Related Defendants 'knew' the Employment Agreements 'prohibited the Former Employees from joining a competitor within 12 months of leaving Apex' and 'from retaining any of Apex['s] confidential information or trade secrets."  Related MTD at 13 (quoting Compl. at ¶ 65).  The Complaint further alleges that "Related and Kraus *were aware*

Page 18

that the Former Employees had Employment Agreements with Apex Capital containing confidentiality provisions and non-competition and non-solicitation provisions." Compl. at ¶ 165 (emphasis added). Nonetheless, the Related Defendants argue that these allegations lack other, factual support, making the allegations "speculative" and "conclusory." Related MTD at 13–14. Again, the Related Defendants are wrong. To support its allegations that the Related Defendants "knew" about and "were aware" of the Employment Agreements, Apex alleges:

- Kraus, Related's CFO, was a "longtime friend and business associate" of Belinkie's. Compl. at ¶ 64.

- "Kraus and Belinkie discussed moving Related's work, and Belinkie's team, from Apex Capital to IQ-EQ." *Id.* at ¶ 66.

- The Former Employees and the Related Defendants "kept their plans secret because they knew their actions would violate the Employment Agreements . . . ." *Id.* at ¶ 67.

- Kraus "conspir[ed] with the Former Employees and others to encourage Apex Capital employees assigned to Related's account to leave for IQ-EQ, in violation of their Employment Agreements." *Id.* at ¶ 108.

- The non-competition, non-solicitation, and confidentiality/non-disclosure provisions of the Employment Agreements are "standard in the financial industry;" *Id.* at ¶ 165.

- "[T]he Former Employees would have discussed the existence of these restrictive covenants with Kraus in connection with their plans to leave Apex Capital in favor of employment with IQ-EQ." *Id.*

In short, it is not just plausible but likely that, in light of Kraus's and Belinkie's close friendship, the coordinated moves by Former Employees and Related to IQ-EQ, and the intimate working relationship between these parties—in addition to the ubiquity of these types of Employment Agreements in the financial services industry—that the Related Defendants knew about the

restrictions in the Former Employees' Employment Agreements.[9]  At the very least, Apex's allegations are sufficient to withstand dismissal.

### 3.    Apex Adequately Alleges that the Related Defendants Induced a Breach of the Employment Agreements

Finally, the Related Defendants' argument that Apex's allegations of inducement are "conclusory" lacks merit.  The Complaint contains detailed allegations of the myriad ways in which the Related Defendants conspired with and induced the Former Employees to breach their Employment Agreements (some of which the Related Defendants themselves recite):

- Kraus and Belinkie 'began formulating their plan in the summer of 2024' by 'discuss[ing] moving' RFM's business from Apex to IQ-EQ."  Related MTD at 15 (quoting Compl. at ¶ 66).

- "'[A]t Kraus's encouragement,' the Former Employees 'planned' to 'move Related's business to IQ-EQ' along with 'the information they would need to seamlessly service Related's accounts at IQ-EQ.'"  *Id.* (quoting Compl. at ¶ 66).

- "[W]ith Kraus's encouragement and knowledge, Belinkie recruited key members of his team to join IQ-EQ, including Chaney, Callen, and Hope."  Compl. at ¶ 66.

- "[I]n the months leading up to the Former Employees' resignations, Related (led by Kraus) was working hard behind the scenes to move its business—and all of Apex Capital's core resources—to IQ-EQ."  *Id.* at ¶ 106.

- "Kraus knew about" other employees' departures from Apex "because he was conspiring with the Former Employees and others to encourage Apex Capital employees assigned to Related's account to leave for IQ-EQ, in violation of their Employment Agreements."  *Id.* at ¶ 108.[10]

---

[9] Apex's allegations stand in stark contrast to the allegations at issue in the cases cited by the Related Defendants.  For example, in *TileBar v. Glazzio Tiles*, the plaintiff's allegation of knowledge was one, conclusory sentence based only on "information and belief."  723 F. Supp. 3d 164, 201 (E.D.N.Y. 2024).  Likewise, in *CPM Consulting LLC v. Capsugel US, LLC*, the plaintiff's allegation of knowledge was one, sentence, and there were no other allegations supporting any inference of defendant's knowledge.  2019 WL 3769651, at *3 (N.D. Tex. Aug. 9, 2019).

[10] The Related Defendants argue that Kraus's knowledge about "forthcoming departures of different employees" cannot support Apex's tortious interference claim because the Former Employees had already left Apex by then.  *See* Related MTD at 15.  That argument makes no sense.  Apex alleges that the Former Employees continued to violate the non-solicitation provision of their Employment Agreements *after* their departure by recruiting up to 11 additional Apex employees and did so at the Related Defendants' encouragement.  *See* Compl. at ¶¶ 107–110.

- "When Belinkie tried to gain access to Apex Capital's proprietary database after his resignation, he did so with Kraus's knowledge and/or on Kraus's instruction as part of the plan they hatched together in the preceding months." *Id.* at ¶ 111.

- "After Belinkie was unable to steal Apex Capital's proprietary client database, Belinkie and Kraus conspired with the other Former Employees to download and steal as much information as possible from Apex Capital's computer systems prior to their departures." *Id.* at ¶ 112.

- Only after "coordinating the movement of its service team from Apex Capital to IQ-EQ and securing the information it needed to smoothly continue operations with its new servicer, Related immediately took steps to end its relationship with Apex Capital." *Id.* at ¶ 120.

These allegations are a far cry from the type of allegations deemed insufficient in the cases cited by the Related Defendants.[11]

Finally, according to the Related Defendants, it would have made no sense to execute the MSA in January 2024 only to move to a competitor six months later. Related MTD at 15. But of course, companies make business decisions (even bad ones) for all sorts of reasons, and it is not this Court's job at the motion to dismiss phase to decide whether the Related Defendants' musings about timing undermine Apex's otherwise plausible and facially sufficient claim for tortious interference. That is a fact issue for another day. The Related Defendants' motion to dismiss the tortious interference claim should be denied.

---

[11] In *TileBar*, the plaintiff's cursory allegations of inducement lacked any factual support in the complaint. 723 F. Supp. 3d at 202–03. In *Manbro Energy Corp. v. Chaterjee Advisors, LLC*, the plaintiff failed to allege any factual basis for its conclusory allegation of inducement. 2021 WL 2037552, at *7 (S.D.N.Y. 2021). In *Hoffman v. L&M*, the plaintiff made only naked assertions without factual support. 774 F. Supp. 2d 826, 846 (N.D. Tex. 2011). And in *Poole v. AXA Equitable Life Insurance Co.*, while the plaintiff came "close[]" to alleging a cognizable claim, she did not allege that the defendants engaged in any act of interference, which was fatal. 2020 WL 10050562, at *7–8 (N.D. Tex. Apr. 29, 2020). The Related Defendants also cite *Rochester Drug Coop.,v. Biogen Idec U.S. Corp.*, 130 F. Supp. 3d 764, 777 (W.D.N.Y. 2015), but that case does not even involve a claim for tortious interference.

E.      **Apex Sufficiently Pleads a Breach of Contract Claim Against Related (Count Six)**

The Complaint also states a claim for breach of the MSA.  As set forth above, the elements of a claim for breach of contract are the existence of a contract, the plaintiff's performance, the defendant's breach, and resulting damages.  *LMEG Wireless, LLC*, 190 A.D.3d at 718.  Related does not dispute that Apex has sufficiently pleaded three of these four elements.  *See* Compl. at ¶¶ 172, 174–177.  However, Related argues that Apex fails to plead its own performance under the MSA, warranting dismissal.  Related MTD at 16–17.  Related is wrong.

First, Apex does plead its own performance.  Specifically, the Complaint alleges that "Apex Capital performed its obligations under the MSA by providing the contracted services to Related. Further, Apex Capital performed its obligations in good faith and with all due care, skill, and diligence expected of a provider of similar services in the same market."  Compl. at ¶ 173.  Thus, Apex's Complaint stands in stark contrast to the complaint at issue in *Transcience Corp. v. Big Time Toys, LLC*, where the plaintiff flatly conceded that it failed to include an allegation about performance in its amended complaint.  50 F. Supp. 3d 441, 451 & n.7 (S.D.N.Y. 2014) (cited in Related MTD at 16).

Nonetheless, citing two paragraphs of the Complaint, Related claims that it "requested access to its data so that it could smoothly end its relationship with Apex," and that Apex's failure to deliver that data on demand justified Related's contract termination.  *See id.* at 16–17 (citing Compl. at ¶ 110, 114).  Related gets this exactly wrong.  As the Complaint makes clear, when Related was demanding data from Apex, the parties' MSA was still in place, and Apex believed the parties' relationship was "salvageable."  *Id*. at ¶¶ 110, 114.  Further, far from asking for access to data so it could "smoothly end its relationship with Apex," the Complaint alleges that  Related actively "concealed its true intentions to move the entire Related business to Apex Capital's

competitor." Compl. at ¶ 113. And what Related asked Apex to provide was not Related's data but "access to Apex Group's proprietary database." *Id.* at ¶ 114. As Apex explicitly alleges, Apex told Related that "no such obligation existed in the MSA." *Id.* at ¶ 122. As the Complaint also alleges, Apex was obligated to return Related's records only upon proper termination of the MSA. *Id.* In other words, Apex's purported breaches of the MSA by refusing to hand over Apex's proprietary database and to do so in advance of proper contract termination "were not breaches at all." *Id.* And in any event, the Complaint makes clear that Related breached the MSA first, by failing to afford Apex an opportunity to cure and terminating prematurely and without cause.[12]

The Court should deny Related's motion to dismiss the breach of contract claim.

## F.    Apex Sufficiently Pleads that Related Breached the Implied Covenant of Good Faith and Fair Dealing (Count Seven)

Apex also states a claim against Related for breach of the implied covenant of good faith and fair dealing. Again, to plead a claim for breach of the implied covenant, a plaintiff must allege that (1) the defendant owed a duty of good faith and fair dealing, (2) the defendant breached that duty, and (3) resulting harm. *255 Butler Assoc. LLC*, 2021 N.Y. Misc. 6548, at *4–5 (Sup. Ct. 2021). Related does not dispute that the Complaint alleges these elements. *See* Compl. at ¶¶ 179–182. Instead, Related argues that the breach of implied covenant claim should be dismissed because it is duplicative of Apex Capital's breach of contract claim. Again, Related is wrong.

First, as Related acknowledges, a plaintiff may sue for breach of the implied covenant and also for breach of express contract, so long as the claims are supported by factually distinct allegations. *See Hosp. Auth. of Rockdale County*, 2011 WL 182066, at *4; Related MTD at 18.

---

[12] Thus, Related's citation to *Maltbie's Garage Co., Inc. v. General Motors LLC* is also unavailing. In that case, unlike here, the plaintiff's complaint admitted to several *prior* material breaches of the agreement at issue, negating the element of the plaintiff's performance. 2021 WL 4972738, at *7 (N.D.N.Y. Oct. 26, 2021).

That is precisely the case here. Apex alleges that Related breached the MSA by: (1) "refusing to pay Apex Capital for services rendered," and (2) "purporting to terminate the contract without affording Apex an opportunity to cure." Compl. at ¶¶ 174–75. By contrast, Apex alleges that Related breached the implied covenant by "manufacturing complaints about Apex Capital's service while secretly plotting to move its business to IQ-EQ, conspiring with the Former Employees to misappropriate Apex Capital's trade secrets and confidential information, coordinating the mass exodus of Apex Capital's employees supporting Related, and by conspiring with the Former Employees to move its business to IQ-EQ." Id. at ¶ 180. The Complaint alleges that, as a result of these actions, "Related destroyed Apex Capital's right to receive the fruits of the MSA." Id. It is unclear how any of these actions would be breaches of express provisions of the MSA, but in any event, the allegations supporting the implied covenant claim are vastly different than those supporting the breach of contract claim.[13]

Nor do the two claims seek identical damages, as Related suggests. In its breach of contract claim, Apex primarily seeks damages in the form of payments owed by Related on its unpaid invoices (approximately $1.84 million), plus accrued interest. See Compl. at ¶ 176. By contrast, Apex seeks damages for its breach of implied covenant claim for the "loss of revenue associated with the MSA and loss of the value (actual and expected) of Apex Capital's investment in servicing Related's account." Id. at ¶ 181. As a result, Apex does not seek "identical" damages on both claims, and mere overlap does not warrant dismissal, particularly where the factual allegations underlying the claims are readily distinguishable. See New York Botanical Garden v. Allied World

---

[13] Related cites two inapposite cases to support its argument. In EFG Bank AG v. AXA Equitable Life Ins. Co., the plaintiff's breach of contract claim and breach of implied covenant claim were virtually identical, both in substance and in words. 309 F. Supp. 3d 89, 93 (S.D.N.Y. 2018). Likewise, in Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P., the plaintiff's breach of implied covenant claim incorporated by reference the breach of contract claim and was entirely "duplicative." 259 F. Supp. 3d 16, 37 (N.D.N.Y. 2017).

*Assur. Co. Inc.*, 206 A.D. 3d 474, 476 (1st Dep't 2022) (implied covenant claim not duplicative even though there was overlap).

### G.    Apex Adequately Pleads a Claim for Breach of Fiduciary Duty (Count Eight)

Apex also states a claim against the Former Employees for breach of fiduciary duty. To plead a claim for breach of fiduciary duty, the plaintiff must allege (1) a fiduciary duty exists, (2) a knowing breach of that duty, and (3) resulting damages. *Berkovits v. Berkovits*, 190 A.D.3d 911, 916 (2nd Dep't. 2021).

The Former Employees do not seriously dispute that Apex's Complaint alleges each of these required elements. Apex alleges that each employee held "positions of trust and confidence" with Apex and that "each owed Apex Capital a fiduciary duty." Compl. at ¶ 184. And in any event, "[a]n employee owes a fiduciary duty to his employer as a matter of law and is prohibited from acting in a manner inconsistent with his agency or trust." *Louis Capital Markets, L.P. v. REFCO Grp. Ltd., LLC*, 801 N.Y.S.2d 490, 496 (Sup. Ct. 2005). The Complaint also alleges that the Former Employees breached their fiduciary duties to Apex and did so knowing that they were violating the positions of trust they held with the company. *See, e.g.*, Compl. at ¶¶ 65, 67, 81, 88, 98, 185. Finally, Apex alleges damages proximately caused by the breaches of fiduciary duty. *Id.* at ¶¶ 186–87.

Rather than dispute that Apex alleges the required elements of a breach of fiduciary duty claim, the Former Employees identically argue that the claim should be dismissed because it is duplicative of Apex's breach of contract claim. *See* Callen MTD at 18–19; Hope MTD at 21–22; Chaney MTD at 22–23; Belinkie MTD at 21–23. Again, the Former Employees are wrong.

First, the Former Employees' argument that Apex "expressly grounds" its breach of fiduciary duty claim on violations of the employees' Employment Agreements is both irrelevant and false. "It is well-settled that the same conduct which may constitute the breach of a contractual

obligation may also constitute the breach of a duty arising out of the relationship created by the contract but which is independent of the contract itself." *37 E. 50th St. Corp. v. Rest. Grp. Mgmt. Servs., LLC*, 68 N.Y.S.3d 424, 427 (App. Div. 1st Dep't 2017). Thus, a breach of fiduciary duty claim is "not subject to dismissal as duplicative" even if it "concerns some of the same underlying conduct as the breach of contract claim," so long as the "allegations concern a breach of a duty is that is independent of the contract." *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 156 (S.D.N.Y. 2018) (internal citation and quotation omitted); *37 E. 50th St. Corp.*, 68 N.Y.S.3d at 427 (denying motion to dismiss breach of fiduciary duty claim as duplicative of breach of contract claim). In other words, it makes no difference that some of the actions taken by the Former Employees that constitute a breach of fiduciary duty also violate their Employment Agreements. So long as the employees' fiduciary exists independently of their contractual duties, the claim may proceed.

Second, the fiduciary duty claim is not merely identical to the breach of contract claim. Instead, the fiduciary duty claim targets *disloyal* actions taken by the Former Employees while they were still employed by Apex. Those actions include efforts to access and extract Apex's proprietary database, surreptitiously planning their company departures (with each other and with Related) to ensure their extra-contractual retention bonuses were paid, coordinating an exit with one of Apex's core clients, and engaging in other duplicitous conduct knowing it would destroy the value of Apex's business. *See, e.g.*, Compl. at ¶¶ ¶¶ 65, 67, 71–73, 81, 88, 98.[14] In short, the

---

[14] Thus, Apex's allegations are distinguishable from those in the cases cited by the Former Employees. For example, in *Banco Espirito Santo de Investimento, S.A. v. Citibank., N.A.*, the court found that Citibank did not even owe the plaintiff a fiduciary duty and that all duties were purely contractual. 2003 WL 23018888, at *15 (S.D.N.Y. Dec. 22, 2003). Likewise, in three other cases cited by the Former Employees, the courts dismissed the fiduciary duty claim because no fiduciary duty existed. *Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 244

Complaint adequately alleges that the Former Employees violated their fiduciary duty of trust and loyalty to Apex.

### H.    Apex Adequately Pleads a Claim for Unjust Enrichment (Count Nine)

Apex also states a claim for unjust enrichment against all Defendants.  To plead unjust enrichment, the plaintiff must allege (1) the defendant was enriched, (2) the enrichment was at the plaintiff's expense, and (3) defendant's retention of the benefit would be unjust.  *Regel v. Campbell Soup Co.*, 2025 WL 2733840, at *4 (S.D.N.Y. Sept. 25, 2025).

Apex adequately pleads each of these elements.  First, Apex alleges that all Defendants were unjustly enriched in various ways.  Compl. at ¶ 190.  Second, Apex alleges that Defendants' enrichment "came at the expense of Apex Capital, which incurred considerable expense to acquire SandsPoint, to hire additional staff to service Related, and to accommodate extra-contractual requests for service by Related." *Id.* at ¶ 192.  And finally, Apex alleges that "the retention of these benefits by Defendants under the circumstances would be inequitable." *Id.* at ¶ 193.  Defendants do not dispute that Apex alleges the required elements; rather, Defendants make other, unavailing arguments for dismissal.

### 1.    The Unjust Enrichment Claim Is Not Duplicative

Defendants initially argue that the unjust enrichment claim is duplicative of Apex's breach of contract claims, but this is wrong for several reasons.

First, it is permissible at the pleading stage to allege a claim for unjust enrichment (a quasi-contract claim) in the alternative to a breach of contract claim.  *Newman & Schwartz v. Asplundh*

---

(S.D.N.Y. 2014); *Northern Shipping Funds I, LLC v. Icon Capital Corp.*, 921 F. Supp. 2d 94, 105 (S.D.N.Y. 2013); *Spartan Cap. Sec., LLC v. Sports Field Hldgs., Inc.*, 2021 WL 665031, at *2 (S.D.N.Y. Feb. 19, 2021).  Unlike in these cases, there is no dispute that the Former Employees owed Apex fiduciary duties as a matter of law.  The last case cited by the Former Employees, *New York Univ. v. Continental Ins. Co.*, 87 N.Y.S.2d 308, 316 (1995) does not contain the quote cited and does not even discuss breach of fiduciary duties.

*Tree Expert Co.,* 102 F.3d 660, 663 (2d Cir. 1996) (denying dismissal because claims for "quantum meruit and unjust enrichment" were "properly pleaded . . . in the alternative to the contractual claim"); *Randolph Equities, LLC v. Carbon Capital, Inc.,* 2007 WL 914234, at *6 (S.D.N.Y. Mar. 26, 2007) (same); *Knudsen v. Quebecor Printing (U.S.A.) Inc.,* 792 F. Supp. 234, 237 (S.D.N.Y. 1992) (same); *see also Seiden Assoc., Inc. v. ANC Holdings, Inc.,* 754 F. Supp. 37, 39–40 (S.D.N.Y. 1991) (denying dismissal of quasi-contract claim because "[d]ismissal of plaintiff's alternative theories . . . would violate the liberal policy of Rule 8(e)(2) which allows plaintiffs wide 'latitude' in framing their right to recover") (internal citations omitted). Apex has expressly pleaded its unjust enrichment claim in the alternative. Compl. at ¶ 189. That is sufficient to preclude dismissal.

In any event, dismissal of an alternative unjust enrichment claim is particularly unwarranted where, as here, all Defendants dispute the enforceability of several of the underlying agreements. *Aquavit Pharmaceuticals, Inc. v. U-Bio Med, Inc.,* No. 19-cv-3351, at *3 (S.D.N.Y. 2020). [15] Specifically, both the Former Employees and the Related Defendants dispute the enforceability of the Employment Agreements. Nonetheless, the Former Employees confusingly argue that because *Apex* does not dispute the enforceability of the Employment Agreements, it cannot maintain an alternative unjust enrichment claim. *See* Callen MTD at 20; Hope MTD at 23; Callen MTD at 23–24; Belinkie MTD at 23. That makes no sense, and it is not the law. The courts allow alternative pleading to prevent *the non-claimant* from disavowing its contractual obligations

---

[15] The Former Employees cite several cases to support their argument that New York law bars unjust enrichment claims, even when pleaded in the alternative. *See* Callen MTD at 19; Hope MTD at 22–23; Chaney MTD at 23; Belinkie MTD at 23. But those cases only confirm that pleading in the alternative is allowed where, as here, defendants dispute the validity or enforceability of the contract. *See Clark-Fitzpatrick v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987) *Johnson v. Clearview*, 2024 WL 2274267, at *10 (S.D.N.Y. 2024). *Johnson v. Clearview AI, Inc.*, 2024 WL 2274267, at *10 (S.D.N.Y. May 20, 2024); *Webster Bank, N.A. v. Watson*, 2025 WL 2732826, at *6 (S.D.N.Y. Sept. 25, 2025).

and simultaneously arguing that quasi-contractual relief is unavailable. Apex may plead its claims in the alternative precisely to avoid that situation. *Casey v. Citibank*, 915 F. Supp. 2d 255, 265 (N.D.N.Y. 2013) ("[A]t this early stage of litigation, it is reasonable to permit plaintiffs to plead unjust enrichment claims in the alternative to their breach of contract claims."). The Related Defendants, for their part, argue that the unjust enrichment claim against them cannot stand because nobody disputes the validity of the MSA. But that argument does not help Kraus, because he is not a party to the MSA. And in any event, courts in this Circuit permit alternative pleading even when the counter-party does not dispute the validity of the contract. *See, e.g.*, *Nat'l City Comm. Cap. Co., LLC v. Global Golf, Inc.*, 2009 WL 1437620, at *1 (E.D.N.Y. May 20, 2009) (denying dismissal of quasi-contract claim even in absence of dispute about validity of parties' contract) (citing cases).

In short, "duplication" is not a reason to dismiss Apex's alternative unjust enrichment claim at this juncture.

### 2.    Apex's Allegations Are Sufficiently Specific

Defendants next complain that the Complaint does not specify how each Defendant was enriched. Again, Defendants are wrong. The Complaint alleges that the Former Employees were enriched because, through their deception, they were able to obtain their hefty retention bonuses only to jump ship to a competitor and because they unlawfully retained confidential information to use at IQ-EQ. Compl. at ¶¶ 68, 69–105. Apex alleges that Related was enriched by Apex's diversion of costly resources and personnel to its account at a time when Related was already working behind the scenes to steal Apex's core employees and move its business to IQ-EQ. *Id.* at ¶¶ 114, 120. And Apex alleges that Kraus was enriched because, through his unlawful actions, he was able to keep working with his friend Belinkie and the core team of people with whom he was most familiar while also simultaneously getting access to the proprietary information that Apex

Page 29

had denied him. *Id.* at ¶¶ 63–68, 112. These allegations are sufficiently specific to state a claim against each Defendant.[16]

### 3. Apex's Alleged Damages Are Not Duplicative

Lastly, the Former Employees identically argue that the Court should dismiss the unjust enrichment claim because Apex seeks the same remedy through its misappropriation of trade secrets claims. Callen MTD at 20; Hope MTD at 23; Chaney MTD at 24; Belinkie MTD at 24. But "it is permissible to plead an unjust enrichment claim in the alternative even if a party cannot simultaneously recover upon it and another claim for the same injury." *Vogel v. TakeOne Network Corp.*, 2023 WL 5276857, at *8 (S.D.N.Y. Aug. 16, 2023) (refusing to dismiss unjust enrichment claim as duplicative of trade secret claim).

The singular case cited by the Former Employees—*Aquavit Pharms., Inc. v. U-Bio Med, Inc.*, 2020 WL 4504737 (S.D.N.Y. Aug. 5, 2020)—is inapposite. In that case, unlike here, the defendant pleaded an unjust enrichment claim as an alternative to a misappropriation of trade secrets claim *because the statute of limitations had already run* on the misappropriation claim. *See id.* at *4. In other words, the defendant pleaded unjust enrichment because the defendant could not plead the primary claim it wanted to pursue. Under those unique circumstances, the court held that the defendant could not use an unjust enrichment claim to "circumvent the statute of limitations" and "obtain relief that they failed to pursue diligently." *Id.* In this case, by contrast, Apex has diligently pursued its misappropriation of trade secrets claim, and the Former Employees seek dismissal of that claim as well. It may be true that Apex cannot recover the same damages

---

[16] Related also argues that the unjust enrichment claim fails because Apex does not sufficiently allege "fraud or duress" or "undue advantage" by Related. Related MTD at 23. But this is not an element of unjust enrichment under Texas law. *SVT, LLC v. Seaside Vill. Townhome Ass'n*, 2021 WL 2800463, at *6 (Tex. App—Houston [14th Dist.] 2021). Rather, to allege unjust enrichment, a plaintiff need only allege that the defendant received a benefit, even passively, that would be unjust to retain. *Id.*

under two different theories, but it is permitted to plead alternative theories of recovery at this stage of proceedings.

Apex has stated an alternative claim for unjust enrichment, and the Court should allow it to proceed.

## I.    Apex Adequately Pleads a Claim for Civil Conspiracy (Count Ten)

Apex also states a plausible claim for civil conspiracy.  To plead civil conspiracy, a plaintiff must allege (1) an agreement between two or more parties, (2) an overt act in furtherance of the agreement, (3) the parties' intentional participation in furtherance of the plan or purpose, and (4) and resulting damage or injury.  *Abacus Fed. Sav. Bank v. Lim*, 75 A.D.3d 472, 474 (1st Dep't 2010).  Apex's Complaint adequately alleges each of these elements.  *See* Compl. at ¶¶ 194–200. Nonetheless, Defendants make several irrelevant or erroneous arguments to support dismissal.

First, all Defendants irrelevantly contend that civil conspiracy is not an independent tort. *See* Related MTD at 24; Callen MTD at 21; Hope MTD at 24; Chaney MTD at 24; Belinkie MTD at 24.  But Apex has not alleged civil conspiracy as a stand-alone claim.  Rather, Apex alleges three underlying torts—misappropriation of trade secrets, breach of fiduciary duty, and tortious interference with contract.  Compl. at ¶¶ 126–144, 163–170, 183–187.  Apex's civil conspiracy claim also makes particular reference to the unlawful conduct underlying those torts.  *See id.* at ¶ 196.  And if that were not enough, the first three sentences of the Complaint's introduction describe the conspiracy succinctly:

> This case arises from a conspiracy between Related and Kraus, on the one hand, and several management-level employees of plaintiff Apex Capital, on the other hand, to move an entire business line and professional group to Apex Capital's direct competitor, IQ-EQ US Management Co., LLC ("IQ-EQ") and to steal Apex Capital's confidential information, intellectual property, and trade secrets in the process.  In furtherance of the conspiracy, the Former Employees breached the confidentiality, non-competition and non-solicitation provisions of their Employment Agreements and unlawfully downloaded and stole information from their Apex Capital work systems.  Related and Kraus, for their part, knowingly

induced the Former Employees to breach their Employment Agreements and encouraged them to steal data from Apex Capital to facilitate Related's move to IQ-EQ.

*Id.* at 1–2.  In short, there can be no doubt that the conspiracy alleged hinges on other torts, making Defendants' first argument irrelevant.

Defendants also argue that the Complaint fails to allege an agreement between the parties. The Former Employees, for their part, contend that the Complaint fails to plead the "who, when, and where of any conspiracy agreement."  *See* Callen MTD at 22; Hope MTD at 25; Chaney MTD at 25; Belinkie MTD at 25.  And the Related Defendants argue that Apex's allegations of an agreement are too "conclusory."  Related MTD at 25.  But Defendants ignore the litany of allegations in the Complaint supporting Apex's civil conspiracy claim.  By way of example, the Complaint alleges that:

- "[I]n or around the summer of 2024, Kraus began conspiring with the Former Employees to convince them to breach their Employment Agreements, jump ship to a local competitor of Apex Capital, and take Apex Capital's confidential and protected business information with them."  Compl. at ¶ 65.

- "[W]ith Kraus's encouragement and knowledge, Belinkie recruited key members of his team to join IQ-EQ, including Chaney, Callen, and Hope."  *Id.* at ¶ 66.

- "Over the following few weeks, Belinkie successfully recruited Chaney, Callen, and Hope, who all agreed to move with Related and Belinkie to IQ-EQ, notwithstanding the restrictions of their Employment Agreements and the damage they would be doing to Apex Capital's business."  *Id.* at ¶ 67.

- "The Former Employees' departures can only be described as coordinated. . . . Between October and December 2024, the Former Employees began giving deliberately staggered notices of their resignations from the company."  *Id.* at ¶ 68; *see also id.* at ¶¶ 70, 80, 88, 98 (describing exact timing and circumstances of each employee's resignation and departure).

- "As part of the plan hatched between Belinkie and Kraus, around the time that Belinkie staged his departure (and anticipating that other core team members would soon make their own moves to IQ-EQ), Related began manufacturing complaints about Apex Capital's service."  *Id.* at ¶ 106.

- Kraus knew that other Apex Capital employees would soon be leaving the company "because he was conspiring with the Former Employees and others to encourage Apex Capital employees assigned to Related's account to leave for IQ-EQ, in violation of their Employment Agreements." *Id.* at ¶ 108.

- "[T]he Former Employees worked together to recruit additional Apex Capital employees. . . . Between November 29, 2024 and January 31, 2025, 11 more Apex Capital employees from the Related service team resigned from Apex Capital." *Id.* at ¶ 110.

- "When Belinkie tried to gain access to Apex Capital's proprietary database after his resignation, he did so with Kraus's knowledge and/or on Kraus's instruction as part of the plan they hatched together in the preceding months." *Id.* at ¶ 111.

- "After Belinkie was unable to steal Apex Capital's proprietary database, Belinkie and Kraus conspired with the other Former Employees to download and steal as much information as possible from Apex Capital's computer systems prior to their departures." *Id.* at ¶ 112.

The Complaint also contains numerous allegations about how Defendants acted in secret. *See, e.g.*, *id.* at ¶¶ 79, 81, 88, 98, 106–119. These allegations, taken together, support the existence of an agreement and soundly refute any argument that the Complaint fails to identify the "who, when, and where" of the agreement or is too "conclusory" to state a claim.[17]

The Former Employees next argue—in an identical, single-sentence argument—that the Complaint's "vague and conclusory assertions of [the employees'] involvement in the purported conspiracy are insufficient." *See* Callen MTD at 22; Hope MTD at 25; Chaney MTD at 25; Belinkie MTD at 25. They cite a single case to support this argument—*Fometal S.R.L. v. Keili Trading LLC*, 2024 WL 307976 (S.D.N.Y. Jan. 26, 2024). *Id.* But in *Fometal*, unlike here, the

---

[17] Apex's allegations stand in stark contrast to the allegations in the cases cited by Defendants. *Cf.*, *DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, 770 F. Supp. 2d 627, 659 (S.D.N.Y. 2011) (conspiracy allegations were devoid of *any* factual detail, and plaintiff offered no response to defendants' motion to dismiss the conspiracy claim); *Swartz v. Swartz*, 145 A.D.3d 818, 826 (2d Dep't 2016) (conducting no analysis of the conspiracy allegations and merely concluding that the claim was not sufficiently pleaded); *Jack in the Box Inc. v. San-Tex Rests., Inc.*, 2021 WL 148058, at *12 (W.D. Tex. Jan. 14, 2021) (complaint alleged *no facts*, "direct or indirect" against a critical co-conspirator, without which no conspiracy claim could lie); *Walker v. Beaumont Indep. Sch. Dist.*, 2017 WL 11639369, at *7 (E.D. Tex. May 1, 2017) (conspiracy claim barred by statute of limitations and also alleged no facts supporting conclusory assertion of agreement).

plaintiff did not even allege an underlying tort supporting the conspiracy claim, which was fatal. *Id.* at *13.  Moreover, in *Fometal*, unlike here, the plaintiff's conspiracy claim amounted to two, conclusory sentences that did not identify "specific times, facts, and circumstances of the alleged conspiracy."  *Id.*  In that very different factual scenario, the court dismissed the plaintiff's civil conspiracy claim.  As set forth above, Apex's complaint contains detailed allegations of each Defendant's role in the conspiracy.  And the Complaint contains pages of allegations about the myriad ways in which each individual Former Employee contributed to the conspiracy.  *See, e.g.*, Compl., Dkt. 80 at ¶¶ 66–67, 69–105, 109–112, 119.  These allegations are sufficient to allege an "overt act" by the Former Employees.

The Former Employees also identically contend that Apex's civil conspiracy claim fails because it "merely repackages the breach of contract claims and other tort claims."  Callen MTD at 21; Hope MTD at 24; Chaney MTD at 25; Belinkie MTD at 25.  But as set forth above, a civil conspiracy claim is always dependent upon an underlying, cognizable tort.  So the Complaint must make reference to Apex's "other tort claims."  And as set forth above, the Complaint makes clear that Defendants' conspiracy enabled the various breaches of contract and torts and was independent of, and larger than, any individual unlawful act.  The sole case cited by the Former Employees, *Spartan Cap. Sec., LLC v. Sports Field Holdings, Inc.*, 2021 WL 665031 (S.D.N.Y. Feb. 19, 2021), is inapposite.  In *Spartan*, unlike here, the plaintiff failed to allege *any* underlying tort supporting the civil conspiracy claim.  *Id.* at *3.  And even then, the sole basis for the conspiracy claim in *Spartan* was the plaintiff's allegation that defendants conspired to breach the parties' contract.  *Id.*  That is not all Apex alleges here.

Finally, the Related Defendants again muse that there is some other explanation for Defendants' behavior inconsistent with civil conspiracy, such that the Court should dismiss the

claim. *See* Related MTD at 26. Again, the Related Defendants contend that they "did not need to sign the MSA" in January 2024 and "could have simply terminated" it rather than engaging in the conspiracy alleged. *Id.* The facts as alleged in the Complaint easily dispel the latter argument. As the Complaint explains, the MSA contained cure and termination provisions that prohibited the quick and cost-free termination that Related desired and attempted. *See* Compl. at ¶¶ 60–61, 121–125. And the Related Defendants' argument that no formal agreement between Apex and Related was necessary is illogical. These are sophisticated, highly regulated businesses. Formal agreements are the norm. And as the Complaint alleges, at the time the parties executed the MSA, the Defendants had not yet hatched their conspiracy. *See id.* at ¶¶ 52, 65. In any event, this is not the time for the Court to make determinations of fact or weigh competing theories not tethered to the well-pleaded allegations of the Complaint.

There are ample allegations to support Apex's civil conspiracy claim, and the Court should allow it to proceed.

## J.    TUTSA Preemption Does Not Apply

For all the reasons set forth above, Apex's Complaint states plausible claims for breach of fiduciary duty, civil conspiracy, and unjust enrichment. But the Former Employees take one final stab at defeating those claims, by arguing that TUTSA preempts all three claims. *See* Callen MTD at 22–23; Hope MTD at 25–26; Chaney MTD at 26; Belinkie MTD at 26. They are wrong.

TUTSA preempts claims only when they are "based on the same facts that underpin the TUTSA claim." *Caliber Home Loans, Inc. v. Cove,* 2025 WL 71983, at *13 (N.D. Tex. Jan. 10, 2025). But TUTSA is not a plaintiff's "sole remedy whenever the allegations somehow touch on business information or trade secrets." *Id.* (quoting *Philips N. Am. LLC v. Image Tech. Consulting, LLC*, 2022 WL 17168372, at *5 (N.D. Tex. Nov. 21, 2022)). Thus, where a claim is not "a mere duplicate" of a TUTSA claim, it is not preempted. *Id.*

Page 35

This principle defeats the Former Employees' preemption argument. Apex's breach of fiduciary duty, civil conspiracy, and unjust enrichment claims are not "mere duplicate[s]" of the TUTSA claim, nor are those claims limited to trade secret misappropriation. *See* Sections III.G, III.H, III.I, *supra*. Thus, the conduct underlying all three claims exists independently of trade secret misappropriation, and TUTSA preemption does not apply. *See , Home Loans, Inc.*, 2025 WL 71983, at *13, *17 (finding that fiduciary duty and civil conspiracy claims were not preempted by TUTSA because the facts at issue were not a mere duplicate of the TUTSA claim, even if there was some overlap).

## IV.    INJUNCTIVE RELIEF REMAINS APPROPRIATE

Apex agrees that the non-competition and non-solicitation provisions in the Employment Agreements have expired, and Apex no longer seeks permanent injunctive relief based on those provisions. However, permanent injunctive relief remains appropriate to prevent further use and disclosure of Apex's trade secrets under both DTSA and TUTSA. *See* 18 U.S.C. § 1836(b)(3)(A); TEX. CIV. PRAC. & REM. CODE § 65.011.

## V.    ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE

To the extent the Court grants any portion of Defendants' Motions to Dismiss, Apex respectfully submits that it should do so without prejudice,

Rule 15(a) mandates that leave to amend "shall be freely given when justice so requires." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993); Fed. R. Civ. P. 15(a). Indeed, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block*, 988 F.2d at 350. Consistent with that standard, when a motion to dismiss is granted, "the usual practice is to grant leave to amend the complaint." *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990). This remains true even where a plaintiff has amended previously, particularly where the plaintiff has not yet had the benefit of a ruling.

*Cruz v. Local 32BJ*, 762 F. Supp. 3d 286, 289 (S.D.N.Y. 2025). Indeed, as Cruz explains, "there is no practical difference between Defendants opposing Plaintiff's motion to amend and Defendants filing a motion to dismiss after Plaintiff files her Second Amended Complaint." *Id.*

While Defendants insist that Apex has had several bites at the apple, that is untrue. Apex voluntarily dismissed its first complaint against the Former Employees based on their representations that they would return any information stolen from Apex. When they did not do so, Apex initiated a new state-court lawsuit (under different pleading standards) against the Former Employees, Related, and Kraus, alleging new and different claims. Defendants removed that lawsuit to federal court, and the current First Amended Complaint represents Apex's first opportunity to plead all of its claims alleged under federal pleading standards against all Defendants. Accordingly, to the extent the Court grants any portion of Defendants' motions, Apex respectfully requests that the Court do so with leave to amend.

## CONCLUSION

For all the foregoing reasons, Apex has properly pleaded its claims against Defendants, and the Court should deny Defendants' motions to dismiss.

Date: January 28, 2025

Respectfully submitted,

Pillsbury Winthrop Shaw Pittman LLP

*/s/ Amy Ruhland*

Amy L. Ruhland
Abigail L. Griffith
401 W 4th Street
Suite 3200
Austin, TX 78701
(512) 580-9600
amy.ruhland@pillsburylaw.com
abby.griffith@pillsburylaw.com

Patricia Rothenberg
31 West 52nd Street

New York, NY 10019-6131
(212) 858-1000
Patricia.rothenberg@pillsburylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that, on January 28, 2026, a copy of the foregoing was served on all counsel of record via ecf electronic filing.

*/s/ Amy L. Ruhland*
Amy L. Ruhland

## CERTIFICATE OF WORD COUNT

Pursuant to Rule 4B(i) of the Individual Practices in Civil Cases, I hereby certify that the word count of the brief is 12,702.

*/s/ Amy L. Ruhland*
Amy L. Ruhland