UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| APEX GROUP CAPITAL ADVISORS LLC F/K/A SANDSPOINT CAPITAL ADVISORS LLC,<br><br>　　　Plaintiff,<br><br>v.<br><br>RELATED FUND MANAGEMENT, LLC; JAMES KRAUS; LUCAS BELINKIE; PRESTON CALLEN; WILLIAM C. CHANEY; and RYAN HOPE,<br><br>　　　Defendants. | Case No. 1:25-cv-08892-VEC<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS RELATED FUND MANAGEMENT, LLC AND JAMES KRAUS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................................ 1

ARGUMENT ........................................................................................................................................ 2

    I.    Fact-Free Speculation is Insufficient to Plead Tortious Interference or Civil Conspiracy ............................................................................................................................ 2

        A.    Tortious Interference ................................................................................................ 2

        B.    Civil Conspiracy ....................................................................................................... 4

    II.   Contract Reformation Cannot Save Apex's Tortious Interference Claim ........................ 5

    III.  Apex's Failure to Allege its Own Performance Dooms its Contract Claim ...................... 7

    IV.  Apex's Good Faith and Fair Dealing Claim Fails Because It Is Duplicative ..................... 9

    V.   Apex's Unjust Enrichment Claim Is Duplicative and Fails to Allege Enrichment ........... 10

    VI.  Leave For Further Amendment is Unwarranted ............................................................... 11

CONCLUSION .................................................................................................................................. 12

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
   No. 12 CIV. 4828, 2018 WL 1273343 (S.D.N.Y. Mar. 5, 2018) ..............................................3

*Barton v. Pret A Manger (USA) Ltd.*,
   535 F. Supp. 3d 225 (S.D.N.Y. 2021)...................................................................................10

*BDO Seidman v. Hirshberg*,
   93 N.Y.2d 382 (1999) ..............................................................................................................6

*Boustead Sec., LLC v. Leaping Grp. Co.*,
   No. 20-CV-3749, 2021 WL 3774116 (S.D.N.Y. Aug. 25, 2021).........................................7, 8

*CAC Grp., Inc. v. Maxim Grp., LLC*,
   No. 12 CIV. 5901, 2012 WL 4857518 (S.D.N.Y. Oct. 10, 2012), *aff'd*, 523 F.
   App'x 802 (2d Cir. 2013) ........................................................................................................4

*Corsello v. Verizon New York, Inc.*,
   18 N.Y.3d 777 (2012) ............................................................................................................10

*Fierro v. Gallucci*,
   No. 06-CV-5189, 2008 WL 2039545 (E.D.N.Y. May 12, 2008) ............................................4

*Fin. One Pub. Co. v. Lehman Bros. Special Fin.*,
   414 F.3d 325 (2d Cir. 2005)....................................................................................................7

*FTI Consulting, Inc. v. Graves*,
   No. 05 CIV 6719, 2007 WL 2192200 (S.D.N.Y. July 31, 2007) ............................................7

*Ham v. Lenovo (United States) Inc.*,
   664 F. Supp. 3d 562 (S.D.N.Y. 2023)...................................................................................10

*Henderson v. Golden Corral Franchising Sys., Inc.*,
   663 F. Supp. 3d 313 (S.D.N.Y. 2023).....................................................................................9

*Hoffman v. L & M Arts*,
   774 F. Supp. 2d 826 (N.D. Tex. 2011) ...................................................................................3

*Hudson Neurosurgery, PLLC v. UMR, Inc.*,
   No. 20-CV-9642, 2023 WL 6311218 (S.D.N.Y. Sept. 28, 2023).........................................11

*IVDV Assocs. Inc. v. Seruya*,
   No. 17-CV-1009, 2020 WL 1501857 (E.D.N.Y. Mar. 24, 2020)............................................7

*Love Terminal Partners, L.P. v. City of Dallas, Tex.*,
  527 F. Supp. 2d 538 (N.D. Tex. 2007) .................................................................................5

*In re Navidea Biopharmaceuticals Litig.*,
  No. 19-CV-1578, 2019 WL 7187111 (S.D.N.Y. Dec. 26, 2019) ............................................9

*Newington Ltd. v. Forrester*,
  No. 3:08-CV-0864-G, 2008 WL 4908200 (N.D. Tex. Nov. 13, 2008) ..................................10

*Orthoflex, Inc. v. ThermoTek, Inc.*,
  No. 3:10-CV-2618-D, 2012 WL 2864510 (N.D. Tex. July 12, 2012) ......................................6

*Primula Mgmt., LLC v. Primrose Sch. Franchising Co. LLC*,
  No. 25-CV-1795, 2026 WL 508755 (S.D.N.Y. Feb. 24, 2026) .............................................10

*QED, LLC v. Faber Daeufer & Itrato, P.C.*,
  No. 20-CV-2767, 2021 WL 707073 (S.D.N.Y. Feb. 22, 2021) ................................................5

*Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*,
  441 F. Supp. 3d 1 (S.D.N.Y. 2020) ...............................................................................10, 11

*TileBar v. Glazzio Tiles*,
  723 F. Supp. 3d 164 (E.D.N.Y. 2024) .................................................................................2, 3

*Veramark Techs., Inc. v. Bouk*,
  10 F. Supp. 3d 395 (W.D.N.Y. 2014) ....................................................................................5

*Zhang v. Wang*,
  317 F. App'x 26 (2d Cir. 2008) ..............................................................................................3

**Statutes**

Tex. Bus. & Com. Code § 15.51(c) ...............................................................................................6

**Other Authorities**

Rule 12(b)(6)..................................................................................................................................1

The Related Defendants respectfully submit this reply memorandum of law in further support of their Rule 12(b)(6) motion to dismiss.[1]  *See* Motion, ECF Nos. 97–98.

**PRELIMINARY STATEMENT**

Apex attempts to defeat this motion with quantity over quality.  Its Opposition sidesteps the dispositive problem—that its conclusory and speculative allegations fail to state actionable claims—by listing repetitive and deficient paragraphs from the Amended Complaint.  This effort simply demonstrates the pleadings' insufficiency by stacking bare recitals of claim elements and legal conclusions, unaccompanied by supporting factual allegations.

Then, to dodge these flaws, Apex creates a straw man, arguing that the Related Defendants conflate Apex's ultimate evidentiary burden with its pleading requirements.  Not so.  Rather, the Related Defendants insist that Apex must plead *factual allegations* that support a reasonable inference of entitlement to relief.  Apex's failure to do so is fatal to its claims.

When stripped of conclusory allegations, the Amended Complaint describes routine business events in a competitive market: Apex failed to perform its contractual obligations, failed to retain employees necessary to staff RFM's account, and thus lost RFM as a client.  The Court should not entertain Apex's (renewed[2]) attempt to transform this dispute with a grandiose but unsupported conspiracy theory.

---

[1] Capitalized terms not defined herein have the meaning set forth in the Related Defendants' Motion.  Unless stated otherwise, caselaw citations omit internal quotation marks and citations, and adopt all alterations.

[2] Apex argues the Court cannot consider its prior pleadings for the truth of the matter stated therein.  Opp. at 2 n.1.  No matter—the Related Defendants do not ask the Court to do so.  Rather, they offer the January Action materials on background, not for their truth, *see* Mot. at 6, because those filings reveal how Apex has rewritten its fictional conspiracy.  Regardless, the Court need not rely on these materials to grant the Motion.

1

# ARGUMENT

I. **Fact-Free Speculation is Insufficient to Plead Tortious Interference or Civil Conspiracy**

Apex pleads none of the factual details that could support plausible claims of tortious interference or conspiracy. Mot. at 10–16, 24–26. Rather, Apex defends its paper-thin accounts with bulleted lists of empty allegations. Opp. at 19–21; 32–33. But the quantity of conclusory allegations cannot cure their inadequate quality.

A. **Tortious Interference**

Apex relies on conclusory allegations to plead two mandatory elements of tortious interference: knowledge of the specific contractual provisions and inducement of the breaches. Mot. 13–16. Its pleading fails to meet the bar as to either.

To show the Related Defendants' purported knowledge, Apex repeats conclusory statements that the Related Defendants "knew" or "were aware" of the restrictive covenants, provides a bulleted list of unsupported allegations, and relies on purported industry standards. *See* Opp. at 18–19. For example, Apex alleges without factual support that Kraus and Belinkie "discussed moving Related's work, and Belinkie's team, from Apex[] to IQ-EQ," and that Kraus "conspir[ed] with the Former Employees" to encourage them to break their employment agreements. Opp. at 19. Setting aside the obvious lack of necessary detail (*when* and *where* was this discussed?), these allegations say nothing about the Related Defendants' *knowledge* of the relevant contract terms. Pleading that Belinkie and Kraus were "longtime friend[s] and business associate[s]," with an "intimate" working relationship, *id.*, does not constitute a plausible allegation of actual knowledge of relevant terms. *See TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 201 (E.D.N.Y. 2024) ("conclusory and speculative allegation is insufficient to plead . . .

2

actual knowledge of the [agreement], let alone the specific sections allegedly breached by the [defendants]").

New York and Texas law require more. Apex must allege actual knowledge of the specific, allegedly breached contract terms; allegations of general industry practice do not suffice. Mot. at 13–14 (citing *TileBar*, 723 F. Supp. 3d at 201 and *CPM Consulting LLC*, 2019 WL 3769651, at *3); *see also A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, No. 12 CIV. 4828, 2018 WL 1273343, at *11 (S.D.N.Y. Mar. 5, 2018) ("General allegations that a party 'knew or should have known' about the contract in question fall short"; collecting cases); *Hoffman v. L & M Arts*, 774 F. Supp. 2d 826, 847 (N.D. Tex. 2011) (plaintiff did "not allege sufficient facts to establish that [defendant] in fact knew" about "confidentiality provisions"). Apex fails this test, and its argument that the complaints in *TileBar* and *CPM Consulting LLC* each pled knowledge with only a single conclusory allegation misses the point. *See* Opp. at 20 n.9. The sufficiency of a pleading is determined by its allegations' substance, not their quantity.

Apex takes a similar approach to defending its inducement allegations, again itemizing its conclusory allegations, as if repetition could fill factual gaps. Opp. at 20–21. But Apex's allegations say nothing about *how* the Related Defendants allegedly induced breaches—they simply repeat empty synonyms for inducement: Kraus "encourage[d]" Belinkie; Kraus and Belinkie "formulat[ed] their plan"; Kraus "work[ed] hard" to move RFM's business; Belinkie acted "with Kraus's knowledge and/or on Kraus's instruction"; Belinkie and Kraus "conspired"; and RFM "coordinat[ed] the movement of" the Former Employees. Opp. at 20–21. These are merely conclusions, devoid of any factual detail that supports an inference of inducement. *See Zhang v. Wang*, 317 F. App'x 26, 28 (2d Cir. 2008) (allegations that defendant "encouraged and

3

forced" plaintiff to breach contract "even when construed in the most liberal manner, are nothing more than legal conclusions").[3]

### B. Civil Conspiracy

Apex employs the same tactic for its civil conspiracy claim. Opp. at 31–33. Again, it offers a bulleted list of conclusory allegations, including: Belinkie recruited others with "Kraus's encouragement and knowledge"; the Former Employees "all agreed to move with Related"; the departures "can only be described as coordinated"; Belinkie and Kraus "hatched" a "plan"; Kraus was "conspiring with the Former Employees"; and Belinkie sought access to Apex's systems "with Kraus's knowledge and/or on Kraus's instruction." *Id.* The list also contains three mere recitations of the cause of action—that Kraus was "conspiring" or "conspired" with the Former Employees. *Id.*

These allegations will not do. *See* Mot. 25–26. When and how did the parties allegedly conspire? According to Apex, Kraus "hatched" an undefined "plan" pursuant to which he either knew *or* "instruct[ed]" Belinkie to "steal as much information as possible" from Apex. *See* Opp. at 32–33. But Apex does not allege any specific instructions, nor what information Kraus planned or instructed others to steal. *See Fierro v. Gallucci*, No. 06-CV-5189, 2008 WL 2039545, at *16 (E.D.N.Y. May 12, 2008) ("to survive a motion to dismiss, a complaint must . . . allege the specific times, facts, and circumstances of the alleged conspiracy"). Nor does Apex

---

[3] Apex contends that Kraus's alleged January 2025 statement supports an inference that (in some other, undescribed conversation) Kraus induced the Former Employees (who had already left Apex months prior) to themselves induce other (unnamed) employees to leave Apex. Opp. at 20 n.10. "[T]he caselaw simply does not allow" that "number of inferential leaps" to state a tortious interference claim. *CAC Grp., Inc. v. Maxim Grp., LLC*, No. 12 CIV. 5901, 2012 WL 4857518, at *6 (S.D.N.Y. Oct. 10, 2012), *aff'd*, 523 F. App'x 802 (2d Cir. 2013).

4

allege facts to support its allegation that RFM's "complaints about Apex['s] service" were "manufactur[ed]" by Kraus. *See* Opp. at 32.

The closest Apex comes to anything specific is a vague timeframe beginning "in or around the summer of 2024." Am. Compl. ¶ 65. This cannot support a civil conspiracy claim. *See QED, LLC v. Faber Daeufer & Itrato, P.C.*, No. 20-CV-2767, 2021 WL 707073, at *7 n.13 (S.D.N.Y. Feb. 22, 2021) ("repeated allegations that Defendants 'conspired' . . . are conclusory and insufficient" to state a claim for civil conspiracy). Without "some further factual enhancement," these allegations "stop[] short of the line between possibility and plausibility of entitlement to relief." *Love Terminal Partners, L.P. v. City of Dallas, Tex.*, 527 F. Supp. 2d 538, 553–54 (N.D. Tex. 2007) (allegations that during particular months defendants "secretly discuss[ed]" and "agreed" to destroy airport terminal in anticompetitive conspiracy were conclusory).

## II.  Contract Reformation Cannot Save Apex's Tortious Interference Claim

Apex's tortious interference claim against RFM fails for the additional reason that it arises from unenforceable restrictive covenants. Mot. at 11–13. Specifically, the noncompete clauses are unenforceable given their global scope, *id.* at 12, and the nonsolicitation clauses are unenforceable given their overbroad restrictions on the Former Employees' post-employment speech, *id.* at 12–13.

Apex barely contests these points. *See* Opp. at 11, 18. Instead, Apex asks this Court to save its claim by rewriting the Employment Agreements to conform to New York public policy. Opp. at 11–12. New York courts have declined to do just that. *See Veramark Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395, 407 (W.D.N.Y. 2014) ("any partial enforcement" of overly broad restrictive covenant, including based on geographic scope, "would necessarily go beyond 'blue penciling' and become a wholesale revision"). Even Apex's proposed revision—deleting the

5

word "affiliates" from the agreements, *see* Opp. at 12 n.6—would not save its claim. The agreements still would encompass numerous locations across the country. *See* Am. Compl. ¶ 22 (SandsPoint acquisition added to Apex's offerings "in the US"); Mot. at 12 (citing *ABH Nature's Prods., Inc.*, 2024 WL 1345228, at *7 (collecting cases)). The agreements would also extend to "any jurisdiction in which [Apex] . . . has documented plans to become engaged" at the time of the employees' departure, regardless of the employees' services in those jurisdictions. *See* Am. Compl. ¶¶ 30, 36, 42, 48. The noncompetes would therefore remain impermissibly overbroad, extending beyond the contours of the Former Employees' actual work for Apex. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 392 (1999) (noncompete overbroad where extends to "clients with whom a relationship with defendant did not develop through assignments to perform direct, substantive []services"). That is to say nothing of the nonsolicit's overbreadth, *see* Mot. at 12–13, for which Apex offers no proposed revision at all.

Reformation cannot save Apex's claim under Texas law, either. Texas law "allows for reformation of unenforceable noncompete clauses" but "does not permit damages to be recovered for actions that occurred before reformation." *See Orthoflex, Inc. v. ThermoTek, Inc.*, No. 3:10-CV-2618-D, 2012 WL 2864510, at *6, *6 n.16 (N.D. Tex. July 12, 2012) ("tortious interference with contractual relations claim must be dismissed" where plaintiff sought "damages only for actions that would have occurred before reformation" of unenforceable restrictive covenant); *see also* Tex. Bus. & Com. Code § 15.51(c). Because Apex "no longer seeks permanent injunctive relief based on" the noncompetes and nonsolicits, Opp. at 36, the inability

6

to pursue damages on an otherwise overbroad restrictive covenant under Texas law is fatal to Apex's tortious interference claim against the Related Defendants.[4]

### III.    Apex's Failure to Allege its Own Performance Dooms its Contract Claim

Apex contends that it pled its own performance under the MSA, but, again, relies on a conclusory recitation of the elements rather than substantive allegations. *See* Opp. at 22 (citing Am. Compl. ¶ 173: "Apex Capital performed its obligations under the MSA by providing the contracted services to Related."). These empty words are inadequate; this Court has rejected even more detailed allegations as "conclusory and insufficient to plead performance" for a contract claim. *Boustead Sec., LLC v. Leaping Grp. Co.*, No. 20-CV-3749, 2021 WL 3774116, at *3 (S.D.N.Y. Aug. 25, 2021) (Caproni, J.) (dismissing claim where plaintiff alleged it "performed all of its obligations pursuant to its contracts with [defendants], which included but are not limited to, financial advising, underwriting services and other activities as specifically described in the parties' respective agreements").

Worse, Apex pleads its *non*-performance. Mot. at 16–17. By its own account, Apex refused to honor RFM's request that Apex return its data months prior to RFM terminating the MSA. Mot. at 16–17; Am. Compl. ¶ 114 (Apex began "project" of "separat[ing]" RFM's data but then "learned new information that raised alarm bells"); Opp. at 22 (Apex "believed the

---

[4] Because reformation cannot salvage Apex's breach of contract claim under New York or Texas law, there is no conflict requiring the Court to engage in a choice of law analysis. *See* Mot. at 9–10. If, however, the Court does so, Texas law should apply to the tortious interference claim pursuant to New York's interest analysis because the contracting parties were domiciled in Texas. *See IVDV Assocs. Inc. v. Seruya*, No. 17-CV-1009, 2020 WL 1501857, at *12–13 (E.D.N.Y. Mar. 24, 2020). That the parties selected New York law in the Employment Agreements does not change this outcome. *See FTI Consulting, Inc. v. Graves*, No. 05 CIV 6719, 2007 WL 2192200, at *10–11 (S.D.N.Y. July 31, 2007); *see also Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 335 (2d Cir. 2005).

parties' relationship was 'salvageable'"[5]). Apex maintains that, because the "MSA was still in place," Apex had no obligation to return RFM's data. Opp. at 22–23. But the MSA required Apex to "use reasonable endeavours to assist" with transfer to a "replacement service provider" "without undue disruption." MSA § 12(b). Such a transfer must occur while the MSA is "still in place," *see* Opp. at 22, lest RFM suffer a service gap. Apart from mentioning its general "devot[ion of] considerable time, money, and human capital" to returning RFM's data, Am. Compl. ¶ 114, Apex "failed to identify a single specific action it took pursuant to" the MSA to do so, *Boustead Sec., LLC*, 2021 WL 3774116, at *3. Apex's misreading of its MSA obligations, Opp. at 23, does not excuse its manifest failure to plead its own performance. This is fatal to the contract claim.

Apex also attempts to excuse its allegations of non-performance by arguing that RFM sought access not to its data but to "Apex Group's proprietary database." Opp. at 23. This is a red herring. Apex omits the rest of its own allegation, which makes clear that RFM sought "*Related's* accounting records." Am. Compl. ¶ 122 (emphasis added). The MSA is clear: upon termination, Apex must deliver to RFM "all . . . documents *relating to the affairs* or belonging to [RFM]." MSA § 12(c) (emphasis added). Whatever the contents of the supposedly "proprietary" database, much of what the Amended Complaint describes indisputably "belong[s] to" RFM, or, at minimum, "relat[es] to the affairs" of RFM. *See id.*; Am. Compl. ¶ 71. Apex's contention that RFM requested access to its "proprietary database" is no defense to Apex's failure to plead its own contract performance.

---

[5] Apex pled the opposite in the January Action Complaint, describing "Related's position" as similar to other client relationships that were "at risk, if not already doomed." January Action Compl. ¶ 79.

### IV.     Apex's Good Faith and Fair Dealing Claim Fails Because It Is Duplicative

The implied covenant claim is rooted in the same allegations that underlie the breach of contract claim: that RFM wrongfully terminated the MSA.  *See* Opp. at 23–24; Mot. 18–19.  Apex's allegations—including that the Related Defendants "manufactur[ed] complaints about" the services it provided pursuant to the MSA and "conspir[ed] with the Former Employees to move its business to IQ-EQ," Opp. at 24—provide the factual "predicate" for both claims.  *Henderson v. Golden Corral Franchising Sys., Inc.*, 663 F. Supp. 3d 313, 331–32 (S.D.N.Y. 2023).  Likewise, while Apex claims to seek different damages for its implied covenant claim, in fact, the damages for the contract claim are the same: "unpaid invoices" and "loss of revenue" are two sides of the same coin.  *See* Opp. at 24.  Such redundancy requires dismissal.

Apex also posits that it "is unclear how any of these actions would be breaches of *express* provisions of the MSA."  Opp. at 24.  To the contrary, the MSA's confidentiality provision encompasses Apex's allegation that the Related Defendants "conspire[d] with the Former Employees to misappropriate" Apex's confidential information.  *See* Opp. at 24; MSA § 8.1.  Similarly, the Related Defendants' purported "coordinat[ion of] the mass exodus of Apex[]'s employees supporting" RFM, Opp. at 24, would violate the MSA's requirement that RFM "co-operate with Apex in all matters relating to the Services," MSA § 3.1(a).  The Court should not entertain Apex's attempt to re-package its contract claim into a redundant implied covenant claim.  *In re Navidea Biopharmaceuticals Litig.*, No. 19-CV-1578, 2019 WL 7187111, at *6 (S.D.N.Y. Dec. 26, 2019) (Caproni, J.) (A "claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of an express provision of the underlying contract.").

9

## V. Apex's Unjust Enrichment Claim Is Duplicative and Fails to Allege Enrichment

Apex contends that RFM "was enriched by Apex's diversion of costly resources and personnel to its account." Opp. at 29. But that is not enrichment—that is merely Apex's cost of doing business. Further, Apex's staffing and services for RFM is the exact subject matter of the MSA, and therefore Apex's unjust enrichment claim fails.[6] *Shane Campbell Gallery, Inc. v. Frieze Events, Inc.*, 441 F. Supp. 3d 1, 6 (S.D.N.Y. 2020). Apex raises "no dispute" that the MSA is valid and enforceable; "the only question" it raises is whether RFM breached the MSA. *See id.* In these circumstances, Apex may not plead unjust enrichment in the alternative to act as "a catchall cause of action to be used when others fail." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012); *Barton v. Pret A Manger (USA) Ltd.*, 535 F. Supp. 3d 225, 249 (S.D.N.Y. 2021) ("The fact that the Federal Rules permit Plaintiff to assert claims in the alternative does not change the Court's analysis."). Because the MSA governs the parties' business relationship, Apex's unjust enrichment claim duplicates its contract claim and must be dismissed. *See Ham v. Lenovo (United States) Inc.*, 664 F. Supp. 3d 562, 584 (S.D.N.Y. 2023) ("[I]f a plaintiff's other claims are defective[,] an unjust enrichment claim cannot remedy the defects."); *Primula Mgmt., LLC v. Primrose Sch. Franchising Co. LLC*, No. 25-CV-1795, 2026 WL 508755, at *16 (S.D.N.Y. Feb. 24, 2026).

That Kraus is not a party to the MSA cannot salvage this claim. *See* Opp. at 29. Apex contends that Kraus "was enriched" by continuing to work with Apex employees and accessing

---

[6] Apex misconstrues Texas law in arguing that it does not require fraud, duress, or undue advantage for unjust enrichment. *See* Opp. at 30 n.16. Texas courts disagree as to whether unjust enrichment is a separate cause of action, or simply a theory of recovery. Under the latter view, there may be no *element* of wrongfulness, although even then, Texas courts recognize that "fraud, duress, or the taking of undue advantage" is typically present where a party has been unjustly enriched. *See Newington Ltd. v. Forrester*, No. 3:08-CV-0864-G, 2008 WL 4908200, at *3–4 (N.D. Tex. Nov. 13, 2008).

10

Apex's proprietary information, *id.* at 29–30—all by virtue of the MSA-governed relationship between RFM and Apex. In other words, the "subject matter" of Apex's allegations of unjust enrichment against Kraus is covered by the MSA. *See Shane Campbell Gallery, Inc.*, 441 F. Supp. 3d at 6. New York courts "have consistently held that claims for unjust enrichment may be precluded by the existence of a contract which governs the dispute even if one of the parties to the lawsuit is not a party to the contract." *Hudson Neurosurgery, PLLC v. UMR, Inc.*, No. 20-CV-9642, 2023 WL 6311218, at *8 (S.D.N.Y. Sept. 28, 2023). That is especially true here, where Kraus signed the MSA as RFM's Chief Financial Officer. *See* MSA.

Nor has Apex alleged that Kraus was enriched. Mot. at 23–24. According to Apex, Kraus "was able to keep working with his friend" and other "familiar" people while using Apex's "proprietary information." Opp. at 29–30. But to plead enrichment, Apex "must show that [Kraus] actually received a benefit that is both specific and direct" or "otherwise obtain[ed] financial relief because of" such a benefit. *Hudson Neurosurgery, PLLC*, 2023 WL 6311218, at *6. Apex's risible gesture toward friendship as a cognizable enrichment fails; friendship is obviously not the type of financial benefit that can support an unjust enrichment claim, nor can Kraus be said to "possess[]" that friendship. *See id.* at *6–7. As for Apex's proprietary information, Apex, at most, implies that Kraus' access to that information may have *indirectly* benefitted *RFM*. *See* Opp. at 29–30. Such an allegation cannot support a claim for unjust enrichment.

## VI.     Leave For Further Amendment is Unwarranted

The Court should deny Apex leave to further amend its pleading. *See* Opp. at 37. Regardless of the January Action, Apex already amended its pleading in this case after receiving documents from the Former Employees, *see* ECF No. 16, and Defendants' initial motions to

11

dismiss, *see* ECF Nos. 46–53, 57–58.  Apex had ample opportunity to cure its pleading deficiencies and failed to do so.

## CONCLUSION

The Court should grant the Related Defendants' motion to dismiss all claims with prejudice.

Dated: February 26, 2026

                                             */s/ Nicole Gueron*
                                    CLARICK GUERON REISBAUM LLP
                                    Nicole Gueron
                                    David Kimball-Stanley
                                    Elizabeth R. Baggott
                                    41 Madison Avenue, 23rd Floor
                                    New York, NY 10010
                                    Phone:  (212) 633-4310
                                    Fax:  (646) 478-9484
                                    ngueron@cgr-law.com
                                    dkimballstanley@cgr-law.com
                                    ebaggott@cgr-law.com

                                    *Counsel for Defendants Related Fund Management, LLC and James Kraus*

**CERTIFICATE OF COMPLIANCE PURSUANT TO LOCAL CIVIL RULE 7.1(c)**

      Nicole Gueron, undersigned counsel for Defendants Related Fund Management, LLC and James Kraus, hereby certifies that the number of words within the attached memorandum of law, excluding the caption, table of contents, table of authorities, and signature block, is 3,500 according to the word-processing system used to prepare the aforesaid document.

                                                                                                 /s/ Nicole Gueron
                                                                                           Nicole Gueron