**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

APEX GROUP CAPITAL ADVISORS LLC
F/K/A SANDSPOINT CAPITAL ADVISORS
LLC,

      Plaintiff,

v.

RELATED FUND MANAGEMENT, LLC;
JAMES KRAUS; LUCAS BELINKIE;
PRESTON CALLEN; WILLIAM C. CHANEY;
and RYAN HOPE,

      Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/24/2026____

Case No. 1:25-cv-08892-VEC

## STIPULATED & ORDERED ESI PROTOCOL

**WHEREAS**, the Parties, through their counsel, stipulate as follows and request that this Court issue an order governing the production of documents, both hard-copy documents and electronically stored information ("ESI"), that the Parties may produce in connection with discovery in the above-captioned action ("ESI Protocol");

**WHEREAS**, the Parties each possess ESI in various formats, repositories, systems, and other materials, which are potentially relevant to these proceedings ("Discovery Materials");

**WHEREAS**, the Parties intend to reasonably cooperate in the discovery process in order to minimize costs, delays, and duplication of efforts;

**WHEREAS**, the Parties intend to establish a joint protocol for efficiently identifying, searching, reviewing, and producing Discovery Materials proportional to the needs of the case;

**WHEREAS**, the Parties each possess Discovery Materials that are potentially relevant to this dispute but are believed to be protected from disclosure by privilege or other protections (including the work-product doctrine), and the Parties seek an efficient means to log and identify privileged materials that have been withheld or redacted; and

**WHEREAS**, the Court finds that good cause exists for the issuance of an ESI Protocol,

**IT IS HEREBY ORDERED** that any person subject to this ESI Protocol—including without limitation, the Parties to this action, their representatives, agents, experts and consultants, all third parties providing discovery in this action, and all other interested persons with actual or constructive notice of this ESI Protocol—shall adhere to the following terms:

**I.    GENERAL PROVISIONS**. The procedures and protocols set forth in this ESI Protocol shall govern the production of Documents in this matter, unless the Parties agree in writing to change them or they are changed by the Court at the request of a Party.

A.    The Parties shall take reasonable steps to comply with the ESI Protocol in good faith and agree to promptly alert all other Parties concerning any technical problems associated with complying with this ESI Protocol. The Parties shall, as necessary, meet and confer to exchange information regarding issues associated with any electronic production of discoverable ESI, including but not limited to procedures, privilege issues, issues involving redaction, and Document delivery mechanisms.

B.    Entering into this Stipulation, or agreeing to and/or producing or receiving Documents or otherwise complying with the terms of this Stipulation shall not:

1.    Establish any agreement as to the scope of discovery in this action or the relevance of any particular ESI or information contained within;

2.    Prejudice the Parties' rights to (a) seek production of Documents they consider subject to discovery, or (b) object to the production of Documents they consider not subject to discovery;

3.    Require either Party to employ a specific method or technique to locate, redact, or exclude Privileged Information from Documents they produce;

4.    Prejudice the Parties' rights to petition the Court for an order relating to discovery;

5.    Prejudice the Parties' rights to object to the relevance, authenticity, use, or admissibility of any Document, testimony, or other evidence subject to this ESI Protocol;

6.    Preclude any Party from objecting to discovery requests that it believes to be otherwise improper, disproportionate, or unduly burdensome or oppressive;

7.    Operate as a waiver of any attorney-client, work product, business strategy, trade secret, or other privilege or immunity;

8.    Operate as a waiver of any claims or defenses; or

9.    Constitute an agreement by any Party to produce any documents or other materials in discovery not otherwise agreed upon or required by Court order or the Federal Rules of Civil Procedure.

C.    Nothing in this ESI Protocol alters or expands the preservation obligations of the Parties. The Parties shall take reasonable steps to preserve relevant Documents that are within their possession, custody, or control.

D.      Nothing in this ESI Protocol is intended to be an exhaustive list of discovery obligations or rights of a Party. To the extent additional obligations or rights not addressed in this ESI Protocol arise under the governing case law, the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the Southern District of New York, or any other applicable rules or regulations pertaining to the U.S. District Court for the Southern District of New York, those obligations or rights remain.

E.      This ESI Protocol shall not apply to Documents that are to be reproduced from productions that have been made in other litigation matters. To the extent that third parties may produce Documents in this case, the Parties agree that such third parties may elect to abide by the terms of this ESI Protocol.

F.      A Party that issues a non-Party subpoena (the "Issuer") will include a copy of this ESI Protocol with the subpoena and with instructions to produce documents in accordance with the specifications set forth herein. The Issuer must produce any documents obtained under a subpoena to all other parties. Any documents the Issuer does not intend to process for its own use may be disseminated to all other Parties in the format in which such documents are received by the Issuer. If the non-party production is not Bates-stamped, the Issuer will endorse the non-party production with unique prefixes and Bates Numbers prior to producing them to all other Parties.

G.      The handling of privilege, including inadvertent disclosures, claw-back procedure, and claims of privilege are addressed by the Parties' separate confidentiality agreement and protective order of the Court in this action.

H.      To the extent reasonably practicable, the production of Documents shall be conducted to maximize efficient and quick access to Documents and minimize related discovery costs.

I.      Each Party shall bear its own costs in connection with producing ESI and Discovery Materials, unless otherwise ordered by the Court.

J.      The Court will retain jurisdiction to enforce and/or to modify this ESI Protocol.

## II.    DEFINITIONS

A.      The term "**Bates Number**" means a unique identifying number affixed to each page of a document produced in the Litigation.

B.      The term "**Confidentiality Designation**" means the designation of information pursuant to any agreement and Protective Order in this action.

C.      The term "**Custodian**" means any individual of a Producing Party for whom the Producing Party will produce Documents, either as disclosed during good faith meet and confers between the Parties or by an order of the Court.

D.      The term "**Custodial Data Source**" means any data source used that is in the possession, custody, or control of a Producing Party, in or on which the Producing Party knows or reasonably believes that a Custodian for said Producing Party stored potentially

relevant Documents, ESI, or Hard Copy Documents, whether or not created or generated by a Custodian.

E.      The term "**Database System**" means any system that is accessible consisting of a group of integrated files, which is stored in one location or distributed across multiple locations in a network and made available to several users and/or Custodians, and consisting of a tabulation of corresponding information which can be searched, organized, classified, and accessed in multiple ways.

F.      The term "**Document**" means any and all written, graphic, or electronically stored information (including e-mails), however produced or reproduced, and each and every thing from which information can be processed or transcribed. "Document" shall include both Hard-Copy Documents and ESI. "Document" is synonymous in meaning and equal in scope to the usage of the term under Federal Rule of Civil Procedure 34.

G.      The term "**Document Family**" means a collection of pages or files maintained together constituting a logical single communication of information, but consisting of more than a single standalone record. Examples include an email and associated attachments, or a presentation.

H.      The term "**Electronically Stored Information**" ("ESI") means information that is stored in or on any electronic storage medium (including storage in a Database System), whether physical or virtualized, that can be obtained or translated into a reasonably usable form. ESI carries the broadest possible meaning consistent with Federal Rules of Civil Procedure 26 and 34 and includes but is not limited to: Metadata, email, word processing files (*e.g.*, Microsoft Word), computer presentations (*e.g.*, PowerPoint), spreadsheets (*e.g.*, Excel), image files (*e.g.*, PDF, AutoCAD, DWG, DXF, and PDS), accounting materials (*e.g.*, Oracle 1li), and project planning and scheduling (*e.g.*, Primavera P6).

I.      The term "**Extracted Text**" means the textual content of a Native File including all header, footer, and document body information, copied into a separate data file, typically by an eDiscovery processing tool, for electronic production to facilitate ingestion to an eDiscovery review tool.

J.      The term "**Hard-Copy Document**" means Documents maintained or otherwise existing in paper or other tangible form at the time of collection.

K.      The term "**Load File**" means an electronic data file (.dat and .opt), typically created by an eDiscovery processing tool and provided with a production set of Document images, metadata, or other information, which provides information about the interrelationships of the component parts of an electronic document production, including cross-reference information, that facilitates the loading and correlation of such information into or within a Receiving Person's document review platform or eDiscovery review tools.

L.      The term "**Metadata**" means (i) information associated with or embedded in a Native File that does not constitute the primary content of the file but which describes the characteristics, origins, usage, and/or validity of the electronic file; and (ii) information

generated automatically by the operating system(s) of a computer or other information technology system when a Native File is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system.

M.     The terms "**Native Format**" or "**Native ESI**" mean ESI that has an associated file structure defined by the creating or viewing application in the file type for (or of) the application in which such ESI is normally created, viewed, and/or modified (also referred to in terms of "**Native Production**").

N.     The term "**Precision**" means the fraction of documents identified as likely responsive by the Predictive Coding Process that are in fact responsive.[1]

O.     The term "**Predictive Coding Proces**s" means the use by a Party of Predictive Coding Software to categorize documents into those that are likely responsive and those that are likely non-responsive.

P.     The term "**Producing Person**" means any entity or person, or counsel for such entity or person, that produces Documents in this action, including but not limited to non-Parties acting on a Party's behalf or responding to discovery pursuant to a subpoena.

Q.     The term "**Receiving Person**" means any entity or person, or counsel for such entity or person, that requests or receives Documents in this action.

R.     The term "**Recall**" means the fraction of responsive documents that are identified as likely responsive by the Predictive Coding Process.

S.     The term **"Responsiveness Categories"** means the coding designation assigned to a document during a review reflecting whether the document is "Responsive," "Not Responsive," or any substantially similar responsiveness determination used by the reviewing Party.

T.     The terms "**Party**" or "**Parties**" mean or refer to the named Plaintiffs and Defendants in the above-captioned case.

U.     The term "**Searchable Text**" means the native text extracted from ESI and any Optical Character Recognition ("**OCR**") text generated from a Hard-Copy Document or electronic image files.

V.     The term "**Statistically Valid Sample**" means a random sample of sufficient size and composition to permit statistical extrapolation with a margin of error of +/2.0% at the 95% confidence level.[2]

---

[1] Definitions of "Precision" and "Recall" are adapted from the "Qrossman–Cormack Glossary of Technology–Assisted Review," 7 Fed. Cts. L.Rev. 1, 25, 27 (2013).

[2] The size of the sample may vary depending upon several factors, and shall be calculated using the formula $[n = (\chi^2 N p(1 - p)) / (ME^2 (N - 1) + \chi^2 p(1 - p))]$ where, ME is the margin of error; $\chi$ is the Confidence Level (1.96 for a 95% Confidence Level); p is judgment of richness, N is the population and n is sample

W.    The term "**TAR**" means Technology Assisted Review.

## III.    PRESERVATION

A.    Absent a Party's specific written notice of good cause, the Parties agree that Documents and ESI in the following data sources are presumed to be inaccessible, not discoverable, and need not be preserved:

1.    ESI permanently deleted or otherwise not retained in the ordinary course of business before the time a preservation obligation in this matter came into effect;

2.    Deleted, "slack," fragmented, or unallocated data;

3.    Random Access Memory ("RAM"), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system;

4.    Online access data such as (without limitation) temporary internet files, history files, cache files, cookies, and DHCP and IP logs;

5.    Data in metadata fields that are frequently updated automatically, such as last-opened or last-printed dates;

6.    Server, system, network, software application logs, and executable files (for example, exe or .dll);

7.    Data remaining from systems no longer in use that is unintelligible on the systems in use;

8.    Electronic data (*e.g.*, call logs, email, calendars, contact data, notes, etc.) sent to or from mobile devices (Blackberry, Android, or iPhone, for example), if a copy of such electronic data is routinely saved elsewhere (such as on a server, laptop, desktop computer, or "cloud" storage) and has been preserved; and

9.    Backup data files that are maintained in the normal course of business for purposes of disaster recovery, including (but not limited to) backup tapes, disks, SAN, and other forms of media, and that are substantially duplicative of data more accessible elsewhere that has been preserved.

B.    Absent a Party's receipt of specific written notice of good cause or knowledge that a backed-up system is likely to contain relevant information that was not otherwise preserved as of or after January 31, 2025, no Party shall be required to modify or suspend

---

size. Where richness is not reasonably estimable, 0.5 may be used. Based on a Confidence Level of 95%, richness of 0.5, a Population of 1,000,000, and a margin of error of 5%, the resulting sample size is 384 documents.

procedures, including rotation of backup media, used in the normal course of business to back up data and systems for disaster recovery purposes.

C.    Metadata can easily be altered unintentionally or inadvertently, and it can also be highly volatile and easily altered in the collection process. The Parties shall take reasonable steps to preserve Metadata fields set forth herein to the extent it is relevant, available, and is maintained in the ordinary course of business.

D.    Unless doing so would imperil the preservation of relevant Documents or Metadata, nothing in this ESI Protocol shall prohibit the following actions taken in the ordinary course of business: (1) routine maintenance, operation, or replacement of computer systems or equipment; and (2) upgrading, loading, reprogramming, customizing, or migrating software, even if such actions modify or alter the way in which ESI is maintained, stored, or viewed, provided the integrity of the original ESI is reasonably maintained.

E.    **<u>Meet and Confer</u>**

1.    The Parties agree to meet and confer upon request about the appropriate scope of Documents to be preserved and collected, including:

a)    The Custodians and non-custodial repositories suitable for collection, and the identification of any known sources of relevant Documents deemed too duplicative, costly, burdensome, inaccessible, or immaterial to collect;

b)    Adjustments to the relevant time period;

c)    Document sources that are not reasonably accessible due to undue burden or cost, such as back-up tapes for the purpose of disaster recovery; and

d)    In addition to the sources listed in Paragraph III.A, any other Document sources that will not be preserved because such preservation would not be proportional to the needs of the case.

2.    The Parties further agree to meet and confer upon request about the methods and search terms they will use to identify potentially responsive ESI and about how they will confirm and validate the reasonableness of those search terms and methods.

## IV.    COLLECTION, PROCESSING, AND REVIEW

A.    In general, ESI processing, review, and production will consist of (1) loading ESI into a secure review platform selected by the Producing Person; (2) culling via filters based upon file creation or message dates, key word searching, and the application of additional filters such as deduplication of identical files on a family level using MD5 or SHA-2 hash values; (3) assessment for relevance, responsiveness, and privilege of Documents in the culled dataset; and (4) production of relevant and responsive non-

privileged ESI. Nothing in this Stipulation entitles a Requesting Party to dictate the keywords to be used by a Producing Party, or prohibits a Producing Person from objecting to the use of any keyword proposed by a Requesting Party.

B.      The parties shall disclose the keywords used for the search and meet and confer regarding any objections. If a party proposes reasonable keywords, the Producing Party shall run those terms across its collection and disclose the resulting hit counts for each term, along with the total number of unique documents returned. If review of the documents returned by such searches would not be unduly burdensome, the Producing Party shall review those documents and produce any non-privileged, responsive documents.

C.      The Parties recognize that there exists a variety of search tools and methodologies, including but not limited to search terms, TAR, Predictive Coding Processes and other statistical sampling, to reasonably prioritize, scope and target their respective assessments and identify when to defensibly stop linear review. Upon request by a Party, the Parties agree to meet and confer regarding the use of search terms, statistical sampling tools, and TAR before any particular tool or methodology is applied.

D.      To the extent that a Party wishes to use TAR or any Predictive Coding Process, then prior to the use of either, the Party shall disclose in writing its intention to use predictive coding and shall include the following information:

    1.      The name, publisher, version number, and a description of the Predictive Coding Software and Predictive Coding Process to be used;

    2.      The name and qualifications of the person who will oversee the implementation of the Predictive Coding Process (the "Technical Expert");

    3.      A description of the documents to be subjected to the Predictive Coding Process (the "Document Universe"), including:

        a)      Custodian/Source;
        b)      Data types (e.g., email, electronic documents, etc.)
        c)      The validation metrics to be used to manage the process,
        d)      The number of documents in the Document Universe, in total and for each Custodian/Source

    4.      The Parties shall meet and confer to address any questions or disputes about the selection of the Predictive Coding Software, the Technical Expert, the Document Universe, the validation process, and the Responsiveness Categories, and the Party using TAR or any Predictive Coding Process shall make its Technical Expert reasonably available to address questions about the technical operation of the Predictive Coding Software.

E.      To the extent that a party uses TAR or any Predictive Coding Process, that Party shall produce and/or disclose the following:

8

1.      The Document Universe & Excluded Documents: If the Party decides to use search terms or other criteria to reduce the volume of the Document Universe, it shall promptly (1) disclose in writing to all Parties the criteria used and the number of documents removed by the criteria (the "Excluded Documents"); (2) review a Statistically Valid Sample from the Excluded Documents, disclose the size of that sample set, and produce any responsive, non-privileged documents the Responding Party identifies; and  (3) meet and confer with the all Parties, if requested, to address any questions or disputes about the reasonableness and appropriateness of the Culling Criteria.

2.      **The Control Set**: All non-privileged, documents reviewed as part of the Statistically Valid Sample drawn from the Document Universe used to determine the prevalence of responsive information (the "Control Set"). For each document in the Control Set, the producing Party shall disclose the Responsiveness Categories assigned to each document. The producing Party shall also disclose the size of the Control Set and the number of documents coded for each Responsiveness Category.

3.      **The Seed Set**: The Party using TAR may use any reasonable method, including, but not limited to, search terms, to identify a set of documents to be used to initially train the Predictive Coding Software (the "Seed Set"). All non-privileged documents used to train the Predictive Coding Process, including seed or training documents used to develop or refine the model. For each document, the Party shall disclose the Responsiveness Categories assigned to each document.

4.      **Training Sets:** Upon completion of the training, the Party using TAR shall disclose in writing the results of the training to all Parties, including, to the extent reasonably available, the number of documents reviewed, the number of documents coded for each of the Responsiveness Categories during training, the number of documents identified as likely responsive by the Predictive Coding Process, and the estimated rates of Recall and Precision with their associated error margins. The Responding Party shall produce all nonprivileged documents used to train the Predictive Coding Software and disclose for each document the Responsiveness Categories, if any, to which it is responsive. The Requesting Party shall raise any disputes regarding how the documents were coded within ten (10) business days of their production, and the parties agree to meet and confer in good faith over any such disputes.

5.      **Uncategorized Documents:** The Party using TAR shall manually review any documents the Predictive Coding Software is unable to evaluate for any reason, including the unavailability of machine-readable text or documents that could not be ranked, and in order to identify responsive, non-privileged documents for production.

6.      **Validation Sample**: All non-privileged, responsive and non-responsive documents from any Statistically Valid Sample used to evaluate or validate the performance of the Predictive Coding Process. For each document in the

Statistically Valid Sample, the producing Party shall disclose the Responsiveness Categories assigned to each document.

7.      To the extent a Producing Party asserts that these requirements do not apply to workflows that do not depend on fixed seed or training sets, including methodologies in which model training occurs dynamically during the course of review without discrete training rounds (e.g., continuous active learning), then the parties shall meet and confer about a reasonable and transparent validation process sufficient to demonstrate the adequacy of the review, and the Party using TAR shall provide comparable information set forth in paragraph IV.D-E, showing the adequacy of the review.

F.      The Parties need not specify the particular request(s) to which a produced Document is responsive, provided the production format specifications of this agreement are met.

G.      If a Producing Person determines that certain documents are easily identifiable and segregable, that party may collect such documents without the use of search terms or other agreed-upon advanced search methodology (*e.g.*, analytics, TAR).

## V.    PRODUCTION METHOD

A.      Unless a different method of production is discussed and agreed upon by the Parties, the Producing Party shall send productions by secure file transfer protocol ("SFTP") via email, or, by agreement, via encrypted physical media such as a Hard Drive or USB sent via FedEx overnight service.

B.      All productions will be containerized, encrypted, and password protected. The Parties will each send usernames and passwords separately from the data and media itself. The Producing Party shall have the obligation to provide the password for any documents that it produces in password-protected form.

C.      Every production must be accompanied by a letter including the name of this action, the production date, and the Bates Number range of the material contained in the production.

D.      Each Party may produce Documents and ESI on a rolling basis, unless otherwise agreed or ordered, with supplemental productions to occur regularly thereafter until complete.

E.      Documents will be deemed produced once they are uploaded to the SFTP site and notification is sent via email to the other Parties of their availability for download, with the corresponding username and password. If, upon agreement, Documents are produced through any other mechanism, they will be deemed produced upon receipt by the Receiving Party.

10

VI.    **PRODUCTION FORMAT**

A.    **Hard-Copy Documents**

1.    To the extent reasonably practicable, the Parties shall convert responsive Hard-Copy Documents to electronically-searchable images for production.

2.    If a Hard-Copy Document consists of more than one page, the unitization of the Document and any attachments and/or affixed notes shall be reasonably maintained as it existed in the original when creating the TIFF image files. When scanning Hard-Copy Documents, the Parties should use reasonable efforts to ensure that distinct Documents are not merged into a single record, and single Documents are not split into multiple records.

3.    All Hard-Copy Documents that contain fixed notes shall be scanned with the notes affixed, if it can be done in a manner so as not to obstruct other content on the document. If the content of a Hard-Copy Document is obscured by affixed notes, the Hard-Copy Document without the notes affixed shall be scanned as one Document Image and the Hard-Copy Document with the notes affixed shall be scanned as a separate Document Image.

4.    Reasonable efforts shall be used to scan Hard-Copy Document pages at or near their original size and so that the image appears straight and not skewed. Physically oversized originals, however, may appear reduced (unless full-size images/copies are reasonably requested). In addition, reducing image size may be necessary to display Bates Numbers and Confidentiality Designations without obscuring text.

B.    **Time Zones for ESI**

The Producing Party may process ESI using the time zone in which the majority of its Documents were created, or the majority of its communications were sent. The "Time_Zone" metadata field shall reflect what time zone the documents were processed in.

C.    **Mobile Data, Text Messages and Chat Data**

1.    To the extent that the parties need to produce mobile data, text messages and ESI from chat platforms such as Slack, Microsoft Teams, Google Chat, Skype, WhatsApp, iMessage, SMS/MMS, and similar platforms (collectively, "**Chat Message Data**"), it shall be collected and produced in a manner that preserves conversational context, as further set forth below.

2.    All Chat Message Data shall be produced in a format that consolidates individual messages into a single, chronologically ordered TIFF image file that presents the conversation thread in a user-readable format.

3.    Messages shall be grouped by custodian, conversation/channel, and 24-hour intervals, with each TIFF image file representing all messages within a single

11

conversation that occurred in a given 24-hour period (midnight to 11:59 PM in the custodian's local time zone, unless otherwise agreed).

4.     Any attachments (*e.g.*, images, documents, voice notes) referenced in the Chat Message Data shall be extracted and produced as separate documents, linked using standard parent/child relationships in the load file.

**D.     Native Format ESI**

1.     Native ESI that is password protected, encrypted, or compressed (as in the case of .zip folders) in the usual course of business shall, where reasonably possible, be unencrypted or have password protection removed, and be uncompressed, in order to enable review and production of the underlying Documents, except where such measures are necessary to comply with data security laws or to protect the privacy or security of the data.

2.     In order to preserve the integrity of Native ESI, no Bates Number, Confidentiality Designation, or internal tracking number shall be added to the Native ESI. The Producing Party shall provide a slipsheet with the Bates Number for documents produced natively.

3.     The Parties agree to produce Microsoft Excel and other spreadsheet files natively. In the event a Party requests native copies of other ESI, they shall be provided upon good cause shown. In particular, the Parties are generally entitled to request and receive native files for produced ESI where visibility, usability, or functionality is impaired by the ESI Image and extracted text format specified herein. If a dispute arises over the production of files in native format, the Parties shall promptly meet and confer.

4.     To the extent a Producing Person determines that the production of information contained in a Database System is appropriate, the Producing Person may determine the sets of data or fields to be included in a reasonably usable and exportable electronic file (*e.g.*, Excel or CSV format) for review by the Receiving Person, in lieu of producing the Database System. The Receiving Person may make reasonable requests for additional information from a Database System, including requests to explain the database schema, codes, abbreviations, or different report formats or requests for additional responsive data from identified fields. The Parties further agree to meet and confer as necessary regarding the format of production for information contained in Database Systems or other relational or dynamic repositories, or in non-standard format not considered herein.

5.     The Parties will utilize industry standard file exclusion, including the NIST list (www.nsrl.nist.gov), to remove system and other executable files from productions.

E.      **Foreign Language Documents**

1.      The Producing Party shall make reasonable efforts to ensure that all technologies and processes used to collect, process, and produce the text of any Document—including all TIFF conversion and OCR processes, and the extraction of text from Native EDI—preserves all foreign language text, punctuation, and other characteristics as they exist in the source Native ESI.

2.      If any portion of a Document is in a foreign language, the Producing Party has no obligation to produce an English translation of that portion and does not have an obligation to render that portion text searchable via OCR or other means if the foreign language does not use the Latin alphabet, consistent with the Federal Rules.

3.      To the extent reasonably and technically possible, foreign language text files shall be delivered in UTF-8 and be Unicode compliant, with the correct encoding to enable the preservation of the Documents' original language.

F.      **Attachment Families**

1.      For purposes of determining what materials should be produced, each Document "family" (*e.g.*, cover letter and enclosures; e-mail and attachments; chat messages and attached images, documents, or voice notes; binder containing multiple documents, or other documents where a parent-child relationship exists between the documents) shall be treated as a single document, meaning that if any portion of a Document family contains information rendering it subject to production, then the entire Document family shall be produced, subject to any claims of privilege or work product protection. The Parties agree that hyperlinked files and other "modern attachments" are not considered as attachments under this Protocol.

2.      Document families shall be maintained using the BEGDOC and ENDDOC fields of the Load File, provided however that the Producing Party shall only be required to present one level of any parent-child relationship. Images generated from attachments to emails stored in Native Format shall be produced contemporaneously and sequentially immediately after the parent email in their Bates numbering.

3.      In instances where the Producing Party asserts a privilege with respect to some but not all family members, the Producing Party should replace any portion or subset of privileged Documents within the family for which it is claiming a privilege with slipsheets containing: "Document Withheld as Privileged" stated at the center of the page, Confidential Designation(s) at the bottom left of the page, and Bates branding at the bottom right of the page. Each slipsheet must be re-OCR'd at time of production to remove Extracted Text.

13

G.    **De-Duplication**

1.    The Parties shall use reasonable, good faith efforts to remove exactly-duplicative files in their collections by the application of industry-accepted threading or hash-value deduplication technology ("De-Duplication"), provided these technologies do not exclude unique content from review consideration or production.

2.    De-Duplication should be performed across all sources (*i.e.*, global or horizontal De-Duplication).

3.    Near duplicates or similar documents shall not be subject to De-Duplication and will be produced.

4.    If a duplicate Document exists as part of a Document family, the duplicate will only be removed if the entire family is a duplicate (*i.e.*, a single Document will not be removed from a family even if that document, but not the entire family, is an exact duplicate).

5.    The Parties shall identify duplicate Custodians in the appropriate Metadata fields of their Load Files, such as the AllCustodians field.

H.    **Designations**

1.    Unless stated otherwise herein, each page of a produced Document shall have a legible Bates Number electronically "burned" onto the image at a location that does not unreasonably obliterate, conceal, or interfere with any information from the source document, preferably at the bottom right of each page.

2.    The Bates Numbers shall consist of a short two to eight letter prefix, associated with the Producing Party's name, followed by a zero-padded sequence of eight numbers (e.g. ABCD00000001). The prefix should include only letters, dashes, or underscores. The prefix and number should not be separated by a space. Each page in the production must be assigned a unique, sequential Bates Number. The prefix must be the same for all pages produced from the same Producing Party.

3.    Confidentiality Designations shall be "burned" onto each document's image at a location that does not unreasonably obliterate or obscure any information from the source document, preferably at the bottom left of each page.

4.    No other legend or stamp will be placed on the Document Image other than a confidentiality designation (where applicable), redactions, and the Bates Number.

I.    **Redactions**

1.    A Producing Person may redact personally identifying information ("PII"), such as dates of birth, social security numbers, account numbers, and license and passport numbers. A Producing Person may also redact private health information.

2.      All redactions shall be clearly marked on the Document over each specific portion that has been redacted. The redactions shall be performed such that the words "REDACTED" or "CONFIDENTIAL," or other applicable text, are OCR Searchable Text in black print against a white background and visible within the redaction box itself.

3.      Any failure to redact information does not waive any right to claims of privilege or privacy, or waive any objection, including relevancy, as to the specific Document or any other Document that is or will be produced.

4.      In the event a Document is redacted, the Producing Party shall withhold the redacted text for that Document.

5.      A Party may redact the contents of Metadata fields from a Load File only if producing that Metadata would reveal redacted information. Load file redactions shall be designated as "REDACTED."

6.      The Parties will apply an industry-standard OCR process to any redacted Documents, and OCR-rendered text will be provided in the multi-page text file instead of the extracted text.

**J.      Clawbacks**

1.      To the extent a Party requests the return or destruction of documents or ESI based on an inadvertent production, the Producing Party shall provide replacement slip sheets for each such document as an overlay production. The slip sheets shall identify the document as withheld on the basis of privilege or other protection and shall contain the same Bates number as the document that return was requested for.

2.      The Parties will treat any such documents that the return is requested in accordance with the Parties' Confidentiality Stipulation and Order.

**K.      File Structure**

1.      The Producing Person shall produce the following sets of files for all produced documents.

2.      *Load Files*. The Parties agree to produce Metadata for all ESI and Hard-Copy Documents in a Load File as set forth below. There is no obligation on the Producing Person to create Metadata where it does not exist and is not reasonably available. Metadata field information available from Native ESI will be extracted therefrom and will not be altered or modified from the original.

a)      Document-level Load Files (.dat or .txt) will be provided with each production and shall preserve the original document unitization.

b)      Each individual file will be renamed using a unique item identifier (that matches the Bates Number on a file-by-file basis versus a page-by-

15

page basis). Attachment associations to email and other documents (*e.g.*, embedded files) will be preserved as attachment number range fields.

c)      The first row of the Load File shall contain the column/field names. Each subsequent row shall contain the metadata for a single Document.

d)      Load Files will include the Metadata listed in **Appendix A**. For Chat Message Data, the parties shall meet and confer regarding the format and contents of the metadata to be produced.

e)      Every row of the Load File must have the same number of columns/fields (empty values are acceptable). The fields Begin Bates, End Bates, and NativePath must be present for all Documents originating as ESI. Text must be encoded in either ASCII, UTF-8, or UTF-16 as follows:

- The "comma" delimiter is "," (ASCII 020)

- The "quote" delimiter is "þ" (ASCII 254)

- The "new line" delimiter is "®" (ASCII 174)

- The first line must contain the column/field names

f)      Each production must include an Opticon formatted (.opt) delimited cross-reference image file ("**Image Load File**"), which links the TIFF images and any Native ESI to the Load File. Each line of the Image Load File represents one image and should be separated into seven, comma-delimited fields. From left to right, the fields are: (1) page identifier, (2) volume identifier, (3) image path (including the image filename and extension), (4) document marker ("Y" denotes the first page of a new document, otherwise leave blank), (5) can be used to indicate box, (6) can be used to indicate folder, and (7) page count, which is only included for the first page of a new Document. There should be a BEGDOC number in each Load File that corresponds with the name of each image in the Image Load File.

g)      All Load Files will be provided in a folder called "DATA" on the production media.

3.      ***Extracted Text and OCR Files (.txt files).*** Each production must contain a single text file for each Document, which contains all the Document's pages in text.

a)      All Documents shall be produced with the associated extractable text. If a Document does not have extractable text, or if the Document is redacted, then an industry-standard OCR process will be executed, and OCR-rendered text, if available, will be provided in the multi-page text file

instead. The Producing Person is not required to ensure that the extractable or OCR text is an exact duplicate of the contents of the Document.

b)      The extractable or OCR text will be provided in separate multi-page .txt files organized at the Document level and named with the corresponding Document name, with a corresponding path reference appearing in the TEXTLINK field of the Load File.

c)      The filename of each text file will equal the production BEGDOC number of the corresponding Document page and have a .txt file extension. Text and filenames must be encoded in UTF-8.

d)      The text files will be provided in a folder called "TEXT" on the production media.

4.      *Image Files*. Images shall be produced as black and white (or, upon reasonable request, in color if the original document is in color), Group IV compression, 300-dpi, single-page TIFF files.

a)      Images shall be labeled as follows: "<PageID>.TIF (*e.g.*, "CHDJV_ESI_00000005.TIF") (with no spaces in the file name).

b)      No other information should be provided in image filenames, including confidentiality status. Filenames must be encoded in UTF-8.

c)      Images will be provided in a folder called "IMAGES" on the production media. All images for a single Document will be in one subfolder within the IMAGES folder, and the number of ESI image files in any one subfolder will not exceed 1,000.

5.      *Native Files.* Native Files shall be produced with a placeholder image endorsed with a sequential Bates Number and Confidentiality Designation and stating: "This document produced in native file format only."

a)      The file name of the placeholder image shall match the Bates Number of the Native File, include any appropriate Confidentiality Designation, and retain the Native File extension: *e.g.*, BATES000001–CONFIDENTIAL.xls.  Filenames must be encoded in UTF-8.

b)      Each filename, including extension, must correspond to the NativePath metadata field in its corresponding Document's row in the Load File. There shall be a corresponding path reference appearing in the NATIVELINK field of the Load File for each Native File produced.

c)      Native Files will be provided in a folder called "NATIVES" on the production media.

6.      Documents that are unreadable because of imaging or formatting problems shall be promptly identified by the Receiving Party. The Producing Person and the

Receiving Party shall meet and confer to attempt to resolve problem(s), to the extent the problem(s) are within the Parties' control.

## VII.  SECURITY

A.  The Parties agree to take reasonable steps to prevent the unauthorized access, use, or disclosure of the Documents received during discovery in this action. Each Receiving Person shall treat such Documents with the same standard and duty of care with which the Receiving Person treats and protects its own Documents.

B.  In no event shall any Party access produced Documents over public wireless networks without the use of secure socket layer ("SSL") tunneling, a virtual private network conduit ("VPN"), or similarly secure networking technology in place.

C.  All Receiving Persons shall host Documents received in this action in secure systems, encrypted in transit and at rest, and otherwise subject to appropriate physical security measures, with suitable authentication systems.

## VIII.  PRIVILEGE LOG

A.  The Parties shall not be required to log any privileged, work product, or joint defense confidential communications or documents exchanged with, created, generated, or written by or at the direction of their counsel on or after January 31, 2025, to the extent such communications or documents relate to the prosecution or defense of this action.

B.  For any Documents withheld or redacted based on a claim of privilege, the Parties agree to provide for each such document the following Metadata fields (if available) to facilitate the determination of the basis of privileged claimed:[3]

- SORT NUMBER
- CUSTODIAN(S)
- BEGBATESNUMBER (redacted docs)
- EMAIL_DATERCVD
- EMAIL_TIMERCVD
- EMAIL_DATESENT
- EMAIL_TIMESENT
- LASTMODDATE
- LASTMODTIME
- CREATEDDATE
- CREATEDTIME
- AUTHOR (if applicable)
- EMAIL_FROM
- EMAIL_TO
- EMAIL_CC
- EMAIL_BCC
- EMAIL_SUBJECT

---

[3] Where a Date field includes time information, the Producing Party is not required to provide a separate Time field.

## IX.    AMENDMENTS AND DISPUTES

A.    Any practice or procedure set forth herein may be varied by agreement of the Parties and/or third parties (where applicable), confirmed in writing, where such variance is deemed appropriate to facilitate the timely and economical production of Documents.

B.    All Parties agree to negotiate in good faith any issues that arise concerning the terms of this agreement, or any other issues that arise in the course of Document productions during this action.

C.    All Parties and third parties shall meet and confer regarding requests to seek additional documents outside the scope of this agreement and/or to seek to revise the terms of this agreement if an issue arises regarding the technical ability to review and/or produce pursuant to this agreement.

D.    If the Parties and/or third parties are unable to agree; need further clarification on any issue relating to the preservation, collection, or production of ESI; or require modification of this Stipulation, any Party or third party may seek appropriate relief from the Court.

4504757

**APPENDIX A**

| Field Name | Description |
|---|---|
| BegDoc | Bates Number on first page of each document |
| EndDoc | Bates Number on last page of each document |
| BegAttach | Beginning attachment number. This is usually the first Bates Number in a bundle. *E.g.*, for an email with 3 attachments, BEGATTACH is the first page of the parent email. |
| EndAttach | Ending attachment number. This is usually the last Bates Number in a bundle. *E.g.*, for an email with 3 attachments, ENDATTACH is the last page of the last attachment. |
| Document Type | Document type shall effectively distinguish email, attachments, standalone ESI files, and Hard Copy Documents. |
| Media_Volume | Production Volume Number |
| PageCount | Number of pages |
| AttachCount | Number of attachments |
| Custodian | Name of each person from whom the file was obtained |
| AllCustodians | For de-duplicated documents, list of all custodians the duplicate copy was collected from |
| File Path | Original source file path, folder name, filename, and extension |
| All Paths | For de-duplicated documents, list of all file paths for duplicate copies |
| Filename | Document filename, including extension |
| FileExt | Document extension (.docx, .pdf, etc.) |
| MD5Hash | The calculated MD5 hash value of the document |
| Author | Document creator identified in the Metadata |
| Title | Metadata title of an electronic document |
| From | Email address of person sending an email |
| To | Email address of persons to whom an email is sent |
| CC | Email addresses of persons carbon copied on an email |
| BCC | Email addresses of persons blind carbon copied on an email |
| Subject | Subject line of an email |
| DateSent | Date an email was sent |
| TimeSent | Time an email was sent |
| DateRcvd | Date an email was received |
| TimeRcvd | Time an email was received |
| MessageID | Unique message id from internet headers |
| ThreadID | Email thread identification for an email |
| Time_Zone | Time zone in which document is processed |
| CreatedDate | Date document was created (mm/dd/yyyy) |
| CreatedTime | Time document was created |
| LastModDate | Date document was last modified (mm/dd/yyyy) |
| LastModTime | Time document was last modified |
| Designation | Confidentiality Designation |
| TextPath | Relative file path of text record within production, including filename and extension of the text file within the production |

| Field Name | Description |
|---|---|
| NativePath | Full relative path to the current location of the native or near-native document used to link to native produced file, including filename and extension of native file within the production<br>(Only for documents produced in native format) |
| Placeholder | If Bates stamped document is produced with a placeholder image (values: Y or N) |
| Hash | MD5 Hash value for de-dupe. |
| Redacted | Whether the document contains any redactions (values: Y or N) |
| SortDate | Date field used to pair attachments to parent documents for purposes of chronological sorting, which may include two subfields for FAMDATE and FAMTIME. |

**SO STIPULATED.**

/s/ Amy L. Ruhland
PILLSBURY WINTHROP SHAW PITTMAN LLP
Amy L. Ruhland (admitted *pro hac vice*)
Abigail L. Griffith (admitted *pro hac vice*)
401 West 4th Street, Suite 3200
Austin, TX 78701
(512) 580-9600
amy.ruhland@pillsburylaw.com
abby.griffith@pillsburylaw.com

Patricia Rothenberg
31 West 52nd Street
New York, NY 10019
(212) 858-1000
patricia.rothenberg@pillsburylaw.com

*Attorneys for Plaintiff Apex Group Capital Advisors LLC*

/s/ Nicole Gueron
CLARICK GUERON REISBAUM LLP
Nicole Gueron
David C. Kimball-Stanley
Elizabeth R. Baggott
41 Madison Avenue, 23rd Floor
New York, NY 10010
ngueron@cgr-law.com
dkimballstanley@cgr-law.com
ebaggott@cgr-law.com

*Attorneys for Defendants Related Fund Management LLC and James Kraus*

/s/ Laurie N. Patton
SPENCER FANE LLP
Laurie N. Patton (admitted *pro hac vice*)
5700 Granite Parkway, Suite 650
Plano, Texas 75024
(972) 324-0300
lpatton@spencerfane.com

Kunal Shah
Elizabeth Conway
43 West 43rd Street, Suite 268
New York, NY 10036-7424
(972) 324-0334
kshah@spencerfane.com
econway@spencerfane.com

*Attorneys for Defendant William C. Chaney*

/s/ Wilson E. Wray, Jr.
ATWOOD & MCCALL PLLC
Wilson E. Wray, Jr. (admitted *pro hac vice*)
Austin F. Pennington (*pro hac forthcoming*)
8150 North Central Expressway, Suite 1100
Dallas, TX 75206
(972) 665-9600
wwray@atwoodmccall.com
apennington@atwoodmccall.com

SADIS & GOLDBERG LLP
Samuel J. Lieberman
Jennifer Rossan
Scott Ferrier
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-8164
slieberman@sadis.com
sferrier@sadis.com
jrossan@sadis.com

*Attorneys for Defendant Preston Callen*

/s/ Samuel J. Lieberman

SADIS & GOLDBERG LLP
Samuel J. Lieberman
Jennifer Rossan
Scott Ferrier
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-8164
slieberman@sadis.com
sferrier@sadis.com
jrossan@sadis.com

*Attorneys for Defendant Ryan Hope*

/s/Stephanie K. Osteen

FARROW-GILLESPIE HEATH WILMOTH LLP
Stephanie K. Osteen (admitted *pro hac vice*)
Caylin Cierra Craig (admitted *pro hac vice*)
1900 North St. Paul Street, Suite 2100
Dallas, TX 75201
(214) 361-5600
stephanie.osteen@fghwlaw.com
caylin.craig@fghwlaw.com

SADIS & GOLDBERG LLP
Samuel J. Lieberman
Jennifer Rossan
Scott Ferrier
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-8164
slieberman@sadis.com
sferrier@sadis.com
jrossan@sadis.com

*Attorneys for Defendant Lucas Belinkie*

**SO ORDERED.**

SIGNED on _____4/24/2026_____

_____
Honorable Valerie Caproni
United States District Judge