# Exhibit A

Q4RGapeC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

APEX GROUP CAPITAL ADVISORS
LLC f/k/a SANDSPOINT CAPITAL
ADVISORS LLC,

                Plaintiff,

        v.                          25 Cv. 8892 (VEC)
                                    Telephone Conference
RELATED FUND MANAGEMENT, LLC,
*et al.*,

                Defendants.

------------------------------x
                                    New York, N.Y.
                                    April 27, 2026
                                    12:00 p.m.

Before:

                HON. VALERIE E. CAPRONI,

                                    District Judge

                    APPEARANCES

PILLSBURY WINTHROP SHAW PITTMAN LLP
     Attorneys for Plaintiff
BY:  AMY RUHLAND
     BRIAN BECKERMAN

WINSTON & STRAWN LLP
     Attorneys for Defendants Related Fund Management LLC,
James Kraus
BY:  NICOLE GUERON
     DAVID KIMBALL-STANLEY

FARROW-GILLESPIE HEATH WILMOTH LLP
     Attorneys for Defendants Lucas Belinkie, Preston Callen,
William Chaney, Ryan Hope
BY:  SAMUEL LIEBERMAN
     SCOTT FERRIER

Q4RGapeC

(The Court and all parties appearing telephonically)

THE COURT:  There are a lot of people on this call, so you need to identify yourself each time before you speak.  Try to wait until whoever else is speaking to stop talking, because otherwise, the court reporter is not going to be able to keep a rational transcript.

So I've read a description of what you have communicated to my law clerk is the issue.  Let me say my understanding of the issue is that the defendants believe that the plaintiff has not adequately identified -- please mute your phone if you are not speaking; I am getting feedback.  So the main dispute is the defendants' contention that the plaintiff has failed to adequately describe in response to an interrogatory question exactly what the trade secret is that plaintiff contends that the defendants have taken.

Mr. Ferrier and Mr. Kimball-Stanley, is that an adequate description of the dispute?

MR. FERRIER:  Yes, your Honor, that is an adequate description of the dispute.  Again, happy to provide more detail or answer any questions that you have.

THE COURT:  Well, let's start with Mr. Beckerman.

Mr. Beckerman, why do you believe that you have adequately described the trade secret?

MR. BECKERMAN:  Your Honor, this is a case where there could be many thousands of trade secrets at issue.  As stated

Q4RGapeC

in the complaint, surrounding the time of their departure from plaintiff, the defendant employees downloaded tens of thousands of documents, approximately 41,000 documents to be more precise, from plaintiff's database.  These were not ordinary course downloads.  The download volume didn't comport with their historical download volume, with some of the defendants downloading thousands of documents on the eve of their departure.

To give your Honor a sense of the documents, the downloads include such things as multiple client lists, client work products such as financial analyses, dilation documents, client strategy documents.  Plaintiff is still going through the process of reviewing all of the documents that were downloaded.  It's hundreds of gigabytes of data.  Base stamping them and categorizing them, that takes time.

Critically here, your Honor, plaintiff doesn't yet know which of the 41,000 documents were further misappropriated by the employee defendants beyond just being downloaded on their work laptops.  We know that when these downloads were happening that the defendant employees had personal e-mails open, access to personal Google drives, USB devices plugged in, things like that.  That's about all we know for the vast majority of the 41,000 documents until we receive discovery from the defendant employees, which we've been waiting on.

So defendant employees' interrogatories demanding that

Q4RGapeC

plaintiffs identify and describe all trade secrets at issue and how they were used and how this information is so uniquely valuable to qualify the trade secret, respectfully, your Honor, puts the proverbial cart before the horse, and it also violates Local Rule 33.3.  These interrogatories were propounded before the parties had agreed to a protective order or an ESI protocol and before a single document had been produced in this case. They are precisely the sort of contention -- sorry, your Honor.

THE COURT:  Hold on a second.  Hold on to that for a second.

Do you now have an ESI protocol and a protective order?

MR. BECKERMAN:  Yes, your Honor.

THE COURT:  OK.  So that may be a football, but let's move forward from that since there now is an ESI protocol and a protective order.

MR. BECKERMAN:  Yes, your Honor.

THE COURT:  I hear you.  On the other hand, you brought the lawsuit.

How do you expect the defendant to defend when you are not identifying what you believe are the trade secrets that they stole?

MR. BECKERMAN:  So, your Honor, we have identified ten categories of trade secrets, and for half of those categories, specific documents that were produced by the employee

Q4RGapeC

defendants.  As far as other trade secrets which were misappropriated, we are still waiting on that discovery to learn exactly which of the documents of the 41,000 were misappropriated.

What we've done, your Honor, is on Friday, this past Friday, we produced a massive report showing all of the documents by file name that were downloaded during the relevant time period, all 41,000 of the documents, all trade secrets that plaintiffs will ultimately be claiming were misappropriated by defendant employees in this action other than, of course, any misappropriated trade secrets plaintiff is currently unaware of is going to be on those reports.  The reports show the file name, the downloader, the date of download, among other things, and they give the employee defendants exactly what they requested, guardrails for discovery.  Put more simply, your Honor, employee defendants can look at those reports and then produce any documents relating to the documents that were downloaded.

So the short of it, your Honor, is until we know exactly what the employee defendants did with any of those 41,000 documents -- for example, did they send it to their personal e-mails, did they send it to competitor IQ-EQ -- plaintiff is limited in what it can disclose on these in response to these interrogatories.  We would submit, your Honor, that that's exactly the reason why the Local Rule 33.3

Q4RGapeC

is in place.

Of course, by the end of discovery, plaintiff will ultimately supplement its interrogatory responses identifying the trade secrets at issue in the case that were misappropriated by defendant once we find out.  But, your Honor, plaintiffs would respectfully submit that the time for doing so is later in discovery, not now in discovery when discovery has just begun.

THE COURT:  OK.  Mr. Ferrier, are you taking the lead on this?

MR. FERRIER:  Yes, your Honor.  I'd like to respond on several points.  One, as you brought up --

THE COURT:  Hang on a second before you start talking.  One of the things I was going to suggest was that the plaintiffs identify the stolen documents.  It sounds to me like they have done that.  So take that into account that that seems to me to largely give you what you need in order to proceed at this stage of the case.  Tell me why that's not true.

MR. FERRIER:  One, your Honor, they haven't identified that document to us.  And if it is the document that I think Mr. Beckerman is speaking about, it really only identifies 65 -- well, I don't know what document he's specifically referring to in his production from Friday.  He hasn't given me a base number or any identification to a document that lists 41,000 downloads from the defendant.

Q4RGapeC

THE COURT:  You are telling me you don't know what he is talking about?

MR. FERRIER:  So if it is -- not specifically; right? If I am thinking of the document he's referring to, I believe it shows 65 downloads from the employee defendants to non-Apex devices, however, he has not specifically identified this document.

THE COURT:  Hang on.

Mr. Beckerman, is that the production that you were talking about?

MR. BECKERMAN:  No, your Honor.  On this past Friday, three days ago, we produced seven files that are titled -- for example, one of them is "October files 10/22/2024, to 10/31/2024."  It's seven files.  We are grabbing the base right now.  We are happy to provide them to opposing counsel.  But no, the document he just mentioned that's only 60, that's not what I had in mind, your Honor.

MR. FERRIER:  Your Honor, I think that he is misreading the document too.

THE COURT:  Sorry?

MR. FERRIER:  I think Mr. Beckerman may be misreading the document.  This is Mr. Ferrier.  I apologize.

THE COURT:  What do you mean he's misreading the document?

MR. FERRIER:  Well, he keeps claiming that these

Q4RGapeC

documents show that we downloaded hundreds of thousand of files, but from what I have seen of these documents that he's referring to, they show downloads to the work computers that were returned to Apex.  So I'm not sure where in them he's referring to.  And this is the larger point; right?

THE COURT:  No.  Hang on, Mr. Ferrier.  He explained to you what the theory is.  The theory is these were abnormal downloads right before these men left the company.  He doesn't know right now whether those documents moved from their laptops or they were duplicated from the Apex laptop to a personal device of the defendants.  That's what he's asking for in discovery.

MR. FERRIER:  Right.  What I am saying too and the larger issue here is that our interrogatory that we have propounded requests that they identify a trade secret, right, their trade secrets.  They allege that these guys downloaded thousands of documents, and the employee defendants have produced 364 documents.  They should be able, from those sets of documents, to specifically identify which ones contain their trade secrets and where in those documents the trade secrets are located.

Moreover, this is a general rule in trade secrets claims.  In prediscovery into a defendant's documents and into the trade secret claims, a plaintiff must provide with reasonable particularity what the trade secrets is.  This

Q4RGapeC

includes identifying documents and specific locations within documents where the trade secret is located.  We've cited to them the *Rocket Pharmaceutical*s case, which is directly on point.  In that case, the defendants had produced 631 documents.  Here, we have produced 364.  In that case, the Court ordered the plaintiff to directly identify which documents were its trade secrets and where in those documents the trade secrets were located.  We would request a similar order here.

THE COURT:  I'm sorry.  You are looking for them to tell you, of the documents that you have acknowledged to them that your clients took, where within those 65 documents are trade secrets?

MR. FERRIER:  Yes, where in those 64.  Exactly, your Honor.  And also I would want -- if they are claiming we took 40,000 documents, I would like a specific identification as to which of the 40,000 are their trade secrets, are they claiming are their trade secrets.

THE COURT:  Well, I'm not sure that you need that if your response is you didn't take any of those.  If you did take them, that's a different story.  So that's a matter of how do you state the discovery; right?

MR. FERRIER:  Right. I would say those -- if they are claiming we took them, for us to be able to look and see if we have them or not, they need be able to identify them.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q4RGapeC

THE COURT:  Well, that's what they've identified to you.  They told you what the documents are.  There were unusual downloads from the plaintiff's system.  Your client should know whether they moved those documents from Apex laptops onto their personal devices or not.  Specifically, what page and line of any given document contains trade secrets is not necessary for your client to respond to discovery saying did you take those materials.

MR. FERRIER:  So we produced 364 documents already.  So those are the documents from their system that we have in our possession; right?  Those are the ones --

THE COURT:  And you are saying there are no others?

MR. FERRIER:  Yes, correct.

THE COURT:  Mr. Beckerman, if that's it, I'm not sure where you are going with this.  If they represented and they are saying under oath that the 364 documents are the only documents they removed from Apex, where does that leave you with your 40,000 documents?

MR. BECKERMAN:  Your Honor, again, we don't think the 360 documents or so that we've received so far is remotely close to all of the documents that were misappropriated.  We think further discovery is going to show that.  And with respect to the prior issue of defendants' request, that we go through tens of thousands, hundreds of thousands of documents or rows in these Excels and identify which of those are trade

Q4RGapeC

secrets before defendants produce discovery showing which ones are actually misappropriated, it would be incredibly burdensome, your Honor.  I just wanted to mention that.

And I now have the base stamps available just so the record is clear for the other side.  It's at Apex 17, Apex 16, and Apex 08.  Those are the audit reports, or the Agnite reports, I believe they are called, showing all of the documents downloaded.  To directly answer your question, your Honor, we don't think that the 360 documents is remotely close to the volume of documents that were actually misappropriated.

MR. FERRIER:  Your Honor, if I may.  I think that the point is the plaintiffs need to identify what their trade secrets are.  There's cases saying that a trade secret plaintiff needs to specifically state what its trade secret is and where it's located.  Again, we produced 364 documents. They should be able to tell us so we can -- even if it is so we can do an additional search, what is the trade secret, where is the trade secret, how was it used.  They haven't done this.

THE COURT:  Well, I'm not understanding why they need to do that for you to further determine whether you have taken any of their documents.  What isn't making a lot of sense to me is your representation that you have dutifully done the search and you know that the employee defendants only took 364 documents, which you have now provided back to the plaintiff.

But you say if they can identify what the trade

Q4RGapeC

secrets are in there, you can go do some further searching. Your clients know what they took or what they would move onto personal instruments from the Apex laptops.  I mean, it defies reason that they don't know.

MR. FERRIER:  Again, our position is we've returned the documents that we have from Apex.  Apex is now claiming some nebulous universe of documents that we have or removed from devices that we returned to them, but they have no proof of that, and they haven't given us any information to that extent.  And again, the case law says if they are claiming a trade secret, it's their burden to tell us what the trade secret is.  We just keep getting nebulous things like "all workbooks."

THE COURT:  So I haven't seen the list of the ten categories.  Mr. Beckerman, give me a sense of what's on your list of categories of trade secrets.  The stuff that you started out talking about seems clearly to be trade secrets, things like client lists, evaluation documents, plans for clients, the like.

If that's the sort of things that's on the list, Mr. Ferrier, I don't quite understand what your objection is.

MR. BECKERMAN:  Yes, your Honor.  Just to give you some examples:  number one, plaintiff contends that client lists containing client contact information, pricing, and services is a trade secret.  Number three, plaintiff contends

that the processes and formulas used to create proprietary workbooks is trade secret information. And then we list one, two, three, four, five, six, seven different documents by their base number. Plaintiffs contend that its pricing data, including but not limited to Chaney 1713, Chaney 1845, Chaney 1847, and Chaney 1853-55 is trade secret information. I could keep going, your Honor, but that's a sampling.

THE COURT:  That's adequate, Mr. Beckerman.

Mr. Ferrier, I'm not sure what you are looking for that isn't within that.

MR. FERRIER:  Your Honor, the one he skipped is number two. Plaintiff contends all information contained in the proprietary workbooks and reports it produces for its clients other than the client's raw data constitutes trade secret information. It cites to one document that was created by Related Fund Management, and they don't even tell us where in this document is the client data versus what is their proprietary information.

Similarly, where they disclose formulas to number three, they claim formulas are their trade secrets. They don't point to any specific formula in those documents. If I go look at those documents, what are in them is simple sum, subtraction, multiplication, division. That can not be their trade secrets. If it is and they are claiming those are its trade secrets, they need to tell me that. They can't just

Q4RGapeC

claim nebulous formulas are their trade secrets or formulas that are embedded in a document.  That doesn't define what we are talking about here.  It keeps it in the general nebulous area where we don't even know what the trade secret is, then.

The other problem is, two, I have to then craft search terms over this.  When I ask for all workbooks, what I get back from Mr. Beckerman and the team is that's too broad and vague for a search term.  This is the problem.  I don't know what to ask for in search terms to come up with documents that are what they are claiming are their trade secrets.

THE COURT:  Mr. Beckerman, what did you call them, "workbooks"?

MR. BECKERMAN:  Yes, your Honor.  Yes, so category number two, he mentions we've only identified one document. Again, your Honor, that's the document we are aware of.  To the extent that there are other documents like that, that contain the proprietary workbooks and reports that plaintiff produces for its client, the defendants should know that.  The defendant should know what other workbooks and reports were taken from plaintiff.

And again, on Friday, we just produced an Excel listing all of the documents that were downloaded.  And so they can refer to that report and then see which ones did they send to their personal e-mail, which ones did they send to their Google drives.

Q4RGapeC

THE COURT:  No, no.  That's not my question.  Sorry. My question is:  A workbook, is that a document?  It's called workbook?  Is it a document that's called something else?

MR. BECKERMAN:  I'm not sure if that's necessarily the title of the document, your Honor.  It's how, internally, we refer to them.  The client refers to these reports, but they are physical documents.  And we include as an example one of the documents that Mr. Chaney produced, Chaney 944, that gives them an example and an indication of what we are talking about.

MR. FERRIER:  Yes, your Honor.  He gives one example, but he claims that their trade secrets include but are not limited to that one example.  Again, they filed a complaint where they claimed we downloaded thousands of document.  I would expect in this interrogatory response more than one workbook that's identified, names of the workbooks, where in the workbook is their trade secret.  All I get is one document that they claim include but are not limited to their trade secret.  It's not helpful.  Go ahead, your Honor.  Sorry.

THE COURT:  I disagree.  I think that the defendants are being unreasonable at this point.  But I'll give you an opportunity to give me:

One, I need to see the list of the ten categories. Because in the abstract, that seems like it should be adequate, but I'd like to see them.

Second, I'll give you an opportunity, up to a

Q4RGapeC

three-page letter brief, to explain to me why the detail -- why what they are providing you is inadequate under established Second Circuit law at this stage of the litigation for purposes of discovery.

How long would you like to submit that?

MR. FERRIER:  Your Honor, I think if it's three pages, we can get you something by the end of this week, if that works.

THE COURT:  OK.  That would be by May 1.

Mr. Beckerman, you also have three pages to respond, and your response is due May 8.  In either one of them — in the May 1 submission would be the most useful place for it — can you also include the list that they have provided you of the ten categories of trade secrets that they contend have been misappropriated?

MR. FERRIER:  Yes.

THE COURT:  OK.  I encourage the parties to meet and confer again rather than proceeding down the route of submitting letters to me.  If you can't work it out yourself based on this telephone conversation, then, Mr. Ferrier, the defendants' letter is due on May 1, and the plaintiff's letter is due on May 8.  I think that you all could probably work this out between you if you try.  OK.

Anything further from the plaintiff, Mr. Beckerman?

MR. BECKERMAN:  No, your Honor.  Thank you.

Q4RGapeC

THE COURT:  Anything further from related, who seems incredibly quiet during this call, Mr.  Kimball-Stanley?

MR. KIMBALL-STANLEY:  Nothing further from us.

THE COURT:  OK.  And how about you, Mr. Ferrier?

MR. FERRIER:  Nothing further, your Honor.  Thank you.

THE COURT:  All right.  Thanks everybody.

(Adjourned)