# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| APEX GROUP CAPITAL ADVISORS LLC F/K/A SANDSPOINT CAPITAL ADVISORS LLC, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:25-cv-08892 |
| RELATED FUND MANAGEMENT, LLC; IQEQ US MANAGEMENT CO., LLC; JAMES KRAUS; LUCAS BELINKIE; PRESTON CALLEN; WILLIAM C. CHANEY; and RYAN HOPE, | § § § § § § § | |
| Defendants. | § | |

**PLAINTIFF'S ~~FIRST~~SECOND AMENDED COMPLAINT**

Plaintiff Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex Capital") brings this ~~First~~Second Amended Complaint against Related Fund Management, LLC ("Related"), James Kraus, in his capacity as Chief Financial Officer of Related ("Kraus"), IQEQ US Management Co., LLC ("IQEQ"), Lucas Belinkie ("Belinkie"), Preston Callen ("Callen"), William Chaney ("Chaney"), and Ryan Hope ("Hope") (the "Former Employees" and, collectively with Related ~~and~~, Kraus, and IQEQ, the "Defendants").  In support thereof, Apex Capital alleges as follows:

**INTRODUCTION**

1.    This case arises from a ~~conspiracy between Related and Kraus, on the one hand, and several management-level employees of plaintiff Apex Capital, including Belinkie, Callen, Chaney, and Hope (the "Former Employees"), on the other hand, to move an entire business line and professional group~~coordinated scheme to dismantle a critical business line of Apex Capital, transfer it to Apex Capital's direct competitor~~, IQ-EQ US Management Co., LLC ("IQ-EQ") and~~

~~to~~ IQEQ, and steal Apex Capital's confidential information, intellectual property, and trade secrets in the process.

2. The scheme was neither accidental nor the product of ordinary marketplace competition. Rather, it was a deliberate and carefully orchestrated effort that depended on the active participation of all Defendants. Defendants acted in concert to engineer a seamless migration of Related's business from Apex Capital to IQEQ by raiding Apex Capital's workforce, appropriating Apex Capital's confidential information and trade secrets, and leveraging those resources so IQEQ could seize Related's accounts with minimal disruption and maximum benefit to themselves. Each Defendant stood to benefit from the conspiracy, and each took deliberate steps to advance it.

3. ~~In furtherance of the conspiracy~~The Former Employees served as the engine of the scheme by taking the people, know-how, trade secrets, and confidential information that made Apex Capital's services to Related valuable. Acting in concert with the other Defendants, the Former Employees breached the confidentiality, non-competition and non-solicitation provisions of their Employment Agreements and unlawfully downloaded and stole information from their Apex Capital work systems. ~~Related and Kraus, for their part, knowingly induced~~Their conduct enabled IQEQ to seize Related's account using not only the same employees, institutional knowledge, and proprietary know-how that Apex Capital had already developed, but also Apex Capital's confidential information, proprietary data, work product, and trade secrets that the Former Employees ~~to breach their Employment Agreements and encouraged them to steal data~~ had wrongfully acquired and retained.

4. ~~from Apex Capital to facilitate Related's move to IQ-EQ. Meanwhile,~~ Related and Kraus ~~actively concealed their intentions~~ensured that the scheme achieved its ultimate

Page 2

objective by steering Related's business away from Apex Capital, while concealing their intentions until the transition could be completed.  Related and Kraus induced Apex Capital to hire new dedicated personnel and to reassign existing personnel to service Related's accounts, andall while planning to terminate that relationship.  Related also manufactured and amplified complaints aboutconcerning Apex Capital's service to justify a premature termination of the parties' contract and to justify Related's refusalservices—including complaints arising from employee departures that Defendants themselves were coordinating—to create a pretext for prematurely terminating the parties' contractual relationship and refusing to pay for services rendered.  Defendants did all of this immediately on the heels of Apex Capital's final acquisition of a line of business largely dependent on revenue from the Related relationship and knowing that their actions would destroy Apex Capital's enterprise value.

5.    IQEQ became the vehicle through which the scheme was carried out.  Once IQEQ agreed to employ the Former Employees and pursue the Related opportunity—an account that Belinkie and Chaney admitted "IQEQ would love to steal"—IQEQ worked hand-in-hand with Related to execute the transition.  IQEQ drafted emails and talking points for Related to send to Apex concerning the transfer of Related's business, the migration of data, and the information required to effectuate the transition.  IQEQ also aggressively recruited Apex Capital personnel despite knowing they were subject to restrictive covenants.

6.    Together, Defendants executed a coordinated plan that struck at the heart of Apex Capital's business.  Their actions were directed toward a common objective: moving the Related relationship from Apex Capital to IQEQ by appropriating the personnel, confidential information, trade secrets, and proprietary know-how that Apex Capital had already developed to service Related's accounts.

7.    Defendants carried out their plan at a moment when they knew it would inflict maximum harm on Apex Capital.  Defendants executed this scheme immediately after Apex Capital completed the final stage of an acquisition whose value depended substantially on the longstanding Related relationship.  Defendants knew that removing both the Related account and the team responsible for servicing it would inflict severe damage on Apex Capital's business and enterprise value.

8.    As a direct and proximate result of Defendants' ~~actions~~conduct, Apex Capital has suffered~~,~~ substantial damages and continues to suffer~~,~~ irreparable harm.

## THE PARTIES

9.    ~~1.~~ Apex Capital is a single-source financial solutions provider that works with asset managers, allocators, financial institutions, and family offices.  Apex Capital is a Delaware limited liability company that does business and maintains an office located at 500 East John Carpenter Fwy, Suite 500, Irving, Texas 75062.

10.    ~~2.~~ Related provides real estate asset investment and advisory services to private funds, institutional investors, and high-net-worth clients worldwide.  Related is a Delaware limited liability company headquartered in New York, New York at 30 Hudson Yards, 83rd Floor New York, New York 10001 and does business and maintains an office located at 611 South Congress Ave., Suite 320, Austin, Texas 78704.  Related has been served with process and has appeared in this lawsuit.

11.    ~~3.~~ Kraus is the Chief Financial Officer of Related.  On information and belief, Kraus is a citizen of the state of Connecticut.  Kraus has been served with process and has appeared in this lawsuit.

12.    IQEQ is an investor services group that works with fund managers, multinational companies, family offices, and private clients.  IQEQ is a limited liability company, with offices maintained throughout the United States, including in New York.  IQEQ does business at and maintains an office at 250 West 57th Street, New York, New York 10107.  IQEQ is a direct competitor of Apex.

13.    4. Belinkie is a citizen of the state of Texas and, on information and belief, resides at 3807 Holland Avenue, Dallas, Texas 75219.  Until December 4, 2024, Belinkie was Head of Real Assets Product – Americas at Apex Capital.  Belinkie has been served with process and has appeared in this lawsuit.

14.    5. Callen is a citizen of the state of Texas and, on information and belief, resides at 521 Blackfield Drive, Coppell, Texas 75019.  Until December 20, 2024, Callen was Assistant Manager, Real Assets at Apex Capital.  Callen has been served with process and has appeared in this lawsuit.

15.    6. Chaney is a citizen of the state of Texas and, upon information and belief, resides at 2717 Howell Street, Apt. 2103, Dallas, TX 75204.  Until December 13, 2024, Chaney was Senior Manager, Real Assets at Apex Capital.  Chaney has been served with process and has appeared in this lawsuit.

16.    7. Hope is a citizen of the state of Texas and, on information and belief, resides at 6216 Flagstone Drive, McKinney, Texas 75070.  Until December 13, 2024, Hope was Manager, Real Assets at Apex Capital.  Hope has been served with process and has appeared in this lawsuit.

**JURISDICTION AND VENUE**

17.    8. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because Apex Capital's claim for misappropriation of trade secrets arises under the federal Defend Trade Secrets Act, U.S.C. § 1831, *et seq*. This Court has supplemental jurisdiction over the remaining causes of action pursuant to 28 U.S.C. § 1367(a).

18.    9. This Court has personal jurisdiction over Related because it ~~maintains an office in New York and regularly conducts~~has a principal place of business in New York and the claims asserted herein arise from Related's transaction of business and other conduct in New York.

19.    10. This Court has personal jurisdiction over Kraus because he is employed by Related in New York and regularly conducts business in New York.

20.    This Court has personal jurisdiction over IQEQ because it maintains an office in New York, regularly transacts business in New York, and the claims asserted herein arise from or relate to IQEQ's transaction of business and other conduct in New York.

21.    11. Belinkie, Callen, Chaney, and Hope explicitly consented to personal jurisdiction in this Court by seeking transfer of the claims in this lawsuit to this Court from the United States District Court for the Northern District of Texas.

22.    12. Venue is proper pursuant to the Order of the United States District Court for the Northern District of Texas, which transferred the lawsuit to this Court.

23.    Venue is also proper pursuant to 28 U.S.C. § 1391 because Related and IQEQ reside in this judicial district and conduct business in this judicial district.

**JURY DEMAND**

24.    13. Apex Capital demands a trial by jury on all issues triable in this lawsuit.

## STATEMENT OF FACTS

I. **Apex Group Ltd. Creates and Carefully Protects Proprietary Systems for Servicing Clients in the Financial Services Industry**

25. ~~14.~~ Apex Capital is an indirect subsidiary of Apex Group Ltd. ("Apex Group"). Apex Group is a global financial services provider with over 13,000 employees across 112 offices worldwide.  Apex Group offers clients a broad range of services, including fund administration, corporate services, ESG advisory services, digital banking, and custody solutions.  Apex Group aims to provide the highest standards of innovative technology at a fair price with a talented team across the globe.

26. ~~15.~~ To provide services to clients across its platform, Apex Group uses a licensed database in connection with proprietary spreadsheets that generate specific, customized reports for each individual client.  Apex Group and its subsidiaries, including Apex Capital, develop client-specific, customized reports over a period of years, based on their understanding of each client's needs and specifications.  In the case of Related, Apex Capital developed intricate spreadsheets to service Related's accounts based on Apex Capital's understanding of Related's business needs.  These spreadsheets were developed over the course of a nine-year contractual relationship.

27. ~~16.~~ In addition, Apex Group prepares and provides company- and client-specific trainings to its employees.  These trainings allow employees to provide the highest standards of service to Apex Group's clients.  The trainings also allow Apex Group and its subsidiaries, including Apex Capital, to provide tailored service to each individual client and fund.  Apex Group and its subsidiaries, including Apex Capital, have expended and continue to expend significant time, effort, and money to develop their relationships with customers, to learn their customers' specific business needs (including developing best practices to service those

customers), to develop substantial contacts and goodwill with their customers, to train employees using Apex Group's proprietary systems, and to market and provide specialized services to customers.

28.     17. To operate its business and service its customers, Apex Capital provides its employees, including the Former Employees, access to Apex Capital's confidential information and trade secrets as necessary.  The confidential information and trade secrets to which the Former Employees had access included financial, organizational, and operational information, the revenues, gross and net income, compensation and profitability of Apex Capital and its employees, customers, and affiliates, investment research reports, the identity of Apex Capital's clients, customers, prospective clients, and prospective customers, information about customers' preferences, business plans, and strategies, and strategic methods for specific client servicing, including deliverables data and strategic plans.

29.     18. Apex Capital's confidential and trade secret information creates a significant competitive advantage for Apex Capital.  The information would be an irreparably harmful tool in the hands of Apex Capital's competitors.  To protect its considerable investment in developing its confidential and trade secret information, Apex Capital carefully protects the secret nature of these materials.  For example, Apex Capital (and the Apex Group of companies) utilizes password-protected, secure, cloud-based systems, networks, and computers to store and maintain confidential information and trade secrets.  Apex Capital further limits access to its secure systems to employees and other authorized individuals.  Apex Group also requires all employees in the Apex Group family to abide by written policies and procedures regarding data management, information security, and content access standards.  Among those policies and

procedures is a Data Privacy and Data Protection Policy, which defines all non-public information as "Confidential Data" that may not be shared with third parties without permission.

30.    19. Further, a Code of Conduct and Ethics Policy requires employees to treat the information they receive in the course of their employment as confidential.

31.    20. Apex Capital also limits employee access to its confidential and trade secret information to what is reasonably needed to perform their duties on behalf of Apex Capital. Finally, Apex Capital requires employees who have access to Apex Capital's confidential information and trade secrets to sign agreements mandating that they maintain in confidence all of Apex Capital's confidential and trade secret information.

32.    21. Apex Capital's efforts and successes have allowed it to develop goodwill and relationships with its customers. In turn, these efforts and successes benefit Apex Capital's employees, who develop relationships with Apex Capital's key customers and receive confidential information regarding those customers. Apex Capital developed its trade secrets, confidential information, and other valuable proprietary data which are not readily ascertainable to Apex Capital's competitors solely for Apex Capital's use and benefit. Protecting the confidentiality of this information is essential to maintaining its value and commercial benefit to Apex Capital. Thus, the disclosure and use of this confidential and trade secret information would irreparably harm Apex Capital.

## II.    Apex Group Acquires SandsPoint

33.    22. In August 2022, following robust due diligence pursuant to mutual non-disclosure agreements, Apex Group acquired a majority of the outstanding member interests of SandsPoint Capital Advisors LLC ("SandsPoint"), with the option to acquire the remaining shares of SandsPoint if certain earnings milestones were met. The acquisition was driven, in

large part, by SandsPoint's expertise and specialization in the real estate market. As Apex Group publicly described: "The addition of the SandsPoint business deepens the Group's existing Real Estate service offering in the US and will add assets under administration . . . of over $30bn, serviced by 70 employees, based in Dallas, Texas."

34. 23. At the time of the acquisition, Related was one of SandsPoint's largest clients, generating a substantial portion of the company's annualized net revenue. As a result, SandsPoint's enterprise value for acquisition purposes was driven in large part by the company's existing and long-term relationship with Related. For that reason, it was important to retain key SandsPoint personnel in the acquisition, including the Former Employees. To that end, Apex Group promised and paid large retention bonuses to each of the Former Employees.

35. 24. Following the acquisition, SandsPoint changed its name to Apex Group Capital Advisors LLC (the Plaintiff herein). All legacy SandsPoint personnel, including the Former Employees, continued in their same capacities and became employees of Apex Capital under the same terms and conditions set forth in the Employment Agreements described below.

III.      The Former Employees Enter Into Employment Agreements with Apex Capital

36. 25. As discussed below, the Former Employees each entered into an employment agreement with Apex Capital. The Employment Agreements subjected the Former Employees to substantively identical obligations concerning confidentiality and non-disclosure of Apex Capital's confidential and trade secret information, non-competition, and employee non-solicitation.

37. 26. The restrictions in the Employment Agreements sought to protect the goodwill and reputation that Apex Capital (and its predecessor, SandsPoint) had developed in the marketplace and to prohibit unfair competition in the form of exploitation of the relationships

and proprietary information that Apex Capital/SandsPoint had developed, including the resources expended to build, support, and protect their customer base and employee relationships.

### A.    The Belinkie Agreement

38.    ~~27.~~ On August 23, 2013, as a condition of his employment with Apex Capital's predecessor SandsPoint, Belinkie executed a letter agreement with SandsPoint (the "Belinkie Agreement").

39.    ~~28.~~ The Belinkie Agreement set forth employment restrictions that were intended to protect SandsPoint's (and later, Apex Capital's) legitimate business interests.

40.    ~~29.~~ Pursuant to the Belinkie Agreement, Belinkie agreed to protect Apex Capital's confidential information and trade secrets and not to make any unauthorized disclosure of that information to any third party:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .

> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

41. 30. Pursuant to the Belinkie Agreement, Belinkie also agreed not to work for a competitor of Apex Capital for 12 months after the termination of his employment with Apex Capital:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

42. 31. Pursuant to the Belinkie Agreement, Belinkie further agreed not to solicit or induce other Apex Capital employees from terminating employment with Apex Capital:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

43. 32. The Belinkie Agreement stated that it would inure "to the benefit of the Company and its successors and assigns," including Apex Capital.

**B.      The Chaney Agreement**

44.    ~~33.~~ On October 18, 2015, as a condition of his employment with Apex Capital's predecessor SandsPoint, Chaney executed a letter agreement with SandsPoint (the "Chaney Agreement").

45.    ~~34.~~ The Chaney Agreement set forth employment restrictions that were intended to protect SandsPoint's (and later, Apex Capital's) legitimate business interests.

46.    ~~35.~~ Pursuant to the Chaney Agreement, Chaney agreed to protect Apex Capital's confidential information and trade secrets and not to make any unauthorized disclosure of that information to any third party:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or

any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

47. 36. Pursuant to the Chaney Agreement, Chaney also agreed not to work for a competitor of Apex Capital for 12 months after the termination of his employment with Apex Capital:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

48. 37. Pursuant to the Chaney Agreement, Chaney further agreed not to solicit or induce other Apex Capital employees from terminating employment with Apex Capital:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

49. 38. The Chaney Agreement stated that it would inure "to the benefit of the Company and its successors and assigns," including Apex Capital.

### C.    The Hope Agreement

50.    ~~39.~~ On February 15, 2019, as a condition of his employment with Apex Capital's predecessor SandsPoint, Hope executed a letter agreement with SandsPoint (the "Hope Agreement").

51.    ~~40.~~ The Hope Agreement set forth employment restrictions that were intended to protect SandsPoint's (and later, Apex Capital's) legitimate business interests.

52.    ~~41.~~ Pursuant to the Hope Agreement, Hope agreed to protect Apex Capital's confidential information and trade secrets and not to make any unauthorized disclosure of that information to any third party:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any

reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

53.    42. Pursuant to the Hope Agreement, Hope also agreed not to work for a competitor of Apex Capital for twelve months after the termination of his employment with Apex Capital:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

54.    43. Pursuant to the Hope Agreement, Hope further agreed not to solicit or induce other Apex Capital employees from terminating employment with Apex Capital:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

55.    44. The Hope Agreement stated that it would inure "to the benefit of the Company and its successors and assigns," including Apex Capital.

**D.      The Callen Agreement**

56.    45. On April 19, 2021, as a condition of his employment with Apex Capital (formerly known as SandsPoint), Callen executed a letter agreement with SandsPoint (the "Callen Agreement").

57.    46. The Callen Agreement set forth employment restrictions that were intended to protect SandsPoint's (and later, Apex Capital's) legitimate business interests.

58.    47. Pursuant to the Callen Agreement, Callen agreed to protect Apex Capital's confidential information and trade secrets and not to make any unauthorized disclosure of that information to any third party:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or

Page 17

any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

59.    48. Pursuant to the Callen Agreement, Callen also agreed not to work for a competitor of Apex Capital for 12 months after the termination of his employment with Apex Capital:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

60.    49. Pursuant to the Callen Agreement, Callen further agreed not to solicit or induce other Apex Capital employees from terminating employment with Apex Capital:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

61.    50. The Callen Agreement stated that it would inure "to the benefit of the Company and its successors and assigns," including Apex Capital.

62.    51. The Belinkie Agreement, Callen Agreement, Chaney Agreement, and Hope Agreement are referred to collectively herein as "the Employment Agreements."

Page 18

**IV.        Related and Apex Capital Enter into the MSA**

63.    52. On or about January 29, 2024, Apex Capital and Related entered into a new Master Services Agreement (the "MSA").  Among other things, the MSA included several schedules, including a Data Protection Addendum, a Form of Agreement of Adherence, and a separately-executed Order Document – Fund Administration ("Order Document").  The Order Document listed more than 50 entities—all affiliates of Related's corporate parent, The Related Companies—covered by the MSA.  In broad terms, the MSA and Order Document required Apex Capital to provide certain services to those entities, and Related agreed to pay for those services.  Notably, in the event of any inconsistency between the MSA and the Order Document (or any other schedule), the MSA provided that "the provisions of the relevant Schedules shall prevail."

64.    53. Thereafter, in February, April, and June 2024, the parties executed three Agreements of Adherence.  By virtue of those Agreements, Related requested that Apex Capital provide services under the MSA to approximately eight additional entities in exchange for additional fees.

65.    54. Pursuant to the Order Document, fees for Apex Capital's services were due within 30 days of invoicing:

> ## Part B - Fees
>
> Fees shall be computed and payable in advance of the calendar quarter to which the fee relates and are due within thirty (30) days of invoicing. Payments received after the due date are subject to a late charge of 6% per annum charged monthly. Additional fees may be charged by Apex for

66.    55. Notably, Kraus executed the MSA, the Order Document, and each of the Agreements of Adherence.  Further, each of the Former Employees serviced Related as part of

their duties at Apex Capital, and each was aware of the terms of the Master Services Agreement and the Order Document.

67.    ~~56.~~ Under Section 3.2 of the MSA, Related and Apex Capital agreed that Apex Capital would not be liable for any delay in Apex Capital's performance caused by Related:

> 3.2    If Apex's performance of its obligations under this Agreement is prevented or delayed by any act or omission of the Client, its agents, subcontractors, consultants or employees then, without prejudice to any other right or remedy it may have, Apex shall be allowed a day-for-day extension of time to perform its obligations in respect of the period of delay caused by the Client and shall not be liable to the Client for any delay in such performance.

68.    ~~57.~~ Along the same lines, in Section 14.2, Related agreed that it "shall not interfere with any arrangements, instructions, procedures or authority pursuant to which Apex has taken action hereunder."  In Appendix 4 to the MSA, Related also agreed to give Apex Capital such information as it may "reasonably require in order to be able to perform its duties in a timely manner and shall not stop, countermand, restrain nor seek to restrain nor otherwise interfere" with Apex Capital's services.

69.    ~~58.~~ Under Section 7 of the MSA, Apex Capital and Related further agreed that Related "shall not acquire any right, title or interest in any of" Apex Capital's intellectual property rights of any nature, including "rights in databases."

70.    ~~59.~~ Under Section 8 of the MSA, Related and Apex Capital agreed to protect—and not disclose—each other's confidential information:

> Each Party undertakes that it shall not at any time during the validity of this Agreement, and for a period of two (2) years after termination or expiry of this Agreement or such other period as determined by Applicable Law, disclose to any person any confidential information concerning the business, affairs, clients or service providers of the other party or of any member of the group of companies to which the other Party belongs, except as permitted by clause 8.2(a).

Further, although the MSA allowed the parties to disclose information to their respective "employees, officers, representatives . . . or advisers," as necessary to carry out obligations under the MSA, the agreement required each party to "direct that its employees, officers, representatives . . . or advisers to whom it discloses the other Party's confidential information comply with this clause 8." And finally, the MSA precluded either party from using "the other Party's confidential information for any purpose other than to exercise its rights and perform its obligations under or in connection with th[e] Agreement."

71. 60. Related and Apex Capital agreed that either party could terminate the MSA in the event of the other party's material breach, but only after providing a 30-day opportunity to cure. Alternatively, either party could terminate the MSA without cause with at least 90 days' written notice.

72. 61. In the event of termination of the MSA by either party, Related agreed to "immediately pay to Apex Capital all of Apex Capital's undisputed outstanding unpaid invoices and other moneys, expenses and disbursements accrued and due to it up to the date of such termination."

73. 62. Following execution of the MSA, Apex Capital provided services to Related in good faith. But shortly thereafter, and without Apex Capital's knowledge, RelatedDefendants concocted a plan to steer Apex Capital's employees to a competitorIQEQ and to steal Apex Capital's proprietary business information.

**V.        Kraus Lures the Former Employees Away**

74. 63. In July 2024, Apex Capital exercised its option to acquire the remaining membership interests of SandsPoint.

75. ~~64.~~ When Apex Capital exercised that option, Related had already begun considering moving its business to ~~a competitor of Apex.  But at the same time,~~IQEQ.  Kraus wanted to keep working with the Former Employees—including Kraus's longtime friend and business associate Belinkie—all of whom ~~had worked on~~serviced Related's accounts and ~~who were intimately familiar with its~~possessed extensive knowledge of Related's business and real estate portfolios.  ~~So~~ Kraus therefore devised a plan to ~~do just that~~move Related's business to IQEQ while ensuring that the Former Employees would follow.

76. ~~65.~~ Kraus and Related knew that the Former Employees were bound by their Employment Agreements, knew that the Employment Agreements prohibited the Former Employees from joining a competitor within 12 months of leaving Apex, and knew that the Employment Agreements prohibited the Former Employees from retaining any of Apex Capital's confidential information or trade secrets.  Nonetheless, in or around the summer of 2024, Kraus began conspiring with the Former Employees to convince them to breach their Employment Agreements, jump ship to a local competitor of Apex Capital, and take Apex Capital's confidential and protected business information with them.

77. ~~66.~~ On information and belief, Kraus and Belinkie began formulating their plan in the summer of 2024.  Kraus and Belinkie discussed moving Related's work, and Belinkie's team, from Apex Capital to ~~IQ-EQ.  And with~~IQEQ.  With Kraus's encouragement and ~~knowledge~~active involvement, Belinkie systematically recruited key members of his Apex Capital team to join ~~IQ-EQ~~IQEQ, including Chaney, Callen, and Hope.  ~~Also at Kraus's encouragement, Belinkie and his recruits planned to take from Apex Capital the information they would need to seamlessly service Related's accounts at IQ-EQ.~~

78. At the same time, Belinkie, his recruits, Kraus, and IQEQ coordinated a plan to preserve and transfer the institutional knowledge, proprietary work product, and confidential information necessary to ensure that Related's accounts could be transitioned from Apex Capital to IQEQ without interruption.

79. Throughout this period, Kraus communicated directly with Ben Jamron ("Jamron"), the Head of Fund Administration at IQEQ, regarding the coordinated transition of Related's business from Apex Capital to IQEQ.  Those communications concerned, among other things, the anticipated hiring of the Former Employees, the timing of their departures from Apex Capital, and a strategy to "lift and shift" Apex Capital's database "to seamlessly create a new environment from which IQ-EQ can in effect service [Related] 'status quo.'"  Jamron acted as IQEQ's point person in coordinating with Kraus and worked with Kraus to facilitate IQEQ's acquisition of both the Former Employees and Related's business.  Rather than building its own capabilities independently, IQEQ sought to replicate Apex Capital's services by acquiring the very employees and information that had made Apex Capital successful in servicing Related.

80. After the Former Employees left Apex Capital and joined IQ-EQIQEQ, the plan was for Kraus to falsely manufacture complaints about Apex Capital's services and then move Related's business to IQ-EQ.  And IQEQ.

81. Defendants kept their plans secret because they knew their actions would violate the Employment Agreements, violate the MSA, and gut Apex Capital's business.

82. 67. Over the following few weeks, Belinkie successfully recruited Chaney, Callen, and Hope, who all agreed to move with Related and Belinkie to IQ-EQIQEQ, notwithstanding the restrictions of their Employment Agreements and the damage they would be

doing to Apex Capital's business.  IQEQ offered employment to, negotiated with, and hired these individuals with knowledge of their ongoing work on Related's accounts at Apex Capital.

83.    68. Worse still, the Former Employees waited to implement their plans until after Apex Capital exercised its option to acquire the remaining shares of SandsPoint, at which point the Former Employees received the last of their retention bonuses.

**A.    Belinkie Leaves for IQ EQIQEQ, in Violation of His Employment Agreement**

84.    69. The Former Employees' departures can only be described as coordinated. After receiving the last installments of their sizeable retention bonuses from Apex, between October and December 2024, the Former Employees began giving deliberately staggered notices of their resignations from the company. Each joined IQEQ, enabling IQEQ to immediately seize Related's accounts using the very team that had serviced those accounts at Apex Capital and possessed the experience, institutional knowledge, and client familiarity necessary to ensure a seamless transition.

85.    70. Belinkie gave his notice of resignation on October 24th, 2024, setting his last day of work for Apex Capital on December 4th, 2024.  At the time of his resignation, Belinkie was Head of Real Assets Product – Americas for Apex Capital.

86.    71. After giving notice of resignation, Belinkie asked Apex Group's IT department to help him extract information from Apex's proprietary database.  That database, which Apex Group acquired by purchasing a costly license, contains confidential information and other trade secrets, including client data, accounting and auditing processes, communications with investors, strategic plans, and pricing information, among other highly sensitive information that is not easily accessible or replicable by others in the marketplace.

87.    ~~72.~~ Further, because Apex Capital's business involves servicing private investment funds, Apex Capital (and Apex Group generally) has stringent controls in place to preserve the confidentiality of the information about those funds contained in its database, as is required under relevant securities laws and client confidentiality agreements.

88.    ~~73.~~ Thus, Belinkie's request to extract the database—or any information from it—was highly unusual, required a comprehensive approval process, and—in light of his recent resignation—raised red flags.  Consequently, Apex Capital rejected the request.

89.    ~~74.~~ Undeterred, during the approximately six-week period between his notice of resignation and the last day of his employment at Apex Capital, Belinkie downloaded a substantial amount of information from his work computer to an unknown destination.  Notably, this was not business as usual—the downloading activity was significantly higher than it had been in the past and did not coincide with Belinkie's ordinary work duties.  Indeed, the three highest days of downloading activity occurred approximately one week after he gave his notice of resignation, on the day before his last day of employment, and on his last day of employment at Apex Capital.

90.    ~~75.~~ Moreover, between October 4, 2024, and December 4, 2024 (Belinkie's last day at Apex Capital), Belinkie used his personal web-based email account while logged into his work computer and actually sent email messages from his work email address to his gmail account. Belinkie also used external web browsers and drives, including Google Drive, while logged into his work computer.

91.    ~~76.~~ Many of the files downloaded by Belinkie constituted Apex Capital's confidential and trade secret information that he was not authorized to share or retain after his employment with Apex Capital ended.  Those files include, but are not limited to, files

Page 25

concerning Apex Capital's billing practices, personnel, salary and compensation, and clients.

The files also include security information concerning Apex Capital's proprietary database and

information concerning SandsPoint's integration to Apex Capital.   For example, Belinkie

downloaded the following files:

a.      *Americas    Consolidated_Client    List    and    Collection    terms_Genstar Dashboard-v2.xlsx*.  This document is a consolidated client list of all Apex Capital's clients in the Americas along with account managers for each client.

b.      *Billing Sheet – July 2024 – Suntx.xlsx*.  This document contains a billing sheet showing what Apex Capital was billing Related for Apex Capital's services over the course of the parties' relationship.

c.      *SP P&L Analysis – February 2024.xlsx*.  This document contains Apex Capital's review of the profits and losses relating to the SandsPoint business it acquired.

All of these files are Apex Capital's confidential and trade secret information.

92.      77.  On December 3, 2024—his second to last day at Apex Capital—Belinkie

downloaded hundreds of documents in quick succession between 8:59 a.m. and 11:38 a.m. from

Apex Capital's systems.   This was highly unusual and inconsistent with Belinkie's previous

downloading activity.   Among the hundreds of documents that Belinkie downloaded between

8:59 a.m. and 11:38 a.m. on his second to last morning at Apex Capital are the following:

(a) a. *SandsPoint Apex Capital Advisors Employee Contracts with Integration Award info as of 05.03.2024.xlsx*.  This document is an Excel spreadsheet showing all of Apex Capital's employees and the integration bonuses received by those employees.

(b) b. *2022_11-22_RE Sandspoint - Legal - Discovery.msg* and *2022_11-18_RE Sandspoint - Legal - Update call.msg*.  These documents include confidential attorney-client communications with Apex Group's legal team and privileged work product concerning Apex Group's acquisition of SandsPoint and subsequent integration.

(c) c. *Daily Cash Booking Process Flow Chart v2.pptx*.   This document is a PowerPoint presentation showing Apex Capital's proprietary and confidential work processes for servicing clients.

93.    This unusual downloading activity came on the heels of an equally unusual email exchange between Related and IQEQ concerning the transfer of Apex Capital's data and work product.  On December 3, 2024—the same day as Belinkie's mass download—Jamron of IQEQ advised Kraus that IQEQ was preparing templates to "request/transition data from Investran," requested Apex work papers and a chart of accounts, and established an IQEQ-controlled Egnyte repository to collect the information. When Kraus questioned whether it was "odd" for Apex information to be uploaded to an IQEQ repository, Jamron did not deny the concern.  Instead, he acknowledged that the arrangement was "[a] little" odd but suggested that it would not be problematic "if it is only going to your primary lead"—namely, Belinkie.  The timing and substance of this exchange demonstrate that IQEQ and Related were actively coordinating the collection and transfer of Apex Capital information through systems controlled by IQEQ, and that Belinkie's mass download activity was the means by which that plan was partially carried out.

94.    78. Belinkie did not obtain written permission from Apex Capital to share the files downloaded with any third party.  Yet there is no doubt that Belinkie retained and used these files in his role at Apex Capital's competitor, IQ EQIQEQ.  There is no conceivable reason Belinkie would have taken the files but to use them in his new role at IQ EQIQEQ.

95.    79. Further, knowing that he was constrained by the non-competition clause in his Employment Agreement, Belinkie immediately went to work for IQ EQIQEQ—a direct competitor of Apex Capital—in its Dallas, Texas office, where today he is working on Related's accounts.  Although asked where he would be working, Belinkie refused to disclose to Apex Capital that he would be going to IQ EQIQEQ at the time of his departure.

**B.        Chaney Leaves for ~~IQ-EQ~~IQEQ, in Violation of His Employment Agreement**

96.    ~~80.~~ Chaney was the next to give his notice of resignation—just six days after Belinkie's resignation—on October 30, 2024.  At the time of his resignation from Apex Capital, he was a Senior Manager, Real Assets.  His last day of employment with Apex Capital was December 13, 2024.

97.    ~~81.~~ At the time of his departure, Chaney told Apex Capital that he was upset that Belinkie had left the company, that he planned to take some time off, and that he had nothing else lined up at that time.  Those statements were false when made and were made to mask Chaney's unlawful intention to join Belinkie at ~~IQ-EQ~~IQEQ.

98.    ~~82.~~ As of no later than January 13, 2025, in violation of the non-competition clause in his Employment Agreement, Chaney was employed by ~~IQ-EQ~~IQEQ as a Managing Director in its Dallas office.  Indeed, Chaney received an encrypted offer letter from ~~IQ-EQ~~IQEQ on or before October 21, 2024, before he gave his notice and before Belinkie gave his notice.

99.    ~~83.~~ The day before Chaney submitted his resignation notice, he downloaded hundreds of files from his work computer to a device that was not issued by Apex Capital and that has not been returned to Apex Capital.  The three highest days of downloading activity occurred on the day before he gave his notice of resignation, on the day before his last day of employment, and on his last day of employment at Apex Capital.  This downloading activity was unusual and not coincident with Chaney's work duties.

100.    ~~84.~~ Many of the files downloaded by Chaney constituted Apex Capital's confidential information and trade secrets that he was not authorized to share or to retain after his employment with Apex Capital ended, including the following:

(a) a. *SandsPoint Pricing RFM – 3.15.22.docx*.   Chaney downloaded this file at approximately 7:34 p.m. on October 29, 2024.   This file contains historical pricing and client strategy information for Related.

(b) b. *SP Pref Equity Valuation Process Memo – 2Q23.docx*.   Chaney downloaded this file to ~~laptop11~~laptop 11 at approximately 8:08 p.m. on October 29, 2024. This file describes Apex Capital's valuation processes, including the company's valuation methodology and its process for preparing regular client updates.

(c) c. *Loan Servicing Pitch Bullet Points.docx*.   Chaney downloaded this file at approximately 8:05 p.m. on October 29, 2024.   This file contains sales and pitch discussion points for Apex Capital's loan servicing platform.

(d) d. *State Street Consulting Tracker – 2.8.23.xlsx*.   Chaney downloaded this file at approximately 7:42 p.m. on October 29, 2024.   This file contains financial information associated with Apex Capital's consultants, including revenue, invoices, and associated fees.

(e) e. *SandsPoint Instructional Guide_FINAL – PW Update.pdf*.   Chaney downloaded this file at 8:47 p.m. on October 29, 2024.   This file contains step-by-step instructions for performing Apex Capital's asset management tasks.

(f) f. *SandsPoint Consulting Revenue Projections – 2022 & 2023 – 12.1.22.xlsx*. Chaney downloaded this file at approximately 7:38 p.m. on October 29, 2024. This file contains detailed client financial information and methods that Apex Capital uses to project revenue.

101.   85. Between September 2024 and December 2024, Chaney used his Apex Capital-issued laptop to access at least three web-based email accounts, which he used to access and send Apex Capital trade secrets and confidential information to ~~IQ-EQ~~IQEQ.   Chaney attempted to cover his tracks by deleting a large number of files downloaded to his Apex Capital-issued computer before his departure.

102.   86. As an example, at approximately 7:34 p.m. on October 29, 2024—the day before his public resignation from Apex Capital and after he had received an offer of employment from ~~IQ-EQ~~IQEQ—Chaney downloaded a file called *Portfolio_Management_Responsibilities.docx*, which contained descriptions of Apex Capital's

Page 29

confidential valuation processes.  Less than a month ~~later~~after leaving Apex, Chaney forwarded

this very document from his personal gmail address to his newly-issued ~~IQ-EQ~~IQEQ address:

> **From:** Clark Chaney <clarkc08@gmail.com>
> **To:** clark.chaney@iqeq.com
> **Subject:** Valuation Process
> **Date:** Tue, 07 Jan 2025 13:46:44 -0600
> **Attachments:** Portfolio_Management_Responsibilities.docx
>
> ───────────────────────────────────────────
>
> Per your request, see below for our preparation / review process when we receive RE Equity Deal
> Models and create one pagers:

103.  ~~87.~~ Chaney also downloaded guidelines and templates for employee recruiting,

bullet points for a pitch for new business, draft statements of work, performance evaluations for

other employees, including some who remain Apex Capital employees, and several employee

contact lists.  Chaney was not authorized to download any of these documents to a non-work

device, nor did he obtain written permission from Apex Capital to disclose these files to any

third party.  The documents Chaney downloaded to a non-Apex Capital device without

authorization included Apex Capital's confidential and trade secret information.  These files had

no value or utility to Chaney personally; they were only valuable if Chaney retained and used the

files in his new role at Apex Capital's competitor, ~~IQ-EQ~~IQEQ.  Indeed, that is the only rational

conclusion to be drawn from Chaney's downloading activities in the lead-up to his departure

from Apex Capital.

**C.    Hope Leaves for ~~IQ-EQ~~IQEQ, in Violation of His Employment Agreement**

104.  ~~88.~~ Just over two weeks after Chaney resigned, Hope gave his notice of

resignation on November 20, 2024.  Conveniently, he resigned to Chaney, who reported to Apex

Capital management that Hope had "found another opportunity (didn't mention the company)

and made it clear there is nothing we can do to get him to stay."  Chaney knew at the time that

Hope would be taking a position at ~~IQ-EQ~~IQEQ and deliberately concealed that fact.  Hope likewise intentionally concealed his plans to take a position with and join Belinkie and Chaney at ~~IQ-EQ~~IQEQ.

105.    ~~89.~~ At the time of his resignation, Hope was a Manager, Real Assets at Apex Capital.    ~~Like Chaney, his~~His last day of work at Apex Capital was the same day as Chaney's—December 13, 2024.

106.    ~~90.~~ In violation of the non-competition clause in his Employment Agreement, Hope is currently employed by ~~IQ-EQ~~IQEQ in its Dallas office.

107.    ~~91.~~ Between October and December 2024, Hope downloaded thousands of documents from Apex Capital's systems.  This was highly unusual and inconsistent with Hope's previous downloading activity.  On December 11, 2024, just two days before his last day at Apex Capital, Hope downloaded thousands of documents in a late-night spree between 10:20 p.m. and 12:02 a.m.

108.    ~~92.~~ Many of the files that Hope downloaded during this spree constituted Apex Capital's confidential information and trade secrets that he was not authorized to share or to retain after his employment with Apex Capital ended, including the following:

> (a) ~~a.~~ *RE RFM Freddie K112 LLC - Brokerage Acct Info.msg*.  This email contains wire instructions, including account numbers.

> (b) ~~b.~~ *LOC Balances 9.30.xlsx* and *LOC Balances 3.31.24.xlsx*.  These Excel files contain Apex Capital's detailed financial analyses regarding client lines of credit, including information on maximum borrowing limits, outstanding balances, interest payments, and available credit.

> (c) ~~c.~~ *2. 3.20.2024 Distribution Analysis - Mobil Pref.xlsx*.  This Excel file contains Apex Capital's detailed financial analysis and client financial information, including income, expense reserves, distributions, records of distributions, names of investors with distributions and capital balances, and wiring instructions (including account and routing numbers).

109.   93.   These files had no value or utility to Hope personally; they were only valuable if Hope retained and used the files in his new role at Apex Capital's competitor, IQ-EQIQEQ.  Indeed, that is the only rational conclusion to be drawn from Hope's download activities in the lead-up to his departure from Apex Capital.

110.   94.  In fact, Hope later produced documents containing Apex Capital's confidential and trade secret information, documents that Hope retained after his departure from Apex Capital and after beginning work for IQ-EQIQEQ.  These documents include the following:

(a)  a.  *3.31.2024 - VOGO_Quarterly Monitoring Template_Related MF Core+2 PE - Support*.  This Excel file contains Apex Capital's detailed financial analysis of client investments, including equity investments, loan amounts and interest rates, unrealized proceeds, and profits.

(b)  b.  *CSC Analysis_September*.  This Excel file contains Apex Capital's detailed financial analysis for its clients.  The analysis includes bank account numbers, thousands of invoice numbers and amounts, and payment status.

(c)  c.  *Investment Acvity Detail Valuation Team (1)*.  This Excel file contains Apex Capital's detailed financial analysis of client investments, including capital investment data, cash income data, and realized gains and losses.

111.   95.  In some cases, the documents that Hope downloaded and retained after leaving Apex Capital state explicitly that they contain Apex Capital's confidential information, such as the following excerpt:

112.   96.  Hope did not obtain written permission from Apex Capital to retain these documents, nor did he obtain permission to disclose any of these files to any third party.

**D.        Callen Leaves for ~~IQ-EQ~~IQEQ, in Violation of His Employment Agreement**

113.    ~~97.~~ Callen submitted his notice of resignation on December 4, 2024, just two weeks after Hope resigned.  At the time of his resignation, Callen was an Assistant Manager, Real Assets, with Apex Capital.

114.    ~~98.~~ Callen also resigned to Chaney, who reported Callen's resignation to Apex Capital management with the identical language to that used when notifying Apex Capital of Hope's resignation.  According to Chaney, Callen "found another opportunity (didn't mention the company) and made it clear there is nothing we can do to get him to stay."   Again, both Chaney and Callen were aware that Callen was taking a job with ~~IQ-EQ~~IQEQ at the time of his resignation, and this charade was intended to mask the Defendants' unlawful conspiracy.

115.    ~~99.~~ Callen's last day of employment with Apex Capital was December 20, 2024.

116.    ~~100.~~ In violation of the non-competition clause of his Employment Agreement, Callen immediately took a job with ~~IQ-EQ~~IQEQ in its Dallas office.

117.    ~~101.~~ On December 19, 2024, the day before his last day working for Apex Capital, Callen downloaded thousands of files from Apex Capital's server.  Just between 12:56 p.m. and 1:14 p.m. that day, Callen downloaded hundreds of files.  Between 4:22 p.m. and 4:59 p.m. that day, Callen downloaded thousands more files.

118.    ~~102.~~ Callen downloaded more files on his second to last day at Apex Capital than he downloaded in all the days from October to December 2024 combined.  This downloading activity was highly unusual and not coincident with Callen's work duties.

119.    ~~103.~~ Among the files that Callen downloaded on December 19, 2024, were the following:

> (a) ~~a.~~ *09.24 IP1 JPMC Capital Reserve Bank Rec.pdf*; *09.24 IP1 JPMC Capital Reserve Bank Stmt.pdf*; *09.24 IP1 JPMC Escrow Bank Rec.pdf*; *09.24 IP1 JPMC Escrow Bank Stmt.pdf*; *09.24 IP1 Wells Fargo Bank Rec.pdf*; and *09.24 IP1 Wells*

*Fargo Bank Stmt.pdf.* These documents contain confidential banking and financial information about Apex Capital's clients, including account numbers, transaction history, and account balances.

(b) ~~b.~~ Hundreds of documents used in financial audits, including confidential financial information from Apex Capital and its clients, confidential loan agreements involving Apex Capital's clients, and account statements that Apex Capital prepared for clients.

120. ~~104.~~ These documents, and many others that Callen improperly downloaded without authorization, included Apex Capital's confidential and trade secret information.

121. ~~105.~~ Moreover, between September 11, 2023, and December 19, 2024 (the day before Callen left Apex Capital), Callen's Apex Capital-issued computer was connected to a USB device that was not issued by Apex Capital. And between October 30, 2024, and December 19, 2024, Callen connected to and accessed an unknown, non-Apex Capital-issued computer from the Apex Capital internal network. These files had no value or utility to ~~Hope~~Callen personally; they were only valuable if ~~Hope~~Callen retained and used the files in his new role at Apex Capital's competitor, ~~IQ EQ~~IQEQ. Indeed, that is the only rational conclusion to be drawn from Callen's downloading activities in the lead-up to his departure from Apex Capital.

**E.** **Related Manufactures Complaints about Apex Capital's Service While Working Behind the Scenes to Move Apex Capital's Core Business Team to ~~IQ EQ~~IQEQ**

122. ~~106.~~ Unbeknownst to Apex Capital, in the months leading up to the Former Employees' resignations, Related (led by Kraus) was working hard behind the scenes to move its business—and all of Apex Capital's core resources—to ~~IQ EQ.~~ IQEQ. IQEQ was an active participant in this effort, working hand in hand with Kraus and Related to recruit Apex Capital personnel, facilitate the transition of Related's accounts, and position itself to seize those accounts immediately upon the Former Employees' departures.

123.    As part of the plan hatched between Belinkie and Kraus, around the time that Belinkie staged his departure (and anticipating that other core team members would soon make their own moves to ~~IQ-EQ~~IQEQ), Related began manufacturing complaints about Apex Capital's service.  In particular, Related complained that staff turnover—the very turnover that Related was orchestrating—was impacting Apex Capital's service levels and deliverables.  In response, Apex Capital began efforts to hire replacement staff and assigned high-level Apex Capital management to personally oversee and service Related's account.  In addition, Apex Capital set up weekly management calls to ensure that Related's concerns were being addressed. Kraus was involved in many of these calls.

124.    ~~107.~~ During a weekly call in January 2025, Apex Capital employees Ken Fullerton, Sanjay Vatsa, and Jonathan Schmitz informed Kraus that they had just received additional resignation notices from Apex Capital staff assigned to the Related account.  In response, Kraus said that he anticipated there would be five more resignations.  When asked how he could possibly know that information, Kraus refused to say more, would not disclose who was resigning, when they were resigning, or how he knew—other than to say, "I have my sources."

125.    ~~108.~~ That source was Jamron from IQEQ.  Kraus knew about the departures because he was conspiring with IQEQ, the Former Employees, and others to encourage Apex Capital employees assigned to Related's account to leave for ~~IQ-EQ~~IQEQ, in violation of their Employment Agreements.

126.    ~~109.~~ In violation of his non-solicitation agreement, Belinkie agreed to work for ~~IQ-EQ~~IQEQ first and then solicited other employees of Apex Capital to terminate their employment with Apex Capital in favor of ~~IQ-EQ~~IQEQ as well.  Thereafter, the Former Employees worked together to recruit additional Apex Capital employees.  In engaging in such

conduct, the Former Employees violated the employee non-solicitation covenants set out in Section 4(c) of their respective Employment Agreements.

127. ~~110.~~ Between November 29, 2024, and January 31, 2025, ~~11 more~~eleven additional Apex Capital employees ~~from~~assigned to the Related ~~service team~~account resigned. Most refused to identify their new employer despite direct inquiries from Apex Capital. ~~Most of those employees refused to disclose their employment plans after resignation, but~~ Apex Capital has since discovered that ~~at least one of those employees, Karri Neal, is now employed by IQ-EQ. To this day, in an~~the majority of these former employees joined IQEQ. On information and belief, these employees deliberately concealed their employment with IQEQ to prevent Apex Capital from uncovering the coordinated raid of its Related service team and from promptly enforcing the restrictive covenants and other contractual obligations binding the Former Employees. Consistent with that effort to conceal ~~their unlawful acts,~~the scheme, many of the Former Employees and other departing employees have still not updated their LinkedIn profiles to ~~list~~identify IQEQ as their ~~current~~ employer and instead continue to falsely represent that they ~~are~~remain employed ~~at~~by Apex Capital.

128. IQEQ continued recruiting Apex Capital employees over the ensuing months, confirming that the raid on Apex Capital's workforce was part of a deliberate strategy, not an isolated hiring initiative.

129. ~~111.~~ As set forth above, Kraus and Belinkie were longtime friends, and they had worked together for many years as client and servicer, respectively, on the Related account. When Belinkie tried to gain access to Apex Capital's proprietary database after his resignation, he did so with Kraus's knowledge and/or on Kraus's instruction as part of the plan they hatched together in the preceding months.

130.    ~~112.~~ After Belinkie was unable to steal Apex Capital's proprietary client database, Belinkie ~~and~~, Kraus, and IQEQ conspired with the other Former Employees to download and steal as much information as possible from Apex Capital's computer systems prior to their departures.

131.    ~~113.~~ All the while, Kraus and others at Related continued to speak on a weekly basis with managers at Apex Capital, Related continued to complain about the employee departures that Kraus and the Former Employees were secretly orchestrating, and Related continued to conceal its true intentions to move the entire Related business to Apex Capital's competitor.

132.    During this time, IQEQ was aggressively pursuing access to Apex Capital's proprietary database and related work product as part of its effort to assume all servicing responsibilities for Related's accounts. Working through Related and often scripting Related's communications, IQEQ repeatedly sought Apex Capital's proprietary data, financial records, work papers, chart of accounts, and other information necessary to replicate Apex Capital's services on an IQEQ platform.

133.    ~~114. During this time, Related repeatedly asked for access to Apex Group's proprietary database.~~ At the time, Apex Capital believed the Related relationship was salvageable and wanted to demonstrate that it was a good service partner. Accordingly, Apex Capital indicated that it would make efforts to separate other clients' data from the proprietary database so that Apex Capital could provide portions of the database to Related. Apex Capital devoted considerable time, money, and human capital to this endeavor. Unbeknownst to Apex Capital, however, IQEQ was simultaneously working behind the scenes with Related to obtain a

"lift and shift" of Apex Capital's data and systems that would allow IQEQ to service Related in substantially the same manner as Apex Capital.

134.     But before the project was complete, Apex Capital learned new information that raised alarm bells.

**VI.     Apex Capital Learns That the Former Employees Breached their Employment Agreements by Joining ~~IQ-EQ~~IQEQ**

135.     ~~115.~~ On January 14, 2025, Kimarley Wilson, a Controller at Related, inadvertently sent an email containing an attached email string to a distribution group at Apex Capital. Twenty minutes later, Wilson unsuccessfully attempted to recall the email, but not before Apex Capital was able to read it.

136.     ~~116.~~ The email was between Wilson and Chaney; Callen, Hope, and another former Apex Capital employee, Karri Neal, were copied on it.  Chaney, Callen, Hope, and Neal each had an "@iqeq.com" email address:

> **From:** Clark Chaney <Clark.Chaney@iqeq.com>
> **Sent:** Monday, January 13, 2025 6:13 PM
> **To:** RFM Finance <rfm.finance@related.com>
> **Cc:** Preston Callen <Preston.Callen@iqeq.com>; Karri Neal <Karri.Neal@iqeq.com>; Ryan Hope <Ryan.Hope@iqeq.com>
> **Subject:** FMC / 35 HY Projected CF's - 4Q24

137.     ~~117.~~ It was the first time that Apex Capital knew its former employees were employed by its competitor, ~~IQ-EQ~~IQEQ.

138.     ~~118.~~ Shortly after learning that three members of Related's service team at Apex Capital had joined ~~IQ-EQ~~IQEQ, an Apex Capital employee called ~~IQ-EQ~~IQEQ and asked to speak to Belinkie.  Although Belinkie was not available, the call did confirm that Belinkie had also joined ~~IQ-EQ~~IQEQ.

139.    ~~119.~~ The timing and circumstances of the employee departures make clear that the Former Employees discussed their respective moves to ~~IQ-EQ~~IQEQ and, in light of their Employment Agreements' restrictive covenants, conspired to hide the circumstances of their departures from Apex Capital.

## VII.    Apex Capital Sues IQEQ and the Former Employees in Texas

140.    On January 31, 2025, Apex Capital sued IQEQ and the Former Employees in the Northern District of Texas (the "Texas Action"), asserting claims arising from IQEQ's coordinated effort to recruit the Former Employees, interfere with the Former Employees' restrictive covenants, and benefit from the suspected misappropriation of Apex Capital's confidential and trade secret information.  Apex Capital alleged that IQEQ knowingly employed individuals who were subject to enforceable non-competition, confidentiality, and employee non-solicitation obligations; tortiously interfered with those contractual obligations; and participated in a coordinated raid of Apex Capital personnel that threatened Apex Capital's relationships with customers, including Related.  Apex Capital further alleged, on information and belief, that the Former Employees had misappropriated Apex Capital's confidential and trade secret information and that IQEQ stood to benefit from the use of that information in competing with Apex Capital for business.

141.    A few weeks later, Apex Capital agreed to dismiss IQEQ from the Texas Action based on representations and commitments IQEQ made regarding its lack of involvement in the misconduct alleged (the "Settlement Agreement").  In a February 17, 2025 letter from Chris Marsden, Group General Counsel at IQEQ, IQEQ represented, among other things:

- IQEQ would "lead a full forensic investigation into [Apex Capital's] allegations of data exfiltration";

Page 39

- If IQEQ "discover[ed] any Apex proprietary data on any of [its] systems, [it would] destroy it and [would] not make any use of it for commercial purposes";

- If IQEQ "discover[ed] any Apex proprietary data has been shared with any third party, [it would] inform Apex":

- IQEQ had "not made any use of any proprietary Apex data in its discussions with Related regarding additional services";

- If IQEQ concluded that any of the Former Employees "were bad actors in their use of Apex proprietary data," IQEQ would "not allow them to work for Related for a minimum of 12 months"; and

- "Any transition of client data between Apex and IQ-EQ, in connection with any client transitions, [would] be subject to the terms of the contracts with relevant clients."

142. Apex Capital and IQEQ agreed that both parties should be permitted to "compet[e] in the marketplace" so long as they did so "fairly."

143. IQEQ then followed up, on March 27, 2025, with the results of its purported "exhaustive" forensic investigation. IQEQ had found: "[n]o evidence that Apex's proprietary information or documents ('Apex Information') [had] been shared with third parties"; "[n]o retention of Apex Information on IQEQ's systems"; and "[n]o evidence of the [Former Employees] engaging in 'Bad Actor' activity."). IQEQ also conveyed representations from the Former Employees that they had not retained any Apex data on their personal devices and would not use Apex's information at IQEQ.[1]

144. Apex Capital also dismissed the Former Employees from the Texas Action but did so without prejudice.

---

[1] According to IQEQ, Chaney specifically certified that "to the extent he had any Apex information on his personal computer, Google Drive, or any other personal device, he has removed such information." On July 17, 2026, however, as the parties were in the midst of discovery, counsel for Chaney disclosed that, notwithstanding IQEQ's purported "exhaustive" internal investigation, an entire archived Outlook .pst file—containing over seven years of Apex Capital emails, calendar invites, and attachments—had suddenly been located on Mr. Chaney's personal laptop.

## VIII.        IQEQ's Coordinated Raid of Apex Personnel

145.    Only weeks after Apex Capital dismissed the Texas Action, IQEQ informed Related that several more Apex Capital employees were resigning from Apex Capital. Upon information and belief, most of those employees were moving to IQEQ. Unbeknownst to Apex Capital, IQEQ was continuing to closely monitor and celebrate the successful completion of a coordinated employee raid.

## IX.        VII. Related Refuses to Pay Its Invoices

146.    120. After coordinating the movement of its service team from Apex Capital to IQ EQIQEQ and securing the information that it needed to smoothly continue operations with its new servicer, Related immediately took steps to end its relationship with Apex Capital. From late 2024 through early 2025, while continuing to conceal its plan from Apex Capital (and knowing that a dedicated service team was already ensconced at IQ EQIQEQ), Related continued to feign frustration with staff turnover at Apex Capital. Meanwhile, Apex Capital had hired new dedicated personnel and continued to work overtime to meet its service obligations to Related under the MSA. To the extent that Related raised any specific complaints about Apex Capital's service or deliverables, Apex Capital immediately addressed those complaints and rectified the issues raised.

147.    IQEQ, for its part, viewed the acquisition of Apex Capital's personnel and Apex Capital's proprietary information as the prerequisites to replacing Apex Capital. Once the database was officially "ready to be moved" and "the team [was] all resigned," on March 13, 2025, IQEQ urged Related to terminate the MSA. Jamron told Kraus that "it is definitely time to get tough and the termination probably has to come imminently." IQEQ declared that "we are

near the end with them" – a telling acknowledgement that, in IQEQ's view, it had all but completed its plan to supplant Apex Capital as Related's service provider.

148.    121. NonethelessApproximately three weeks later, on April 4, 2025, Related notified Apex Capital that it intended to terminate the MSA "effective as of July 1, 2025." That notice, while surprising, comported with the MSA's termination provisions, which allowed either party to terminate the parties' contractual relationship by giving the other party at least 90 days' written notice. Apex Capital acknowledged receipt of the notice of termination on April 7, 2025.

149.    122. Two days later, on April 9, 2025, Related's in-house counsel sent another letter to Apex Capital. In that letter, Related claimed that Apex Capital breached its obligations under Section 2 of the MSA in two ways. First, Related claimed that Apex Capital breached the agreement by losing "virtually all personnel" working on Related's account, even though Related itself secretly coordinated and encouraged those departures. Second, Related claimed that Apex Capital breached its obligation to deliver Apex Group's proprietary database containing Related's accounting records. But no such obligation existed in the MSA. Further, while the MSA required Apex Capital to return Related's records upon termination, Apex Capital was only required to do so on the actual date of termination—*i.e.*, July 1, 2025. In other words, the identified breaches were not breaches at all. Nonetheless, Related demanded that Apex Capital "cure" these issues by April 11, 2025, or face more immediate termination of the parties' relationship.

150.    123. Apex Capital timely responded to Related's demands on April 10, 2025, explaining why the identified concerns were not in fact breaches of the MSA. Less than one week later, on April 16, 2025, Related sent a letter purporting to terminate the MSA "effective

immediately," claiming that Apex Capital could have no "'reasonable opinion' . . . that its defaults can be cured."

151. ~~124.~~ On April 16, 2025, Apex Capital responded by letter, refuting that cure was impossible or that immediate termination was proper under the MSA and requesting payment of Apex Capital's outstanding and undisputed invoices, then totaling $1,816,195.00.

152. ~~125.~~ By letter dated April 23, 2025, Related refused to pay the outstanding invoices, again citing Apex Capital's phantom breaches of the MSA as a basis for the refusal.

153. Apex Capital lost Related as a customer, and, with it, millions of dollars in annual revenue. Without the core employees and prior work product, Related would never have transferred its business to IQEQ; by IQEQ's own admission, servicing Related's account from scratch would have required an "army" of resources.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT
### (FORMER EMPLOYEES AND IQEQ)

154. ~~126.~~ Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

155. ~~127.~~ The Former Employees and IQEQ misappropriated Apex Capital's trade secrets and have used and disclosed those trade secrets in connection with their work for Related ~~and~~ at ~~IQ EQ~~ IQEQ, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*. ("DTSA").

156. ~~128.~~ Apex Capital's trade secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.

Page 43

Apex Capital has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

157. ~~129.~~ Apex Capital's trade secrets are related to products or services used in, or intended for use in, interstate commerce.

158. ~~130.~~ At all relevant times, Apex Capital has taken reasonable measures to maintain the confidential and secret nature of its trade secrets.

159. ~~131.~~ The Former Employees took, refused to return, and used and/or disclosed Apex Capital's trade secrets and other valuable business information by improper means in violation of their contractual and other obligations to Apex Capital.

160. ~~132.~~ The Former Employees engaged in this conduct despite acquiring Apex Capital's trade secrets under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, ~~which~~a duty which the Former Employees owed and continue to owe to Apex Capital.

161. IQEQ knew or had reason to know that Apex Capital's information constituted confidential and proprietary information and that Apex Capital claimed ownership and confidentiality rights in that information. Nevertheless, IQEQ sought a "lift and shift" of Apex Capital's systems and information, established repositories for the collection and transfer of Apex Capital information, requested Apex Capital work papers and related materials, and coordinated with Related and the Former Employees regarding the acquisition and transfer of Apex Capital data.

162. ~~133.~~ ~~The~~IQEQ's and the Former Employees' foregoing conduct constitutes an actual and threatened misappropriation and misuse of Apex Capital's trade secrets in violation of the DTSA.

Page 44

163.    ~~134.~~ As a direct and proximate result of IQEQ's and the Former Employees' actual and threatened misappropriation of Apex Capital's trade secrets, Apex Capital has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless IQEQ and the Former Employees are enjoined from engaging in any further acts of misappropriation, and from continued possession in any form of trade secret information belonging to Apex Capital.

164.    ~~135.~~ As a direct and proximate result of IQEQ's and the Former Employees' actual and threatened misappropriation, Apex Capital has suffered and/or will suffer damages and is entitled to all damages and remedies permitted under the DTSA.  Apex Capital's damages include, but are not limited to, loss of the value (actual and expected) of Apex Capital's trade secrets and the amount by which IQEQ, the Former Employees, and Related have been unjustly enriched due to the misappropriation.

## COUNT TWO
## VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT
## (FORMER EMPLOYEES AND IQEQ)

165.    ~~136.~~ Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

166.    ~~137.~~ The Former Employees and IQEQ misappropriated Apex Capital's trade secrets and have used and disclosed those trade secrets in connection with their work for Related and at ~~IQ EQ~~IQEQ, in violation of the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq*. ("TUTSA").

167.    ~~138.~~ Apex Capital's trade secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use.

Apex Capital has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

168.    139. Apex Capital takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of its trade secrets.

169.    140. The Former Employees took, refused to return, and used and/or disclosed Apex Capital's trade secrets and other valuable business information by improper means in violation of their contractual and other obligations to Apex Capital.

170.    141. The Former Employees engaged in this conduct despite acquiring Apex Capital's trade secrets under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, a duty the Former Employees owed and continue to owe to Apex Capital.

171.    IQEQ knew or had reason to know that Apex Capital's information constituted confidential and proprietary information and that Apex Capital claimed ownership and confidentiality rights in that information. Nevertheless, IQEQ sought a "lift and shift" of Apex Capital's systems and information, established repositories for the collection and transfer of Apex Capital information, requested Apex Capital work papers and related materials, and coordinated with Related and the Former Employees regarding the acquisition and transfer of Apex Capital data.

172.    142. The IQEQ's and the Former Employees' foregoing conduct constitutes an actual and threatened misappropriation and misuse of Apex Capital's trade secrets in violation of TUTSA.

173.    143. As a direct and proximate result of IQEQ's and the Former Employees' actual and threatened misappropriation of Apex Capital's trade secrets, Apex Capital has

suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless IQEQ and the Former Employees are enjoined from engaging in any further acts of misappropriation, and from continued possession in any form of trade secret information belonging to Apex Capital.

174.    ~~144.~~ As a direct and proximate result of IQEQ's and the Former Employees' actual and threatened misappropriation, Apex Capital has suffered and/or will suffer damages and is entitled to all damages and remedies permitted under ~~the~~ TUTSA.

**COUNT THREE**
**MISAPPROPRIATION OF CONFIDENTIAL INFORMATION**
**(IQEQ)**

175.    Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

176.    Apex Capital possessed confidential information to which the Former Employees were provided access as necessary to perform their duties for Apex Capital and to service Apex Capital's customers.

177.    The Former Employees were obligated to maintain the confidentiality of Apex Capital's confidential information, not to disclose such information to any third party without Apex Capital's prior written consent, and to return Apex Capital's confidential and proprietary information upon termination of their employment.

178.    The Former Employees breached their confidential relationships with Apex Capital by downloading, copying, retaining, transferring, disclosing, and/or making available Apex Capital's confidential information without authorization, including in connection with their departures from Apex Capital and subsequent employment with IQEQ.

179.    IQEQ improperly discovered Apex Capital's confidential information despite knowing or having reason to know that the information belonged to Apex Capital, was confidential, and was subject to restrictions on access, use, disclosure, and retention.

180.    IQEQ used Apex Capital's confidential information without Apex Capital's authorization, including in connection with IQEQ's efforts to assume the servicing of Related's accounts and to replicate services that Apex Capital had provided to Related.

181.    As a direct and proximate result of IQEQ's misappropriation of Apex Capital's confidential information, Apex Capital has suffered and will continue to suffer damages, including, without limitation, costs incurred to investigate, contain, remediate, and address the unauthorized acquisition, retention, transfer, disclosure, and use of Apex Capital's confidential information; loss of the benefit of Apex Capital's confidential business information; and other damages in an amount to be proven at trial.

**COUNT FOUR**
**BREACH OF THE EMPLOYMENT AGREEMENTS**
**(FORMER EMPLOYEES)**

182.    ~~145.~~ Apex Capital incorporates by reference its allegations set forth in the preceding paragraphs as if fully set forth herein.

183.    ~~146.~~ The Employment Agreements, including the confidentiality, non-competition, and employee non-solicitation covenants contained therein, are valid and enforceable contracts.

184.    ~~147.~~ The Employment Agreements were executed at the commencement of employment and are supported by adequate and sufficient consideration.

185.   ~~148.~~ In their respective Employment Agreements, each of the Former Employees agreed that they would not disclose to any third party or, after termination, retain any confidential information or trade secrets belonging to Apex Capital.

186.   ~~149.~~ By improperly downloading and retaining Apex Capital's trade secrets and confidential information following the termination of their employment with Apex Capital, each of the Former Employees is in violation of the terms of the confidentiality and non-disclosure covenants set forth in their respective Employment Agreements.

187.   ~~150.~~ In their respective Employment Agreements, each of the Former Employees agreed that, for 12 months following the end of their employment with Apex Capital, they would not "enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged."

188.   ~~151.~~ By accepting employment with ~~IQ-EQ~~IQEQ, a direct competitor of Apex Capital with an office in the same city out of which the Former Employees worked while employed by Apex Capital, the Former Employees are in direct violation of the terms of the non-competition covenant set forth in their respective Employment Agreements.

189.   ~~152.~~ In their respective Employment Agreements, each of the Former Employees agreed that, for 12 months after the end of their employment with Apex Capital, they would not induce or solicit any Apex Capital employees to terminate their own employment with Apex Capital.

190.   ~~153.~~ Nonetheless, the Former Employees acted in concert with one another and with Kraus to coordinate their departures from Apex Capital, move to ~~IQ-EQ~~IQEQ (Apex Capital's competitor), and to induce other employees of Apex Capital to terminate employment

Page 49

with Apex Capital in favor of ~~IQ-EQ~~IQEQ.  By engaging in such conduct, the Former Employees violated the non-solicitation covenants set forth in their respective Employment Agreements.

191.    ~~154.~~ The restrictive covenants in the Employment Agreements are reasonable in scope and duration and are necessary to protect Apex Capital's legitimate business interests in securing its confidential and trade secret information, protecting its goodwill with customers and employees, and preserving its business reputation.  Moreover, Apex Capital only seeks to enforce the restrictive covenants to the extent they preclude Former Employees from working for a direct competitor in the Dallas, Texas market.

192.    ~~155.~~ Apex Capital has complied with the material terms of each of the Employment Agreements and has performed its obligations thereunder.

193.    ~~156.~~ As a direct and proximate result of the Former Employees' respective breaches of the Employment Agreements, Apex Capital has suffered and will continue to suffer damages and irreparable harm.

194.    ~~157.~~ Apex Capital is entitled to damages to be proven at trial, as well as pre- and post-judgment interest, and injunctive relief.

### COUNT ~~FOUR~~FIVE
### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (FORMER EMPLOYEES)

195.    ~~158.~~ Apex Capital incorporates by reference its allegations set forth in the preceding paragraphs as if fully set forth herein.

196.    ~~159.~~ The Former Employees—as employees and parties in contract—each owed Apex Capital a duty of good faith and fair dealing.

197.    ~~160.~~ By taking the actions detailed herein—including misappropriating Apex Capital's trade secrets and confidential information, coordinating the mass exodus of the employees supporting Related, and by conspiring with Related to move its business to Apex Capital's direct competitor, ~~IQ-EQ~~IQEQ—the Former Employees destroyed Apex Capital's right to receive the fruits of the Employment Agreements.  Thus, the Former Employees breached their duty of good faith and fair dealing.

198.    ~~161.~~ As a direct and proximate result of the Former Employees' breach of the duty of good faith and fair dealing, Apex Capital has suffered and will continue to suffer injury. Such injury includes, but is not limited to, loss of the value (actual and expected) of Apex Capital's investment in acquiring SandsPoint, the cost of replacing numerous experienced employees, and the loss of revenue reasonably foreseeable from the Former Employees' departure with Apex Capital's client, Related.

199.    ~~162.~~ Apex Capital is further entitled to an award of punitive damages sustained by Apex Capital as a result of the Former Employees' breach of the duty of good faith and fair dealing, including their willful and malicious conduct.

**COUNT ~~FIVE~~SIX**
**TORTIOUS INTERFERENCE WITH ~~EXISTING CONTRACT~~EMPLOYMENT AGREEMENTS**
**(RELATED AND KRAUS)**

200.    ~~163.~~ Apex Capital incorporates by reference its allegations set forth in the preceding paragraphs as if fully set forth herein.

201.    ~~164.~~ Apex Capital was a party to the Employment Agreements, which are valid and enforceable contracts.

202.    ~~165.~~ Related and Kraus were aware that the Former Employees had Employment Agreements with Apex Capital containing confidentiality provisions and non-competition and

non-solicitation provisions.  Such provisions are standard in the financial industry, and the Former Employees would have discussed the existence of these restrictive covenants with Kraus in connection with their plans to leave Apex Capital in favor of employment with ~~IQ-EQ~~IQEQ.

203.    ~~166.~~ Related and Kraus willfully and intentionally interfered with the Employment Agreements by inducing the Former Employees (i) to breach their Employment Agreements by stealing Apex Capital's confidential information and trade secrets, (ii) to leave their employment with Apex Capital in favor of employment with ~~IQ-EQ~~IQEQ, in violation of the non-competition covenants in their Employment Agreements, and (iii) to solicit other Apex Capital employees to work for ~~IQ-EQ~~IQEQ, in violation of the non-solicitation covenants in their Employment Agreements.

204.    ~~167.~~ Apex Capital had a reasonable expectation that the Former Employees would comply with their Employment Agreements and that Apex Capital would receive the benefit of the bargain embodied in the Employment Agreements.

205.    ~~168.~~ By engaging in the wrongful and unlawful conduct described herein, Related and Kraus tortiously, intentionally, and willfully interfered with Apex Capital's contractual relationships with the Former Employees for their own benefit, without right or justification, and at the expense of Apex Capital.

206.    ~~169.~~ As a direct and proximate result of Related's and Kraus's intentional interference with the Employment Agreements, Apex Capital has suffered and will continue to suffer damages and irreparable harm, including damage to the reputation and goodwill of Apex Capital and the loss of customers and employees, for which Apex Capital has no adequate remedy at law.

207. ~~170.~~ Apex Capital is entitled to injunctive relief restraining Related and Kraus from further tortious interference, an award of damages sustained by Apex Capital as a result of Related's and Kraus's actions, punitive damages, and any other available legal and equitable relief.

**COUNT ~~SIX~~SEVEN**
**BREACH OF THE MSA**
**(RELATED)**

208. ~~171.~~ Apex Capital incorporates by reference its allegations set forth in the preceding paragraphs as if fully set forth herein.

209. ~~172.~~ The MSA is a valid and enforceable contract between Apex Capital and Related.

210. ~~173.~~ Apex Capital performed its obligations under the MSA by providing the contracted services to Related.  Further, Apex Capital performed its obligations to Related in good faith and with all due care, skill, and diligence expected of a provider of similar services in the same market.

211. ~~174.~~ Related breached the MSA by refusing to pay Apex Capital for services rendered.

212. ~~175.~~ Related further breached the MSA by purporting to terminate the contract without affording Apex Capital an opportunity to cure, as required.

213. ~~176.~~ As a direct and proximate result of Related's breach, Apex Capital has suffered damages in the form of unpaid invoices in the amount of at least $1.84 million, as well as pre- and post-judgment interest.

214. ~~177.~~ As a direct and proximate result of Related's breach, Apex Capital also has suffered additional foreseeable injuries, including but not limited to costs and damages

associated with ~~of~~ hiring additional employees at Related's request, reallocating employees to Related's account in lieu of their other work responsibilities, and performing additional work requested by Related without compensation.

**COUNT ~~SEVEN~~EIGHT**
**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
**(RELATED)**

215. ~~178.~~ Apex Capital incorporates by reference its allegations set forth in the preceding paragraphs as if fully set forth herein.

216. ~~179.~~ Related—as a party in contract—owed Apex Capital a duty of good faith and fair dealing.

217. ~~180.~~ By taking the actions detailed herein—including by manufacturing complaints about Apex Capital's service while secretly plotting to move its business to ~~IQ-EQ~~IQEQ, conspiring with the Former Employees to misappropriate Apex Capital's trade secrets and confidential information, coordinating the mass exodus of Apex Capital's employees supporting Related, and by conspiring with the Former Employees to move its business to ~~IQ-EQ~~IQEQ—Related destroyed Apex Capital's right to receive the fruits of the MSA. Thus, Related breached its duty of good faith and fair dealing.

218. ~~181.~~ As a direct and proximate result of Related's breach of the duty of good faith and fair dealing, Apex Capital has suffered and will continue to suffer injury. Such injury includes, but is not limited to, loss of revenue associated with the MSA and loss of the value (actual and expected) of Apex Capital's investment in servicing Related's account.

219. ~~182.~~ Apex Capital is further entitled to an award of punitive damages sustained by Apex Capital as a result of Related's breach of the duty of good faith and fair dealing, including its willful and malicious conduct.

**COUNT ~~EIGHT~~NINE**
**BREACH OF FIDUCIARY DUTY**
**(FORMER EMPLOYEES)**

220.    ~~183.~~ Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

221.    ~~184.~~ The Former Employees all held positions of trust and confidence with Apex Capital while employed by Apex Capital, and each owed Apex Capital a fiduciary duty.

222.    ~~185.~~ By taking the actions detailed herein, including misappropriating Apex Capital's trade secrets, coordinating the mass exodus of the employees supporting Related, and by conspiring with Related to move its business to Apex Capital's direct competitor, ~~IQ EQ~~IQEQ, the Former Employees breached their fiduciary duties owed to Apex Capital.

223.    ~~186.~~ As a direct and proximate result of the Former Employees' breaches of their respective fiduciary duties, Apex Capital has suffered and will continue to suffer damages in an amount to be proven at trial.

224.    ~~187.~~ Apex Capital is further entitled to an award of punitive damages sustained by Apex Capital as a result of the Former Employees' breaches of their respective fiduciary duties, including their willful and malicious conduct.

**COUNT ~~NINE~~TEN**
**UNJUST ENRICHMENT**
**(~~ALL DEFENDANTS~~RELATED, KRAUS, AND FORMER EMPLOYEES)**

225.    ~~188.~~ Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

226.    ~~189.~~ Apex Capital alleges in the alternative to its breach of contract claims that Apex Capital is entitled to recover under the doctrine of unjust enrichment if the Court determines that either a valid and enforceable contract does not exist, that the existing contracts

do not cover the subject matter of this dispute, or that the existing contracts are void, invalid, or unenforceable.

227.    ~~190.~~ As a result of their misconduct detailed herein, Defendants have been unjustly enriched or will be unjustly enriched through:

228.    ~~a.~~ The use of and access to Apex Capital's trade secrets and confidential information wrongfully misappropriated by the Former Employees; and

229.    ~~b.~~ The use of and access to Apex Capital's personnel who were induced to and left Apex Capital in violation of their Employment Agreements.

230.    ~~191.~~ Further, Related has been unjustly enriched by Apex Capital's employment of additional personnel to service Related's accounts after its corporate raid of Apex Capital and through retention of the fees that should have been paid to Apex Capital for its services.

231.    ~~192.~~ The enrichment to Defendants came at the expense of Apex Capital, which incurred considerable expense to acquire SandsPoint, to hire additional staff to service Related, and to accommodate extra-contractual requests for service by Related.

232.    ~~193.~~ The retention of these benefits by Defendants under the circumstances is inequitable and, therefore, Defendants should be required to disgorge their wrongful gains.

**COUNT ~~TEN~~ELEVEN**
**CIVIL CONSPIRACY**
**(~~ALL DEFENDANTS~~RELATED, KRAUS, AND FORMER EMPLOYEES)**

233.    ~~194.~~ Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

234.    ~~195.~~ Defendants unlawfully and secretly combined and agreed among themselves to take the tortious and improper actions described herein in concert for the purpose of and with the effect of benefitting themselves and ~~IQ-EQ~~IQEQ, to the detriment of Apex Capital.

Page 56

235.    196. To facilitate their unlawful conspiracy, Defendants deliberately engaged in the various unlawful activities described herein, including but not limited to breaching their fiduciary duties, engaging in willful, malicious, and intentional conduct, and tortiously interfering with contracts.

236.    197. Defendants designed and carried out their conspiracy knowing that Apex Capital would be unfairly and unlawfully crippled in its ability to retain and compete for customers and business.

237.    198. Defendants' conduct was willful and intentional, and Apex Capital has been damaged and will continue to be damaged by their actions.

238.    199. As a direct and proximate result of Defendants' conduct, Apex Capital has suffered and will continue to suffer injury.  Such injury includes, but is not limited to, loss of expected revenue from Related, the amount by which Defendants have been unjustly enriched by the use of Apex Capital's confidential information at IQ-EQIQEQ, and the loss of enterprise value suffered by Apex Capital as a result of Defendants' actions.

239.    200. Apex Capital is further entitled to an award of punitive damages sustained by Apex Capital as a result of Defendants' conduct, including their willful and malicious conduct.

**COUNT TWELVE**
**TORTIOUS INTERFERENCE WITH MSA**
**(IQEQ)**

240.    Apex Capital incorporates by reference its allegations set forth in the preceding paragraphs as if fully set forth herein.

241.    Apex Capital was a party to the MSA, a valid and enforceable contract.

242.    IQEQ was aware that Related and Apex were parties to the MSA.

243.    Apex Capital had a reasonable expectation that Related would comply with the MSA and that Apex Capital would receive the benefit of the bargain embodied in the MSA.

244.    IQEQ willfully and intentionally interfered with the MSA by: working hand-in-hand with Related and the Former Employees to acquire the confidential information and work product necessary to replicate Apex Capital's services, coordinating with Related to manufacture a pretext for terminating the agreement, and ultimately urging Related to prematurely terminate the MSA. By engaging in the wrongful and unlawful conduct described herein, IQEQ tortiously, intentionally, and willfully interfered with Apex Capital's contractual relationship with Related for its own benefit, without right or justification, and at the expense of Apex Capital.

245.    Following IQEQ's intentional interference, Related breached the MSA by refusing to pay Apex Capital for services rendered and by purporting to terminate the contract without affording Apex Capital an opportunity to cure.

246.    As a direct and proximate result of IQEQ's tortious interference with the MSA, Apex Capital has suffered damages in the form of unpaid invoices in the amount of at least $1.84 million, as well as pre- and post-judgment interest.  Apex Capital also has suffered additional foreseeable injuries, including but not limited to, costs and damages associated with hiring additional employees at Related's request, reallocating employees to Related's account in lieu of their other work responsibilities, and performing additional work requested by Related without compensation.

247.    Apex Capital has suffered and will continue to suffer damages and irreparable harm, including damage to the reputation and goodwill of Apex Capital and the loss of customers and employees, for which Apex Capital has no adequate remedy at law.

248.     Apex Capital is entitled to injunctive relief restraining IQEQ from further tortious interference, an award of damages sustained by Apex Capital as a result of IQEQ's actions, punitive damages, and any other available legal and equitable relief.

## COUNT THIRTEEN
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## (IQEQ)

249.     Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

250.     The Former Employees all held positions of trust and confidence with Apex Capital while employed by Apex Capital, and each owed Apex Capital a fiduciary duty.

251.     The Former Employees breached those duties by, among other things, misappropriating Apex Capital's trade secrets, coordinating the mass exodus of the employees supporting Related, and by conspiring with IQEQ and Related to move Related's business to Apex Capital's direct competitor, IQEQ.

252.     IQEQ had actual knowledge of those fiduciary duties and the Former Employees' breaches thereof.

253.     IQEQ knowingly induced and provided substantial assistance to the Former Employees in carrying out those breaches.  Among other things, IQEQ facilitated the acquisition and transfer of Apex Capital's trade secrets and confidential information, worked with Related to transition business away from Apex Capital, and otherwise assisted conduct that violated duties owed to Apex Capital.

254.     IQEQ's substantial assistance was a direct and proximate cause of Apex Capital's injuries.

255. As a result, Apex Capital has suffered damages in an amount to be determined at trial.

**COUNT FOURTEEN**
**FRAUDULENT INDUCEMENT**
**(IQEQ)**

256. Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

257. In February 2025, while the Texas Action was pending, IQEQ sought to secure its dismissal from that lawsuit by inducing Apex Capital to enter into the Settlement Agreement.

258. In connection with the negotiation of the Settlement Agreement, IQEQ, through its Group General Counsel, Chris Marsden, knowingly made numerous representations of existing fact and present intent, including that it had "not made any use of any proprietary Apex data in its discussions with Related regarding additional services" and that it would not use any Apex proprietary data for "commercial purposes."

259. At the time IQEQ made these representations, they were false, and IQEQ knew they were false or made them with reckless disregard for their truth. In reality, IQEQ had already participated in and continued to participate in the coordinated scheme alleged herein, including by coordinating with Related and the Former Employees to obtain and exploit Apex Capital's confidential information and trade secrets and facilitating the transition of Related's business to IQEQ using Apex Capital's personnel, work product, and proprietary information.

260. IQEQ made these misrepresentations with the intent that Apex Capital would rely upon them by dismissing IQEQ from the Texas Action and entering into the Settlement Agreement rather than continuing to pursue claims and immediate equitable relief against IQEQ.

261. Apex Capital reasonably relied on IQEQ's representations. Had Apex Capital known the true facts—that IQEQ had already engaged in and intended to continue the coordinated misconduct alleged herein—it would not have entered into the Settlement Agreement or voluntarily dismissed IQEQ from the Texas Action.

262. In reliance on IQEQ's fraudulent misrepresentations, Apex Capital entered into the Settlement Agreement, dismissed IQEQ from the Texas Action, refrained from pursuing immediate injunctive relief, and delayed discovery into IQEQ's misconduct.

263. As a direct and proximate result of IQEQ's fraudulent inducement, IQEQ became further entrenched as Related's service provider, additional Apex Capital employees departed for IQEQ, Apex Capital's confidential information and trade secrets were further disseminated and exploited, Apex Capital lost additional business opportunities, and Apex Capital incurred substantial additional litigation expenses and other damages that would not have occurred had IQEQ truthfully disclosed its conduct.

264. IQEQ's conduct was willful, malicious, and undertaken with conscious disregard of Apex Capital's rights, entitling Apex Capital to recover compensatory and punitive damages in an amount to be determined at trial.

## COUNT FIFTEEN
## BREACH OF THE SETTLEMENT AGREEMENT
## (IQEQ)

265. Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

266. Apex Capital and IQEQ entered into the Settlement Agreement to resolve Apex's claims against IQEQ in the Texas Action.

Page 61

267.    The Settlement Agreement is a valid and enforceable contract between Apex Capital and IQEQ.

268.    Apex Capital performed its obligations under the Settlement Agreement by dismissing all claims against IQEQ in the Texas Action.

269.    Related breached the Settlement Agreement by conspiring with Related and the Former Employees to misappropriate Apex Capital's trade secrets and confidential information.

270.    As a direct and proximate result of IQEQ's breach, IQEQ has become substantially entrenched as Related's service provider, Apex Capital's trade secrets and confidential information have been further disseminated, Apex Capital has lost additional personnel and business opportunities, and Apex Capital has incurred substantial additional litigation expenses and damages that would have been avoided had IQEQ truthfully disclosed its conduct.

271.    As a result, Apex Capital has suffered damages in an amount to be determined at trial.

**COUNT SIXTEEN**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(IQEQ)**

272.    Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

273.    Apex Capital and IQEQ entered into the Settlement Agreement to resolve Apex's claims against IQEQ in the Texas Action.

274.    Implicit in the Settlement Agreement was a covenant that neither party would act in a manner that deprived the other of the fruits of the parties' agreement or rendered the agreement illusory.

275.    IQEQ represented that it would refrain from using Apex Capital's proprietary information.

276.    Contrary to those representations and in bad faith, IQEQ conspired with Related and the Former Employees to misappropriate Apex Capital's trade secrets and confidential information—thus destroying Apex Capital's right to receive the fruits of the agreement resolving the Texas Action.  IQEQ therefore breached its duty of good faith and fair dealing.

277.    As a direct and proximate result of IQEQ's breach of the duty of good faith and fair dealing, Apex Capital has suffered and will continue to suffer injury.

278.    Apex Capital is further entitled to an award of punitive damages sustained by Apex Capital as a result of IQEQ's breach of the duty of good faith and fair dealing, including its willful and malicious conduct.

**APPLICATION FOR PERMANENT INJUNCTIVE RELIEF**

279.    201.  Apex Capital incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

280.    202.  Each of the Former Employees has misappropriated Apex Capital's confidential and trade secret information or has used or benefited from the misappropriated confidential and trade secret information.  If their conduct is not immediately stopped and is permitted to proceed unabated, the Former Employees could continue to disclose and otherwise misuse Apex Capital's confidential and trade secret information, which will cause irreparable harm to Apex Capital for which there is no adequate remedy at law, including, without limitation, loss of business opportunities and loss of goodwill and business reputation.  Such harm is not readily reduced to monetary damages.

281. 203. The Former Employees are in clear breach of their non-competition obligations under their respective Employment Agreements, as each is currently employed by IQ-EQ, a direct competitor of Apex Capital in the very same market, Dallas, Texas.  If the Former Employees are not barred from continuing to work for IQ-EQ, Apex Capital will suffer irreparable harm from the improper use of its confidential and trade secret information and from the loss of its customer goodwill.

282. 204. Moreover, if the Former Employees are not enjoined from continuing to solicit their former Apex Capital colleagues to join them at IQ-EQ, and to further hinder Apex Capital's ability to staff projects, serve clients, and protect its confidential and trade secret information and customer goodwill, Apex Capital will suffer irreparable harm.

283. 205. Further, if the Former Employees are not compelled to return Apex Capital's confidential information and trade secrets that they misappropriated, Apex Capital will suffer irreparable harm.

284. 206. There is a substantial likelihood that Apex Capital will prevail on the merits of its claims.

285. 207. If injunctive relief is not entered, Apex Capital will suffer irreparable harm, and monetary damages will not be sufficient to redress Apex Capital's injuries.

286. 208. The threatened injury to Apex Capital outweighs any possible damage to the Defendants.

287. 209. The public interest would be served by the entry of the requested injunctive relief.

**PRAYER FOR RELIEF**

Apex Capital prays that this Court enter judgment against Defendants, jointly and severally, and award Apex Capital the following relief:

a.      Grant Apex Capital permanent injunctive relief (i) prohibiting Defendants (and all those acting in concert with them) from maintaining, disclosing, or otherwise using any Apex Capital trade secrets and/or confidential information; and (ii) requiring Defendants to return to Apex Capital all of Apex Capital's trade secrets and confidential information in their possession, custody, or under their control;

b.      Grant Apex Capital permanent injunctive relief compelling the Former Employees to abide by the non-competition covenant set out in Section 4(b) of their Employment Agreements;

c.      Grant Apex Capital permanent injunctive relief compelling the Former Employees to abide by the employee non-solicitation covenant set out in Section 4(c) of the Employment Agreement executed by each of the Former Employees at the outset of employment with Apex Capital and supported by sufficient consideration;

d.      Require Defendants, at their own cost, to make available to a third-party forensic expert any and all personal and business USB drives, cell phones, computers, hard drives, tablets, other electronic devices, email accounts, and cloud-based file management accounts (such as Google Drive) owned or used by Defendants, on which Apex Capital's trade secrets and/or confidential information resides, has resided, or may reside, for the purpose of determining the extent of their acts in violation of their contractual, statutory, and common law obligations;

e.      Award Apex Capital monetary damages to compensate for economic injuries caused as a result of Defendants' conduct;

f.      Award Apex Capital treble, exemplary, and/or punitive damages;

g.      Award Apex Capital its attorneys' fees and costs incurred in this action; and

h.      Grant such other and further relief as the Court deems just and proper.

Date: ~~November 5~~July 27, ~~2025~~2026        Respectfully submitted,

PILLSBURY WINTHROP SHAW PITTMAN LLP

/s/   ~~Stephanie M. Coughlan~~Brian L. Beckerman

Brian L. Beckerman
Stephanie M. Coughlan

Page 65

31 West 52nd Street
New York, NY 10019-6131
(212) ~~858-1149~~858-1500
brian.beckerman@pillsburylaw.com
stephanie.coughlan@pillsburylaw.com

Amy L. Ruhland (admitted *pro hac vice* ~~*forthcoming*~~)
Abigail L. Griffith (admitted *pro hac vice* ~~*forthcoming*~~)
401 W 4th Street
Suite 3200
Austin, TX 78701
(512) 580-9600
amy.ruhland@pillsburylaw.com
abby.griffith@pillsburylaw.com

*Attorneys for Apex Group Capital Advisors LLC*