**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| APEX GROUP CAPITAL ADVISORS LLC F/K/A SANDSPOINT CAPITAL ADVISORS LLC, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:25-cv-08892 |
| RELATED FUND MANAGEMENT, LLC; JAMES KRAUS; LUCAS BELINKIE; PRESTON CALLEN; WILLIAM C. CHANEY; and RYAN HOPE, | § § § § § § § | |
| Defendants. | § | |

**AMENDED MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION TO AMEND FIRST AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT..................................................................................... 1

II.   PROCEDURAL & FACTUAL BACKGROUND....................................................... 4

      A.    IQEQ Actively Worked with the Former Employees to Solicit and Hire Apex
            Capital's Core Team............................................................................................ 6

      B.    IQEQ Facilitated the Misappropriation of Apex Capital's Confidential and
            Trade Secret Information .................................................................................... 6

      C.    Armed with Apex Capital's Key Personnel and Confidential and Trade Secret
            Information, IQEQ Then Urged Related to "Imminently" Terminate the MSA........... 8

      D.    IQEQ Fraudulently Misrepresented the Former Employees' Misconduct and
            Its Own Involvement to Secure Its Dismissal from the First Texas Action.................. 8

III.  LEGAL STANDARD .................................................................................................. 10

IV.   ARGUMENT ............................................................................................................... 10

      A.    Apex Capital Did Not Unduly Delay Seeking Amendment ..................................... 11

      B.    Apex Capital Seeks Amendment in Good Faith ...................................................... 13

      C.    Defendants Will Not Be Prejudiced by the Proposed Amendment............................ 14

      D.    The Proposed Amendment Is Not Futile................................................................ 16

            1.    Misappropriation of Trade Secrets Under DTSA and TUTSA ........................ 16

            2.    Misappropriation of Confidential Information.............................................. 17

            3.    Tortious Interference with the MSA............................................................. 19

            4.    Aiding and Abetting Breach of Fiduciary Duty ............................................ 20

            5.    Fraudulent Inducement............................................................................... 21

            6.    Breach of the Settlement Agreement............................................................ 22

            7.    Breach of Implied Covenant of Good Faith and Fair Dealing ........................ 23

      E.    Good Cause Exists to Modify the Scheduling Order Under Rule 16(b)(4)................ 23

V.    CONCLUSION............................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Agerbrink v. Model Serv. LLC*,
  155 F. Supp. 3d 448 (S.D.N.Y. 2016)......................................................................................15

*Anderson v. Durant*,
  550 S.W.3d 605 (Tex. 2018)...................................................................................................22

*Apex Group Capital Advisors LLC v. IQEQ US Management Co.*,
  *LLC et al.*, No. 3:25-cv-00260 (N.D. Tex.) .............................................................................5

*Catalyst Advisors, L.P. v. Catalyst Advisors Inv'rs Glob. Inc.*,
  602 F. Supp. 3d 663 (S.D.N.Y. 2022)......................................................................................17

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, No. 14-MC-2548 (VEC),
  2017 WL 9480384, at *3 (S.D.N.Y. June 8, 2017) .................................................................23

*Cooper v. Trs. of Coll. of Holy Cross*,
  No. 13 Civ. 8064 KPF, 2014 WL 2738545 (S.D.N.Y. June 17, 2014) ...................................15

*Darocy v. Abildtrup*,
  345 S.W.3d 129 (Tex. App.—Dallas 2011, no pet.)............................................................20, 21

*DGI-BNSF Corp. v. TRT LeaseCo, LLC*,
  No. 18-CV-3252 (VEC), 2019 WL 5781973 (S.D.N.Y. Nov. 6, 2019) ...................................11

*Fishoff v. Coty Inc.*,
  634 F.3d 647 (2d Cir. 2011)......................................................................................................23

*Friedl v. City of New York*,
  210 F.3d 79 (2d Cir. 2000)........................................................................................................11

*Getaway 151, LLC v. ACE Prop. & Cas. Ins. Co.*,
  No. 25 CIV. 2975 (PAE), 2025 WL 2910594 (S.D.N.Y. Oct. 14, 2025)...........................15, 16

*ITC Ltd. v. Punchgini, Inc.*,
  9 N.Y.3d 467 (2007) .................................................................................................................18

*J. Pub. Co. v. Am. Home Assur. Co.*,
  771 F. Supp. 632 (S.D.N.Y. 1991)......................................................................................11, 12

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)......................................................................................................10

*Martin v. Sprint/United Mgmt. Co.*,
No. 15 CIV. 5237 (PAE), 2016 WL 2757431 (S.D.N.Y. May 12, 2016) ...................11, 13, 14

*Meadows v. Planet Aid, Inc.*,
676 F. Supp. 2d 83 (E.D.N.Y. 2009) ...............................................................................21, 22

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
998 F. Supp. 2d 157 (S.D.N.Y. 2014), *aff'd sub nom. DeAngelis v. Corzine*, 611 F. App'x 34
(2d Cir. 2015)......................................................................................................................20

*Michalek v. Amplify Sports & Ent. LLC*,
No. 11 Civ. 508 (PGG), 2012 WL 2357414 (S.D.N.Y. June 20, 2012) ..................................10

*Nwokenkwo v. JP Morgan Chase Bank, N.A.*,
No. 14-22-00001-CV, 2023 WL 3115697 (Tex. App.—Houston [14th Dist.] Apr. 27, 2023,
pet. denied)..................................................................................................................22, 23

*On Track Innovations Ltd. v. T-Mobile USA, Inc.*,
No. 12 CIV. 2224 AJN JCF, 2014 WL 406497 (S.D.N.Y. Feb. 3, 2014) ...............................16

*Perez v. Escobar Constr., Inc.*,
342 F.R.D. 378 (S.D.N.Y. 2022) .......................................................................................14

*Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*,
29 S.W.3d 74 (Tex. 2000)..............................................................................................19, 20

*Regeneron Pharm., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024) ..............................................................................................19

*Retail Services WIS Corp. v. Crossmark, Inc.*,
No. 05-20-00937-CV, 2021 WL 1747033 (Tex. App.—Dallas May 4, 2021, pet. denied)....17

*Samsung Elecs. Am., Inc. v. Yang Kun Chung*,
No. 3:15-CV-4108-D, 2017 WL 635031 (N.D. Tex. Feb. 16, 2017) .....................................18

*Schottenstein v. Lee*,
No. 22CV1197 (DLC), 2024 WL 515247 (S.D.N.Y. Feb. 9, 2024).......................................14

*Sicom S.P.A. v. TRS Inc.*,
168 F. Supp. 3d 698 (S.D.N.Y. 2016)..................................................................................22

*TNS Media Research, LLC v. TRA Global, Inc.*,
No. 11 Civ. 4039 (SAS), 2012 WL 2052679 (S.D.N.Y. June 4, 2012)..................................11

## Statutes and Codes

Defend Trade Secrets Act, 18 U.S.C. §§ 1831–1839 ..................................................................16

Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001–134A.008........16

Rules and Regulations

Federal Rules of Civil Procedure
    Rule 15 ................................................................................................................1, 4, 10, 11
    Rule 16 ................................................................................................................1, 10, 23, 24
    Rule 21 ................................................................................................................1, 4, 10, 11

Plaintiff Apex Group Capital Advisors LLC ("Apex Capital")[1] respectfully moves for leave to file the proposed Second Amended Complaint ("SAC") attached to the Beckerman Declaration as Exhibit A, pursuant to Rules 15(a)(2), 16(b)(4), and 21 of the Federal Rules of Civil Procedure.[2] The proposed amendment adds IQEQ US Management Co., LLC ("IQEQ") as a defendant and asserts claims arising from IQEQ's central role in the coordinated misconduct already at issue in this litigation.

## I.    PRELIMINARY STATEMENT

This motion arises from a development in discovery that fundamentally alters the landscape of this case. Newly-discovered evidence demonstrates that IQEQ was not merely the beneficiary of the transition of one of Apex Capital's most valuable client relationships—Defendant Related—and the core personnel responsible for servicing and growing it—the Former Employees. Rather, IQEQ was the principal architect.

Determined to capture the Related account worth millions in annual revenue—business that Belinkie and Chaney admitted "IQEQ would love to steal" (Beckerman Decl. Ex. C)—IQEQ recognized that it could not seamlessly displace Apex Capital without also acquiring the core employees who had serviced the account for nearly a decade, along with Apex Capital's proprietary information, institutional knowledge and work product that enabled those services. To accomplish that objective, IQEQ worked hand-in-hand with Related, its Chief Financial Officer James Kraus,

---

[1] Capitalized terms not defined herein have their meaning as in Apex Capital's First Amended Complaint, Dkt. 80. The Declaration of Brian L. Beckerman, dated July 27, 2026, filed contemporaneously herewith, is referenced herein as the "Beckerman Declaration" or "Beckerman Decl." Defendant Related Fund Management, LLC is referenced herein as "Related." Defendants Lucas Belinkie, Preston Callen, William Chaney, and Ryan Hope are collectively referenced herein as the "Former Employees."

[2] A redline comparing the First Amended Complaint ("FAC") against the SAC is attached to the Beckerman Declaration as Exhibit B.

and the Former Employees to orchestrate the transition of the Related account from Apex Capital to IQEQ with minimal disruption.

In short, IQEQ's stratagem was simple: **get the team, get the data, then get the business**. Or, as Belinkie and Chaney put it, "lift and shift" the Related team, data and account from Apex Capital to IQEQ. *See* Beckerman Decl. Exs. D and E. With help from Related, Kraus and the Former Employees, IQEQ did just that.

*First*, IQEQ recruited the key Apex Capital employees responsible for servicing the Related account, notwithstanding their non-competition and non-solicitation restrictions and fiduciary obligations to Apex Capital. To circumvent those restrictions, IQEQ spearheaded the recruitment efforts so it would look like the Former Employees were not involved. Knowing that a mass migration of employees would set off red flags, IQEQ strategically hired Apex Capital employees in tranches. Within six months, 11 Apex Capital employees who had serviced the Related account had resigned, with many moving to IQEQ, including all four Former Employees.

*Second*, IQEQ pursued what it described as a "pure lift" of Apex Capital's trade secret and confidential information created over Apex Capital's nine-year relationship with Related to enable IQEQ to service the Related account immediately without any disruption. *See* Beckerman Decl. Ex. F. Specifically, IQEQ established a cloud-based repository to collect Apex Capital's confidential and trade secret information, directed the transfer of such information, and even scripted communications for Related to send Apex Capital to facilitate the transfer of such information. Notably, the very same day IQEQ's Head of Fund Administration, Ben Jamron, created an Egnyte link for purposes of housing "a final set of work papers as of 9/30 for all of the [Related] entities," Belinkie downloaded hundreds of confidential files from Apex's database concerning the Related account. *See* Beckerman Decl. Ex. G. The Former Employees collectively

2

downloaded tens of thousands of documents from Apex Capital's database in the weeks preceding their departure as part of their "lift and shift" objective. *See* Beckerman Decl. Exs. D and E.

Once IQEQ believed it had secured both the personnel and the information necessary to replicate Apex Capital's services, it then urged Related to "get tough" with Apex Capital and "terminat[e] . . . imminently" its Master Services Agreement between Apex Capital and Related (the "MSA"), using the loss of key personnel that IQEQ and Related themselves set in motion as the pretext. *See* Beckerman Decl. Ex. H. As a result, Apex Capital lost Related as a customer, and, with it, millions of dollars in annual revenue. Without the core employees and prior work product, Related would never have transferred its business to IQEQ; by IQEQ's own admission, servicing Related's account from scratch would have required an "army" of resources. *See* Beckerman Decl. Ex. I.

These facts were not known when Apex Capital initially commenced this action. To the contrary, Apex Capital previously dismissed claims against IQEQ based on representations, among other things, (i) that IQEQ had launched a "full forensic investigation" into Apex Capital's allegations that the Former Employees had misappropriated Apex Capital's confidential data before joining IQEQ, and (ii) that IQEQ had not used Apex Capital's proprietary information in connection with Related, and would not use such information for any commercial purposes. *See* Beckerman Decl. Ex. J. Weeks later, IQEQ informed Apex Capital of the results of its forensic investigation: there was "[n]o retention of Apex Information on IQEQ's systems", and "[n]o evidence of the [Former Employees] engaging in 'Bad Actor' activity." *See* Beckerman Decl. Ex. K.

As set forth below, those representations were knowingly false. Discovery in this action has revealed a materially different reality—one in which IQEQ actively orchestrated the very

3

misconduct it previously denied. Recent events have only further undermined IQEQ's prior representations and reinforced that they cannot be reconciled with the facts now known. Just last week, counsel for Chaney disclosed that, notwithstanding IQEQ's purported "exhaustive" internal investigation, an entire archived Outlook .pst file—containing over seven years of Apex Capital emails, calendar invites, and attachments—had suddenly been located on Chaney's personal laptop. *See* Beckerman Decl. Exs. K and L. That revelation calls into serious question IQEQ's representations upon which Apex Capital relied when dismissing IQEQ from that prior case.

In light of the above newly-discovered evidence, Apex Capital now seeks to add IQEQ as a defendant and assert claims against IQEQ for: misappropriation of Apex Capital's trade secrets and confidential information; tortious interference with the MSA; aiding and abetting breach of fiduciary duty; fraudulent inducement; breach of the settlement agreement; and breach of the implied covenant of good faith and fair dealing. These claims arise from the same nucleus of operative facts already before the Court and are supported by the documentary evidence produced during discovery.

Federal Rules of Civil Procedure 15(a)(2) and 21 embody a liberal policy favoring amendment and joinder where, as here, justice so requires. Apex Capital did not delay in moving to amend, the amendment is sought in good faith, Defendants would not be prejudiced by this amendment, and the amendment is not futile. Accordingly, the Court should grant Apex Capital leave to file its proposed SAC.

## II.    PROCEDURAL & FACTUAL BACKGROUND

This litigation follows an earlier action filed by Apex Capital in the Northern District of Texas. On January 31, 2025, Apex Capital sued IQEQ and the Former Employees in the United States District Court for the Northern District of Texas (the "First Texas Action"). *See Apex Group*

*Capital Advisors LLC v. IQEQ US Management Co, LLC et al.*, Case No. 3:25-cv-00260. In that action, as against IQEQ, Apex Capital asserted five claims stemming from IQEQ's interference with the Former Employees' contractual non-competition, non-solicitation, and confidentiality obligations to Apex Capital: tortious interference with contract; tortious interference with prospective business relations; unjust enrichment; unfair competition; and civil conspiracy. *See id*.

In February 2025, Apex Capital agreed to dismiss IQEQ from the First Texas Action based on IQEQ's representations during settlement (the "Settlement Agreement") regarding, among other things, its lack of involvement in the misconduct alleged and its commitment to launch a "full forensic investigation into the[] allegations of data exfiltration." *See* Beckerman Decl. Ex. J. IQEQ specifically represented that it would not use "any Apex proprietary data . . . for commercial purposes" and, more specifically, that it had "not made any use of any proprietary Apex data in its discussions with Related regarding additional services." *See id*. IQEQ also represented it would restrict the Former Employees from working on the Related account for 12 months if they were found to have misappropriated Apex Capital's confidential and proprietary information or trade secrets. *See id.* Based on those representations, Apex Capital dismissed IQEQ from the First Texas Action with prejudice and dismissed the Former Employees without prejudice.

Shortly thereafter, however, Apex Capital uncovered evidence demonstrating that the Former Employees' misconduct—and the coordinated scheme in which they participated with Related and Kraus—was far more egregious and extensive than initially understood, prompting Apex Capital to commence this action against the Former Employees, Related, and Kraus on May 27, 2025. The First Amended Complaint asserts ten claims against the Former Employees, Related and Kraus, all stemming from the coordinated departure of Apex Capital employees, the alleged

misappropriation of Apex's confidential information and trade secrets, and the transition of Related's business from Apex Capital to IQEQ. *See* Dkt. 80.

On January 9, 2026, the Court entered its Civil Case Management Plan and Scheduling Order, setting September 30, 2026 as the deadline for fact discovery. *See* Dkt. 112. Evidence disclosed during discovery in this case has uncovered the following:

### A.    IQEQ Actively Worked with the Former Employees to Solicit and Hire Apex Capital's Core Team

Discovery demonstrates that IQEQ recruited and hired the key Apex Capital employees responsible for servicing the Related account, knowing that it could not get Related's business without them. IQEQ started by recruiting the four Former Employees, each of whom were bound by confidentiality, non-competition and non-solicitation obligations to IQEQ. To circumvent those restrictions, IQEQ spearheaded the recruitment efforts so it would look like the Former Employees were not involved. In addition, knowing that a mass migration of employees would set off red flags, IQEQ strategically hired Apex Capital employees in tranches. Between late November 2024 and January 2025, eleven additional Apex Capital employees assigned to the Related account resigned, with the majority ultimately joining IQEQ. IQEQ continued recruiting Apex Capital employees over the ensuing months, confirming that the raid on Apex Capital's workforce was part of a deliberate strategy, not an isolated hiring initiative.

### B.    IQEQ Facilitated the Misappropriation of Apex Capital's Confidential and Trade Secret Information

Rather than independently develop a servicing platform for Related, which would have required an "army" of resources, IQEQ instead sought to replicate Apex Capital's existing operations by facilitating a "pure lift" of Apex Capital's data so that IQEQ could perform what IQEQ characterized as a "lift and shift" of Related's business without requiring a traditional migration to IQEQ's own systems. *See* Beckerman Decl. Exs. F and I. Ben Jamron put it best:

6

"The goal of this 'lift and shift' would be to seamlessly create a new environment from which IQ-EQ can in effect service [Related] 'status quo.'" *See id.*

In furtherance of that objective, IQEQ designed and supervised the process by which Apex Capital's trade secret and confidential information would be extracted and transferred, and repeatedly instructed Related regarding both the mechanics of obtaining Apex Capital's confidential information and the strategy for transitioning the Related account away from Apex Capital. IQEQ prepared transition templates, scripted communications for Related to send to Apex Capital as its own, and established the infrastructure through which Apex Capital's information would be collected and delivered. *See* Beckerman Decl. Exs. F, M, and N.

The evidence disclosed in discovery leaves no doubt that IQEQ was directing the operation. On December 3, 2024, Ben Jamron informed Related that IQEQ was preparing templates to facilitate the transfer of Apex Capital data, and had created an IQEQ-controlled Egnyte repository specifically for the collection of Apex Capital information. *See* Beckerman Decl. Ex. G. When Related's CFO, James Kraus, questioned whether uploading Apex Capital materials to an IQEQ repository appeared "odd," Jamron conceded that it was "[a] little" odd, but nevertheless instructed Kraus to provide repository access only to his "primary lead"—i.e., Defendant Lucas Belinkie, who was then still employed by Apex Capital, owed Apex Capital fiduciary and contractual duties, and had already accepted employment with IQEQ. *See id.* In other words, IQEQ directed that Apex Capital's confidential information be surreptitiously funneled through an employee who remained inside Apex Capital while secretly preparing to join IQEQ.

Although Apex Capital has yet to receive discovery regarding the contents of that Egnyte repository, circumstantial evidence suggests Belinkie followed those instructions. On the very same day that IQEQ established the Egnyte repository, Belinkie—then in the final days of his

employment with Apex Capital—downloaded hundreds of Apex Capital documents from Apex Capital's systems in rapid succession.

### C. Armed with Apex Capital's Key Personnel and Confidential and Trade Secret Information, IQEQ Then Urged Related to "Imminently" Terminate the MSA

IQEQ viewed the acquisition of Apex Capital's personnel and confidential and trade secret information as prerequisites to capturing Related's business. Once the database was officially "ready to be moved" and "the team [had] all resigned," on March 13, 2025, IQEQ urged Related to "get tough" and "imminently" terminate the MSA. *See* Beckerman Decl. Ex. H. Three weeks later, Related terminated the MSA. *See* Beckerman Decl. Ex. O.

### D. IQEQ Fraudulently Misrepresented the Former Employees' Misconduct and Its Own Involvement to Secure Its Dismissal from the First Texas Action

After IQEQ had facilitated the coordinated departure of key Apex Capital personnel and the misappropriation of Apex Capital confidential and trade secret information, and only weeks before IQEQ was urging Related to immediately terminate the MSA, IQEQ represented to Apex Capital that:

- IQEQ would "lead a full forensic investigation into [Apex Capital's] allegations of data exfiltration";

- If IQEQ "discover[ed] any Apex proprietary data on any of [its] systems, [it would] destroy it and [would] not make any use of it for commercial purposes";

- If IQEQ "discover[ed] that any Apex proprietary data has been shared with any third party, [it would] inform Apex":

- IQEQ had "not made any use of any proprietary Apex data in its discussions with Related regarding additional services";

- If IQEQ concluded that any of the Former Employees "were bad actors in their use of Apex proprietary data," IQEQ would "not allow them to work for Related for a minimum of 12 months"; and

8

- "Any transition of client data between Apex and IQ-EQ, in connection with any client transitions, [would] be subject to the terms of the contracts with relevant clients."

*See* Beckerman Decl. Ex. J. Based on those representations, Apex Capital dismissed IQEQ from the First Texas Action.

IQEQ then followed up, on March 27, 2025, with the results of its purported "exhaustive" forensic investigation. *See* Beckerman Decl. Ex. K. IQEQ had found: "[n]o evidence that Apex's proprietary information or documents ('Apex Information') [had] been shared with third parties"; "[n]o retention of Apex Information on IQEQ's systems"; and "[n]o evidence of the [Former Employees] engaging in 'Bad Actor' activity." *See id.* IQEQ also conveyed representations from the Former Employees that they had not retained any Apex data on their personal devices and would not use Apex's information at IQEQ. *See id.* Chaney specifically certified that "to the extent he had any Apex information on his personal computer, Google Drive, or any other personal device, he has removed such information." *See id.*

All the above representations are belied by evidence recently disclosed during discovery in this case. For instance, mere months after IQEQ created an Egnyte repository specifically for the collection of Apex Capital confidential and trade secret information (*see* Beckerman Decl. Ex. G) and after Ben Jamron had told Kraus he was trying to get a "pure lift out" of Apex's database so IQEQ could run a standalone platform for Related (*see* Beckerman Decl. Ex. F), IQEQ was representing that it was not seeking Apex Capital's information and that it did not have any Apex Capital information. *See* Beckerman Decl. Ex. K. This evidence—coupled with the fact that Chaney just disclosed he had an entire archived Outlook file containing thousands of Apex Capital's emails and attachments spanning nearly a decade—puts into serious doubt whether IQEQ conducted any internal investigation whatsoever.

9

In sum, the discovery record paints a markedly different picture of IQEQ's role than the one known by Apex Capital when this action was commenced. This newly discovered evidence forms the basis for IQEQ's motion to amend.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 15(a)(2) directs courts to "freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). This reflects the Second Circuit's "permissive standard" governing amendments and its "strong preference for resolving disputes on the merits" rather than on the pleadings. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (citations and internal quotation marks omitted). Because Apex also seeks leave to add IQEQ as a defendant, Federal Rule of Civil Procedure 21 likewise applies. *See Michalek v. Amplify Sports & Ent. LLC*, No. 11 Civ. 508 (PGG), 2012 WL 2357414, at *1 (S.D.N.Y. June 20, 2012). Rule 21 provides that a party may be added "at any time, on just terms," and courts evaluate motions for joinder under the same liberal standard governing amendments under Rule 15. *Id.* Accordingly, leave to amend and join a new party should be granted absent undue delay, bad faith, undue prejudice, or futility. *Id.* at *2. A party seeking leave to amend after a deadline set in a scheduling order should also show "good cause." Fed. R. Civ. P. 16(b)(4).

## IV.    ARGUMENT

The standards governing amendment and joinder strongly favor granting leave here. There has been no undue delay. Apex Capital moved to amend promptly after discovery revealed IQEQ's previously unknown role in orchestrating the misconduct alleged in this action. Nor is there any suggestion of bad faith. Apex Capital seeks leave based on evidence uncovered in discovery—not as a litigation tactic or in response to an adverse ruling.

Amendment likewise will not prejudice any party. Discovery remains ongoing, and the proposed claims arise from the same core facts that have been the subject of discovery throughout

10

this litigation. Indeed, IQEQ has been deeply involved in this case as a non-party, has participated extensively in discovery, and is represented by the same counsel representing Defendants Belinkie, Hope, and Callen. Finally, amendment is plainly not futile. As set forth below, the proposed claims are supported by substantial documentary evidence demonstrating IQEQ's central role in orchestrating the recruitment of its key personnel, the misappropriation of Apex Capital's confidential information and trade secrets, and the transition of the Related account.

Because there has been no undue delay, bad faith, prejudice, or futility, Rules 15(a)(2) and 21 compel granting Apex Capital leave to amend.

### A.    Apex Capital Did Not Unduly Delay Seeking Amendment

Courts consistently hold that there is no undue delay where, as here, discovery reveals new facts warranting additional claims or parties. *See, e.g., Friedl v. City of New York*, 210 F.3d 79, 88 (2d Cir. 2000) ("[T]here has been no showing of . . . undue delay, given that the amendment was proposed only after discovery revealed additional relevant facts"); *DGI-BNSF Corp. v. TRT LeaseCo, LLC*, No. 18-CV-3252 (VEC), 2019 WL 5781973, at *2-6 (S.D.N.Y. Nov. 6, 2019) (Caproni, J) (granting leave to amend where plaintiff "sought leave from the Court to amend its complaint to add a claim against [defendant] for fraudulent inducement" based on "newly discovered evidence" that came to light in discovery); *Martin v. Sprint/United Mgmt. Co.*, No. 15 CIV. 5237 (PAE), 2016 WL 2757431, at *4 (S.D.N.Y. May 12, 2016) (acknowledging the "many cases in which courts have approved amendments to the pleadings based on facts that later came to light, *e.g.*, during discovery"); *TNS Media Research, LLC v. TRA Global, Inc.*, No. 11 Civ. 4039 (SAS), 2012 WL 2052679, at *1 (S.D.N.Y. June 4, 2012) (granting leave to add additional counterclaim-defendants where the movant "had reason to suspect" their coordinated involvement when it filed its original pleading, but "[i]t was only through discovery that [the movant] obtained the information necessary to assert affirmative counterclaims against [them]"); *J. Pub. Co. v. Am.*

11

*Home Assur. Co.*, 771 F. Supp. 632, 637 (S.D.N.Y. 1991) (no undue delay even though discovery was already complete because "plaintiffs' proposed amended complaint is based, at least in part, on facts that came to light during discovery").

That is precisely what happened here. The proposed amendment is based upon evidence produced during discovery in this litigation that fundamentally altered Apex Capital's understanding of IQEQ's role. When Apex Capital dismissed IQEQ from the First Texas Action in February 2025, it did so after IQEQ represented, among other things, that it engaged external counsel and forensic experts "to lead a full forensic investigation into the[] allegations of data exfiltration;" that "IQEQ has not made any use of any proprietary Apex data in its discussions with Related regarding additional services;" and that it would not "make any use" of Apex Capital's proprietary data "for commercial purposes." *See* Beckerman Decl. Ex. J. And IQEQ's follow-up correspondence regarding the purported results of its internal investigation only further led Apex Capital astray. *See* Beckerman Decl. Ex. K.

The documents produced during discovery, however, demonstrate that IQEQ was: actively planning what it described as a "pure lift" of Apex Capital's proprietary systems (Beckerman Decl. Ex. F); establishing an IQEQ-controlled repository for Apex Capital's confidential information (*id.*, Ex. G); requesting Apex Capital work papers and accounting materials (*id.*); and pushing for "imminent[]" termination of the MSA between Apex Capital and Related (*id.*, Ex. H). Those facts differ materially from both the allegations asserted in the First Texas Action and the representations upon which Apex Capital relied in dismissing IQEQ from that case.

Recent events have only further undermined IQEQ's prior representations and reinforced that they cannot be reconciled with the facts now known. Just last week, on July 17, 2026, counsel for Chaney disclosed that, notwithstanding IQEQ's purported "exhaustive" internal investigation

12

and forensic analysis, an entire archived Outlook .pst file—containing over seven years of Apex Capital emails, calendar invites, and attachments—had suddenly been located on Chaney's personal laptop. *See* Beckerman Decl. Exs. K and L.

Apex Capital acted promptly by seeking leave to amend as soon as the record justified doing so. Under these circumstances, there has been no undue delay.

**B.    Apex Capital Seeks Amendment in Good Faith**

Apex Capital likewise seeks leave to amend in good faith. Although Apex Capital knew that IQEQ secured Related's business, it did not possess evidence establishing that IQEQ had actively orchestrated the scheme at the heart of this case by directing the acquisition of Apex Capital's confidential and trade secret information (Beckerman Decl. Ex. I), establishing a repository to collect that information (*id*., Ex. G), scripting Related's communications (*id*., Exs. F, M, and N), and urging Related to terminate the MSA once IQEQ believed it had secured both the team and the data necessary to service the account (*id*., Ex. H). Those facts emerged only through discovery.

These are precisely the circumstances in which courts have held that amendment is appropriate and reflects diligence rather than bad faith. That Apex Capital was previously aware IQEQ had benefitted from the scheme alleged in the First Amended Complaint does not mean that Apex Capital is acting in bad faith by seeking to formally add IQEQ as a party now once IQEQ's full involvement has been uncovered. For instance, in *Martin v. Sprint/United Mgmt. Co*., No. 15 CIV. 5237 (PAE), 2016 WL 2757431, at \*4 (S.D.N.Y. May 12, 2016), this Court explained that a plaintiff's awareness of a party's association with the alleged misconduct "did not oblige [it] then to add [that party] as a defendant." Rather, the plaintiff "[was] free to wait until [it] learned more," and its subsequent decision to amend does not "mean that [it was] acting in bad faith." *Id.* Instead, where a party learns "new information" revealing a prospective defendant's greater involvement

13

through litigation, amendment is properly viewed as "simply a result of what was learned" during the course of the case. *Id.*

Here, IQEQ is now being added as a defendant as a direct result of what Apex Capital learned during discovery.

## C.    Defendants Will Not Be Prejudiced by the Proposed Amendment

The proposed amendment likewise will not prejudice any party. "In determining what constitutes prejudice, a court considers whether the assertion of a new claim would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *Schottenstein v. Lee*, No. 22CV1197 (DLC), 2024 WL 515247, at *2 (S.D.N.Y. Feb. 9, 2024) (citation and internal quotation marks omitted). "[I]t is defendants' burden to show prejudice." *Perez v. Escobar Constr., Inc.*, 342 F.R.D. 378, 382 (S.D.N.Y. 2022) (internal quotations and citation omitted).

Defendants cannot make any such showing here. Discovery remains ongoing, and this case is still far from trial. No depositions have been taken, no summary judgment motions have been filed, and the Court has not yet set a trial date. *See* Beckerman Decl. ¶ 18.

Nor will adding IQEQ as a party defendant require the parties to retrace their steps in discovery. IQEQ is already actively participating in discovery as a non-party: Apex Capital served its first set of document requests on IQEQ, IQEQ is preparing its initial production, and two IQEQ depositions have already been subpoenaed and scheduled for deposition. *See* Beckerman Decl. ¶¶ 19-21. Moreover, as explained above, the claims against IQEQ arise from the same nucleus of operative facts already at issue in this litigation—the coordinated departure of Apex Capital employees, the alleged misappropriation of Apex's confidential information and trade secrets, and the transition of Related's business from Apex Capital to IQEQ. Accordingly, permitting the proposed amendment will not require duplicative discovery, significantly expand the scope of the

14

litigation, or materially disrupt the existing schedule. *See Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 455 (S.D.N.Y. 2016) (granting leave to amend and finding no prejudice where "discovery is still underway, and neither a summary judgment briefing schedule nor a trial date has been set") (citation omitted).

Any claim of prejudice is further undermined by the fact that IQEQ will not be required to retain new counsel unfamiliar with the case. IQEQ is represented in this litigation by the same counsel—Sadis & Goldberg LLP—who currently represent Defendants Belinkie, Callen and Hope. *See* Beckerman Decl. ¶¶ 19, 22. Those attorneys have litigated this case from its inception, have participated in discovery, and are thoroughly familiar with the factual allegations, legal issues, and discovery record. Indeed, it was Sadis & Goldberg that assisted with IQEQ's purported internal investigation at the core of the Settlement Agreement. As a result, adding IQEQ as a defendant will not require new counsel to become acquainted with the case or otherwise delay the proceedings.

In sum, permitting amendment will not require an entirely new factual investigation or materially alter the scope of discovery. Instead, it will allow the parties to litigate in a single action the claims arising from the same operative facts, involving many of the same witnesses, documents, and legal issues.

By contrast, denying leave would require Apex Capital to commence a separate action against IQEQ, resulting in duplicative discovery, overlapping motion practice, and the possibility of inconsistent rulings concerning the same underlying conduct. *See Cooper v. Trs. of Coll. of Holy Cross*, No. 13 Civ. 8064 KPF, 2014 WL 2738545, at *9 (S.D.N.Y. June 17, 2014) (granting motion to amend where declining to allow joinder "could result in [p]laintiff filing a separate action in state court"); *Getaway 151, LLC v. ACE Prop. & Cas. Ins. Co.*, No. 25 CIV. 2975 (PAE), 2025 WL

2910594, at *3 (S.D.N.Y. Oct. 14, 2025) (granting motion to amend and noting that "denial of joinder could well prompt [plaintiff] to file a separate action against INC in state court, resulting, inefficiently, in parallel litigation") (citation omitted). Allowing amendment therefore promotes, rather than undermines, judicial economy.

### D.    The Proposed Amendment Is Not Futile

"A court may deny a motion to amend for futility only where no colorable grounds exist to support a claim or defense." *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, No. 12 CIV. 2224 AJN JCF, 2014 WL 406497, at *4 (S.D.N.Y. Feb. 3, 2014) (citations omitted). "As when deciding a motion to dismiss, all reasonable inferences must be drawn in favor of the plaintiff." *Id.* (citation omitted).

The proposed SAC alleges in extensive detail IQEQ's participation in the coordinated misconduct underlying this litigation. Based on the newly discovered facts, Apex Capital asserts claims arising directly from IQEQ's own conduct, including claims for misappropriation of trade secrets and confidential information, tortious interference with contract, aiding and abetting breach of fiduciary duty, fraudulent inducement, breach of contract, and breach of the covenant of good faith and fair dealing. Those claims arise from the same operative facts already before the Court and are supported by detailed factual allegations concerning IQEQ's own actions.

#### 1.    Misappropriation of Trade Secrets Under DTSA and TUTSA

The SAC plausibly alleges that IQEQ knowingly participated in the misappropriation of Apex Capital's trade secrets in violation of both the Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act (SAC, Counts I and II).

The SAC first alleges that Apex Capital owned valuable trade secrets and took reasonable measures to maintain the secrecy of that information through password-protected secure, cloud-based systems, networks and computers; restricted employee access; confidentiality policies; and

16

contractual confidentiality obligations imposed on its employees. SAC ¶¶ 156-58, 167-68. The SAC further alleges that IQEQ knowingly misappropriated those trade secrets. Specifically, it alleges that IQEQ sought a "lift and shift" of Apex Capital's proprietary systems to replicate Apex Capital's services; established an IQEQ-controlled repository to receive Apex Capital's trade secrets; coordinated with Related and the Former Employees regarding the acquisition and transfer of Apex Capital's data; and did so knowing that the information belonged to Apex Capital and was subject to confidentiality restrictions. SAC ¶¶ 161, 171.

The SAC also alleges that IQEQ exploited that information to position itself to replace Apex Capital as Related's service provider, thereby acquiring and using Apex Capital's trade secrets through improper means for its own competitive advantage. SAC ¶¶ 161, 171. Finally, the SAC alleges that IQEQ's misappropriation caused Apex Capital substantial injury, including the loss of the value of its trade secrets, unjust enrichment to IQEQ, and irreparable competitive harm. SAC ¶¶ 161-64, 171-74.

Those allegations readily state plausible claims under both statutes. *See Catalyst Advisors, L.P. v. Catalyst Advisors Inv'rs Glob. Inc.*, 602 F. Supp. 3d 663, 671 (S.D.N.Y. 2022) ("To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that [i] it possessed a trade secret, and [ii] the defendant misappropriated the trade secret.") (internal quotations and citations omitted); *Retail Services WIS Corp. v. Crossmark, Inc.*, No. 05-20-00937-CV, 2021 WL 1747033, at *8 (Tex. App.—Dallas May 4, 2021, pet. denied) ("The elements of a TUTSA claim are: (1) ownership of a trade secret; (2) misappropriation of the trade secret; and (3) an injury, if the plaintiff is seeking damages.") (citation omitted).

### 2.      Misappropriation of Confidential Information

The SAC likewise plausibly alleges that IQEQ knowingly acquired and used Apex Capital's confidential information under common law. SAC, Count III. The SAC first alleges the

existence of confidential information to which the Former Employees were provided access as necessary to perform their duties for Apex Capital and to service Apex Capital's customers. SAC ¶ 176. The Former Employees were obligated to maintain the confidentiality of Apex Capital's confidential information, not to disclose such information to any third party without Apex Capital's prior written consent, and to return Apex Capital's confidential and proprietary information upon termination of their employment. SAC ¶ 177. Notwithstanding these restrictions, the Former Employees breached their confidential relationships with Apex Capital and disclosed Apex Capital's confidential information to IQEQ. SAC ¶ 178. IQEQ then used Apex Capital's confidential information without Apex Capital's authorization to assume the servicing of Related's accounts and to replicate services that Apex Capital had provided to Related, causing Apex Capital to lose the benefit of its confidential business information and suffer substantial competitive and economic harm. SAC ¶¶ 180-81.

Those allegations sufficiently state a claim for misappropriation of confidential information. *See ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 478 (2007) ("Under New York law, an unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." (cleaned up) (citation omitted)); *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, No. 3:15-CV-4108-D, 2017 WL 635031, at *14 (N.D. Tex. Feb. 16, 2017) ("To state a claim for misappropriation of confidential information, [a plaintiff] must plausibly allege (1) the existence of confidential information, (2) breach of a confidential relationship or improper discovery of confidential information, (3) use of the confidential information without the plaintiff's authorization, and (4) resulting damages.") (citation omitted).

### 3.    Tortious Interference with the MSA

The SAC also states a viable claim that IQEQ intentionally interfered with the MSA between Apex Capital and Related. SAC, Count XII.

The SAC first alleges the existence of a valid and enforceable contract—the MSA between Apex Capital and Related—and that IQEQ knew of that agreement while working to replace Apex Capital as Related's service provider. SAC ¶¶ 239-240. The SAC further alleges that IQEQ intentionally procured Related's breach of the MSA by acquiring the confidential information and work product necessary to replicate Apex Capital's services, coordinating with Related to manufacture a pretext for terminating the agreement, and ultimately urging Related to prematurely terminate the MSA. SAC ¶ 242. The SAC then alleges that IQEQ's conduct resulted in an actual breach of the MSA, as Related refused to pay Apex Capital's outstanding invoices and terminated the agreement without complying with its own contractual obligations. SAC ¶ 243-44. Finally, the SAC alleges that Apex Capital suffered substantial damages as a direct and proximate result of IQEQ's interference, including unpaid invoices, the costs of hiring and reallocating personnel, lost business, reputational harm, and other consequential damages. SAC ¶¶ 244-45.

Those allegations plausibly establish IQEQ's tortious interference with the MSA. *See Regeneron Pharm., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 343 (2d Cir. 2024) ("Under New York law, a plaintiff claiming tortious interference with contract must plead (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." (cleaned up) (internal quotation marks and citation omitted)); *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) ("We have identified the elements of tortious interference with an existing contract as: (1) an existing contract subject to interference, (2) a

19

willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss.") (citation omitted).

### 4. Aiding and Abetting Breach of Fiduciary Duty

The SAC likewise adequately alleges that IQEQ aided and abetted the Former Employees' breaches of fiduciary duty. SAC, Count XIII.

The SAC first alleges that the Former Employees owed Apex Capital fiduciary duties arising from their positions of trust and confidence, and that they breached those duties by misappropriating Apex Capital's confidential information and trade secrets, coordinating the raid of Apex Capital's workforce, and conspiring to move Related's business to Apex Capital's direct competitor. SAC ¶ 249. The SAC further alleges that IQEQ had actual knowledge of those fiduciary obligations and the Former Employees' ongoing breaches. Specifically, it alleges that IQEQ knowingly recruited employees who remained subject to confidentiality and other post-employment obligations, but nevertheless worked hand-in-hand with the Former Employees to facilitate the acquisition and transfer of Apex Capital's confidential information and seize Related's business. SAC ¶¶ 250-51.

Those allegations more than plausibly establish that IQEQ knowingly participated in—and provided substantial assistance to—the Former Employees' breaches of their fiduciary duties, thereby causing Apex Capital's injuries. SAC ¶¶ 249-53. *See In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 182 (S.D.N.Y. 2014), *aff'd sub nom. DeAngelis v. Corzine*, 611 F. App'x 34 (2d Cir. 2015) ("To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: (1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." (cleaned up) (citation omitted)); *Darocy v. Abildtrup*, 345 S.W.3d 129, 137 (Tex. App.—Dallas 2011, no pet.) ("When a defendant

20

knowingly participates in the breach of a fiduciary duty, he becomes a joint tortfeasor and is liable as such.") (citations omitted).

### 5.    Fraudulent Inducement

The fraudulent inducement claim is likewise adequately pleaded. SAC, Count XIV.

The SAC first alleges that, while the Texas Action was pending, IQEQ made material misrepresentations of existing fact and present intent, including that it had not used Apex Capital's proprietary information in its discussions with Related and that it would not use Apex Capital's proprietary information for commercial purposes. SAC ¶¶ 255-56. The SAC further alleges that these representations were false when made and that IQEQ knew they were false because it had already participated in—and intended to continue participating in—the coordinated scheme to obtain and exploit Apex Capital's confidential information to divert Related's business to IQEQ. SAC ¶¶ 257-58.

The SAC next alleges that IQEQ made those representations with the specific intent of inducing Apex Capital to enter into the Settlement Agreement and dismiss IQEQ from the Texas Action, and that Apex Capital reasonably relied on those representations by doing exactly that. SAC ¶¶ 258-60. As a direct and proximate result of IQEQ's fraudulent inducement, IQEQ became further entrenched as Related's service provider, additional Apex Capital employees departed for IQEQ, Apex Capital's confidential information and trade secrets were further disseminated and exploited, Apex Capital lost additional business opportunities, and Apex Capital incurred substantial additional litigation expenses and other damages that would not have occurred had IQEQ truthfully disclosed its conduct. SAC ¶ 261.

Those allegations plausibly satisfy each element of fraudulent inducement. *See Meadows v. Planet Aid, Inc.*, 676 F. Supp. 2d 83, 99 n.2 (E.D.N.Y. 2009) ("In New York, the elements of fraudulent inducement are (1) representation of a material fact; (2) falsity of that representation;

21

(3) scienter; (4) reliance; and (5) damages."); *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) ("Fraudulent inducement is a species of common-law fraud that shares the same basic elements: (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury.").

### 6.    Breach of the Settlement Agreement

The SAC further states a claim for breach of the Settlement Agreement. SAC, Count XV.

The SAC first alleges the existence of a valid and enforceable Settlement Agreement between Apex Capital and IQEQ resolving Apex Capital's claims in the Texas Action, with Apex Capital fully performing its obligations by dismissing all claims against IQEQ. SAC ¶¶ 264-66. The SAC further alleges that IQEQ breached the Settlement Agreement by engaging in the very conduct it had agreed to refrain from—namely, conspiring with Related and the Former Employees to misappropriate Apex Capital's confidential information and trade secrets—and that Apex Capital suffered damages as a direct and proximate result of that breach. SAC ¶¶ 267-69.

Those allegations readily satisfy the pleading standard. *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 705 (S.D.N.Y. 2016) ("Under New York law, a settlement agreement is a contract, and any alleged breach of a settlement agreement must be analyzed according to the ordinary principles of contract law"; "To establish breach of the Settlement Agreement, plaintiff must prove: (1) that a contract existed; (2) that [plaintiff] adequately performed under the contract; (3) that [defendant] breached the contract; and (4) damages attributable to the breach.") (citations omitted); *Nwokenkwo v. JP Morgan Chase Bank, N.A.*, No. 14-22-00001-CV, 2023 WL 3115697, at *10 (Tex. App.—Houston [14th Dist.] Apr. 27, 2023, pet. denied) ("A breach of contract claim requires proof of (1) the existence of a valid contract, (2) the plaintiff's performance or tender of performance, as the contract required, (3) the defendant's breach by failure to perform, and (4)

22

damages sustained by the plaintiff as a result of the breach.") (citation omitted).

### 7.    Breach of Implied Covenant of Good Faith and Fair Dealing

Finally, Apex Capital plausibly alleges that IQEQ breached the implied covenant of good faith and fair dealing inherent in the Settlement Agreement. SAC, Count XVI.

The SAC first alleges that Apex Capital and IQEQ entered into a valid Settlement Agreement, which carried with it an implied covenant that neither party would act in a manner that deprived the other of the benefits of the agreement or rendered it illusory. SAC ¶¶ 271-73. The SAC next alleges that IQEQ acted in bad faith by conspiring with Related and the Former Employees to misappropriate Apex Capital's trade secrets and confidential information. In doing so, IQEQ destroyed Apex Capital's right to receive the fruits of the Settlement Agreement—namely, protection of its contractual and proprietary rights—and caused Apex Capital to suffer direct and proximate damages. SAC ¶¶ 274-76.

Those allegations plainly state a viable implied covenant claim. *See Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) ("Under New York law, a covenant of good faith and fair dealing is implied in all contracts. . . . This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.") (citation and internal quotation marks omitted).

### E.    Good Cause Exists to Modify the Scheduling Order Under Rule 16(b)(4)

To the extent the Court concludes that Rule 16(b)(4) of the Federal Rules of Civil Procedure applies because the January 9, 2026 Civil Case Management Plan and Scheduling Order set a deadline for amendment of pleadings (Dkt. 112), good cause likewise exists to modify that scheduling order. "'Good cause' is primarily a question of diligence." *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, No. 14-MC-2548 (VEC), 2017 WL 9480384, at *3 (S.D.N.Y. June 8, 2017) (Caproni, J). For the reasons set forth above, Apex Capital acted diligently

in seeking leave to amend.

The proposed amendment rests exclusively on evidence that did not exist in the record when the Court entered the Scheduling Order (January 9, 2026) or when the deadline to amend pleadings expired (February 8, 2026). Instead, that evidence emerged only through discovery in the months that followed: on April 24, 2026, Apex received Related's communications with IQEQ concerning the planned "lift and shift" of the Related account (Beckerman Decl. Exs. F–I and M–N); on May 29, 2026, Apex received Chaney's text messages revealing the contemporaneous planning, coordination, and execution of the scheme (Beckerman Decl. Exs. C–E); and, finally, on July 17, 2026, Apex learned of Chaney's previously undisclosed archived Outlook .pst file containing years of Apex emails, calendar invites, and attachments (Beckerman Decl. Ex. L). Beckerman Decl. ¶¶ 5-11, 14-16. Apex moved for leave promptly after obtaining that evidence. As explained above, the discovery record fundamentally altered Apex's understanding of IQEQ's role, revealing for the first time that IQEQ was not merely a downstream beneficiary of Defendants' conduct, but an active participant in planning, facilitating, and concealing the very misconduct at issue in this litigation. Because Apex could not reasonably have sought these amendments before obtaining this evidence, and because it acted diligently once the necessary factual record was developed, good cause exists under Rule 16(b)(4) to modify the Scheduling Order and permit the requested amendment.

## V.    CONCLUSION

Accordingly, because there has been no undue delay, no bad faith, no prejudice, and no futility, the Court should grant Apex Capital leave to file its proposed Second Amended Complaint adding IQEQ as a defendant.

Dated: July 29, 2026

Respectfully submitted,

PILLSBURY WINTHROP SHAW
PITTMAN LLP

*/s/ Brian L. Beckerman*
Brian L. Beckerman
Stephanie M. Coughlan
31 West 52nd Street
New York, NY 10019-6131
Tel: 212.858.1000
Fax: 212.858.1500
brian.beckerman@pillsburylaw.com
stephanie.coughlan@pillsburylaw.com

Amy L. Ruhland (admitted *pro hac vice*)
Abigail L. Griffith (admitted *pro hac vice*)
401 W 4th Street, Suite 3200
Austin, TX 78701
(512) 580-9600
amy.ruhland@pillsburylaw.com
abby.griffith@pillsburylaw.com

*Attorneys for Apex Group Capital Advisors
LLC*

25

## WORD COUNT CERTIFICATION

Pursuant to Local Civil Rule 7.1 of the United States District Court for the Southern District of New York, I hereby certify that the foregoing Memorandum of Law contains 7,325 words, excluding the sections exempted. This word count was calculated using the word-count function of Microsoft Word.

/s/ Brian L. Beckerman
Brian L. Beckerman