# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| APEX GROUP CAPITAL ADIVSORS LLC, Plaintiff, v. RELATED FUND MANAGEMENT LLC et al., Defendants. | Docket No.: 25-cv-8892<br><br>New York, New York<br>August 18, 2026 |

TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE GARY STEIN

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff: PILLSBURY WINTHROP SHAW PITTMAN
BY: Brian L. Beckerman, Esq.
Amy L. Ruhland, Esq.
Stephanie M. Coughlan, Esq.
Abigail L. Griffith, Esq.
31 West 52nd Street
New York, New York 10019

For Defendant: James Kraus — CLARICK GUERON REISBAUM LLP
BY: David C. Kimball-Stanley, Esq.
Nicole L. Gueron, Esq.
Erin P. Woodruff, Esq.
Tolu Sogade, Esq.
41 Madison Avenue
New York, New York 10010

For Defendant: Ryan Hope — SADIS & GOLDBERG LLP
BY: Samuel J. Lieberman, Esq.
Scott Ferrier, Esq.
Jennifer Rossan, Esq.
Cameron Posillico, Esq.
551 Fifth Avenue
New York, New York 10176

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

APPEARANCES (Continued)

For Defendant: Callen
ATWOOD & McCALL PLLC
BY: Wilson E. Wray, Jr., Esq.
8150 N Central Expressway
Suite 1100
Dallas, Texas 75206

For Defendant: Chaney
SPENCER FANE LLP
BY: Laurie Patton, Esq.
5700 Granite Parkway
Suite 650
Plano, Texas 75024

THE DEPUTY CLERK: In the matter of 25-cv-8892, Apex Group Capital Advisors, LLC v. Related Fund Management, LLC, et al.

Counsel, would you please state your name for the record, starting with the plaintiffs.

MS. RUHLAND: Good morning, your Honor. My name is Amy Ruhland, from Pillsbury Winthrop Shaw Pittman, on behalf of Apex Group Capital Advisors.

And today I'm joined by my colleague, Brian Beckerman, who will be carrying most of the water this morning, as well as my colleagues, Stephanie Coughlan and Abby Griffith.

MR. BECKERMAN: Good morning, your Honor.

THE COURT: Good morning to all of you.

I know we have different groups of defendants. Why don't we start with the Related defendants; capital R, Related.

MR. KIMBALL-STANLEY: Good morning, your Honor. I'm David Kimball-Stanley. I'm here with my colleagues, Nicole Gueron, Erin Woodruff and Tolu Sogade, from Clarick Gueron Reisbaum. I'll be speaking on behalf of the Related Fund Management defendant and James Kraus.

THE COURT: Very well. Good morning.

Then we have -- and I may get this wrong,

but we have defendants, Preston Callen and Hope?

MR. LIEBERMAN: Yes. Good morning, your Honor. Sam Lieberman of Sadis & Goldberg. I will be speaking today on behalf of Mr. Hope and Mr. Callen and be making, perhaps, the majority of the arguments on behalf of all four employee defendants.

With respect to Mr. Callen, my co-counsel, Bill Wray, is here today. And with respect to Mr. Hope, my colleagues from Sadis & Goldberg, Scott Ferrier, Jennifer Rossan and Cameron Posillico with me today.

THE COURT: All right. Good morning.

And then for Defendant Belinkie?

MS. CRAIG: Good morning, your Honor. Caylin Craig and Stephanie Osteen, on behalf of Lucas Belinkie. I think Stephanie is having audio trouble, it looks like.

THE COURT: I'm sorry. That's Stephanie -- who would -- who will be speaking, if anyone, for Mr. -- I'm assuming it is Mr. Belinkie.

MS. CRAIG: Stephanie Osteen will, but Mr. Lieberman will be making the majority of the arguments on behalf of the employee defendants today.

THE COURT: All right.

All right. And last, I believe, but I don't want to suggest least, Counsel for Mr. Chaney?

MS. PATTON: Morning, your Honor. Laurie Patton, from the firm of Spencer Fane, on behalf of William Clark Chaney as an employee defendant.

THE COURT: All right. Good morning to you as well.

All right. We are here for a discovery conference for several discovery disputes raised in a joint monthly status discovery report filed on July 15th at Docket Number 153.

Plaintiff submitted a letter dated July 22nd with respect to one aspect of those disputes to which Defendant Chaney responded on August 7th. I reviewed all three of those letters or filings, and I'm prepared to discuss them today.

Separately, Defendants Callen and Hope submitted a letter on August 12th seeking to raise a discovery dispute regarding their request for forensic imaging of certain Apex-issued computers. Apex responded to that with its own letter on August 17th.

With regard to that letter -- that is to say the letter on behalf of Defendants Callen and

Hope submitted on August 12th -- I do have to agree with Apex, that the issues defendants are seeking to raise are not properly before me, at least at this time. The Order of Reference in this case issued by Judge Caproni on July 16th refers this case to me only for resolution of the specific discovery disputes outlined in the parties' letter of July 15th at Docket Number 153. She has not referred the separate dispute at Docket Number 169, which is the August 12th letter.

We will coordinate with Judge Caproni's chambers about who will be handling that dispute. It may well be me, but at the moment it is not, so I'm not going to be addressing that one today.

But I would like to address the seven disputes raised in the joint status report of July 15th. My suggestion would be that we go one by one, and I'll hear from counsel on each issue. I would suggest that I hear first from the side that is making the request for information or discovery first and then hear from other affected parties.

So the first issue is the forensic imaging of the employee defendants' personal devices and accounts. That is a request being made by Apex, so I assume I will be hearing from Mr. Beckerman.

MR. BECKERMAN: Yes, your Honor. Thank you.

Your Honor, forensic imaging is necessary here because there are serious questions about the employee defendants, about whether the employee defendants have identified, preserved and produced all of Apex's confidential information and trade secrets.

Apex examination of the employee defendants' company-issued laptops show that they downloaded tens of thousands of documents immediately before leaving Apex, activity that was highly unusual, not part of their ordinary work. They also accessed personal e-mail accounts, external devices and cloud storage services during that same period, for example.

THE COURT: So let me stop you there because I read your letter, which said the same thing; number one, they downloaded lots of information. I don't know that you said tens of thousands of documents, which you've said now, but, in any event, lots of information to their Apex-issued devices.

And you also said that you've seen them accessing personal e-mail accounts and, as your

letter says, external storage devices and cloud storage platforms.

My question is, is it the same information -- or do you see the same information being downloaded to their Apex-issued devices and then being transferred or forwarded or sent in some manner to their personal e-mail accounts or some other personal device of theirs?

MR. BECKERMAN: Well, some of it, your Honor. Some of that has already been produced by the employee defendants back to us, a few hundred of those documents, but not all.

And so the fundamental discovery question for plaintiff is --

THE COURT: When you say "not all," not all of what? Not all of everything they were -- that was downloaded to their Apex-issued devices.

But I'm missing the connection as to why you think, other than, perhaps, educated guesswork, that any of that material, other than what you've received from them, the hundreds of documents that you have received from them, wound up on their personal devices.

MR. BECKERMAN: Well, it -- your Honor, it defies logic to us that these employees would

download tens of thousands of documents immediately preceding their departure from the company, only to then take a mere fraction of those once their foot were -- once their feet were out the door.

Now, the fact that they have produced back to us, in normal discovery, hundreds of Apex confidential information and trade secrets demonstrates that they did, in fact, take some of these documents. And --

THE COURT: It also demonstrates that they've produced such materials.

MR. BECKERMAN: It demonstrates, yes, your Honor, that they produced some of them, but Apex's concern is they did not produce all.

And I want to highlight the fact that a mere few weeks ago, Defendant Chaney informed us that he had discovered this PST Outlook file containing years of historical e-mails, attachments, that they did not discover until a year after the court's TRO and preliminary injunction order directing that they return all Apex information.

The mere fact that they just discovered that information, in addition to the fact that there are now discrepancies with respect to the text messages produced by the employee defendants,

strongly suggests that there is more information that is missing.

THE COURT: What are the discrepancies with regard to the text messages? I'm not sure I know about that, or if I do, I've forgotten.

MR. BECKERMAN: Yes, your Honor.

So there were -- in the first round of discovery, the employee defendants produced some text messages. The vast majority of them came from Defendant Chaney. And in reviewing Mr. Chaney's text messages, we uncovered a treasure trove of critical evidence supporting plaintiff's claims. For example, text messages where certain of the employee defendants were discussing, you know, a "lift and shift" of the related accounts from Apex to IQ-EQ. And in those text messages, your Honor, we noticed that there were -- Chaney produced them, but there were other employee defendants in some of those threads.

And so when we went to try and see those same threads produced by the other employee defendants, we couldn't find them, particularly Defendant Hope and Defendant Belinkie. So we reached out to opposing counsel and said, there appears to be discrepancies. How come you haven't

produced these very same text-message threads that were produced by Chaney?

And after rounds of back and forth, the defendants, Hope, Callen and Belinkie, essentially admitted that they had failed to preserve text messages during this critical time period.

When I say "critical time period" --

THE COURT: Oh, okay. I do know that issue. All right.

And then they're allowing you to forensically image their mobile phones, as I understand.

MR. BECKERMAN: Yes, your Honor.

THE COURT: And has the protocol for that been agreed to now?

MR. BECKERMAN: Not yet, your Honor. We submitted an additional forensic inspection protocol to opposing counsel, but we haven't yet received a response to that. I suspect that opposing counsel was waiting for this conference to take place.

THE COURT: Okay.

MR. BECKERMAN: So we would -- we would submit, your Honor, that, taken together, the unusual downloading activity immediately preceding their departure, the use of personal e-mails and

cloud service sites, the later discovery of Apex materials that should have been identified much earlier, and then the loss of relevant text messages demonstrate why forensic imaging is both relevant and necessary in this case.

THE COURT: Do you have an example of any particular piece of confidential information or trade secret that you see downloaded by them to their Apex-issued devices and you know it was used for some reason, either because a client told you or you somehow know that, and that particular information was not produced by them in -- by defendants in discovery?

MR. BECKERMAN: When your Honor says "used," are you saying that we know was used by defendants after they left Apex?

THE COURT: Yes.

MR. BECKERMAN: Well, we don't -- well, let me step back and say there are thousands of documents that were downloaded by the employee defendants that haven't yet been produced to us. But with respect to documents that we know were used by defendants in servicing related after they left Apex, we don't yet know that. So that -- there aren't any specific documents that I can point you

to in that regard, your Honor.

THE COURT: Okay. Thank you very much.

Who wants to go first for -- I'm sorry. Were you finished, Mr. Beckerman?

MR. BECKERMAN: Yes, your Honor. Thank you.

THE COURT: Thank you.

Who would like to go first for defendants?

MR. LIEBERMAN: If I may, your Honor, Sam Lieberman, on behalf of Hope and Callen, and also speaking for the employee defendants.

I think your questioning of Mr. Beckerman has revealed some really important points here, which are as follows:

There's a real tension between their allegations of all these downloading and what they're claiming has been taken. And they have not been able to identify the -- connect the downloading with documents produced. And the reason is, what Mr. Beckerman is not telling you is that the downloading at issue here was downloading from an Egnyte system, which is a cloud-based system, to a work computer. And they've alleged 40,000 such downloads, which such downloading activity may be

nothing other than accessing a document for use at Apex. And then they're trying to extrapolate that to some exfiltration to personal devices.

And when you put him to the test: Well, which one was actually taken and used? Where's the example? They don't have one.

And what's particularly inaccurate about the presentation is the reference to Mr. Chaney's archive. And the reason there is that Mr. Chaney's archive, which was found by counsel and produced, which highlights the fact that counsel is producing documents here, those are documents that have not been modified since 2023. So those are not at all these documents that are allegedly downloaded.

And Mr. Beckerman is omitting to tell you that, in fact, these downloads were just -- that's how it's done with a cloud-based system. Like if you have NetDocs or you have Egnyte, to get the file, it's actually in the cloud. You click on it, and then it gets downloaded to your system. To do your job, you have to download these files to your work computer.

And what's missing is where they're saying, oh, there's a particular thing that they found that was withheld that has been produced or is

being used. They're not able to do it because that has nothing to do with this dispute here.

In fact, the text messages that he's been talking about, those are text messages where, one, Mr. Chaney has preserved all of his text messages. Two, there's been some issue with failing to disable auto-delete. There was a blunder by three employees. They did not disable auto-deletes and there's a certain period for which they don't have text messages.

But there's no allegation that the exfiltration is happening by text message here. I mean, they have the Clark Chaney text messages. They're not alleging, oh, there's this big attachment in the text message, and they're talking about a lift and shift.

They're not pointing to specific documents. They haven't done that action.

THE COURT: But the text messages seems like the least of it because, I guess, everybody, other than Chaney, is turning over their mobile phones to be imaged for that purpose. That would cover the text messages.

MR. LIEBERMAN: Yeah, well --

THE COURT: So I'm not sure why you

focused on that.

MR. LIEBERMAN: Well, they seem to focus on it as some sort of evidence of impropriety. But when you're thinking about the high burden and expense of -- and the intrusive nature of forensic imaging of all these personal devices, that's significant outside of the text message realm. And we don't think they've shown the type of intentional destruction of evidence that would justify such an intrusive search, particularly because you have privacy issues with respect to other communications with family members. You have communications directly with counsel. And we don't think they have shown that, especially given that counsel in this case has been forthcoming producing documents. It's not as if Chaney's counsel saw the archive and said, well, I'm going to hold that back. We produced the archive of documents.

We have done a search, and we have produced documents that they're claiming contain Apex confidential information. And we have, by their own admission, produced hundreds of them. And the question will be whether those things were actually improperly exfiltrated or whether they actually occurred through a different method. Or it

may have been an issue with respect to how Apex handled that business unit, allowing them to actually access the Apex system using their own remote computers for that business unit. And these things may have shown up -- are maybe different documents that showed up on their files because the underlying client, Related, may have sent this to them. So there's going to be a dispute about that.

But the big question is the type of predicate you need for the severe -- the severe issue of actually looking and having a forensic image of personal files we don't think is here because we don't have the widespread destruction or an attempt to destroy information or withhold it. We've done all we can and worked very hard to gather the documents, to actually review the files and to push to get the files out through litigation here.

THE COURT: Let me ask you about that because --

MR. LIEBERMAN: Sure.

THE COURT: -- Ms. Conway's August 7th letter addresses Mr. Braverman's -- Braverman. I apologize -- Mr. Beckerman's concern that the defendants self-collected the material at issue here.

And Ms. Conway says pretty clearly, in my way of thinking, that, at least with regard to Mr. Chaney, he did not do that; that Mr. Chaney retained a third-party e-discovery vendor to collect the potentially relevant discovery materials from his devices, and that counsel then conducted a review of that material using the agreed-upon search terms. Then counsel then reviewed the documents that hit on those search terms and produced responsive documents.

Ms. Conway's letter suggests that that was true of all the defendants, but since she only represents Mr. Chaney, I want representations, if truthful, that all of the relevant defendants did the same thing.

Can you make that representation with respect to Callen and Hope and anybody else you represent?

MR. LIEBERMAN: Yeah. So Callen and Hope and, you know, Ms. Patton can say more as well about Mr. Chaney, but as well as Belinkie.

There were -- we had counsel directing the search, making images -- you know, working with a firm to make images of the various -- or collections of the various devices. And then using

that --

THE COURT: By "firm," do you mean an e-discovery vendor?

MR. LIEBERMAN: Yeah, an e-discovery vendor. And counsel directing the conduct of the e-discovery vendor to thoroughly search the files and to review the files and then review them for responsiveness.

So all the employee defendants have engaged discovery vendors with respect to collection, with respect to review and production, and have made those productions here. So that has --

THE COURT: Before you move on --

MR. LIEBERMAN: Sure.

THE COURT: -- can I get the same representation from Ms. Craig or Ms. Osteen?

You're on mute, Ms. Craig.

MS. OSTEEN: Yes. Lucas Belinkie -- Stephanie Osteen for Mr. Belinkie.

Yes, the exact same procedure was followed with respect to his collection and production.

THE COURT: Okay. Thank you.

All right. Mr. Lieberman, you can

proceed.

MR. LIEBERMAN: So, you know, we have conducted that search, and, you know, where we have identified -- it's usually a rare situation where there's something that evades that initial review.

And there was one, given the particular circumstances, with respect to it being an archived PST that was through a calendar file with respect to Mr. Chaney. And then where that was found, we made that production.

I mean, I think what the record shows is that counsel has tried -- you know, has engaged in multiple waves to keep looking for responsive documents. And we have produced documents as we've conducted our review, and we faithfully applied the search terms that the parties have agreed upon.

So we don't think that this is a situation where counsel was making representations as to what they were doing, and then it turned out that those representations were blatantly false that would justify --

THE COURT: All right.

MR. LIEBERMAN: -- the more invasive forensic review.

THE COURT: All right. Thank you.

Who would like to go next for defendants on this issue?

MS. PATTON: Your Honor, this is Laurie Patton, counsel for Mr. Chaney.

And I do understand you've read our papers, and we've set it forth pretty clearly, but I do think it's important to underscore that, you know, the archived PST really is a red herring because, even under the time period that was proposed for the forensic review, it would not have captured these documents because they were prior to 2024, so --

THE COURT: Well, let me make sure I understand that.

You say the relevant time period is, what, January 2024, going forward? And this file, as I understand it, is documents from 2016, I think, to 2023.

However, I looked at the TRO and the preliminary injunction order, and I didn't see any time scope on the defendants' obligation to return confidential information and trade secrets belonging to Apex.

And so whether or not that material falls within the date range of the discovery requests, by

providing that file, you're not doing some favor, going above and beyond what your obligations are. You're required to turn that over under the TRO and the preliminary injunction order. And you were required to turn that over last year, correct?

MS. PATTON: That's correct. And we're not disputing that we're doing some sort of favor. I'm just highlighting that it doesn't connect to the forensic review that's requested because it wouldn't have been identified under that scope. And, you know, while we did a thorough review initially, as Mr. Lieberman highlighted, there were reasons this wasn't initially uncovered, and we promptly produced it as soon as it was.

THE COURT: Well, does that mean that the same type of forensic review, for lack of a better term, although I think it's what you just used, that was done for purposes of discovery was not done for purposes of compliance with the TRO and preliminary injunction order?

And I'm not necessarily saying there's something wrong about that. I'm just trying to understand the facts.

MS. PATTON: There were differences in the scopes of review at that time. We didn't use

search terms that were proposed by counsel during the discovery process at that time. We, you know, used our best judgment to help the e-discovery vendors find any potentially related documents to Apex, but there were additional protocols in place when we did the later review using the search terms.

THE COURT: Is -- sorry. I'm going to jump back to Mr. Lieberman just because I think I know the answer from your client's perspective.

But, Mr. Lieberman, in light of what's come to light more recently, just through Mr. Chaney's production, for example, have you, on behalf of your clients, revisited what was done in terms of complying with the TRO and preliminary injunction order and taken additional steps to make sure that nothing was missed?

MR. LIEBERMAN: We did provide additional documentation in response, and we did conduct, you know, further documentation.

I think there are some documents where there's a dispute as to whether -- over the ownership of the document, if it's Related owned or Apex owned, because you have here a service provider. Apex is a fund administrator and compliance provider. And there were some documents,

including, like, UCC filings and deeds that were owned -- that are owned by Related.

As part of looking back and making sure that everything was provided, we provided -- we made an additional production of documents of that sort where there could be any argument that, even though, in our view, those things were Related owned, we provided that.

So we did go back and conduct additional steps to make sure and to get that out and to get that produced, and so we have gone back to take additional steps to address this.

THE COURT: All right.

And, Ms. Osteen, is that also true with regard to your client?

MS. OSTEEN: Yes, your Honor. We concur with what Mr. Lieberman said.

THE COURT: Well, he was only speaking, as I understood it, about his clients. I'm asking you a different question, which is whether you've done the same with regard to your clients.

MS. OSTEEN: We did the same thing. We did not uncover anything additional to produce, your Honor.

THE COURT: And, Ms. Patton, one thing

that was said in Mr. Beckerman's July 22 letter, which I'm not sure you responded to in your August 7th letter, is -- there was something about Mr. Chaney's document production appearing to indicate that the Outlook archive was discovered and collected in April of 2026, and he expressed some concern about why it wasn't produced for another three months or so.

Can you address that?

MS. PATTON: Yes, your Honor.

So that -- the April date would have been when all of the documents were collected and pulled into the e-discovery platform to run the search terms. When we applied the search terms, it did not hit on these documents. And we later discovered, by looking outside of the search-term parameters, these documents, and then promptly worked to produce them.

THE COURT: All right. Thank you.

All right. Assuming I've heard from all the defendants who want to be heard on this issue, Mr. Beckerman, I'll give you a brief opportunity for rebuttal, if you would like.

MR. BECKERMAN: Thank you, your Honor. There's a lot to respond to, so I'll do my best, moving through it quickly.

First, your Honor, I believe Mr. Lieberman made the point that Mr. Chaney's archive that was produced recently contains only documents that have been modified since 2023. That is not accurate. There are a handful of documents from the PST file that appear to have been modified between January 2024 and January 2025.

Second, with respect to representation that Mr. Chaney hired an e-discovery vendor for purposes of collecting from his devices, the fact that there was this PST file containing thousands of documents over seven years that was missed by them until very recently, until, like, apparently early July, that raises some real concerns for us.

And with respect to the representations that they went -- opposing counsel went back to do some cleanup collections from their clients, the real issue here, your Honor, is whether they forensically determined whether any documents had been deleted.

Now, I know your Honor didn't want us to focus on the text messages, but the reason why it's particularly relevant here is because the text messages demonstrate that certain of the employee defendants did delete or fail to preserve relevant

evidence.

And with respect to the representations that certain of them failed to disable auto-delete functions, I just want to just rebut this with respect to Mr. Belinkie's phone.

Opposing counsel indicated that he failed to preserve text messages between -- before January 17, 2025, but the fact is that Mr. Belinkie produced over a dozen text messages -- text message threads with third parties predating January 17th. So this demonstrates that some text messages were, in fact, preserved during that time period.

As your Honor knows, when you fail to delete -- or fail to disable an auto-delete function, right, that auto-delete function will delete everything, right? Not -- typically, not selected text messages.

So Mr. Belinkie's production indicates that some text messages -- coincidentally, the ones that were very favorable to plaintiff's case -- were not preserved, whereas other text messages during that same time period, for some reason, were.

That indicates that, at least with respect to Mr. Belinkie, there had been potential spoliation of evidence.

I think -- oh, the last thing I wanted to mention to your Honor is that -- we also raise a text message issue to show that the discrepancies in their document production in this regard were only remedied after we brought it to their attention. It wasn't until we flagged these discrepancies and said, look, there are some text messages which appear to be missing, which we only knew because Mr. Chaney had produced certain of them, that they then went back and determined that some spoliation may have occurred.

With respect to Apex confidential information and trade secrets that may have been taken by the employee defendants and then deleted, we don't know what we don't know. There's no way for us to determine whether or not those documents had been deleted by the employee defendants and then failed to be collected by their counsel.

So the fact is that, because they only remedied the text message discrepancies after we brought it to their attention -- we can't bring things to their attention that we don't know, so that's why the forensic imaging is necessary for us to determine whether or not the employee defendants deleted any confidential information and trade

secrets on their personal devices so, that way, we can go back, and that can be remedied.

THE COURT: I thought you were asking for forensic imaging to locate trade secret and confidential information in the defendants' possession. Now, I'm hearing that, actually, you're looking for evidence of deletion.

MR. BECKERMAN: It's both, your Honor.

If they -- if we can show that there were confidential information and trade secrets on their personal devices, right, which weren't produced to -- produced by them to us, and then they deleted them, it was still in their possession. It was still misappropriated from Apex.

So does that answer your Honor's question?

THE COURT: Well, I guess so, but I could see in -- and, obviously, you're pointing to the text messages, which sound equivocal, at best, in terms of evidence of spoliation. But the notion of allowing forensic imaging so that the adversary can see whether information was deleted, I'm not even sure what the standard for that is. Maybe it's not different from the -- from general standard, but you could always have that concern. And absent

something -- unless you tell me there's a case out there, absent some indication beyond what you have already mentioned, that information was intentionally deleted and spoliated from their personal devices, I don't see where there's a basis for that. That would open the door to these kinds of forensic imaging in all sorts of cases based on very flimsy showings.

MR. BECKERMAN: Well, we would submit, your Honor, that the circumstances of this case, the developments -- particularly, the development that happened recently with respect to Mr. Chaney's production of an entire PST Outlook file gives rise to --

THE COURT: They've explained that in their August 7th letter.

I know you had suspicions that they were hiding things and so forth, and it's -- and you question the timing of their waiting until two days after the July 15th letter to produce that material. I didn't find that persuasive at all. I looked at the e-mails, correspondence, prior to that. They told you they were looking at this material and they might have further productions, and so it couldn't have been a surprise or a shock to you that, a

couple days after the July 15th letter, they had this material.

MR. BECKERMAN: Well, it was a surprise to us, your Honor, that 8,000 documents were produced to Apex a year after the court's TRO and PI orders had been issued, right, which had no temporal restrictions whatsoever on them. So the fact that opposing counsel said, well, they were outside the time range, that doesn't make sense because, again, the court's order --

THE COURT: I addressed that with her. I understand.

MR. BECKERMAN: The fact that it took them a year, your Honor, to produce that information to us, coupled with the fact that we know text messages from certain of the employee defendants were deleted, we would condemn, gives rise to the forensic imaging of their personal devices to see what else they have in their possession and may have deleted.

THE COURT: Okay. Thank you very much.

All right. I'm prepared to rule on this issue. The standard for forensic imaging of an adversary's computer devices or personal devices is very stringent. I am quoting from a case called

*Freeman v. Deebs-Elkenaney*; 2023 Westlaw 2535195, Southern District, March 16, 2023, a decision by Magistrate Judge Netburn.

"Requests to inspect an adversary's computer are granted only under limited circumstances when there is reason to believe that a litigant has tampered with the computer or hidden relevant materials or when the possession or use of the computer is an element of the parties' claims or defense."

It continues: "Absent a demonstrated widespread destruction or withholding of relevant information, courts are unlikely to find the burden and expense of a proposed computer inspection justified."

I find that plaintiff has not satisfied this stringent standard here. Plaintiff's claim that there was more material downloaded to the defendants' Apex-issued computers than was produced by defendants does not persuade me in and of itself that defendants have been engaged in widespread withholding or destruction of information.

Plaintiff has not made any sort of particularized showing, and I think this was demonstrated during the colloquy this morning, that

information that clearly should be on defendants' personal devices was not produced. There just doesn't seem to be any such specific or concrete evidence.

Defendants' counsel have all represented that they did not, contrary to plaintiff's concern, simply rely on their clients to self-collect the responsive material from their personal devices; rather, counsel have all represented that e-discovery vendors were involved in collecting the documents and that the documents were then reviewed by counsel and that counsel produced all the responsive material. I am entitled to rely on those representations which were made to me by counsel as officers of the court.

I will cite for that proposition my own decision in *Ball v. Metro-North Commuter Railroad*; 2024 Westlaw 1118783, at page 5, a decision from March 13, 2024, which, in turn, cites other cases by more distinguished judges for that same proposition.

I was not persuaded by plaintiff's argument, in its July 22 letter, based on Mr. Chaney's participation -- or production of an archived Microsoft Outlook file on July 17th. That's largely for the reasons set forth in

Mr. Chaney's letter of August 7th. I don't regard the facts as described in the letters and in the e-mail correspondence attached as indicative of an intentional withholding of documents by Mr. Chaney or a failure to abide by his discovery obligations.

I also don't regard the assertions with regard to potential spoliation of text messages as creating a sufficient basis for the extraordinary request for forensic imaging of the defendants' personal devices, which I note goes beyond the imaging of the three defendants' mobile phones where there were text messages deleted because the defendants have agreed to forensic imaging of those devices.

So I'll deny the request for forensic imaging of the employee defendants' personal devices at this time because there hasn't been an adequate showing that such relief is warranted. It may well be that Apex will develop additional evidence, through depositions or otherwise, that would enable it to meet the standard to get forensic imaging. And they're certainly free to renew their motion if and when that occurs. And needless to say, nothing that I'm saying is intended to relieve defendants, Belinkie, Hope and Callen of their agreement to turn

over their mobile phones for forensic imaging. And I trust they will respond to the proposed protocol promptly so that that can be accomplished.

All right. That's my ruling with regard to Issue 1.

Moving on to Issue Number 2, the defendants' request for depositions of Mr. Klingerman and Mr. Moats. I'll hear from counsel for the defendants on that issue.

MR. LIEBERMAN: Yes, your Honor. Thank you very much.

So the defendants are seeking the deposition of Mr. Klingerman and Moats for a specific reason, which is that, during the preliminary injunction briefing, Klingerman and Moats submitted fact declarations, attesting to having made images of the defendants' work computers. And they inspected those computers, and they identified certain downloading activity. And they put in fact declarations to say that this downloading activity occurred at times that were suspicious and occurred in volumes that were greater than other times.

And that information was not only used in declarations, affirmative declarations that were

used to support the preliminary injunction motion, but, you know, the results of that analysis are presented in the complaint. You see it in paragraphs 74 to 105 of the amended complaint, talking about alleged download activity.

They did not put in a declaration on peripheral issues. They put a declaration in on the main merits issue involved in the trade-secret and the confidentiality-breach claims, which is that -- the theft of alleged -- of alleged confidential information from Apex.

For that reason, we view this in -- from -- in two ways: One, they are witness -- the viewers of the occurrences which give rise to the suit. They've actually come in and are percipient witnesses to what the computers' context -- contents reveal, and so we want the opportunity to learn more about what it is they saw.

In particular, we think that what may be not -- may have been selectively left out of their declaration, or may be actually reflected in their declaration, but it's more about reading between the lines, is that this download activity was just from this cloud-based source to the work computer. And also, we think that there are certain things in the

computers, such as browser artifacts. There are certain files that allow you to analyze USB ports to see if data was taken from those USB ports to a third device. And we want the opportunity to talk to them based on what they saw, to understand what it is they saw, and get the information about what those computer contents have.

Now, we are aware, you know, and there's been a letter submitted. I mean, we actually have our own -- what was interesting about the letter submitted last night is that there's been actually a back and forth of case law between Apex and the defendants about the case law that addresses issues of when someone puts information from someone they call a consulting expert affirmatively into a complaint.

We provided our own case law. They omitted to inform the Court of that. We would love the opportunity to provide it. But there are certain cases, you know, that address this fact that we pointed out, which is --

THE COURT: Just so I'm clear, this case law was or was not submitted in connection with the issue I'm not getting to today, correct?

MR. LIEBERMAN: I don't know if all of it

was because I think we just argue -- that was with respect to the issue of just the forensic image. And I don't believe we've submitted cases, including the *Commodity Exchange, Inc., Gold Futures and Options Trading Litigation* case by Judge Caproni, with respect to a situation where there was a strategic decision to include documents in the complaint and the results of the non-testifying expert's analysis. There would be a waiver of improper objection.

THE COURT: Well, that's -- I'm not sure that's the issue before me.

MR. LIEBERMAN: Yeah. I think I -- you're right.

THE COURT: Because you're saying these guys submitted fact declarations in connection with the preliminary injunction motion.

Do you view that as expressions of expert opinion?

MR. LIEBERMAN: I view -- no. I view that as expressions of fact. And that's our primary argument.

THE COURT: Okay. And that's what you want to depose them about?

MR. LIEBERMAN: Yes.

THE COURT: Now, what if they were also, as is, at least, suggested by Apex, acting as consulting experts for Apex and offering opinions to Apex and so forth?

Would you agree that that's off limits for purposes of these depositions and that your deposition should be confined to what you've said you want to ask them about, which is the facts set forth in the declaration, such as, as you mentioned, what they saw on the computers?

MR. LIEBERMAN: Yeah. I think that I would agree that if it's about non-testifying consultant work about strategy for the case and, you know, potential angles that, you know, plaintiffs could pursue, I think that would be different.

That would be hitting at the consulting experts' consulting. For us, it's about examining them about what they put into the public record. So I would agree with that, your Honor.

THE COURT: All right.

MR. LIEBERMAN: And I think the parties can -- you know, because we actually have a written -- we actually have a written document that discusses what it is he did and what it is he made as the facts and put into the record here, I think

it's not as hard to police that. I don't think it's that hard to police it.

You know, there could be some gray areas, and counsel is very good at working through, you know, discovery issues ourselves. But we actually do have a declaration. We have the specific paragraphs, and there are words in those paragraphs. And, you know, to the extent we're going beyond that, you know, counsel will have the ability to say, well, now, you're getting into our case strategy.

THE COURT: Okay.

MR. LIEBERMAN: So -- yeah, so that's where we draw the line, and that's why we have made this motion, and that's why we wanted to speak about it.

THE COURT: On the assumption that no other defendants' representative wants to be heard on that issue, I will ask Mr. Beckerman or Ms. Ruhland, one or the other, to respond.

MS. RUHLAND: Thank you, your Honor. I'll be addressing this issue, and I want to start with disputing the fundamental premise of Mr. Lieberman's argument, which is that these experts somehow testified in their declarations

about downloading activity by these defendants. That's not true at all.

And, in fact, your Honor, I invite you to go read those declarations, which are incredibly narrow and have nothing to do with the downloading activity at issue here. Instead --

THE COURT: Well, I did. I did look at the declarations. I'm not sure I can agree or disagree with --

MS. RUHLAND: Okay. Well --

THE COURT: -- them.

But the more important point, at least in my view, is they did seem to be submitting declarations about facts. I didn't read them as offering expert opinions.

So whatever those facts are, whether they're what Mr. Lieberman says or what you say, why isn't it fair game for the defendants to depose them about those facts --

MS. RUHLAND: Your Honor, I --

THE COURT: -- which do seem relevant to the lawsuit?

MS. RUHLAND: Yeah. Your Honor, I will tell you that the case law is very clear on this, including the case law that, I think, Mr. Lieberman

was probably referencing, and that is that a consulting expert, an expert that is hired purely for litigation purposes, in anticipation of litigation, which is why Mr. Moats and Mr. Klingerman were hired -- they have never -- they are not percipient witnesses to any facts independently of their consulting expert work in this case. And the case law that says that consulting experts can be deposed about facts are cases where those experts learned the facts prior to their retention as consulting experts in the case. And the --

THE COURT: Are those cases in which the consulting experts put in affidavits?

MS. RUHLAND: Some of them are, in fact, your Honor. And even then -- I'm actually just looking at the case law that the defendants cited.

So, yes, those -- they are not cases in which the defendant -- the experts put in affidavits, but they are cases where the experts had involvement with the facts of the case prior to being hired as consulting experts, and it was that narrow --

THE COURT: All right. But -- I'm sorry to interrupt, but are you contending that they

offered expert opinion in those declarations?

MS. RUHLAND: No. But I am --

THE COURT: Is that your contention --

MS. RUHLAND: I am --

THE COURT: So how can you rely on the consulting expert privilege to shield probing by the defendants as to the facts -- whatever they are -- the facts set forth in those affidavits?

MS. RUHLAND: Your --

THE COURT: Doesn't matter that they -- that they were or were not acting as consulting experts on the side for the plaintiff. They put in these factual affidavits, it has nothing to do with expert testimony. And the defendants want to find out more about the facts and what it was based on.

MS. RUHLAND: Your Honor, I respectfully disagree. Where witnesses have been hired as expert consultants purely in anticipation of litigation, and they put in a declaration consistent with their consulting expert work, that declaration does not make their -- the facts that these experts learn in connection with their consulting agreement fair game for depositions.

And, your Honor, the closest -- I looked at a lot of case law about this, and the closest

case I could find on this issue was a case called *Wreal v. Amazon.com*, which is a case that is very, very similar to our case, your Honor, where the plaintiff used the declaration of its consulting expert in support of a motion for preliminary injunction and actually even allowed that expert to testify as a witness at the evidentiary hearing on the preliminary injunction. And then later, after the preliminary injunction phase of the trial, Amazon sought to depose that expert, that consulting expert, during discovery.

The plaintiff in that case moved to quash the subpoena, arguing that the expert was immune from deposition under Federal Rule of Civil Procedure 26(b)(4)(D). And the court agreed. It said, listen, this preliminary injunction phase is separate and apart from whether the consulting expert is qualified as a testifying expert for trial purposes.

The majority approach in federal jurisprudence is that allowing a consultant expert to submit a declaration in connection with a preliminary injunction hearing does not convert that expert into a fact witness for purposes of trial, and there's no prejudice by disallowing the

deposition because the consulting expert isn't coming to trial to testify about the "facts" that were at issue in the preliminary injunction hearing.

And that's exactly what's going on here, your Honor. In fact -- and I'm going to represent this to the Court: We do not intend -- these consulting experts are not going to come to trial in any capacity in this case. Apex does not intend to rely on anything set forth in those declarations for purposes of proving its case at trial. And, in fact, to the extent that any of the opinions set forth in these declarations, or any of the facts set forth in these declarations are part of trial, that will be part of a separate expert case that Apex is putting on with testifying experts who will produce reports, who will sit for deposition, who will talk about any facts at issue underlying those opinions, and who defendants can depose at that time, but this just really isn't fair game. And --

THE COURT: Is it your position that, unless the individual testifies at trial, the Rule 26(b)(4)(D) protection applies?

MS. RUHLAND: In almost all cases, your Honor, unless there are some sort of extraordinary circumstances that aren't present here, where --

THE COURT: Well, I have -- I'm asking because I have seen some cases where an expert puts in an affidavit on summary judgment, and then the party that retained them says, well, they're not testifying at trial, and the courts have rejected that, and it seems, to me, properly so.

That's not the situation we have here, to be sure, but these guys did testify, in manner of speaking. They submitted declarations.

MS. RUHLAND: They did, your Honor, but the bulk of the testimony that Mr. Lieberman is talking about is actually the subject of different declarations in the case by fact witnesses who will be coming to trial, including Maria von Horvath, who is actually someone that defendants have already sought to depose and who is the deponent -- or is the declarant who actually talked about all this downloading activity, and that's the downloading activity that's also referenced in the complaint.

So there is a fact witness available for the defendants to depose about these issues because that's the fact witness that Apex relied upon on in connection with its preliminary injunction motion.

THE COURT: Well -- so you contend that Klingerman and Moats submitted their declarations as

experts?

MS. RUHLAND: My testimony is that they were experts. They were consulting experts. And they did do something that -- you know, frankly, your Honor, they did something that our lay witnesses can't do, which is they looked at images of the Apex computers used by these defendants, and they said, listen, at the time when this downloading activity occurred -- which, again, is the subject of lay testimony by a different declarant, Maria von Horvath.

At the time this downloading activity occurred, they could see that the defendants had open Google Drives, a web-based e-mail, and at least in one case, a USB device. But, again, that testimony is super limited. It doesn't go to any of the ultimate issues in the case. And we do not intend to rely on that, on that testimony, or that evidence for part of our case in chief at trial.

So to the extent we do have somebody testifying about what might -- what other web-based applications might have been open on these defendants' computers, for purposes of trial, we will produce an expert report. We will produce that person to testify at trial. And that phase of

discovery is happening later, starting in October, after fact discovery closes.

And by the way, your Honor, if we get to that phase of trial and the defendants are still jumping up and down and screaming that they can't get at relevant facts for purposes of trial and they really need Mr. Moats and Mr. Klingerman to come testify as fact witnesses, then we can discuss that then. But the timing is very premature because we -- we do intend to provide expert testimony on these computer issues for purposes of trial that the defendants can test and depose people about and seek discovery about.

THE COURT: Thank you.

All right. Mr. Lieberman, so what about that?

MR. LIEBERMAN: Well --

THE COURT: In particular, I'm focused on two things: One is the case law, including the *Amazon* case that Ms. Ruhland mentioned, which, as described by her, sounded on point.

MR. LIEBERMAN: I think it --

THE COURT: And secondly, the notion that the preliminary injunction motion is in the rearview mirror. Maybe you could have deposed them in

connection with the preliminary injunction motion, but, obviously, the time for that has passed, and now that's really no longer relevant.

MR. LIEBERMAN: Okay.

Your Honor, the fact declaration makes them fact witnesses. And what they're really saying is that they're entitled to tell us which fact witnesses we can depose and which ones we can't.

Notably, in the -- there was actually examination of the witness in the case they're describing. A cite was not provided, and I'm not sure which court they're even citing for this *Wreal* case, but there was an opportunity to examine that fact witness.

The word "download" shows up in Mr. -- in Mr. Klingerman's declaration, including the charts, over 50 times. He talks about the accessing from remote desktops and the use of web browsers to interact with the computer, and he provided it.

This is -- basically, is just depriving us of the opportunity to speak to someone who was first on the scene to actually analyze the -- these key documents. And there's plenty of cases that say, well, when you actually put your non-testifying expert consultant out there with factual

information, we have -- we cited the *Haier* case from the Northern District of California, where a non-testing expert invoked the forensic psychologist's assessment as grounds for denying the plaintiff's request for reasonable accommodations.

This is obviously a preliminary part of the case, too, but we're actually seeking to get to the facts of what was done early in the case and what was found. And they've already put the person out there to put the facts out there. They are saying, well, now that we have pocketed our preliminary injunction, and we've gotten it, you can't get this information anymore.

Well, I think that --

THE COURT: Yeah. What's wrong with that argument, if they've said, as they've said very emphatically, they're not putting any of this into trial, other than through separate experts who will be identified in the expert witness --

MR. LIEBERMAN: Well, the reason is because it's fact testimony. It's like saying, well, we have a star witness, and now you can't speak to our star witness anymore because we're not calling the star witness at trial.

THE COURT: But the star witness, by

virtue of being called "the star witness," is somebody who's going to testify at trial as a star.

MR. LIEBERMAN: Well, someone who puts in an affidavit in the middle of the case is relevant into the case. That would be like saying, well, you know, that witness didn't work out for us and, you know, now you can't have him anymore.

They've had unilateral access to Mr. Klingerman, who looked at -- and he puts in -- he puts in a chart of all this: Users, Chaney, downloads, Ben 5-29 agreement. He talks about how he looked at web artifacts. And these are important facts that are not just in that affidavit; they're actually in their complaint. They talk about downloading activity.

We note that with respect to Ms. Horvath, they've taken the position, mind you -- and that will be an issue that comes up later. They will say, well, Ms. Horvath, you can only have one day with her, and she's no longer an employee. They're already talking about restricting access to Ms. Horvath for that.

And this is the point: They put stuff out there, and then they're pulling it back. And there are actual facts that are addressed here that

are not addressed by Ms. Horvath and that are part of what's being alleged in the complaint.

So I think the big difference is he actually addressed a merits issue, which is the downloading activity. So I don't think -- if it's the case with any fact witness that you can't put the fact witness out there and then pull their facts away, our argument is he has been advanced as a fact witness, and not just a fact witness; a fact witness that helps secure relief in the case.

Well, we're entitled to do that. And one thing in a trade-secrets case -- I'll note one other point, your Honor.

In a trade-secrets case, there is an issue of whether the plaintiff actually had an adequate grounds for bringing the complaint. And if they fail to have that adequate grounds, there could be an award of attorneys' fees against them.

What they're basically saying is, we don't get discovery into that because they are saying --

THE COURT: Well, hold on a second.

Let's say they never submitted declarations, but the complaint says what the complaint says, but they were consulting experts

with regard to that.

Are you saying the possibility of a defense argument that they had no basis for bringing the claim is -- constitutes some sort of exceptional circumstances that warrants an exception to the privilege contained in 26(b)(4)(D)?

MR. LIEBERMAN: Well, I say two things. One, it's an additional grounds for relevance on a fact basis. And number two, it could require it. But our point is, and I think where we started this is, this is not, this is not non-testifying consulting expert witness testimony.

THE COURT: All right. I'm not persuaded by that argument. And among other reasons, a federal judge has found enough merit in the case to issue a temporary restraining order and a preliminary injunction, so I think you're wasting your breath with regard to that argument.

But look, on this issue, I feel I need to take it under advisement. I -- and I feel I need a little more education from the parties about the relevant case law, so I'm going to ask for letters by the end of the week from each of you telling me whatever you want to tell me about the case law as it bears on this issue.

Obviously, I would like to see the *Wreal v. Amazon* case and the cases going the other way as described by Mr. Lieberman. I appreciate, although I don't know, that some of those cases may be in some letter that I did receive, that I swore not to look at for purposes of today. So even if they are already discussed, I would ask Mr. Lieberman to cut and paste that discussion and put it in a separate letter that's tied to this particular issue.

MS. RUHLAND: Thank you, your Honor.

MR. LIEBERMAN: Thank you, your Honor.

THE COURT: All right. Thank you. Thank you, both.

All right. Issue Number 3, defendants' request for what is described as departure information relating to certain employees and clients.

So, Mr. Lieberman, assuming that is you again, I would ask you to proceed. And I will acknowledge at the outset and ask for your help in terms of -- I don't really know what exactly it is that you're talking about. I don't know what the Apex/Related team is or the Dallas office or the Sanne Group as a newcomer to the case, so please feel free to educate me about that.

MR. LIEBERMAN: Absolutely, your Honor. Thank you for the guidance.

So, in this case, Apex is alleging that Related and the employee defendants somehow teamed up to leave Apex and solicit other employees to leave Apex to go to a competitor, IQ-EQ, and take Related's business from Apex to IQ-EQ and, in doing so, took solicited, improperly solicited, key employees from Apex and bring them to IQ-EQ.

This is part of what they're calling a lift and shift to another competing company. They are alleging that, in doing so, they were bringing some confidential information with them, but also the soliciting of other employees. And one of the claims is a breach of non-solicitation provisions in the employee defendants' agreements by soliciting other employees to go to IQ-EQ.

As damages -- Apex is alleging as damages, among other things, enterprise-wide damages. They're saying that they lost the full value of this Related business unit. There is actually -- it's a full business unit from what used to be called SandsPoint Capital Advisors and is now Apex Capital Advisors. And, basically, the whole business was -- that whole business has suffered

damage as a result of taking these employees and this client away. And --

THE COURT: What's the name of that business unit --

MR. LIEBERMAN: It was called -- it was called SandsPoint Capital Advisors. And now, they call it Apex Capital Advisors.

THE COURT: Okay.

MR. LIEBERMAN: And, you know, so, basically, you know, they are saying that by doing that, the whole -- they want damages including -- they purchased this business unit, Apex did, and they're looking for damages including what they paid for the business unit.

And so to address these allegations, we want to point out two things. One, there were a whole -- there was a huge amount of employee departures from this SandsPoint Capital Advisors unit that was going on independent of this scheme. There were dozens of people leaving, and people were leaving because they were unhappy there because of how Apex ran its business.

Apex ran its business like it was seeking an IPO. On a financial balance sheet, it looked great, but you didn't want to live there. And

that's the real reason that the employee defendants left. That's why many other people left. And it was part of a pattern that was happening at that business unit. Many people were leaving.

And it happened at another business unit called the Sanne Group, which was also in Dallas, within a year earlier. And in actual communications with the CEO, Peter Hughes, of Apex, Lucas Belinkie and others said, we need to have bigger bonuses or we going to lose people from the SandsPoint team just like with the Sanne Group, specifically referencing that experience. So --

THE COURT: So just so I understand, the impairment -- or any impairment to the Sanne Group is not part of what you understand to be the damages claim made by Apex; is that -- am I correct about that?

MR. LIEBERMAN: I -- look, we don't have full transparency into the damages claim, but I think that's a fair statement of my understanding at this point.

THE COURT: So how is information about departures from the Sanne Group relevant to the damages issue?

MR. LIEBERMAN: Okay. So the reason it's

relevant is because, in their own statements, they said the experience of the Sanne Group will be recreated here. The point is, they reference that as --

THE COURT: So what?

MR. LIEBERMAN: Well, it shows a larger problem at Apex has contributed to the damages here. You know, so -- yeah.

I mean, look, if you want to know what people are talking about, you have to know, well, we lost -- if they lost all their clients at the Sanne Group and they lost employees at the Sanne Group, it raises an inference that it was not the employee defendants and it was not Related that caused the damage at this business unit. It was a business decision to follow the same practice as was followed with respect to the Sanne Group.

So that's our submission on the Sanne Group. But your Honor pointed it out, it's a distinction. You can address that.

There's also this business unit. And for this business unit, we don't have a list of all the departures here, which are important because it goes to, one, enterprise damages. Was it really these 11 employees that caused the enterprise-wide damages?

Or were people leaving this business unit anyway, and that caused part of the damages?

So it, at least, mitigates the damages because people were leaving regardless. It also establishes that the employees were leaving because they were just unhappy there, and they had been looking for other employment.

And I will tell you, they've named Maria von Horvath, your Honor. She's their big expert. She's gone. In fact, 14 of the 20 custodians in this case are gone from Apex. They are gone. They are all -- they are all leaving. And so they're coming to us saying, you can only have so much time with these witnesses because they've left.

There is a huge, massive set of departures from Apex that we want to show has nothing to do with this. In fact, it's the same reason Related wanted to leave, because what they are doing is they're not investing in the business. They are not paying their employees, and their customers are unhappy. They are claiming it's some big, tinfoil-hat conspiracy of Related working together, but our point is, no, this is part of a larger migration of employees and clients from that business unit.

Yes, they bought it, and then they didn't give retention bonuses. They made affirmative decisions not to pay people, and oftentimes they would replace domestic employees with people in India. And that goes to our point, which is there is a completely different reason for why this happened.

And it's important because they're going to try to say, well, look at these individuals just here. But, in fact, there are many employees that -- even that they allege are solicited who went to different places.

So if we can't have that information, I think it really does not -- it's an unfair situation with respect to proving our alternative theory of the case.

THE COURT: All right.

I'll hear from plaintiff's counsel.

MR. BECKERMAN: Yes, your Honor. Thank you. Just some further background, your Honor.

Plaintiff, Apex Capital, is a subgroup of Apex Group. Apex Group is a global financial services provider with over 13,000 employees across 112 offices worldwide.

In this case, your Honor is correct, that

Plaintiff Apex Capital's damages do not include impairment to the Sanne Group, which is a completely different entity.

In this case, we have already identified all legacy SandsPoint a/k/a plaintiff, Apex Capital, employees who were based in the Dallas office, who left through June 2025. We have, likewise, identified all such clients who left plaintiff, Apex Capital.

THE COURT: Whether or not they went to IQ-EQ.

MR. BECKERMAN: Correct, your Honor.

THE COURT: Okay.

MR. BECKERMAN: And we have recently produced documents, again, substantiating everybody who left plaintiff, Apex Capital, from November 2024 to June 2025 from the Dallas office.

So we think this issue, your Honor, has now been mostly resolved. I think it's -- the only issue outstanding is with respect to the Sanne Group. And as your Honor pointed out --

THE COURT: Before you get to the Sanne Group, what you just described in terms of you providing that information, that's a change from after the July 15th letter was submitted?

MR. BECKERMAN: No. That happened before, your Honor.

THE COURT: Oh.

MR. BECKERMAN: We consider that issue resolved.

On -- some more context: On July 11th, we had proposed providing a list of all employees who departed Apex from November 2024 to June 2025. And we did that, although opposing counsel never got back to us on that, on that position.

So, perhaps, from their position, that aspect of this dispute hasn't been resolved from -- but from our position, that aspect is resolved.

THE COURT: Okay. And I cut you off. You were about to go back to the Sanne Group.

MR. BECKERMAN: With respect to the Sanne Group, we simply don't see the relevance of asking for client and employee departures from other companies, other subs owned by Apex Group.

Completely unrelated to the damages in this case, opposing counsel is trying to draw some comparison between departures, I guess, that may have happened in the Sanne Group and departures that have happened in plaintiff, Apex Capital, based off of, in one e-mail, somebody drawing comparisons. We

don't -- we still don't see the discovery into Sanne Group departures as being relevant or proportional to the needs of this case.

THE COURT: Thank you.

All right. Mr. Lieberman.

MR. LIEBERMAN: If I may, there's been a misstatement here. Just want to get something on the record here.

This purchase of SandsPoint Capital occurred in 2022. There have been people working on the Related team in '23 and '24. We've provided to them one of their own Related team org charts, and there are people missing from it, including Nathan Johns, Kyle Vanderbeck, Kanishka Arora, Ruby Bacha, Challa Sreekanth Reddy, that are not identified.

So one thing they're doing is they're saying, were you actually employed in SandsPoint Capital in 2022? And did you depart? And then we're going to -- and then we're going to ignore the other people who are at this entity for the two years later that are even servicing the Related team.

And they're leaving those out from what they've produced. And we found dozens of these people that has not been provided. What they've

done is they --

THE COURT: I'm sorry. I'm a little lost. Are you saying -- I think Mr. Beckerman said they've identified people during a time frame of -- I may get this wrong, but November '24 to some date in 2025.

Are you saying that's inadequate because you need to know people who left before that point in time?

MR. LIEBERMAN: Oh, absolutely. Because that led to this. The allegations in the complaint, for example, are about Lucas Belinkie making machinations in August 2020 --

THE COURT: All right. Hold on. I just need to understand what the issue is.

Do you agree that they have provided the names of employees and clients who left SandsPoint or the SandsPoint business unit during some period of time?

MR. LIEBERMAN: They've offered for November 2024 in response to that. We don't believe they provided everyone for that period of time.

As to clients, they may have for that period of time, but they have offered on November 2024, and we think that's deficient because the

responsive period for the entire case has been January 1, 2024, through June 30, 2025, number one. And number two --

THE COURT: You are looking for identification of the employees and clients who left from June 1 -- I'm sorry -- January 2024 to November 2024.

Assuming for purposes of analysis that they either have provided or will provide the information after November 2024, you want the information for the prior nine months or so -- or 10 months?

MR. LIEBERMAN: That's correct. 10 months.

THE COURT: Okay.

MR. LIEBERMAN: And that's correct.

THE COURT: All right.

MR. LIEBERMAN: And we also think that they've scraped the definition of what the "Related team" means because it's just important what -- the actual business unit represented two clients. There's the Related group. There's also another major advisor that this business unit has serviced.

What they're doing is they are only looking for people who actually were hired as of

2022, at the time of signing this purchase. So they say, well, you were a SandsPoint Capital employee. But there are actually dozens of people who are actually working on the Related group and working in this business unit who are retained after the acquisition in August 2022, who are there and hired and then have departed.

And so what they are not doing is monitoring the actual departures from the Related team after the August 2022 time period. And that's important. That's important not just for the claims we're making, your Honor, with the employee defendants to show that.

But one point, you know, our brothers on the defense docket -- one point they're making is that Related left Apex because there was a wave of departures from the Related business unit. And that's the reason they left. They even -- it's even acknowledged in the complaint. Apex says that's the pretext. Well --

THE COURT: Well, that's a question of what Related's understanding was. And you can get testimony from them and so forth. I don't even know that it's relevant for that person to know who --

MR. LIEBERMAN: Well, Related is here.

THE COURT: -- who actually left.

MR. LIEBERMAN: Well --

THE COURT: The question is related to perception.

MR. LIEBERMAN: Well --

THE COURT: So that doesn't persuade me.

MR. LIEBERMAN: Well, Related is a defendant.

THE COURT: No, I understand.

MR. LIEBERMAN: And the point is, there are HR documents for the Related team, as well as for the other major asset advisor that was advised by SandsPoint Capital Advisors, which is now Apex Capital Advisors. HR has the whole list of it.

But what they've done and what they provided us, they said, can they specifically point the person to employment at SandsPoint Capital Advisors, not actually seeing were they on this team and part of this business unit during the two years?

And so the point is, if other people employed at the same business unit at the same time of Mr. Belinkie are departing at the same time because they're not happy there, it's arbitrary to leave them out just because the person joined in September 2022, when -- you know, after this

transaction occurred as opposed to just before.

THE COURT: Okay.

MR. LIEBERMAN: Their HR record shows --

THE COURT: You have a dispute as to the timing of their disclosure and as to the scope of it.

So, Mr. Beckerman, you have an issue with going back to January of 2024.

MR. BECKERMAN: Apex -- so the acquisition of SandsPoint didn't complete until sometime in 2024, your Honor. Essentially, Apex Group acquired a majority of shares, but then had a -- an ability to purchase the rest of them in 2024. And so I'm trying, now, to get the date of when it finally -- the acquisition finally occurred.

It was July/August 2024. So, therefore, we don't understand the need to go back to January 2024. That was before, you know, plaintiff -- or Apex Group had fully acquired SandsPoint --

THE COURT: Had it been acquired as of January 2024?

MR. BECKERMAN: Right. They -- it was fully acquired in -- around July/August --

THE COURT: That wasn't my -- my question was, how much did they own prior to that?

MR. BECKERMAN: 51 percent was acquired.

THE COURT: As of?

MR. BECKERMAN: I believe that was January 2022.

THE COURT: Okay. So that's majority ownership. That's control.

MR. BECKERMAN: Yes, your Honor.

THE COURT: So why does it matter if it was full ownership or majority ownership? I don't understand that.

MR. BECKERMAN: Well, I guess I would say there -- the operations didn't fully transform, right, didn't get merged into the, let's say, Apex Group operations until the -- you know, the acquisition had finally completed.

So it wasn't until July 2024 when that happened. And so this, this narrative, or this theory that they have that, you know, Apex Group is this terrible place to work and that's what actually caused all of these employees to leave, that wouldn't -- even assuming it's true -- which it is not -- that -- there wouldn't be any documents prior to July 2024 when that would be relevant to that.

THE COURT: All right.

And what about the scope of the

individuals who you have identified in terms of -- and I really don't know that I quite understand this, but it has something to do with when they started employment with the company.

Did you, in fact, provide that filter on what you disclosed, and what's the justification for that filter?

MR. BECKERMAN: I'm not -- to be candid, your Honor, I'm not sure I fully understand that point of theirs either.

What I can say is, we have scraped everyone who worked for plaintiff, Apex Capital, and who departed from November 2024 through 2025, which is really the critical time period in this case.

During a meet and confer on July 11th -- or, I'm sorry, in an e-mail we sent on July 11th, we proposed to them providing a list of all employees who departed Apex Capital from November 2024 to June 2025 and were being billed to the Apex Group Capital Advisors entity that worked on the Related account.

So opposing counsel has made this point, that we're not listing everybody who truly worked on the Related account. And so we offer to go even broader and say, we will list all of the employees who worked on the Related account. And that's what

we offered, and we think that's a reasonable compromise. And we never got a response from them on that.

THE COURT: All right.

Mr. Lieberman, I'm not going to give you a response because we have a lot of issues to cover, and there's no way I'm going to sort this out on this call.

So I will say the following: The Sanne Group, not to be confused with SandsPoint, but Sanne Group -- S-A-N-N-E -- they're out. Apex does not have to identify the employees or clients who left the Sanne Group. That is not relevant and proportional to the claims and defenses in this action. I will direct plaintiff to go back to January of 2024 and identify employees and clients who left between that period of time and November.

In terms of the scope and whether it is covering all of the employees and clients who belong to the Relevant business unit, I direct the parties to meet and confer further about that issue and report back to me within a week, all right?

MR. BECKERMAN: Thank you, your Honor.

MR. LIEBERMAN: Thank you, your Honor.

THE COURT: All right.

The fourth issue, additional deposition time. So I did note in advance of the conference that the depositions have been deferred at the parties' request and by order of Judge Caproni until after Judge Caproni has ruled on the motion for leave to amend the complaint. So I am wondering whether that is a reason to defer deciding this issue of additional deposition time until we know, for example, whether there's going to be yet another defendant in the case -- and I don't know if that defendant would be represented or not -- so that this issue can be better assessed and determined on the basis of the facts existing at that time.

I guess this is a request from defendants, so I will ask defendants to respond in the first instance.

MR. LIEBERMAN: Well, look, I think there -- there's some wisdom to that. I mean, the facts would be slightly different at a different point in time. I think the only reluctance -- and I'll seek the Court's view on it -- is we wanted this issue with respect to certain persons who are former employees to be addressed in advance, as opposed to the usual step of you take a deposition and then see how much time you get because, if

they're former employees, that might be -- that might need to get addressed in advance of the deposition so that there's less inconvenience, like Ms. von Horvath and Jonathan Schmitz, for example.

At the same time, I do think your Honor's point is right, that if -- you know, the motion for leave to amend will resolve whether there's yet one more party in the case, which can impact how the ruling goes.

So I think so long as there is an opportunity to address this shortly after a decision on the motion for leave to amend, perhaps, but before the depositions occur, that might be more humane for the former employees, that we have a protocol where we don't have to bring them back.

THE COURT: Not to mention, for me.

Yes, I was contemplating that you would like a ruling before the depositions. That is my understanding.

What do the plaintiffs say?

MR. BECKERMAN: Your Honor, it makes sense to us to defer the ruling on that.

THE COURT: All right. It's deferred.

All right. Issue Number 5, Mr. Kraus' text messages, which is a request of the plaintiff.

And this relates to whether Mr. Kraus should have to run the revised search terms proposed by Apex.

MR. BECKERMAN: Yes, your Honor.

Thus far in discovery, Mr. Kraus, who is a party defendant in this case, has produced one document in discovery. We provided Mr. Kraus with additional search terms and asked that they be run against his personal data and provide a hit report so we can see how the search terms were run and see if there are potentially more documents that may be in his possession, particularly when compared against the prior search terms that they had run.

As set forth in the complaint, Mr. Kraus' role in the alleged conspiracy to take confidential information and employees from Apex and bring them to IQ-EQ, we think is clearly set forth therein. He's a party defendant. And our simple request is that he run our new search terms and provide us a hit report so we can discern whether he has additional documents in his possession. We think that's a reasonable request. And Mr. Kraus' counsel has refused to provide the hit report.

THE COURT: But the request is just for a search of his text messages?

MR. BECKERMAN: That's correct, your

Honor.

THE COURT: Okay. And the revised search terms -- they are revised search terms you were proposing specifically for Mr. Kraus. You haven't asked other defendants to run searches with the revised search terms.

MR. BECKERMAN: That's correct, your Honor. There's 11 of -- 11 search terms in total.

THE COURT: 11 new ones?

MR. BECKERMAN: 11 new ones, your Honor.

THE COURT: Okay. And it -- it's basically an outgrowth of your belief that the -- given the small volume, I'll say, of documents produced, that the original search terms were not, at least as applied to Mr. Kraus, sufficient, and you would like these additional search terms to be run?

MR. BECKERMAN: Correct, your Honor. That's exactly right.

THE COURT: And when you say he produced one document, you mean one text message or one document of any kind.

MR. BECKERMAN: It was one text message, your Honor.

THE COURT: Well, of course, he's -- I

assume his business-related e-mails and so forth were handled by Related, his employer, not by him.

MR. BECKERMAN: Correct.

THE COURT: The request to him really was for information that he has personally or, for example, text messages.

MR. BECKERMAN: Yes.

My understanding is that opposing counsel also ran the searches against personal e-mail, right, in our personal cloud storage sites. And our request for running the revised search terms was focused on his text messages because only one had been produced. And in this case, we have, as I mentioned previously, uncovered very favorable evidence with just -- you know, evidence showing that the defendants communicated regularly via text message, at least the employee defendants, and so these revised search terms are meant to see if additional text messages are in Mr. Kraus' possession.

THE COURT: Now, Mr. Kraus' counsel said, as I recall from the letters, that had counsel reviewed every text exchanged between Mr. Kraus and his purported co-conspirators, whatever that means. And as I understood it, that was a representation

that they reviewed every text exchanged with those individuals, regardless of whether it hit on the search terms or not. Not sure I'm right about that.

But if that is what they've done, why isn't that sufficient?

MR. BECKERMAN: It's not sufficient, your Honor, because there may be text messages with other individuals, other than his co-conspirators, talking about the allegations in the complaint. And so if -- you know, if opposing counsel -- you know, if the representation is correct that they've already reviewed all the text messages between Mr. Kraus and the co-conspirators in this case, then running these search terms and seeing -- you know, seeing how many other people he may have been speaking with about the subject matter of this case wouldn't be a heavy lift at all.

THE COURT: Okay.

I'll hear from Mr. Kraus' counsel.

MR. KIMBALL-STANLEY: Thank you, your Honor. Hello.

THE COURT: Hello.

MR. KIMBALL-STANLEY: In case you may -- it looks like you're looking for me.

THE COURT: Yeah.

MR. KIMBALL-STANLEY: Here I am. Hi.

THE COURT: It took a while. There are a lot of squares. This --

MR. KIMBALL-STANLEY: I understand. Yeah.

THE COURT: This is much more than Hollywood Squares.

MR. KIMBALL-STANLEY: See, I want to correct the description that we just heard about what's happened so far in the discovery.

Mr. Kraus has produced thousands of documents; they're from his work files. You're correct, this case concerns exclusively conduct that came as Mr. Kraus' conduct as CFO of RFM, and so the productions and the searches have reflected that.

We've reviewed e-mails from his RFM e-mail account, his RFM electronic files. And, yes, also produced other custodians at RFM, two other custodians.

Apex has identified zero deficiencies with those productions. I mean, not even -- it's not even like there's a dispute over deficiencies, and we think we are right. There has been no allegation of any deficiencies whatsoever in that production.

Now, nevertheless, they wanted us to search Mr. Kraus' personal files, and we thought that was unnecessary because he does not text about work. He does not use his personal files for work. But in a show of good faith, we agreed to make a collection and run some searches over his personal files. So we ran their search terms over his personal e-mails, his personal drives, and -- yes, and his text messages.

We then ran a broader search on our own to show just what we were saying was true, that he doesn't have relevant documents on these -- in these sources. We ran a search for a -- for any communications between Mr. Kraus and any other defendant. And that -- and then we also ran a search for any communication between Mr. Kraus and IQ-EQ's -- his client contact at IQ-EQ, Ben Jamron. Those searches were performed with -- no additional search terms were applied whatsoever. There were no time limitations. It was all communications with those people.

From those, we found one responsive text, an unanswered text from Mr. Jamron at IQ-EQ, and so we produced it. Plaintiff responded that these results were not credible. But they are credible.

They are entirely predictable because we had told them Mr. Kraus does not text about work on his phone. That's just not something he does.

They can point to nothing that undermines that representation. Apex has offered nothing. They don't represent -- they have not been able to point to any documents produced in discovery by anyone, Mr. Kraus or otherwise, that reference texts from Mr. Kraus. They have not produced a text message from some other party and Mr. Kraus that bears on anything relevant in the case.

I mean, in fact, they have actually -- there's no document -- there are no texts produced from any other party with Mr. Kraus at all. He does not text about these matters. So there's no basis to say there should be more. And all they can say is -- you know, when we asked them to explain why we should continue running these searches, they point to one bare allegation in the complaint that he was friends with Mr. Belinkie. At this point, we've done enough.

THE COURT: But you -- I take it the text messages with Mr. Belinkie was part of what you reviewed independent of any search terms.

MR. KIMBALL-STANLEY: Yes. And we

reviewed -- there were -- I think there were two text messages.

No. There was one text message with Mr. Belinkie, which was -- it wasn't produced because it was non-responsive. We're happy to produce it. It was an unanswered text from Mr. Belinkie telling Mr. Kraus that he could not be heard on a Zoom call.

So we -- at this point, more searches are a waste of resources. And, you know, their line of logic here has no end. They say that because so little has been produced, that means there must be more, but then we'll just be searching forever. You know, we cannot prove a negative, but we have come very close, and we think plaintiff should be satisfied at this point.

THE COURT: All right. Thank you.

Any rebuttal, Mr. Beckerman?

MR. BECKERMAN: Just briefly, your Honor.

While we may have received text messages from the other defendants in this case, the employee defendants, and Mr. Kimball-Stanley's representation is correct, that we haven't found any text messages with Mr. Kraus among them, we still have not received -- we don't know, again, if Mr. Kraus had

texted other individuals for whom we have not received text messages; for example, other custodians, document custodians, at Related; other individuals at Related who aren't document custodians.

This isn't -- Mr. Kimball-Stanley makes it seem like we've gone back and forth with them requesting time and time again that they run different searches, when, in reality, they ran searches. And we went back to them, said, we would ask that you run these 11 targeted revised search terms and provide us with a hit report and go from there. And they refuse.

So, again, we would say, your Honor, under the circumstances -- and particularly given the very low volume of documents produced by Mr. Kraus in his personal capacity -- again, one document -- and Mr. Kraus is a party defendant, we would -- we contend that simply running this hit report and further negotiating whether additional document review is required is necessary.

THE COURT: Thank you.

All right. I'm going to deny this request. I don't see a basis for it. It seems to originate with the lack of responsive text messages

that were produced, but as Mr. Kimball-Stanley has explained, there's reasons for that. The fellow doesn't use text messages to communicate with work.

Counsel has inquired about that. They have done more than that. They have looked at his -- they have done some analysis of his phone, both in response to the original search terms and independently on their own, as described, to review texts with other defendants and as well as the IQ-EQ guy without regard to search terms, and that review didn't reveal any responsive texts.

So even though I do think the request from Apex is modest, I don't see a justification for it. You had your chance to ask for search terms. You proposed -- you asked the search terms -- you asked them to run the search terms you thought were appropriate. And the fact that you're not happy with the results is not a basis to require them to run new search terms under the circumstances here that I have described.

Issue Number 6, supplementing trade secret disclosures. I guess that is a request from defendants.

MR. LIEBERMAN: Yes.

So we have an issue in this case that,

you know, we're trying -- as typical in trade-secret cases, the parties identified the trade secrets that -- with particularity, that they're claiming have been taken, provide some description of them and their value, and then the defendants can use that to guide their collection, guide the scope of discovery, and guide their defense.

Early on, we flagged this issue for the Court, and the Court, you know, ordered there to be a supplementation of identifying of certain categories. But we're now further on in the case, on the eve of deposition, and the strength of the showing sufficient to identify trade secrets with sufficient particularity is supposed to change with the stage of the case.

And our concern is we are deep into the discovery, right, at the deposition stage, and we really don't have a full understanding of what it is that the plaintiffs are claiming are the trade secrets.

They have previously identified -- they provided a list of ten categories and then just a chart of documents that they claim have trade secrets in them, but here's the problem with that: It doesn't say specifically what the trade secret

is, what's the value of the trade secret that derives from being secret, how it provides a commercial advantage over competitors, and it's not even alleging the use.

Now, we've heard from plaintiffs, well, we can't tell you what's being used. We still need discovery and to examine, you know, what it is that the parties have taken in order to tell you what has been stolen from us.

Well, I think you can provide some information on the use that you're claiming here. But we also need to know what is it they're claiming is the value and the commercial advantage of what it is they're claiming. They've pointed to a bunch of Excel spreadsheets, and they say, look at that spreadsheet.

Well, that doesn't tell me what the trade secret is. You're pointing to a spreadsheet. Doesn't tell me what the trade secret is, how it provides an advantage. And so as we get to depositions, you know, I can't bring out -- like, here's 200 -- here's 300 spreadsheets. Well, you, Witness, tell me on 300 spreadsheets, you know, what it is you're saying is stolen.

I think it is creating issues of

management of this case, that Apex cannot say, this is what our secret sauce is, this is what the competitive advantage is.

And this is a profound issue because, at the end of the day, Apex is an accounting service provider. They are -- they deal in the world of gap. They deal in the world of providing -- of providing end-of-year valuations and financial reporting. We need to know why -- what it is they're claiming is some secret sauce that's better than everything else.

They've noted one thing they're not claiming is a trade secret, which is an FIS Investran database. It's a database that's created by FIS and Investran, so it's not Apex's. But then they say the inputs and the outputs of that.

Well, we're having trouble. We have actually put our hands on these spreadsheets. We're saying, what's the secret sauce you're claiming that we've stolen? And how can we tell if someone's making use of it? You know, what is this amazing Apex stuff that you're claiming that we lifted in order to bring Related? And we don't have that description.

There's an early -- you know, Judge

Caproni said early on, you know, it's okay to identify, you know, the documents and categories, but we're further along in the case, and it's going -- I fear it's going to be a nightmare at depositions because I really don't know what it is they're claiming is the secret sauce.

They've generically mentioned certain labels, like they say, customer lists. Well, not all customer lists are trade secrets. Usually, it has to be some identification of some specific, unique, confidential information, so we haven't even seen the specification of that. But look, that might be an easier one to address.

The other address is just these things that they call worksheets and inputs and outputs of a database that anyone can license. You know, anyone can go and get an FIS Investran database. You pay a licensing fee and you get that. In fact, in the private equity space, people all use an FIS Investran database. It's a database that helps you allocate numbers that you input into spreadsheets.

But what we're having trouble figuring out is, what's the Apex secret sauce that you're claiming we stole and that we're out there -- and that we're out there, you know, using as employee

defendants to solicit additional people. And we are not getting --

THE COURT: Isn't that what you're supposed to be asking about in deposition?

MR. LIEBERMAN: We can ask for that at deposition --

THE COURT: Well, wouldn't that, in fact, be a superior method of getting the information because it's an iterative dialogue?

MR. LIEBERMAN: Well, the problem is we don't get the opportunity to have examples of it in the deposition if they're identifying it for the first time in deposition.

So they're going to say, well, it's --

THE COURT: I'm not sure they are identifying it for the first time because it sounds like they have identified, at least at a level of generality, perhaps, that you find disappointing, but it seems to enable you, unless I misunderstand this, to ask questions about it.

MR. LIEBERMAN: Yes, I am disappointed, your Honor, that's true, but let me tell you just why.

I mean, in other cases, we've seen disclosures of, you know, 50 pages describing

software and its code and -- or describing in a narrative format what things are. We don't have the narrative format here.

And so, yes, you're right, I can have some back-and-forth. But I don't know if I'm going to be able to get through with any witness, you know, potentially 300 documents to address every trade secret. And I'm not even sure what a deposition looks like when I say, well, tell me every trade secret that you're saying that we've taken and why it's important. I fear it's going to be unwieldy.

So, you know, your point is well taken, that depositions can be very helpful, but given the number that we're talking about here of spreadsheets and given the lack of narrative and description, I think that that's going to prove very problematic for me to get in there with any one witness any -- it's going to take many witnesses to get through that, and I don't think that the time will end up getting used wisely.

THE COURT: All right. Thank you.

I'll hear from plaintiff's counsel.

MR. BECKERMAN: Thank you, your Honor.

Your Honor, on May 13, 2026, Judge

Caproni already decided this issue. She ordered that Apex need only supplement its responses to defendants' interrogatories by identifying the documents within the employee defendants' production of 364 documents, which was, as of that date, that Apex contended contain trade secrets; and where Apex did not contend that entire document is a trade secret, that Apex would identify where in the document, specifically, the alleged trade secret is located. She also ordered that Apex would do the same for documents in future productions after receiving them.

Your Honor, that's exactly what we've done. We've supplemented our interrogatory responses. We've identified trade secrets that were produced by defendants by specific reference to Bates ranges. To the extent that documents in their entirety are being claimed by Apex to be trade secrets, we identified where the trade secrets could be found.

One issue is, candidly, your Honor, that the employee defendants keep producing more and more trade secrets to us, requiring us to constantly supplement. Our position has simply been that Apex can't supplement and identify all the trade secrets

at issue in this case until it has discovery into what the employee defendants took. Our position --

THE COURT: Well, your letter says Apex claims that it needs forensic imaging to be able to identify all its trade secrets at issue in this case. For better or worse, I've denied your request for forensic imaging, except with respect to the mobile phones, I guess.

So since you're not getting the forensic imaging, what's the reason for waiting?

MR. BECKERMAN: Your Honor, you beat me to the punch. I was going to say, candidly, your Honor, now that you've resolved that issue, I think we can supplement and identify all of the trade secrets that are going to be at issue in this case quite promptly.

With respect to the detail, however, that defendants are requesting, as your Honor stated, defendants can ask questions about all the -- all of that detail during depositions.

Our position is, we need not go any further than identify the trade secrets, and if an entire document doesn't constitute a trade secret, where on the document the trade secret can be found, pursuant to Judge Caproni's order.

THE COURT: All right.

So my understanding, based on what Mr. Beckerman just said, is that defendants will be promptly supplementing their trade secret disclosures. I'm not going to rule now on what the scope of that needs to be and how detailed it needs to be. If, after defendants receive the supplemental disclosure, they're still disappointed sufficiently to bring the issue back to the Court after meeting and conferring with plaintiff's counsel, then they will do that. All right?

All right.

MR. BECKERMAN: Thank you, your Honor.

MR. LIEBERMAN: Thank you, your Honor.

THE COURT: All right. Number 7, Mr. Vatsa's phone. Who is Mr. Vatsa?

MR. LIEBERMAN: Mr. Vatsa is the leading executive at Apex who was involved in discussions regarding the replacement of staff and regarding the -- you know, the hiring of staff and whether or not to provide bonuses to the business unit of the employee defendants in 2024, which was an issue that came up shortly before they departed. And so he's someone who's involved in discussions both about, you know, whether Apex should spend more money to

retain the employee defendants in their business unit or not, as well as how to deal with the aftermath of the employee defendants leaving and Related's complaints about staffing.

So, you know, he's an important executive involved here. And when we reviewed his documents, we saw an unusually large number of e-mails where it says, "Sent from a mobile phone." And among the various custodians in this matter, he has more e-mails sent --

THE COURT: Were any of those e-mails sent from a personal e-mail address?

MR. LIEBERMAN: That is not something we -- that's not the observation we made.

THE COURT: Right. So I think -- I assume there are plenty of e-mails that I send relating to court business that are sent from my personal phone. I don't know if it says that, but I certainly send such e-mails. But it really doesn't matter. It could equally have been sent from my -- from here, from my computer, in the office. It's not really probative of anything in terms of text messages.

MR. LIEBERMAN: I think it shows he is using his phone for work.

THE COURT: Many people use their phone for work. Many people use their phone for work purposes in terms of sending text messages, I agree with you. Some people don't; for example, Mr. Kraus.

MR. LIEBERMAN: Kraus. Yeah.

Yes. I did think that the Kraus conversation --

THE COURT: So do you have any evidence that Mr. Vatsa has communicated about work-related matters via text?

MR. LIEBERMAN: I'm going to sound like Mr. Beckerman. I'm going to say I don't know what I don't know. But I don't. I don't.

I think, you know, what troubled us was, there wasn't even a search of any scope to look at those text messages, as opposed to --

THE COURT: Well, here's my view. And this -- well, my view is there's an obligation on the part of counsel to inquire of an employee or executive as to whether they use their phone to communicate via text. It's very prevalent in the business world today, as we all know. Doesn't mean it necessarily happened. And I didn't see a representation from Apex that they've made that

inquiry.

I saw them argue that defendants have not set forth a sufficient basis to believe that he does do that. And that may be true. But I do believe that counsel has an obligation to find out and then take appropriate steps if there's reason to believe that the phone needs to be searched.

So with that as a prelude, Mr. Beckerman, or Ms. Ruhland, I'll let you respond.

MR. BECKERMAN: Yes, your Honor, we would agree with you. And we did inquire of Mr. Vatsa whether or not he used text messages for work purposes, and he informed us that he did not.

As your Honor indicated, the mere fact that Mr. Vatsa sent work e-mails, you know, that -- on his phone that indicate on the bottom that he had sent it from his personal phone don't indicate that he also sent text messages.

And with respect to those e-mails that he sent on his phone, this goes without saying, your Honor, but those e-mails were collected, right, pursuant to the normal collection of e-mails, of Outlook e-mails.

And just on that point, I just want to mention that we've produced over 1,500 documents for

which Mr. Vatsa is the custodian. And we have collected over 60,000 documents for which he was the custodian. So we don't think there's any further collection that is required, especially given Mr. Vatsa's confirmation that he did not use text messages for work purposes.

THE COURT: All right. I mean, if he did use text messages for work purposes, the number or volume of non-text message communications that were produced wouldn't matter.

But let me ask one other question, just to be clear about this, because you raised this issue in your letter, and I think you made the argument that the phone is not within Apex's control.

I don't share that view and neither does the case law, so I just want to make clear, although I think it's evident, that you're not relying on that argument as a basis for saying there are no responsive text messages.

In other words, you're not saying, there are no text messages within our control. You're saying there are no text messages, based on what he's telling you.

MR. BECKERMAN: Correct, your Honor.

THE COURT: Okay. All right.

Well, based on that representation and the absence of any affirmative indication that Mr. Vatsa does communicate about work-related matters on his phone, I'm going to deny the request that Apex be compelled to search Mr. Vatsa's personal phone.

Again, there may be developments in the future. If somebody produces a text message with Mr. Vatsa, the analysis could change, but based on the current state of affairs, that is my ruling. All right?

All right. It's been a long morning into afternoon. I really do want to thank and commend all counsel for their excellent arguments. It's very helpful.

There's a couple of things that need to be done after this, which I'm not going to try to remember now, but hopefully you all were taking notes.

Is there anything else that anybody wants to raise before we conclude this very long call?

Plaintiff?

MS. RUHLAND: Not from plaintiffs, your Honor.

MR. LIEBERMAN: Not for the employee defendants.

MR. KIMBALL-STANLEY: Not for the Related defendants either.

THE COURT: All right. Very good.

Again, thank you all. Have a very good day.

MS. RUHLAND: Thank you.

THE COURT: Thank you.

oOo

C E R T I F I C A T E

I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Apex Group Capital Advisors LLC v. Related Fund Management, et al.; Docket #25CV8892 was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature Adrienne M. Mignano ___________________________

ADRIENNE M. MIGNANO, RPR

Date: August 20, 2026