# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| APEX GROUP CAPITAL ADVISORS LLC F/K/A SANDSPOINT CAPITAL ADVISORS LLC, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 3:25-cv-01627-X |
| RELATED FUND MANAGEMENT, LLC; JAMES KRAUS; LUCAS BELINKIE; PRESTON CALLEN; WILLIAM C. CHANEY; and RYAN HOPE | § | |
| Defendants. | § | |

**DECLARATION OF MARIA VON HORVATH**
**IN SUPPORT OF AMENDED MOTION FOR PRELIMINARY INJUNCTION**

1. My name is Maria Von Horvath. I am over eighteen (18) years of age and am legally competent to make this Declaration, which is true and correct and based on my personal knowledge.

2. I am the Local Managing Director for Apex Group in Dallas, Texas. In my capacity as Local Managing Director, I am responsible for overseeing various client teams, including those operating in portfolio management and fund accounting. After Apex Group acquired SandsPoint Capital Advisors LLC ("SandsPoint") in August 2022, SandsPoint employees Lucas Belinkie, Preston Callen, William C. ("Clark") Chaney, and Ryan Hope became employees of Apex Capital Advisors LLC ("Apex Capital"), an Apex Group subsidiary, in the company's Dallas office. Throughout this Declaration, unless otherwise specified, I refer to Apex Group and Apex Capital Advisors LLC collectively as "Apex."

3. While they were employed by SandsPoint, Lucas Belinkie, Clark Chaney, Preston Callen, and Ryan Hope (who are referred to collectively in Plaintiff's Amended Motion for Entry of Preliminary Injunction ("Motion") as the "Former Employees") worked on the account of Related Fund Management, LLC ("Related"), which I understand was a significant SandsPoint client. Because of their institutional knowledge and industry experience, when the Former Employees became employees of Apex Capital, they continued to work on Related's account.

4. Each of the Former Employees entered into a written employment agreement with Apex. A true and correct copy of Lucas Belinkie's Employment Agreement is attached to this declaration as Exhibit A. A true and correct copy of Preston Callen's Employment Agreement is attached to this declaration as Exhibit B. A true and correct copy of William Chaney's Employment Agreement is attached to this declaration as Exhibit C. A true and correct copy of Ryan Hope's Employment Agreement is attached to this declaration as Exhibit D.

5. As employees of Apex Capital, the Former Employees were given access to various company files that Apex would consider highly confidential and proprietary, including Apex's financial, organizational, and operational information; the revenues, gross and net income, compensation and profitability of Apex and its employees, customers, and affiliates; investment research reports; the identity of Apex's clients, customers, prospective clients, and prospective customers; information about customers' preferences, business plans, and strategies; and strategic methods for specific client servicing, including deliverables data and strategic plans. All of this information is critical to Apex's business and gives it a competitive advantage in the marketplace.

6. In my experience, the information to which the Former Employees had access is critical to Apex's business and commercial success and would be a harmful tool in the hands of

Apex's competitors. As a result, Apex and its parent company, Apex Group, work hard to protect the confidentiality of this information and to prevent employees from misusing it.

7. For that reason, Apex is careful to maintain the confidentiality of its proprietary data. Apex also requires all employees to abide by written policies and procedures regarding data management, information security, and content access standards. Attached as Exhibit E is a true and correct copy of Apex Group's Data Privacy and Data Protection policy, which defines what the company considers "Confidential Data" that may not be shared with third parties. Attached as Exhibit F is a true and correct copy of Apex's Code of Conduct and Ethics Policy, which also requires employees to treat the information they receive in the course of their employment as confidential. In addition, and among other things, Apex uses password-protected, secure, cloud-based systems, networks, and computers to store and maintain the confidentiality of its proprietary data. Apex further limits access to its secure system to employees and other authorized individuals. And finally, Apex limits employee access to information that is reasonably needed to perform their duties on behalf of Apex.

8. Apex's efforts and successes have allowed it to develop goodwill and relationships with its customers in the markets in which it operates. In turn, these efforts and successes benefit Apex's employees, who develop relationships with Apex's key customers and receive confidential information regarding those customers.

9. Apex acquired SandsPoint in August 2022. At that time, Related was one of SandsPoint's largest clients, generating a substantial portion of the company's annualized net revenue. As a result, SandsPoint's enterprise value for acquisition purposes was driven in large part by the company's existing and long-term relationship with Related. For that reason, it was important to retain key SandsPoint personnel in the acquisition, including the Former Employees.

Case 1:25-cv-08892-VEC-GS Document 17 Filed 07/28/25 Page 8 of 28

To do so, Apex promised and paid large retention bonuses to key SandsPoint personnel as part of the acquisition.

10. Following the acquisition, SandsPoint changed its name to Apex Capital Advisors LLC. Apex and Related executed a new Master Services Agreement at that point as well. A true and correct copy of the Master Services Agreement is attached hereto as Exhibit G. All legacy SandsPoint personnel, including the Former Employees, continued in their same capacities and became employees of Apex Capital under the same terms and conditions set forth in the employment agreements the employees had signed while at SandsPoint.

11. Prior to Apex's acquisition of SandsPoint, Related had been a client of SandsPoint for many years pursuant to a services agreement between the companies, and the Former Employees had been employed by SandsPoint to work on Related's accounts.

12. Between October and December 2024, the Former Employees began giving notices of their resignation from Apex Capital.

13. Lucas Belinkie ("Belinkie") gave his notice of his resignation on October 24, 2024. At the time, he was Head of Real Assets Product – Americas for Apex Capital and primarily worked (as he had at SandsPoint) on Related's accounts. Belinkie's last day at Apex Capital was December 4, 2024. He did not disclose where he was going to work. Shortly after learning that Chaney, Hope, and Callen had joined IQ-EQ, my team investigated to determine whether Belinkie had also taken a position at IQ-EQ. Through a telephone call placed by one of my team members, we obtained confirmation that he had.

14. Clark Chaney ("Chaney") gave his notice of resignation one week later, on October 30, 2024. At the time, he was a Senior Manager, Real Assets. His last day at Apex Capital was December 13, 2024. When he left, Chaney told Apex management that he was upset that Belinkie

had resigned, that he planned to take some time off, and that he had nothing else lined up for work. I later learned that Chaney had received an encrypted offer letter from IQ-EQ around October 21, 2024, before either he or Belinkie gave their notices of resignation.

15. Ryan Hope ("Hope") gave his notice of resignation on November 20, 2024. At the time, he was a Manager, Real Assets. Like Chaney, Hope's last day of work at Apex Capital was December 13, 2024. Chaney reported Hope's resignation to me by email, explaining that Hope had "found another opportunity and made it clear there is nothing we can do to get him to stay." Neither Chaney nor Hope described to me what "opportunity" Hope was taking.

16. Preston Callen ("Callen") gave his notice of resignation on December 4, 2024. At the time, Callen was an Assistant Manager, Real Assets. Callen also resigned to Chaney, who reported Callen's resignation to me by email. According to Chaney, Callen "found another opportunity and made it clear there is nothing we can do to get him to stay." Callen's last day at Apex Capital was December 20, 2024.

17. Between November 29, 2024, and January 31, 2025, 11 more Apex employees who were working on Related's account resigned. At some point during this period, my colleagues in management and I reported several of the recent resignations to Related's Chief Financial Officer, James Kraus. In response, Kraus told us that he anticipated five more resignations but would not disclose how he could possibly know that information, beyond claiming, "I have my sources."

18. On January 14, 2025, Kimarley Wilson, a Controller at Related, inadvertently sent an email containing an attached email string to a distribution group at Apex. A true and correct copy of Kimarley Wilson's email is attached to this declaration as Exhibit H.

19. In April 2025, Related terminated its relationship with Apex Capital and moved its business to Apex's direct competitor in Dallas, IQ-EQ. By that time, I was aware that the Former

Employees had moved to IQ-EQ, and I believed that they had likely coordinated their departure to coincide with Related's movement of its business to IQ-EQ. As a result, I personally assisted in conducting an investigation to determine whether the Former Employees had accessed or stolen any confidential or proprietary information from Apex prior to their departures.

20. There was a particular incident involving Belinkie that led me and others in Apex's management to believe that an investigation was necessary. Specifically, after Belinkie gave his notice of resignation, he asked Apex's IT department to help him extract Apex's proprietary database. That database, which Apex acquired for use by its subsidiaries by purchasing a costly license, contains highly confidential client data, and accounting and auditing processes.

21. Because Apex's business involves servicing private investment funds, Apex has implemented stringent controls to preserve the confidentiality of the information about those funds contained in its database, as is required under relevant securities laws and client confidentiality agreements. Misusing that information is against Apex's policies, including the Apex Group Code of Conduct and Ethics Policy.

22. Belinkie's request to extract the database—or any information from it—was highly unusual, required a comprehensive approval process, and—in light of his recent resignation—raised red flags. Consequently, Apex rejected the request.

23. Our investigation of the Former Employees revealed that, in the six weeks between Belinkie's notice of resignation and his departure from Apex Capital, Belinkie downloaded a substantial amount of information from his work computer to an unknown destination. The three highest days of download activity occurred approximately one week after he gave his notice of resignation, on the day before his last day of employment, and on his last day of employment at

Apex Capital. This pattern of download activity is unusual and not consistent with his normal course of business.

24. Among the files Belinkie downloaded are:

a. Americas Consolidated_Client List and Collection terms_Genstar Dashboard-v2.xlsx. This document is a consolidated client list of all Apex's clients in the Americas along with the account managers for each client. The document includes Apex's confidential business information that a competitor could use to its advantage.

b. Billing Sheet – July 2024 – Suntx.xlsx. this document contains a billing sheet showing what Apex was billing Related over the course of the relationship. This document includes Apex's confidential business information that a competitor could use to its advantage.

c. SandsPoint Apex Capital Advisors Employee Contracts with Integration Award infor as of 05.03.2024.xlsx. This document contains an Excel spreadsheet showing all of the employees and the integration bonuses received by those employees. This document includes Apex's confidential business information that a competitor could use to its advantage.

d. SP P& L Analysis – February 2024.xlsx. This document includes Apex's review of the profit and losses for SandsPoint's business. This document includes Apex's confidential business information that a competitor could use to its advantage.

25. The files are just a few examples of the files downloaded by Belinkie. Belinkie's downloads also include, but are not limited to, files concerning Apex's billing practices, personnel,

salary and compensation, and clients. They also include security information concerning Apex's proprietary database and information concerning SandsPoint's integration into Apex. All of the files listed above contained data used in Apex Capital's relationship with Related and other clients, and Belinkie would have been made aware that Apex Group's company policy and the agreement between Apex Capital and Related limited his access to and use of those files and prohibited him from exporting those files or from using those files outside of his work for Apex. Belinkie did not obtain written permission from Apex to disclose these files to any third party.

26. The day before Chaney submitted his resignation notice, he downloaded 1,021 files from his work computer to a device ("laptop11") that was not issued by Apex. The three highest days of download activity occurred on the day before he gave his notice of resignation, on the day before his last day of employment, and on his last day of employment at Apex Capital. This pattern of download activity is unusual and not consistent with his normal course of business.

27. Among the files that Chaney downloaded to laptop11 are the following:

a. Portfolio Management Responsibilities.docx. Chaney downloaded this file to laptop11 at approximately 7:34 p.m. on October 29, 2024. I personally reviewed this file and accessed it from the same location in Apex's system from where Chaney downloaded it. This document contains descriptions of Apex's valuation processes and includes Apex's confidential business information that a competitor could use to its advantage.

b. SandsPoint Pricing RFM – 3.15.22.docx. Chaney downloaded this file to laptop11 at approximately 7:34 p.m. on October 29, 2024. This file contains Apex's pricing information and client strategy and includes Apex's confidential business information that a competitor could use to its advantage.

c. SP Pref Equity Valuation Process Memo - 2Q23.docx. Chaney downloaded this file to laptop11 at approximately 8:08 p.m. on October 29, 2024. This file describes Apex's valuation process, including the company's valuation methodology and process for preparing regular client updates. This file includes Apex's confidential business information that a competitor could use to its advantage.

d. Loan Servicing Pitch Bullet Points.docx. Chaney downloaded this file to laptop11 at approximately 8:05 p.m. on October 29, 2024. This file contains sales and pitch discussion points for Apex's loan servicing platform and includes Apex's confidential business information that a competitor could use to its advantage.

e. State Street Consulting Tracker – 2.8.23.xlsx. Chaney downloaded this file to laptop11 at approximately 7:42 p.m. on October 29, 2024. This file contains financial information associated with Apex consultants, including revenue, invoices, and fees associated with Apex consultants. This file includes Apex's confidential business information that a competitor could use to its advantage.

f. SandsPoint Instructional Guide_FINAL - PW Update.pdf. Chaney downloaded this file to laptop11 at approximately 8:47 p.m. on October 29, 2024. This file contains step-by-step instructions for Apex's asset management tasks and includes Apex's confidential business information that a competitor could use to its advantage.

g. SandsPoint Consulting Revenue Projections - 2022 & 2023 - 12.1.22.xlsx. Chaney downloaded this file to laptop11 at approximately 7:38 p.m. on October

29, 2024. This file contains detailed client financial information and methods that Apex uses to project revenue. This file includes Apex's confidential business information that a competitor could use to its advantage.

28. The files listed above are just a few examples of the types of files that Chaney downloaded to laptop11 on October 29, 2024. All of the files listed above contained data used in Apex Capital's relationship with Related and other clients, and Chaney would have been made aware that Apex Group's company policy and the agreement between Apex Capital and Related limited his access to and use of those files and prohibited him from exporting those files to a personal device or from using those files outside of his work for Apex.

29. Among the other documents that Chaney downloaded to laptop11 were guidelines and templates for employee recruiting, bullet points for a pitch for new business, and draft statements of work. Chaney also downloaded performance evaluations for other employees, including some who remain Apex employees, and several employee contact lists. Chaney was not authorized to download any of these files to a non-work device, nor did he obtain written permission from Apex to disclose these files to any third party. The documents Chaney downloaded to laptop11 without authorization included highly confidential and proprietary information.

30. Between October 22, 2024, and December 13, 2024, Hope downloaded more than 24,000 documents from Apex's systems. The documents included bank statements, financial statements, audits, valuation documents, capital call documentation, closing binders, corporate agreements, and organization charts. In addition, he downloaded highly confidential Apex company documents, such as company procedures, fee information, and employee handbooks.

31. On the day Hope gave his notice of resignation alone, he downloaded over 7,000 files and folders from his work computer to an unknown destination. In the two days before his final day of work at Apex Capital, Hope downloaded another approximately 11,550 files and folders. The more than 18,000 files and folders downloaded over those three days was more than 2/3 of all the downloads Hope completed from October through his last date of employment at Apex Capital. This pattern of download activity is unusual and not consistent with his normal course of business. Many of the documents and files downloaded by Hope without authorization included highly confidential and proprietary information.

32. On November 20, 2024, less than two weeks before Callen gave his notice of resignation, he downloaded more than 2,600 files and folders, or almost 20% of the approximately 12,260 folders and files he downloaded between October and December 20, 2024, his last day of employment with Apex Capital. More than 50% of the files/folders Callen downloaded during the October-December time frame—approximately 6,380 files/folders—were downloaded on December 19, 2024, the day before his last day working for Apex Capital. This pattern of download activity is unusual and not consistent with his normal course of business. Hope did not obtain written permission from Apex to disclose these files to any third party. Many of the documents and files downloaded by Callen without authorization included highly confidential and proprietary information.

33. On January 17, 2025, Apex, through counsel, sent letters to each of the Former Employees that, among other things, demanded the immediate return of any Apex confidential information or trade secrets in the possession, custody, or control of any Former Employee. Apex also demanded that the Former Employees comply with their contractual non-compete obligations

by terminating their employment with IQ-EQ, a direct competitor of Apex. True and correct copies of those letters are attached hereto as Exhibit I.

34. On January 24, 2025, Apex received a response to its letters from outside counsel to the Former Employees. Among other things, the Former Employees committed to returning any of Apex's confidential information or trade secrets in their possession, custody, or control. A true and correct copy of that response is attached hereto as Exhibit J.

35. To date, the Former Employees have not returned most of the materials improperly downloaded by the Former Employees (including Apex's highly confidential information and proprietary information discussed herein).

36. I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 25, 2025 Signed: Signed by: Maria Von Horvath
2FA83B6D792247E...
Maria Von Horvath

Case 1:25-cv-08892-VEC Document 17 Filed 07/28/25 Page 17 of 23

# EXHIBIT A

**SANDSPOINT**
CAPITAL ADVISORS LLC

August 23, 2013

Mr. Lucas Belinkie
3807 Holland Avenue
Dallas, TX 75219

Dear Lucas,

On behalf of SandsPoint Capital Advisors LLC (the "Company"), I am pleased to offer you a position as a Vice President with the Company. This letter agreement (this "Agreement") sets forth the understanding between you and the Company with respect to certain terms and conditions of your employment. Your employment will start on or around September 23, 2013 or such other date as may be mutually agreed upon by you and the Company (such date, your "Start Date").

1. **Duties.** During your employment, you shall advise the Company's clients and otherwise perform such other duties as may be reasonably assigned to you from time to time by Kevin D. Naughton, the Founder and Chief Executive Officer of the Company. During your employment, your principal place of employment will be the Company's offices in Dallas, TX. You shall be employed on a full-time basis and shall devote substantially all of your business time and attention to the conscientious performance of your duties and responsibilities as set forth herein.

2. **Compensation; Benefits; Expense Reimbursement**. During your employment, you will be **(a)** initially paid an annualized base salary of $150,000 which shall be paid in accordance with the Company's standard pay practices and receive a bonus for year 2013 of $20,000 to be paid no later than March 2014 **(b)** future annual bonuses and increase to the base salary will be in the sole discretion of the Company, which (if any such bonus is awarded) shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally (but not later than March 15th of the year following the year to which such bonus relates), **(c)** entitled to twenty (20) paid vacation days **(d)** eligible to participate in any medical and health benefit plan sponsored by the Company for its employees, on terms and conditions set forth in such plans (as may be amended from time to time).

(e) eligible to participate in and receive company funded matching contributions in respect of self fund contributions to the company's 401K or similar retirement plan. In addition, the Company will reimburse you, in accordance with the Company's expense reimbursement program, for reasonable business expenses that you incur in connection with the performance of your duties hereunder, provided you obtain the Company's authorization prior to incurring any such expenses.

3. **Termination of Employment**. Your employment shall commence on the Start Date, but this Agreement does not guarantee any fixed term; your employment with the Company is "at will." This means that both you and the Company are free to terminate the employment relationship at any time, for any reason or for no reason at all, with or without cause, subject only to the terms of this Agreement.

4. **Confidentiality; Non-Solicitation; Non-Disparagement.** During your employment, the Company will provide you with certain confidential and proprietary information in order to facilitate the performance of your duties hereunder. If this information were obtained by a competitor, became public or otherwise did not remain confidential, the Company's interests and competitive position would be greatly prejudiced. For these reasons, the Company considers this information to be confidential and proprietary trade secrets, and in consideration of the Company's agreement to provide you with such confidential and proprietary information, you agree to the following provisions of this Section 4.

**(a)** During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning **(i)** the Company, **(ii)** any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), **(iii)** any of the Company's clients or customers, **(iv)** any affiliates of such clients or customers, or **(v)** any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company; provided, however, that notwithstanding the foregoing, nothing herein shall prevent you from **(x)** disclosing information that is known publicly (other than as a result of your breach of this provision) and **(y)** responding to lawful subpoenas or court orders, provided that you shall have given the Company written notice of any such subpoena promptly following your receipt thereof.

**(b)** During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

(c) During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, **(i)** induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or **(ii)** solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

**(d)** During your employment with the Company and thereafter without limitation of time, you shall not, directly or indirectly, engage in any conduct or make any statement to the press or to any media outlet or medium (including but not limited to trade magazines, the internet or cable or broadcast television or radio), or to anyone affiliated with the press or any such media outlet or medium, disparaging or criticizing in any way the Company or any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company. You further agree that you shall not, directly or indirectly, engage in any other conduct or make any other statement to anyone that could be reasonably expected to impair the reputation or goodwill of the Company, except to the extent required by law, and then only after consultation with the Company to the extent possible, or to enforce the terms of this Agreement.

**(e)** In the event of the termination of your employment, you shall promptly deliver to the Company **(i)** all property of the Company then in your possession; and **(ii)** all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

**(f)** You hereby acknowledge and agree that the consideration to be paid to you pursuant to the terms of this Agreement is adequate consideration for the covenants, agreements and obligations contained in this Section 4. Additionally, you acknowledge and agree that, although you consider the restrictions contained in this Section 4 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against you, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

**5. Governing Law; Assignability.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of laws provisions. In addition, the provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provisions. This Agreement shall inure to the benefit of the Company and its successors and assigns. However, this Agreement is personal in nature to you and therefore you may not assign this Agreement to any other person or entity.

**6. Application Process.** This offer is contingent upon **(a)** the Company's verification of your employment and education history, **(b)** your ability to meet the US Immigration requirements, **(c)** your completion of satisfactory background and compliance checks, and **(d)** your successful passing of our drug screening test.

7. **Taxes**. The Company shall withhold all amounts required to be withheld to satisfy its obligations required under applicable federal, state and local laws and regulations.

8. **Entire Agreement**. Except for the Company's policies, procedures, and handbooks, that you will receive and sign an acknowledgment of receipt, which you acknowledge and agree contains terms and conditions of your employment and which you further acknowledge and agree to be bound by and subject to, this Agreement constitutes the entire agreement between you and the Company relating to the terms of your employment.

*-- Signature page follows --*

By your signature below, you acknowledge that you have carefully read this Agreement, and that you understand and agree to its terms. You also acknowledge and agree that if you breach or threaten to breach this Agreement, the Company may obtain injunctive relief to enjoin any actual, threatened or further breaches. Finally, your signature below will confirm that the performance of your obligations as an employee of the Company will not conflict with or violate any agreement, court order, obligation or other restriction to which you are a party or are subject.

**SANDSPOINT CAPITAL ADVISORS LLC**

By: ____________________

SANDSPOINT

Kevin D. Naughton
Founder and Chief Executive Officer

Date: 8/23/13

**Acknowledged and Agreed**

By: ____________________
Lucas Belinkie

Date: 8/23/13

# EXHIBIT B

SANDSPOINT
CAPITAL ADVISORS LLC

April 16, 2021

Preston Callen
521 Blackfield Drive
Coppell, TX 75019

**Via Email: preston_callen@me.com**

Dear Preston,

On behalf of SandsPoint Capital Advisors LLC (the "Company"), I am pleased to offer you a position as an Analyst with the Company. This letter agreement (this "Agreement") sets forth the understanding between you and the Company with respect to certain terms and conditions of your employment. Your employment will start on or around 05/03/2021, or such other date as may be mutually agreed upon by you and the Company (such date, your "Start Date").

**1. Duties.** During your employment, you shall advise the Company's clients and otherwise perform such other duties as may be reasonably assigned to you from time to time by Kevin D. Naughton, the Founder and Chief Executive Officer of the Company. During your employment, your principal place of employment will be the Company's offices in Dallas, TX. You shall be employed on a full-time basis and shall devote substantially all of your business time and attention to the conscientious performance of your duties and responsibilities as set forth herein.

**2. Compensation; Benefits; Expense Reimbursement**. During your employment, you will be **(a)** paid an annualized base salary of $75,000 which shall be paid in accordance with the Company's standard pay practices, **(b)** receive a pro-rated discretionary annual bonus for the year 2021 which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally, but not later than March 31, 2022 **(c)** future annual bonuses (if any such bonus is awarded), shall be in the sole discretion of the Company, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally (but not later than March 31st of the year following the year to which such bonus relates), **(d)** entitled to 20 paid vacation days during each calendar year, which days shall accrue monthly and which shall not be eligible for use in any year following the year in which such days accrue, **(e)** eligible to participate in any medical and health benefit plan sponsored by the Company for its employees, on terms and conditions set forth in such plans (as may be amended from time to time), **(f)**

Case 1:25-cv-08892-VEC Document 17 Filed 10/28/25 Page 25 of 145

eligible to participate in the Company's 401(k) after ninety days of continuous employment. In addition, the Company will reimburse you, in accordance with the Company's expense reimbursement program, for reasonable business expenses that you incur in connection with the performance of your duties hereunder, provided you obtain the Company's authorization prior to incurring any such expenses.

**3.** **Termination of Employment**. Your employment shall commence on the Start Date, but this Agreement does not guarantee any fixed term; your employment with the Company is "at will." This means that both you and the Company are free to terminate the employment relationship at any time, for any reason or for no reason at all, with or without cause, subject only to the terms of this Agreement.

**4.** **Confidentiality; Non-Solicitation; Non-Disparagement.** During your employment, the Company will provide you with certain confidential and proprietary information in order to facilitate the performance of your duties hereunder. If this information were obtained by a competitor, became public or otherwise did not remain confidential, the Company's interests and competitive position would be greatly prejudiced. For these reasons, the Company considers this information to be confidential and proprietary trade secrets, and in consideration of the Company's agreement to provide you with such confidential and proprietary information, you agree to the following provisions of this Section 4.

**(a)** During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning **(i)** the Company, **(ii)** any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), **(iii)** any of the Company's clients or customers, **(iv)** any affiliates of such clients or customers, or **(v)** any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company; provided, however, that notwithstanding the foregoing, nothing herein shall prevent you from **(x)** disclosing information that is known publicly (other than as a result of your breach of this provision) and **(y)** responding to lawful subpoenas or court orders, provided that you shall have given the Company written notice of any such subpoena promptly following your receipt thereof.

**(b)** During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

**(c)** During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, **(i)** induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or **(ii)** solicit for hire, hire, or attempt to hire any person directly or indirectly on

behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

**(d)** During your employment with the Company and thereafter without limitation of time, you shall not, directly or indirectly, engage in any conduct or make any statement to the press or to any media outlet or medium (including but not limited to trade magazines, the internet or cable or broadcast television or radio), or to anyone affiliated with the press or any such media outlet or medium, disparaging or criticizing in any way the Company or any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company. You further agree that you shall not, directly or indirectly, engage in any other conduct or make any other statement to anyone that could be reasonably expected to impair the reputation or goodwill of the Company, except to the extent required by law, and then only after consultation with the Company to the extent possible, or to enforce the terms of this Agreement.

**(e)** In the event of the termination of your employment, you shall promptly deliver to the Company **(i)** all property of the Company then in your possession; and **(ii)** all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

**(f)** You hereby acknowledge and agree that the consideration to be paid to you pursuant to the terms of this Agreement is adequate consideration for the covenants, agreements and obligations contained in this Section 4. Additionally, you acknowledge and agree that, although you consider the restrictions contained in this Section 4 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against you, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

**5. Governing Law; Assignability**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of laws provisions. In addition, the provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provisions. This Agreement shall inure to the benefit of the Company and its successors and assigns. However, this Agreement is personal in nature to you and therefore you may not assign this Agreement to any other person or entity.

**6. Application Process**. This offer is contingent upon **(a)** the Company's verification of your employment and education history, **(b)** your ability to meet the US Immigration requirements, **(c)** your completion of satisfactory background and compliance checks, and **(d)** your successful passing of our drug screening test.

**7. Taxes**. The Company shall withhold all amounts required to be withheld to satisfy its obligations required under applicable federal, state and local laws and regulations.

**8.** **Entire Agreement**. Except for the Company's policies, procedures, and handbooks, that you will receive and sign an acknowledgment of receipt, which you acknowledge and agree contains terms and conditions of your employment and which you further acknowledge and agree to be bound by and subject to, this Agreement constitutes the entire agreement between you and the Company relating to the terms of your employment.

-- S*ignature page follows* **–**

By your signature below, you acknowledge that you have carefully read this Agreement, and that you understand and agree to its terms. You also acknowledge and agree that if you breach or threaten to breach this Agreement, the Company may obtain injunctive relief to enjoin any actual, threatened or further breaches. Finally, your signature below will confirm that the performance of your obligations as an employee of the Company will not conflict with or violate any agreement, court order, obligation or other restriction to which you are a party or are subject.

**SANDSPOINT CAPITAL ADVISORS LLC**

By: ______________________

Kevin D. Naughton
Founder and Chief Executive Officer

Acknowledged and Agreed:

______________________

Preston Callen

April 19th, 2021

# EXHIBIT C

**SANDSPOINT**
CAPITAL ADVISORS LLC

October 16, 2015

William C. Chaney
2717 Howell Street #2103
Dallas, TX 75204

**Via Email: clarkc08@yahoo.com**

Dear Clark,

On behalf of SandsPoint Capital Advisors LLC (the "Company"), I am pleased to offer you a position as an Associate with the Company. This letter agreement (this "Agreement") sets forth the understanding between you and the Company with respect to certain terms and conditions of your employment. Your employment will start on or around October 19, 2015, or such other date as may be mutually agreed upon by you and the Company (such date, your "Start Date").

1. **Duties.** During your employment, you shall advise the Company's clients and otherwise perform such other duties as may be reasonably assigned to you from time to time by Kevin D. Naughton, the Founder and Chief Executive Officer of the Company. During your employment, your principal place of employment will be the Company's offices in Irving, TX. You shall be employed on a full-time basis and shall devote substantially all of your business time and attention to the conscientious performance of your duties and responsibilities as set forth herein.

2. **Compensation; Benefits; Expense Reimbursement**. During your employment, you will be **(a)** paid an annualized base salary of $108,000 which shall be paid in accordance with the Company's standard pay practices, **(b)** receive a discretionary prorated bonus for the year 2015, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally, but not later than March 31, 2016, **(c)** future annual bonuses (if any such bonus is awarded), shall be in the sole discretion of the Company, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally (but not later than March 15th of the year following the year to which such bonus relates), **(d)** entitled to 15 paid vacation days during each calendar year, which days shall accrue monthly and which shall not be eligible for use in any year following the year in which such days accrue, **(e)** upon your first anniversary at the Company your will be entitled to 20 paid vacation days during each calendar year, which days shall accrue monthly and which shall not be eligible for use in any year following the year in which such days accrue **(f)** eligible to participate in any medical and

health benefit plan sponsored by the Company for its employees, on terms and conditions set forth in such plans (as may be amended from time to time), **(g)** eligible to participate in the Company's 401(k) after ninety days of continuous employment. In addition, the Company will reimburse you, in accordance with the Company's expense reimbursement program, for reasonable business expenses that you incur in connection with the performance of your duties hereunder, provided you obtain the Company's authorization prior to incurring any such expenses.

**3. Termination of Employment**. Your employment shall commence on the Start Date, but this Agreement does not guarantee any fixed term; your employment with the Company is "at will." This means that both you and the Company are free to terminate the employment relationship at any time, for any reason or for no reason at all, with or without cause, subject only to the terms of this Agreement.

**4. Confidentiality; Non-Solicitation; Non-Disparagement.** During your employment, the Company will provide you with certain confidential and proprietary information in order to facilitate the performance of your duties hereunder. If this information were obtained by a competitor, became public or otherwise did not remain confidential, the Company's interests and competitive position would be greatly prejudiced. For these reasons, the Company considers this information to be confidential and proprietary trade secrets, and in consideration of the Company's agreement to provide you with such confidential and proprietary information, you agree to the following provisions of this Section 4.

**(a)** During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning **(i)** the Company, **(ii)** any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), **(iii)** any of the Company's clients or customers, **(iv)** any affiliates of such clients or customers, or **(v)** any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company; provided, however, that notwithstanding the foregoing, nothing herein shall prevent you from **(x)** disclosing information that is known publicly (other than as a result of your breach of this provision) and **(y)** responding to lawful subpoenas or court orders, provided that you shall have given the Company written notice of any such subpoena promptly following your receipt thereof.

**(b)** During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

**(c)** During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, **(i)** induce, or attempt to

induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or **(ii)** solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

**(d)** During your employment with the Company and thereafter without limitation of time, you shall not, directly or indirectly, engage in any conduct or make any statement to the press or to any media outlet or medium (including but not limited to trade magazines, the internet or cable or broadcast television or radio), or to anyone affiliated with the press or any such media outlet or medium, disparaging or criticizing in any way the Company or any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company. You further agree that you shall not, directly or indirectly, engage in any other conduct or make any other statement to anyone that could be reasonably expected to impair the reputation or goodwill of the Company, except to the extent required by law, and then only after consultation with the Company to the extent possible, or to enforce the terms of this Agreement.

**(e)** In the event of the termination of your employment, you shall promptly deliver to the Company **(i)** all property of the Company then in your possession; and **(ii)** all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

**(f)** You hereby acknowledge and agree that the consideration to be paid to you pursuant to the terms of this Agreement is adequate consideration for the covenants, agreements and obligations contained in this Section 4. Additionally, you acknowledge and agree that, although you consider the restrictions contained in this Section 4 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against you, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

5. **Governing Law; Assignability**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of laws provisions. In addition, the provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provisions. This Agreement shall inure to the benefit of the Company and its successors and assigns. However, this Agreement is personal in nature to you and therefore you may not assign this Agreement to any other person or entity.

6. **Application Process.** This offer is contingent upon **(a)** the Company's verification of your employment and education history, **(b)** your ability to meet the US Immigration requirements, **(c)** your

completion of satisfactory background and compliance checks, and **(d)** your successful passing of our drug screening test.

7. **Taxes**. The Company shall withhold all amounts required to be withheld to satisfy its obligations required under applicable federal, state and local laws and regulations.

8. **Entire Agreement**. Except for the Company's policies, procedures, and handbooks, that you will receive and sign an acknowledgment of receipt, which you acknowledge and agree contains terms and conditions of your employment and which you further acknowledge and agree to be bound by and subject to, this Agreement constitutes the entire agreement between you and the Company relating to the terms of your employment.

*– Signature page follows –*

By your signature below, you acknowledge that you have carefully read this Agreement, and that you understand and agree to its terms. You also acknowledge and agree that if you breach or threaten to breach this Agreement, the Company may obtain injunctive relief to enjoin any actual, threatened or further breaches. Finally, your signature below will confirm that the performance of your obligations as an employee of the Company will not conflict with or violate any agreement, court order, obligation or other restriction to which you are a party or are subject.

**SANDSPOINT CAPITAL ADVISORS LLC**

By: [signature]
Kevin D. Naughton
Founder and Chief Executive Officer

Acknowledged and Agreed:

William Chaney [signature]
William C. Chaney

October 18th, 2015

# EXHIBIT D

**SANDSPOINT**
**CAPITAL ADVISORS LLC**

February 15, 2019

Ryan Hope
6216 Flagstone Drive
McKinney, TX 75070

**Via Email: Rbhope0117@gmail.com**

Dear Ryan,

On behalf of SandsPoint Capital Advisors LLC (the "Company"), I am pleased to offer you a position as an Analyst with the Company. This letter agreement (this "Agreement") sets forth the understanding between you and the Company with respect to certain terms and conditions of your employment. Your full-time employment will start on or around March 4, 2019, or such other date as may be mutually agreed upon by you and the Company (such date, your "Start Date").

1. **Duties.** During your employment, you shall advise the Company's clients and otherwise perform such other duties as may be reasonably assigned to you from time to time by Kevin D. Naughton, the Founder and Chief Executive Officer of the Company. During your employment, your principal place of employment will be the Company's offices in Dallas, TX. You shall be employed on a full-time basis and shall devote substantially all of your business time and attention to the conscientious performance of your duties and responsibilities as set forth herein.

2. **Compensation; Benefits; Expense Reimbursement.** During your employment, you will **(a)** be paid an annualized base salary of $75,000 which shall be paid in accordance with the Company's standard pay practice, **(b)** receive a pro-rated discretionary annual bonus for the year 2019, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally, but not later than March 31, 2020, **(c)** future annual bonuses (if any such bonus is awarded), shall be in the sole discretion of the Company, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally (but not later than March 31st of the year following the year to which such bonus relates), **(d)** entitled to 20 paid vacation days during each calendar year, which days shall accrue monthly and which shall not be eligible for use in any year following the year in which such days accrue, **(e)** eligible to participate in any medical and health benefit plan sponsored by the Company for its employees, on terms and conditions set forth in such plans (as may be amended from time to time), **(f)**

eligible to participate in the Company's 401(k) after ninety days of continuous employment. In addition, the Company will reimburse you, in accordance with the Company's expense reimbursement program, for reasonable business expenses that you incur in connection with the performance of your duties hereunder, provided you obtain the Company's authorization prior to incurring any such expenses.

3. **Termination of Employment.** Your employment shall commence on the Start Date, but this Agreement does not guarantee any fixed term; your employment with the Company is "at will." This means that both you and the Company are free to terminate the employment relationship at any time, for any reason or for no reason at all, with or without cause, subject only to the terms of this Agreement.

4. **Confidentiality; Non-Solicitation; Non-Disparagement.** During your employment, the Company will provide you with certain confidential and proprietary information in order to facilitate the performance of your duties hereunder. If this information were obtained by a competitor, became public or otherwise did not remain confidential, the Company's interests and competitive position would be greatly prejudiced. For these reasons, the Company considers this information to be confidential and proprietary trade secrets, and in consideration of the Company's agreement to provide you with such confidential and proprietary information, you agree to the following provisions of this Section 4.

**(a)** During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning **(i)** the Company, **(ii)** any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), **(iii)** any of the Company's clients or customers, **(iv)** any affiliates of such clients or customers, or **(v)** any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company; provided, however, that notwithstanding the foregoing, nothing herein shall prevent you from **(x)** disclosing information that is known publicly (other than as a result of your breach of this provision) and **(y)** responding to lawful subpoenas or court orders, provided that you shall have given the Company written notice of any such subpoena promptly following your receipt thereof.

**(b)** During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

**(c)** During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, **(i)** induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or **(ii)** solicit for hire, hire, or attempt to hire any person directly or indirectly on

behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

**(d)** During your employment with the Company and thereafter without limitation of time, you shall not, directly or indirectly, engage in any conduct or make any statement to the press or to any media outlet or medium (including but not limited to trade magazines, the internet or cable or broadcast television or radio), or to anyone affiliated with the press or any such media outlet or medium, disparaging or criticizing in any way the Company or any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company. You further agree that you shall not, directly or indirectly, engage in any other conduct or make any other statement to anyone that could be reasonably expected to impair the reputation or goodwill of the Company, except to the extent required by law, and then only after consultation with the Company to the extent possible, or to enforce the terms of this Agreement.

**(e)** In the event of the termination of your employment, you shall promptly deliver to the Company **(i)** all property of the Company then in your possession; and **(ii)** all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

**(f)** You hereby acknowledge and agree that the consideration to be paid to you pursuant to the terms of this Agreement is adequate consideration for the covenants, agreements and obligations contained in this Section 4. Additionally, you acknowledge and agree that, although you consider the restrictions contained in this Section 4 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against you, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

**5. Governing Law; Assignability.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of laws provisions. In addition, the provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provisions. This Agreement shall inure to the benefit of the Company and its successors and assigns. However, this Agreement is personal in nature to you and therefore you may not assign this agreement to any other person or entity.

**6. Application Process.** This offer is contingent upon **(a)** the Company's verification of your employment and education history, **(b)** your ability to meet the US Immigration requirements, **(c)** your completion of satisfactory background and compliance checks, and **(d)** your successful passing of our drug screening test.

7. **Taxes**. The Company shall withhold all amounts required to be withheld to satisfy its obligations required under applicable federal, state and local laws and regulations.

8. **Entire Agreement**. Except for the Company's policies, procedures, and handbooks, that you will receive and sign an acknowledgment of receipt, which you acknowledge and agree contains terms and conditions of your employment and which you further acknowledge and agree to be bound by and subject to, this Agreement constitutes the entire agreement between you and the Company relating to the terms of your employment.

-- *Signature page follows* --

By your signature below, you acknowledge that you have carefully read this Agreement, and that you understand and agree to its terms. You also acknowledge and agree that if you breach or threaten to breach this Agreement, the Company may obtain injunctive relief to enjoin any actual, threatened or further breaches. Finally, your signature below will confirm that the performance of your obligations as an employee of the Company will not conflict with or violate any agreement, court order, obligation or other restriction to which you are a party or are subject.

**SANDSPOINT CAPITAL ADVISORS LLC**

By: ______________________

Kevin D. Naughton
Founder and Chief Executive Officer

Acknowledged and Agreed:

______________________
Ryan Hope

February 15th, 2019

# EXHIBIT E

# Data Privacy and Data Protection Policy

V1.8 | December 2024

**Not for external distribution without the permission of a member of the Executive Committee**

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 08/21/26 Page 40 of 145

APEX

# Table of Contents

1. Introduction and Scope ..... 3
2. Approval and Adoption ..... 4
3. Risk Appetite Statement ..... 4
4. Definitions ..... 5
5. Minimum Standards and Controls ..... 6
6. Roles and Responsibilities ..... 7
7. Policy Exceptions, Exemptions and Non-Compliance ..... 10
8. Data Privacy Principles ..... 10
9. Personal Data Sharing ..... 12
10. Transfer of personal data outside the EEA/countries with equivalent personal data protection laws ..... 12
11. Technology Controls to protect personal data ..... 12
12. Personal Data Controls ..... 13
13. Workday ..... 14
14. Privacy for Clients and Employees ..... 14
15. Data Subject Access Requests ("DSAR") ..... 15
16. Record of Processing Activities ..... 15
17. Breaches ..... 15
18. Agreements ..... 17
19. Data Privacy and Data Protection Training ..... 17
20. Policy Exception, Exemptions and Non-Compliance ..... 17
21. Contact Information ..... 18
22. Document Version Control ..... 18
Appendix 1: Breach Reporting Process ..... 19
Appendix 2: Data Classification Impact Level Definitions ..... 23
Appendix 3: Data breach investigation form ..... 24
Appendix 4: Data protection impact assessment ("DPIA") process ..... 26
Appendix 5: Data Subject Access Request ..... 29

APEX

# 1. Introduction and Scope

1.1 Apex Group Ltd., together with its affiliates and subsidiaries (the "Apex Group", "Group" or "Apex") is committed to safeguarding and handling the data entrusted to it by clients, shareholders, employees and any third parties appropriately and in line with applicable laws and regulations.

1.2 This policy applies to all permanent, temporary, and contracted employees working at Apex Group and includes Directors (Executive and Non-Executive), and Board members of Apex Group its affiliates, branches and integrated entities whether the entity is regulated or otherwise (jointly referred to as "Staff").

1.3 Data privacy and data protection management is about processing data in a controlled manner and within the Group's processes, using the tools and systems available within the Group.

1.4 The Data Privacy and Data Protection policy (the "policy") establishes the minimum expected standards and outlines guidelines on how the Group ensures compliance with applicable data protection legislation and regulations and addresses the protection of the data that it handles. Many of the jurisdictions in which the Group operates have implemented local data protection legislation and regulations; for example the General Data Protection Regulation ("GDPR") in the EU, the Data Protection Law in the Cayman Islands, the Personal Information Protection Act in Bermuda, the Personal Data Protection Act in Singapore, The Privacy Act in Australia , the Data Protection (Jersey) Law 2018 and the Data Protection Authority (Jersey) Law 2018 in Jersey, the UK Data Protection Act 2018, the UK GDPR, the Personal Data (Privacy) Ordinance in Hong Kong and the Protection of Personal Information Act, 2013 in South Africa. The intention of this policy is to implement a framework that enables the Group's offices to comply with applicable law and/or regulation in all Jurisdictions.

1.5 This policy:

- Defines terminology used in this policy and across the Group in the management of personal data. Refer to the Definitions section below.
- Establishes a compliant and consistent approach to the handling of actual and attempted personal data breaches.
- Formalises roles and responsibilities of employees for respecting and protecting data and the process to be applied in case of a personal data breach.
- Establishes control standards to ensure that the confidentiality, integrity and availability of data is maintained at all times.
- Governs the personal data handles by the Group and covers:
    - Initial management of personal data
    - Continuing obligations with regard to personal data including preservation, maintenance, and destruction and outsourcing within the Group and to third parties respecting the formalized framework established in the policy.

APEX

- All forms of personal data regardless of the format, establishing administrative, technical and physical safeguards to protect the security, confidentiality and/or integrity of electronic, paper and/or other records containing personal data.
- Internal and external risks to personal data and ensures reasonable protection against unauthorized access to or use of data and preventing theft, abuse, fraud or identity theft.
- The establishment of administrative, technical and physical safeguards to protect the security, confidentiality and/or integrity of electronic, paper, or other records containing data.
- Outlining the reporting and escalation procedure in the event of a personal data breach.
- In relation to personal data management of requests by data subjects including access to, correction of, management, and removal of personal data.
- The policy does not cover regulatory requirements on filing requirements with the data protection authorities in relevant countries.

## 2. Approval and Adoption

2.1 This policy has been approved by the Group's Executive Committee ("ExCo") via its delegated authority from the Group's Board.

2.2 This policy is owned by the Group Data Protection Officer (the Group DPO), who maintains accountability for its content and will arrange periodic reviews and updates on at least an annual basis, or upon a trigger, and in accordance with Apex's Policy Framework.

2.3 All Group entities must comply with the minimum standards within this policy. Where local legislation, statutory or regulatory obligations differ from the Group policy minimum standards, the highest standard must apply and must be documented.

2.4 For the avoidance of doubt, this policy supersedes any previously published policy, whether by Apex Group or that of an acquired entity.

## 3. Risk Appetite Statement

3.1 Apex Group is committed to safeguarding and handling the data entrusted to it by clients, shareholders, employees and any third parties appropriately and in line with applicable laws and regulations, and our values of integrity, transparency and trust.

3.2 Apex Group has no appetite for non-compliance with relevant data protection legislation or regulation.

3.3 Apex Group has no appetite for repeat and/or systemic breaches of data or failure to promptly remediate breaches, or failure to promptly remediate systemic control deficiencies.

3.4 Apex Group has zero tolerance for wilful or deliberate manipulation, alteration or unauthorized modification of the data we handle.

3.5 Apex Group has zero tolerance for wilful or deliberate unauthorized use of, unauthorized access to (or an attempt to knowingly access without authority), or unauthorized disclosure of data.

## 4. Definitions

The following terms are used within the policy and are described as:

| Terminology | Description |
|---|---|
| Confidential Data | information that is not available to the public, it may be information in relation to Apex itself or Apex clients and/or their agents. There will often be contractual protections in place which set out how Apex must treat confidential client data. For the purposes of the Policy references to data refers to both confidential and personal data. |
| Data Controller | any person (or organization) that makes decisions with regard to particular personal data, including decisions regarding the purposes for which personal data is processed and the way in which the personal data is processed. |
| Data Privacy | the appropriate collection, use, protection, retention and dissemination of personal or private information about individuals or organizations. |
| Data Processor | a natural or legal person, public authority, agency or other body which processes personal data on behalf of the controller, usually under contract (not including an employee of the data controller). |
| Data Protection | the process of safeguarding personal data, both physically and electronically, and involves the relationship between the collection and dissemination of personal data and technology, the public perception and expectation of privacy and the political and legal underpinnings surrounding that personal data. It aims to strike a balance between individual privacy rights while still allowing data to be used for business purposes. |
| Data Protection Impact Assessment / DPIA | Is a type of risk assessment undertaken to identify and minimize risks and liability relating to personal data processing activities to ensure best practices for data security and privacy. |
| Data Protection Office / DPO | encourages and ensures that personal data is processed in compliance with the applicable data protection laws, as well as acting as a point of contact for data protection queries. |
| Data subject | an identified or identifiable natural person to whom the personal data relates. An identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person. At Apex data subjects include clients, investors, beneficiaries, shareholders, client employees and Apex employees. |

APEX

| | |
|---|---|
| Personal data | any information relating to an identified or identifiable natural person ("data subject"); an identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person.[1] |
| Personal Data Breach | a breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to, personal data transmitted, stored or otherwise processed. |
| Processing | any operation or set of operations performed upon personal data or sets of personal data, whether or not by automated means, such as collection, recording, organization, structuring, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, restriction, erasure or destruction. |
| Special/Sensitive Category Data | personal data that requires more protection because it is sensitive. It is personal data concerning:<br>• racial or ethnic origin;<br>• political opinions;<br>• religious or philosophical beliefs;<br>• trade union memberships;<br>• genetic data;<br>• biometric data (where used for identification purposes);<br>• health;<br>• a person's sex life;<br>• a person's sexual orientation; or<br>• a person's criminal record or alleged criminal activity. |
| Third Party | any individual/organization other than the data subject, the data controller or the data controller's agents. |

## 5. Minimum Standards and Controls

5.1 All employees must:

- maintain the confidentiality, integrity, and availability of data.
- use data only for the purpose for which it is intended.
- ensure the data is accurate and where necessary up to date and should limit the circulation of data solely on a "need to know" basis.
- escalate and report data breaches and other related incidents that:
  - expose or have the potential to expose data to unauthorized parties;
  - result in the loss or unauthorized alteration or destruction of data; and/or
  - attempt to access, or result in the unauthorized access of, data processing resources.

[1] For South Africa "personal data" shall include "personal information" as defined in The Protection of Personal Information Act, 2013 and includes personal information of juristic persons.

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 07/28/25 Page 48 of 145

APEX

- File a breach report when necessary and escalate the issue to local senior management, Compliance and their local DPO as soon as possible.
- Immediately refer data subject access requests to local senior management, Compliance and their local DPO.

5.2 All printouts from fax, printers and photocopiers containing personal data must be retrieved without delay and stored in locked desk drawers, locked filing cabinets or locked filing rooms.

5.3 Filing cabinets and rooms containing larger amounts of personal data must be kept closed and locked when unattended or not in use. Appropriate security measures should be put in place by the local managing director.

5.4 ID badges/access cards must be protected. Where an ID badge/access card has been lost or stolen, the local office procedure for reporting this should be followed.

5.5 Personal data must not be removed from Apex premises in any format without prior notification and approval of the local DPO and local senior management:

- Employees must not email Apex stored personal data (including personal data of Apex clients or other employees) from their work emails to their personal email accounts;
- Apex personal data/devices must not be left in a vehicle;
- Employees on business trips must not leave personal data unattended. Luggage containing data should not be checked in when travelling on a plane and should be stored in carry-on baggage or on the person of the employee

5.6 Passwords must be protected in line with the Information Security Policy.

5.7 Apex policies, procedures and checklists are to be considered for "Apex Internal" use only, and therefore cannot be shared with third parties. In the event of a due diligence request from a third party e.g. client's auditors, clients, etc., these documents can only be reviewed in hardcopy form at Apex premises.

## 6. Roles and Responsibilities

| Role | Responsibilities |
|---|---|
| All Staff | • Responsible for adhering to the minimum standards set out in this policy.<br>• Should escalate any data breaches to local Compliance/the local DPO, as well as the Group DPO in the case of more serious breaches. |
| First Line of Defence | Apex operates a Three Lines of Defence model for managing risk and under this model the First Line of Defence owns the risks associated with everyday business activities. Included in the First Line of Defence are:<br>• Chief Information Security Officer |

| | |
|---|---|
| | The Chief Information Security Officer and Information Security team are responsible for oversight and governance of the Information Security programme as set out in the Information Security Policy<br><br>• Country Heads<br>The key responsibilities of country heads include implementation of the policy in the daily business processes with immediate and appropriate escalation where required.<br><br>Along with local DPOs country heads are responsible for Identifying areas of their business where data is collected, used, processed, shared or transferred with formalized checklists and 4 eyes principles to be implemented where necessary. These include (but are not limited to):<br>o Client and regulatory reporting (including FATCA and CRS);<br>o Audit reports (external and internal);<br>o KYC related communications; and<br>o Shareholder service functions.<br>o Regular monitoring of access rights within business lines, outside of the business lines including any access provided to external third parties.<br><br>• Human resources<br>The key responsibilities for the Human Resources Department include:<br>o Sound management of employee data utilising appropriate systems including Workday;<br>o Safe storage of data obtained in paper form (which must be kept securely in locked storage); and<br>o Ensuring that this policy is provided to new employees and records are maintained of this process. |
| Second Line of Defence | The Second Line of Defence owns the Apex Risk Management Framework and provides independent oversight of the First Line of Defence. Included in the Second Line of Defence are:<br><br>• Local Data Protection Officers (DPOs)<br>The local DPOs have primary responsibility for overseeing the implementation and maintenance of the Policy in relation to personal data.<br>The key responsibilities of local DPOs include: |

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 07/28/26 Page 50 of 145

APEX

| | |
|---|---|
| | ◦ maintenance of breach logs, and other documentation required under applicable data protection law;<br>◦ analysis of cross-border personal data transfers;<br>◦ analysis of privacy aspects in all relevant procedures and policies applied by the local entity;<br>◦ analysis of data security events and personal data breaches;<br>◦ implementation of regional variations to the Policy to be deployed at local level;<br>◦ contribution to data protection impact assessments;<br>◦ communication and training to relevant employees and clients where necessary;<br>◦ ensuring compliance with local legislation and demonstrating such compliance and accountability;<br>◦ execution and reporting of personal data protection tasks established by this policy; and<br>◦ coordinate other efforts to promote personal data privacy and security when requested to do so<br><br>• Legal Department<br>The Apex Legal Department is responsible for drafting and negotiating third party contracts including appropriate personal data protection and confidentiality clauses that are consistent with the policy.<br><br>The standards highlighted in this policy apply to engagements where the services to be performed by a third party include the receipt, maintenance, processing of or access to data held by Apex.<br><br>Whenever an existing contract of a third party is under review, these standards have to be included to ensure consistency of data privacy and that data protection measures are applied. |
| Third Line of Defence | The Third Line of Defence, Internal Audit provides senior management with assurance that Apex's governance structures, risk management framework, and internal controls are effective.<br><br>In its role as Apex's Third Line of Defence, the Internal Audit function:<br>◦ assesses the adequacy and effectiveness of governance structures, risk management and the internal control environment, including data protection policies, standards, and guidelines; |

| | |
|---|---|
| | o notifies all relevant businesses and business partner areas of any audit issues or concerns related to data protection policies, standards, and guidelines; and<br>o performs independent audit during on-site visits to ensure compliance with internal policies. |

# 7. Policy Exceptions, Exemptions and Non-Compliance

7.1 Every effort has been made to ensure this policy is written in a manner that can be applied to all staff, in all geographies and across all business lines. Where this is not possible, a policy exception (for specific standards) or a policy exemption (for an entire Group Policy) must be raised.

7.2 Policy exceptions or exemptions must be raised with the policy owner in the first instance, for assessment and approval, or decline, of the request. The Policy Owner will advise the Risk Function of the request and decision.

7.3 All requests for an exception or exemption will be recorded by the Risk Function.

7.4 Failure of any employee to comply with the Policy may result in disciplinary action taken against them, which can include termination of their contract of employment (or equivalent).

# 8. Data Privacy Principles

Lawfulness, fairness and transparency

8.1 Personal data is to be processed lawfully, fairly and in a transparent manner.

Purpose limitation

8.2 Personal data is to be collected only for specified, explicit and legitimate purposes and not further processed in a manner incompatible with those purposes.

Data minimization

8.3 Personal data shall be adequate, relevant and limited to what is necessary in relation to the purposes for which it is processed.

Accuracy

8.4 Apex will maintain the accuracy of personal data and, where necessary, keep it up to date and provide that reasonable steps will be taken to ensure that personal data that is inaccurate, having regard to the purposes for which it is processed, is erased or rectified without delay.

Storage limitation

8.5 Personal data is not kept in a form which permits identification of data subjects for longer than is necessary for the purposes for which the personal data is processed.

Security, integrity and confidentiality

8.6 Personal data is to be processed in a manner that ensures its security, using appropriate technical and organizational measures to protect against any unauthorized or unlawful processing and against accidental loss, destruction or damage.

Lawful basis for processing

8.7 There must be a lawful basis in order to process personal data. Apex staff may only collect, process and share personal data fairly and lawfully for specified purposes. These restrictions ensure Apex processes personal data fairly and without adversely affecting a data subject.

8.8 There are a number of lawful bases for processing. The legal basis of processing will depend on the purpose for processing and the relationship that Apex has with the data subject. The legal grounds for processing personal data are:

- the data subject has consented to the processing;
- the processing is necessary for a contract in place with the individual;
- the processing is necessary to comply with legal obligations (not including contractual obligations);
- the processing is in the data subject's vital interests;
- the processing is necessary to perform a task in the public interest or for an official function, and such task or function should have a clear basis in law; and
- the processing is necessary for Apex's legitimate interests or the legitimate interests of a third party, unless there is a good reason to protect the individual's personal data which overrides those legitimate interests.

Transfer limitation

8.9 Personal data must not be transferred to another country without appropriate safeguards being in place.

Data subject's rights and request

8.10 In accordance with regulatory requirements, and the timeframes set out in those requirements, personal data must be made available to data subjects, and data subjects should be allowed to exercise certain rights in relation to their personal data.

8.11 Regular reporting on data breaches and provision of root cause assessments with mitigations put in place are produced regularly as part of senior management and Local DPO/Compliance reporting to local and as well as the group board of Apex.

## 9. Personal Data Sharing

9.1 Apex may share personal data internally or to third parties. In the event of any transfer, the recipient will need to afford the same or a comparable level of data protection to this policy.

9.2 In the event of any transfer it must be in accordance or compatible with the purpose for which it was collected and based on one or more legal bases. Before agreeing to transfer personal data, Apex will need to assess the level of data protection that will be provided by the third party or Apex Group company. This assessment will also look at applicable laws and regulations, policies of the third parties, specific contractual obligations and the technical and organizational means of data security put in place. A DPIA may also need to be carried out if certain criteria are reached, the DPIA procedure and criteria are set out in Appendix 4.

## 10. Transfer of personal data outside the EEA/countries with equivalent personal data protection laws

10.1 Personal data can only be transferred to organisations in third countries, outside the EEA, where there are guarantees that appropriate safeguards are in place to ensure an adequate level of protection for the personal data and in compliance with necessary legal requirements.

10.2 Where cross-border personal data transfers are intended, proposed or discussed, the Local DPO must be consulted prior to any transfer.

## 11. Technology Controls to protect personal data

Technology is responsible for ensuring that the following internal controls relating to personal data are in place:

11.1 Identification and assessment of reasonably foreseeable internal and external risks to the security, confidentially and/or integrity of electronic, paper or other records containing personal data.

11.2 Evaluation and improvement of the effectiveness of current safeguards for limiting such risks, including but not limited to the means for detecting and preventing security system failure (where technically feasible) as well as failure of manual controls.

11.3 To the extent technically feasible, secure user authentication processes will be implemented with the help of:

- Control of user IDs;
- Secure methods of assigning and selecting passwords/unique identifiers or tokens;
- Appropriate password controls;
- Restricting access to IT systems, drives, software and physical work spaces;
- Blocking user IDs after 3 attempts to gain access;
- Restricting access to records, files and systems containing or processing personal data to those who need such information to perform their job duties.

11.4 To the extent technically feasible, ensure system housing files containing personal data that are connected to the Internet will possess appropriate up-to-date firewall protection and have operating system security designs in place to maintain the integrity of personal data.

# 12. Personal Data Controls

12.1 Exposure to personal data breaches should be reduced by ensuring the following principles and standards are followed:

- Collection is only for a legitimate purpose and is limited to the purpose intended.
- Collection is on a "need to know basis only" and is limited to the personal data that is ultimately necessary for a purpose and as defined in the Apex standards, e.g. KYC checklists. Where deviation is required, please consult with the Compliance Officer/Local DPOs.
- Limit the retention time of personal data. Data retention periods should be adhered to and personal data should not be retained for periods longer than the timeframe agreed with the data subject or the service purpose or as imposed by the local jurisdiction.
- Apply secure data destruction processes in line with the data retention and destruction procedure whenever personal data is destroyed.
- Access to personal data should be limited to those persons required to process such information in order to accomplish the purpose for which it is collected, or to comply with applicable record retention requirements. Review access to personal data within the business unit to determine whether all of the individuals who have access actually require access to all elements of the personal data.
- Ensure employees strictly apply the principles and standards outlined in the Clear Desk and Screen Guidance.

<u>Use of personal data for training</u>

12.2 Personal data must not be used for training materials unless the personal data is anonymised. Where anonymised personal data needs to be used, a request should

be submitted to your local DPO. The local DPO may refuse the request where there is no justifiable requirement to use such data.

12.3 For the purposes of this policy, "training materials" means all methods of the provision of training including, but not limited to, presentation slides and Summit training materials. Some in-person training may require the use of personal data, however, in-person use of personal data for training purposes should be limited to a 'need to know' basis.

## 13. Workday

13.1 Workday is used by Apex to manage employee personal data and time recording for matters such as recording leave (annual, sickness, maternity, etc.), goals, annual and mid-year performance reviews and employee personal data. Such highly sensitive information is protected and only shared on a "need to know" basis.

## 14. Privacy for Clients and Employees

14.1 Appropriate privacy disclosures for all data subjects, including clients and employees, are maintained and made available as required by data protection law. These privacy disclosures are reviewed at least annually.

Clients

14.2 Apex will ensure that there are appropriate organisational and technical controls in place to ensure the protection of client personal data.

14.3 Apex will ensure that all clients are aware of the data that is required to be provided for the requested services.

14.4 Where the Apex contracting office has a service delegation model in place, employees of other Apex offices will require access to various systems and data to perform their duties. Such access will be granted only on a need-to-know basis and such access is regularly monitored to ensure employee joiner/leaver processes are considered. Such delegation will be communicated in writing to impacted clients and consent will be obtained, where required.

14.5 Specific care will be taken by Apex where new systems are implemented or existing systems are extended due to new initiatives, and a DPIA will be completed if necessary (the DPIA procedure is set out in Appendix 4).

14.6 Personal data must not be used in the development of new systems or processes unless the personal data is anonymized ("scrubbed" personal data) or enhanced security measures are implemented to minimize risk of a personal data breach. Client personal data must be protected during testing to the degree that it is not traceable back to the live production information.

14.7 All marketing and other publications distributed externally should contain any necessary privacy notices, drafted in consultation with Legal, Compliance and any relevant local DPOs.

Employees

14.8 Apex will ensure that there are appropriate organisational and technical controls in place to ensure the protection of employee personal data.

14.9 Apex will ensure that all employees will be provided with appropriate training and information in relation to the privacy of their personal data and that of any third parties.

## 15. Data Subject Access Requests ("DSAR")

15.1 Data subjects have the right to request information about whether Apex is using or storing their personal data by way of a DSAR. When a DSAR is received, the process for responding is set out in Appendix 5 of the Policy.

15.2 Employees should make a DSAR via their local Human Resources representative.

## 16. Record of Processing Activities

16.1 Local DPOs, with support from country heads, are expected to maintain appropriate records of personal data held by Apex. In a number of jurisdictions, including under GDPR, there are requirements to map what personal data an organization holds.

16.2 Specimen templates suitable for GDPR requirements (and those jurisdictions that have similar requirements to GDPR) are available here:

https://ico.org.uk/media/for-organisations/documents/2172937/gdpr-documentation-controller-template.xlsx

https://ico.org.uk/media/for-organisations/documents/2172936/gdpr-documentation-processor-template.xlsx

## 17. Breaches

17.1 Incidents may occur that threaten the privacy of Apex`s clients, shareholders and/or Apex employees. Certain breaches may negatively impact the trust and the reputation of Apex and might even expose Apex to possible legal action and/or regulatory sanctions.

17.2 All employees of Apex are required to immediately report any actual or potential data incidents or breaches as outlined in this Policy as soon as possible, and to comply with the processes for data security breaches set out in Appendix 1 of the Policy. This process applies whether a data breach originates within Apex or within any organization that processes data on behalf of Apex.

Definitions/types of breach

17.3 A data breach is any act or omission that compromises the security, confidentiality, integrity or availability of personal data or the physical, technical, administrative or organisational safeguards that we or our third-party service providers put in place to protect it. The loss, or unauthorised access, disclosure or acquisition, of personal data is a personal data breach. The extent of damage or potential damage caused by any data breach will need to be assessed and determined by the volume and sensitivity of the information exposed and the degree of exposure which results.

17.4 A data breach may include one or more of the following elements:

- "Confidentiality breach" - where there is an unauthorized or accidental disclosure of, or access to, data;
- "Availability breach" - where there is an accidental or unauthorized loss of access to, or destruction of, data;
- "Integrity breach" - where there is an unauthorized or accidental alteration of personal data.

17.5 Examples of a data breach includes but is not restricted to, the following:

- Loss or theft of confidential or sensitive data or equipment on which such data is stored (e.g. loss of laptop, USB stick, iPad / tablet device, or paper record);
- Equipment theft or failure;
- System failure;
- Unauthorized use of, access to or modification of data or information systems;
- Attempts (failed or successful) to gain unauthorized access to information or IT system(s) e.g. hacking including where data on those systems is modified e.g. website defacement;
- Unauthorized disclosure of sensitive/confidential data;
- Unforeseen circumstances such as a fire or flood;
- Human error e.g. an e-mail containing personal data sent to incorrect e-mail addresses; or
- 'Blagging' offences where information is obtained by deceiving the organization that holds it.

17.6 Breaches of clients/shareholders and/or employee privacy are generally detected via the below sources:

- External discovery: Client/shareholder
- Apex Internal discovery: Employee
- External Discovery: Auditors, third party, media

17.7 If a breach of privacy occurs, the Data Breach Investigation Form (see Appendix 3) needs to be completed and then escalated to your direct line manager.

17.8 The direct line manager is required to follow the privacy breach process outlined in Appendix 1 and contact the local DPO, who is responsible for investigating, escalating and overseeing the application of the required process.

# 18. Agreements

18.1 All legal agreements with third parties must contain appropriate confidentiality or data protection clauses in relation to the treatment and security of data used and created so as to protect and safeguard the data in accordance with the standards outlined in the Policy.

18.2 Any new agreements or significant amendments to existing agreements must be referred to Legal for review.

# 19. Data Privacy and Data Protection Training

19.1 Provision of training to employees around cyber security, privacy and data protection standards is key for understanding and in the application of such concepts in day-to-day business. All employees are required, at least annually, to complete data protection and data privacy training.

# 20. Policy Exception, Exemptions and Non-Compliance

20.1 Every effort has been made to ensure this policy is written in a manner that can be applied to all staff, in all geographies and across all business lines. Where this is not possible, a policy exception (for specific standards) or a policy exemption (for an entire Group Policy) must be raised.

20.2 Policy exceptions or exemptions must be raised with the Policy owner in the first instance, for assessment and approval, or decline, of the request. The Policy Owner will advise the Risk Function of the request and decision.

20.3 All requests for an exception or exemption will be recorded by the Risk Function.

20.4 Failure of any employee to comply with the Policy may result in disciplinary action taken against them, which can include termination of their contract of employment (or equivalent).

APEX

# 21. Contact Information

The following staff can be contacted in case of need with regards to any aspect of this Group Policy.

| Name | Role | Details |
|---|---|---|
| Rose Hasler | Managing Counsel (Regulatory) and Group Data Protection Officer | Rose.hasler@apexgroup.com<br>+44(0) 789 9743 679 |
| Philip Hanssens | Chief Compliance Officer | Philip.hanssens@apexgroup.com<br>+44(0)20 3961 1435 |

# 22. Document Version Control

| Version Number | Issue Date | Issued By | Details of changes (amendments, whole, partial specific details) |
|---|---|---|---|
| 1.0 | Nov 2017 | Global Compliance | Full Version |
| 1.1 | Mar 2018 | Global Compliance | Yearly review |
| 1.2 | Jul 2019 | Global Compliance | Yearly review<br>Inclusion of data breach in case of external phishing/hacking attack |
| 1.3 | Nov 2020 | Global Compliance and Legal | Yearly review<br>Detail added on DSARs, DPIAs, and data breach process |
| 1.4 | Jan 2021 | Global Compliance and Legal | Update to data breach form |
| 1.5 | Nov 2021 | Global Compliance and Legal | Yearly review<br>Update to data destruction procedure (emails) and confidentiality/personal data obligations |
| 1.6 | Nov 2022 | Global Compliance and Legal | Yearly review |
| 1.7 | Dec 2023 | Global Compliance and Legal | Yearly review and update to format |
| 1.8 | Dec 2024 | Global Compliance and Legal | Yearly review and updates. Removal of data retention and destruction procedure which now forms part of the Data Management Policy<br>Updated "OCEO" reference to "ExCo" |

APEX

# Appendix 1: Breach Reporting Process

## 1. Breach process

**Severity Check**

Any data privacy breach will have to undergo a severity check allowing classification of the breach and the respective mitigation process to be applied. Severity will be assessed on the following components:

- Impact on Apex reputation;
- Impact on Apex clients or other data subjects and the risk to their rights/freedoms;
- Impact on Apex business;
- Impact on Apex employees; and
- Regulatory Impact (sanction/fine).

Improper handling of data privacy breaches can increase the severity of the impact of the breach. Appropriate handling of a data breach can reduce the severity and exposure for clients, employees and Apex.

- Low Severity

E.g. Disclosure of client, shareholder or employee data to another individual. Apex advised of this inadvertent disclosure.

  - Impact on reputation → little/none
  - Impact on clients or other data subjects → minimal number of names/data exposed – localized issue to a particular client or data subject / little or no risk to rights and freedoms of data subject. No sensitive data disclosed.
  - Impact on Business → single or minimal geographic/local impact on business
  - Impact on resources to mitigate → little/few nominal resources required to address issue

- Medium Severity

E.g. Personal data/client data has been compromised within an office due to incident for example technology issue or system issue. Premises compromised and client information is lost risking local media attention.

  - Impact on reputation → localized adverse impact on Apex reputation. Limited media attention forecasted.

- Impact on clients or other data subjects → moderate number of names/data exposed – still considered localized issue / moderate (if any) risk to rights and freedoms of data subject.
- Impact on Business → moderate number of units affected in one region, still considered geographically limited impact on business.
- Impact on resources to mitigate → moderate resources required to address issue.

- High Severity

  E.g. Larger scale systems issue resulting in improper disclosure of client information to or in respect of multiple client's e.g. large scale statement error. Large scale impact of compromised client information (potentially fraud involved) could involve employee theft. Loss of client information through third parties e.g. system provider, suppliers, etc. National press attention is anticipated.

  - Impact on reputation → National /Global impact on Apex reputation and brand but with potential to be recovered and with moderate media attention.
  - Impact on clients or other data subjects → moderate to large number of names/data exposed/high risk to rights and freedoms of data subject.
  - Impact on Business → cross functional business impact. Large number of units impacted across multiple geographic regions impacting business globally
  - Impact on resources to mitigate → moderate number of recourses required cross-border to address issue.

- Extreme High Severity

  E.g. System attack exposing client data on a large scale (including identity theft/ fraud attack). System breaches exposing client data with national/international press attention.

  - Impact on reputation → significant national/global negative impact exposing Apex reputation and public perception. Extensive media attention possible.
  - Impact on clients or other data subjects → large number impacted across many entities within Apex/extremely high risk to rights and freedoms of data subject.
  - Impact on Business → cross geographic business impact.
  - Impact on resources to mitigate → significant and extensive resources required internally across a number of entities as well as externally to resolve the issue.

The above severity classification of the data breach impact depends on the type data involved. The details can be found in the Data Breach Classification Impact Level Matrix in Appendix 2.

## 2. Breach process

In the case of any breach, local DPO must be informed immediately so that they can consider whether it is a reportable breach to either a supervisory authority and/or local regulatory bodies.

- Low Severity
  - Responsibility – every employee must report the breach to their direct line manager as soon as possible and within 24 hours. The line manager is then obliged to comply with the data breach process set out in this procedure together with the local DPO.
  - Escalation process - data breach template has to be completed and direct line managers/business unit managing director have to be involved to sign-off on the data breach details/classification.
  - Mitigation process – Identification of process and system gaps that caused the data privacy breach have to be remediated including all relevant department owners until the gap is closed and the solution approved by all relevant parties within Apex. The local DPO to review and determine areas requiring further investigations in collaboration with IT, Risk and business unit managing directors. Legal where necessary to be included.
  - Reporting to the local risk officer/local risk committee.

- Medium/High/Extreme Severity
  - Responsibility – every employee must report the breach to their direct line manager as soon as possible and within 24 hours. The direct line manager is then obliged to comply with the process set out in this Appendix 2 together with the local DPO.
  - Escalation process - data breach template has to be completed and direct line managers/business unit managing directors have to be involved to sign off on the data breach details/classification. Requires mandatory escalation to the Group DPO and to the Global Chief Information Security Officer.
  - Action:
  - Prior validation of the proposed mitigation action plan by the Group DPO and the Global Chief Information Security Officer.
  - Involvement of the Executive Committee as per escalation from Group DPO and the Global Chief Information Security Officer.
  - Assignment of a designated person to resolve the data breach.
  - Local and Global DPO to remain involved during resolution.

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 08/21/26 Page 60 of 145

APEX

- Prior validation of the intended client/employee approach/communication to resolve issue and maintain client/employee confidence.
- Investigation of the circumstances that caused the data privacy breach.
- Review and amend the process and system gaps that allowed the data privacy breach to occur.
- Reporting to the Chief Risk Officer/Group Risk Committee.

## 3. Privacy mitigation process

Data breaches require appropriate assessment to ensure the required mitigation process is applied to resolve and limit the incident.

It is the responsibility of the impacted business unit to complete this process including data breach declaration, reporting and remedial action. Wherever processes are amended or newly implemented the possibility of future potential data breaches and what can be done to avoid them must be considered.

In order to determine the severity of the breach outlined above, the Data Breach Classification Impact Level Matrix set out in Appendix 2 will need to be consulted for guidance on application of the relevant mitigation.

Case 1:25-cv-08892-VEC-GS Document 17 Filed 07/28/25 Page 61 of 145

# Appendix 2: Data Classification Impact Level Definitions

| Data Classification Impact Level Definitions | | | | |
|---|---|---|---|---|
| Security Objective | Potential Impact / severity | | | |
| | Very High | High | Moderate | Low |
| Reputation | Significant national negative impact exposing Apex reputation and public perception. Extensive media attention possible. | National impact on Apex reputation and brand but with potential to be recovered and with moderate media attention. | Localized adverse impact on Apex reputation. Limited media attention forecasted | Disclosure of client, shareholder or employee or other data subject data to another individual has very low or no reputational impact. |
| Client | Large number impacted across Apex group, especially where there are shared clients within Apex locations | Moderate to large number of names/data exposed. This kind of issue is still considered as localized | Moderate number of names/data exposed. This kind of issue is still considered as localized | Disclosure of client, shareholder or employee or other data subject data to another individual is minimal due to the restraint number of names/data exposed. It is generally a localized issue. |
| Business | Cross geographic business impact | Cross functional business impact with large number of units impacted across multiple geographic regions impacting business | Moderate number of units affected in one region, still considered geographically limited impact on business | Disclosure of client, shareholder or employee data or other data subject to another individual has very low or minimal geographic/local impact on business |
| Resources to Mitigate the Risk | This kind of issue generally require a significant and extensive resources required internally as well as externally to resolve the issue – group resources required as well. | This kind of issue generally require a moderate amount of resources cross border in order to address and mitigate/solve the issue | This kind of breaches generally require a moderate amount of resources in order to address and mitigate/solve the issue | This kind of breaches generally require a limited amount of resources in order to address and mitigate/solve the issue |

APEX

# Appendix 3: Data breach investigation form

THIS FORM MUST BE COMPLETED IMMEDIATELY FOLLOWING DISCOVERY OF A DATA BREACH AS THERE MAY BE A REQUIREMENT TO NOTIFY THE DATA SUBJECT OR SUPERVISORY AUTHORITY WITHIN 72 HOURS

| **SECTION 1:** [To be completed by the impacted Department] | |
|---|---|
| **EMPLOYEE COMPLETING:** | |
| **LINE OF BUSINESS AND DEPARTMENT:** | |
| **OVERVIEW OF INCIDENT:** (Please attach copy of client or third party communication(s), if applicable) | |
| **CLIENT NAME(S), ACCOUNT NUMBER(S) AND ADDRESS, IF KNOWN:** (Please attach a separate listing if necessary) | |
| **DATE/TIME WHEN INCIDENT OCCURRED:** | |
| **DEPARTMENT OF BREACH:** | ☐ Regulatory Breach<br>☐ TA Breach<br>☐ FA Breach<br>☐ Corporate Secretary Breach<br>☐ IT Breach |
| **TYPE OF BREACH:** | ☐ Failure to make regulatory filings/updates on time<br>☐ Capital adequacy<br>☐ Breach of confidentiality (e.g. disclosure of personal data with wrong party)<br>☐ Breach of integrity (e.g. alternation of date)<br>☐ Breach of availability (e.g. accidental destruction or loss/unavailability of data) |
| **REASON FOR BREACH:** | ☐ Human Error: Existing procedures not applied/followed<br>☐ Governance: Missing procedures<br>☐ IT internal issue<br>☐ IT external issue (i.e. phishing, hacking) |
| **Breach Reported to Regulatory Authority/Data Protection Authority, as applicable** | ☐ Yes<br>☐ No<br>☐ N/A |
| **Did the incident involve lost or stolen Apex hardware?** | ☐ Yes<br>☐ No<br>☐ Uncertain |

| | | |
|---|---|---|
| **If yes, was IT Security and Data Protection Officer advised and when?** | | |
| **Did the incident involve Confidential / Highly Confidential Information?** | ☐ Yes<br>☐ No<br>☐ Uncertain | |
| **Did the incident involve inappropriate access to Confidential Information?** | ☐ Yes<br>☐ No<br>☐ Uncertain | |
| **Root cause assessment performed: (please outline root cause assessment and outcome)** | | |
| **Mitigation process applied: (What has been applied by the department concerned to avoid such breaches in the future: training, reminder, new process, change of procedure, etc?)** | | |
| **Sign off section:** | **Name & Signature:** | **Date:** |
| Employee/Drafter of above details: | | |
| Line Manager/MD approval: | | |

# Appendix 4: Data protection impact assessment ("DPIA") process

## 1. What is a DPIA?

A DPIA enables you to systematically and comprehensively analyze your personal data processing and help to identify and minimize personal data protection risks arising from a new project (or outsourcing) which may affect Apex or the individuals that it engages with. Apex's DPIA form is available from the intranet.

DPIAs should consider compliance risks, but also broader risks to the rights and freedoms of individuals, including the potential for any significant social or economic disadvantage. The focus is on the potential for harm – to individuals or to society at large.

A DPIA does not have to indicate that all risks have been eradicated. But it should help you document them and assess whether or not any remaining risks are justified.

DPIAs are a legal requirement for processing that is likely to be high risk. But an effective DPIA can also bring broader compliance, financial and reputational benefits, helping you demonstrate accountability data protection by design and default and building trust and engagement with individuals.

A DPIA may cover a single processing operation or a group of similar processing operations. A group of controllers can do a joint DPIA.

A DPIA is not a one-off exercise. You should see it as an ongoing process that is subject to regular review in the event of a change of process or of any of the details contained in the DPIA form. The form should be updated to reflect these changes.

## 2. Do we need a DPIA?

A DPIA is mandatory where personal data processing "is likely to result in a high risk to the rights and freedoms of natural persons" or where we are onboarding an External Outsourcing Service Provider ("EOSP") that is processing personal data on Apex's behalf. This is particularly likely to arise when a new data processing technology is being introduced or a project involving the processing of personal data. At Apex you will be provided with a DPIA form via the Implementation Team when a new vendor is being onboarded.

In the context of this guidance a project could include the development or enhancement of any activity, function or processing such as a system, database, program, application, service or scheme. The time and effort put into carrying out the DPIA should be proportionate to the risks.

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 08/21/26 Page 65 of 145



Below are some listed examples of when a DPIA should be carried out:

- When the processing involves systematic and extensive evaluation of personal information particularly in cases of automatic processing or profiling where decisions are made that could have a significant or legal impact on an individual.
- When processing on a large scale of special categories of data or data relating to criminal convictions and offences.
- The monitoring of a publicly accessible area on a large scale; or
- Any other cases specified by the relevant Data Protection Authority.

The above list is non exhaustive. In light of the principles of accountability and data protection by design (and the general risk-based approach embodied by data protection law), there are likely to be many scenarios in which DPIAs are used as a good practice tool despite not being mandatory.

Screening questions in the DPIA form

If the project includes the use of any personal data then screening questions on the DPIA form should be completed to confirm whether a DPIA is needed. If the answer to all the screening questions is 'No' then the remainder of the assessment does not need to be completed but the results from the screening questions should be sent to the local DPO for recording. If the response to any of the screening questions is 'Yes' you should complete the remainder of the DPIA form.

## 3. Completing the DPIA

It is the responsibility of the person leading the project or proposing the onboarding of an EOSP to carry out a DPIA, in consultation with the local DPO and the Data Privacy Team. Guidance notes are included at the end of the form to help the user ensure that the assessment is properly completed.

The DPIA should be carried out in the initial phase of a project, ensuring that risks are identified and taken into account before the problems become embedded in the design and causes higher costs due to making changes at a later stage (privacy by design).

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 07/28/21/26 Page 69 of 145

## 4. Overview of the DPIA process



# Appendix 5: Data Subject Access Request

## 1. What is a subject access request?

A person whose personal data is being processed by Apex has a right to receive a copy of this personal data. Where Apex is acting as data controller e.g. for employees or individuals on a marketing subscription list, it will be responsible for ensuring that requests for access are responded to and the required information is provided to the data subject.

Additionally in its capacity as data processor Apex may receive subject access requests, this is where Apex is processing personal data on behalf of another data controller e.g. a client. In this situation Apex will need to understand its contractual obligations to notify controllers of any exercise of data subject rights and comply with those obligations. Apex may have a duty to assist in responding to the data subject and will need to notify the client that it has received a subject access request.

All DSARs should be escalated to the Group DPO. Requests must be responded to without undue delay and normally within one month or four weeks (depending on your location) of receipt of request or (if later) within one month or four weeks (depending on your location) of receipt of:

- Any information requested to confirm the requestor's identity; or
- A fee (which can only be charged if the request is manifestly unfounded or excessive; or if an individual requests further copies of their data following a request and must be "reasonable").

## 2. Information to be included in the response

Individuals have the right to obtain the following from Apex:

- Confirmation that their personal data is being processed;
- A copy of their personal data; and
- Other supplementary information – this largely corresponds to the information that is provided in Apex's privacy notice.

Personal data to be provided
The local DPO in conjunction with the responsible individuals as set out in section 5 below should decide where any personal data about the individual concerned may be held. The main business areas where personal data is stored are Marketing, HR and Finance. IT should make appropriate searches of the email servers.

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 01/28/26 Page 71 of 145

Once the personal data is collected, it should be processed and examined to establish what personal data needs to be disclosed. It may be necessary to redact the personal data of other individuals, along with confidential client data and legally privileged information.

## 3. Other rights

In addition to access rights, data subjects have a number of other rights:

- Right of rectification

  Data subjects have the right to have their inaccurate personal data rectified. Rectification can include having incomplete personal data completed, for example, by a data subject providing a supplementary statement regarding the data. Where such a request is made, Apex shall, unless there is an exemption, rectify the personal data without undue delay.

  Apex shall also communicate the rectification of the personal data to each recipient to whom the personal data have been disclosed (for example, our third-party service providers who process the data on our behalf), unless this is impossible or involves disproportionate effort. Apex shall also inform the data subject about those recipients if the data subject requests it.

- Right to restrict processing

  Data subjects have the right in certain circumstances and unless there is an exemption, to restrict the processing of their personal data. Apex shall communicate the restriction of processing of the personal data to each recipient to whom the personal data have been disclosed, unless this is impossible or involves disproportionate effort. Apex shall also inform the data subject about those recipients if the data subject requests it.

- Right to port

  Data subjects have the right, in certain circumstances, to receive their personal data that they have provided to us in a structured, commonly used and machine-readable format that they can then transmit to another company. Where such a request is made, Apex shall, unless there is an exemption, provide the personal data without undue delay (and in any event within one month or 4 weeks (depending on your location)).

- Right to object

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 07/28/25 Page 72 of 145

APEX

Data subjects have the right to object to the processing of their personal data in certain circumstances. Where such an objection is made, Apex shall, unless there is an exemption, no longer process a data subject's personal data.

- Right to object to automated decision making

Data subjects have the right, in certain circumstances, not to be subject to a decision based solely on the automated processing of their personal data, if such decision produces legal effects concerning them or similarly significantly affects them.

## 4. Subject access request log

The Group DPO maintains a log of DSARs received globally.

Each local DPO maintains a DSAR log to record requests and any decisions made about the response, including decisions to restrict or refuse a request.

| Heading | Content |
|---|---|
| Date request made | Date |
| Response deadline | Date |
| Status | In progress / Awaiting more info / Completed / Refused (note reason why) |
| Data subject name | Person's name |
| Data subject type | Description of person |
| Method of contact | Email / Post etc. |
| Contact details | Email address etc. |
| Proof of identity needed | Yes / No |
| Identity verified | Date identifying information received |
| Confirmation of processing | Date sent |
| Scope of request | Data to be included, noting any exemptions or restrictions |
| Format of response | Date |

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 07/28/25 Page 72 of 145

APEX

## 5. Responsibility matrix

All staff are responsible for recognizing a DSAR and redirecting to the relevant person so it can be processed in line with this procedure.

HR are responsible for processing all DSARs relating to employment matters and from prospective, current or former Apex employees.

Marketing are responsible for processing all DSARs relating marketing mailing lists and any personal data retained in relation to prospective clients or other marketing contacts.

Relevant business areas are responsible for assisting clients or others responding to DSARs where Apex is acting in the capacity of data processor. As well as processing any client or other data subject related DSARs where Apex is data controller.

| Action | Responsibility |
|---|---|
| Subject access request received | Sent to Local DPO (if responsibility not clear sent to Group DPO to be assigned) |
| Log subject access request and respond to data subject | Local DPO |
| Discussion of subject access request | Local DPO, Compliance, HR and Legal |
| Information gathering | IT to collate personal data at request of responsible business area or support function as set out above who can direct where searches need to be made;<br>Processing to be carried out according to responsible business area or support function as set out above. |
| Send response to data subject within timeframe (and include any necessary documents) | Local DPO |

# EXHIBIT F

Case 1:25-cv-08892-VEC Document 37 Filed 07/28/25 Page 75 of 208



APEX

# Code of Conduct and Ethics Policy

V1.7 | December 2024

Not for external distribution without the permission of a member of the Office of Chief Executive Officer

© Apex Group Ltd. - 2024

# Table of Contents

Introduction and Scope ..... 3
Approval and Adoption ..... 4
Ethical Core Values ..... 4
Apex Business Values ..... 5
Minimum Standards and Controls ..... 6
Roles And Responsibilities ..... 9
Speaking Up - Whistleblowing ..... 9
Policy Exceptions, Exemptions and Non- Compliance ..... 10
Training ..... 10
Further Reference ..... 11
Contact Information ..... 12
Document Version Control ..... 12

# Introduction and Scope

1. The purpose of the Apex Group Code of Conduct and Ethics Policy (hereafter, the "Policy") is to provide a clear statement of the ethical values and professional standards that Apex Group expects all employees at all levels of responsibility, to uphold during their daily work. The Policy applies to all permanent, temporary, seconded and contracted staff working at or for Apex Group Ltd and its affiliates, including directors (executive or non-executive), board member of Apex Group and its affiliates, branches and the integrated entities (jointly and severally referred to as "Employee(s)").

2. This Policy must be read in conjunction with the Compliance Charter, Financial Crime Prevention Policy, Anti-Bribery and Anti-Corruption Policy, Conflict of Interest Policy, Anti-Fraud Policy, Data Privacy and Data Protection Policy, Gift and Hospitality Policy, Whistleblowing Policy, Clear Desk and Screen Guidance, Personal Account Dealing Statement of Principles Policy, and related procedural frameworks, as well as local office policies/handbooks for the aforesaid policies and guidance.

3. Employees are responsible for being aware of, fully understanding and following all Apex policies and procedures, including but not limited to this Policy, that apply to them.

4. Global Compliance is responsible for reviewing and updating this Policy on an annual basis or when a new law or regulation impacts defined standards.

5. The most current version of this Policy is available on Grapevine and Summit Learning Platform, through which employees are required to read and complete this policy.

6. This Policy forms part of your employment or relationship with Apex Group entities. Failure by any Employee to comply with the Policy or any other applicable policy or procedure, as well as any violation of the outlined standards, may result in disciplinary action, which may subsequently include the termination of the Employee's employment or relationship.

7. In circumstances that are not specifically addressed by this Policy, every employee is expected to apply common sense and sound judgement. Where an employee is unsure of the correct course of conduct, the employee must seek prior advice from their line management, Compliance or HR.

8. Unless specifically defined in this Policy, any defined terms must be taken from the Financial Crime Prevention Policy.

APEX

## Approval and Adoption

9. This Apex Group Policy has been approved by the Office of Chief Executive Officer ("OCEO") via its delegated authority from the Group's Board.

10. Upon approval, the Policy is effective for all Apex Group affiliates and subsidiaries. Confirmation of adoption is required at the Board level of each Apex Group affiliate and subsidiary as may be applicable under local laws and regulations.

11. This Apex Group Policy is owned by the Apex Chief Compliance Officer and Apex Group Compliance, who maintain accountability for its content and will arrange periodic reviews and updates on at least an annual basis and in accordance with Apex Group's Policy Framework.

12. For the avoidance of doubt, this Policy supersedes any previously published policy, whether by Apex Group or that of an acquired entity.

## Risk Appetite

13. Apex is committed to the highest standards of conduct and ethical behaviour and has no appetite or tolerance for knowingly or negligently being involved in or associated with criminal activities, nor the non-compliance with relevant rules, regulations and laws.

14. Apex believes that every Employee is responsible for integrating Apex's ethical and business values into the way they conduct themselves as Apex employees.

15. Integrity is essential for the success and the good reputation of Apex Group as a whole. Apex has no tolerance for employees that conduct themselves in a manner that is detrimental to the reputation of Apex or that is offensive or discriminatory with respect to clients, fellow employees or other stakeholders.

## Ethical Core Values

16. Below is a non-exhaustive list of Apex's core ethical values:

    a. Service excellence at all times

Daily deployment of the "Client first" service attitude is the basis of collaborating with our Clients and is the reason for our long-term relationships with them.

b. Team work

Trust in colleagues, efficient teamwork and knowledge sharing will allow us to collectively achieve more and create greater opportunities for Apex.

c. Integrity

Be respectful, transparent and fair in all relationships, with the courage to stand up for what we believe and foster constructive change where beneficial to Apex and Apex Clients. Always act professionally, honestly and ethically when dealing with Apex colleagues and Apex clients.

d. Risk Culture

Disciplined and risk averse attitude as part of an intelligent management framework.

e. Accountability

Make a difference and feel empowered to grow and exceed expectations. Ensure continuous learning as a key component in your development and as part of adapting current services to future technology and regulatory frameworks.

f. Adherence to Laws and Regulations

Employees are expected to comply with all applicable laws and regulations, and the Apex Group policies and procedures at all times. Leading by example and positive reinforcement is the required culture of all Employees.

g. Diversity and Inclusion

Encourage others to learn and achieve more by including respective different experiences, perspectives and solutions, while challenging historical approaches.

## Apex Business Values

17. Defined below are the Apex Group business values; the business values are adopted in addition to the ethical core values.

a. We Care

We care about each other, we care about doing a good job and we strive to put what is right for the team and for the Client, first.

b. We Promote Respect

We respect each other, every role and every person brings value. We do not tolerate dismissive behaviour, lack of inclusivity or bias.

c. We are Exceptional
We go beyond, striving to be the best. We are motivated and always learning. We are never complacent and we believe in our people.

d. We Drive Growth
We drive growth through collaboration and openness, inclusivity, investment in our business and our people. We drive growth through the promotion of excellence.

# Minimum Standards and Controls

## Maintaining Confidentiality of Information

18. Employees must assume that the Client and any other information obtained in the course of their employment or relationship with Apex, is confidential, unless the contrary is declared in writing by the Employee’s local Managing Director (MD)/Country Head, local Data Protection Officer, Compliance or Legal.

19. Information relating to an identified or identifiable natural person (including but not limited to clients, customers, investors, employees of vendors, third party service providers, employees and job applicants for Apex jobs posted) such as name, address, gender or identification number, must be considered as sensitive, and the use of such personal information requires compliance with applicable data protection laws. Refer to the Data Privacy and Data Protection Policy for further information.

20. Misuse, mishandling, loss, theft or accidental disclosure of information entrusted to Apex in the course of business relationships, could have serious business and regulatory implications. Employees must treat information as outlined in this Policy with due care and in line with applicable laws and regulations, as well as Apex policies and procedures. Refer to the Data Privacy and Data Protection Policy, Clear Desk and Screen Guidance, and Data Management Policy.

21. Employees must not leave potentially confidential information such as printing and faxes unattended on printers, faxes, desks or other areas that are accessible by anyone. At the end of each working day, all information must be locked away and computers must be shut down. Refer to the Clear Desk and Screen Guidance.

22. Employees must never use any type of confidential or personal information for personal gain or benefit, such as personal trading. This includes not using information for the gain or benefit of a friend, family member or any other third party. Refer to the Personal Account Dealing Statement of Principles Policy, Conflict of interest Policy, Anti-Corruption and Anti-Bribery Policy and the respective procedural framework.

23. Employees must not disclose outside of the Apex Group any Apex proprietary or confidential information, any information relating to clients nor any confidential matters including details of an internal or external audit (other than certification audits for use by clients), any internal investigation, regulatory investigation or inspection. This prohibition of disclosure includes family members, friends, acquaintances, clients, vendors, and industry colleagues. Employees must never post confidential information on social media networks in whatever form.
24. Under no circumstances should Employees share their username or password for any system or software with anyone inside or outside of the specific Apex company. Refer to the Password Standards, Clear Desk and Screen Guidance, Data Privacy and Data Protection Policy, and Information Security Policy.
25. Unauthorised access to, use of, interception or distribution of Apex computers and communication systems and communications is strictly prohibited. Such conduct may also be a violation of law. For more information, please see the relevant policies and procedures around IT system security/information security.

## Compliance with Applicable Laws and Regulations

26. Apex provides business services in many different jurisdictions and compliance with a variety of legal and regulatory obligations is a key component of the Apex business.
27. Each Employee must comply in good faith with all applicable laws and regulations in every jurisdiction where Apex has a footprint.
28. The local Compliance Officer is responsible for advising the applicable obligations and responsibilities. Where an Employee is unclear about his/her obligation, they must seek advice from the local Compliance Officer and Senior Management to ensure full understanding of the applicable laws and regulations.
29. Employees must participate in and complete all training required at induction and on a periodic basis to ensure their professional knowledge is up to date and processes are well understood.

## Outside Business Interests as Conflicts of Interest

30. A conflict of interest is defined as a situation in which a person or company can in some way exploit a professional or official capacity for their own benefit or that of the company.
31. Therefore, a conflict of interest occurs when an Employee's private interests interfere, or even appear to interfere, with the interests of Apex and/or its Clients.
32. A conflict can arise when an Employee takes actions or has interests that may make it difficult to perform his/her/their work in an objective and effective manner.
33. For further details, please refer to the Conflict of Interest Policy.

## Gift and Hospitality

34. Employees with a higher level of Client contact may receive gifts or hospitality benefits as acknowledgement of their daily work for the Client.

35. The personal benefit associated with such a gesture cannot be allowed to impair the objective and independent judgement of the recipient.
36. Refer to the Gift and Hospitality Policy and the Anti-Bribery and Anti-Corruption Policy for the principles of accepting acceptable gifts or hospitality benefits from, or offering same to, a Client.

# Personal Conduct of Business

### Integrity

37. Integrity is essential for the success and the good reputation of Apex as a whole. Maintaining integrity also includes ensuring that Employees are always making decisions in line with the principles and values of this Policy.
38. Employees must control and minimize any potential reputational risk to Apex. Before making a statement or releasing information to the media related to work or via private channels, Employees must obtain prior written approval from Global Marketing.

### Professional Conduct and Work Environment

39. Every Employee is responsible for integrating Apex's ethical and business values into the way they conduct themselves as Apex employees.
40. Appropriate language, behaviour and dressing is part of the employment obligation during working hours and during work-related events.
41. Apex does not tolerate any speech or action that could reasonably be seen as insulting or derogatory, or as an instance of discrimination, harassment or abuse, of any kind. Employees must never use threatening language or engage in bullying, intimidation, or violence.

### Accountability

42. Employees must never alter or falsify a business record. This applies universally, but in particular to the following situations:

    42.1 Falsification of books, records, or accounts for the purposes of fraud or deceit including submitting falsified expense reports or inaccurate time records;

    42.2 Altering a record after the fact, particularly in anticipation of internal or external audits or regulatory visits.

43. For further details, please refer to the Anti-Fraud Policy.

# Roles And Responsibilities

## Manager Responsibility

44. Employees who hold management and other key roles within Apex including those serving as the Country Head/local MD and local Managers have the responsibility to set the tone for a respectful, inclusive, and compliant workplace. The Country Head/local MD and local Managers must remain vigilant for any signs of discrimination or abuse involving Employees in his/her/their teams and report without hesitation actual or suspected instances to Senior Management, local Compliance Officer, and HR.
45. The Country Head/local MD and local Managers are expected to maintain an "open door policy" towards any Employee who asks to discuss workplace or employment issues.
46. The Country Head/local MD and local Managers must be well informed about the regulatory framework and the policies and procedures applying to the Employees under their management; this includes local, regional, and global standards of Apex and they must help familiarize new Employees with these policies and requirements.
47. The Country Head/local MD and local Managers are responsible for the hiring of appropriate and qualified staff and they are under the obligation to manage these resources, applying a performance review process to ensure deliveries meet the required standards.
48. The Country Head/local MD and local Managers are responsible for ensuring that all Employees complete their required training.

## Transitions

49. Any change in an Employee's employment status or job function typically involves a change in the policy requirements to which the Employee are subject. It may also involve changes in the Employee's physical or systems access permissions. It is the Employee's duty and responsibility to stay abreast of all such changes.

## Speaking Up - Whistleblowing

50. Apex Group has zero tolerance regarding any conduct and/or ethical misbehaviour, including but not limited to harassment or bullying in any form, and will take firm steps to deal with such behaviours if ever and wherever it comes up. If an Employee or an Employee's colleague experiences any form of harassment or bullying at Apex, the Employee is encouraged to speak up.
51. Employees must promptly report all known, suspected, or potential situations of harassment and or bullying to their Senior Manager, local Compliance Officer, or HR or use the Apex Whistleblowing line. Refer to the Whistleblowing Policy for further information.

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 08/21/26 Page 81 of 145

APEX

## Corporate Social Responsibility (CSR)

52. Apex Group has published a CSR Statement, which can be found at: https://www.apexgroup.com/corporate-social-responsibility/.

## Policy Exceptions, Exemptions and Non-Compliance

53. Every effort has been made to ensure this Policy is written in a manner that can be applied to all Employees, in all geographies and across all business lines. Where this is not possible, a policy exception (for specific standards) or a policy exemption (for theentire Policy) must be raised.
54. Non-compliance with this Policy may lead to disciplinary action, up to and including termination of the Employee's employment or relationship. Violating any part of an anti-bribery or anti-corruption law may expose the Employee and/or Apex to criminal and/or civil penalties.
55. Policy exceptions or exemptions must be raised with the Policy owner in the first instance, for assessment and approval, or decline, of the request. The Policy Owner will advise the Risk Function of the request and decision.
56. All requests for an exception or exemption will be recorded by the Risk Function.

## Training

57. Apex Group is obliged to provide training to relevant Staff.
58. Apex Group has a dedicated training plan that is reviewed on an annual basis and updated according to new services and regulations in force.
59. Employees from any level will be provided with periodic (at least annual) training programs addressing the anti-money laundering laws (acts and regulations) of their local jurisdiction and the applicable policies, procedures, practices and controls relating to anti-money laundering, countering terrorist financing and proliferation financing. Training will ensure that all relevant Staff are fully aware of their responsibilities both under the laws and regulations as well as Apex Group's policies and procedures.

60. Regional and local Compliance Officers/MLROs (as applicable) must ensure that the following trainings are in place or otherwise delivered for relevant, local Employees, and Senior Management:

    60.1 New Hire training to be completed within thirty (30) calendar days after e-mail access is granted for all new Employees;

    60.2 Annual Code of Conduct and Ethics training for identified Employees and Management;

    60.3 Targeted training when needed based on Business Unit assessment.

61. New Employees are required to be fully aware of policies, procedures, practices, and controls by attending the mandatory trainings at the commencement of their employment, reading this Policy and all associated procedures applicable to the relevant office.

62. Detailed records of the dates of all training, who has attended and the content of the course is maintained by the Learning and Development team and shared with local offices.

63. Apex Group should develop and create relevant Code of Conduct and Ethics training. Such training will be delivered online and relevant Staff will be required to complete the training by a due date.

# Further Reference

64. The following documents should be read and considered in relation to this Policy.

- Compliance Charter
- Financial Crime Prevention Policy
- Anti-Bribery and Anti-Corruption Policy
- Conflict of Interest Policy
- Anti-Fraud Policy
- Data Privacy and Data Protection Policy
- Gift and Hospitality Policy
- Whistleblowing Policy
- Clear Desk and Screen Guidance
- Personal Account Dealing Statement of Principles Policy

APEX

# Contact Information

65. For additional information or questions regarding this policy, please contact your Regional Compliance Officer, whose contact information can be found at [Compliance (sharepoint.com)].

# Document Version Control

| Version number | Issue date | Issued by | Details of changes (amendment, whole, partial) |
|---|---|---|---|
| 1.0 | Feb 2017 | Global Compliance | Initial version |
| 1.1 | Feb 2019 | Global Compliance | Restructure of Introduction chapter<br><br>Inclusion of the new Apex business values communicated by the ExCo<br><br>Removal of principles in business conflicts as not relevant<br><br>Changes in Chapter 2.2 as too focused on AML<br><br>Added “company internal” mention in the footer<br><br>Mention of the whistleblowing policy and zero tolerance of Apex Group Ltd towards harassment and bullying (par 3.6)<br><br>Addition of Chapter 4 on CSR |
| 1.2 | Oct 2019 | Global Compliance | Annual rewording and review in light of integration<br><br>New Layout |
| 1.3 | Mar 2020 | Global Compliance | Annual rewording and review in light of integration |
| 1.4 | Apr 2021 | Global Compliance | Annual rewording and review in light of integration |
| 1.5 | Jun 2022 | Global Compliance | Annual rewording and review in light of integration |
| 1.6 | Dec 2023 | Global Compliance | Annual rewording and review in light of integration.<br>Reformatting |
| 1.7 | Dec 2024 | Global Compliance | Annual rewording and review |

# EXHIBIT G

APEX

**Master Services Agreement**

**Between**

**SandsPoint Capital Advisors LLC**

**and**

**Related Fund Management LLC**

**Dated: January 29, 2024 (the "Effective Date")**

## GENERAL TERMS

The Parties shall enter from time to time into an Order Document for the provision of certain Services. The following are the General Terms, which shall apply to, and be incorporated by reference into, each Order Document between the Parties.

1. **Definitions**

**Affiliate** in relation to a Party, means any entity that directly or indirectly controls, is controlled by, or is under common control with that party from time to time.

**Adherence Agreement** means an adherence agreement in substantially the same form as the template set out in Appendix 2.

**Agreement** means these General Terms (including the Data Protection Addendum), an Order Document that references the General Terms executed by the Parties, and (if any) an Agreement of Adherence that references the General Terms and relevant Order Document executed by the Parties.

**Apex** means the Apex Group entity entering into an agreement for service pursuant to an Order Document referencing these General Terms.

**Apex Group** means Apex and any Affiliate of Apex.

**Applicable Law** means all applicable laws, statutes, statutory duties, regulation and codes from time to time in force including all applicable domestic and international laws, statutes, regulations and codes relating to payment of taxes, tax avoidance, tax evasion, anti-bribery and anti-corruption.

**Associated Person** means in relation to Apex a director, shareholder, officer, company secretary, employee or provider of corporate administration services or agent thereof. For the avoidance of doubt, an Associated Person shall include a nominated director, as relevant.

**CCPA** means the California Consumer Privacy Act.

**Client** means the Apex counterparty in the relevant Order Document, as may be amended by an Adherence Agreement.

**Controller, processor, data subject, personal data, personal data breach and processing** are as defined in the Data Protection Laws.

**Controlling Person** means the person or entity with control of the relevant entity, including (a) the general partner of a partnership, (b) the managing member of limited liability company, and (c) the person or entity with majority ownership of voting shares in a corporation, or if different, the person or entity with the power to appoint the majority of directors in a corporation.

**Data Protection Laws** means the mandatory laws and regulations applicable to the Parties' processing of personal data under this Agreement which may include, but is not limited to, the GDPR, DPA and CCPA.

**DPA** means the Cayman Islands' Data Protection Act (2021 Revision).

**GDPR** means the General Data Protection Regulations (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 (General Data Protection Regulation), as amended from time to time.

**Governing Documents** means the offering documents, partnership agreement, articles of incorporation, bylaws, LLC agreement, and/or organizational document (as relevant) of the relevant entity.

**gross negligence** means, in relation to a person, a standard of conduct beyond negligence whereby that person acts with reckless disregard for the consequences of his or her action or inaction.

**Order Document** means a document identifying Supplied Services to be performed by Apex pursuant to the General Terms and any Product Terms in substantially the same form as the template set out in Appendix 3.

**Party** or **Parties** means Apex and the Client.

**Person** includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

**Sub-Processors** means any person appointed by Apex or a company in the Apex Group to process personal data on behalf of Apex for the provision of the Services.

**Supplied Services** means those Services as detailed in an Order Document exclusively detailing Services to be provided by Apex and the special provisions thereto as set out in the relevant Order Document.

**Service(s)** means the services and deliverables which are provided by Apex under all Order Documents.

**Third Country** means all countries outside of the scope of the data protection laws of the European Economic Area ("EEA"), excluding countries approved as providing adequate protection for Personal Data by the European Commission from time to time.

**VAT** means value added tax or any equivalent tax chargeable in respect of the Supplied Services.

1.1 Clause, schedule and paragraph headings shall not affect the interpretation of this Agreement. Unless the context otherwise requires, words in the singular shall include the plural and in the plural shall include the singular.

1.2 Unless the context otherwise requires, a reference to one gender shall include a reference to the other gender.

1.3 The Agreement shall be binding on, and enure to the benefit of, the Parties and their respective personal representatives, successors and permitted assigns, and references to any Party shall include that party's personal representatives, successors and permitted assigns.

1.4 Reference to a statute or statutory provision is a reference to it as amended, extended or re-enacted from time to time.

1.5 A reference to writing or written includes fax and email.

**2. Service Provider Responsibilities**

During the term of the Agreement, Apex shall at all times perform its obligations in good faith and with all due care, skill and diligence expected of a provider of similar services in the same market. Apex shall provide the Services to the Client within identified timeframes in accordance with the relevant Order Document. Apex carries no responsibility to perform any services not described in an Order Document. Apex shall inform the Client whether any requested or proposed services are outside the scope of an Order Document. The Parties shall thereafter negotiate an additional Order Document or amendment for the out-of-scope services. If Apex performs out-of-scope services per the Client's written authorization, and until the Parties execute an additional Order Document or amend for the out-of-scope services, Apex is entitled to payment for those services at its then-standard hourly rates.

**3. Client's obligations**

3.1 The Client shall:

a) co-operate with Apex in all matters relating to the Services;

b) provide to Apex in a timely manner all documents, information, items and materials in any form (whether owned by the Client or a third party) required under an Order Document or otherwise reasonably required by Apex in connection with the Supplied Services and ensure that they are accurate and complete in all material respects;

c) maintain during the term of the Agreement all necessary licences and consents and comply in all material respects with all Applicable Law as required to enable Apex to provide the Services; and

d) comply with any additional responsibilities or requirements as set out in the relevant Order Document.

3.2 If Apex's performance of its obligations under this Agreement is prevented or delayed by any act or omission of the Client, its agents, subcontractors, consultants or employees then, without prejudice to any other right or remedy it may have, Apex shall be allowed a day-for-day extension of time to perform its obligations in respect of the period of delay caused by the Client and shall not be liable to the Client for any delay in such performance.

3.3 Any Service is specific to Client's business only and such Services provision is based solely upon the information provided by the Client, in particular Apex shall suffer no liability where information provided is incomplete or delayed, including with regards to any statutory submission.

3.4 Apex reserves the right to carry out due diligence on the Client as required under its internal policy and guidance or any Applicable Law during the term of the Agreement. The Client shall promptly provide all relevant documentation and information reasonably requested, and the provision of the Services shall be conditional on the Client continuing to satisfy all due diligence requirements imposed by Apex or Applicable Law.

**4. Fees**

4.1 For the Services provided pursuant to this Agreement, the Client shall pay Apex the fees as set out in the relevant Order Document or such other sums as may be agreed in writing by the Parties from time to time, together with VAT, if any, thereon. Apex reserves the right to suspend the Services due to non-payment of fees within the time-frame required under this Agreement.

4.2 The fees in any Order Document are premised on certain express assumptions in that Order Document. Client shall promptly inform Apex if those assumptions, if any, become invalid. In that event, or if Apex determines that assumptions are invalid, the Parties shall negotiate an amended Order Document. If the Parties fail to promptly agree to an amended Order Document, Apex may, upon 90 days notice, terminate the relevant Order Document.

**5. Compliance with laws**

In performing its obligations under this Agreement, Apex and the Client shall comply with Applicable Law and Apex may refuse to perform the Services if it is of the reasonable belief that doing so would breach any Applicable Law, conflict with any provision of relevant Governing Documents or expose it to any risk of prosecution or sanction of any kind.

**6. Data protection**

Both Parties will comply with all applicable requirements of the Data Protection Laws and as further set out in the Data Protection Addendum set out in Appendix 1.

**7. Intellectual Property Rights**

Except where otherwise provided for by way of licence, the Client shall not acquire any right, title or interest in any of Apex Group's intellectual property rights of any nature anywhere in the world whether registered, registerable or otherwise, including patents, trademarks, registered designs and domain names, applications for any of the foregoing, trade or business names, goodwill, copyright and rights in the nature of copyright, design rights, rights in databases, moral rights or know-how.

**8. Confidentiality**

8.1 Each Party undertakes that it shall not at any time during the validity of this Agreement, and for a period of two (2) years after termination or expiry of this Agreement or such other period as determined by Applicable Law, disclose to any person any confidential information concerning the business, affairs, clients or service providers of the other party or of any member of the group of companies to which the other Party belongs, except as permitted by clause 8.2(a). Confidential information shall include, but not be limited to, any information relating to the Client or Client Affiliates or Client's investors or clients or their respective representatives or related parties, including all personal data, the Client's bank account details, transactional information, and any other information which is either designated by the Client as confidential at the time of disclosure or that a reasonable person would consider to be of a confidential or proprietary nature.

8.2 Each Party may disclose the other Party's confidential information:

(a) to its employees, officers, representatives, Affiliates, contractors, subcontractors or advisers who need to know such information for the purposes of exercising the Party's rights or carrying out its obligations under or in connection with this Agreement. Each Party shall direct that its employees, officers, representatives, contractors, subcontractors or advisers to whom it discloses the other Party's confidential information comply with this clause 8; and

(b) as may be required by law, to a court of competent jurisdiction or any governmental, the rules of any securities exchange or regulatory authority or as otherwise legally compelled.

8.3 No Party shall use the other Party's confidential information for any purpose other than to exercise its rights and perform its obligations under or in connection with this Agreement or in accordance with Applicable Law save that Apex may share or store confidential information with Affiliates for the purposes of prudential risk management.

**9. Liability**

9.1 Apex's liability for any claim under this Agreement shall be limited to the aggregate fees it received from Client (or Client's affiliates) during the prior thirty-six (36) months; provided, however, that no such liability cap shall apply in the event of Apex's recklessness, wilful misconduct, fraud or wilful violation of Applicable Law.

9.2 Neither Party shall be liable to the other for any punitive damages, indirect, consequential, or special loss arising out of or in connection with this Agreement or an Order Document or any breach or non-performance of it no matter how fundamental (including by reason of that Party's negligence) whether or not that Party had been informed of or was aware that there was a serious possibility of such loss.

**10. Indemnity**

The Client shall indemnify Apex, its Affiliates and Associated Persons (each an "Indemnitee") for, and will defend and hold each Indemnitee harmless from and against any and all liabilities, actions, demands, judgements, suits, regulatory fines, actual losses, disbursements and expenses (including and without limitation reasonable legal fees and amounts reasonably in settlement with the agreement of the Client actually incurred by an Indemnitee in any action or proceeding between Apex and any third party (including any investor, or any other competent regulatory, prosecuting, tax or government authority in any jurisdiction, domestic or foreign) arising from or in connection with the performance of this Agreement (each referred to as a "Loss"), imposed on, incurred by, or asserted against Apex in connection with or arising out of Apex's performance of its obligations and duties under this Agreement in accordance with this Agreement, , except any Loss resulting from (i) the gross negligence, wilful misconduct or fraud of Apex, its Affiliates or Associated Persons, (ii) Apex's wilful violation of Applicable Law.

This Section 10 shall survive the expiration or earlier termination of this Agreement.

**11. Term and Termination**

11.1 The Agreement shall commence upon the effective date identified in the relevant Order Document and remain in effect for an initial term of one year ("Initial Term"), unless the relevant Order Document provides alternative terms. Unless the relevant Order Document provides alternative terms, each

Order Document may be terminated in whole or in part after by either of the Parties by giving to the other Party a notice in writing specifying the date of such termination, which shall be not less than ninety (90) days after the date of such notice (or such shorter period as the Parties may agree in writing from time to time).

11.2 On full termination or expiry of all existing Order Documents, this Agreement shall terminate automatically.

11.3 The Agreement or any Order Document may be terminated forthwith by either Party giving written notice to the other Party if at any time:

(a) the other Party becomes insolvent or goes into liquidation (except for a voluntary liquidation for the purposes of reconstruction or amalgamation) or a receiver or examiner is appointed to the other Party or upon the happening of a like event whether at the direction of an appropriate regulatory agency or a court of competent jurisdiction or otherwise;

(b) the other Party commits a material breach of any term of this Agreement and (if such breach is remediable in the reasonable opinion of the other Party) fails to remedy that breach within a period of thirty (30) days after being notified in writing to do so;

(c) Apex ceases to be permitted to provide Services pursuant to Applicable Law;

(d) the Client ceases to be authorised by its regulator or pursuant to Applicable Law;

(e) the terminating party has reasonable grounds to believe that the other Party breaches any laws or regulations or becomes subject to a lawsuit, regulatory action, government investigation, allegation, demand, claim, request, inquiry, sanction, arbitration or proceeding that in each case, the terminating party reasonably determines could cause it material liability or reputational harm; or

(f) the other Party suspends or ceases, or threatens to suspend or cease, carrying on all or a substantial part of its business.

11.4 Without affecting any other right or remedy available to it, Apex may terminate this Agreement or any Order Document with immediate effect by giving written notice to the Client if:

(a) the Client fails to pay any amount due under this Agreement on the due date for payment and remains in default for not less than forty-five (45) days after being notified in writing to make such payment; or

(b) there is a change of control of the Client, as reasonably determined by Apex.

**12. Obligations on termination and survival**

12.1 On termination or expiry of this Agreement:

(a) the Client shall immediately pay to Apex all of Apex's undisputed outstanding unpaid invoices and other moneys, expenses and disbursements accrued and due to it up to the date of such termination, including transfer, dissolution and liquidation fees;

(b) Both Parties shall use reasonable endeavours to assist in transferring the Services without undue disruption to any replacement service provider at the sole cost and expense of the Client; and

(c) Apex shall deliver or cause to be delivered to the Client all accounts, records, registers, correspondence and documents relating to the affairs or belonging to the Client in its possession or control Apex.

12.2 **Survival**

(a) Any provision of this Agreement that expressly or by implication is intended to come into or continue in force on or after termination of this Agreement shall remain in full force and effect.

(b) Termination or expiry of this Agreement shall not affect any rights, remedies, obligations or liabilities of the Parties that have accrued up to the date of termination or expiry, including the right to claim damages in respect of any breach of the Agreement which existed at or before the date of termination or expiry, including rights set out in this clause 12.

**13. Force majeure**

13.1 Force Majeure Event means any circumstance that is not within a party's reasonable control including, without limitation:

(a) acts of God, flood, drought, earthquake or other natural disaster;

(b) epidemic or pandemic;

(c) terrorist attack, civil war, civil commotion or riots, war, threat of or preparation for war, armed conflict, imposition of sanctions, embargo, or breaking off of diplomatic relations;

(d) nuclear, chemical or biological contamination or sonic boom;

(e) any law or any action taken by a government or public authority, including without limitation imposing an export or import restriction, quota or prohibition, or failing to grant a necessary licence or consent;

(f) collapse of buildings, fire, explosion or accident;

(g) any labour or trade dispute, strikes, industrial action or lockouts (other than in each case by the party seeking to rely on this clause, or companies in the same group as that party); or

(h) the breakdown, failure or malfunction of any utilities, telecommunications systems or computer system.

13.2 Provided it has complied with clause 13.3, if a party is prevented, hindered or delayed in or from performing any of its obligations under this Agreement by a Force Majeure Event (**Affected Party**), the Affected Party shall not be in breach of this Agreement or otherwise liable for any such failure or delay in the performance of such obligations. The time for performance of such obligations shall be extended accordingly.

13.3 The Affected Party shall:

(a) as soon as reasonably practicable after the start of the Force Majeure Event, notify the other party of the Force Majeure Event, the date on which it started, its likely or potential duration, and the effect of the Force Majeure Event on its ability to perform any of its obligations under the Agreement; and

(b) use reasonable endeavours to mitigate the effect of the Force Majeure Event on the performance of its obligations.

**14. Representations and Warranties**

14.1 Each Party hereto on its own behalf hereby represents, warrants and undertakes to the other that:

(a) it has requisite power and authority to conduct its business and to enter into and perform and will perform its obligations under this Agreement and all necessary corporate, shareholder and other action to enable it to execute, deliver and perform the same has been taken;

(b) this Agreement has been validly created and constitutes a valid and legally binding obligation enforceable against it in accordance with its terms;

(c) all necessary licences, authorisations, consents and approvals have been obtained;

(d) the performance and observance by it of its obligations hereunder does not and will not:

(i) contravene any existing Applicable Law or any judgment decree or permit to which it is subject;

(ii) conflict with or result in any breach of any of the terms of or constitute a default under any agreement or other instrument to which it is a party; or

(iii) contravene or conflict with any provisions of its Governing Documents.

14.2 The Client represents, warrants and covenants that for as long as this Agreement shall operate, the Client shall promptly give or shall procure that Apex will be given instructions and such other information as Apex may reasonably require in order to enable it to settle transactions and perform the other Services contemplated herein in a timely manner and shall not interfere with any arrangements, instructions, procedures or authority pursuant to which Apex has taken action hereunder.

**15. Delegation and Outsourcing**

Subject to prior written notice to Client, Apex shall be entitled to subcontract, outsource, or delegate all or any part(s) of the obligations regarding the services to any company within the Apex Group (the "Sub-Delegate"). The Sub-Delegate may further subcontract, outsource, or delegate the obligations regarding the services delegated to it by Apex to any company within the Apex Group with the prior written approval of Apex and notice to Client. Apex shall remain liable to the Client for its obligations under this Agreement irrespective of any subcontracting, outsourcing or delegation by Apex or the Sub-Delegate. Any fees and expenses payable to the Sub-Delegate or any other delegate shall be borne by Apex and any liability shall remain with Apex.

**16. Instructions and Notices**

16.1 In carrying out its duties under any Order Document, Apex will comply with all reasonable instructions of the Client. All instructions, acknowledgements or notices required to be given from time to time under an Order Document may be given by email or electronic communication or by letter or by such other means as may from time to time be agreed between the Parties (including, without limitation, oral instructions) to the intended recipient at the address set out in the Order Document or at such address, email or addresses as may from time to time be notified by each Party to the other and shall be deemed to be duly given upon receipt.

16.2 Apex may rely or act upon any communication, notice, instruction, or document executed through electronic method whether sent through surface mail or by email, or other similar electronic method which Apex believes to have been issued by the Client who, on the face of the communication, appears to have been the authorised person or shareholder of the Client and Apex's understanding shall be deemed accurate. Apex assumes no risk arising out of the use of electronic methods of communication or execution of documents, including without limitation any risk of Apex acting on unauthorised instructions, or the risk of interception and misuse by third parties.

16.3 Each Party will be responsible for protecting its own systems and interests and, to the fullest extent permitted by law, will not be responsible to the other on the basis (contract tort or otherwise) for any loss, damage or omission in any way arising from the use of internet or from access by Apex or its Affiliates to networks, applications, electronic data or other systems of the Client.

16.4 The Parties agree that any of them may execute this Agreement or any part thereof by electronic signature and that this method of signature is as conclusive of the Party's intention to be bound by this Agreement, or such relevant part thereof, as if signed by each Party's manuscript signature. The Parties agree that receiving this Agreement, or such relevant part thereof, executed by any of them by electronic signature shall be equivalent to receiving the original thereof. Each Party (including those executing the General Terms) further agrees to take any and all reasonable additional actions, if any, evidencing its intent to be bound by the terms of this Agreement. The Parties hereto waive any potential right or claim relating to the existence or validity of such electronic signature as well as relating to the validity of this Agreement on the ground that it has been executed by way of such electronic signature. The Parties agree that this Agreement and any additional information incidental hereto may be maintained as electronic records. For the purposes hereof, "electronic signature" means data in electronic form which is attached to or logically associated with other data in electronic form and which is used by a signatory Party to sign this Agreement.

16.5 Apex may rely on any instruction, acknowledgement or notice which it reasonably believes to have been issued by the authorised signatories of the Client.

16.6 Apex may decline to accept or act upon any instruction to it or other communication if it reasonably considers that compliance with such instruction would not be feasible, risk it incurring any financial liability or would breach the terms of the law or any government department or body whose requirements (whether legally binding or not) Apex is subject to, any relevant law, decree, regulation or order of any government or governmental body (including any court or tribunal) or which would be contrary to any provision of this Agreement provided that Apex shall not be under any obligation to ensure that any instruction received by it would not contravene any of the laws, authorities or

documents referred to and provided that Apex shall immediately notify the Client of its refusal to act and give its reasons therefore where permitted under Applicable Law to do so.

16.7 Any notice or other communication required to be given under this Agreement shall be in writing in the English language. A notice shall be deemed effectively served:

(a) if sent by email, on the date when receipt has been personally acknowledged by return email (electronically generated receipts shall not be valid);

(b) if delivered personally, on the date when left at Apex's registered office or the Client's registered office (as applicable) and signed for; or

(c) if given by post, on the date when the notice has been signed for at Apex's registered office or the Client's registered office.

## 17. Cyber and IT Technology Security [1]

17.1 Each Party shall maintain appropriate information security policy and procedures and implement measures ("Policies and Procedures") to monitor and protect any data and information (including any personal data) ("Information") maintained and provided by or on behalf of the other Party (to include in respect of the Client, the directors and/or the shareholders) from theft, unauthorised disclosure and unauthorised access. For the avoidance of doubt, such Policies and Procedures shall include each party providing appropriate training to their staff and conducting their own security audits as required. Each Party shall be responsible for ensuring such Policies and Procedures are in place and implemented by all third party service providers engaged by them. On reasonable request, each Party shall provide evidence of implementation of such Policies and Procedures to the other Party.

17.2 In the event of a Cyber Incident (as defined below), each Party shall have the right, at its own cost, to review or conduct an independent audit (using a third party) of the IT controls of the other Party.

17.3 If a Party becomes aware of (i) failure or significant malfunction of any hardware or software used by it or its third party service provider; (ii) loss of Information by it or a third party service provider (a "Cyber Incident"); or (iii) any other unauthorised access or use by a third party or misuse, damage or destruction by any person of Information (the "Other Incident"), and that such Cyber Incident or Other Incident could have resulted in a denial of service or unauthorised access to the Information relating to the other Party (to include in respect of the Client, its shareholders) that would have had a material impact on the other Party then it shall take reasonable steps to notify the other Party in writing without delay of the Cyber Incident or Other Incident. In relation to any Cyber Incident or Other Incident, the Party that became aware of the incident, as per clause 20.2 above, shall provide such information as may reasonably be requested by the other Party including (i) obtaining evidence about how, when and by whom its information system and/or data relating to the other Party (to include in respect of the Client, its shareholders) has been compromised (ii) implementing any mitigation strategies to reduce the impact of the Cyber Incident or Other Incident or the likelihood or impact of any future similar

[1] Where the Client has appointed a manager/investment manager to undertake activities on behalf of the Client (which will include reliance by it on the manager/investment manager's IT infrastructure and the manager/investment manager submitting data on the Client's behalf) the obligations within this clause should also apply to the manager/investment manager.

incident; and (iii) preserving and protecting data relating to the other Party (to include in respect of the Client, its shareholders) (including as necessary reverting to any backup or alternative site).

**18. Assignment and other dealings**

18.1 Neither party shall assign, transfer, mortgage, charge, subcontract, delegate (other than in compliance with this Agreement), declare a trust over or deal in any other manner with any of its rights and obligations under this Agreement, provided, however, that Apex may do so in relation to an Affiliate or as required by lenders, finance partners, or similar upon notice.

**19. Variation**

No variation of this Agreement shall be effective unless it is in writing and signed by the Parties.

**20. Waiver**

20.1 A waiver of any right or remedy under this Agreement or by law is only effective if given in writing and shall not be deemed a waiver of any subsequent right or remedy.

20.2 A failure or delay by a party to exercise any right or remedy provided under this Agreement or by law shall not constitute a waiver of that or any other right or remedy, nor shall it prevent or restrict any further exercise of that or any other right or remedy. No single or partial exercise of any right or remedy provided under this Agreement or by law shall prevent or restrict the further exercise of that or any other right or remedy.

20.3 A party that waives a right or remedy provided under this Agreement or by law in relation to one party, or takes or fails to take any action against that party, does not affect its rights in relation to any other party.

**21. Rights and remedies**

The rights and remedies provided under this Agreement are in addition to, and not exclusive of, any rights or remedies provided by law.

**22. Severance**

If any provision or part-provision of this Agreement is or becomes invalid, illegal or unenforceable, it shall be deemed deleted, but that shall not affect the validity and enforceability of the rest of this Agreement.

**23. Entire agreement**

23.1 This Agreement constitutes the entire agreement between the Parties and supersedes and extinguishes all previous agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter.

23.2 Each Party agrees that it shall have no remedies in respect of any statement, representation, assurance or warranty (whether made innocently or negligently) that is not set out in this Agreement. Each Party agrees that it shall have no claim for innocent or negligent misrepresentation based on any statement in this Agreement.

**24. Conflict**

If there is an inconsistency between any of the provisions of this Agreement and the provisions of the Schedules, the provisions of the relevant Schedules shall prevail.

**25. No partnership or agency**

25.1 Nothing in this Agreement is intended to, or shall be deemed to, establish any partnership or joint venture between any of the Parties, constitute any party the agent of another party, or authorise any party to make or enter into any commitments for or on behalf of any other party.

25.2 Each Party confirms it is acting on its own behalf and not for the benefit of any other person.

**26. Third party rights**

Unless it expressly states otherwise, this Agreement does not give rise to any rights to any third party to enforce any term of this Agreement.

**27. Counterparts**

This Agreement may be executed in any number of counterparts, including via electronic means, each of which shall constitute an original, but all of which together shall constitute one and the same agreement.

**28. Adherence Agreement**

If any person or entity that is formed in connection with the Client where the Client is the direct or indirect shareholder/interest holder or exercises control and management on such person or entity (each a "Person") wishes to be added as a party to this Agreement, after necessary due diligence by Apex such Person shall execute and deliver an Adherence Agreement to the existing parties to this Agreement which may only be accepted by the original parties to this Agreement. Following such execution and deliverance of the Adherence Agreement, such Person shall be included in the definition of "Client" for the purposes of this Agreement (unless the context requires otherwise). Apex shall update the relevant schedule with the name of such Person added to this Agreement. Pursuant to the Adherence Agreement, Apex shall render the relevant services to such Person jointly with the Client for the applicable fees as provided in the relevant Order Document or in the Adherence Agreement.

**29. Insurance**

At all times during the term of this Agreement and for the additional period specified herein, Apex will maintain in full force and effect, insurance as specified in Appendix 2 attached hereto.

**30. Governing law and Jurisdiction**

This Agreement shall be construed in accordance with, and governed by the laws of the State of New York and the Parties submit to the exclusive jurisdiction of the federal and state courts situated in the State of New York, County of New York.

These General Terms have been entered into on the Effective Date.

Signed by Frederick Shaw for and on behalf of **SandsPoint Capital Advisors LLC** — January 29, 2024 — Managing Director

Signed by James Kraus for and on behalf of **Related Fund Management LLC** — January 29, 2024 — Chief Financial Officer

## Appendix 1

## Data Protection Addendum

### Part A Terms of Data Processing

1. This Schedule is in addition to, and does not relieve, remove or replace, a party's obligations or rights under the Data Protection Laws.

2. The Parties acknowledge that for the purposes of the Data Protection Laws, the Client is the controller and Apex is the processor. Both Parties undertake to the other that they will comply with their respective obligations under the Data Protection Laws and will not perform their respective obligations under this Agreement in such a way as to cause the other to breach any of its applicable obligations under the Data Protection Laws.

3. Where Apex is processor of personal data under this Agreement, without prejudice to the generality of clause 1 of this Schedule, the Client will ensure that it has lawful grounds for processing personal data under the Data Protection Laws, and notices in place to enable lawful transfer of the personal data to the Client for the duration and purposes of this Agreement.

4. The Client provides a general authorisation that Apex may engage sub-processors to process personal data on the Client's behalf. The sub-processors currently engaged by Apex are set out in Part C of this Schedule and the Client hereby authorises engagement of the sub-processors set out therein. Apex will notify the Client of any changes to the sub-processors engaged, and the Client will have 14 days to object to the change. Apex confirms that it has entered into or (as the case may be) will enter into with the sub-processor a written agreement incorporating terms which are substantially similar to those set out in this Schedule. Apex shall remain fully liable for all acts or omissions of any sub-processor appointed by it pursuant to this Schedule.

5. Without prejudice to the generality of clause 1 of this Appendix, Apex shall, in relation to any personal data processed in connection with the performance by Apex of its obligations under this Agreement:

   (a) comply with all applicable Data Protection Laws in the processing Personal Data;

   (b) not process personal data other than on the Client's documented instructions, and only to provide the Services, unless required to do so by Applicable Law. In this case, Apex shall inform the Client of that legal requirement before processing, unless the law prohibits this on important grounds of public interest. This Schedule sets out the details of processing;

   (c) ensure that all individuals authorised to process the personal data are subject to confidentiality undertakings, professional or statutory obligations of confidentiality; and

   (d) shall inform the Client if, in its reasonable opinion, an instruction issued by the Client infringes the Data Protection Laws.

6. Apex may act as a data controller including, but not limited to, circumstances when it is conducting activity required to comply with any Applicable Law, regulation or internal policy or at the request of any competent regulator, public authority or governmental authority.

7. On termination of the Agreement for any reason, or upon written request from Client at any time, Apex shall cease processing any personal data, and (at the Client's direction) return to the Client or delete (to the extent technically possible and in accordance with Apex's document retention and deletion policies), any personal data in Apex's possession or control, unless Applicable Law or Member State Law requires storage of the personal data.

8. Taking into account the state of the art, the costs of implementation and the nature, scope, context and purposes of processing as well as the risk of varying likelihood and severity for the rights and freedoms of natural persons, Apex shall in relation to the personal data have in place appropriate technical and organisational measures to protect against unauthorised or unlawful processing of personal data and against accidental loss or destruction of, or damage to, personal data, appropriate to the harm that might result from the unauthorised or unlawful processing or accidental loss, destruction or damage and the nature of the data to be protected, having regard to the state of technological development and the cost of implementing any measures (those measures may include, where appropriate, pseudonymising and encrypting personal data, ensuring confidentiality, integrity, availability and resilience of its systems and services, ensuring that availability of and access to personal data can be restored in a timely manner after an incident, and regularly assessing and evaluating the effectiveness of the technical and organisational measures adopted by it).

9. Apex shall, taking into account the nature of the processing and information available to Apex assist the Client, at the Client's cost, in responding to any request from a data subject and in ensuring compliance with its obligations under the Data Protection Laws with respect to data security, personal data breach notifications, data protection impact assessments and consultations with supervisory authorities or regulators.

10. Subject to clause 9 of this Schedule, Apex will assist the Client, at the Client's reasonable cost, in the Client's obligation to respond to data subject's requests to exercise their rights as provided under the Data Protection Laws. If Apex receives a request directly from a data subject, Apex shall, unless prohibited from doing so by Applicable Law (including binding terms of the request itself), notify the Client about such request and only take further action as instructed by the Client.

11. In the event of a personal data breach concerning the personal data processed by the Apex on behalf of the Client, Apex shall notify the Client without undue delay and within 72 hours of becoming aware of such personal data breach. Apex will provide the Client with the following as soon as it becomes available:

    a. a description of the nature of the personal data breach, including where possible the categories and approximate number of data subjects concerned;

b. the name and contact details of Apex contact from whom more information can be obtained; and

c. a description of the measures taken or proposed to be taken to address the personal data breach, including, where appropriate, measures to mitigate its possible adverse effects.

12. Apex shall not transfer any personal data to a Third Country unless the following conditions are fulfilled:

a. Apex complies with reasonable instructions notified to it in advance by the Client with respect to the processing of the personal data;

b. Apex has provided appropriate safeguards as set out in the Data Protection Laws in relation to the transfer; and

c. Apex complies with its obligations under the Data Protection Laws by providing an adequate level of protection to any personal data that is transferred.

13. Apex shall make available to the Client on request all information reasonably necessary to demonstrate compliance with this Schedule and shall reasonably allow for audits, including inspections, conducted by the Client or another auditor mandated by the Client and approved by Apex for the purpose of demonstrating compliance by Apex with its obligations under the Data Protection Laws.

14. The Client shall:

a. give Apex reasonable notice of the audit or inspection to be conducted under this clause 14;

b. conduct audits during regular business hours where reasonably possible, and may not unreasonably interfere with Apex's business activities;

c. not require audits or inspections to be carried out more frequently than is reasonably necessary and shall ensure that appropriate confidentiality provisions are agreed between Apex and any third party involved in the audit or inspection; and

d. be entirely responsible for the cost of any such audit or inspection.

**Part B - Details of Processing**

| | |
|---|---|
| Nature and Purpose of the processing | Apex will process personal data in order to provide the Services pursuant to this Agreement |
| Duration of the processing | Subject to this Schedule, Apex will process personal data for the duration of this Agreement unless otherwise agreed in writing |
| Types of personal data | Any information related to an identifiable natural person or 'Data Subject' that can be used to directly or indirectly identify the person. This may include, but is not limited to, name, ID number, location data or an online identifier, photograph, residential address, place of business, email address, contact details, corporate contact information, signature, nationality, country of residence, place of birth, date of birth, tax identification, tax jurisdiction, employment and job history, education details, regulatory status, credit history, correspondence records, passport number, bank account details, certain financial information contained within KYC documents, source of funds and details relating to investment activity or preferences. |
| Categories of data subjects | Any natural person whose Personal Data is processed by a controller or processor, including but not limited to, investors, Apex personnel, investor personnel and representatives, directors, professional advisers, affiliated entities |

**Part C - List of Sub-Processors – see Appendix 4 Order Document – Fund Administration**

| Name of the service provider | Location of Personal Data (and where applicable mechanism of transfer) | Processing activities |
|---|---|---|
| [•] | [] | [] |

**Note: additional sub-processors (if any) in respect of a particular Service will be set out in the Order Document for that Service.**

**Appendix 2**

**Minimum Insurance Requirements**

1. **Insurance Requirements.** At all times during the term of this Agreement and for the additional periods specified herein, Apex and any affiliate of Apex providing Supplied Services will maintain or be covered via an Apex Group policy (hereafter throughout this Exhibit, Apex and each such affiliate will be referred to as "Insured Consultant") to maintain, in full force and effect, insurance as specified herein, covering the Insured Consultant's operations and anyone directly or indirectly employed by any of them:

   a) As required under Applicable Law, workers compensation insurance covering all employees in compliance with all applicable statutory requirements.

   b) Commercial general liability insurance written on ISO standard form CG 00 01 on an "occurrence" basis, including coverage for bodily injury, property damage, products and completed operations, and personal & advertising injury with minimum limits of $2,000,000 per occurrence, $4,000,000 aggregate. The following coverages will not be limited, by endorsement or otherwise: contractual liability coverage, including the definition of "Insured Contract" and the contractual liability exception to the employers' liability exclusion.

   c) Professional Liability (Errors and Omissions) insurance shall be purchased in an amount not less than $5,000,000 each claim and annual aggregate. Such insurance shall include prior acts coverage sufficient to cover the Supplied Services under this Agreement and shall have a retroactive date that precedes the start of the Services.

   d) Cyber (Privacy/network) liability coverage providing protection against liability for (1) liability arising from the loss or disclosure of confidential information no matter how it occurs, (2) system breaches, (3) denial or loss of service, (4) introduction, implantation, or spread of malicious software code, (5) unauthorized access to or use of computer systems with limits of $5,000,000. No exclusions or restrictions for unencrypted portable devices or media should be on the policy.

   e) Crime/Fidelity insurance coverage covering Insured Consultant and all of Insured Consultant's employees who have access to or are responsible for the handling of funds, with minimum limits of insurance of not less than $5,000,000) and including coverage for employee theft, computer and funds transfer fraud, and theft, disappearance and destruction.

## Appendix 3

**Form of Agreement of Adherence**

THIS AGREEMENT OF ADHERENCE is made the ______ day of ______, 20___

BETWEEN:

(1) [Name of Client], having its registered office at [ ] (hereinafter referred to as the "**Client**"); and

(2) [Name of additional party], having its registered office at [ ] (hereinafter referred to as the "**Additional Party**"); and

(3) [Name of Service Provider] having its registered office at [ ] (hereinafter referred to as the "Service Provider").

WHEREAS:

(A) Service Provider provides services pursuant to an Order Document between [Apex Entity] and [Client Entity] effective [date] (Ref. No ) (the "Order Document").

(B) The Client has requested Service Provider to provide services to the Additional Party as though it was a party to the Order Document, from the date hereof.

Service Provider has accepted to provide services to the Additional Party as though it was a party to the Order Document, from the date hereof.

AGREED:

**1 Adherence**

1.1 The Additional Party confirms that it has been supplied with a copy of the Order Document and of all associated General Terms, supplements, variations and amendments thereto and hereby covenants with the Client and Service Provider to observe, perform and be bound by all the terms and conditions of the Order Document which are capable of applying to the Additional Party to the intent and effect that the Additional Party shall be deemed as and with effect from the date hereof to be a party to the Order Document.

1.2 Words and expressions defined in the Order Document shall have the same meaning in this Agreement.

**2 Counterparts**

This Agreement may be executed by facsimile or other electronic transmission in multiple counterparts, each of which will constitute an original but all of which together shall constitute one and the same agreement.

**3 Governing Law**

This Agreement is governed by and shall be construed in all respects in accordance with the laws applicable to the Order Document.

IN WITNESS whereof the parties hereto have caused this Agreement of Adherence to be executed on the day and year first before written.

**SIGNED** for and on behalf of

**[Client]**

________________________

Authorized Signatory

**SIGNED** for and on behalf of

**[Additional Party]**

________________________

Authorized Signatory

**SIGNED** for and on behalf of

**[Service Provider]**

________________________

Authorized Signatory

# Appendix 4

## Order Document - Fund Administration

The General Terms, as agreed between SandsPoint Capital Advisors LLC and Related Fund Management LLC effective January 29, 2024, are incorporated herein by reference. All capitalized terms not defined herein shall be as defined in the General Terms. The Parties to this Order Document are SandsPoint Capital Advisors LLC ("**Apex**" or the "**Administrator**") and Related Fund Management LLC on behalf of the following entities listed below, along with their annual fee schedule in U.S. dollars, receiving service (each, a "**Fund**").

The effective date of this Order Document shall be January 29, 2024, for the purposes of clause 11.1 of the General Terms.

**Subject Entities**[1]

| | Annual base fee | Annual investment fee (1) | Annual blocker fee (1) | Annual entity fee (1) | Sub close fee | Excess capital event fee |
|---|---|---|---|---|---|---|
| ***Related Real Estate Recovery Fund, L.P. and Affiliates*** | | | | | | |
| Related Real Estate Recovery Fund, L.P. | 192,500 | 22,000 | - | | | See table (1) |
| Related Real Estate Recovery Feeder Fund | - | - | 2,750 | | | - |
| ***Related Real Estate Fund II, L.P. and Affiliates*** | | | | | | |
| Related Real Estate Fund II, L.P. | 300,000 | 22,000 | - | 2,750 | | See table (1) |
| Related Real Estate Fund II (Feeder), L.P. | 82,500 | | 5,500 | - | | - |
| Related Real Estate Fund II (Feeder-2), L.P. | 66,000 | | | - | | |
| Related Real Estate Fund II Investor LLC | 2,980 | | | - | | |
| ***Related Real Estate Fund III, L.P and Affiliates*** | | | | | | |
| Related Real Estate Fund III, L.P and Affiliates | 165,000 | 16,500 | | - | | See table (1) |
| Related Real Estate Fund III (Jersey Feeder), L.P. | 99,000 | - | 5,500 | - | | - |
| Related Real Estate Fund III Investor LLC | 52,540 | - | - | - | | |
| Related Real Estate Access Fund III, L.P. | 66,000 | | - | - | | |
| ***RFM Cactus Holding Company, LLC and Subsidiaries*** | | | | | | |
| RFM Cactus Holding Company, LLC | 66,000 | - | - | - | | See table (1) |
| DD-MA, LLC | 148,500 | 8,250 | - | - | | - |
| FMC-MA LLC | 110,000 | 8,600 | - | - | | - |
| RECS-MA, LLC | 148,500 | 11,000 | - | - | | - |
| RDF-MA, LLC | 164,300 | 5,300 | - | - | | - |
| RFM Cactus Affordable, LLC | 71,500 | - | - | - | | - |
| RFM Javelin Participants | 21,730 | - | - | - | | - |
| RFM Cactus Javelin AM LLC | 3,300 | - | - | - | | - |
| RFM Cactus Affordable Sub LLC | 3,300 | - | - | - | | - |
| RFM Cactus Javelin LLC | 3,300 | - | - | - | | - |
| Javelin 2022, LLC | 3,300 | - | - | - | | - |
| Javelin 2022 REIT, LLC | 3,300 | - | - | - | | - |
| ***RFM-NEC MA, LLC*** | 110,000 | 8,250 | - | - | - | See table (1) |
| ***Universe R.E., LLC*** | 110,000 | 9,250 | - | - | | See table (1) |
| ***RFM Cactus NYSS LLC*** | 110,000 | 11,000 | - | - | - | See table (1) |
| ***RFM NYCRS Sandy LLC*** | 137,500 | 16,500 | - | - | - | See table (1) |
| ***Related Energy Focused Real Estate Fund, L.P. and Affiliates*** | | | | | | |
| Related Energy Focused Real Estate Fund, L.P. | 126,500 | 16,500 | - | - | - | See table (1) |
| Related Energy Focused Real Estate Fund (Feeder), L.P. | - | - | 5,500 | - | - | - |
| Related Energy Focused Investor, LLC | 1,520 | - | | - | - | - |
| RFM-TREI Presidential Apartments LLC | 33,000 | - | | - | - | - |

[1] A detailed list of each entity under administration is maintained in the Legal Entity Responsibility Listing ("LERL") which is updated as needed and approved by the Client following each update. The entities listed in this appendix correspond to the entities which are invoiced by Apex.

| | Annual base fee | Annual investment fee [1] | Annual blocker fee [1] | Annual entity fee [1] | Sub close fee | Excess capital event fee |
|---|---|---|---|---|---|---|
| ***CAM Master Holdco, LLC & Related Multi-Family Master HoldCo, LLC*** | 5,500 | - | - | - | - | - |
| ***Related UBC Opportunity Fund, LP*** | 187,000 | - | - | - | - | - |
| ***RFM Mobil Preferred Participants LLC*** | 17,540 | - | - | - | - | - |
| ***Related Real Estate Debt Fund, L.P. and Affiliates*** | | | | | | |
| RDS REIT, LLC | 247,500 | 24,200 | | - | 10,000 | See table (1) |
| RDS US Western Lender, LLC | 80 | - | - | - | | - |
| RDF Depot, LLC | 80 | - | | - | | - |
| Related Real Estate Debt Fund Investor LLC | 2,240 | - | | - | - | - |
| ***RFM VOGO Cherry Street LP*** | 71,500 | - | | | | - |
| ***Core RE Strategies I LLC and Affiliate*** | | | | | | |
| Core RE Strategies I LLC | 77,000 | 6,600 | 4,400 | - | - | See table (1) |
| Core RE Strategies I Investor | 1,040 | - | - | - | - | - |
| ***RFM-VF Multifamily Core+ 2 LLC and Affiliates*** | | | | | | |
| RFM-VF Multifamily Core+ 2 LLC | 79,200 | 6,600 | - | - | - | See table (1) |
| RFM KCH Participants LLC | 240 | - | - | - | - | - |
| RFM-VF Multifamily Core+ 2 Investor LLC | 1,040 | - | - | - | - | - |
| ***RHRE Debt IV Co-Investment Fund, L.P.*** | 118,800 | 5,300 | - | - | - | See table (1) |
| ***Related Real Estate Debt Fund IV, L.P. and Affiliates*** | | | | | | |
| RDS REIT IV, LLC | | | | | | See table (1) |
| Commitments up to $400M | 164,300 | 10,600 | - | - | 10,600 | - |
| Commitments of $401M to $600M | 174,900 | 12,190 | - | - | 10,600 | - |
| Commitments over $600M | 185,500 | 13,780 | - | - | 10,600 | - |
| RDS REIT IV, LLC plus parallel structure: | | | | | | See table (1) |
| Commitments up to $400M | 217,300 | 13,780 | | | 10,600 | |
| Commitments of $401M to $600M | 227,900 | 18,550 | | | 10,600 | |
| Commitments over $600M | 238,500 | 23,320 | | | 10,600 | |
| RDF IV Investor LLC | 1,360 | | | | | |
| ***Related Real Estate Fund IV, L.P. and Affiliates*** | | | | | | |
| Related Real Estate Fund IV, L.P. [2] | | 25,000 | | | 15,000 | See table (1) |
| Recurring annual fee | 165,000 | | | | | |
| Annual fee on commitments through the commitment period | 1.0 bps | | | | | |
| To be named Jersey feeder entity [3] | 95,000 | | | | | |
| To be named REIT structure entity - see note [3] | 60,000 | | | | | |
| To be named additional feeder structure if audited [3] | 65,000 | | | | | |
| To be named additional feeder structure if not audited [3] | 50,000 | | | | | |
| Stand-alone Jersey feeder audit | 10,000 | | | | | |

**Table (1): Excess capital event fees:**

For capital events in excess of six during any calendar year the following charges will apply per event.

| | Type of event | | |
|---|---|---|---|
| Legal entity | Capital call | Distribution | Net event |
| Related Real Estate Recovery Fund, L.P. and Affiliates | 1,500 | 2,500 | 3,500 |
| Related Real Estate Fund II, L.P. and Affiliates | 2,500 | 3,500 | 4,500 |
| Related Real Estate Fund III, L.P and Affiliates | 2,500 | 3,500 | 4,500 |
| RFM Cactus Holding Company, LLC and Subsidiaries | 1,500 | 2,500 | 3,500 |
| RFM-NEC MA, LLC | 1,500 | 2,500 | 3,500 |
| Universe R.E., LLC | 1,500 | 2,500 | 3,500 |
| RFM Cactus NYSS LLC | 1,500 | 2,500 | 3,500 |
| RFM NYCRS Sandy LLC | 1,500 | 2,500 | 3,500 |
| Related Energy Focused Real Estate Fund, L.P. and Affiliates | 1,500 | 2,500 | 3,500 |
| Related Real Estate Debt Fund, L.P. and Affiliates | 2,500 | 3,500 | 4,500 |
| Core RE Strategies I LLC and Affiliate | 1,500 | 2,500 | 3,500 |
| RFM-VF Multifamily Core+ 2 LLC and Affiliates | 1,500 | 2,500 | 3,500 |
| RHRE Debt IV Co-Investment Fund, L.P. | 1,500 | 2,500 | 3,500 |
| Related Real Estate Debt Fund IV, L.P. and Affiliates | 2,500 | 3,500 | 4,500 |
| Related Real Estate Fund IV, L.P. and Affiliates | 2,500 | 3,500 | 4,500 |

***Notes:***

[1] Fees for each quarter are determined quarterly in advanced based on the prior quarter's values and are also subject to a look-back calculation in the following quarter's invoice. An example of this calculation using assumptions is presented below:

<u>Theoretical investment fee calculation for Q1 2024:</u>

| | |
|---|---|
| Annual investment fee | 22,000 |
| Quarterly amount | 5,500 (a) |
| Number of investments at 12/31/23 | 5 (b) |
| Number of investments at 9/30/23 | 6 (c) |
| Current quarter's investment fee (a) x (b) | 27,500 (d) |
| Look-back fee for prior quarter [(b)-(c)] x (a) | (5,500) (e) |
| Net Q1 2024 investment fee (d) + (e) | 22,000 |

[2] The annual fee on commitments will be charged through the end of the commitment period as specified in the Fund's partnership agreement. At the end of the commitment period this fee will no longer apply.

[3] The names of these entities are not known at the date of this contract. This fee schedule will be updated once the names of the entities are known.

## Part A - Supplied Services

**Services Description:**

**Fund Administration**

1 **Books and Records**

1.1 Record cash journal entries daily for contracted legal entities by investment and by allocation to limited partner based on client-provided directives and support

1.2 Prepare Fund calculations including management fees, unfunded commitment, partner transfers, and net income reallocations resulting from subsequent closings for client review and approval

1.3 Record accrual journal entries for contracted legal entities by vendor and by allocation to limited partner as directed by client

1.4 Record fair valuation entries provided by client

1.5 Create support package for entries

1.6 Produce trial balance with detailed standard workpaper support package

1.7 Determine/propose accounting treatment for all fund activities (i.e., determine character of proceeds, treatment of expenses, etc.)

1.8 Maintain detailed cash sheets, which track the sources and uses of cash by deal and by transaction type, to prevent comingling of funds as needed

1.9 Track liquidity of fund, including projected investment fundings, expense needs, and maturing line of credit draws

1.10 Prepare management fee calculations and direct payment based on agreement

1.11 Propose settlement of inter-company balances with client's management company or affiliates

1.12 Prepare weekly management reports including analysis of cash balances, unfunded commitments, summary of credit facility balances, etc.

1.13 Maintain loan schedules for credit facilities, debt investments, bridge loans, intercompany loans, and any other debt instrument and initiate draws.

1.14 As required, collaborate with property-level or entity-level accountants to support reporting and reconciliation of accounts with entities below the Fund structure.

1.15 As required, collaborate with and provide portfolio valuation team with all historical cash flows and other data as requested for use in the quarterly valuation process

1.16 Store Fund, Investment, and Investor-level information in Investran CRM database to create reports using source data

2 **Financial Reporting:**

2.1 Financial Statements:

2.1.1 Prepare and update standard fund level financial statements and client-provided financial disclosures templates with relevant accounting information as requested

2.1.2 Update statements based on review comments from client and for audit adjustments provided by client or its auditors

2.1.3 Collaborate with client and auditors to create financial statement and supplementary notes to financial statements and update quantitative and qualitative elements on a quarterly basis

2.1.4 Prepare flux analysis of financial statement line items and highlight variance drivers

2.1.5 Compute and update financial disclosures required in supplementary notes
2.1.6 Review and reconcile all disclosures in portfolio summaries to financial statement data for each Investment
2.1.7 Update quarterly portfolio summaries as requested by client with financial statement data
2.1.8 Controller-level reviewer performs comprehensive review of all financial statements and notes prior to sending to client for review

2.2 Partner Capital Statements:
2.2.1 Produce system generated fund level capital account roll-forward schedule
2.2.2 Prepare standard partner capital account statement using system data
2.2.3 Collaborate with client to create standard partner capital statement template and customized partner statements as required by side letter agreements or as requested by client for specific partners

3 **Audit and Tax Support**

3.1 Audit Support:
3.1.1 Provide information readily available from Investran to auditors for testing as requested by client
3.1.2 Lead interim and annual audit test work; be first point of contact for auditors
3.1.3 Participate in coordination of interim and annual audit testing
3.1.4 Attend status and open item meetings
3.1.5 Escalate questions and issues to client

3.2 Tax Support:
3.2.1 Provide information readily available from Investran to tax preparers as requested by client
3.2.2 Make tax payments or withholding payments as directed by client
3.2.3 Coordinate payments with tax preparer and client
3.2.4 Track historical tax withholdings by partner
3.2.5 Address questions and requests from client tax preparer

4 **Investor Relations Support**

4.1 Provide client with financial statement supporting documentation readily available from Investran to assist client in responding to investor requests or audit confirmations
4.2 Prepare templates for recurring investor requests, prepare responses to ad hoc investor requests
4.3 Support and/or participate in communications to investors regarding financial information at direction of client
4.4 Track investor contact information at the request of the Fund and update as needed
4.5 Track investor requests received, completed, and status of outstanding requests
4.6 Prepare investment-level information requests as requested

5 **Capital Calls:**

5.1 Prepare pro-rata allocation of capital call amounts by partner based on aggregate call amounts provided by client
5.2 For subsequent closings, update pro-rata calculation based on client provided amounts by partner

5.3 Prepare individual capital call letters by partner based on client-approved calculation by partner and client-provided capital call letter template
5.4 Track capital call receipts and follow up with Investor Relations on outstanding calls
5.5 Prepare draft capital call letter template for client approval
5.6 Provide analysis of current and future liquidity needs and propose capital call amounts, classification, and timing with client
5.7 Confirm partner transfers of interest, assignments, or name changes with client
5.8 Compute capital calls for subsequent closings
5.9 Upon receipt of calls, pro-actively direct the use of proceeds (i.e. fund investment, pay-down line of credit, etc.)
5.10 Assist client in answering questions from investors throughout the capital call process as needed
5.11 Prepare supplementary customized call notices as required by side letter agreements or other agreement with client (e.g., ILPA-compliant notice supplements, or aggregated calculations)

**6 Distributions**

6.1 Prepare pro-rata allocation of distribution amounts by partner based on aggregate distribution amounts provided by client including characterization of distribution amounts (e.g., return of capital, income, gain, withholding taxes, etc.).
6.2 Update calculation with data inputs provided by client for incentive allocation, tax withholdings, and subsequent closings based on client calculations, if applicable.
6.3 Prepare individual distribution letters based on client-provided template
6.4 Prepare submission of wire transfers based on client-provided wire instructions
6.5 Review cash activity for returned wires and notify client of any returns
6.6 Prepare draft distribution letter template for client approval
6.7 Prepare current and future liquidity needs and amount to reserve from distribution with client
6.8 Confirm partner transfers of interest, assignments, or name changes with client
6.9 Determine characterization of proceeds (i.e. return of capital, income, gain) to be distributed using information from fund subsidiary accountants or as directed by client
6.10 Calculate distribution amounts by partner in respect of subsequent closings
6.11 Update fund waterfall model to compute allocation amounts by partner, if applicable.
6.12 Provide information to client tax preparer for determination if tax withholding is required

**7 Portfolio Management Services**

7.1 Support real estate quarterly valuation process:
- 7.1.1 Prepare and manage the quarterly valuation calendar
- 7.1.2 Calculate the Net Assets
- 7.1.3 High level review of cash flows, quarterly variances, and business plans updates in the deal models prepared by investment professional
- 7.1.4 Prepare investment valuation summaries with FMV, IRR, Profits, and IRR information
- 7.1.5 Create fund valuation books with investment memos
- 7.1.6 Facilitate internal reviews and committee meetings
- 7.1.7 Liaise between investment professionals and accounting team on investment valuations

7.2 Provide support on the fund liquidity analysis and capital management forecasts

7.3 Coordinate responses for valuation audit and liaise between investment professionals and audit firm for transaction and valuation support
7.4 Assist investor relations with ad-hoc investment requests and fundraising related due diligence questionnaires

**8 Treasury Services**

8.1 Prepare monthly bank reconciliations
8.2 Retrieve cash activity from on-line banking portals
8.3 Execute wires as specifically directed by client
8.4 Facilitate bank account openings and closings
8.5 Execute wires throughout all levels of a fund structure as requested
8.6 Facilitate draw down and repayment notices for credit facilities and complete any reporting requirements
8.7 Organize and process CSC invoices

## Part B - Fees

Fees shall be computed and payable in advance of the calendar quarter to which the fee relates and are due within thirty (30) days of invoicing. Payments received after the due date are subject to a late charge of 6% per annum charged monthly. Additional fees may be charged by Apex for its time spent on intermittent issues such as legal and regulatory matters. The fees shall include all properly vouched disbursements and out-of-pocket expenses reasonably incurred by Apex in the performance of its duties under this Agreement; provided, however, any such expense in excess of $500 in the aggregate shall require Client's prior written approval. Any increase to the fees shall be subject to the Client's prior written approval. All fees are subject to an increase equal to the annual increase in U.S. inflation on January 1st on the first anniversary of this Agreement and on each January 1st thereafter.

If for no fault of the Administrator, the Administrator is required to restate any NAV, the Administrator shall be entitled to charge the Fund applicable NAV calculation fees in respect of each restated NAV.

Subject to the Client's prior written approval, additional fees may be charged by the Administrator for its time spent on intermittent issues such as legal and regulatory matters.

If this Agreement becomes effective as of any time other than the beginning of a calendar quarter, a pro-rated administration fee for such quarter shall be due and payable.

The above fees are based on the Fund being administered through the following standard technology platform: Investran. Fees will be revised if there is a change in technology platform.

The Administrator will follow the Apex Group standard pricing policy in respect of all listed/exchange-traded securities and non-listed/over the counter securities. Any deviations that are agreed by the Administrator to the Apex Group standard pricing policy will incur additional fees.

Should any of the Fund's NAV's be subsequently adjusted on a quarterly basis, any adjustment to the administration fees chargeable shall be settled after such relevant period.

The billing process and payment of fees will start, in respect of where the provision of services has commenced, once this Agreement is effective. Any fee(s) incurred prior to the fund launch, shall be paid upon the delivery of the service by the Administrator. The Investment Manager/General Partner will be responsible for the settlement of fee(s).

## Part C – Product Terms

### 1. Appointment of Administrator

1.1 The Fund hereby appoints the Administrator to act as its administrator, and to provide the administration services set out in Part A of this Order Document subject to the terms and conditions set forth in this Agreement and subject to relevant laws, rules and regulations. The Administrator accepts such appointment and agrees to provide the administration services for the remuneration provided in this Agreement.

1.2 The Administrator will provide the function of administrator to each Fund in accordance with its Limited Liability Company or Partnership Agreement and relevant law with the professional skill and care that would reasonably be expected of a prudent and professional administrator.

1.3 In carrying out its duties and functions hereunder, the Administrator shall at all times be subject to the control of and review by the General Partner and shall comply with and conform to all the reasonable and proper orders, directions and requirements of the General Partner. The Administrator shall, to the extent the same shall be necessary or advisable, consult with the General Partner.

1.4 Except as expressly provided in this Agreement, or as the Administrator may be otherwise authorized, the Administrator has no authority to act for or represent the Fund.

1.5 Upon prior written notice to the Client, the Administrator may delegate all or any of its powers and duties relating to the administration services set out in this Agreement to any company in the Apex Group (the "Sub-Administrator"). Upon prior written notice to the Client, the Sub-Administrator may further delegate the powers and duties delegated to it by the Administrator to any company in the Apex Group. Any such delegation shall be governed by a delegation agreement between the Administrator and the Sub-Administrator. Any further delegation from the Sub-Administrator shall be approved by the Administrator and the Client in writing. The Administrator may delegate all or any of its powers and duties relating to the administration services set out in this Agreement to any third party. Unless otherwise agreed between the Fund, the Administrator and the Sub-Administrator, any fees and expenses payable to the Sub-Administrator or any other delegate shall be borne by the Administrator and any liability shall remain with the Administrator.

1.6 The Fund and Controlling Person acknowledge that they may be considered a U.S. withholding agent and/or may be required to file information or other tax returns under the U.S. Internal Revenue Code and related regulations ("IRC and Regulations"). The Fund agrees that it or its designated agents are, and will

Case 1:25-cv-08892-VEC Document 37-6 Filed 11/21/25 Page 17 of 48

continue to be, in compliance in all material respects with all withholding and reporting required by the IRC and Regulations. Therefore, unless otherwise specified in a written agreement, the Administrator and its affiliates will not be responsible for withholding or depositing taxes, nor will it/they be responsible for any related tax filings or information reporting, including but not limited to Forms 1099, 945, 1042S, 1042, 1065, 1065 K-1, 8804, 8805, 8966, 1120 or 1120F;

1.7 The Fund and Controlling Person acknowledge that the Administrator is not a public accounting or auditing firm, is not a fiduciary of a public accounting or auditing firm, and does not provide public accounting or auditing services or advice.

2. **Covenants**

The Fund and the Controlling Person covenant with the Administrator that for as long as this Order Document shall operate, they shall:

2.1 promptly procure that the Administrator be given such information as the Administrator may reasonably require in order to be able to perform its duties in a timely manner and shall not stop, countermand, restrain nor seek to restrain nor otherwise interfere with any arrangements, instructions, procedures or authority pursuant to which the Administrator has taken action under this Agreement provided that the Fund and the Controlling Person shall be entitled to substitute new instructions or any instructions in respect of which the Administrator has not taken action and to subsequently instruct the Administrator to revise or reverse any action taken pursuant to instructions given by the Fund and the Controlling Person;

2.2 prepare and provide material and information for preparation of, or inclusion in annual or other reports of each Fund;

2.3 provide the Administrator with the prices and valuations of investments which are not listed, quoted or dealt in on a recognized exchange or which are not available from the pricing and valuation services designated by the Fund and that prompt responses are received to any request by the Administrator for clarification or confirmation of prices and valuations so provided including, but not limited to, clarification as to the methodology utilized by the Fund for valuing unquoted assets and whether such methodology meets recognized standards in reaching such valuations. Notwithstanding the aforementioned, the Administrator shall be entitled to rely on such other prices, pricing services or pricing mechanisms as it deems appropriate and the Administrator shall not be liable for any loss suffered by the Fund or any other person or entity by reason of any error in such calculations by the Administrator resulting from any inaccuracy in such prices, pricing services or pricing mechanisms used by it. For the avoidance of doubt, the Fund acknowledges that the Administrator has not been retained to act as an independent valuation agent to the Fund or in relation to the Fund's investments;

2.4 ensure that the Controlling Person is responsible for the monitoring of the investment restrictions pursuant to the Governing Documents;

2.5 determine the source of and make available funds to be utilized in making distributions to the Fund investors;

2.6 determine Fund expenses and execute payment accordingly;

2.7 ensure that all expenses incurred by the investment manager on behalf of the Fund are necessary and solely relate to the Fund's operations;

2.8 promptly notify the Administrator of any concerns in connection with Fund investors introduced to the Administrator by the Fund or its delegate(s) in the context of relevant money laundering legislation/regulations in the event that any suspicious circumstances relating to any such Fund investors come to its attention;

2.9 promptly notify the Administrator of all investment transactions and activities affecting any of the Fund's investments and provide the Administrator with all supporting documentation and transaction details at the earliest opportunity;

2.10 promptly notify the Administrator of the Fund investors' commitments that need to be called to fund such Fund investment commitments and expenses;

2.11 notify the Administrator in writing as soon as reasonably practicable of any material changes occurring from time to time in the Fund's constitution, legal status or/ and of any changes occurring from time to time in the ownership (where such change exceeds 10%) of the Fund;

2.12 deliver to the Administrator for review prior to finalization thereof a draft of any Governing Document update or addendum, updated subscription agreement or redemption notice, letter from the Fund to its investors, voting materials to be sent to the Fund investors or proposed amendment to the Governing Documents (each a "**Fund Document**"). Any alteration to or amendment of any Fund Document will not be effective for the purposes of this Agreement against the Administrator if it affects the manner in which the Administrator performs its duties hereunder if the Administrator has given its prior written notice that such Fund Document is not acceptable to it. The Fund hereby undertakes that no such Fund Document will be finalized, issued, registered or distributed unless and until all necessary regulatory consents and permissions of whatever jurisdiction have been obtained; and

2.13 ensure that facsimile is not used as a form of communication or notification between the Fund and its counterparties, such counterparties to include Partners to the Fund.

3 **Information provided to the Administrator**

The Administrator may from time to time rely on information provided to it by or on behalf of the Fund or by any pricing sources or valuation agents selected by the Fund or Controlling Person or other parties in the course of discharging its duties under this Order Document including in respect of pricing. The Administrator shall not be liable to the Fund and the Controlling Person for any loss, liability, claim, cost or expense suffered by any person as a result of the Administrator (i) having relied absolutely or in part upon the authority, accuracy, truth and completeness of information provided to it including, without limitation, information supplied to the Administrator by or on behalf of the Fund or the Controlling Person in relation to trades in respect of the assets of the Fund and in

relation to the expenses of the Fund; or (ii) having relied absolutely or in part upon the authority, accuracy, truth and completeness of information furnished to the Administrator by or on behalf of the Fund or the Controlling Person or by any prices, pricing sources or pricing mechanisms selected by the Fund, or any other prices, pricing sources or pricing mechanisms used by the Administrator, in the course of the Administrator discharging its duties with respect to the calculation of the net asset value ("NAV") of the Fund.

4. **Approval of Net Asset Value**

Upon preparation and review of the relevant periodical NAV of the Fund, the Administrator shall send the relevant periodical NAV reports to the Fund and the Controlling Person in accordance with the time frames agreed between the Administrator and the Fund. The relevant periodical NAV reports shall be released to the Partners upon the acknowledgement of the Controlling Person's receipt and approval of the relevant periodical NAV reports. Where the Fund intends to have the relevant periodical NAV reports released to the Partners without the Fund's acknowledgment of receipt and approval, the Fund shall, in advance, advise the Administrator in writing of such intention.

5. **Governing Law**

Governing law for this Agreement shall be that of the state of New York regardless of conflicts of law principles, and all matters concerning this Agreement shall be brought in the courts located in the state of New York to whose jurisdiction the Parties submit.

## Part D - Additional Sub-processors

| Name of the service provider | Location of Personal Data (and where applicable mechanism of transfer) | Processing activities |
|---|---|---|
| Apex Fund Services LLP | India | Fund administration |
| Apex Fund Services (Canada) Ltd. | Canada | Fund administration |

## Part E - Authorised Persons and Specimen Signatures

In providing the Services, Apex is requested to liaise with the following "Authorised Persons," whose names and specimen signatures appear below.

______________________________

By:
Passport Nbr.:
Issued by:
Title: Authorised Person
Tel.:
Email:

______________________________

By:
Passport Nbr.:
Issued by:
Title: Authorised Person
Tel.:
Email:

**This Order Document has been entered into on the effective date referenced at the beginning of this Order Document.**

| | |
|---|---|
| Signed by Frederick Shaw for and on behalf of<br>**SandsPoint Capital Advisors LLC** | January 29, 2024<br>Managing Director |
| Signed by James Kraus for and on behalf of<br>**Related Fund Management LLC** | January 29, 2024<br>Chief Financial Officer |

# EXHIBIT H

**From:** Jonathan Schmitz
**To:** Jonathan Schmitz
**Subject:** FW: FMC / 35 HY Projected CF"s - 4Q24
**Date:** Tuesday, January 14, 2025 11:15:20 AM
**Attachments:** image003.png
image004.png
image005.jpg
image001.png

---

**CAUTION:** This email originated from outside of the organisation. Do not click links or open attachments unless you recognise the sender and know the content is safe.

Jonathan Schmitz
Regional Head of Operations RA –
North America & Local Managing Director (LMD), Charlotte

t: +1 704-927-5403
Jonathan.Schmitz@apexgroup.com
Apex Group, 15720 Brixham Hill Avenue, Suite 206, Charlotte, North Carolina, 28277, USA
Americas | APAC | Europe | MEA

---

**From:** Wilson, Kimarley <KiWilson@related.com>
**Sent:** Tuesday, January 14, 2025 9:29 AM
**To:** DL_Portfolio Management <dl_portfoliomanagement@apexgrpfs.com>
**Subject:** RE: FMC / 35 HY Projected CF's - 4Q24

Hi Team – Can you please share the 35 HY deal model when you get the chance, thanks.

**Kimarley Wilson, CPA**
Controller
Related Fund Management
212.419.8582 Office
347.802.5607 Mobile
kiwilson@related.com

30 Hudson Yards
New York, NY 10001

---

**From:** Clark Chaney <Clark.Chaney@iqeq.com>
**Sent:** Monday, January 13, 2025 6:13 PM
**To:** RFM Finance <rfm.finance@related.com>
**Cc:** Preston Callen <Preston.Callen@iqeq.com>; Karri Neal <Karri.Neal@iqeq.com>; Ryan Hope <Ryan.Hope@iqeq.com>
**Subject:** FMC / 35 HY Projected CF's - 4Q24

Kimarley,

Hope all is well! Would you please send over the 4Q24 FMC CF Projections from Collin? Also, would you please provide an updated 35 HY deal model from Tom Deighton? Thanks.

Clark Chaney
Managing Director

E clark.chaney@iqeq.com
T +1 646 893 5918

2777 North Stemmons Freeway, Suite 1425
Dallas, TX 75207, United States

**www.iqeq.com [iqeq.com]**

[iqeq.foleon.com]

The contents of this email and any file(s) attached are strictly confidential and are intended solely for the addressee. It may contain information and/or attachments that are privileged, confidential, proprietary and protected from disclosure, which cannot be reproduced, transmitted, disclosed, or used in whole or in part, without the written consent of any of the entities of IQ-EQ group. If you are not the intended recipient, please notify the sender immediately and delete this email. All statements of opinion or advice presented in this email are solely those of the author and do not necessarily represent those of or are endorsed by the entity in the signature block. IQ-EQ group is neither liable for the proper and complete transmission of the information contained in this communication nor for any delay in its receipt.

This communication or any attachment thereto is not intended, and should not be construed, as investment advice and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. This communication or any attachment thereto is not intended, and should not be construed, as legal, tax, public accounting or auditing advice or opinions. You should consult your legal counsel, accountants and/or tax advisors prior to making any decisions or taking any action concerning the matters in this communication. Attachments hereto may have additional important disclosures and disclaimers, which you should read. When addressed to clients, any information contained in this e-mail shall be subject to the terms and conditions in the

applicable client contract. The sender of this email may not be acting on its own account and may be acting as agent of another party. If this email relates to matters pertaining to another party, the sender is sending this email in its appointed capacity for that third party.

IRS CIRCULAR 230 NOTICE: In order to comply with the requirements mandated by the IRS, we are required to advise you that any Federal tax advice contained in this e-mail message, including attachments to this message, is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing, or recommending to another party any transaction or tax-related matter addressed in this e-mail message or attachments.

The information contained in this message and any attachment(s) may be privileged, confidential, proprietary or otherwise protected from disclosure and is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this message and any attachment is strictly prohibited and may be unlawful. If you have received this message in error, please notify us immediately by replying to this email and permanently delete the message from your computer. Nothing contained in this message and/or any attachment(s) constitutes a solicitation or an offer to buy or sell any securities.

**[EXTERNAL] This message originated from outside your organization.**

# EXHIBIT I

fisherphillips.com

**Philadelphia**
Two Logan Square
12th Floor
100 N. 18th Street
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6117

**Writer's E-mail:**
soberlander@fisherphillips.com

January 17, 2025

***Via Email and Overnight Delivery***

Lucas Belinkie
3807 Holland Avenue
Dallas, TX 75219
lucas.belinkie@gmail.com

***Re: Cease and Desist - Contractual and Statutory Obligations Owed to Apex***

Dear Mr. Belinkie:

This Firm represents Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex" or the "Company") with respect to your resignation therefrom, and your violations of your contractual and legal post-employment obligations thereto. This correspondence carries serious and time-sensitive legal implications. Failure to comply will require Apex to pursue legal action against you.

*Your Contractual and Statutory Obligations to Apex*

On August 23, 2013, as a condition of your employment with the Company's predecessor, SandsPoint, you executed a letter agreement (your "Agreement"). A copy of your Agreement is enclosed herewith for reference. Through your Agreement, you agreed to a series of post-employment restrictions designed to protect Apex's legitimate business interests, including, among other things:

**Non-Disclosure and Return of Apex's Confidential Information**

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or

Case 1:25-cv-08892-VEC-GS Document 17-4 Filed 10/28/25 Page 127 of 145



> (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Agreement at § 4(a), 4(e).

**Non-Competition**

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*Id.* at § 4(b).

**Non-Solicitation**

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or

contractor of the Company or any of its affiliates.

*Id.* at § 4(c).

You reiterated the reasonableness of these restrictions and the adequacy of the consideration you received pursuant to the Agreement in Section 4(f).

Please also be aware that, in addition to your contractual obligations, you also have a statutory duty to protect the confidentiality of, and to refrain from exploiting for your own benefit, all trade secret information belonging to Apex. Multiple state and federal laws provide for injunctive relief to protect against the misuse of trade secrets, as well as compensatory and punitive damages and other relief in the event of misuse, improper disclosure or other misappropriation of trade secret information.

<u>*Your Breaches of Your Legal Obligations*</u>

Despite the foregoing, Apex is aware that you have violated your restrictive covenants by joining a direct competitor of Apex, IQ-EQ, along with four additional colleagues who recently resigned from Apex. To date, you have already objectively breached the Agreement's non-compete provision, and presumably breached its non-solicitation provision. To make matters far worse, Apex is aware that, on behalf of IQ-EQ, you are apparently working with a significant Apex client with whom you previously worked on behalf of Apex, Related Companies. Your conduct represents a clear breach of Section 4(b) of the Agreement and has already gravely harmed Apex's legitimate business interests that the Agreement was designed to protect. Apex also understands that additional employees are being, or have been, recruited by IQ-EQ, which may constitute a violation of Section 4(c) of the Agreement.

Your blatant disregard for your non-competition and non-solicitation obligations naturally raises concerns that you have also violated your confidentiality obligations to Apex. Indeed, you had access to a trove of Apex trade secrets relating to Related Companies and other clients you presumably intend to solicit and work with at IQ-EQ. While Apex's investigation is ongoing, to the extent you have misappropriated and used Apex's trade secrets and intend to continue to use them going forward, this conduct is unlawful and must stop immediately.

<u>*Demand for Compliance*</u>

Please understand that Apex takes these contractual and other legal duties seriously and expects its former employees to abide by all legal obligations. Accordingly, Apex demands full compliance with your Agreement and other legal duties, including that you:

(a) **<u>immediately cease your employment or other affiliation with IQ-EQ</u>**, and refrain for one year from engaging in any business that will place you in violation of your covenant not to compete;

(b) refrain for one year from engaging in any prohibited solicitation of Apex employees, consultants, and contractors;

(c) refrain from disclosing or making any improper use of Apex's trade secrets or confidential information;

(d) immediately arrange for return to the undersigned as counsel for Apex any non-public documents or information about Apex's business, including but not limited to Apex's financial, organizational and operational information; investment research reports and such other reports and/or information as are relevant to the Apex's business; the identities of clients, customers, prospective clients or prospective customers; and any other information that could be reasonably be expected to aid a competitor or potential competitor of Apex; and

(e) execute the acknowledgment at the end of this correspondence and return it to the undersigned.

*Demand for Preservation of Evidence*

Given the imminence of litigation, Apex demands that you take immediate action to preserve all documents and information, including electronically-stored information, that may contain evidence relevant to the above-stated concerns. This includes, but is not limited to, emails, text messages, and other electronic communications, electronically stored documents, recordings, spreadsheets, calendars, and telephone records relating to, among other things, (1) your communications with Apex customers or prospective customers; (2) your recruitment by, and employment with, IQ-EQ, including but not limited to communications with IQ-EQ about your hiring, Apex customers or prospective customers, or joining IQ-EQ with other Apex employees; and (3) your communications with Preston Callen, Karri Neal, Ryan Hope, and/or William Chaney regarding your resignation from Apex, joining IQ-EQ, and soliciting and/or servicing Apex customers or prospective customers. You may not delete, alter or otherwise make unavailable any such information without first taking forensically sound measures to preserve electronically-stored information prior to deletion. Failure to do so may expose you to liability for destruction and spoliation of potentially relevant evidence in this matter.

Please respond to us by the close of business on **January 22, 2025**, confirming that you will comply as set forth above. Without taking the actions identified above, Apex will not hesitate to seek relief in court to obtain your compliance with your post-employment obligations to Apex. This would include seeking a temporary restraining order and ultimately a preliminary injunction, in addition to seeking compensatory damages for the harm you have already caused, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

Again, this matter involves important legal rights and obligations. Thus, **a failure to return your signature and acknowledgement of this correspondence by January 22, 2025 may compel Apex to take further action against you.**

For the avoidance of any doubt, Apex is also reaching out to IQ-EQ to ensure that it does not continue to interfere with your legal obligations to Apex. If you have any questions, please feel free to contact the undersigned. Until this matter is resolved, Apex reserves all rights.

Sincerely,

Scott C. Oberlander
For FISHER & PHILLIPS LLP

Enclosure

cc: Michael P. Avila, Esq. (Fisher & Phillips LLP)

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS LETTER AND MY AGREEMENT AND UNDERSTAND MY OBLIGATIONS UNDER THE AGREEMENT.

**LUCAS BELINKIE**

Signature

Date

fisherphillips.com

**Philadelphia**
Two Logan Square
12th Floor
100 N. 18th Street
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6117

**Writer's E-mail:**
soberlander@fisherphillips.com

January 17, 2025

***Via Email and Overnight Delivery***

Preston Callen
521 Blackfield Drive
Coppell, TX 75019
preston_callen@me.com

***Re:*** ***Cease and Desist - Contractual and Statutory Obligations Owed to Apex***

Dear Mr. Callen:

This Firm represents Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex" or the "Company") with respect to your resignation therefrom, and your violations of your contractual and legal post-employment obligations thereto. This correspondence carries serious and time-sensitive legal implications. Failure to comply will require Apex to pursue legal action against you.

*Your Contractual and Statutory Obligations to Apex*

On April 19, 2021, as a condition of your employment with the Company's predecessor, SandsPoint, you executed a letter agreement (your "Agreement"). A copy of your Agreement is enclosed herewith for reference. Through your Agreement, you agreed to a series of post-employment restrictions designed to protect Apex's legitimate business interests, including, among other things:

**Non-Disclosure and Return of Apex's Confidential Information**

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or

Case 1:25-cv-08892-VEC Document 31 Filed 10/21/25 Page 129 of 145



> (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Agreement at § 4(a), 4(e).

**<u>Non-Competition</u>**

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*Id.* at § 4(b).

**<u>Non-Solicitation</u>**

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or

Case 1:25-cv-08892-VEC-GS Document 17-4 Filed 07/28/25 Page 13 of 28



contractor of the Company or any of its affiliates.

*Id.* at § 4(c).

You reiterated the reasonableness of these restrictions and the adequacy of the consideration you received pursuant to the Agreement in Section 4(f).

Please also be aware that, in addition to your contractual obligations, you also have a statutory duty to protect the confidentiality of, and to refrain from exploiting for your own benefit, all trade secret information belonging to Apex. Multiple state and federal laws provide for injunctive relief to protect against the misuse of trade secrets, as well as compensatory and punitive damages and other relief in the event of misuse, improper disclosure or other misappropriation of trade secret information.

*<u>Your Breaches of Your Legal Obligations</u>*

Despite the foregoing, Apex is aware that you have violated your restrictive covenants by joining a direct competitor of Apex, IQ-EQ, along with four additional colleagues who recently resigned from Apex. To date, you have already objectively breached the Agreement's non-compete provision, and presumably breached its non-solicitation provision. To make matters far worse, Apex is aware that, on behalf of IQ-EQ, you are apparently working with a significant Apex client with whom you previously worked on behalf of Apex, Related Companies. Your conduct represents a clear breach of Section 4(b) of the Agreement and has already gravely harmed Apex's legitimate business interests that the Agreement was designed to protect. Apex also understands that additional employees are being, or have been, recruited by IQ-EQ, which may constitute a violation of Section 4(c) of the Agreement.

Your blatant disregard for your non-competition and non-solicitation obligations naturally raises concerns that you have also violated your confidentiality obligations to Apex. Indeed, you had access to a trove of Apex trade secrets relating to Related Companies and other clients you presumably intend to solicit and work with at IQ-EQ. While Apex's investigation is ongoing, to the extent you have misappropriated and used Apex's trade secrets and intend to continue to use them going forward, this conduct is unlawful and must stop immediately.

*<u>Demand for Compliance</u>*

Please understand that Apex takes these contractual and other legal duties seriously and expects its former employees to abide by all legal obligations. Accordingly, Apex demands full compliance with your Agreement and other legal duties, including that you:

(a) **<u>immediately cease your employment or other affiliation with IQ-EQ</u>**, and refrain for one year from engaging in any business that will place you in violation of your covenant not to compete;

Case 1:25-cv-05089-VEC Document 3 Filed 07/08/25 Page 134 of 2



(b) refrain for one year from engaging in any prohibited solicitation of Apex employees, consultants, and contractors;

(c) refrain from disclosing or making any improper use of Apex's trade secrets or confidential information;

(d) immediately arrange for return to the undersigned as counsel for Apex any non-public documents or information about Apex's business, including but not limited to Apex's financial, organizational and operational information; investment research reports and such other reports and/or information as are relevant to the Apex's business; the identities of clients, customers, prospective clients or prospective customers; and any other information that could be reasonably be expected to aid a competitor or potential competitor of Apex; and

(e) execute the acknowledgment at the end of this correspondence and return it to the undersigned.

*Demand for Preservation of Evidence*

Given the imminence of litigation, Apex demands that you take immediate action to preserve all documents and information, including electronically-stored information, that may contain evidence relevant to the above-stated concerns. This includes, but is not limited to, emails, text messages, and other electronic communications, electronically stored documents, recordings, spreadsheets, calendars, and telephone records relating to, among other things, (1) your communications with Apex customers or prospective customers; (2) your recruitment by, and employment with, IQ-EQ, including but not limited to communications with IQ-EQ about your hiring, Apex customers or prospective customers, or joining IQ-EQ with other Apex employees; and (3) your communications with Lucas Belinkie, Ryan Hope, William Chaney, and/or Karri Neal regarding your resignation from Apex, joining IQ-EQ, and soliciting and/or servicing Apex customers or prospective customers. You may not delete, alter or otherwise make unavailable any such information without first taking forensically sound measures to preserve electronically-stored information prior to deletion. Failure to do so may expose you to liability for destruction and spoliation of potentially relevant evidence in this matter.

Please respond to us by the close of business on **January 22, 2025**, confirming that you will comply as set forth above. Without taking the actions identified above, Apex will not hesitate to seek relief in court to obtain your compliance with your post-employment obligations to Apex. This would include seeking a temporary restraining order and ultimately a preliminary injunction, in addition to seeking compensatory damages for the harm you have already caused, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

Again, this matter involves important legal rights and obligations. Thus, **a failure to return your signature and acknowledgement of this correspondence by January 22, 2025 may compel Apex to take further action against you.**

For the avoidance of any doubt, Apex is also reaching out to IQ-EQ to ensure that it does not continue to interfere with your legal obligations to Apex. If you have any questions, please feel free to contact the undersigned. Until this matter is resolved, Apex reserves all rights.

Sincerely,

Scott C. Oberlander
For FISHER & PHILLIPS LLP

Enclosure

cc: Michael P. Avila, Esq. (Fisher & Phillips LLP)

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS LETTER AND MY AGREEMENT AND UNDERSTAND MY OBLIGATIONS UNDER THE AGREEMENT.

**PRESTON CALLEN**

______________________________ ______________________
Signature Date

fisherphillips.com

**Philadelphia**
Two Logan Square
12th Floor
100 N. 18th Street
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6117

**Writer's E-mail:**
soberlander@fisherphillips.com

January 17, 2025

***Via Email and Overnight Delivery***

Ryan Hope
6216 Flagstone Drive
McKinney, TX 75070
Rbhope0117@gmail.com

***Re: Cease and Desist - Contractual and Statutory Obligations Owed to Apex***

Dear Mr. Hope:

This Firm represents Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex" or the "Company") with respect to your resignation therefrom, and your violations of your contractual and legal post-employment obligations thereto. This correspondence carries serious and time-sensitive legal implications. Failure to comply will require Apex to pursue legal action against you.

*Your Contractual and Statutory Obligations to Apex*

On February 15, 2019, as a condition of your employment with the Company's predecessor, SandsPoint, you executed a letter agreement (your "Agreement"). A copy of your Agreement is enclosed herewith for reference. Through your Agreement, you agreed to a series of post-employment restrictions designed to protect Apex's legitimate business interests, including, among other things:

**Non-Disclosure and Return of Apex's Confidential Information**

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or

(v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company

. . . .

In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Agreement at § 4(a), 4(e).

**Non-Competition**

During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*Id.* at § 4(b).

**Non-Solicitation**

During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or

contractor of the Company or any of its affiliates.

*Id.* at § 4(c).

You reiterated the reasonableness of these restrictions and the adequacy of the consideration you received pursuant to the Agreement in Section 4(f).

Please also be aware that, in addition to your contractual obligations, you also have a statutory duty to protect the confidentiality of, and to refrain from exploiting for your own benefit, all trade secret information belonging to Apex. Multiple state and federal laws provide for injunctive relief to protect against the misuse of trade secrets, as well as compensatory and punitive damages and other relief in the event of misuse, improper disclosure or other misappropriation of trade secret information.

*Your Breaches of Your Legal Obligations*

Despite the foregoing, Apex is aware that you have violated your restrictive covenants by joining a direct competitor of Apex, IQ-EQ, along with four additional colleagues who recently resigned from Apex. To date, you have already objectively breached the Agreement's non-compete provision, and presumably breached its non-solicitation provision. To make matters far worse, Apex is aware that, on behalf of IQ-EQ, you are apparently working with a significant Apex client with whom you previously worked on behalf of Apex, Related Companies. Your conduct represents a clear breach of Section 4(b) of the Agreement and has already gravely harmed Apex's legitimate business interests that the Agreement was designed to protect. Apex also understands that additional employees are being, or have been, recruited by IQ-EQ, which may constitute a violation of Section 4(c) of the Agreement.

Your blatant disregard for your non-competition and non-solicitation obligations naturally raises concerns that you have also violated your confidentiality obligations to Apex. Indeed, you had access to a trove of Apex trade secrets relating to Related Companies and other clients you presumably intend to solicit and work with at IQ-EQ. While Apex's investigation is ongoing, to the extent you have misappropriated and used Apex's trade secrets and intend to continue to use them going forward, this conduct is unlawful and must stop immediately.

*Demand for Compliance*

Please understand that Apex takes these contractual and other legal duties seriously and expects its former employees to abide by all legal obligations. Accordingly, Apex demands full compliance with your Agreement and other legal duties, including that you:

(a) **immediately cease your employment or other affiliation with IQ-EQ**, and refrain for one year from engaging in any business that will place you in violation of your covenant not to compete;

(b) refrain for one year from engaging in any prohibited solicitation of Apex employees, consultants, and contractors;

(c) refrain from disclosing or making any improper use of Apex's trade secrets or confidential information;

(d) immediately arrange for return to the undersigned as counsel for Apex any non-public documents or information about Apex's business, including but not limited to Apex's financial, organizational and operational information; investment research reports and such other reports and/or information as are relevant to the Apex's business; the identities of clients, customers, prospective clients or prospective customers; and any other information that could be reasonably be expected to aid a competitor or potential competitor of Apex; and

(e) execute the acknowledgment at the end of this correspondence and return it to the undersigned.

*Demand for Preservation of Evidence*

Given the imminence of litigation, Apex demands that you take immediate action to preserve all documents and information, including electronically-stored information, that may contain evidence relevant to the above-stated concerns. This includes, but is not limited to, emails, text messages, and other electronic communications, electronically stored documents, recordings, spreadsheets, calendars, and telephone records relating to, among other things, (1) your communications with Apex customers or prospective customers; (2) your recruitment by, and employment with, IQ-EQ, including but not limited to communications with IQ-EQ about your hiring, Apex customers or prospective customers, or joining IQ-EQ with other Apex employees; and (3) your communications with Preston Callen, Lucas Belinkie, Karri Neal, and/or William Chaney regarding your resignation from Apex, joining IQ-EQ, and soliciting and/or servicing Apex customers or prospective customers. You may not delete, alter or otherwise make unavailable any such information without first taking forensically sound measures to preserve electronically-stored information prior to deletion. Failure to do so may expose you to liability for destruction and spoliation of potentially relevant evidence in this matter.

Please respond to us by the close of business on **January 22, 2025**, confirming that you will comply as set forth above. Without taking the actions identified above, Apex will not hesitate to seek relief in court to obtain your compliance with your post-employment obligations to Apex. This would include seeking a temporary restraining order and ultimately a preliminary injunction, in addition to seeking compensatory damages for the harm you have already caused, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

Again, this matter involves important legal rights and obligations. Thus, **a failure to return your signature and acknowledgement of this correspondence by January 22, 2025 may compel Apex to take further action against you.**

For the avoidance of any doubt, Apex is also reaching out to IQ-EQ to ensure that it does not continue to interfere with your legal obligations to Apex. If you have any questions, please feel free to contact the undersigned. Until this matter is resolved, Apex reserves all rights.

Sincerely,



Scott C. Oberlander
For FISHER & PHILLIPS LLP

Enclosure

cc: Michael P. Avila, Esq. (Fisher & Phillips LLP)

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS LETTER AND MY AGREEMENT AND UNDERSTAND MY OBLIGATIONS UNDER THE AGREEMENT.

**RYAN HOPE**

______________________________ ________________________
Signature Date

Case 1:25-cv-08892-VEC Document 37 Filed 07/28/25 Page 141 of 228

Fisher Phillips

fisherphillips.com

**Philadelphia**
Two Logan Square
12th Floor
100 N. 18th Street
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6117

**Writer's E-mail:**
soberlander@fisherphillips.com

January 17, 2025

***Via Email and Overnight Delivery***

William C. Chaney
2717 Howell Street #2103
Dallas, TX 75204
clarkc08@yahoo.com

***Re:*** ***Cease and Desist - Contractual and Statutory Obligations Owed to Apex***

Dear Mr. Chaney:

This Firm represents Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex" or the "Company") with respect to your resignation therefrom, and your violations of your contractual and legal post-employment obligations thereto. This correspondence carries serious and time-sensitive legal implications. Failure to comply will require Apex to pursue legal action against you.

*Your Contractual and Statutory Obligations to Apex*

On October 18, 2015, as a condition of your employment with the Company's predecessor, SandsPoint, you executed a letter agreement (your "Agreement"). A copy of your Agreement is enclosed herewith for reference. Through your Agreement, you agreed to a series of post-employment restrictions designed to protect Apex's legitimate business interests, including, among other things:

**Non-Disclosure and Return of Apex's Confidential Information**

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or

> (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Agreement at § 4(a), 4(e).

**<u>Non-Competition</u>**

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*Id.* at § 4(b).

**<u>Non-Solicitation</u>**

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or

contractor of the Company or any of its affiliates.

*Id.* at § 4(c).

You reiterated the reasonableness of these restrictions and the adequacy of the consideration you received pursuant to the Agreement in Section 4(f).

Please also be aware that, in addition to your contractual obligations, you also have a statutory duty to protect the confidentiality of, and to refrain from exploiting for your own benefit, all trade secret information belonging to Apex. Multiple state and federal laws provide for injunctive relief to protect against the misuse of trade secrets, as well as compensatory and punitive damages and other relief in the event of misuse, improper disclosure or other misappropriation of trade secret information.

*<u>Your Breaches of Your Legal Obligations</u>*

Despite the foregoing, Apex is aware that you have violated your restrictive covenants by joining a direct competitor of Apex, IQ-EQ, along with four additional colleagues who recently resigned from Apex. To date, you have already objectively breached the Agreement's non-compete provision, and presumably breached its non-solicitation provision. To make matters far worse, Apex is aware that, on behalf of IQ-EQ, you are apparently working with a significant Apex client with whom you previously worked on behalf of Apex, Related Companies. Your conduct represents a clear breach of Section 4(b) of the Agreement and has already gravely harmed Apex's legitimate business interests that the Agreement was designed to protect. Apex also understands that additional employees are being, or have been, recruited by IQ-EQ, which may constitute a violation of Section 4(c) of the Agreement.

Your blatant disregard for your non-competition and non-solicitation obligations naturally raises concerns that you have also violated your confidentiality obligations to Apex. Indeed, you had access to a trove of Apex trade secrets relating to Related Companies and other clients you presumably intend to solicit and work with at IQ-EQ. While Apex's investigation is ongoing, to the extent you have misappropriated and used Apex's trade secrets and intend to continue to use them going forward, this conduct is unlawful and must stop immediately.

*<u>Demand for Compliance</u>*

Please understand that Apex takes these contractual and other legal duties seriously and expects its former employees to abide by all legal obligations. Accordingly, Apex demands full compliance with your Agreement and other legal duties, including that you:

(a) **<u>immediately cease your employment or other affiliation with IQ-EQ</u>**, and refrain for one year from engaging in any business that will place you in violation of your covenant not to compete;

Case 1:25-cv-08892-VEC Document 3-7 Filed 10/28/25 Page 14 of 23



(b) refrain for one year from engaging in any prohibited solicitation of Apex employees, consultants, and contractors;

(c) refrain from disclosing or making any improper use of Apex's trade secrets or confidential information;

(d) immediately arrange for return to the undersigned as counsel for Apex any non-public documents or information about Apex's business, including but not limited to Apex's financial, organizational and operational information; investment research reports and such other reports and/or information as are relevant to the Apex's business; the identities of clients, customers, prospective clients or prospective customers; and any other information that could be reasonably be expected to aid a competitor or potential competitor of Apex; and

(e) execute the acknowledgment at the end of this correspondence and return it to the undersigned.

*Demand for Preservation of Evidence*

Given the imminence of litigation, Apex demands that you take immediate action to preserve all documents and information, including electronically-stored information, that may contain evidence relevant to the above-stated concerns. This includes, but is not limited to, emails, text messages, and other electronic communications, electronically stored documents, recordings, spreadsheets, calendars, and telephone records relating to, among other things, (1) your communications with Apex customers or prospective customers; (2) your recruitment by, and employment with, IQ-EQ, including but not limited to communications with IQ-EQ about your hiring, Apex customers or prospective customers, or joining IQ-EQ with other Apex employees; and (3) your communications with Preston Callen, Lucas Belinkie, Ryan Hope, and/or Karri Neal regarding your resignation from Apex, joining IQ-EQ, and soliciting and/or servicing Apex customers or prospective customers. You may not delete, alter or otherwise make unavailable any such information without first taking forensically sound measures to preserve electronically-stored information prior to deletion. Failure to do so may expose you to liability for destruction and spoliation of potentially relevant evidence in this matter.

Please respond to us by the close of business on **January 22, 2025**, confirming that you will comply as set forth above. Without taking the actions identified above, Apex will not hesitate to seek relief in court to obtain your compliance with your post-employment obligations to Apex. This would include seeking a temporary restraining order and ultimately a preliminary injunction, in addition to seeking compensatory damages for the harm you have already caused, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

Again, this matter involves important legal rights and obligations. Thus, **a failure to return your signature and acknowledgement of this correspondence by January 22, 2025 may compel Apex to take further action against you.**

Case 1:25-cv-08892-VEC Document 37 Filed 07/28/25 Page 145 of 228



For the avoidance of any doubt, Apex is also reaching out to IQ-EQ to ensure that it does not continue to interfere with your legal obligations to Apex. If you have any questions, please feel free to contact the undersigned. Until this matter is resolved, Apex reserves all rights.

Sincerely,

Scott C. Oberlander
For FISHER & PHILLIPS LLP

Enclosure

cc: Michael P. Avila, Esq. (Fisher & Phillips LLP)

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS LETTER AND MY AGREEMENT AND UNDERSTAND MY OBLIGATIONS UNDER THE AGREEMENT.

**WILLIAM C. CHANEY**

______________________________ ______________________

Signature Date

# EXHIBIT J

Case 1:25-cv-08892-VEC-GS Document 176-4 Filed 07/28/25 Page 144 of 145

SADIS

Jennifer Rossan, Esq.
Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Phone: 212.947.3793
jrossan@sadis.com

January 24, 2025 **CONFIDENTIAL**

**BY EMAIL**
Scott C. Oberlander
Fisher Phillips
Two Logan Square, 12th Floor
Philadelphia, PA 19103
soberlander@fisherphillips.com

Re: Response to Apex Cease and Desist Letters

Dear Mr. Oberlander:

I write separately on behalf of Lucas Belinkie, Ryan Hope, William Chaney, Preston Callen, and Karri Neal (the "Resignees"), as employees of IQEQ US Management Co, LLC ("IQEQ"), in response to your cease and desist letters dated January 17, 2025, regarding their resignations of from Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex"), and their related Apex employment agreements.

*First*, the Resignees hereby confirm that they fully intend to abide by their restrictions on using or retaining any Apex Confidential Information. The Resignees do not seek to use any Apex Confidential Information in their new employment, and have not sought to use any such information since resigning from Apex. In response to Apex's letters, the Resignees conducted a further review of their possessions to confirm that they will not use or retain any Apex Confidential Information. The Resignees will continue to investigate whether they could have any Apex Confidential Information in any form, in any of their possessions, and in the unlikely event that they discover any such information, they will return such information to Apex immediately. If Apex has any particular information or suspicion about any Resignee retaining or using Apex Confidential Information, please let me know and it will be addressed promptly.

*Second*, the Resignees further confirm that they fully intend not to engage in any solicitation of Apex employees to leave Apex and join IQEQ. The Resignees made independent decisions to leave Apex and sought new employment to advance their careers at IQEQ. They have found new employment, and intend to leave it at that.

*Third*, the Resignees respectfully decline Apex's demand that they cease employment with IQEQ. This demand puts an improper, and anti-competitive, burden on the employees' rights to seek better employment and terms of employment from a new employer. Further, this demand seeks to prevent the Resignees from working virtually anywhere in the world after leaving Apex. The Resignees here have only sought better employment, which they should be allowed to keep.

The non-compete provisions Apex cites are from employment agreements that imposed restrictive covenants as a condition of employment, and are thus disfavored under New York law. These provisions are unenforceable where they have no reasonable geographic scope, go beyond an employer's legitimate interests, or are unreasonably burdensome to the employee. *See BDO*

Case 1:25-cv-08892-VEC Document 3 Filed 07/28/25 Page 148 of 228



*Seidman v. Hirschberg*, 93 N.Y.2d 382, 389 (1999). Here, the non-competition provisions are unenforceable because they are unreasonably burdensome to the Resignees and have no reasonable geographic limitations. They improperly restrict the Resignees from working "in any jurisdiction in which the Company or any of its affiliates is engaged" or has "plans to become engaged." Agreement §4(b). Of course, Apex has "worldwide," operations with "112 offices," in every major city in America, and most major cities throughout the world. *See* Apex Group Website, "Our Story," *available at* https://www.apexgroup.com/our-story/. Thus, the non-compete provisions have no geographic limitations and are unenforceable.

Courts in New York routinely hold that non-compete provisions with "worldwide restrictions" are unenforceable. *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 507 (S.D.N.Y. 2011) (citing *Silipos, Inc. v. Bickel*, 2006 WL 2265055, at *6 (S.D.N.Y. Aug. 8, 2006))); *Heartland Sec. Corp. v. Gerstenblatt*, No., 2000 WL 303274, at *7 (S.D.N.Y. Mar. 20, 2000) (refusing to enforce a non-compete with no geographic limitations); *accord Garfinkle v. Pfizer, Inc.*, 162 A.D.2d 197, 197 (1st Dep. 1990) (noncompete "geographic scope" encompassing the "entire world" struck down as unenforceable). That is particularly true where, as here, the non-compete is provided as a condition to an employment agreement, without ongoing compensation for the ongoing restriction.

Moreover, the purported non-competition agreements are unenforceable because there is no showing that the services provided by the Resignees are sufficiently unique or extraordinary to justify the burden on their employment careers. The Resignees are, generally speaking, accountants — and none of the services they provided are so unique or extraordinary to an extent that would "make [their] replacement impossible or that the loss of such services would cause [Apex] irreparable injury." *Garfinkle v. Pfizer, Inc.*, 162 A.D.2d 197, 197 (citing *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 274 (1963)). Indeed, *BDO Seidman* itself concluded that "accounting services" did not involve the type of "uniqueness or extraordinary" status that could justify an otherwise improper non-compete agreement. 93 N.Y.2d at 390.

*Finally*, the Resignees have not joined IQEQ seeking to work solely on work for the Related Companies. They are working on a variety of projects with various clients. As IQEQ has its own, prior engagement with the Related Companies – which does not involve using Apex Confidential Information – that should not be held against the Resignees.

If Apex believes it has any evidence or additional information contradicting the statements and positions of the Resignees in this letter, please provide it promptly so the Resignees can address it. As noted, the Resignees seek to abide by the restrictions on using Apex Confidential Information and on solicitation of current Apex employees. Please contact me if you wish to discuss these matters further. The Resignees reserve all rights.

Very truly yours,

s/ Jennifer Rossan
Jennifer Rossan