**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| APEX GROUP CAPITAL ADVISORS LLC F/K/A SANDSPOINT CAPITAL ADVISORS LLC,<br><br>Plaintiff,<br><br>v.<br><br>RELATED FUND MANAGEMENT, LLC; JAMES KRAUS; LUCAS BELINKIE; PRESTON CALLEN; WILLIAM C. CHANEY; and RYAN HOPE<br><br>Defendants. | Case No. 1:25-cv-8892-VEC<br><br>**ORAL ARGUMENT REQUESTED** |

**EMPLOYEE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S UNTIMELY MOTION FOR LEAVE TO AMEND THE COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

A. Apex Sues IQ-EQ and the Employee Defendants in January 2025 ..... 3

B. Apex Dismisses its Complaint Against IQ-EQ, Without Conducting Any Discovery ..... 4

C. Apex Files a New Complaint on May 27, 2025 Alleging that IQ-EQ is Using Apex's Trade Secrets – But Only Names the Employee Defendants and Related as Parties ..... 6

D. Apex Adds Allegations that IQ-EQ is Using Apex Trade Secrets in a November 2025 Amended Complaint – But Again Delays Seeking to Add IQ-EQ as a Defendant ..... 7

E. The Court Issues a Scheduling Order Setting a February 9, 2026 Deadline for Any Motion to Amend or to Join Additional Parties ..... 8

F. Apex Moves to Amend the Complaint Six Months After the Court's Deadline ..... 9

LEGAL STANDARD ..... 11

ARGUMENT ..... 12

I. APEX CANNOT SHOW GOOD CAUSE UNDER RULE 16, BECAUSE ITS MAY 2025 PLEADING ALLEGED IQ-EQ WAS USING APEX TRADE SECRETS ..... 12

II. *RES JUDICATA* BARS THE DTSA, TUTSA, CONFIDENTIAL INFORMATION, TORTIOUS INTERFERENCE, AND AIDING/ABETTING CLAIMS, WHICH HAVE THE SAME OPERATIVE FACTS AS THE JANUARY 2025 COMPLAINT ..... 16

III. THE NARROW FRAUD EXCEPTION TO RES JUDICATA DOES NOT APPLY – AND APEX HAS FAILED TO ALLEGE FRAUD WITH PARTICULARITY ..... 18

IV. APEX HAS FAILED TO STATE A CLAIM FOR BREACH OF CONTRACT OR THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING ..... 22

CONCLUSION ..... 24

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abrams v. HBM Prenscia Inc.*,
2020 WL 6482881 (S.D.N.Y. Nov. 4, 2020) ........ 12, 15

*Baergas v. City of N.Y.*,
2005 WL 2105550 (S.D.N.Y. Sept. 1, 2005) ........ 15

*BPP Ill., LLC v. Royal Bank of Scotland Grp. PLC*,
859 F.3d 188 (2d Cir. 2017) ........ 12

*Charles v. City of N.Y.*,
2015 WL 756886 (S.D.N.Y. Feb. 20, 2015) ........ 14

*Chase Manhattan Bank, N.A. v. Celotex Corp.*,
56 F.3d 343 (2d Cir. 1995) ........ 17

*Cho v. Blackberry Limited*,
991 F.3d 155 (2d Cir. 2021) ........ 12, 17

*Cytec Indus. Inc. v. Allnex (Luxembourg) & Cy S.C.A.*,
2017 WL 2634177 (S.D.N.Y. June 19, 2017) ........ 24

*D & L Holdings, LLC v. RCG Goldman Co., LLC*,
287 A.D.2d 65 (1st Dep't 2001) ........ 24

*Dellutri v. Vill. of Elmsford*,
895 F. Supp. 2d 555 (S.D.N.Y. 2012) ........ 17

*EMA Fin., LLC v. NFusz, Inc.*,
509 F. Supp. 3d 18 (S.D.N.Y. 2020) ........ 15

*Fitzgerald v. Chase Home Fin., LLC*,
2011 WL 9195046 (S.D.N.Y. Feb. 28, 2011) ........ 23

*Gache v. Hill Realty Assocs., LLC*,
2014 WL 5048336 (S.D.N.Y. Sept. 22, 2014) ........ 18

*Grochowski v. Phoenix Constr.*,
318 F.3d 80 (2d Cir. 2003) ........ 12

*Gullo v. City of N.Y.*,
540 F. App'x 45 (2d Cir. 2013) ........ 1, 14

*Harris v. Provident Life & Accident Ins. Co.*,
310 F.3d 73 (2d Cir. 2002) ........ 24

*Holmes v. City of N.Y.*,
2020 WL 918611 (S.D.N.Y. Feb. 26, 2020) .................................................................. 20

*Hudson Neurosurgery, PLLC v. UMR, Inc*.,
2022 WL 902107 (S.D.N.Y. Mar. 28, 2022).................................................................. 23

*iMedicor, Inc. v. Access Pharms., Inc*.,
290 F.R.D. 50 (S.D.N.Y. 2013)...................................................................................... 15

*In re Aluminum Warehousing Antitrust Litig*.,
2016 WL 1629350 (S.D.N.Y. Apr. 25, 2016) ................................................................ 14

*In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*,
735 F. Supp. 3d 352 (S.D.N.Y. 2024) ........................................................................... 22

*In re Layo*,
460 F.3d 289 (2d Cir.2006) ........................................................................................... 20

*iOptimize Realty Inc. v. Cox Enters., Inc*.,
2025 WL 2696475 (E.D.N.Y. Sept. 22, 2025) ..........................................................19-20

*Kassner v. 2nd Ave. Delicatessen Inc*.,
496 F.3d 229 (2d Cir. 2007) .......................................................................................... 15

*L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc*.,
198 F.3d 85 (2d Cir. 1999) ........................................................................... 2, 12, 17, 19

*McCarthy v. Dun & Bradstreet Corp*.,
482 F.3d 184 (2d Cir. 2007) .......................................................................................... 14

*Mohamad v. Rajoub*,
767 F. App'x 91 (2d Cir. 2019)................................................................................... 2, 17

*Negrete v. Citibank, N.A*.,
187 F. Supp. 3d 454 (S.D.N.Y. 2016) ........................................................................... 23

*Nemaizer v. Baker*,
793 F.2d 58 (2d Cir. 1986) ............................................................................................ 17

*Ningbo Prods. Imp. & Exp. Co. v. Eliau*,
2011 WL 5142756 (S.D.N.Y. Oct. 31, 2011)........................................................... 12, 19

*Oscar v. BMW of N. Am. LLC*,
2011 WL 6399505 (S.D.N.Y. Dec. 20, 2011) ............................................................... 14

*Parker v. Columbia Pictures Indus*.,
204 F.3d 326 (2d Cir. 2000) .......................................................................................... 12

*Phillips v. Google LLC*,
2025 WL 1795894 (S.D.N.Y. June 30, 2025) .................................................................. 23

*Prairie St. Cap., Inc. v. Afek*,
2026 WL 710080 (S.D.N.Y. Mar. 13, 2026)........................................................... 3, 22

*Saabirah El v. City of N.Y.*,
300 F. App'x 103 (2d Cir. 2008)........................................................................ 2, 19, 20

*Sanders v. Sanders*,
2021 WL 4392053 (S.D.N.Y. Sept. 24, 2021) ................................................................. 20

*SAT Aero Hldgs., Inc. v. Aerolinea del Estado Mexicano, S.A. de C.V.*,
2025 WL 3012989 (S.D.N.Y. Oct. 28, 2025)................................................................. 22

*Tardif v. City of N.Y.*,
2016 WL 2343861 (S.D.N.Y. May 3, 2016) .................................................................... 13

*Trireme Energy Hldgs., Inc. v. RWE Renewables Americas, LLC*,
757 F. Supp. 3d 445 (S.D.N.Y. 2024) ....................................................... 12, 19, 20, 21

*Waldman v. Vill. of Kiryas Joel*,
207 F.3d 105 (2d Cir.2000) ............................................................................................ 18

*Weider Health & Fitness v. Austex Oil Ltd.*,
2018 WL 6625072 (S.D.N.Y. Sept. 30, 2018) ................................................................ 14

*Woods v. Dunlop Tire Corp.*,
972 F.2d 36 (2d Cir. 1992) ............................................................................................. 17

**Statutes**

18 U.S.C. § 1831 .............................................................................................................. 6

TEX. CIV. PRAC. & REM. CODE § 134A.001 ................................................................... 7

## PRELIMINARY STATEMENT

The Court should deny Apex Group Capital Advisors LLC's ("Apex") Motion for Leave to File a Second Amended Complaint ("Motion"), filed nearly six months after the February 9, 2026 amendment deadline in the Case Management Plan and Scheduling Order ("Scheduling Order"). Apex cannot show good cause for its untimely amendment under Rule 16(b)(4), because its May 2025 pleading confirms that it had notice of the basis for its motion but delayed seeking leave to amend to add IQ-EQ as a party for over two years. Further, Apex's proposed new claims are barred by *res judicata*, because they are based on the same operative facts as a January 2025 Complaint against IQ-EQ that it dismissed with prejudice—and Apex has not pled with particularity any basis for the narrow fraud exception to *res judicata*.

*First*, Apex's May 27, 2025 pleading shows it had notice of the basis of this motion—that IQ-EQ allegedly used Apex's proprietary information to service Related's business—over two years ago. Apex's May 2025 pleading repeatedly alleged that the *"Employee Defendants misappropriated Apex's confidential information and trade secrets … and have used … that information in connection with their work* ***for Related and at IQ-EQ***." (Ex. 3, Dkt. No. 1-3 ¶143 p. 30 (emphasis added); *id.* ¶¶154, 160 (same).) Apex's November 2025 Amended Complaint repeated these allegations in greater detail. (Dkt. No. 80 ¶¶127, 137; 78, 85.) Thus, Apex cannot show good cause to amend under Rule 16 because it was not diligent in seeking leave.

Even worse, Apex admits it received the key documents underlying its motion on April 24, 2026, yet waited over three months to seek leave. That is delay—not diligence. *See Gullo v. City of N.Y.*, 540 F. App'x 45, 47 (2d Cir. 2013) (affirming denial of leave to amend under Rule 16 where plaintiff "waited over three months" to seek leave). This inexcusable delay alone warrants denial, particularly given the prejudice to Defendants. Apex's motion would prejudice Defendants by (i) mooting their motions to dismiss, which have been fully-briefed and pending for six months;

(ii) expanding the scope of discovery by adding six new causes of action and a new party just two months before the end of fact discovery; and (iii) significantly increasing the costs of litigation and delaying resolution.

*Second,* Apex's proposed Counts 1-3 and 12-13 against IQ-EQ are barred by *res judicata* because they are based on the same alleged operative facts as Apex's January 2025 Complaint against IQ-EQ that it voluntarily dismissed with prejudice. Apex's January 2025 Complaint also alleged that the "Defendants misappropriated Apex's confidential and trade secret information and [have] disclosed that information to and/or used that information on behalf of IQ-EQ" (Ex. 1 ¶112), including "to bolster their collective effort to divert Related's business from Apex to IQ-EQ." (*Id.* ¶103). Apex's "voluntary dismissal with prejudice" of the January 2025 Complaint against IQ-EQ "is an adjudication on the merits for purposes of res judicata," which disposes of the proposed Counts 1-2 and 12-13. *Mohamad v. Rajoub*, 767 F. App'x 91, 92–93 (2d Cir. 2019).

*Third*, Apex cannot satisfy the narrow fraud exception to *res judicata* because Apex "simply did not take *any* discovery before" it voluntarily dismissed the January 2025 Complaint against IQ-EQ with prejudice. *Saabirah El v. City of N.Y.*, 300 F. App'x 103, 105 (2d Cir. 2008) (emphasis in original). Apex cannot make the required fraud exception showing that it was impossible to obtain the information at issue through discovery on the January 2025 Complaint or that IQ-EQ fraudulently concealed evidence because it did not seek any discovery. Instead, discovery in this case proves Apex "could have ascertained" the allegedly new "information through due diligence, including … discovery upon the original complaint." *L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999). Thus, *res judicata* applies.

*Fourth*, Apex has not pled fraudulent inducement with particularity as required by Rule 9(b). It has not alleged with particularity (i) what specific information shows that any IQ-EQ

statement was false when made, (ii) that IQ-EQ acted with scienter, knowing that its statements were false when made, or (iii) what specific Apex proprietary information IQ-EQ has allegedly used to solicit Related's business and for commercial purposes. Apex has repeatedly told the Court that it cannot identify with particularity which of its trade secrets IQ-EQ has used, including telling Magistrate Judge Stein twenty-two days after filing this motion "that – there aren't any specific documents that I can point you to in that regard." (Ex. 5, Aug. 18, 2026 Tr. at 12:6-13:1.)

*Finally*, the exhibits attached to Apex's motion defeat its fraudulent inducement claim by showing that IQ-EQ sought to avoid taking Apex information when it won Related's business. IQ-EQ instructed Related to ask for its own data and remove any non-Related data:

> "***I am not looking to access an Apex database. Instead, I am looking for a copy of my [Related's] data,***" and "run a series of scripts to ***remove any non Related Fund Management data from the copied data base***, and then make the database available to me." (Apex Ex. M, Dkt. 159-13 at 1 (emphasis added).)

These documents show that Apex cannot plead fraud with particularity. *Prairie St. Cap., Inc. v. Afek*, 2026 WL 710080, at *4 (S.D.N.Y. Mar. 13, 2026) ("documentary evidence attached to the complaint or incorporated by reference therein" prevails over contradictory general allegations).

The Court should therefore deny Apex's untimely motion for leave to amend.

## BACKGROUND

### A. Apex Sues IQ-EQ and the Employee Defendants in January 2025

On January 31, 2025, Apex sued IQEQ US Management Co, LLC ("IQ-EQ") and the Employee Defendants for the same conduct alleged in the proposed Second Amended Complaint. (*Apex Group Capital Advisors LLC v. IQEQ US Management Co LLC et al.*, No. 25-CV-00260 (N.D. Tex.), Dkt. No. 1, Ex. 1) (the "January 2025 Complaint"). The January 2025 Complaint alleged that IQ-EQ "secretly conspired" with the Employee Defendants (i) to steal "an entire Apex client service team responsible for servicing … The Related Companies ('Related')" in "violation

of the [Employee] Defendants' Agreements," and (ii) "to misappropriate Apex's confidential and trade secret information." (Ex. 1 ¶¶ 58-60.)

*First*, the January 2025 Complaint alleged that IQ-EQ induced the Employee Defendants to violate the non-compete and non-solicit provisions of their Employment Agreements, in order to interfere with Apex's relationship with Related. It alleged that the Employee Defendants "coordinated and conspired with IQ-EQ to leave Apex over time and to re-form the Related team at IQ-EQ, to unfairly divert business from Apex to IQ-EQ." (*Id.* ¶110.) It also alleged that IQ-EQ "wrongfully induc[ed] a large number of Apex employees" who serviced Related "to resign from Apex and to join IQ-EQ en masse" and thus "improperly interfered with, and continue to interfere with, Apex's relationship with its customers" like Related. (*Id.* ¶155*; see also id*. ¶147.)

*Second*, the January 2025 Complaint alleged that "IQ-EQ … induc[ed] and/or participat[ed]" in the Employee Defendants' "retention of and disclosure of Apex Trade Secrets." (*Id.* ¶147.) It alleged that the "confidential and trade secret information misappropriated" from Apex "has been … used by" IQ-EQ and the Employee Defendants "to bolster their collective effort to divert Related's business from Apex to IQ-EQ." (*Id.* ¶103.)

The January 2025 Complaint alleged five causes of action against IQ-EQ. (*Id.* (Counts IV-V, VII-X, tortious interference with agreements with Employee Defendants and Related; unfair competition; unjust enrichment; conspiracy).) All five claims against IQ-EQ focused on:

"a. The misappropriation of Apex's confidential information, including the Apex Trade Secrets;

b. The unlawful raid of Apex's personnel to destroy its ability to provide services to existing and prospective customers;" including Related." (*Id.* ¶¶ 168a-b, 172a-b.)

**B. <u>Apex Dismisses its Complaint Against IQ-EQ, Without Conducting Any Discovery</u>**

Despite alleging in the January 2025 Complaint that IQ-EQ conspired with the Employee Defendants to steal Apex's trade secrets and employees, Apex voluntarily dismissed all claims

against IQ-EQ with prejudice on February 19, 2025 – just nineteen (19) days after filing that complaint. (Ex. 2, Notice of Voluntary Dismissal, C.A. No. 25-cv-00260, Dkt. No. 24.) Apex's Voluntary Dismissal provides that "***Apex … gives notice that all claims against Defendant IQEQ US Management Co, LLC in the above-captioned action are voluntarily dismissed in their entirety, with prejudice***." (*Id.* (emphasis added).)

*Notably*, ***Apex dismissed its claims against IQ-EQ with prejudice without conducting any discovery***. Apex did not serve a single document request, interrogatory, or request for admission—nor even await Rule 26 initial disclosures. It made that decision without seeking any discovery to test its allegations.

Before dismissing the Complaint, Apex had informal discussions with IQ-EQ. In a February 17, 2025 "Draft Letter from IQ-EQ to Apex," IQ-EQ's Chris Marsden wrote to Apex's Georges Archibald that IQ-EQ committed that it would conduct a "forensic review" and that:

> "1. If we discover any Apex proprietary data on any of our systems, we will destroy it and will not make any use of it for commercial purposes.
>
> 2. If we discover that any Apex proprietary data has been shared with any third party, we will inform Apex.
>
> 3. IQ-EQ has not made any use of any proprietary Apex data in its discussions with Related regarding additional services." (Apex Ex. J, Dkt. No. 159-10.)

IQ-EQ asked Apex to confirm that "if IQ-EQ" would "make the above commitments, Apex would drop the lawsuit against IQ-EQ." (*Id.* at 3.)

Just two days after IQ-EQ's February 17, 2025 draft letter, Apex dismissed its January 2025 Complaint against IQ-EQ with prejudice. Apex took no discovery to verify these commitments before dismissing. Apex did not wait for IQ-EQ's forensic review to be completed. Nor did Apex seek proof that IQ-EQ had begun a forensic investigation.

On March 27, 2025, a month after Apex dismissed the January 2025 Complaint, IQ-EQ reported back to Apex that its forensic investigation found "No evidence that Apex's proprietary information or documents … has been shared with third parties" or retained "on IQEQ's systems." (Apex Ex. K, Dkt. No. 159-11 at 2.) IQ-EQ also reported that it had obtained "certifications from each employee" stating that he "will not use Apex Information at IQEQ."

Notably, even Apex's Motion to Amend its current complaint does not identify a single Apex document that it claims has been used on IQ-EQ's systems.

### C. Apex Files a New Complaint on May 27, 2025 Alleging that IQ-EQ is Using Apex's Trade Secrets – But Only Names the Employee Defendants and Related as Parties

On "April 16, 2025, Related sent a letter" terminating its relationship with Apex "effective immediately," asserting that Apex had breached its agreement with Related and that Apex's breach could not "be cured." (Am. Compl. ¶123.) Apex responded by filing a new Complaint on May 27, 2025 alleging the same conduct as the January 2025 Complaint, but naming only the Employee Defendants and Related as Defendants – not IQ-EQ (the "May 2025 Complaint"). (Ex. 3, Dkt. No. 1-3 at 11-51.) Notably, the May 2025 Complaint shows that ***Apex believed by May 27, 2025 that IQ-EQ was using Apex's trade secrets – yet delayed for two years before moving to amend its Complaint to add IQ-EQ as a party***.

Specifically, the May 2025 Complaint alleged at least five times that IQ-EQ used Apex's trade secrets in rendering services to Related:

- *Id.* ¶143: "The Employee Defendants misappropriated Apex's confidential information and trade secrets (the "Apex Trade Secrets") and have used and disclosed that information in connection with their work for Related ***and at IQ-EQ***, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831, et seq. ("DTSA")."
- *Id.* ¶154: "the Employee Defendants misappropriated the Apex Trade Secrets and, on information and belief, have used and disclosed that information in connection with their work for Related ***and at IQ-EQ***, in Violation of the Defend Trade Secrets Act."

- *Id.* ¶160: The Employee Defendants misappropriated the Apex Trade Secrets and, on information and belief, have used and disclosed that information in connection with their work for Related ***and at IQ-EQ***, in Violation of the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE § 134A.001 et seq. ("TUTSA").

- *Id.* ¶156: "Related and Kraus intended to assist the Employee Defendants in their misappropriation of the Apex Trade Secrets ***as a means of facilitating Related's and the Employee Defendants' transition from Apex to its direct competitor, IQ-EQ***."

- *Id.* ¶109: Related "coordinat[ed] the movement of its service team from Apex to IQ-EQ and secur[ed] the information that it needed to smoothly continue operations with its new servicer." (emphasis added in all bullets).

These allegations show Apex has no excuse for delaying fourteen (14) months to seek to add IQ-EQ as a Defendant after the deadline in the Court's Scheduling Order.

**D. <u>Apex Adds Allegations that IQ-EQ is Using Apex Trade Secrets in a November 2025 Amended Complaint – But Again Delays Seeking to Add IQ-EQ as a Defendant</u>**

After Defendants moved to dismiss, Apex amended its Complaint on November 5, 2025, but again did not name IQ-EQ as a Defendant. Apex's Amended Complaint added even more allegations that IQ-EQ used Apex's trade secrets. (Dkt. No. 80.) Specifically:

- Dkt. No. 80 p. 2: "Related and Kraus … knowingly induced the Former Employees ***… to steal data from Apex Capital to facilitate Related's move to IQ-EQ***."

- *Id.* ¶66: "at Kraus's encouragement, Belinkie and his recruits planned to ***take from Apex Capital the information they would need to seamlessly service Related's accounts at IQ-EQ***."

- *Id.* ¶78: "***Yet there is no doubt that Belinkie retained and used these files in his role at Apex Capital's competitor, IQ-EQ***. There is no conceivable reason Belinkie would have taken the files but to use them in his new role at IQ-EQ."

- *Id.* ¶85: "Chaney used his Apex Capital-issued laptop to access at least three web-based email accounts, ***which he used to access and send Apex Capital trade secrets and confidential information to IQ-EQ***."

- *Id.* ¶93: "the only rational conclusion to be drawn from Hope's download activities in the lead-up to his departure from Apex Capital" is that "Hope retained and use the files" from Apex "***in his new role at Apex Capital's competitor, IQ-EQ***."

- *Id.* ¶105: "the only rational conclusion to be drawn from Callen's download activities in the lead-up to his departure from Apex Capital" is that he "retained and use the files" from Apex "***in his new role at Apex Capital's competitor, IQ-EQ***."

- *Id.* ¶¶127, 137: "The Former Employees ***misappropriated Apex Capital's trade secrets and have used and disclosed those trade secrets in connection with their work for Related and at IQ-EQ***."

- *Id.* ¶199: "Defendants have been unjustly enriched by ***the use of Apex Capital's confidential information at IQ-EQ***." (emphasis added in all bullets).

Yet Apex continued to delay seeking to amend its Complaint to add IQ-EQ as a Defendant.

**E. <u>The Court Issues a Scheduling Order Setting a February 9, 2026 Deadline for Any Motion to Amend or to Join Additional Parties</u>**

On January 9, 2026, this Court issued a Civil Case Management Plan and Scheduling Order. (Dkt. No. 112.) The January 9, 2026 Scheduling Order expressly provides that "Any motion to amend or to join additional parties shall be filed within 30 days from the date of this Order," *i.e.*, February 9, 2026. (*Id.* ¶2.) But Apex did not move to amend the Complaint to add IQ-EQ as a Defendant by the February 9, 2026 deadline, despite all of Apex's allegations in the Amended Complaint that IQ-EQ used Apex's trade secrets and confidential information.

Instead, the parties have engaged in extensive discovery and briefing on pending motions to dismiss under a tight schedule required by the January 9, 2026 Scheduling Order. The parties fully briefed the Defendants' motions to dismiss the Amended Complaint from January through February 26, 2026. (Dkt. Nos. 98, 101, 103, 106, 108, 115, 130-31.) Further, the parties engaged in extensive document discovery, covering tens of thousands of documents, with most parties substantially completing their production of documents by June 15, 2026. (Dkt. No. 152, Status Rpt. ¶ A.1, 5 9-10.) The parties had "agreed that fact depositions would commence on June 1, 2026" and "had diligently negotiated and scheduled depositions for nearly all anticipated witnesses" in July 2026, before "Apex filed its Motion to Amend" on July 27, 2026. (Dkt. No. 166

at 1 (Joint Letter Requesting Stay of Depositions).) Under the Court's January 9, 2026 Scheduling Order, fact discovery is scheduled to end on September 30, 2026. (Dkt. No. 112 ¶5.a.)

**F. <u>Apex Moves to Amend the Complaint Six Months After the Court's Deadline</u>**

On July 27, 2026, Apex finally moved to amend the Complaint to add IQ-EQ as a Defendant. (Dkt. 157.) This was five-and-a-half months after the Court's February 9, 2026 deadline. (Dkt. 112 ¶ 2.) It was also over six months after the parties' initial disclosures (*id.* ) and two months before the close of fact discovery, after the parties had scheduled almost all fact depositions (*id.* ¶5a). Apex's motion did not assert good cause to amend after the Scheduling Order's deadline. Apex only added this argument after Defendants raised the issue. (Dkt. 162.)

*First*, Apex's proposed Second Amended Complaint alleges the same transactions and occurrences as the January 2025 Complaint that Apex dismissed with prejudice, as follows:

| January 2025 Complaint, Ex. 1 | Proposed Sec. Am. Compl., Dkt. No. 159-1 |
|---|---|
| "[D]ating as far back as October 2024, the Defendants secretly conspired to pirate-away virtually an entire Apex client service team responsible for servicing substantial Apex client relationships, including The Related Companies ("Related")." (¶58) | "This case arises from a coordinated scheme to dismantle a critical business line of Apex Capital, transfer it to Apex Capital's direct competitor IQEQ, and steal Apex Capital's confidential information, intellectual property, and trade secrets." (¶1) |
| "In furtherance of Defendants' unlawful conspiracy, … the Individual Defendants also absconded with, misappropriated, and continue to misappropriate Apex's confidential and trade secret information, to unlawfully interfere with Apex's existing customer relationships." (¶60) | "Defendants acted in concert to engineer a seamless migration of Related's business from Apex Capital to IQEQ by raiding Apex Capital's workforce, appropriating Apex Capital's confidential information and trade secrets, and leveraging those resources so IQEQ could seize Related's accounts." (¶2) |
| "[T]he confidential and trade secret information misappropriated by the Individual Defendants has been or will be used by the Defendants to bolster their collective effort to divert Related's business from Apex to IQ-EQ" (¶103) | "IQEQ used Apex Capital's confidential information without Apex Capital's authorization, including in connection with IQEQ's efforts to assume the servicing of Related's accounts and to replicate services that Apex Capital had provided to Related." (*Id.* ¶180). |
| "[T]he Individual Defendants misappropriated Apex's confidential and | "The Former Employees and IQEQ misappropriated Apex Capital's trade secrets |

| | |
|---|---|
| trade secret information and [have] disclosed that information to and/or used that information on behalf of IQ-EQ" (¶¶112, 123) | and have used and disclosed those trade secrets in connection with their work for Related at IQEQ." (¶¶155, 166) |
| "IQ-EQ, … intentionally and wrongfully interfered with the Individual Defendants' contractual obligations by inducing and/or participating in their unlawful acts, including their breaches of the non-competition covenant, the solicitation of other Apex employees, and the retention of and disclosure of Apex Trade Secrets." (¶147) | "IQEQ knowingly induced and provided substantial assistance to the Former Employees in carrying out those breaches. Among other things, IQEQ facilitated the acquisition and transfer of Apex Capital's trade secrets and confidential information, worked with Related to transition business away from Apex Capital, and otherwise assisted conduct that violated duties owed to Apex Capital" (¶253) |
| "Defendants" have engaged in:<br>a. The misappropriation of Apex's confidential information, including the Apex Trade Secrets;<br>b. The unlawful raid of Apex's personnel to destroy its ability to provide services to existing ….customers." (¶¶168, 172) | "IQEQ willfully and intentionally interfered with the MSA by: working hand-in-hand with Related and the Former Employees to acquire the confidential information and work product necessary to replicate Apex Capital's services," and "coordinating with Related to manufacture a pretext for terminating the agreement" (¶244). |

The proposed Second Amended Complaint's Counts 1-3 and 12-13 against IQ-EQ all focus on the same conduct alleged in the January 2025 Complaint: IQ-EQ's alleged improper recruitment of Apex employees, alleged theft of Apex's trade secrets and confidential information, and alleged interference with Apex's Related relationship. (*Compare* Ex. 1, Causes of Action 4-5; 8-10 ¶¶ 1145-56, 167-79, *with* Dkt. 159-1, Proposed Sec. Am. Compl. Causes of Action 1-3, 12-13 ¶¶ 154-81, 240-55)

*Second*, in a desperate attempt to avoid *res judicata*, Apex argues that IQ-EQ fraudulently induced Apex into dismissing the January 2025 Complaint with prejudice by stating that it had "not made any use of any proprietary Apex data in its discussions with Related regarding additional services" and would not use Apex trade secrets for "commercial purposes." (Dkt. 159-1 ¶141.) But Apex fails to allege—as the fraud exception requires—that it could not have uncovered the alleged fraud with reasonable diligence. Indeed, Apex could easily have discovered the documents upon

which it now relies by conducting discovery upon the original complaint. Yet it conducted no discovery or diligence before dismissing the January 2025 Complaint.

Similarly, Apex does not allege with particularity any affirmative steps by IQ-EQ to conceal any material information from Apex. To the contrary, Apex had a right to conduct thorough discovery of its allegations that IQ-EQ misappropriated Apex trade secrets under the January 2025 Complaint. But Apex chose not to conduct any discovery.

Moreover, the documents attached to (and incorporated in) the proposed Second Amended Complaint contradict any claim that IQ-EQ sought Apex's proprietary information. Specifically:

- On December 5, 2024, IQ-EQ instructed Related to clarify, "Importantly, ***I am not looking to access an Apex database. Instead, I am looking for a copy of my [Related's] data,*** " and "***to remove any non Related Fund Management data*** from the copied data base." (Apex Ex. M, Dkt. 159-13 at 2 (emphasis added).)

- On October 23, 2024, IQ-EQ instructed Related Fund Management ("RFM") to ask to "***remove any non-RFM related data … to create a new database from which Investran can be run.***" (Apex Ex. I, Dkt. No. 159-9 at 2 (emphasis added).)

- On March 13, 2025, IQ-EQ instructed Related to demand that Apex return "**your data**" which Apex is "required" to do under "your MSA" with Apex. (Apex Ex. N, Dkt. No. 159-14 at 2 (emphasis added).)

These documents show that IQ-EQ sought to avoid receiving Apex information when Related moved its account to IQ-EQ, and thus show that Apex cannot plead fraud with particularity.

*Third*, Apex alleges that IQ-EQ violated commitments stated in IQ-EQ's February 17, 2025 draft letter to Apex, and alleges this is a breach of a settlement agreement. (Dkt. No. 159-1 ¶¶ 265-71.) However, Apex does not identify which, if any, provision in the February 17, 2025 letter IQ-EQ materially breached. This is fatal to its contract and duplicative implied covenant claim.

**LEGAL STANDARD**

Apex moved for leave to amend six months "'after the deadline to do so'" in the Court's Scheduling Order, so Apex "'must [first] show good cause'" for leave to amend "'under Rule 16.'"

*Abrams v. HBM Prenscia Inc.*, No. 19-CV-10357 (VEC), 2020 WL 6482881, at *2 (S.D.N.Y. Nov. 4, 2020) (Caproni, J.) (quoting *BPP Ill., LLC v. Royal Bank of Scotland Grp. PLC*, 859 F.3d 188, 195 (2d Cir. 2017)) (alterations in original). "A finding of good cause depends on the diligence of the moving party." *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). A plaintiff's "delay" of several months in seeking leave to amend "is inconsistent with the 'diligence' required to demonstrate 'good cause' under Rule 16." *Abrams*, 2020 WL 6482881, at *2.

*Res judicata* bars "[e]ven claims based on different legal theories . . . provided they arise from the same transaction or occurrence." *Cho v. Blackberry Ltd.*, 991 F.3d 155, 169 (2d Cir. 2021) (*quoting L-Tec Elecs. Corp.*, 198 F.3d at 88). A "plaintiff seeking to apply the fraud exception to res judicata must allege with particularity what the defendant did to conceal any material information and why it was unable to discover defendant's actions." *Trireme Energy Hldgs., Inc. v. RWE Renewables Americas, LLC*, 757 F. Supp. 3d 445, 480 (S.D.N.Y. 2024) (quoting *Ningbo Prods. Imp. & Exp. Co. v. Eliau*, 2011 WL 5142756, at *9 (S.D.N.Y. Oct. 31, 2011)). This exception is "narrow," and if the plaintiff "could have uncovered the allegedly concealed evidence" with "diligence or upon reasonable inspection," the "fraud exception … will not apply." *Ningbo*, 2011 WL 5142756, at *9.

## ARGUMENT

### I. APEX CANNOT SHOW GOOD CAUSE UNDER RULE 16, BECAUSE ITS MAY 2025 PLEADING ALLEGED IQ-EQ WAS USING APEX TRADE SECRETS

Apex cannot establish good cause under Rule 16 because it delayed seeking leave to amend to add IQ-EQ as a party for over two years after alleging that IQ-EQ was using Apex's trade

secrets—and then delayed several months more after receiving much of the very documents on which it now relies.

*First*, Apex's May 2025 pleading shows that Apex had notice of (and believed) that IQ-EQ was using Apex's trade secrets—including to win Related's business—two years before seeking leave to amend, which defeats any claim of diligence. Apex alleged three different times in its May 2025 pleading that the "Employee Defendants misappropriated Apex's confidential information and trade secrets … and ***have used and disclosed that information in connection with their work for Related and at IQ-EQ***. (Ex. 3, Dkt. No. 1-3 ¶143 (emphasis added); *accord id.* ¶¶154, 160 (same).) Further, Apex alleged that IQ-EQ has used Apex's Trade Secrets to win business from Related, alleging that the "Employee Defendants" misappropriated "the Apex Trade Secrets ***as a means of facilitating Related's and the Employee Defendants' transition from Apex to its direct competitor, IQ-EQ***." *Id.* ¶156 (emphasis added).

*Second*, Apex's November 2025 Amended Complaint added more detailed allegations that IQ-EQ used Apex proprietary information, including to win Related's business – eight months before Apex sought leave to amend to add IQ-EQ as a party. It specifically alleged "***the use of Apex Capital's confidential information at IQ-EQ***." (Dkt. 80 ¶199 (emphasis added).) It also repeatedly alleged that the Employee Defendants "***misappropriated Apex Capital's trade secrets and have used and disclosed those trade secrets in connection with their work for Related and at IQ-EQ***." (*Id.* ¶¶127, 137 (emphasis added).) Further, it alleged that the purpose of the Employee Defendants' actions was "***to steal data from Apex Capital to facilitate Related's move to IQ-EQ***." (*Id.* p.2 (Introduction) (emphasis added).) It also alleged that the Employee Defendants improperly downloaded Apex proprietary files, and "***retained and used these files in his role at Apex Capital's competitor, IQ-EQ***." (*Id.* ¶78; *accord id.* ¶85.)

Apex's prior allegations in its May and November 2025 pleadings show that it had notice of the claims it now seeks to assert but failed to seek leave diligently. The rule is clear: "a party lacks good cause 'when the proposed amendment rests on information that the party knew, or should have known, in advance of the deadline.'" *Tardif v. City of N.Y.*, 2016 WL 2343861, *4 (S.D.N.Y. May 3, 2016) (quoting *Charles v. City of N.Y.*, 2015 WL 756886, at *2 (S.D.N.Y. Feb. 20, 2015)). A plaintiff cannot show good cause under Rule 16 where its "prior complaints" show that it had notice of the claims months earlier but delayed seeking leave. *In re Aluminum Warehousing Antitrust Litig.*, 2016 WL 1629350, at *7 (S.D.N.Y. Apr. 25, 2016). Where, as here, a plaintiff has notice sufficient to be "aware of the need to consider a possible claim," it cannot show good cause when it delays seeking leave to amend for many "months" afterward. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 201 (2d Cir. 2007); *accord Weider Health & Fitness v. Austex Oil Ltd.*, 2018 WL 6625072, at *8 (S.D.N.Y. Sept. 30, 2018), *report and recommendation adopted*, 2018 WL 5919521 (S.D.N.Y. Nov. 13, 2018) (prior "notice of" claim defeated good cause); *Oscar v. BMW of N. Am. LLC*, 2011 WL 6399505, at *3 (S.D.N.Y. Dec. 20, 2011) (plaintiff lacked good cause to amend where it was "on notice" of deficiency in claim for over "two years").

In contrast, Apex's claim that discovery "fundamentally altered" its understanding of IQ-EQ's role (Mot. at 12) is refuted by its May and November 2025 complaints, which show it had notice (and believed) that IQ-EQ used its proprietary information but delayed seeking to add IQ-EQ as a party for two years. (Ex. 3, ¶¶143, 154, 156, 160; Dkt. No. 80 ¶¶78, 85, 127, 137, 199.)

*Third*, Apex also lacks good cause because it waited over three months to seek leave after receiving, on "April 24, 2026," six "Related[] communications with IQEQ" that it claims revealed the basis for its motion. (Apex Am. Mot. to Amend, Dkt. No. 162.) Courts in this Circuit hold that a "three-month failure to move for amendment after learning" of facts forming the basis of a

motion for leave to amend "failed to demonstrate the diligence necessary to satisfy Rule 16." *Gullo v. City of N.Y.*, 540 F. App'x 45, 47 (2d Cir. 2013); *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 36 (S.D.N.Y. 2020) (plaintiff lacked good cause for leave to amend where it "waited over three months after" receiving new information "without uttering a word to the Court about its intentions to amend"); *Baergas v. City of N.Y.*, 2005 WL 2105550, at *10 (S.D.N.Y. Sept. 1, 2005) (no good cause where plaintiff "failed to act diligently" due to "more-than-two-month delay in moving to amend the complaint"); *Abrams v. HBM Prenscia Inc.*, 2020 WL 6482881, at *2 (S.D.N.Y. Nov. 4, 2020) ("six-month delay is inconsistent with the "diligence" requirement to demonstrate "good cause" under Rule 16"). This three-month delay is particularly inexcusable given Apex's allegations in its May and November 2025 pleadings that IQ-EQ used its proprietary information.

*Fourth*, although Rule 16's "primary consideration is whether the moving party can demonstrate diligence," the Court may also consider that Apex's untimely amendment "will prejudice defendants" by entirely upending the schedule and claims in this case. *Kassner v. 2nd Ave. Delicatessen Inc*., 496 F.3d 229, 244 (2d Cir. 2007). The prejudice to Defendants includes:

- Mooting Defendants' dispositive motions to dismiss the Amended Complaint, which have been fully-briefed for six months, and requiring a new set of motions; (Dkt. Nos. 130-31.)
- Significantly expanding the scope of the case and discovery, by adding six new causes of action. (Dkt. No. 159-1 ¶¶175-81, 240-78 (Counts 3, 12-16).)
- Effectively re-starting discovery with a new party and six new claims, just two months before the fact discovery deadline, after Defendants had substantially completed their production of documents, and the parties had agreed upon a fact deposition schedule;
- Delaying resolution for at least a year as a new party files and briefs a motion to dismiss, conducts a full set of fact discovery, and seeks its own set of depositions; and
- Significantly increasing the Employee Defendants' costs of litigation and trial.

These factors weigh heavily in favor of denying leave to amend. *See iMedicor, Inc. v. Access Pharms., Inc*., 290 F.R.D. 50, 53 (S.D.N.Y. 2013) (denying leave to amend where "plaintiff's new

claims would both require defendant to expend significant additional resources to conduct discovery and prepare for trial, and significantly delay resolution of the dispute.”).

## II. *RES JUDICATA* BARS THE DTSA, TUTSA, CONFIDENTIAL INFORMATION, TORTIOUS INTERFERENCE, AND AIDING/ABETTING CLAIMS, WHICH HAVE THE SAME OPERATIVE FACTS AS THE JANUARY 2025 COMPLAINT

The Court should also deny Apex’s motion for leave to amend, because *res judicata* bars Apex’s claims against IQ-EQ for (A) misappropriation of trade secret and confidential information claims (Counts 1-3); (B) tortious interference with Apex’s MSA with Related (Count 12); and (C) aiding and abetting the Employee Defendants’ breach of fiduciary duty (Count 13). As shown in Factual Background § F, these claims are based on the same operative facts as the January 2025 Complaint: IQ-EQ’s alleged conspiracy with the Employee Defendants to solicit Apex employees and steal Apex’s proprietary information, to take the Related account from Apex. For example:

| January 2025 Complaint, Ex. 1 | Proposed Sec. Am. Compl., Dkt. No. 159-1 |
|---|---|
| “In furtherance of Defendants’ unlawful conspiracy, … the Individual Defendants also absconded with, misappropriated, and continue to misappropriate Apex’s confidential and trade secret information, to unlawfully interfere with Apex’s existing customer relationships.” (¶60) | “Defendants acted in concert to engineer a seamless migration of Related’s business from Apex Capital to IQEQ by raiding Apex Capital’s workforce, appropriating Apex Capital’s confidential information and trade secrets, and leveraging those resources so IQEQ could seize Related’s accounts.” (¶2) |
| “[T]he confidential and trade secret information misappropriated by the Individual Defendants has been … used by the Defendants to bolster their collective effort to divert Related’s business from Apex to IQ-EQ” (¶103) | “IQEQ used Apex Capital’s confidential information … in connection with IQEQ’s efforts to assume the servicing of Related’s accounts and to replicate services that Apex Capital had provided to Related.” (*Id.* ¶180). |
| “[T]he Individual Defendants misappropriated Apex’s confidential and trade secret information and [have] disclosed that information to and/or used that information on behalf of IQ-EQ” (¶¶112, 123) | “The Former Employees and IQEQ misappropriated Apex Capital’s trade secrets and have used and disclosed those trade secrets in connection with their work for Related at IQEQ.” (¶¶155, 166) |
| “IQ-EQ, … intentionally and wrongfully interfered with the Individual Defendants’ contractual obligations by inducing and/or participating in their unlawful acts, including | “IQEQ knowingly induced and provided substantial assistance to the Former Employees in carrying out those breaches. Among other things, IQEQ facilitated the acquisition and |

| | |
|---|---|
| their breaches of the non-competition covenant, the solicitation of other Apex employees, and the retention of and disclosure of Apex Trade Secrets." (¶147) | transfer of Apex Capital's trade secrets and confidential information, worked with Related to transition business away from Apex Capital" (¶253) |
| "Defendants" have engaged in:<br>a. The misappropriation of Apex's confidential information, including the Apex Trade Secrets;<br>b. The unlawful raid of Apex's personnel to destroy its ability to provide services to existing ….customers." (¶¶168, 172) | IQ-EQ willfully and intentionally interfered with the MSA by: working hand-in-hand with Related and the Former Employees to acquire the confidential information and work product necessary to replicate Apex Capital's services" (¶244). |

*First*, Apex's "voluntary dismissal with prejudice" of the January 2025 Complaint against IQ-EQ "is an adjudication on the merits for purposes of res judicata," and thus Apex is barred from reasserting claims based on the same facts as the January 2025 complaint. *Mohamad v. Rajoub*, 767 F. App'x 91, 92–93 (2d Cir. 2019) (quoting *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995)); *accord Nemaizer v. Baker*, 793 F.2d 58, 60 (2d Cir. 1986) ("A dismissal with prejudice arising out of an agreement of the parties is an adjudication of all matters contemplated in the agreement."); *Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 561–62 (S.D.N.Y. 2012) ("Plaintiff's voluntary dismissal with prejudice" is an adjudication of the merits "for res judicata purposes").

*Second, res judicata* bars these new Apex claims because "they arise from the same transaction[s] or occurrence[s]," even though they are based on slightly "different legal theories" than the January 2025 Complaint. *Cho*, 991 F.3d at 169. As the Second Circuit has held, "new claims [that] arise out of the same factual predicate as the original claims" "are plainly barred by *res judicata*" even where the "new claims are based on different legal theories." *L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999); *accord Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 39 (2d Cir. 1992) ("It is this identity of facts surrounding the occurrence which constitutes the cause of action, not the legal theory upon which [the plaintiff] chose to frame [his]

complaint."). The Proposed SAC alleges the same operative facts as the January 2025 Complaint—that IQ-EQ allegedly stole Apex's trade secret and confidential information and conspired with the Employee Defendants to solicit Apex employees working on the Related account to get Related to move its business to IQ-EQ. Apex's new claims of misappropriation of trade secrets and confidential information, aiding and abetting breach of fiduciary duties, and tortious interference with contract are thus barred by res judicata.

*Third*, *res judicata* applies to bar Apex's proposed misappropriation, tortious interference and aiding and abetting claims against IQ-EQ (proposed Counts 1-3 and 12-13) because they "are grounded almost entirely upon" the same facts alleged in the January 2025 Complaint—despite Apex's "mere inclusion of a few" post-January 2025 facts in the proposed SAC. *Gache v. Hill Realty Assocs., LLC*, 2014 WL 5048336, at *7 n.11 (S.D.N.Y. Sept. 22, 2014); *accord Waldman v. Vill. of Kiryas Joel,* 207 F.3d 105, 114 (2d Cir.2000) ("the mere inclusion of a few post-[adjudication] acts" cannot be used "to resurrect a claim, grounded almost entirely upon" events alleged in the original action). Apex's proposed Second Amended Complaint barely mentions any post-January 2025 events (Dkt. 159-1 ¶¶141-43, 145, 147), and does so primarily to address the different Counts 14-16. These post-January 2025 allegations do not save the trade secret and confidential information misappropriation, tortious interference and aiding and abetting claims.

## III. THE NARROW FRAUD EXCEPTION TO RES JUDICATA DOES NOT APPLY – AND APEX HAS FAILED TO ALLEGE FRAUD WITH PARTICULARITY

The Court should reject Apex's attempt to avoid *res judicata* by arguing that IQ-EQ fraudulently induced it to voluntarily dismiss the January 2025 Complaint with prejudice (Dkt. No. 159-1 ¶¶256-64). Apex has not alleged (i) that it conducted any discovery before dismissing

the January 2025 Complaint, (ii) any particularized conduct by IQ-EQ to fraudulently conceal evidence, or (iii) with particularity that any IQ-EQ statement was fraudulent.

*First*, the narrow fraud exception to res judicata does not apply because Apex voluntarily dismissed its January 2025 Complaint against IQ-EQ without conducting discovery in that action. A "plaintiff seeking to apply the fraud exception to res judicata must 'allege with particularity' what the defendant 'did to conceal any material information' and why it was 'unable to discover defendant's actions.'" *Trireme Energy*, 757 F. Supp. 3d at 480 (quoting *Ningbo*, 2011 WL 5142756, at *9). If the plaintiff "could have uncovered the allegedly concealed evidence with minimal diligence or upon reasonable inspection," this "narrow" "fraud exception … will not apply." *Ningbo*, 2011 WL 5142756, at *9 (internal quotes omitted). Here, the fraud exception does not apply, because Apex "simply did not take *any* discovery" before voluntarily dismissing the January 2025 Complaint with prejudice, so it cannot show that IQ-EQ fraudulently concealed evidence or that Apex could not have discovered the facts with reasonable diligence. *Saabirah El v. City of N.Y.*, 300 F. App'x 103, 105 (2d Cir. 2008) (emphasis in original).

The Second Circuit has rejected the fraud exception to *res judicata* where the plaintiff "could have ascertained" the allegedly new "information through due diligence, including pre-filing investigation or discovery upon the original complaint." *L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999). *L-Tec* governs because Apex had the right and every opportunity to conduct discovery on the January 2025 Complaint to seek the information it now cites in its motion for leave to amend. Apex promptly obtained this information through discovery in this case, from IQ-EQ's alleged conspirators (Related and the Employee Defendants)—without even filing a motion to compel. Apex "made th[e] choice" to "forgo such discovery" on the January 2025 Complaint and thus cannot avoid *res judicata* here. *iOptimize Realty Inc. v. Cox Enters., Inc.*,

2025 WL 2696475, at *7 (E.D.N.Y. Sept. 22, 2025); *accord Trireme Energy*, 757 F. Supp. 3d at 480 (fraud exception to *res judicata* did not apply where the plaintiff did not show "that evidence necessary to bring its … claim was 'fraudulently concealed' or impossible to 'discover with due diligence'").

Similarly, in *Saabirah El*, the Second Circuit held that the plaintiff could not show that "evidence was [] fraudulently concealed" in the first case because the plaintiff "simply did not take *any* discovery before" her case was dismissed. 300 F. App'x at 105. Thus, there was no basis to conclude that the defendants "delayed" or "withheld other documents," and the fraud exception to res judicata did not apply. *Id.*; *In re Layo*, 460 F.3d 289, 292–93 (2d Cir.2006) (barring plaintiff's claims under res judicata when "the most basic type of due diligence" of reviewing mortgage records would have "uncovered" the claims.) *Saabireh El* is directly on point, because just like the *Saabireh El* plaintiff, Apex simply did not take any discovery before voluntarily dismissing the January 2025 Complaint with prejudice. Thus, Apex cannot avoid *res judicata* here.

As this Court has held, "[f]raud is an exception to the application of *res judicata* when there has been a fraud on the court; the exception does not apply just because common law fraud claims are asserted against an opposing party." *Sanders v. Sanders*, 2021 WL 4392053, at *11 (S.D.N.Y. Sept. 24, 2021), *aff'd*, 2022 WL 16984681 (2d Cir. Nov. 17, 2022) (Caproni, J.). Instead, the fraud exception requires particularized evidence that the defendant affirmatively "concealed [] evidence" in a manner that obstructed the plaintiff's "opportunity to have a full and fair hearing." *Holmes v. City of N.Y.*, 2020 WL 918611, at *8 (S.D.N.Y. Feb. 26, 2020). Where, as here, the plaintiff "has not alleged that [IQ-EQ] took action to trick the … court system into ruling in her favor," the fraud "exception … is inapplicable." *Sanders*, 2021 WL 4392053, at *11.

*Critically*, Apex cannot escape *res judicata* by claiming blind reliance on IQ-EQ's draft February 17, 2025 letter, because it is a sophisticated entity represented by counsel that alleged a "forensic investigation" (Ex. 1 ¶83) showed that the Employee "Defendants misappropriated Apex's … trade secret information and has … used that information on behalf of IQ-EQ." (*Id.* ¶¶112, 123). In the *res judicata* context, plaintiffs are required to "undertake a searching inquiry as to potential litigation claims" and are not excused from failing to conduct diligence. Further, where "sophisticated businessmen" have "access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of reliance." *Trireme Energy*, 757 F. Supp. 3d at 483 (rejecting fraud exception to res judicata where sophisticated party had "notice" of its claim at the time of the prior action). Here, Apex had the opportunity to conduct full discovery under the January 2025 Complaint to verify IQ-EQ's February 17, 2025 letter, but failed to take advantage of that access. Apex did not justifiably rely on IQ-EQ's statements under *Trireme Energy*.

*Second*, Apex has failed to plead fraudulent inducement with particularity as required by Rule 9(b). It has not alleged with particularity (i) what specific information shows that any particular IQ-EQ statement was false when made, (ii) that IQ-EQ acted with *scienter*, knowing that its statements were false when made, or (iii) what specific Apex proprietary information IQ-EQ used to solicit Related's business. Specifically, the proposed SAC contains no allegation that IQ-EQ used any particular Apex trade secret or confidential information on IQ-EQ's systems or used any particular Apex proprietary information to solicit Related. Importantly, Apex has repeatedly told the Court that it cannot identify with particularity which of its trade secrets has been misappropriated. Thus, Apex plainly has not—and cannot—specify any Apex trade secret that IQ-EQ knew that it misappropriated at the time it sent its February 17, 2025 draft letter to

Apex. Apex's "[c]onclusory" allegations about IQ-EQ misappropriating Apex proprietary information and about what IQ-EQ "knew or should have known" are insufficient to plead fraud with particularity. *SAT Aero Hldgs., Inc. v. Aerolinea del Estado Mexicano, S.A. de C.V.*, 2025 WL 3012989, at *9 (S.D.N.Y. Oct. 28, 2025); *accord In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 735 F. Supp. 3d 352, 391 (S.D.N.Y. 2024) ("speculative allegations" of falsity and scienter are insufficient to plead fraud with particularity).

Instead, the exhibits to Apex's motion show that IQ-EQ repeatedly sought to avoid using Apex's proprietary information by instructing Related that it should only request Related's data when it terminated its Apex contract – and should ask to remove any non-Related data:

- IQ-EQ instructed Related to state, "***I am not looking to access an Apex database. Instead, I am looking for a copy of my [Related's] data***," and "***to remove any non Related Fund Management data*** from the copied data base." (Apex Ex. M, Dkt. 159-13 at 1 (emphasis added).)

- IQ-EQ also instructed Related Fund Management ("RFM") to ask to "***remove any non-RFM related data … to create a new database from which Investran can be run.***" (Apex Ex. 1, Dkt. No. 159-9 at 1 (emphasis added).)

- On March 13, 2025, IQ-EQ instructed Related to demand that Apex return "**your data**" (Apex Ex. N, Dkt. No. 159-14 at 1 (emphasis added).)

These attached documents are incorporated into the Complaint and show that Apex cannot allege fraud with particularity against IQ-EQ. *Prairie St.*, 2026 WL 710080, at *4 ("documentary evidence attached to the complaint or incorporated by reference therein" prevails over contradictory general allegations).

## IV. APEX HAS FAILED TO STATE A CLAIM FOR BREACH OF CONTRACT OR THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Apex fails to state a breach of contract claim because it does not identify any provision of a contract that IQ-EQ breached. Its good faith and fair dealing claim is likewise duplicative because

Apex, as a sophisticated party, cannot use a good faith and fair dealing claim to add a provision to a contract.

*First*, Apex's breach of contract claim fails because the proposed SAC does not identify any provision of the February 17, 2025 letter (that Apex claims is an agreement) that IQ-EQ has allegedly breached, nor identify how IQ-EQ has breached any such provision. (Dkt. No. 159-1 ¶¶265-71.) Count Fifteen for breach of contract does not identify a contract provision at all—much less explain any breach. The rule is clear: "a breach of contract complaint that does not identify the terms of the contract breached by the defendant, or the acts of the defendant constituting a breach, fails to state a claim." *Phillips v. Google LLC*, 2025 WL 1795894, at *3 (S.D.N.Y. June 30, 2025) (dismissing breach of contract claim where plaintiff failed to allege "how Defendants breached" contract's "terms").

Courts in this district consistently dismiss breach of contract claims where, as here, the plaintiff "fail[ed] to allege the specific provision of the [contract] that [Defendant] allegedly breached—an essential requirement for a breach of contract claim." *Hudson Neurosurgery, PLLC v. UMR, Inc.*, 2022 WL 902107, at *4 (S.D.N.Y. Mar. 28, 2022); *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016), *aff'd*, 759 F. App'x 42 (2d Cir. 2019) (dismissing breach of contract claims because "the Complaint does not specify which clause of the Agreement Defendant is alleged to have breached" or how defendant breached it); *Fitzgerald v. Chase Home Fin., LLC*, 2011 WL 9195046, at *6 (S.D.N.Y. Feb. 28, 2011) ("Plaintiffs fail to state a claim for breach of contract because [p]laintiffs do not identify any terms of the mortgage agreement breached"). Here, Apex's proposed SAC does not identify which specific provision of an agreement IQ-EQ has allegedly breached, nor does it specify how IQ-EQ breached that provision. Apex's breach of contract claim therefore fails.

*Second*, the Court should reject Apex's claim for breach of the implied covenant of good faith and fair dealing because it duplicates the contract claim. Apex bases both claims on the same allegation: "IQEQ conspired with Related and the Former Employees to misappropriate Apex Capital's trade secrets and confidential information." (*Compare* Dkt. No. 159-1 ¶269, *with id.* ¶76 (same).) New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002). Apex's implied covenant claim therefore fails as a matter of law.

Moreover, the Court should also reject Apex's implied covenant of good faith and fair dealing claim to the extent Apex uses it to allege that IQ-EQ should be held liable for anything beyond the express terms of the draft February 17, 2025 letter. Under New York law, "[t]he covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel." *D & L Holdings, LLC v. RCG Goldman Co., LLC,* 287 A.D.2d 65, 73 (1st Dep't 2001). The "Court[] should especially refrain from adding additional terms when sophisticated parties enter into a contract negotiated at arm's length by knowledgeable counsel." *Cytec Indus. Inc. v. Allnex (Luxembourg) & Cy S.C.A.*, 2017 WL 2634177, at *6 (S.D.N.Y. June 19, 2017). As a sophisticated party, Apex cannot use an implied covenant claim to add a new term to a contract, and thus this claim fails as a matter of law.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Apex's untimely motion for leave to file a Second Amended Complaint.

Dated: August 28, 2026

**SADIS & GOLDBERG LLP**

By: */s/ Samuel J. Lieberman*
Samuel J. Lieberman
Jennifer Rossan
Scott C. Ferrier
Cameron Posillico
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-8164
slieberman@sadis.com
jrossan@sadis.com
sferrier@sadis.com
cposillico@sadis.com

*Attorneys for Defendant Ryan Hope*

**SPENCER FANE LLP**

By: */s/ Elizabeth C. Conway*
Laurie N. Patton (*pro hac vice*)
Elizabeth C. Conway
711 Third Avenue
New York, NY 10017
(212) 907-7300
lpatton@spencerfane.com
econway@spencerfane.com

*Attorneys for Defendant William C. Chaney*

**ATWOOD & MCCALL, PLLC**

By: */s/ Wilson E. Wray*
Wilson E. Wray (*pro hac vice)*
Austin F. Pennington (*pro hac vice)*
8150 N. Central Expressway, Suite 1100
Dallas, Texas 75206
T: (972) 665-9600
F: (214) 736-2960
wwray@atwoodmccall.com
apennington@atwoodmccall.com

Samuel J. Lieberman
Jennifer Rossan
Scott C. Ferrier
Cameron Posillico
SADIS & GOLDBERG LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-6675
slieberman@sadis.com
jrossan@sadis.com
sferrier@sadis.com
cposillico@sadis.com

*Attorneys for Defendant Preston Callen*

**FARROW-GILLESPIE HEATH WILMOTH LLP**

By: */s/ Stephanie K. Osteen*
Stephanie K. Osteen (*pro hac vice*)
Caylin Cierra Craig (*pro hac vice*)
1900 North St. Paul Street, Suite 2100
Dallas, TX 75201
(214) 361-5600
stephanie.osteen@fghwlaw.com
caylin.craig@fghwlaw.com

Samuel J. Lieberman
Jennifer Rossan
Scott C. Ferrier
Cameron Posillico
SADIS & GOLDBERG LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-6675
slieberman@sadis.com
jrossan@sadis.com
sferrier@sadis.com
cposillico@sadis.com

*Counsel for Defendant Lucas Belinkie*

**CERTIFICATE OF COMPLIANCE PURSUANT TO LOCAL CIVIL RULE 7.1(c)**

Samuel J. Lieberman, undersigned counsel, hereby certifies that the number of words within the attached memorandum of law, excluding the caption, table of contents, table of authorities, and signature block, is 8,200 words according to the word-processing system used to prepare the aforesaid document.

/s/ Samuel J. Lieberman
Samuel J. Lieberman