# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| APEX GROUP CAPITAL ADVISORS LLC<br><br>Plaintiff,<br><br>v.<br><br>IQEQ US MANAGEMENT CO, LLC, LUCAS BELINKIE, PRESTON CALLEN, WILLIAM C. CHANEY, & RYAN HOPE,<br><br>Defendants. | Civil Action No. |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff Apex Group Capital Advisors LLC ("Apex"), by its undersigned counsel, brings this Complaint against IQEQ US Management Co, LLC ("IQ-EQ"), Lucas Belinkie ("Belinkie"), Preston Callen ("Callen"), William C. Chaney ("Chaney"), and Ryan Hope ("Hope") (Belinkie, Callen, Chaney, and Hope are referred to herein collectively as the "Individual Defendants" and, with IQ-EQ, collectively as "Defendants"), and states as follows:

## THE PARTIES

1. Apex is a limited liability company, with offices maintained throughout the United States, including in Texas.

2. Apex is a single-source financial solutions provider that works with asset managers, allocators, financial institutions, and family offices.

3. Apex does business at and maintains an office located at 500 East John Carpenter Fwy, Suite 500, Irving, TX 75062.

4. IQ-EQ is a limited liability company, with offices maintained throughout the United States, including in Texas.

5. IQ-EQ is an investor services group that works with fund managers, multinational companies, family offices, and private clients.

6. IQ-EQ does business at and maintains an office at 2777 North Stemmons Freeway, Suite 1425, Dallas, TX 75207.

7. IQ-EQ is a direct competitor of Apex.

8. Belinkie is a citizen of the State of Texas and, upon information and belief, resides at 3807 Holland Avenue, Dallas, TX 75219.

9. Until December 4, 2024, Belinkie was Head of Real Assets Product – Americas at Apex. Upon information and belief, Belinkie is currently employed by IQ-EQ.

10. Callen is a citizen of the State of Texas and, upon information and belief, resides at 521 Blackfield Drive, Coppell, TX 75019.

11. Until December 20, 2024, Callen was Assistant Manager, Real Assets at Apex. Upon information and belief, Chaney is currently employed by IQ-EQ.

12. Chaney is a citizen of the State of Texas and, upon information and belief, resides at 2717 Howell Street, Apt. 2103, Dallas, TX 75204.

13. Until December 13, 2024, Chaney was Senior Manager, Real Assets at Apex. Upon information and belief, Chaney is currently employed by IQ-EQ.

14. Hope is a citizen of the State of Texas and, upon information and belief, resides at 6216 Flagstone Drive, McKinney, TX 75070.

15. Until December 13, 2024, Hope was Manager, Real Assets at Apex. Upon information and belief, Hope is currently employed by IQ-EQ.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over Apex's federal claims under 28 U.S.C. § 1331, because it is asserting a claim under the federal Defend Trade Secrets Act.

17. This Court has supplemental jurisdiction over Apex's state law causes of action under 28 U.S.C. § 1367(a), because those claims are so related to Apex's federal question claims that they form part of the same case or controversy.

18. This Court has general personal jurisdiction over Belinkie, Callen, Chaney, and Hope because each is a resident of Texas and works in Texas.

19. This Court has general personal jurisdiction over IQ-EQ because it maintains an office in Texas, regularly conducts business in Texas, and employs each of the individual Defendants, who live and work in Texas.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Belinkie, Callen, and Chaney reside in this judicial district, IQ-EQ and Hope conduct business in this judicial district, and a substantial part of the events giving rise to the claims herein occurred in this judicial district.

## FACTS PERTAINING TO ALL COUNTS

### The Individual Defendants' Contractual Obligations to Apex

21. In 2022, the parent company of Plaintiff Apex, Apex Group Ltd. ("Apex Group"), acquired SandsPoint Capital Advisors LLC ("SandsPoint"). SandsPoint provided advisory and consulting support and solutions to the real estate, private equity, and investment management industries. Following the acquisition, SandsPoint's name was changed to Apex Group Capital Advisors LLC (*i.e.*, "Apex" as used herein). However, all legacy SandsPoint personnel, including

the Individual Defendants, continued in the same capacities, providing services under the new Apex naming convention.

22. On August 23, 2013, as a condition of his employment with SandsPoint, Apex's predecessor, Belinkie executed a letter agreement ("Belinkie Agreement"), a true and correct copy of which is attached hereto as Exhibit A.

23. The Belinkie Agreement sets forth certain post-employment restrictions that are intended to protect Apex's legitimate business interests.

24. Pursuant to Sections 4(a) and 4(e) of the Belinkie Agreement, Belinkie agreed to protect Apex's confidential and trade secret information and to not make any unauthorized disclosure of that information to any third party. Specifically, Belinkie agreed that:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Exhibit A, §§ 4(a), 4(e).

25. Pursuant to Section 4(b) of the Belinkie Agreement, Belinkie agreed not to work for a competitor of Apex for twelve months after the termination of his employment with Apex. Specifically, Belinkie agreed that:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*See* Exhibit A, § 4(b).

26. Pursuant to Section 4(c) of the Belinkie Agreement, Belinkie agreed not to solicit or induce other Apex employees from terminating employment with Apex. Specifically, Belinkie agreed that:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

*See* Exhibit A, § 4(c).

27. The Belinkie Agreement further states that it "shall be governed by and construed in accordance with the laws of the State of New York" and inures "to the benefit of the Company and its successors and assigns." *See* Exhibit A, § 5.

28. On April 19, 2021, as a condition of his employment with SandsPoint, Apex's predecessor, Callen executed a letter agreement ("Callen Agreement"), a true and correct copy of which is attached hereto as Exhibit B.

29. The Callen Agreement sets forth certain post-employment restrictions that are intended to protect Apex's legitimate business interests.

30. Pursuant to Sections 4(a) and 4(e) of the Callen Agreement, Callen agreed to protect Apex's confidential and trade secret information and to not make any unauthorized disclosure of that information to any third party. Specifically, Callen agreed that:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Exhibit B, §§ 4(a), 4(e).

31. Pursuant to Section 4(b) of the Callen Agreement, Callen agreed not to work for a competitor of Apex for twelve months after the termination of his employment with Apex. Specifically, Callen agreed that:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member,

> director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*See* Exhibit B, § 4(b).

32. Pursuant to Section 4(c) of the Callen Agreement, Callen agreed not to solicit or induce other Apex employees from terminating employment with Apex. Specifically, Callen agreed that:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

*See* Exhibit B, § 4(c).

33. The Callen Agreement further states that it "shall be governed by and construed in accordance with the laws of the State of New York" and inures "to the benefit of the Company and its successors and assigns." *See* Exhibit B, § 5.

34. On October 18, 2015, as a condition of his employment with SandsPoint, Apex's predecessor, Chaney executed a letter agreement ("Chaney Agreement"), a true and correct copy of which is attached hereto as Exhibit C.

35. The Chaney Agreement sets forth certain post-employment restrictions that are intended to protect Apex's legitimate business interests.

36. Pursuant to Sections 4(a) and 4(e) of the Chaney Agreement, Chaney agreed to protect Apex's confidential and trade secret information and to not make any unauthorized disclosure of that information to any third party. Specifically, Chaney agreed that:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Exhibit C, §§ 4(a), 4(e).

37. Pursuant to Section 4(b) of the Chaney Agreement, Chaney agreed not to work for a competitor of Apex for twelve months after the termination of his employment with Apex. Specifically, Chaney agreed that:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*See* Exhibit C, § 4(b).

38. Pursuant to Section 4(c) of the Chaney Agreement, Chaney agreed not to solicit or induce other Apex employees from terminating employment with Apex. Specifically, Chaney agreed that:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

*See* Exhibit C, § 4(c).

39. The Chaney Agreement further states that it "shall be governed by and construed in accordance with the laws of the State of New York" and inures "to the benefit of the Company and its successors and assigns." *See* Exhibit C, § 5.

40. On February 15, 2019, as a condition of his employment with SandsPoint, Apex's predecessor, Hope executed a letter agreement ("Hope Agreement"), a true and correct copy of which is attached hereto as Exhibit D.

41. The Hope Agreement sets forth certain post-employment restrictions that are intended to protect Apex's legitimate business interests.

42. Pursuant to Sections 4(a) and 4(e) of the Hope Agreement, Hope agreed to protect Apex's confidential and trade secret information and to not make any unauthorized disclosure of that information to any third party. Specifically, Hope agreed that:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including,

> without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Exhibit D, §§ 4(a), 4(e).

43. Pursuant to Section 4(b) of the Hope Agreement, Hope agreed not to work for a competitor of Apex for twelve months after the termination of his employment with Apex. Specifically, Hope agreed that:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*See* Exhibit D, § 4(b).

44. Pursuant to Section 4(c) of the Hope Agreement, Hope agreed not to solicit or induce other Apex employees from terminating employment with Apex. Specifically, Hope agreed that:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the

> Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

*See* Exhibit D § 4(c).

45. The Hope Agreement further states that it "shall be governed by and construed in accordance with the laws of the State of New York" and inures "to the benefit of the Company and its successors and assigns." *See* Exhibit D, § 5.

46. The Belinkie Agreement, Callen Agreement, Chaney Agreement, and Hope Agreement contain substantively identical provisions that relate to confidentiality and non-disclosure of Apex's confidential and trade secret information, non-competition, and employee non-solicitation. *See* Exhibits A-D. The Belinkie Agreement, Callen Agreement, Chaney Agreement, and Hope Agreement are referred to collectively herein as "the Agreements."

47. The restrictions in the Agreements seek to protect the goodwill and reputation Apex has developed in the marketplace and prohibit unfair competition in the form of exploitation of the relationships and proprietary information that Apex has developed, including the resources expended to build, support, and protect its customer base and employee relationships.

**Apex's Confidential and Trade Secret Information**

48. Apex has expended and continues to expend significant time, effort, and money to develop its relationships with its customers, to learn the customers' specific business needs, including the development of best practices to service the same, to develop substantial contacts and goodwill with its customers, and to market and provide its services to those customers.

49. To operate its business and service its customers, Apex provided its employees, including the Individual Defendants, access to Apex's confidential and trade secret information. This confidential and trade secret information includes but is not limited to: financial,

organizational, and operational information; the revenues, gross or net income, compensation or profitability of Apex and its employees, customers, and affiliates; investment research reports; the identity of any client, customer, prospective client or prospective customer; information about customers' preferences, business plans, and strategies; strategic methods for specific client servicing, including deliverables data and strategic plans.

50. The foregoing confidential and trade secret information creates a significant competitive advantage for Apex and would be an irreparably harmful tool in the hands of Apex's competitors.

51. To protect its considerable investment in developing its confidential and trade secret information, Apex takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of its confidential and trade secret information.

52. For example, Apex utilizes password-protected, secure cloud-based systems, networks, and computers to store and maintain much of its confidential and trade secret information. Apex further limits access to its secure system to employees and certain other authorized individuals.

53. Apex limits employee access to its confidential and trade secret information to what is reasonably needed to perform their duties on behalf of Apex.

54. In exchange for the benefits that employment with Apex confers, Apex requires that its employees that have access to Apex's confidential and trade secret information sign agreements requiring them to maintain in confidence all confidential and trade secret information of Apex. Each of the Individual Defendants has executed an agreement that required them to protect and to not make any unauthorized disclosures of Apex's confidential and trade secret

information, and to return all such information upon the termination of employment with Apex. *See* Exhibits A-D.

55. Apex's efforts and successes have allowed it to develop goodwill and relationships with its customers. In turn, these efforts and successes inure to the benefit of employees of Apex, including the Individual Defendants, who develop relationships with Apex's key customers and receive confidential information regarding the customers.

56. Apex developed its trade secrets, confidential information, and other valuable proprietary data that are not readily ascertainable to Apex's competitors solely for Apex's use and benefit. Protecting the confidentiality of this information is essential to maintaining its value and commercial benefit to Apex.

57. The disclosure and use of this confidential and trade secret information would be irreparably injurious to Apex.

**The Coordinated Departure**

58. Upon information and belief, dating as far back as October 2024, the Defendants secretly conspired to pirate-away virtually an entire Apex client service team responsible for servicing substantial Apex client relationships, including The Related Companies ("Related").

59. Since the inception of Defendants' unlawful conspiracy, much of the aforementioned Apex team have resigned from Apex and joined IQ-EQ in similar if not identical roles.

60. In furtherance of Defendants' unlawful conspiracy, upon information and belief, the Individual Defendants also absconded with, misappropriated, and continue to misappropriate Apex's confidential and trade secret information, to unlawfully interfere with Apex's existing customer relationships.

61. Defendants' goal was not only to unlawfully compete with Apex by stealing an entire client service team in violation of the Individual Defendants' Agreements and the law, but to also cripple Apex's ability to compete with IQ-EQ for the corresponding client relationships.

62. Belinkie, who at the time of his resignation was Head of Real Assets Product – Americas for Apex, gave his notice of resignation on October 24th, 2024, with his last day of work for Apex on December 4th, 2024.

63. At the time of his resignation, Belinkie refused to disclose to Apex the identity of his new employer.

64. Belinkie is currently employed by IQ-EQ, a fact unknown to Apex until recently, when Defendants' unlawful raid further unfolded.

65. Chaney was the next to give his notice of resignation, on October 30, 2024. At the time of his resignation from Apex, he was a Senior Manager, Real Assets. His last day of employment with Apex was December 13, 2024.

66. To explain-away his departure, Chaney stated to Apex that he was upset that Belinkie had left the company, that he planned to take some time off, and that he had nothing else lined up at that time. Upon information and belief, these were all false representations intended to mask Chaney's unlawful intention to join Belinkie at IQ-EQ.

67. As of no later than January 13, 2025, Chaney had become employed by IQ-EQ as a Managing Director.

68. Hope gave his notice of resignation on November 20, 2024. He resigned to Chaney, who reported to Apex management that Hope had "found another opportunity (didn't mention the company) and made it clear there is nothing we can do to get him to stay." A true and correct copy

of the email from Chaney to Apex management regarding Hope's resignation is attached hereto as Exhibit E.

69. At the time of his resignation, Hope was a Manager, Real Assets at Apex. Like Chaney, his last day of work at Apex was December 13, 2024.

70. Hope is currently employed by IQ-EQ, which establishes that his prior representations to Apex were knowingly false and intended to mask his unlawful intentions.

71. Callen submitted his notice of resignation on December 4, 2024. At the time of his resignation, Callen was an Assistant Manager, Real Assets, with Apex.

72. Callen also resigned to Chaney, who reported Callen's resignation to Apex management with the exact same language that he used to notify Apex management of Hope's resignation. Callen had also allegedly "found another opportunity (didn't mention the company) and made it clear there is nothing we can do to get him to stay." A true and correct copy of the email from Chaney to Apex management regarding Callen's resignation is attached hereto as Exhibit F. Again, this charade was intended to mask Defendants' unlawful conspiracy.

73. Callen's last day of employment with Apex was December 20, 2024.

74. Callen is currently employed by IQ-EQ.

75. Between November 29, 2024, and the date of this filing, 11 other Apex employees who worked on the same client service team have resigned from Apex. Only a few of those employees have told Apex of their employment plans after Apex. At least one of those employees, Karri Neal ("Neal"), is also now employed by IQ-EQ.[1]

[1] Neal lives and works in Michigan. Apex intends to file a complaint against Neal in Michigan to seek recourse for her violations of her contractual, statutory, and fiduciary obligations she owed to Apex.

76. Upon information and belief, at least some of the other employees who have resigned from Apex in the last two months have become employed by, or have offers to become employees of, IQ-EQ.

77. As a result of this literal decimation of Apex's workforce by its direct competitor, IQ-EQ, Apex is at imminent risk of losing customers and suffering irreparable harm from the destruction of its goodwill and customer relationships.

78. By way of example, leadership at Related previously conveyed to Apex that it has substantial concerns about Apex's ability to service its relationship due to the lack of staff and has put Apex on notice that Related may terminate its business relationship with Apex due to these concerns about staffing.

79. Related's position is not an isolated one, and other of Apex's existing and prospective relationships are at risk, if not already doomed, as a result of the unlawful actions of Defendants, which have left Apex with a devastated workforce and its confidential and trade secret information in the hands of one of its competitors.

**Misappropriation of Apex Confidential and Trade Secret Information**

80. On January 14, 2025, an employee of Related sent an email to a distribution group at Apex. Within twenty minutes, that employee unsuccessfully attempted to recall that email, but Apex was able to read the content of the email.

81. The email exchange inadvertently sent to Apex was between Chaney and the controller of one of the Related entities; Callen, Hope, and Neal were all copied on the email. Each

of the four former Apex employees had an "@iqeq.com" email address, which was the first time that Apex knew its former employees were now employed at its competitor, IQ-EQ.[2]

82. Shortly after learning that these four members of the team that serviced Related at Apex had joined IQ-EQ, an Apex employee called IQ-EQ and asked to speak to Belinkie. Although Belinkie was not available, the call did confirm for Apex that Belinkie had also joined IQ-EQ, as had at least four of his former Apex colleagues.

83. Apex then immediately began conducting an extensive internal forensic investigation to uncover unusual or unauthorized computer activity by any of the former Apex employees in the months preceding the last day of work of each of the employees.

84. The investigation is ongoing; to date, Apex has already confirmed that one of the four Individual Defendants downloaded a substantial amount of Apex's confidential and trade secret information prior to termination.

85. Defendant Chaney submitted his resignation notice on October 30, 2024. The day before, on October 29, he downloaded 1,021 files to a device that was not issued by Apex and has not been returned to Apex. While some of those files appear to be personal materials, Chaney also downloaded Apex's confidential and trade secret information that he was not authorized to retain after his employment with Apex ended.

86. Among the documents that Chaney downloaded to this non-Apex device on October 29, 2024, were numerous documents concerning Related, as well as documents concerning other Apex clients. As just a few examples of client documents misappropriated by

[2] As of the date of this filing, all four of the Individual Defendants continue to list Apex or SandsPoint as their current employer on LinkedIn. True and correct copies of the LinkedIn profiles for each of the Individual Defendants as of the date of the filing are collectively attached hereto as Exhibit G.

Chaney in the weeks before his departure, Chaney downloaded to the non-Apex device the following files: "RFM/Valuation Review/2024/2024 06 30/Support/Current Balances - Debt Deals.xlsx"; "RFM/Valuation Review/2024/2024 09 30/Support/3Q 24 Debt Valuation Analysis_vSP.xlsx"; and "RFM/Valuation Review/2024/2024 09 30/Support/RDF 3 & RDF 4 Funded amounts as of 9.30.xlsx".

87. In addition to documents containing information concerning Apex clients, Chaney also downloaded documents containing Apex's work product and information on Apex employees. Among those documents were guidelines and templates for employee recruiting, bullet points for a pitch for new business, and draft statements of work. Chaney also downloaded performance evaluations for other employees, including some who remain Apex employees, and several employee contact lists.

88. The documents Chaney downloaded to this non-Apex device without authorization included Apex's confidential and trade secrets information.

89. A preliminary review of Chaney's computer activity during the approximately six weeks between when Chaney gave his notice of resignation and his last date of employment with Apex revealed that the three highest days of download activity occurred on the day before he gave his notice of resignation, on the day before his last day of employment, and on his last day of employment at Apex.

90. During the approximately six-week window for which Apex has conducted a preliminary forensic investigation, Chaney downloaded more than 5,600 files or folders to an as of yet undetermined destination. Of those downloaded files and folders, over 480 had the word "related" in either the file or folder identification path.

91. "Related" is the name of the largest company served by the Individual Defendants while employed at Apex.

92. In addition, in October 2024, shortly after he had announced his intention to resign from Apex, Belinkie asked that Apex's IT department assist Related in obtaining full access to a database that contained that client's data. Apex's IT department was unable to provide the requested access, as information related to other Apex clients was also contained in that database. The Apex employees who were to take over the relationship after Belinkie left Apex were made aware of this request until much later in the process. Moreover, the request was highly unusual.

93. The information Belinkie sought on false pretenses contained Apex's confidential and trade secret information concerning one of Apex's clients.

94. On information and belief, Apex believes that Belinkie requested this information for the improper purpose of using Apex's confidential and trade secret information for the purpose of servicing that client after Belinkie and the other Individual Defendants had joined IQ-EQ.

95. Apex's preliminary forensic review of Belinkie's computer activity has revealed that, like Chaney, Belinkie was downloading a substantial amount of information to an unknown destination during the approximately six-week period between his notice of resignation and the last day of his employment at Apex.

96. Apex's preliminary forensic examination revealed that the three highest days of download activity occurred approximately one week after he gave his notice of resignation, on the day before his last day of employment, and on his last day of employment at Apex.

97. Of the more than 3,000 files and folders Belinkie downloaded during this period, over 200 had the word "related" in either the file or folder identification path.

98. On November 20, 2024, less than two weeks before he gave his notice of resignation, Callen downloaded more than 2,600 files or folders, or almost 20% of the approximately 12,260 folders and files he downloaded between October and December 20, 2024, his last day of employment with Apex. More than 50% of the files/folders Callen downloaded during the October-December time frame – approximately 6,380 files/folders – were downloaded on December 19, 2024, the day before his last day working for Apex.

99. More than 10% (about 1,420) of the files and folders Callen downloaded during this time period had the word "related" in either the file or folder identification path. More than 800 of those files/folders with "related" in the path were downloaded on December 19, 2024, the day before his last day working for Apex.

100. Not to be outdone, on November 20, 2024, the day Hope gave his notice of resignation, he downloaded to an as-of-yet undetermined destination over 7,000 files and folders. On the two days before his final day of work at Apex, Hope downloaded another approximately 11,550 files and folders. The more than 18,000 files and folders downloaded over those three days was more than 2/3 of all the downloads Hope did from October through his last date of employment at Apex.

101. The term "related" appeared in the file or folder path of more than 2,600 of the files/folders downloaded by Hope; more than 1,900 of those downloads occurred on three days – the day Hope gave his notice of resignation and the two days immediately preceding his last day of employment with Apex.

102. Given the emergent nature of this action, Apex's investigation is ongoing and, upon information and belief, will only continue to reveal further wrongdoing.

103. Upon information and belief, the confidential and trade secret information misappropriated by the Individual Defendants has been or will be used by the Defendants to bolster their collective effort to divert Related's business from Apex to IQ-EQ.

**The Defendants' Refusal to Abide by Their Obligations**

104. On January 17, 2025, Apex, through counsel, sent a letter to each of the Individual Defendants that, among other things, demanded the immediate return of any Apex confidential or trade secret information in the possession, custody, and control of any Defendant. Apex also demanded that the Individual Defendants comply with their contractual non-compete obligations by terminating their employment with IQ-EQ, a direct competitor of Apex. True and correct copies of the January 17, 2025, correspondence directed to Belinkie, Callen, Chaney, and Hope are collectively attached hereto as Exhibit H.

105. That same day, Apex, through counsel, sent a letter to the legal department of IQ-EQ, to advise IQ-EQ of Apex's concerns that IQ-EQ conspired with the Individual Defendants to raid Apex and to facilitate the violations of the Individual Defendants' contractual, statutory, and fiduciary obligations to Apex. A true and correct copy of the January 17, 2025, correspondence to IQ-EQ is attached hereto as Exhibit I.

106. On January 24, 2025, both sets of Defendants, while represented by the same law firm, separately responded to Apex's cease and desist letters. Defendants stated that they would not abide by the lawful and binding non-competes each Individual Defendant signed in exchange for employment with Apex, which included access to Apex's customer goodwill and confidential and trade secret information.

107. In addition, the Individual Defendants represented that they did not intend to use or retain any Apex confidential or trade secret information, and that they would immediately return any such information in their possession to Apex.

108. To date, none of the materials improperly downloaded by Chaney to the non-Apex device have been returned, nor has any of the other Individual Defendants returned any Apex confidential or trade secret information.

109. Finally, Defendants represented that the Individual Defendants had not violated the terms of their employee non-solicitation covenants, insisting that the five employees all "made independent decisions to leave Apex and sought new employment to advance their careers at IQEQ."

110. Upon information and belief, the four Individual Defendants and Neal, who worked together on the team supporting Related while at Apex, did not all independently make the decision to quit Apex and join the same company in a matter of two months and immediately become part of IQ-EQ's team supporting Related. Instead, the five members of Apex's team supporting Related – and potentially others – coordinated and conspired with IQ-EQ to leave Apex over time and to re-form the Related team at IQ-EQ, to unfairly divert business from Apex to IQ-EQ.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT
### (AGAINST BELINKIE, CALLEN, CHANEY, AND HOPE)

111. Apex incorporates by reference the allegations set forth in Paragraphs 1 through 110 of this Verified Complaint as if fully set forth herein.

112. Upon information and belief, the Individual Defendants misappropriated Apex's confidential and trade secret information and has disclosed that information to and/or used that information on behalf of IQ-EQ.

113. At least some of the information that the Individual Defendants misappropriated constitute trade secrets of Apex ("the Apex Trade Secrets") subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq*.

114. The Apex Trade Secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use. Apex has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

115. The Apex Trade Secrets are related to products or services used in, or intended for use in, interstate commerce.

116. Apex takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of the Apex Trade Secrets.

117. Upon information and belief, the Individual Defendants took, refused to return, and used and/or disclosed (and likely plan to use and disclose) the Apex Trade Secrets and other valuable business information by improper means in violation of his contractual and other obligations to Apex.

118. The Individual Defendants engaged in this conduct despite acquiring the Apex Trade Secrets under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty the Individual Defendants owed and continue to owe to Apex.

119. The Individual Defendants' foregoing conduct constitutes an actual and threatened misappropriation and misuse of Apex's Trade Secrets in violation of the DTSA.

120. As a direct and proximate result of the Individual Defendants' actual and threatened misappropriation of the Apex Trade Secrets, Apex has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless the Individual Defendants are enjoined from engaging in any further acts of misappropriation, and from continued possession in any form of trade secret information belonging to Apex.

121. As a direct and proximate result of the Individual Defendants' actual and threatened misappropriation, Apex has suffered and/or will suffer damages and is entitled to all damages and remedies permitted under the DTSA.

**COUNT TWO**
**VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT**
**(AGAINST BELINKIE, CALLEN, CHANEY, AND HOPE)**

122. Apex incorporates by reference the allegations set forth in Paragraphs 1 through 121 of this Verified Complaint as if fully set forth herein.

123. Upon information and belief, the Individual Defendants misappropriated Apex's confidential and trade secret information and has disclosed that information to and/or used that information on behalf of IQ-EQ.

124. At least some of the information that the Individual Defendants misappropriated include the Apex Trade Secrets, subject to protection under the Texas Uniform Trade Secrets Act ("TUTSA"), Tex. Civ. Prac. & Rem. Code § 134A.001 *et seq.*

125. The Apex Trade Secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use. Apex has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

126. Apex takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of the Apex Trade Secrets.

127. Upon information and belief, the Individual Defendants took, refused to return, and used and/or disclosed (and likely plans to use and disclose) the Apex Trade Secrets and other valuable business information by improper means in violation of his contractual and other obligations to Apex.

128. The Individual Defendants engaged in this conduct despite acquiring the Apex Trade Secrets under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty the Individual Defendants owed and continue to owe to Apex.

129. The Individual Defendants' foregoing conduct constitutes an actual and threatened misappropriation and misuse of Apex's Trade Secrets in violation of the TUTSA.

130. As a direct and proximate result of the Individual Defendants' actual and threatened misappropriation of the Apex Trade Secrets, Apex has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless the Individual Defendants are enjoined from engaging in any further acts of misappropriation, and from continued possession in any form of trade secret information belonging to Apex.

131. As a direct and proximate result of the Individual Defendants' actual and threatened misappropriation, Apex has suffered and/or will suffer damages and is entitled to all damages and remedies permitted under the TUTSA.

**COUNT THREE**
**BREACH OF CONTRACT**
**(AGAINST BELINKIE, CALLEN, CHANEY, AND HOPE)**

132. Apex incorporates by reference its allegations set forth in paragraphs 1 through 131 of this Verified Complaint as if fully set forth herein.

133. The Agreements, including the confidentiality, non-competition, and employee non-solicitation covenants contained therein, are valid and enforceable contracts.

134. The Agreements were executed at the commencement of employment and are supported by adequate and sufficient consideration.

135. In their respective Agreements, each of the Individual Defendants agreed that they would not disclose to any third party or after termination retain any confidential or trade secret information belonging to Apex. *See* Individual Defendants' Agreements, Exhibits A-D, §§ 4(a), 4(e).

136. By retaining Apex Trade Secrets and other Apex confidential information following the termination of their employment with Apex, each of the Individual Defendants is in violation of the terms of the confidentiality and non-disclosure covenants set out in Sections 4(a) and 4(e) of their respective Agreements.

137. In their respective Agreements, each of the Individual Defendants agreed that, for twelve months following the end of their employment with Apex, he would not "enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged." *See* Individual Defendants' Agreements, Exhibits A-D, § 4(b).

138. By accepting employment with IQ-EQ, a direct competitor of Apex with an office in the same city out of which the Individual Defendants worked while employed by Apex, the Individual Defendants are in perhaps the most direct and immediate violation of the terms of the non-competition covenant set out in Section 4(b) of their respective Agreements that is possible.

139. In their respective Agreements, each of the Individual Defendants agreed that, for twelve months after the end of their employment with Apex, they would not induce or solicit any

Apex employees to terminate their own employment with Apex. *See* Individual Defendants' Agreements, Exhibits A-D,§ 4(c).

140. Upon information and belief, the Individual Defendants acted in concert with one another to coordinate their departures from Apex and affiliation with IQ-EQ, Apex's competitor, and induced other employees of Apex to terminate employment with Apex as well. In engaging in such conduct, the Individual Defendants violated the employee non-solicitation covenants set out in Section 4(c) of their Respective Agreements.

141. The restrictive covenants in the Agreements are reasonable in scope and duration and are necessary to protect Apex's legitimate business interests in securing its confidential and trade secret information, protecting its goodwill with customers and employees, and its business reputation.

142. Apex has complied with the material terms of each of the Agreements and has performed its obligations thereunder.

143. As a direct and proximate result of the Individual Defendants' respective breaches of the Agreements, Apex has suffered and will continue to suffer damages and irreparable harm.

144. Apex is entitled to damages to be proven at trial, as well as pre- and post-judgment interest, and injunctive relief.

**COUNT FOUR**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(IQ-EQ)**

145. Apex incorporates by reference its allegations set forth in paragraphs 1 through 144 of this Verified Complaint as if fully set forth herein.

146. Each of the Individual Defendants is subject to a valid and enforceable Agreement that contains confidentiality/non-disclosure, non-competition, and employee non-solicitation covenants. *See* Exhibits A-D.

147. IQ-EQ, upon information and belief, having knowledge of the existence of the Agreements, intentionally and wrongfully interfered with the Individual Defendants' contractual obligations by inducing and/or participating in their unlawful acts, including their breaches of the non-competition covenant, the solicitation of other Apex employees, and the retention of and disclosure of Apex Trade Secrets.

148. Apex had a reasonable expectation that the Individual Defendants would comply with their Agreements and that Apex would receive the benefit of the bargain embodied in the Agreements.

149. By engaging in the wrongful and unlawful conduct described herein, IQ-EQ has tortiously, intentionally, and willfully interfered with Apex's contractual relationship with the Individual Defendants for its own benefit, without right or justification, and at the expense of Apex.

150. IQ-EQ's conduct has caused and will continue to cause severe and immediate injuries to Apex, including damage to the reputation and goodwill of Apex and the loss of customers and employees, for which Apex has no adequate remedy at law.

151. Apex is entitled to injunctive relief restraining IQ-EQ from further tortious interference, an award of damages sustained by Apex as a result of IQ-EQ's actions, punitive damages, and any other available legal and equitable relief.

**COUNT FIVE**
**TORTIOUS INTEFERENCE WITH EXISTING AND PROSPECTIVE BUSINESS RELATIONS**
**(ALL DEFENDANTS)**

152. Apex incorporates by reference its allegations set forth in paragraphs 1 through 151 of this Verified Complaint as if fully set forth herein.

153. Apex has invested substantial resources in the development and maintenance of its business relationships with customers and in the development of prospective customers.

154. To serve those existing and prospective customers, Apex needs to have qualified personnel available to meet a customer's specific needs and provide timely and comprehensive support. If Apex does not have the personnel needed to support a customer's needs, Apex risks losing existing customers and being unsuccessful in developing business relationships with new customers.

155. By wrongfully inducing a large number of Apex employees, in particular those employees who all serviced a particular customer or customers, to resign from Apex and to join IQ-EQ en masse, the Defendants have intentionally, maliciously, and improperly interfered with, and continue to interfere with, Apex's relationships with its customers.

156. Apex is entitled to injunctive relief restraining the Defendants from further tortious interference, an award of damages sustained by Apex as a result of the Defendants' actions, punitive damages, and any other available legal and equitable relief.

**COUNT SIX**
**BREACH OF FIDUCIARY DUTY**
**(BELINKIE, CALLEN, CHANEY, HOPE)**

157. Apex incorporates by reference its allegations set forth in paragraphs 1 through 156 of this Verified Complaint as if fully set forth herein.

158. The Individual Defendants all held positions of trust with Apex while employed by Apex and each owed Apex a fiduciary duty.

159. In the actions detailed herein, including the misappropriation of Apex Trade Secrets and the coordination of the mass exodus of the employees supporting a customer that Apex and IQ-EQ both pursued a business relationship with, the Individual Defendants committed a clear and egregious breach of the fiduciary duties that the Individual Defendants owed to Apex.

160. As a result of the Individual Defendants' breaches of their respective fiduciary duties, Apex has suffered and continues to suffer injury.

161. Apex is entitled to an award of damages sustained by Apex as a result of the Individual Defendants' breaches of their respective fiduciary duties, punitive damages for their willful and malicious conduct, and any other available legal and equitable relief.

**COUNT SEVEN**
**BREACH OF DUTY OF LOYALTY**
**(BELINKIE, CALLEN, CHANEY, HOPE)**

162. Apex incorporates by reference its allegations set forth in paragraphs 1 through 161 of this Verified Complaint as if fully set forth herein.

163. The Individual Defendants each had a common law duty of loyalty arising from his relationship as an employee of Apex.

164. In the actions detailed herein, including the misappropriation of Apex Trade Secrets and the coordination of the mass exodus of the employees supporting a customer that Apex and

IQ-EQ both pursued a business relationship with, the Individual Defendants intentionally harmed Apex and did so to benefit themselves and their new employer.

165. The foregoing constitutes a breach of the Individual Defendants' duty of loyalty owed to Apex.

166. Apex is entitled to an award of damages sustained by Apex as a direct result of the Individual Defendants' breaches of their respective duties of loyalty, punitive damages for their willful and malicious conduct, and any other available legal and equitable relief.

**COUNT EIGHT**
**UNJUST ENRICHMENT**
**(ALL DEFENDANTS)**

167. Apex incorporates by reference its allegations set forth in paragraphs 1 through 166 of this Verified Complaint as if fully set forth herein.

168. As a result of their misconduct as alleged in this Complaint, Defendants have been unjustly enriched or will be unjustly enriched through:

a. The misappropriation of Apex's confidential information, including the Apex Trade Secrets;

b. The unlawful raid of Apex's personnel to destroy its ability to provide services to existing and prospective customers; and

c. The continued employment of the Individual Defendants by IQ-EQ in violation of the enforceable non-competition covenants that prohibit the employment of the Individual Defendants by a competitor for a year after their last day of employment with Apex.

169. The retention of these benefits by Defendants under the circumstances is inequitable and, therefore, Defendants should be required to disgorge their wrongful gains, to which Defendants knew that they were not entitled.

**COUNT NINE**
**UNFAIR COMPETITION**
**(ALL DEFENDANTS)**

170. Apex incorporates by reference its allegations set forth in paragraphs 1 through 169 of this Verified Complaint as if fully set forth herein.

171. Defendants' conduct as described herein constitutes an unfair method of competition.

172. Specifically, the Defendants have engaged in unfair competition as it relates to Apex, their former employer and their direct competitor in the financial services field:

a. The misappropriation of Apex's confidential information, including the Apex Trade Secrets;

b. The unlawful raid of Apex's personnel to destroy its ability to provide services to existing and prospective customers; and

c. The continued employment of the Individual Defendants by IQ-EQ in violation of the enforceable non-competition covenants that prohibit the employment of the Individual Defendants by a competitor for a year after their last day of employment with Apex.

173. Apex is entitled to an award of damages sustained by Apex as a direct result of Defendants' unlawful acts, punitive damages for their willful and malicious conduct, and any other available legal and equitable relief.

**COUNT TEN**
**CIVIL CONSPIRACY**
**(ALL DEFENDANTS)**

174. Apex incorporates by reference its allegations set forth in Paragraphs 1 through 173 of this Verified Complaint as if fully set forth herein.

175. Defendants unlawfully and secretly combined and agreed among themselves to take the tortious and improper actions described herein in concert for the purpose of and with the effect of benefitting IQ-EQ to the detriment of Apex.

176. To facilitate their unlawful conspiracy, the Individual Defendants deliberately, and with the knowledge and assistance of IQ-EQ, engaged in the various unlawful activities described herein.

177. Defendants designed and carried out this plan knowing that the result would be that Apex would be unfairly and unlawfully crippled in its ability to compete with IQ-EQ for customers and business in the industry in which the two are direct competitors.

178. Defendants' conduct was willful and intentional, and Apex has been damaged, and continues to be damaged, by their actions.

179. Apex is entitled to an award of damages sustained by Apex as a direct result of Defendants' unlawful acts, punitive damages for their willful and malicious conduct, and any other available legal and equitable relief.

**APPLICATION FOR TEMPORARY, PRELIMINARY**
**AND PERMANENT INJUNCTIVE RELIEF**

180. Apex incorporates by reference the allegations set forth in Paragraphs 1 through 179 of this Verified Complaint as if fully set forth herein.

181. Apex intends to promptly file a motion requesting entry of a temporary restraining order until a date set for hearing (not to exceed fourteen days from the date of the order) and, after notice and a hearing, a preliminary injunction.

182. Upon information and belief, each of the Individual Defendants has misappropriated Apex's confidential and trade secret information or has used or benefitted from the misappropriated confidential and trade secret information. If their conduct is not immediately stopped and is permitted to proceed unabated, the Individual Defendants could continue to disclose and otherwise misuse Apex's confidential and trade secret information, and IQ-EQ could continue to obtain an unfair competitive advantage by the use of this misappropriated confidential and trade secret information, which will cause irreparable harm to Apex for which there is no adequate remedy at law, including, without limitation, loss of business opportunities and loss of goodwill and business reputation. Such harm is not readily reduced to monetary damages.

183. The Individual Defendants are in clear breach of their non-competition obligations under their respective Agreements, as each is currently employed by IQ-EQ, a competitor of Apex. If the Individual Defendants are not barred from continuing to work for IQ-EQ, Apex will suffer irreparable harm from the improper use of its confidential and trade secret information and from the loss of its customer goodwill. In fact, Apex has been informed that it is at risk of a losing the business of a customer to IQ-EQ because Apex can no longer provide the staff and personnel resources that IQ-EQ stole from Apex through unlawful means. This would be a loss that no monetary damages cannot properly and fully remedy.

184. Moreover, if the Individual Defendants are not enjoined from continuing to solicit their former Apex colleagues to join them at IQ-EQ, and to further hinder Apex's ability to staff

projects, serve clients, and protect its confidential and trade secret information and customer goodwill, Apex will suffer irreparable harm.

185. There is a substantial likelihood that Apex will prevail on the merits of its claims.

186. Apex has established that, if injunctive relief is not entered, it will suffer irreparable harm and monetary damages will not be sufficient to redress Apex's injuries.

187. The threatened injury to Apex outweighs any possible damage to the Defendants.

188. The public interest would be served by the entry of the requested injunctive relief.

## ATTORNEYS' FEES

189. Apex is entitled to recover reasonable and necessary attorneys' fees under Chapter 38 of the Tex. Civ. Prac. & Rem. Code because this suit is in part for breach of contract, as well as under Tex. Civ. Prac. & Rem. Code § 134A.005.

190. Apex is also entitled to recover reasonable and necessary attorneys' fees under 18 U.S. Code § 1836(b)(3)(D) and Tex. Civ. Prac. & Rem. Code § 134A.005 because the misappropriation of Apex Trade Secrets was willful and malicious.

## CONDITIONS PRECEDENT

All conditions precedent to Apex's claims for relief have been performed, have occurred, or have otherwise been met, waived, or excused.

## JURY DEMAND

Apex demands a trial by jury on all issues triable in this matter.

## PRAYER FOR RELIEF

Apex prays that this Court enter judgment against Defendants, jointly and severally, and award Apex the following relief:

(1) Grant Apex temporary, preliminary, and permanent injunctive relief (a) prohibiting Defendants (and all those acting in concert with them, including but not limited to other IQ-EQ employees) from maintaining, disclosing, or otherwise using any Apex Trade Secrets and/or confidential information; and (b) requiring Defendants to return to Apex all Apex Trade Secrets and confidential information in their possession, custody, or under their control;

(2) Grant Apex temporary, preliminary, and permanent injunctive relief compelling Individual Defendants to abide by the non-competition covenant set out in Section 4(b) of their Agreements;

(3) Grant Apex temporary, preliminary, and permanent injunctive relief compelling Individual Defendants to abide by the employee non-solicitation covenant set out in Section 4(c) of the Agreement executed by each of the Individual Defendants at the outset of employment with Apex and supported by sufficient consideration;

(4) Require Defendants, at their own cost, to make available to a third-party forensic expert any and all personal and business USB drives, cell phones, computers, hard drives, tablets, other electronic devices, email accounts, and Cloud-based file management accounts (such as Google Drive) owned or used by Defendants, on which Apex Trade Secrets and/or confidential information resides, has resided, or may reside, for the purpose of determining the extent of their acts in violation of their contractual, statutory, and common law obligations;

(5) Award Apex monetary damages to compensate for economic injuries caused as a result of Defendants' conduct;

(6) Award Apex treble, exemplary, and/or punitive damages;

(7) Award Apex its attorneys' fees and costs incurred in this action; and

(8) Granting such other and further relief as the Court deems just and proper.

Date: January 31, 2025

Respectfully submitted,

*/s/ Amanda E. Brown*____

Amanda E. Brown
Texas Bar No. 24087839
**FISHER & PHILLIPS LLP**
500 Crescent Court, Suite 300
Dallas, TX 75201
Telephone.: (214) 220-8336
Facsimile: (214) 220-9122
amebrown@fisherphillips.com

Scott Oberlander (*Pro Hac Vice to be filed*)
soberlander@fisherphillips.com
Kathleen Laubenstein
Pennsylvania Bar No. 799941PA
klaubenstein@fisherphillips.com
**FISHER & PHILLIPS LLP**
Two Logan Square
100 N. 18th Street, 12th Floor
Philadelphia, PA 19103
Telephone.: (610) 230-6117
Facsimile: (610) 230-2151

*Attorneys for Plaintiff*
*Apex Group Capital Advisors LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| APEX GROUP CAPITAL ADVISORS LLC<br><br>Plaintiff,<br><br>v.<br><br>IQEQ US MANAGEMENT CO, LLC, LUCAS BELINKIE, PRESTON CALLEN, WILLIAM C. CHANEY, & RYAN HOPE,<br><br>Defendants. | ) | Civil Action No. |

**VERIFICATION**

I, Jonathan Schmitz, Regional Head of Operations RA – North America & Local Managing Director (LMD) for Apex Group Ltd. ("Apex Group"), swear and attest that the information contained in Paragraphs 21-79 and 104-110 of the foregoing Complaint for Injunctive Relief and Damages is either within my personal knowledge or has been obtained from agents, employees, or officers of Apex Group and is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the State of North Carolina that the foregoing is true and correct.

Date: January 31, 2025

________________________
Jonathan Schmitz

**Signature:** Jonathan Schmitz
Jonathan Schmitz (Jan 31, 2025 17:50 EST)

**Email:** jonathan.schmitz@apexgroup.com

# Apex_IQ-EQ - Complaint Verification (Schmitz)( 53675057.3)

Final Audit Report 2025-01-31

| | |
|---|---|
| Created: | 2025-01-31 |
| By: | Kathleen Laubenstein (klaubenstein@fisherphillips.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA7-kzbUiLZ6Szg5RkLhwmJTMLaqwGrrA9 |

## "Apex_IQ-EQ - Complaint Verification (Schmitz)(53675057.3)" History

Document created by Kathleen Laubenstein (klaubenstein@fisherphillips.com)
2025-01-31 - 10:35:27 PM GMT

Document emailed to Jonathan Schmitz (jonathan.schmitz@apexgroup.com) for signature
2025-01-31 - 10:35:30 PM GMT

Email viewed by Jonathan Schmitz (jonathan.schmitz@apexgroup.com)
2025-01-31 - 10:45:49 PM GMT

Document e-signed by Jonathan Schmitz (jonathan.schmitz@apexgroup.com)
Signature Date: 2025-01-31 - 10:50:47 PM GMT - Time Source: server

Agreement completed.
2025-01-31 - 10:50:47 PM GMT

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| APEX GROUP CAPITAL ADVISORS LLC<br><br>Plaintiff,<br><br>v.<br><br>IQEQ US MANAGEMENT CO, LLC, LUCAS BELINKIE, PRESTON CALLEN, WILLIAM C. CHANEY, & RYAN HOPE,<br><br>Defendants. | ) | Civil Action No. |

**VERIFICATION**

I, Maria Von Horvath, Local Managing Director (LMD) for Apex Group Ltd. ("Apex Group"), swear and attest that the information contained in Paragraphs 0-103 of the foregoing Complaint for Injunctive Relief and Damages is either within my personal knowledge or has been obtained from agents, employees, or officers of Apex Group and is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the State of Texas that the foregoing is true and correct.

Date: January 31, 2025

M r r
Maria Von Horvath

**Signature:** Maria Von Horvath
Maria Von Horvath (Jan 31, 2025 17:10 CST)
**Email:** maria.vonhorvath@apexgroup.com

# Apex_IQ-EQ - Complaint Verification (Von Horvath)(53676337.3)

Final Audit Report 2025-01-31

| | |
|---|---|
| Created: | 2025-01-31 |
| By: | Kathleen Laubenstein (klaubenstein@fisherphillips.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAUi8HsQf1csRH7K8P0b3aDAf5oeWkyws4 |

## "Apex_IQ-EQ - Complaint Verification (Von Horvath)(53676337.3)" History

Document created by Kathleen Laubenstein (klaubenstein@fisherphillips.com)
2025-01-31 - 10:50:38 PM GMT

Document emailed to Maria Von Horvath (maria.vonhorvath@apexgroup.com) for signature
2025-01-31 - 10:50:41 PM GMT

Email viewed by Maria Von Horvath (maria.vonhorvath@apexgroup.com)
2025-01-31 - 10:56:35 PM GMT

Document e-signed by Maria Von Horvath (maria.vonhorvath@apexgroup.com)
Signature Date: 2025-01-31 - 11:10:33 PM GMT - Time Source: server

Agreement completed.
2025-01-31 - 11:10:33 PM GMT

# Exhibit A

SANDSPOINT
CAPITAL ADVISORS LLC

August 23, 2013

Mr. Lucas Belinkie
3807 Holland Avenue
Dallas, TX 75219

Dear Lucas,

On behalf of SandsPoint Capital Advisors LLC (the "Company"), I am pleased to offer you a position as a Vice President with the Company. This letter agreement (this "Agreement") sets forth the understanding between you and the Company with respect to certain terms and conditions of your employment. Your employment will start on or around September 23, 2013 or such other date as may be mutually agreed upon by you and the Company (such date, your "Start Date").

1. **Duties.** During your employment, you shall advise the Company's clients and otherwise perform such other duties as may be reasonably assigned to you from time to time by Kevin D. Naughton, the Founder and Chief Executive Officer of the Company. During your employment, your principal place of employment will be the Company's offices in Dallas, TX. You shall be employed on a full-time basis and shall devote substantially all of your business time and attention to the conscientious performance of your duties and responsibilities as set forth herein.

2. **Compensation; Benefits; Expense Reimbursement**. During your employment, you will be **(a)** initially paid an annualized base salary of $150,000 which shall be paid in accordance with the Company's standard pay practices and receive a bonus for year 2013 of $20,000 to be paid no later than March 2014 **(b)** future annual bonuses and increase to the base salary will be in the sole discretion of the Company, which (if any such bonus is awarded) shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally (but not later than March 15th of the year following the year to which such bonus relates), **(c)** entitled to twenty (20) paid vacation days **(d)** eligible to participate in any medical and health benefit plan sponsored by the Company for its employees, on terms and conditions set forth in such plans (as may be amended from time to time).

**(e)** eligible to participate in and receive company funded matching contributions in respect of self fund contributions to the company's 401K or similar retirement plan. In addition, the Company will reimburse you, in accordance with the Company's expense reimbursement program, for reasonable business expenses that you incur in connection with the performance of your duties hereunder, provided you obtain the Company's authorization prior to incurring any such expenses.

**3. Termination of Employment**. Your employment shall commence on the Start Date, but this Agreement does not guarantee any fixed term; your employment with the Company is "at will." This means that both you and the Company are free to terminate the employment relationship at any time, for any reason or for no reason at all, with or without cause, subject only to the terms of this Agreement.

**4. Confidentiality; Non-Solicitation; Non-Disparagement.** During your employment, the Company will provide you with certain confidential and proprietary information in order to facilitate the performance of your duties hereunder. If this information were obtained by a competitor, became public or otherwise did not remain confidential, the Company's interests and competitive position would be greatly prejudiced. For these reasons, the Company considers this information to be confidential and proprietary trade secrets, and in consideration of the Company's agreement to provide you with such confidential and proprietary information, you agree to the following provisions of this Section 4.

**(a)** During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning **(i)** the Company, **(ii)** any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), **(iii)** any of the Company's clients or customers, **(iv)** any affiliates of such clients or customers, or **(v)** any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company; provided, however, that notwithstanding the foregoing, nothing herein shall prevent you from **(x)** disclosing information that is known publicly (other than as a result of your breach of this provision) and **(y)** responding to lawful subpoenas or court orders, provided that you shall have given the Company written notice of any such subpoena promptly following your receipt thereof.

**(b)** During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

**(c)** During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, **(i)** induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or **(ii)** solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

**(d)** During your employment with the Company and thereafter without limitation of time, you shall not, directly or indirectly, engage in any conduct or make any statement to the press or to any media outlet or medium (including but not limited to trade magazines, the internet or cable or broadcast television or radio), or to anyone affiliated with the press or any such media outlet or medium, disparaging or criticizing in any way the Company or any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company. You further agree that you shall not, directly or indirectly, engage in any other conduct or make any other statement to anyone that could be reasonably expected to impair the reputation or goodwill of the Company, except to the extent required by law, and then only after consultation with the Company to the extent possible, or to enforce the terms of this Agreement.

**(e)** In the event of the termination of your employment, you shall promptly deliver to the Company **(i)** all property of the Company then in your possession; and **(ii)** all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

**(f)** You hereby acknowledge and agree that the consideration to be paid to you pursuant to the terms of this Agreement is adequate consideration for the covenants, agreements and obligations contained in this Section 4. Additionally, you acknowledge and agree that, although you consider the restrictions contained in this Section 4 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against you, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

**5. Governing Law; Assignability**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of laws provisions. In addition, the provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provisions. This Agreement shall inure to the benefit of the Company and its successors and assigns. However, this Agreement is personal in nature to you and therefore you may not assign this Agreement to any other person or entity.

**6. Application Process**. This offer is contingent upon **(a)** the Company's verification of your employment and education history, **(b)** your ability to meet the US Immigration requirements, **(c)** your completion of satisfactory background and compliance checks, and **(d)** your successful passing of our drug screening test.

7. **Taxes**. The Company shall withhold all amounts required to be withheld to satisfy its obligations required under applicable federal, state and local laws and regulations.

8. **Entire Agreement**. Except for the Company's policies, procedures, and handbooks, that you will receive and sign an acknowledgment of receipt, which you acknowledge and agree contains terms and conditions of your employment and which you further acknowledge and agree to be bound by and subject to, this Agreement constitutes the entire agreement between you and the Company relating to the terms of your employment.

-- S*ignature page follows* –

By your signature below, you acknowledge that you have carefully read this Agreement, and that you understand and agree to its terms. You also acknowledge and agree that if you breach or threaten to breach this Agreement, the Company may obtain injunctive relief to enjoin any actual, threatened or further breaches. Finally, your signature below will confirm that the performance of your obligations as an employee of the Company will not conflict with or violate any agreement, court order, obligation or other restriction to which you are a party or are subject.

**SANDSPOINT CAPITAL ADVISORS LLC**

**By:** ______________________________

SANDSPOINT

Kevin D. Naughton
Founder and Chief Executive Officer

Date: 8/23/13

**Acknowledged and Agreed**

By: ______________________________
Lucas Belinkie

Date: 8/23/13

# Exhibit B

SANDSPOINT
CAPITAL ADVISORS LLC

April 16, 2021

Preston Callen
521 Blackfield Drive
Coppell, TX 75019

**Via Email: preston_callen@me.com**

Dear Preston,

On behalf of SandsPoint Capital Advisors LLC (the "Company"), I am pleased to offer you a position as an Analyst with the Company. This letter agreement (this "Agreement") sets forth the understanding between you and the Company with respect to certain terms and conditions of your employment. Your employment will start on or around 05/03/2021, or such other date as may be mutually agreed upon by you and the Company (such date, your "Start Date").

1. **Duties.** During your employment, you shall advise the Company's clients and otherwise perform such other duties as may be reasonably assigned to you from time to time by Kevin D. Naughton, the Founder and Chief Executive Officer of the Company. During your employment, your principal place of employment will be the Company's offices in Dallas, TX. You shall be employed on a full-time basis and shall devote substantially all of your business time and attention to the conscientious performance of your duties and responsibilities as set forth herein.

2. **Compensation; Benefits; Expense Reimbursement**. During your employment, you will be **(a)** paid an annualized base salary of $75,000 which shall be paid in accordance with the Company's standard pay practices, **(b)** receive a pro-rated discretionary annual bonus for the year 2021 which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally, but not later than March 31, 2022 **(c)** future annual bonuses (if any such bonus is awarded), shall be in the sole discretion of the Company, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally (but not later than March 31st of the year following the year to which such bonus relates), **(d)** entitled to 20 paid vacation days during each calendar year, which days shall accrue monthly and which shall not be eligible for use in any year following the year in which such days accrue, **(e)** eligible to participate in any medical and health benefit plan sponsored by the Company for its employees, on terms and conditions set forth in such plans (as may be amended from time to time), **(f)**

eligible to participate in the Company's 401(k) after ninety days of continuous employment. In addition, the Company will reimburse you, in accordance with the Company's expense reimbursement program, for reasonable business expenses that you incur in connection with the performance of your duties hereunder, provided you obtain the Company's authorization prior to incurring any such expenses.

**3. Termination of Employment**. Your employment shall commence on the Start Date, but this Agreement does not guarantee any fixed term; your employment with the Company is "at will." This means that both you and the Company are free to terminate the employment relationship at any time, for any reason or for no reason at all, with or without cause, subject only to the terms of this Agreement.

**4. Confidentiality; Non-Solicitation; Non-Disparagement.** During your employment, the Company will provide you with certain confidential and proprietary information in order to facilitate the performance of your duties hereunder. If this information were obtained by a competitor, became public or otherwise did not remain confidential, the Company's interests and competitive position would be greatly prejudiced. For these reasons, the Company considers this information to be confidential and proprietary trade secrets, and in consideration of the Company's agreement to provide you with such confidential and proprietary information, you agree to the following provisions of this Section 4.

**(a)** During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning **(i)** the Company, **(ii)** any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), **(iii)** any of the Company's clients or customers, **(iv)** any affiliates of such clients or customers, or **(v)** any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company; provided, however, that notwithstanding the foregoing, nothing herein shall prevent you from **(x)** disclosing information that is known publicly (other than as a result of your breach of this provision) and **(y)** responding to lawful subpoenas or court orders, provided that you shall have given the Company written notice of any such subpoena promptly following your receipt thereof.

**(b)** During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

**(c)** During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, **(i)** induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or **(ii)** solicit for hire, hire, or attempt to hire any person directly or indirectly on

behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

**(d)** During your employment with the Company and thereafter without limitation of time, you shall not, directly or indirectly, engage in any conduct or make any statement to the press or to any media outlet or medium (including but not limited to trade magazines, the internet or cable or broadcast television or radio), or to anyone affiliated with the press or any such media outlet or medium, disparaging or criticizing in any way the Company or any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company. You further agree that you shall not, directly or indirectly, engage in any other conduct or make any other statement to anyone that could be reasonably expected to impair the reputation or goodwill of the Company, except to the extent required by law, and then only after consultation with the Company to the extent possible, or to enforce the terms of this Agreement.

**(e)** In the event of the termination of your employment, you shall promptly deliver to the Company **(i)** all property of the Company then in your possession; and **(ii)** all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

**(f)** You hereby acknowledge and agree that the consideration to be paid to you pursuant to the terms of this Agreement is adequate consideration for the covenants, agreements and obligations contained in this Section 4. Additionally, you acknowledge and agree that, although you consider the restrictions contained in this Section 4 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against you, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

**5.** **Governing Law; Assignability**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of laws provisions. In addition, the provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provisions. This Agreement shall inure to the benefit of the Company and its successors and assigns. However, this Agreement is personal in nature to you and therefore you may not assign this Agreement to any other person or entity.

**6.** **Application Process**. This offer is contingent upon **(a)** the Company's verification of your employment and education history, **(b)** your ability to meet the US Immigration requirements, **(c)** your completion of satisfactory background and compliance checks, and **(d)** your successful passing of our drug screening test.

**7.** **Taxes**. The Company shall withhold all amounts required to be withheld to satisfy its obligations required under applicable federal, state and local laws and regulations.

**8. Entire Agreement**. Except for the Company's policies, procedures, and handbooks, that you will receive and sign an acknowledgment of receipt, which you acknowledge and agree contains terms and conditions of your employment and which you further acknowledge and agree to be bound by and subject to, this Agreement constitutes the entire agreement between you and the Company relating to the terms of your employment.

-- S*ignature page follows* –

By your signature below, you acknowledge that you have carefully read this Agreement, and that you understand and agree to its terms. You also acknowledge and agree that if you breach or threaten to breach this Agreement, the Company may obtain injunctive relief to enjoin any actual, threatened or further breaches. Finally, your signature below will confirm that the performance of your obligations as an employee of the Company will not conflict with or violate any agreement, court order, obligation or other restriction to which you are a party or are subject.

**SANDSPOINT CAPITAL ADVISORS LLC**

By: ______________________

Kevin D. Naughton
Founder and Chief Executive Officer

Acknowledged and Agreed:

______________________
Preston Callen

April 19th, 2021

# Exhibit C

SANDSPOINT
CAPITAL ADVISORS LLC

October 16, 2015

William C. Chaney
2717 Howell Street #2103
Dallas, TX 75204

**Via Email: clarkc08@yahoo.com**

Dear Clark,

On behalf of SandsPoint Capital Advisors LLC (the "Company"), I am pleased to offer you a position as an Associate with the Company. This letter agreement (this "Agreement") sets forth the understanding between you and the Company with respect to certain terms and conditions of your employment. Your employment will start on or around October 19, 2015, or such other date as may be mutually agreed upon by you and the Company (such date, your "Start Date").

1. **Duties.** During your employment, you shall advise the Company's clients and otherwise perform such other duties as may be reasonably assigned to you from time to time by Kevin D. Naughton, the Founder and Chief Executive Officer of the Company. During your employment, your principal place of employment will be the Company's offices in Irving, TX. You shall be employed on a full-time basis and shall devote substantially all of your business time and attention to the conscientious performance of your duties and responsibilities as set forth herein.

2. **Compensation; Benefits; Expense Reimbursement**. During your employment, you will be **(a)** paid an annualized base salary of $108,000 which shall be paid in accordance with the Company's standard pay practices, **(b)** receive a discretionary prorated bonus for the year 2015, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally, but not later than March 31, 2016, **(c)** future annual bonuses (if any such bonus is awarded), shall be in the sole discretion of the Company, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally (but not later than March 15th of the year following the year to which such bonus relates), **(d)** entitled to 15 paid vacation days during each calendar year, which days shall accrue monthly and which shall not be eligible for use in any year following the year in which such days accrue, **(e)** upon your first anniversary at the Company your will be entitled to 20 paid vacation days during each calendar year, which days shall accrue monthly and which shall not be eligible for use in any year following the year in which such days accrue **(f)** eligible to participate in any medical and

health benefit plan sponsored by the Company for its employees, on terms and conditions set forth in such plans (as may be amended from time to time), **(g)** eligible to participate in the Company's 401(k) after ninety days of continuous employment. In addition, the Company will reimburse you, in accordance with the Company's expense reimbursement program, for reasonable business expenses that you incur in connection with the performance of your duties hereunder, provided you obtain the Company's authorization prior to incurring any such expenses.

**3. Termination of Employment**. Your employment shall commence on the Start Date, but this Agreement does not guarantee any fixed term; your employment with the Company is "at will." This means that both you and the Company are free to terminate the employment relationship at any time, for any reason or for no reason at all, with or without cause, subject only to the terms of this Agreement.

**4. Confidentiality; Non-Solicitation; Non-Disparagement.** During your employment, the Company will provide you with certain confidential and proprietary information in order to facilitate the performance of your duties hereunder. If this information were obtained by a competitor, became public or otherwise did not remain confidential, the Company's interests and competitive position would be greatly prejudiced. For these reasons, the Company considers this information to be confidential and proprietary trade secrets, and in consideration of the Company's agreement to provide you with such confidential and proprietary information, you agree to the following provisions of this Section 4.

**(a)** During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning **(i)** the Company, **(ii)** any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), **(iii)** any of the Company's clients or customers, **(iv)** any affiliates of such clients or customers, or **(v)** any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company; provided, however, that notwithstanding the foregoing, nothing herein shall prevent you from **(x)** disclosing information that is known publicly (other than as a result of your breach of this provision) and **(y)** responding to lawful subpoenas or court orders, provided that you shall have given the Company written notice of any such subpoena promptly following your receipt thereof.

**(b)** During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

**(c)** During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, **(i)** induce, or attempt to

induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or **(ii)** solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

**(d)** During your employment with the Company and thereafter without limitation of time, you shall not, directly or indirectly, engage in any conduct or make any statement to the press or to any media outlet or medium (including but not limited to trade magazines, the internet or cable or broadcast television or radio), or to anyone affiliated with the press or any such media outlet or medium, disparaging or criticizing in any way the Company or any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company. You further agree that you shall not, directly or indirectly, engage in any other conduct or make any other statement to anyone that could be reasonably expected to impair the reputation or goodwill of the Company, except to the extent required by law, and then only after consultation with the Company to the extent possible, or to enforce the terms of this Agreement.

**(e)** In the event of the termination of your employment, you shall promptly deliver to the Company **(i)** all property of the Company then in your possession; and **(ii)** all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

**(f)** You hereby acknowledge and agree that the consideration to be paid to you pursuant to the terms of this Agreement is adequate consideration for the covenants, agreements and obligations contained in this Section 4. Additionally, you acknowledge and agree that, although you consider the restrictions contained in this Section 4 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against you, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

**5. Governing Law; Assignability**. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of laws provisions. In addition, the provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provisions. This Agreement shall inure to the benefit of the Company and its successors and assigns. However, this Agreement is personal in nature to you and therefore you may not assign this Agreement to any other person or entity.

**6. Application Process**. This offer is contingent upon **(a)** the Company's verification of your employment and education history, **(b)** your ability to meet the US Immigration requirements, **(c)** your

completion of satisfactory background and compliance checks, and **(d)** your successful passing of our drug screening test.

**7.** **Taxes**. The Company shall withhold all amounts required to be withheld to satisfy its obligations required under applicable federal, state and local laws and regulations.

**8.** **Entire Agreement**. Except for the Company's policies, procedures, and handbooks, that you will receive and sign an acknowledgment of receipt, which you acknowledge and agree contains terms and conditions of your employment and which you further acknowledge and agree to be bound by and subject to, this Agreement constitutes the entire agreement between you and the Company relating to the terms of your employment.

-- *Signature page follows* –

By your signature below, you acknowledge that you have carefully read this Agreement, and that you understand and agree to its terms. You also acknowledge and agree that if you breach or threaten to breach this Agreement, the Company may obtain injunctive relief to enjoin any actual, threatened or further breaches. Finally, your signature below will confirm that the performance of your obligations as an employee of the Company will not conflict with or violate any agreement, court order, obligation or other restriction to which you are a party or are subject.

**SANDSPOINT CAPITAL ADVISORS LLC**

By: ______________________
Kevin D. Naughton
Founder and Chief Executive Officer

Acknowledged and Agreed:

William Chaney
______________________
William C. Chaney

October 18th, 2015

# Exhibit D

SANDSPOINT
CAPITAL ADVISORS LLC

February 15, 2019

Ryan Hope
6216 Flagstone Drive
McKinney, TX 75070

**Via Email: Rbhope0117@gmail.com**

Dear Ryan,

On behalf of SandsPoint Capital Advisors LLC (the "Company"), I am pleased to offer you a position as an Analyst with the Company. This letter agreement (this "Agreement") sets forth the understanding between you and the Company with respect to certain terms and conditions of your employment. Your full-time employment will start on or around March 4, 2019, or such other date as may be mutually agreed upon by you and the Company (such date, your "Start Date").

1. **Duties.** During your employment, you shall advise the Company's clients and otherwise perform such other duties as may be reasonably assigned to you from time to time by Kevin D. Naughton, the Founder and Chief Executive Officer of the Company. During your employment, your principal place of employment will be the Company's offices in Dallas, TX. You shall be employed on a full-time basis and shall devote substantially all of your business time and attention to the conscientious performance of your duties and responsibilities as set forth herein.

2. **Compensation; Benefits; Expense Reimbursement.** During your employment, you will **(a)** be paid an annualized base salary of $75,000 which shall be paid in accordance with the Company's standard pay practice, **(b)** receive a pro-rated discretionary annual bonus for the year 2019, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally, but not later than March 31, 2020, **(c)** future annual bonuses (if any such bonus is awarded), shall be in the sole discretion of the Company, which shall be paid, subject to your employment by the Company through the applicable payment date, at the same time as annual bonuses are paid to other employees of the Company generally (but not later than March 31st of the year following the year to which such bonus relates), **(d)** entitled to 20 paid vacation days during each calendar year, which days shall accrue monthly and which shall not be eligible for use in any year following the year in which such days accrue, **(e)** eligible to participate in any medical and health benefit plan sponsored by the Company for its employees, on terms and conditions set forth in such plans (as may be amended from time to time), **(f)**

eligible to participate in the Company's 401(k) after ninety days of continuous employment. In addition, the Company will reimburse you, in accordance with the Company's expense reimbursement program, for reasonable business expenses that you incur in connection with the performance of your duties hereunder, provided you obtain the Company's authorization prior to incurring any such expenses.

3. **Termination of Employment.** Your employment shall commence on the Start Date, but this Agreement does not guarantee any fixed term; your employment with the Company is "at will." This means that both you and the Company are free to terminate the employment relationship at any time, for any reason or for no reason at all, with or without cause, subject only to the terms of this Agreement.

4. **Confidentiality; Non-Solicitation; Non-Disparagement.** During your employment, the Company will provide you with certain confidential and proprietary information in order to facilitate the performance of your duties hereunder. If this information were obtained by a competitor, became public or otherwise did not remain confidential, the Company's interests and competitive position would be greatly prejudiced. For these reasons, the Company considers this information to be confidential and proprietary trade secrets, and in consideration of the Company's agreement to provide you with such confidential and proprietary information, you agree to the following provisions of this Section 4.

**(a)** During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning **(i)** the Company, **(ii)** any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), **(iii)** any of the Company's clients or customers, **(iv)** any affiliates of such clients or customers, or **(v)** any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company; provided, however, that notwithstanding the foregoing, nothing herein shall prevent you from **(x)** disclosing information that is known publicly (other than as a result of your breach of this provision) and **(y)** responding to lawful subpoenas or court orders, provided that you shall have given the Company written notice of any such subpoena promptly following your receipt thereof.

**(b)** During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

**(c)** During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, **(i)** induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or **(ii)** solicit for hire, hire, or attempt to hire any person directly or indirectly on

behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

**(d)** During your employment with the Company and thereafter without limitation of time, you shall not, directly or indirectly, engage in any conduct or make any statement to the press or to any media outlet or medium (including but not limited to trade magazines, the internet or cable or broadcast television or radio), or to anyone affiliated with the press or any such media outlet or medium, disparaging or criticizing in any way the Company or any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company. You further agree that you shall not, directly or indirectly, engage in any other conduct or make any other statement to anyone that could be reasonably expected to impair the reputation or goodwill of the Company, except to the extent required by law, and then only after consultation with the Company to the extent possible, or to enforce the terms of this Agreement.

**(e)** In the event of the termination of your employment, you shall promptly deliver to the Company **(i)** all property of the Company then in your possession; and **(ii)** all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

**(f)** You hereby acknowledge and agree that the consideration to be paid to you pursuant to the terms of this Agreement is adequate consideration for the covenants, agreements and obligations contained in this Section 4. Additionally, you acknowledge and agree that, although you consider the restrictions contained in this Section 4 to be reasonable, if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against you, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable. Alternatively, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein.

**5.** **Governing Law; Assignability.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its conflicts of laws provisions. In addition, the provisions of this Agreement are severable and the invalidity of any one or more provisions shall not affect the validity of any other provisions. This Agreement shall inure to the benefit of the Company and its successors and assigns. However, this Agreement is personal in nature to you and therefore you may not assign this agreement to any other person or entity.

**6.** **Application Process.** This offer is contingent upon **(a)** the Company's verification of your employment and education history, **(b)** your ability to meet the US Immigration requirements, **(c)** your completion of satisfactory background and compliance checks, and **(d)** your successful passing of our drug screening test.

7. **Taxes.** The Company shall withhold all amounts required to be withheld to satisfy its obligations required under applicable federal, state and local laws and regulations.

8. **Entire Agreement.** Except for the Company's policies, procedures, and handbooks, that you will receive and sign an acknowledgment of receipt, which you acknowledge and agree contains terms and conditions of your employment and which you further acknowledge and agree to be bound by and subject to, this Agreement constitutes the entire agreement between you and the Company relating to the terms of your employment.

-- *Signature page follows* –

By your signature below, you acknowledge that you have carefully read this Agreement, and that you understand and agree to its terms. You also acknowledge and agree that if you breach or threaten to breach this Agreement, the Company may obtain injunctive relief to enjoin any actual, threatened or further breaches. Finally, your signature below will confirm that the performance of your obligations as an employee of the Company will not conflict with or violate any agreement, court order, obligation or other restriction to which you are a party or are subject.

**SANDSPOINT CAPITAL ADVISORS LLC**

By: ______________________
Kevin D. Naughton
Founder and Chief Executive Officer

Acknowledged and Agreed:

______________________
Ryan Hope

February 15th, 2019

# Exhibit E

**From:** Clark Chaney
**To:** Jonathan Schmitz; Maria Von Horvath
**Cc:** Lucas Belinkie; Lauren Hart
**Subject:** FW: Letter of Resignation (Ryan Hope)
**Date:** Wednesday, November 20, 2024 2:56:58 PM
**Attachments:** image001.png
Letter of Resignation - Ryan Hope (11.20.2024).pdf

**CAUTION:** This email originated from outside of the organisation. Do not click links or open attachments unless you recognise the sender and know the content is safe.

Jonathan and Maria,

I just received the attached resignation letter from Ryan Hope, a strong Vice President on our Portfolio Management / Fund Accounting team. This is very unfortunate news as the plan was to transition him into my role to lead the Portfolio Management team. He found another opportunity (didn't mention the company) and made it clear there is nothing we can do to get him to stay.

I strongly recommend Preston Callen, an AVP, be promoted to VP and assume management of our team. We should then backfill at the AVP level here in the US / Canada, since the responsibilities are client facing, technical, and require complete time-zone coverage. This means we will have 2 open positions on this team (1 AVP and 1 Senior Associate). Please note, Karri Neal will now be the only other member of the Portfolio Management team (works part-time) – previously had 3.5 FTE's (including Ryan and me).

Clark Chaney
Senior Manager, Real Assets

T +1 945-235-7596
A 8750 N Central Expy. #1825, Dallas, TX 75231, USA
W apexgroup.com

Driving
Positive change.

Disclaimer | Privacy Policy

Please consider the environment before printing this email

---

**From:** Ryan Hope <rhope@apexgrpfs.com>
**Sent:** Wednesday, November 20, 2024 1:49 PM

**To:** Clark Chaney <cchaney@apexgrpfs.com>
**Cc:** Lucas Belinkie <lbelinkie@apexgrpfs.com>
**Subject:** Letter of Resignation

Clark –

As discussed, please find my formal resignation letter attached.

I thank you and Lucas for your support of the years and wish you both nothing but the best in future endeavors.

Thanks,

**Ryan Hope**
Manager, Real Assets
T (469) 667-7642 (Cell)
T (945) 235-7697 (Work)
W apexgroup.com

Driving
Positive change.

Abu Dhabi | Australia | Bahamas | Bahrain | Bermuda | Brazil | Bulgaria | Canada | Cayman | China | Cyprus | Denmark | Dubai | France | Germany | Gibraltar | Guernsey | Hong Kong | Hungary | India | Ireland | Isle of Man | Israel | Japan | Jersey | Luxembourg | Malta | Mauritius | New Zealand | Serbia | Singapore | South Africa | Spain | Sweden | Switzerland | The Netherlands | UK | Uruguay | USA

This e-mail and any attachments transmitted with it are solely intended for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please delete it from your system and kindly inform Apex accordingly. Apex excludes any warranty and any liability as to the contents of this e-mail and its attachments which shall not be binding upon Apex. You must not copy the message or disclose its contents to anyone. Disclaimer | Privacy Policy

Please consider the environment before printing this email

# Exhibit F

**From:** Clark Chaney
**To:** Jonathan Schmitz; Maria Von Horvath
**Subject:** Resignations - Preston Callen & Karri Neal
**Date:** Wednesday, December 4, 2024 5:00:49 PM
**Attachments:** image001.png
Notice of Resignation.msg

**CAUTION:** This email originated from outside of the organisation. Do not click links or open attachments unless you recognise the sender and know the content is safe.

Jonathan and Maria,

Please see below for a resignation e-mail from Preston Callen, an AVP on our Portfolio Management / Fund Accounting team. This is very unfortunate news as the plan was to transition him to lead the Portfolio Management team. He found another opportunity (didn't mention the company) and made it clear there is nothing we can do to get him to stay.

Also, per attached, the last member of our Portfolio Management Team just gave notice as I was typing this, Karri Neal, who works 25 hours per week.

We have been very busy training Fathima Syed, Ravi Peri, Amita J, and Narendra Kale over the last week (three training completed) and have 4-5 portfolio management trainings planned. Time zone coverage by the India team would be very helpful particularly the first three weeks of January, since there is quite a bit of back and forth with the deal team in the valuation process. Drew Beck and Gilbert Guerrero may be good employees to PM handle work here, but they will likely be stretched with work on other funds.

Please let me know if you have any questions. Thanks.

Clark Chaney
Senior Manager, Real Assets

T +1 945-235-7596
A 8750 N Central Expy. #1825, Dallas, TX 75231, USA
W apexgroup.com

Driving
Positive change.

Disclaimer | Privacy Policy

Please consider the environment before printing this email

---

**From:** Preston Callen <pcallen@apexgrpfs.com>
**Sent:** Wednesday, December 4, 2024 2:20 PM
**To:** Clark Chaney <cchaney@apexgrpfs.com>
**Subject:** Formal Notice of Resignation

Clark,

I am writing to formally submit my notice of resignation with an effective last day of 12/20/2024.

Please let me know what the next steps will be. Appreciate everything!

Preston Callen
Assistant Manager, Real Assets

T (945) 235-7689
A 870 N Central Expressway, Dallas, TX 75231, Suite 1800
W apexgroup.com

Driving
Positive change.

Abu Dhabi | Australia | Bahamas | Bahrain | Bermuda | Brazil | Bulgaria | Canada | Cayman | China | Cyprus | Denmark | Dubai | France | Germany | Gibraltar | Guernsey | Hong Kong | Hungary | India | Ireland | Isle of Man | Israel | Japan | Jersey | Luxembourg | Malta | Mauritius | New Zealand | Serbia | Singapore | South Africa | Spain | Sweden | Switzerland | The Netherlands | UK | Uruguay | USA

This e-mail and any attachments transmitted with it are solely intended for the use of the individual or entity to whom they are addressed. If you have received this e-mail in error, please delete it from your system and kindly inform Apex accordingly. Apex excludes any warranty and any liability as to the contents of this e-mail and its attachments which shall not be binding upon Apex. You must not copy the message or disclose its contents to anyone. Disclaimer | Privacy Policy

Please consider the environment before printing this email

# Exhibit G



## Lucas Belinkie · 3rd

Head of Real Assets Product - Americas at Apex Group Ltd

Dallas, Texas, United States · Contact info

500+ connections

Message | + Follow | More

### Activity

719 followers

Lucas Belinkie commented on a post • 3mo

Nobody could be more deserving of this. Congratulations!!

Lucas Belinkie commented on a post • 4mo

Congrats Harrison! 🎉

Lucas Belinkie commented on a post • 4mo

Congrats Daniel

Show all comments →

### Experience

**Head of Real Assets Product - Americas**
Apex Group Ltd
Aug 2022 - Dec 2024 · 2 yrs 5 mos
Dallas, Texas, United States

**Managing Director**
SandsPoint Capital Advisors LLC
Sep 2013 - Aug 2022 · 9 yrs
Dallas/Fort Worth Area



## Clark Chaney · 3rd

Director at SandsPoint Capital Advisors LLC

Dallas, Texas, United States · Contact info

500+ connections

Message | + Follow | More

SandsPoint Capital Advisors LLC

Southern Methodist University - Cox School of...

### About

Specialties: Finance, Business Strategy, Negotiations, Microsoft Excel, Communication, Marketing, Consulting, Sales, Real Estate, Problem Solving, Creativity, Innovation, Supply Chain, Management, Building & Maintaining Business Relationships, and Internet Advertising.

### Activity

955 followers

Clark hasn't posted yet

Recent posts Clark shares will be displayed here.

Show all activity →

### Experience

SandsPoint Capital Advisors LLC
9 yrs 4 mos

**Director - Portfolio Management & Consulting**
Jan 2022 - Present · 3 yrs 1 mo
Irving, TX

Leadership

**Vice President - Portfolio Management**
Apr 2020 - Jan 2022 · 1 yr 10 mos
Irving, Texas, United States

Leadership

**Assistant Vice President - Portfolio Management**
Apr 2018 - Mar 2020 · 2 yrs
Irving, TX

Leadership



## Preston Callen · 3rd

Assistant Manager, Real Assets at Apex Group Ltd (Americas)

Carrollton, Texas, United States · Contact info

239 connections

Message | + Follow | More

Apex Group Ltd (Americas)

Texas Tech University

### About

Preston Callen earned his Masters in Science of Accounting in the Spring of 2017 and started his career in audit with Grant Thornton LLP. His industries include Manufacturing, Oil and Gas, Oilfield Services and Retail.

### Activity

240 followers

**Preston hasn't posted yet**

Recent posts Preston shares will be displayed here.

Show all activity →

### Experience

**Apex Group Ltd (Americas)**
3 yrs 9 mos

- **Assistant Manager, Real Assets**
  Full-time
  Jan 2023 - Present · 2 yrs 1 mo
- **Associate**
  Jan 2022 - Jan 2023 · 1 yr 1 mo
- **Analyst**
  Full-time
  May 2021 - Jan 2022 · 9 mos
  Irving, Texas, United States



## Ryan Hope · 3rd

Vice President at SandsPoint Capital Advisors LLC

McKinney, Texas, United States · Contact info

500+ connections

Message | + Follow | More

University of Arkansas at Little Rock

### About

Experienced Business Associate with a demonstrated history of working in the accounting industry. Skilled in Research, Microsoft Excel, Microsoft Word, Microsoft PowerPoint, and Financial Analysis. Strong accounting professional with a Bachelor's Degree focused in Accounting from University of Arkansas at Little Rock.

### Activity

523 followers

Ryan Hope commented on a post • 7mo

Congratulations!

Ryan Hope commented on a post • 8mo

Congrats Drew

Show all comments →

### Experience

**SandsPoint Capital Advisors LLC (a Partner with Apex Group LP)**
5 yrs 10 mos

**Vice President**
Full time
Apr 2023 - Dec 2024 · 1 yr 9 mos
Dallas, Texas, United States · Remote

**Assistant Vice President**
Full time
Jan 2022 - Mar 2023 · 1 yr 3 mos

**Associate**
Apr 2020 - Dec 2021 · 1 yr 9 mos
Dallas/Fort Worth Area

Show all 4 experiences →

# Exhibit H

Fisher Phillips

fisherphillips.com

**Philadelphia**
Two Logan Square
12th Floor
100 N. 18th Street
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6117

**Writer's E-mail:**
soberlander@fisherphillips.com

January 17, 2025

***Via Email and Overnight Delivery***

Lucas Belinkie
3807 Holland Avenue
Dallas, TX 75219
lucas.belinkie@gmail.com

***Re: Cease and Desist - Contractual and Statutory Obligations Owed to Apex***

Dear Mr. Belinkie:

This Firm represents Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex" or the "Company") with respect to your resignation therefrom, and your violations of your contractual and legal post-employment obligations thereto. This correspondence carries serious and time-sensitive legal implications. Failure to comply will require Apex to pursue legal action against you.

*Your Contractual and Statutory Obligations to Apex*

On August 23, 2013, as a condition of your employment with the Company's predecessor, SandsPoint, you executed a letter agreement (your "Agreement"). A copy of your Agreement is enclosed herewith for reference. Through your Agreement, you agreed to a series of post-employment restrictions designed to protect Apex's legitimate business interests, including, among other things:

**Non-Disclosure and Return of Apex's Confidential Information**

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or

> (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Agreement at § 4(a), 4(e).

**<u>Non-Competition</u>**

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*Id.* at § 4(b).

**<u>Non-Solicitation</u>**

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or

contractor of the Company or any of its affiliates.

*Id.* at § 4(c).

You reiterated the reasonableness of these restrictions and the adequacy of the consideration you received pursuant to the Agreement in Section 4(f).

Please also be aware that, in addition to your contractual obligations, you also have a statutory duty to protect the confidentiality of, and to refrain from exploiting for your own benefit, all trade secret information belonging to Apex. Multiple state and federal laws provide for injunctive relief to protect against the misuse of trade secrets, as well as compensatory and punitive damages and other relief in the event of misuse, improper disclosure or other misappropriation of trade secret information.

*Your Breaches of Your Legal Obligations*

Despite the foregoing, Apex is aware that you have violated your restrictive covenants by joining a direct competitor of Apex, IQ-EQ, along with four additional colleagues who recently resigned from Apex. To date, you have already objectively breached the Agreement's non-compete provision, and presumably breached its non-solicitation provision. To make matters far worse, Apex is aware that, on behalf of IQ-EQ, you are apparently working with a significant Apex client with whom you previously worked on behalf of Apex, Related Companies. Your conduct represents a clear breach of Section 4(b) of the Agreement and has already gravely harmed Apex's legitimate business interests that the Agreement was designed to protect. Apex also understands that additional employees are being, or have been, recruited by IQ-EQ, which may constitute a violation of Section 4(c) of the Agreement.

Your blatant disregard for your non-competition and non-solicitation obligations naturally raises concerns that you have also violated your confidentiality obligations to Apex. Indeed, you had access to a trove of Apex trade secrets relating to Related Companies and other clients you presumably intend to solicit and work with at IQ-EQ. While Apex's investigation is ongoing, to the extent you have misappropriated and used Apex's trade secrets and intend to continue to use them going forward, this conduct is unlawful and must stop immediately.

*Demand for Compliance*

Please understand that Apex takes these contractual and other legal duties seriously and expects its former employees to abide by all legal obligations. Accordingly, Apex demands full compliance with your Agreement and other legal duties, including that you:

(a) **immediately cease your employment or other affiliation with IQ-EQ**, and refrain for one year from engaging in any business that will place you in violation of your covenant not to compete;

(b) refrain for one year from engaging in any prohibited solicitation of Apex employees, consultants, and contractors;

(c) refrain from disclosing or making any improper use of Apex's trade secrets or confidential information;

(d) immediately arrange for return to the undersigned as counsel for Apex any non-public documents or information about Apex's business, including but not limited to Apex's financial, organizational and operational information; investment research reports and such other reports and/or information as are relevant to the Apex's business; the identities of clients, customers, prospective clients or prospective customers; and any other information that could be reasonably be expected to aid a competitor or potential competitor of Apex; and

(e) execute the acknowledgment at the end of this correspondence and return it to the undersigned.

*Demand for Preservation of Evidence*

Given the imminence of litigation, Apex demands that you take immediate action to preserve all documents and information, including electronically-stored information, that may contain evidence relevant to the above-stated concerns. This includes, but is not limited to, emails, text messages, and other electronic communications, electronically stored documents, recordings, spreadsheets, calendars, and telephone records relating to, among other things, (1) your communications with Apex customers or prospective customers; (2) your recruitment by, and employment with, IQ-EQ, including but not limited to communications with IQ-EQ about your hiring, Apex customers or prospective customers, or joining IQ-EQ with other Apex employees; and (3) your communications with Preston Callen, Karri Neal, Ryan Hope, and/or William Chaney regarding your resignation from Apex, joining IQ-EQ, and soliciting and/or servicing Apex customers or prospective customers. You may not delete, alter or otherwise make unavailable any such information without first taking forensically sound measures to preserve electronically-stored information prior to deletion. Failure to do so may expose you to liability for destruction and spoliation of potentially relevant evidence in this matter.

Please respond to us by the close of business on **January 22, 2025**, confirming that you will comply as set forth above. Without taking the actions identified above, Apex will not hesitate to seek relief in court to obtain your compliance with your post-employment obligations to Apex. This would include seeking a temporary restraining order and ultimately a preliminary injunction, in addition to seeking compensatory damages for the harm you have already caused, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

Again, this matter involves important legal rights and obligations. Thus, **a failure to return your signature and acknowledgement of this correspondence by January 22, 2025 may compel Apex to take further action against you.**

For the avoidance of any doubt, Apex is also reaching out to IQ-EQ to ensure that it does not continue to interfere with your legal obligations to Apex. If you have any questions, please feel free to contact the undersigned. Until this matter is resolved, Apex reserves all rights.

Sincerely,

Scott C. Oberlander
For FISHER & PHILLIPS LLP

Enclosure

cc: Michael P. Avila, Esq. (Fisher & Phillips LLP)

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS LETTER AND MY AGREEMENT AND UNDERSTAND MY OBLIGATIONS UNDER THE AGREEMENT.

**LUCAS BELINKIE**

______________________________ ________________________
Signature Date

fisherphillips.com

**Philadelphia**
Two Logan Square
12th Floor
100 N. 18th Street
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6117

**Writer's E-mail:**
soberlander@fisherphillips.com

January 17, 2025

***Via Email and Overnight Delivery***

Preston Callen
521 Blackfield Drive
Coppell, TX 75019
preston_callen@me.com

***Re: Cease and Desist - Contractual and Statutory Obligations Owed to Apex***

Dear Mr. Callen:

This Firm represents Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex" or the "Company") with respect to your resignation therefrom, and your violations of your contractual and legal post-employment obligations thereto. This correspondence carries serious and time-sensitive legal implications. Failure to comply will require Apex to pursue legal action against you.

*Your Contractual and Statutory Obligations to Apex*

On April 19, 2021, as a condition of your employment with the Company's predecessor, SandsPoint, you executed a letter agreement (your "Agreement"). A copy of your Agreement is enclosed herewith for reference. Through your Agreement, you agreed to a series of post-employment restrictions designed to protect Apex's legitimate business interests, including, among other things:

**Non-Disclosure and Return of Apex's Confidential Information**

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or

> (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Agreement at § 4(a), 4(e).

**Non-Competition**

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*Id.* at § 4(b).

**Non-Solicitation**

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or

contractor of the Company or any of its affiliates.

*Id.* at § 4(c).

You reiterated the reasonableness of these restrictions and the adequacy of the consideration you received pursuant to the Agreement in Section 4(f).

Please also be aware that, in addition to your contractual obligations, you also have a statutory duty to protect the confidentiality of, and to refrain from exploiting for your own benefit, all trade secret information belonging to Apex. Multiple state and federal laws provide for injunctive relief to protect against the misuse of trade secrets, as well as compensatory and punitive damages and other relief in the event of misuse, improper disclosure or other misappropriation of trade secret information.

*Your Breaches of Your Legal Obligations*

Despite the foregoing, Apex is aware that you have violated your restrictive covenants by joining a direct competitor of Apex, IQ-EQ, along with four additional colleagues who recently resigned from Apex. To date, you have already objectively breached the Agreement's non-compete provision, and presumably breached its non-solicitation provision. To make matters far worse, Apex is aware that, on behalf of IQ-EQ, you are apparently working with a significant Apex client with whom you previously worked on behalf of Apex, Related Companies. Your conduct represents a clear breach of Section 4(b) of the Agreement and has already gravely harmed Apex's legitimate business interests that the Agreement was designed to protect. Apex also understands that additional employees are being, or have been, recruited by IQ-EQ, which may constitute a violation of Section 4(c) of the Agreement.

Your blatant disregard for your non-competition and non-solicitation obligations naturally raises concerns that you have also violated your confidentiality obligations to Apex. Indeed, you had access to a trove of Apex trade secrets relating to Related Companies and other clients you presumably intend to solicit and work with at IQ-EQ. While Apex's investigation is ongoing, to the extent you have misappropriated and used Apex's trade secrets and intend to continue to use them going forward, this conduct is unlawful and must stop immediately.

*Demand for Compliance*

Please understand that Apex takes these contractual and other legal duties seriously and expects its former employees to abide by all legal obligations. Accordingly, Apex demands full compliance with your Agreement and other legal duties, including that you:

(a) **immediately cease your employment or other affiliation with IQ-EQ**, and refrain for one year from engaging in any business that will place you in violation of your covenant not to compete;

(b) refrain for one year from engaging in any prohibited solicitation of Apex employees, consultants, and contractors;

(c) refrain from disclosing or making any improper use of Apex's trade secrets or confidential information;

(d) immediately arrange for return to the undersigned as counsel for Apex any non-public documents or information about Apex's business, including but not limited to Apex's financial, organizational and operational information; investment research reports and such other reports and/or information as are relevant to the Apex's business; the identities of clients, customers, prospective clients or prospective customers; and any other information that could be reasonably be expected to aid a competitor or potential competitor of Apex; and

(e) execute the acknowledgment at the end of this correspondence and return it to the undersigned.

*Demand for Preservation of Evidence*

Given the imminence of litigation, Apex demands that you take immediate action to preserve all documents and information, including electronically-stored information, that may contain evidence relevant to the above-stated concerns. This includes, but is not limited to, emails, text messages, and other electronic communications, electronically stored documents, recordings, spreadsheets, calendars, and telephone records relating to, among other things, (1) your communications with Apex customers or prospective customers; (2) your recruitment by, and employment with, IQ-EQ, including but not limited to communications with IQ-EQ about your hiring, Apex customers or prospective customers, or joining IQ-EQ with other Apex employees; and (3) your communications with Lucas Belinkie, Ryan Hope, William Chaney, and/or Karri Neal regarding your resignation from Apex, joining IQ-EQ, and soliciting and/or servicing Apex customers or prospective customers. You may not delete, alter or otherwise make unavailable any such information without first taking forensically sound measures to preserve electronically-stored information prior to deletion. Failure to do so may expose you to liability for destruction and spoliation of potentially relevant evidence in this matter.

Please respond to us by the close of business on **January 22, 2025**, confirming that you will comply as set forth above. Without taking the actions identified above, Apex will not hesitate to seek relief in court to obtain your compliance with your post-employment obligations to Apex. This would include seeking a temporary restraining order and ultimately a preliminary injunction, in addition to seeking compensatory damages for the harm you have already caused, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

Again, this matter involves important legal rights and obligations. Thus, **a failure to return your signature and acknowledgement of this correspondence by January 22, 2025 may compel Apex to take further action against you.**

For the avoidance of any doubt, Apex is also reaching out to IQ-EQ to ensure that it does not continue to interfere with your legal obligations to Apex. If you have any questions, please feel free to contact the undersigned. Until this matter is resolved, Apex reserves all rights.

Sincerely,

Scott C. Oberlander
For FISHER & PHILLIPS LLP

Enclosure

cc: Michael P. Avila, Esq. (Fisher & Phillips LLP)

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS LETTER AND MY AGREEMENT AND UNDERSTAND MY OBLIGATIONS UNDER THE AGREEMENT.

**PRESTON CALLEN**

______________________________ ________________________

Signature Date

fisherphillips.com

**Philadelphia**
Two Logan Square
12th Floor
100 N. 18th Street
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6117

**Writer's E-mail:**
soberlander@fisherphillips.com

January 17, 2025

***Via Email and Overnight Delivery***

William C. Chaney
2717 Howell Street #2103
Dallas, TX 75204
clarkc08@yahoo.com

***Re: Cease and Desist - Contractual and Statutory Obligations Owed to Apex***

Dear Mr. Chaney:

This Firm represents Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex" or the "Company") with respect to your resignation therefrom, and your violations of your contractual and legal post-employment obligations thereto. This correspondence carries serious and time-sensitive legal implications. Failure to comply will require Apex to pursue legal action against you.

*Your Contractual and Statutory Obligations to Apex*

On October 18, 2015, as a condition of your employment with the Company's predecessor, SandsPoint, you executed a letter agreement (your "Agreement"). A copy of your Agreement is enclosed herewith for reference. Through your Agreement, you agreed to a series of post-employment restrictions designed to protect Apex's legitimate business interests, including, among other things:

**Non-Disclosure and Return of Apex's Confidential Information**

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or

> (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Agreement at § 4(a), 4(e).

**Non-Competition**

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*Id.* at § 4(b).

**Non-Solicitation**

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or

contractor of the Company or any of its affiliates.

*Id.* at § 4(c).

You reiterated the reasonableness of these restrictions and the adequacy of the consideration you received pursuant to the Agreement in Section 4(f).

Please also be aware that, in addition to your contractual obligations, you also have a statutory duty to protect the confidentiality of, and to refrain from exploiting for your own benefit, all trade secret information belonging to Apex. Multiple state and federal laws provide for injunctive relief to protect against the misuse of trade secrets, as well as compensatory and punitive damages and other relief in the event of misuse, improper disclosure or other misappropriation of trade secret information.

*Your Breaches of Your Legal Obligations*

Despite the foregoing, Apex is aware that you have violated your restrictive covenants by joining a direct competitor of Apex, IQ-EQ, along with four additional colleagues who recently resigned from Apex. To date, you have already objectively breached the Agreement's non-compete provision, and presumably breached its non-solicitation provision. To make matters far worse, Apex is aware that, on behalf of IQ-EQ, you are apparently working with a significant Apex client with whom you previously worked on behalf of Apex, Related Companies. Your conduct represents a clear breach of Section 4(b) of the Agreement and has already gravely harmed Apex's legitimate business interests that the Agreement was designed to protect. Apex also understands that additional employees are being, or have been, recruited by IQ-EQ, which may constitute a violation of Section 4(c) of the Agreement.

Your blatant disregard for your non-competition and non-solicitation obligations naturally raises concerns that you have also violated your confidentiality obligations to Apex. Indeed, you had access to a trove of Apex trade secrets relating to Related Companies and other clients you presumably intend to solicit and work with at IQ-EQ. While Apex's investigation is ongoing, to the extent you have misappropriated and used Apex's trade secrets and intend to continue to use them going forward, this conduct is unlawful and must stop immediately.

*Demand for Compliance*

Please understand that Apex takes these contractual and other legal duties seriously and expects its former employees to abide by all legal obligations. Accordingly, Apex demands full compliance with your Agreement and other legal duties, including that you:

(a) **immediately cease your employment or other affiliation with IQ-EQ**, and refrain for one year from engaging in any business that will place you in violation of your covenant not to compete;

(b) refrain for one year from engaging in any prohibited solicitation of Apex employees, consultants, and contractors;

(c) refrain from disclosing or making any improper use of Apex's trade secrets or confidential information;

(d) immediately arrange for return to the undersigned as counsel for Apex any non-public documents or information about Apex's business, including but not limited to Apex's financial, organizational and operational information; investment research reports and such other reports and/or information as are relevant to the Apex's business; the identities of clients, customers, prospective clients or prospective customers; and any other information that could be reasonably be expected to aid a competitor or potential competitor of Apex; and

(e) execute the acknowledgment at the end of this correspondence and return it to the undersigned.

*Demand for Preservation of Evidence*

Given the imminence of litigation, Apex demands that you take immediate action to preserve all documents and information, including electronically-stored information, that may contain evidence relevant to the above-stated concerns. This includes, but is not limited to, emails, text messages, and other electronic communications, electronically stored documents, recordings, spreadsheets, calendars, and telephone records relating to, among other things, (1) your communications with Apex customers or prospective customers; (2) your recruitment by, and employment with, IQ-EQ, including but not limited to communications with IQ-EQ about your hiring, Apex customers or prospective customers, or joining IQ-EQ with other Apex employees; and (3) your communications with Preston Callen, Lucas Belinkie, Ryan Hope, and/or Karri Neal regarding your resignation from Apex, joining IQ-EQ, and soliciting and/or servicing Apex customers or prospective customers. You may not delete, alter or otherwise make unavailable any such information without first taking forensically sound measures to preserve electronically-stored information prior to deletion. Failure to do so may expose you to liability for destruction and spoliation of potentially relevant evidence in this matter.

Please respond to us by the close of business on **January 22, 2025**, confirming that you will comply as set forth above. Without taking the actions identified above, Apex will not hesitate to seek relief in court to obtain your compliance with your post-employment obligations to Apex. This would include seeking a temporary restraining order and ultimately a preliminary injunction, in addition to seeking compensatory damages for the harm you have already caused, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

Again, this matter involves important legal rights and obligations. Thus, **a failure to return your signature and acknowledgement of this correspondence by January 22, 2025 may compel Apex to take further action against you.**

For the avoidance of any doubt, Apex is also reaching out to IQ-EQ to ensure that it does not continue to interfere with your legal obligations to Apex. If you have any questions, please feel free to contact the undersigned. Until this matter is resolved, Apex reserves all rights.

Sincerely,



Scott C. Oberlander
For FISHER & PHILLIPS LLP

Enclosure

cc: Michael P. Avila, Esq. (Fisher & Phillips LLP)

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS LETTER AND MY AGREEMENT AND UNDERSTAND MY OBLIGATIONS UNDER THE AGREEMENT.

**WILLIAM C. CHANEY**

______________________________ Signature

_________________________ Date

fisherphillips.com

**Philadelphia**
Two Logan Square
12th Floor
100 N. 18th Street
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6117

**Writer's E-mail:**
soberlander@fisherphillips.com

January 17, 2025

***Via Email and Overnight Delivery***

Ryan Hope
6216 Flagstone Drive
McKinney, TX 75070
Rbhope0117@gmail.com

***Re: Cease and Desist - Contractual and Statutory Obligations Owed to Apex***

Dear Mr. Hope:

This Firm represents Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex" or the "Company") with respect to your resignation therefrom, and your violations of your contractual and legal post-employment obligations thereto. This correspondence carries serious and time-sensitive legal implications. Failure to comply will require Apex to pursue legal action against you.

*Your Contractual and Statutory Obligations to Apex*

On February 15, 2019, as a condition of your employment with the Company's predecessor, SandsPoint, you executed a letter agreement (your "Agreement"). A copy of your Agreement is enclosed herewith for reference. Through your Agreement, you agreed to a series of post-employment restrictions designed to protect Apex's legitimate business interests, including, among other things:

**Non-Disclosure and Return of Apex's Confidential Information**

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or

> (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Agreement at § 4(a), 4(e).

**<u>Non-Competition</u>**

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*Id.* at § 4(b).

**<u>Non-Solicitation</u>**

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or

contractor of the Company or any of its affiliates.

*Id.* at § 4(c).

You reiterated the reasonableness of these restrictions and the adequacy of the consideration you received pursuant to the Agreement in Section 4(f).

Please also be aware that, in addition to your contractual obligations, you also have a statutory duty to protect the confidentiality of, and to refrain from exploiting for your own benefit, all trade secret information belonging to Apex. Multiple state and federal laws provide for injunctive relief to protect against the misuse of trade secrets, as well as compensatory and punitive damages and other relief in the event of misuse, improper disclosure or other misappropriation of trade secret information.

*Your Breaches of Your Legal Obligations*

Despite the foregoing, Apex is aware that you have violated your restrictive covenants by joining a direct competitor of Apex, IQ-EQ, along with four additional colleagues who recently resigned from Apex. To date, you have already objectively breached the Agreement's non-compete provision, and presumably breached its non-solicitation provision. To make matters far worse, Apex is aware that, on behalf of IQ-EQ, you are apparently working with a significant Apex client with whom you previously worked on behalf of Apex, Related Companies. Your conduct represents a clear breach of Section 4(b) of the Agreement and has already gravely harmed Apex's legitimate business interests that the Agreement was designed to protect. Apex also understands that additional employees are being, or have been, recruited by IQ-EQ, which may constitute a violation of Section 4(c) of the Agreement.

Your blatant disregard for your non-competition and non-solicitation obligations naturally raises concerns that you have also violated your confidentiality obligations to Apex. Indeed, you had access to a trove of Apex trade secrets relating to Related Companies and other clients you presumably intend to solicit and work with at IQ-EQ. While Apex's investigation is ongoing, to the extent you have misappropriated and used Apex's trade secrets and intend to continue to use them going forward, this conduct is unlawful and must stop immediately.

*Demand for Compliance*

Please understand that Apex takes these contractual and other legal duties seriously and expects its former employees to abide by all legal obligations. Accordingly, Apex demands full compliance with your Agreement and other legal duties, including that you:

(a) **immediately cease your employment or other affiliation with IQ-EQ**, and refrain for one year from engaging in any business that will place you in violation of your covenant not to compete;

(b) refrain for one year from engaging in any prohibited solicitation of Apex employees, consultants, and contractors;

(c) refrain from disclosing or making any improper use of Apex's trade secrets or confidential information;

(d) immediately arrange for return to the undersigned as counsel for Apex any non-public documents or information about Apex's business, including but not limited to Apex's financial, organizational and operational information; investment research reports and such other reports and/or information as are relevant to the Apex's business; the identities of clients, customers, prospective clients or prospective customers; and any other information that could be reasonably be expected to aid a competitor or potential competitor of Apex; and

(e) execute the acknowledgment at the end of this correspondence and return it to the undersigned.

*Demand for Preservation of Evidence*

Given the imminence of litigation, Apex demands that you take immediate action to preserve all documents and information, including electronically-stored information, that may contain evidence relevant to the above-stated concerns. This includes, but is not limited to, emails, text messages, and other electronic communications, electronically stored documents, recordings, spreadsheets, calendars, and telephone records relating to, among other things, (1) your communications with Apex customers or prospective customers; (2) your recruitment by, and employment with, IQ-EQ, including but not limited to communications with IQ-EQ about your hiring, Apex customers or prospective customers, or joining IQ-EQ with other Apex employees; and (3) your communications with Preston Callen, Lucas Belinkie, Karri Neal, and/or William Chaney regarding your resignation from Apex, joining IQ-EQ, and soliciting and/or servicing Apex customers or prospective customers. You may not delete, alter or otherwise make unavailable any such information without first taking forensically sound measures to preserve electronically-stored information prior to deletion. Failure to do so may expose you to liability for destruction and spoliation of potentially relevant evidence in this matter.

Please respond to us by the close of business on **January 22, 2025**, confirming that you will comply as set forth above. Without taking the actions identified above, Apex will not hesitate to seek relief in court to obtain your compliance with your post-employment obligations to Apex. This would include seeking a temporary restraining order and ultimately a preliminary injunction, in addition to seeking compensatory damages for the harm you have already caused, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

Again, this matter involves important legal rights and obligations. Thus, **a failure to return your signature and acknowledgement of this correspondence by January 22, 2025 may compel Apex to take further action against you.**

For the avoidance of any doubt, Apex is also reaching out to IQ-EQ to ensure that it does not continue to interfere with your legal obligations to Apex. If you have any questions, please feel free to contact the undersigned. Until this matter is resolved, Apex reserves all rights.

Sincerely,

Scott C. Oberlander
For FISHER & PHILLIPS LLP

Enclosure

cc: Michael P. Avila, Esq. (Fisher & Phillips LLP)

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS LETTER AND MY AGREEMENT AND UNDERSTAND MY OBLIGATIONS UNDER THE AGREEMENT.

**RYAN HOPE**

________________________________ __________________________
Signature Date

# Exhibit I

Fisher Phillips

fisherphillips.com

**Philadelphia**
Two Logan Square
12th Floor
100 N. 18th Street
Philadelphia, PA 19103

(610) 230-2150 Tel
(610) 230-2151 Fax

**Writer's Direct Dial:**
(610) 230-6117

**Writer's E-mail:**
soberlander@fisherphillips.com

January 17, 2025

***Via Email and Overnight Delivery***

Carl Seiler, Esq.
Chief Legal Officer, Americas, IQ-EQ
2777 North Stemmons Freeway, Suite 1425
Dallas, TX 75207
Carl.seiler@iqeq.com

***Re: Cease and Desist - Contractual and Statutory Obligations Owed by Former Apex Employees and IQ-EQ's Interference Thereof***

Dear Mr. Seiler:

This Firm represents Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex" or the "Company") with respect to the group resignation of Lucas Belinkie, William (Clark) Chaney, Ryan Hope, Preston Callen, and Karri Neal (the "Apex Resignees") from Apex, and their violations of their contractual and legal post-employment obligations thereto by virtue of their subsequent employment with IQ-EQ.

We write to demand that IQ-EQ take immediate action in light of IQ-EQ's raid and the Apex Resignees' blatant disregard of their post-employment obligations to Apex. This correspondence carries serious and time-sensitive legal implications. Failure to comply will require Apex to pursue legal action against IQ-EQ and the Apex Resignees.

*The Apex Resignees' Contractual and Statutory Obligations to Apex*

Between 2013 and 2022, as conditions of their respective employments with the Company's predecessor, SandsPoint, each of the Apex Resignees executed a letter agreement (the "Agreement"). A copy of each Apex Resignee's Agreement is enclosed herewith for reference. Through their Agreements, the Apex Resignees agreed to a series of identical post-employment restrictions designed to protect Apex's legitimate business interests, including, among other things:

**Non-Disclosure and Return of Apex's Confidential Information**

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

*See* Agreement at § 4(a), 4(e).

**Non-Competition**

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

*Id.* at § 4(b).

**Non-Solicitation**

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

*Id.* at § 4(c).

The Apex Resignees reiterated the reasonableness of these restrictions and the adequacy of the consideration they received pursuant to the Agreement in Section 4(f).

In addition to their contractual obligations, the Apex Resignees have a statutory duty to protect the confidentiality of, and to refrain from exploiting for their own benefit, Apex's trade secrets. As you are no doubt aware, multiple state and federal laws provide for injunctive relief to protect against the misuse of trade secrets, as well as compensatory and punitive damages and other relief in the event of misuse, improper disclosure or other misappropriation of trade secret information.

*IQ-EQ's Raid and The Apex Resignees' Breaches of Their Legal Obligations*

Despite the foregoing, the Apex Resignees have objectively violated their restrictive covenants when IQ-EQ raided Apex and hired them. As you know, IQ-EQ is a direct competitor of Apex, rendering the Apex Resignees' employment a breach of Section 4(b) of the Agreement. Further, in joining as a group, certain of the Apex Resignees have presumably, if not assuredly, breached the Agreement's non-solicitation provision, as well.

To make matters far worse, Apex is aware that, on behalf of IQ-EQ, the Apex Resignees are apparently working with a significant Apex client with whom they previously worked on behalf of Apex, Related Companies. This unlawful conduct has already gravely harmed Apex's legitimate business interests that the Agreement was designed to protect. Moreover, IQ-EQ inherently induced and permitted the Apex Resignees to engage in their unlawful conduct when conducting its raid.

The Apex Resignees' blatant disregard for their non-competition and non-solicitation obligations naturally raises concerns that, with IQ-EQ's permission or even encouragement, they have also violated their confidentiality obligations to Apex. They had access to a trove of Apex trade secrets relating to Related Companies and other clients they presumably intend to solicit and work with at IQ-EQ. While Apex's investigation is ongoing, to the extent the Apex Resignees have misappropriated and used Apex's trade secrets and intend to continue to use them for IQ-EQ's and their own benefit going forward, this conduct is unlawful and must stop immediately.

Finally, we understand that IQ-EQ is recruiting additional employees from Apex as part of its orchestrated raid. These employees have executed agreements containing non-competes identical to the Apex Resignees, and their hiring by IQ-EQ would constitute a breach of those agreements (and presumably a breach of the Apex Resignees' non-solicitation obligations).

*Demand for Compliance*

Apex takes the Apex Resignees' contractual and other legal duties seriously and expects its former employees to abide by all legal obligations. It also expects that employers such as IQ-EQ refrain from interfering with those duties and obligations. While Apex has separately written to each of the Apex Resignees demanding their compliance with their respective Agreements and other legal duties, Apex separately demands that IQ-EQ:

(a) **immediately terminate each of the Apex Resignees' employment or other affiliation with IQ-EQ**, and refrain from employing them for the remainder of the one-year restricted period pursuant to the Agreements;

(b) refrain from disclosing or making any improper use of Apex's trade secrets or confidential information, to the extent they have been provided by the Apex Resignees to IQ-EQ;

(c) refrain from hiring additional Apex employees whose hiring would constitute a breach of their post-employment non-compete obligations to Apex; and

(c) if already provided to IQ-EQ by the Apex Resignees, immediately arrange for return to the undersigned as counsel for Apex any non-public documents or information about Apex's business, including but not limited to Apex's financial, organizational and operational information; investment research reports and such other reports and/or information as are relevant to the Apex's business; the identities of clients, customers, prospective clients or prospective customers; and any other information that could be reasonably be expected to aid a competitor or potential competitor of Apex.

*Demand for Preservation of Evidence*

Given the imminence of litigation, Apex demands that IQ-EQ take immediate action to preserve all documents and information, including electronically-stored information, that may contain evidence relevant to the above-stated concerns. This includes, but is not limited to, emails, text messages, and other electronic communications, electronically stored documents, recordings, spreadsheets, calendars, and telephone records relating to, among other things, (1) IQ-EQ's recruitment and hiring of the Apex Resignees, including but not limited to communications between IQ-EQ and the Apex Resignees and internal IQ-EQ communications about their hiring; and (2) communications between the Apex Resignees and Apex customers or prospective customers once they joined IQ-EQ. IQ-EQ may not delete, alter or otherwise make unavailable any such information without first taking forensically sound measures to preserve electronically-

stored information prior to deletion. Failure to do so may expose IQ-EQ to liability for destruction and spoliation of potentially relevant evidence in this matter.

Please respond to us by the close of business on **January 22, 2025**, confirming that IQ-EQ will comply as set forth above. Without taking the actions identified above, Apex will not hesitate to seek relief in court against both IQ-EQ and the Apex Resignees. This would include seeking a temporary restraining order and ultimately a preliminary injunction, in addition to seeking compensatory damages for the harm IQ-EQ and the Apex Resignees have already caused, punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

Again, Apex is also reaching out to each of the Apex Resignees to demand compliance with their Agreements. But IQ-EQ must also ensure that it does not continue to interfere with the Apex Resignees' legal obligations. If you have any questions, please feel free to contact the undersigned. Until this matter is resolved, Apex reserves all rights.

Sincerely,



Scott C. Oberlander
For FISHER & PHILLIPS LLP

Enclosures

cc: Michael P. Avila, Esq. (Fisher & Phillips LLP)

JS 44 (Rev. 04/21) (TXND 4/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Apex Group Capital Advisors LLC

**(b)** County of Residence of First Listed Plaintiff: Dallas County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Amanda Brown, Fisher & Phillips LLP, 500 Crescent Court Suite 300, Dallas, TX 75201 (214) 220-8336

**DEFENDANTS**

IQ EQ US Management CO, LLC, Lucas Belinkie, Preston Callen, William C. Chaney, Ryan Hope

County of Residence of First Listed Defendant: Dallas County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☒ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
18 U.S.C. 1831 et seq.

Brief description of cause:
Misappropriation of trade secrets and breach of restrictive covenants, fiduciary duty, tortious interference, unfair competition, and conspiracy.

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P. **DEMAND $** CHECK YES only if demanded in complaint: **JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions)*: JUDGE DOCKET NUMBER

DATE: January 31, 2025

SIGNATURE OF ATTORNEY OF RECORD: /s/ Amanda E. Brown

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.