# EXHIBIT 3

6 CIT - ESERVE
JURY DEMAND

FILED
5/27/2025 2:20 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Dymond Carroll DEPUTY

**CAUSE NO.** DC-25-08300

| | | |
|---|---|---|
| APEX GROUP CAPITAL ADVISORS LLC F/K/A SANDSPOINT CAPITAL ADVISORS LLC, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| RELATED FUND MANAGEMENT, LLC; JAMES KRAUS; LUCAS BELINKIE; PRESTON CALLEN; WILLIAM C. CHANEY; and RYAN HOPE | § | |
| | § | |
| Defendants. | § | 191st JUDICIAL DISTRICT |

**PLAINTIFF'S ORIGINAL PETITION**

Plaintiff Apex Group Capital Advisors LLC f/k/a SandsPoint Capital Advisors LLC ("Apex") brings this Original Petition against Related Fund Management, LLC ("Related"), James Kraus, in his capacity as Chief Financial Officer of Related ("Kraus"), Lucas Belinkie ("Belinkie"), Preston Callen ("Callen"), William Chaney ("Chaney"), and Ryan Hope ("Hope") (and, collectively with Related and Krause, the "Defendants"). In support thereof, Apex alleges as follows:

**INTRODUCTION**

This case arises from a conspiracy between Related and Kraus, on the one hand, and several management-level employees of plaintiff Apex, including Belinkie, Callen, Chaney, and Hope (the "Employee Defendants"), on the other hand, to move an entire business line and professional group to Apex's direct competitor, IQ-EQ US Management Co., LLC ("IQ-EQ") and to steal Apex's confidential information, intellectual property, and trade secrets in the process.

In furtherance of the conspiracy, the Employee Defendants breached the non-competition and non-solicitation provisions of their Employment Agreements, unlawfully downloaded and

stole information from their Apex work systems, and coordinated their move to coincide with Related's movement of its business to IQ-EQ. Related and Kraus, for their part, knowingly induced the Employee Defendants to breach their Employment Agreements and actively encouraged them to steal data from Apex to facilitate Related's move to IQ-EQ. Meanwhile, Related and Kraus actively concealed their intentions from Apex, induced Apex to hire new dedicated personnel and to reassign existing personnel to service Related's accounts, and manufactured complaints about Apex's service to justify a premature termination of the parties' contract and to justify Related's refusal to pay for services rendered. As a result of Defendants' actions, Apex has suffered, and continues to suffer, irreparable harm.

## DISCOVERY CONTROL PLAN

1. Apex intends that discovery be conducted under Level 3.

## THE PARTIES

2. Apex is a single-source financial solutions provider that works with asset managers, allocators, financial institutions, and family offices. Apex is a Delaware limited liability company that does business and maintains an office located at 500 East John Carpenter Fwy, Suite 500, Irving, TX 75062.

3. Related provides real estate asset investment and advisory services to private funds, institutional investors, and high-net-worth clients worldwide. Related is a Delaware limited liability company headquartered in New York, New York that does business and maintains an office located at 611 South Congress Ave., Suite 320, Austin, TX 78704. It may be served with process at 211 E. 7th Street, Suite 620, Austin, TX 78701.

4. Kraus is the Chief Financial Officer for Related Fund Management, LLC. Kraus is a citizen of the state of Connecticut and, upon information and belief, resides at 731 Hollow Tree Ridge, Darien, CT 06820

5. Belinkie is a citizen of the state of Texas and, upon information and belief, resides at 3807 Holland Avenue, Dallas, TX 75219. Until December 4, 2024, Belinkie was Head of Real Assets Product – Americas at Apex.

6. Callen is a citizen of the state of Texas and, upon information and belief, resides at 521 Blackfield Drive, Coppell, TX 75019. Until December 20, 2024, Callen was Assistant Manager, Real Assets at Apex.

7. Chaney is a citizen of the state of Texas and, upon information and belief, resides at 2717 Howell Street, Apt. 2103, Dallas, TX 75204. Until December 13, 2024, Chaney was Senior Manager, Real Assets at Apex.

8. Hope is a citizen of the state of Texas and, upon information and belief, resides at 6216 Flagstone Drive, McKinney, TX 75070. Until December 13, 2024, Hope was Manager, Real Assets at Apex.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction under TEX. GOV'T CODE § 24.007 because the amount in controversy is within the jurisdictional limits of this Court.

10. Plaintiff seeks monetary relief of over $1,000,000.

11. This Court has general personal jurisdiction over Belinkie, Callen, Chaney, and Hope because each is a resident of Texas and works in Texas.

12. This Court has personal jurisdiction over Related because it maintains an office in Texas, regularly conducts business in Texas, and undertook the tortious and unlawful actions described herein in Texas.

13. This Court has personal jurisdiction over Kraus because he regularly conducts business in Texas and because the harms occasioned by his tortious and unlawful actions described herein occurred in Texas.

14. Venue is proper in this Court pursuant to TEX. CIV. P. & REM. CODE § 15.002, because Belinkie, Callen, and Chaney reside in this judicial district, and a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district.

## CONDITIONS PRECEDENT

15. All conditions precedent to Apex's claims for relief have been performed, have occurred, or have otherwise been met, waived, or excused.

## JURY DEMAND

16. Apex demands a trial by jury on all issues triable in this lawsuit.

## STATEMENT OF FACTS

### I. The Employee Defendants Enter Into Employment Agreements with Apex

17. As discussed below, the Employee Defendants each entered into an employment agreement with Apex. The employment agreements subjected the Employee Defendants to substantively identical obligations concerning confidentiality and non-disclosure of Apex's confidential and trade secret information, non-competition, and employee non-solicitation.

18. The restrictions in the employment agreements sought to protect the goodwill and reputation Apex (and its predecessor, SandsPoint Capital Advisors LLC ("SandsPoint")) had developed in the marketplace and to prohibit unfair competition in the form of exploitation of the relationships and proprietary information that Apex/SandsPoint had developed, including the resources expended to build, support, and protect their customer base and employee relationships.

#### A. The Belinkie Agreement

19. On August 23, 2013, as a condition of his employment with Apex's predecessor SandsPoint, Belinkie executed a letter agreement with SandsPoint (the "Belinkie Agreement").

20. The Belinkie Agreement set forth employment restrictions that were intended to protect Apex's legitimate business interests.

21. Pursuant to the Belinkie Agreement, Belinkie agreed to protect Apex's confidential information and trade secrets and to not make any unauthorized disclosure of that information to any third party:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

22. Pursuant to the Belinkie Agreement, Belinkie also agreed not to work for a competitor of Apex for 12 months after the termination of his employment with Apex:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented

> plans to become engaged of which you have knowledge at the time of the termination of your employment.

23. Pursuant the Belinkie Agreement, Belinkie also agreed not to solicit or induce other Apex employees from terminating employment with Apex:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

24. The Belinkie Agreement further stated that it would inure "to the benefit of the Company and its successors and assigns," including Apex.

**B. The Chaney Agreement**

25. On October 18, 2015, as a condition of his employment with Apex's predecessor SandsPoint, Chaney executed a letter agreement with SandsPoint (the "Chaney Agreement").

26. The Chaney Agreement set forth employment restrictions that were intended to protect Apex's legitimate business interests.

27. Pursuant to the Chaney Agreement, Chaney agreed to protect Apex's confidential information and trade secrets and to not make any unauthorized disclosure of that information to any third party:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational

> information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

28. Pursuant to the Chaney Agreement, Chaney also agreed not to work for a competitor of Apex for 12 months after the termination of his employment with Apex:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

29. Pursuant to the Chaney Agreement, Chaney also agreed not to solicit or induce other Apex employees from terminating employment with Apex:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

30. The Chaney Agreement further stated that it would inure "to the benefit of the Company and its successors and assigns," including Apex.

**C. The Hope Agreement**

31. On February 15, 2019, as a condition of his employment with Apex's predecessor SandsPoint, Hope executed a letter agreement with SandsPoint (the "Hope Agreement").

32. The Hope Agreement set forth employment restrictions that were intended to protect Apex's legitimate business interests.

33. Pursuant to the Hope Agreement, Hope agreed to protect Apex's confidential information and trade secrets and to not make any unauthorized disclosure of that information to any third party:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any

> documents containing or pertaining to any such confidential and proprietary information.

34. Pursuant to the Hope Agreement, Hope also agreed not to work for a competitor of Apex for twelve months after the termination of his employment with Apex:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented plans to become engaged of which you have knowledge at the time of the termination of your employment.

35. Pursuant to the Hope Agreement, Hope also agreed not to solicit or induce other Apex employees from terminating employment with Apex:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

36. The Hope Agreement further stated that it would inure "to the benefit of the Company and its successors and assigns," including Apex.

**D. The Callen Agreement**

37. On April 19, 2021, as a condition of his employment with Apex (formerly known as SandsPoint), Callen executed a letter agreement with SandsPoint (the "Callen Agreement").

38. The Callen Agreement set forth employment restrictions that were intended to protect Apex's legitimate business interests.

39. Pursuant to the Callen Agreement, Callen agreed to protect Apex's confidential information and trade secrets and to not make any unauthorized disclosure of that information to any third party:

> During your employment with the Company and thereafter without limitation of time, you shall not divulge, furnish or make available to any third person, without the prior written consent of the Company, any trade secrets or other confidential information concerning (i) the Company, (ii) any shareholder, member, partner, director, officer, agent, representative, attorney, consultant, advisor or employee of the Company (or any of their respective spouses or families), (iii) any of the Company's clients or customers, (iv) any affiliates of such clients or customers, or (v) any business of the foregoing (collectively, the "Protected Entities"), including, without limitation: financial, organizational and operational information; the revenues, gross or net income, compensation or profitability of the Protected Entities; investment research reports and such other reports and/or information as are relevant to the Company's business; the identity of any client, customer, prospective client or prospective customer; the terms of this Agreement; and any other information that could be reasonably be expected to aid a competitor or potential competitor of the Company.
>
> . . . .
>
> In the event of the termination of your employment, you shall promptly deliver to the Company (i) all property of the Company then in your possession; and (ii) all confidential and proprietary information of the Company, together with all documents and data of any nature and in whatever medium of the Company, and you shall not take with you any such property, documents or data or any reproduction thereof, or any documents containing or pertaining to any such confidential and proprietary information.

40. Pursuant to the Callen Agreement, Callen also agreed not to work for a competitor of Apex for 12 months after the termination of his employment with Apex:

> During your employment with the Company and for a period of 12 months thereafter, (the "Restriction Period"), you shall not, directly or indirectly, own any interest in, operate, join, control or participate as a partner, shareholder, member, director, manager, officer, or agent of, enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged, or in which any of the foregoing has documented

> plans to become engaged of which you have knowledge at the time of the termination of your employment.

41. Pursuant to the Callen Agreement, Callen also agreed not to solicit or induce other Apex employees from terminating employment with Apex:

> During the Restricted Period, you shall not directly or indirectly, without the prior written consent of the Company, on behalf of yourself or any other person or entity, (i) induce, or attempt to induce, any employee, consultant or contractor of the Company to leave the employ of or stop providing services to the Company or (ii) solicit for hire, hire, or attempt to hire any person directly or indirectly on behalf of any third party as an employee, consultant or contractor who is, or at any time during the last three months of your employment was, an employee, consultant or contractor of the Company or any of its affiliates.

42. The Callen Agreement further stated that it would inure "to the benefit of the Company and its successors and assigns," including Apex.

43. The Belinkie Agreement, Callen Agreement, Chaney Agreement, and Hope Agreement are referred to collectively herein as "the Employment Agreements."

44. Apex has expended and continues to expend significant time, effort, and money to develop its relationships with its customers, to learn the customers' specific business needs (including developing best practices to service the same), to develop substantial contacts and goodwill with its customers, and to market and provide its services to those customers.

45. To operate its business and service its customers, Apex provided its employees, including the Employee Defendants, access to Apex's confidential information and trade secrets. The confidential information and trade secrets to which the Employee Defendants had access included but was not limited to: financial, organizational, and operational information; the revenues, gross or net income, compensation or profitability of Apex and its employees, customers, and affiliates; investment research reports; the identity of its clients, customers, prospective clients

and prospective customers; information about customers' preferences, business plans, and strategies; and strategic methods for specific client servicing, including deliverables data and strategic plans.

46. The foregoing confidential information and trade secrets create a significant competitive advantage for Apex and would be an irreparably harmful tool in the hands of Apex's competitors.

47. To protect its considerable investment in developing its confidential information and trade secrets, at all relevant times Apex has taken reasonable measures to maintain the confidential and secret nature of these materials.

48. For example, Apex utilizes password-protected, secure, cloud-based systems, networks, and computers to store and maintain much of its confidential information and trade secrets. Apex further limits access to its secure system to employees and certain other authorized individuals.

49. Apex also requires all employees to abide by written policies and procedures regarding data management, information security, and content access standards.

50. Apex further limits employee access to its confidential information and trade secrets to what is reasonably needed to perform their duties on behalf of Apex.

51. In exchange for their employment benefits and the access to Apex's secure system, Apex requires those employees who have access to Apex's confidential information and trade secrets to sign agreements mandating that they maintain in confidence all of Apex's confidential and trade secret information. As explained above, each of the Employee Defendants executed Employment Agreements mandating that they protect and not make any unauthorized disclosures

of Apex's confidential information and trade secrets, and to return all such information upon the termination of their employment with Apex.

52. Apex's efforts and successes have allowed it to develop goodwill and relationships with its customers. In turn, these efforts and successes inure to the benefit of employees of Apex, including the Employee Defendants, who develop relationships with Apex's key customers and receive confidential information regarding the customers.

53. Apex developed its trade secrets, confidential information, and other valuable proprietary data that are not readily ascertainable to Apex's competitors solely for Apex's use and benefit. Protecting the confidentiality of this information is essential to maintaining its value and commercial benefit to Apex.

54. The disclosure and use of this confidential information and trade secrets would irreparably harm Apex.

## II. Apex Group Ltd. Acquires SandsPoint

55. In August 2022, following robust due diligence pursuant to mutual non-disclosure agreements, Apex's parent, Apex Group Ltd. ("Apex Group") acquired the majority of the outstanding member interests of SandsPoint Capital Advisors LLC, with the option to acquire the remaining shares of SandsPoint if certain earnings milestones were met. The acquisition was driven, in large part, by SandsPoint's expertise and specialization in the real estate market. As Apex Group publicly described: "The addition of the SandsPoint business deepens the Group's existing Real Estate service offering in the US and will add assets under administration ("AuA") of over $30bn, serviced by 70 employees, based in Dallas, Texas." At the time of the acquisition, Related was one of SandsPoint's largest clients, generating a substantial portion of the company's annualized net revenue. As a result, SandsPoint's enterprise value for acquisition purposes was driven in large part by the company's existing and long-term relationship with Related. For that

reason, it was important to retain key SandsPoint personnel in the acquisition, including the Employee Defendants. To that end, Apex promised and paid large retention bonuses to key SandsPoint personnel as part of the acquisition.

56. Following the acquisition, SandsPoint changed its name to Apex Capital Advisors LLC (the Plaintiff herein). All legacy SandsPoint personnel, including the Employee Defendants, continued in their same capacities and became employees of Apex under the same terms and conditions set forth in the Employment Agreements described above.

## III. Related and Apex Enter into the MSA

57. On or about January 29, 2024, Apex and Related entered into a new Master Services Agreement (the "MSA"). Among other things, the MSA included several schedules, including a Data Protection Addendum, a Form of Agreement of Adherence, and a separately-executed Order Document – Fund Administration ("Order Document"). The Order Document listed more than 50 entities—all affiliates of Related's corporate parent, The Related Companies—covered by the MSA. In broad terms, the MSA and Order Document required Apex to provide certain services to those entities, and Related agreed to pay for those services. Notably, in the event of any inconsistency between the MSA and the Order Document (or any other schedule), the MSA provided that "the provisions of the relevant Schedules shall prevail."

58. Thereafter, in February, April, and June 2024, the parties executed three Agreements of Adherence. By virtue of those Agreements, Related requested that Apex provide services under the MSA to approximately eight additional entities in exchange for additional fees.

59. Pursuant to the Order Document, fees for Apex's services were "computed and payable in advance of the calendar quarter to which the fee relate[d] and [were] due within thirty (30) days of invoicing."

60. Notably, Kraus executed the MSA, the Order Document, and each of the Agreements of Adherence. Further, each of the Employee Defendants serviced Related as part of their duties at Apex, and each was aware of the terms of the Master Services Agreement and the Order Document.

61. Under Section 8 of the MSA, Related and Apex agreed to protect—and not disclose—each other's confidential information:

> Each Party undertakes that it shall not at any time during the validity of this Agreement, and for a period of two (2) years after termination or expiry of this Agreement or such other period as determined by Applicable Law, disclose to any person any confidential information concerning the business, affairs, clients or service providers of the other party or of any member of the group of companies to which the other Party belongs, except as permitted by clause 8.2(a).

Further, although the MSA allowed the parties to disclose information to their respective "employees, officers, representatives . . . or advisers," as necessary to carry out obligations under the MSA, the agreement required each party to "direct that its employees, officers, representatives . . . or advisers to whom it discloses the other Party's confidential information comply with this clause 8." And finally, the MSA precluded either party from using "the other Party's confidential information for any purpose other than to exercise its rights and perform its obligations under or in connection with th[e] Agreement."

62. The MSA also contained an Indemnity clause requiring Related to indemnify Apex for, among other things, "actual losses, disbursements and expenses (including without limitation reasonable legal fees and amounts reasonably in settlement . . . [of] any action or proceeding between Apex and any third party) . . . arising from or in connection with the performance of this Agreement . . . incurred by Apex in connection with or arising out of Apex's performance of its obligations and duties under th[e] Agreement."

63. Related and Apex agreed that either party could terminate the MSA in the event of the other party's material breach, but only after providing a 30-day opportunity to cure. Alternatively, either party could terminate the MSA without cause with at least 90 days' written notice.

64. In the event of termination of the MSA by either party, Related agreed to "immediately pay to Apex all of Apex's undisputed outstanding unpaid invoices and other moneys, expenses and disbursements accrued and due to it up to the date of such termination."

65. Following execution of the MSA, Apex provided services to Related in good faith. But shortly thereafter, and without Apex's knowledge, Related concocted a plan to steer Apex's employees to a competitor and to steal Apex's proprietary business information.

## IV. Related Lures the Employee Defendants Away

66. In July 2024, Apex exercised its option to acquire the remaining membership interests of SandsPoint.

67. On information and belief, when Apex exercised that option, Related had already begun considering moving its business to a competitor of Apex. But at the same time, Related—and in particular, Related's CFO, Kraus—wanted to keep working with the Employee Defendants, including Kraus's longtime friend and business associate Belinkie, all of whom had worked on Related's accounts and who were intimately familiar with its business and real estate portfolios. So Related devised a plan to have its cake and eat it too.

68. In or around the summer of 2024, Related, through Kraus, began conspiring with the Employee Defendants—all Dallas-based employees—to convince them to breach their Employment Agreements, jump ship to a local competitor of Apex, and take Apex's confidential and protected business information with them. The Employee Defendants waited to implement

the conspiracy until after Apex exercised its option to acquire the remaining shares of SandsPoint, at which point the Employee Defendants received the last of their retention bonuses.

**A. Belinkie Leaves for IQ-EQ, in Violation of His Employment Agreement**

69. Belinkie gave his notice of resignation on October 24th, 2024, setting his last day of work for Apex on December 4th, 2024. At the time of his resignation, Belinkie was Head of Real Assets Product – Americas for Apex.

70. After giving notice of resignation, Belinkie asked Apex's IT department to help him extract Apex's proprietary database. That database, which Apex acquired by purchasing a costly license, contains confidential information and other trade secrets, including client data, accounting and auditing processes, communications with investors, strategic plans, and pricing information, among other highly sensitive information.

71. Further, because Apex's business involves servicing private investment funds, Apex has stringent controls in place to preserve the confidentiality of the information about those funds contained in its database, as is required under relevant securities laws and client confidentiality agreements.

72. Thus, Belinkie's request to extract the database—or any information from it—was highly unusual, required a comprehensive approval process, and—in light of his recent resignation—raised red flags. Consequently, Apex rejected the request.

73. Undeterred, during the approximately six-week period between his notice of resignation and the last day of his employment at Apex, Belinkie downloaded a substantial amount of information from his work computer to an unknown destination. The three highest days of download activity occurred approximately one week after he gave his notice of resignation, on the day before his last day of employment, and on his last day of employment at Apex.

74. Some of the files downloaded by Belinkie constituted Apex's confidential information and trade secrets that he was not authorized to share or retain after his employment with Apex ended. These files include, but are not limited to, files concerning Apex's billing practices, personnel, salary and compensation, and clients. They also include security information concerning Apex's proprietary database and information concerning SandsPoint's integration to Apex. All of these files are Apex's confidential information and trade secrets.

75. Further, knowing that he was constrained by the non-competition clause in his Employment Agreement, Belinkie immediately went to work for IQEQ—a direct competitor of Apex—in its Dallas, Texas office, where today he is working on Related's accounts. Although asked where he would be working, Belinkie refused to disclose to Apex that he would be going to IQ-EQ at the time of his departure.

**B. Chaney Leaves for IQ-EQ, in Violation of His Employment Agreement**

76. Chaney was the next to give his notice of resignation, on October 30, 2024. At the time of his resignation from Apex, he was a Senior Manager, Real Assets. His last day of employment with Apex was December 13, 2024.

77. At the time of his departure, Chaney told Apex that he was upset that Belinkie had left the company, that he planned to take some time off, and that he had nothing else lined up at that time. Those statements were false when made and were made to mask Chaney's unlawful intention to join Belinkie at IQ-EQ.

78. As of no later than January 13, 2025, in violation of the non-competition clause in his Employment Agreement, Chaney was employed by IQ-EQ as a Managing Director in its Dallas office. Indeed, Chaney received an encrypted offer letter from IQ-EQ on or before October 21, 2024, before he gave his notice and before Belinkie gave his notice.

79. The day before Chaney submitted his resignation notice, he downloaded 1,021 files from his work computer to a device that was not issued by Apex and that has not been returned to Apex. The three highest days of download activity occurred on the day before he gave his notice of resignation, on the day before his last day of employment, and on his last day of employment at Apex.

80. Some of the files downloaded by Chaney constituted Apex's confidential information and trade secrets that he was not authorized to share or to retain after his employment with Apex ended.

81. Among the documents that Chaney downloaded to this non-Apex device on October 29, 2024, were documents concerning Apex clients, including Related. For example, Chaney downloaded to the non-Apex device the following files: "RFM/Valuation Review/2024/2024 06 30/Support/Current Balances - Debt Deals.xlsx;" "RFM/Valuation Review/2024/2024 09 30/Support/3Q 24 Debt Valuation Analysis_vSP.xlsx;" and "RFM/Valuation Review/2024/2024 09 30/Support/RDF 3 & RDF 4 Funded amounts as of 9.30.xlsx." All of these files contained data used in Apex's relationship with Related, and Chaney was aware that Apex company policy and the MSA limited his access to and use of those files to performing the company's contractual obligations to Related.

82. In addition to documents containing information concerning Apex clients, Chaney also downloaded documents containing other Apex proprietary information, including information about its employees and their compensation. Among those documents were guidelines and templates for employee recruiting, bullet points for a pitch for new business, and draft statements of work. Chaney also downloaded performance evaluations for other employees, including some who remain Apex employees, and several employee contact lists.

83. The documents Chaney downloaded to a non-Apex device without authorization included Apex's confidential information and trade secrets.

**C. Hope Leaves for IQ-EQ, in Violation of His Employment Agreement**

84. Hope gave his notice of resignation on November 20, 2024. He resigned to Chaney, who reported to Apex management that Hope had "found another opportunity (didn't mention the company) and made it clear there is nothing we can do to get him to stay." On information and belief, Chaney knew at the time that Hope would be taking a position at IQ-EQ and deliberately concealed that fact. Hope likewise intentionally concealed his plans to take a position with and join Belinkie and Chaney at IQ-EQ.

85. At the time of his resignation, Hope was a Manager, Real Assets at Apex. Like Chaney, his last day of work at Apex was December 13, 2024.

86. In violation of the non-competition clause in his Employment Agreement, Hope is currently employed by IQ-EQ in its Dallas office.

87. The day Hope gave his notice of resignation, he downloaded over 7,000 files and folders from his work computer to an unknown destination. In the two days before his final day of work at Apex, Hope downloaded another approximately 11,550 files and folders. The more than 18,000 files and folders downloaded over those three days was more than 2/3 of all the downloads Hope did from October through his last date of employment at Apex. Many of the documents and files downloaded by Hope without authorization included Apex's confidential information and trade secrets.

**D. Callen Leaves for IQ-EQ, in Violation of His Employment Agreement**

88. Callen submitted his notice of resignation on December 4, 2024. At the time of his resignation, Callen was an Assistant Manager, Real Assets, with Apex.

89. Callen also resigned to Chaney, who reported Callen's resignation to Apex management with the identical language to that used when notifying Apex of Hope's resignation. According to Chaney, Callen "found another opportunity (didn't mention the company) and made it clear there is nothing we can do to get him to stay." Again, on information and belief, both Chaney and Callen were aware that Callen was taking a job with IQ-EQ at the time of his resignation, and this charade was intended to mask the Defendants' unlawful conspiracy.

90. Callen's last day of employment with Apex was December 20, 2024.

91. In violation of the non-competition clause of his Employment Agreement, Callen is currently employed by IQ-EQ in its Dallas office.

92. On November 20, 2024, less than two weeks before he gave his notice of resignation, Callen downloaded more than 2,600 files or folders, or almost 20% of the approximately 12,260 folders and files he downloaded between October and December 20, 2024, his last day of employment with Apex. More than 50% of the files/folders Callen downloaded during the October-December time frame—approximately 6,380 files/folders—were downloaded on December 19, 2024, the day before his last day working for Apex. Many of the documents and files downloaded by Hope without authorization included Apex's confidential information and trade secrets.

### E. Related Manufactures Complaints about Apex's Service While Working Behind the Scenes to Move Apex's Core Business Team to IQ-EQ

93. Unbeknownst to Apex, in the months leading up to the Employee Defendants' resignations, Related (led by Krause) was working hard behind the scenes to move its business—and all of Apex's core resources—to IQ-EQ. To that end, around the time that Belinkie staged his departure (and anticipating that other core team would soon make their own moves to IQ-EQ), Related began manufacturing complaints about Apex's service. In particular, Related complained

that staff turnover—the very turnover that Related was orchestrating—was impacting Apex's service levels and deliverables. In response, Apex began efforts to hire replacement staff and assigned high-level Apex management to personally oversee and service Related's account. In addition, Apex set up weekly management calls to ensure that Related's concerns were being addressed. Kraus was involved in many of these calls.

94. During a weekly call in January 2025, Apex employees Ken Fullerton, Sanjay Vatsa, and Jonathan Schmitz informed Kraus that they had just received additional resignation notices from Apex staff assigned to the Related account. In response, Kraus said that he anticipated there would be five more resignations. When asked how he could possibly know that information, Kraus refused to say more, would not disclose who was resigning, when they were resigning, or how he knew—other than to say, "I have my sources." His prediction came true shortly thereafter.

95. Kraus knew about the departures because he was conspiring with the Employee Defendants and others to encourage Apex employees assigned to Related's account to leave for IQ-EQ, in violation of their Employment Agreements.

96. In violation of his non-solicitation agreement, Belinikie moved to IQ-EQ first and then solicited other employees of Apex to terminate employment with Apex in favor of IQ-EQ as well. In engaging in such conduct, the Employee Defendants violated the employee non-solicitation covenants set out in Section 4(c) of their respective Employment Agreements.

97. Between November 29, 2024, and January 31, 2025, 11 more Apex employees from the Related service team resigned from Apex. Most of those employees refused to disclose their employment plans after resignation, but Apex has discovered that at least one of those employees, Karri Neal, is now employed by IQ-EQ. To this day, in an effort to conceal their unlawful acts, the Employee Defendants and other departing employees have not updated their LinkedIn profiles

to list their current employer and instead continue to falsely represent that they are employed at Apex.

98. As set forth above, Kraus and Belinikie were longtime friends, and they had worked together for many years as client and servicer, respectively, on the Related account. On information and belief, when Belinkie tried to gain access to Apex's proprietary database after his resignation, he did so with Kraus's knowledge and/or on Kraus's instruction because both knew that Related would be moving its business to IQ-EQ, where the same core Apex employees would continue servicing Related's account.

99. On information and belief, after Belinkie was unable to steal Apex's proprietary client database, Belinkie and Kraus conspired with the other Employee Defendants to download and steal as much information as possible from Apex's computer systems prior to their departures.

100. All the while, Krause and others at Related continued to speak on a weekly basis with managers at Apex, Related continued to complain about the employee departures that it was secretly orchestrating, and Related and Krause continued to conceal their true intentions to move the entire Related business to Apex's competitor.

101. During this time, Related repeatedly asked for access to Apex's database. At the time, Apex believed the Related relationship was salvageable and wanted to demonstrate that it was a good service partner. Accordingly, Apex indicated that it would make efforts to separate other clients' data from the proprietary database so that Apex could provide the database to Related. Apex devoted considerable time, money, and human capital to this endeavor. But before the project was complete, Apex learned new information that raised alarm bells.

## V. Apex Learns That the Employee Defendants Breached their Employment Agreements by Joining IQ-EQ

102. On January 14, 2025, Kimarley Wilson, a Controller at Related, inadvertently sent an email containing an attached email string to a distribution group at Apex. Twenty minutes later, Wilson unsuccessfully attempted to recall the email, but not before Apex was able to read it.

103. The email was between Wilson and Chaney; Callen, Hope, and another former Apex employee, Karri Neal, were copied on it. Chaney, Callen, Hope, and Neal each had an "@iqeq.com" email address, which was the first time that Apex knew its former employees were now employed at its competitor, IQ-EQ.

104. Shortly after learning three members of Related's service team at Apex had joined IQ-EQ, an Apex employee called IQ-EQ and asked to speak to Belinkie. Although Belinkie was not available, the call did confirm that Belinkie had also joined IQ-EQ.

## VI. The Employee Defendants Refuse to Abide by their Contractual Obligations

105. On January 17, 2025, Apex, through counsel, sent a letter to each of the Employee Defendants that, among other things, demanded the immediate return of any Apex confidential information or trade secrets in the possession, custody, or control of any Employee Defendant. Apex also demanded that the Employee Defendants comply with their contractual non-compete obligations by terminating their employment with IQ-EQ, a direct competitor of Apex.

106. One week later, the Employee Defendants responded through counsel. The Employee Defendants stated that they would not abide by the lawful and binding non-competes each Employee Defendant signed in exchange for employment with Apex, which included access to Apex's customer goodwill and confidential information and trade secrets. Nonetheless, the Employee Defendants committed to returning any information improperly downloaded from Apex's computer systems.

107. Nonetheless, to date, none of the materials improperly downloaded by the Employee Defendants (including Apex's confidential information and trade secrets) has been returned to Apex.

108. Upon information and belief, the Employee Defendants coordinated their departures to IQ-EQ (which all occurred within a two-month period), they did so with the knowledge and participation of Related and Kraus, and all Defendants were aware that Related would soon be moving its entire platform to Apex's competitor, IQ-EQ.

## VII. Related Refuses to Pay its Invoices

109. After coordinating the movement of its service team from Apex to IQ-EQ and securing the information that it needed to smoothly continue operations with its new servicer, Related immediately took steps to end its relationship with Apex. From late 2024 through early 2025, while continuing to conceal its plan from Apex (and knowing that a dedicated service team was already ensconced at IQ-EQ), Related continued to feign frustration with staff turnover at Apex. Meanwhile, Apex had hired new dedicated personnel and continued to work overtime to meet its service obligations to Related under the MSA. To the extent that Related raised any specific complaints about Apex's service or deliverables, Apex immediately addressed those complaints and rectified the issues raised.

110. Nonetheless, on April 4, 2025, Related notified Apex that it intended to terminate the MSA "effective as of July 1, 2025." That notice, while surprising, comported with the MSA's termination provisions, which allowed either party to terminate the parties' contractual relationship by giving the other party at least 90 days' written notice. Apex acknowledged receipt of the notice of termination on April 7, 2025.

111. Two days later, on April 9, 2025, Related's in-house counsel sent another letter to Apex. In that letter, Related claimed that Apex breached its obligations under Section 2 of the

MSA in two ways. First, Related claimed that Apex breached the agreement by losing "virtually all personnel" working on Related's account, even though Related itself secretly coordinated and encouraged those departures. Second, Related claimed that Apex breached its obligation to deliver Apex's proprietary database containing Related's accounting records. But no such obligation existed in the MSA. Further, while the MSA required Apex to return Related's records upon termination, Apex was only required to do so on the actual date of termination—i.e., July 1, 2025. In other words, the identified breaches were not breaches at all. Nonetheless, Related demanded that Apex "cure" these issues by April 11, 2025, or face more immediate termination of the parties' relationship.

112. Apex timely responded to Related's demands on April 10, 2025, explaining why the identified concerns were not in fact breaches of the MSA. Less than one week later, on April 16, 2025, Related sent a letter purporting to terminate the MSA "effective immediately," claiming that Apex could have no "'reasonable opinion' . . . that its defaults can be cured."

113. On April 16, 2025, Apex responded by letter, refuting that cure was impossible or that immediate termination was proper under the MSA and requesting payment of Apex's outstanding and undisputed invoices, then totaling $1,816,195.00.

114. By letter dated April 23, 2025, Related refused to pay the outstanding invoices, again citing Apex's phantom breaches of the MSA as a basis for the refusal.

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF THE EMPLOYMENT AGREEMENTS
### (EMPLOYEE DEFENDANTS)

115. Apex incorporates by reference its allegations set forth in the preceding paragraphs as if fully set forth herein.

116. The Employment Agreements, including the confidentiality, non-competition, and employee non-solicitation covenants contained therein, are valid and enforceable contracts.

117. The Employment Agreements were executed at the commencement of employment and are supported by adequate and sufficient consideration.

118. In their respective Employment Agreements, each of the Employee Defendants agreed that they would not disclose to any third party or after termination retain any confidential information or trade secrets belonging to Apex.

119. By improperly downloading and retaining Apex trade secrets and other Apex confidential information following the termination of their employment with Apex, each of the Employee Defendants is in violation of the terms of the confidentiality and non-disclosure covenants set forth in their respective Employment Agreements.

120. In their respective Employment Agreements, each Employee Defendant agreed that, for 12 months following the end of his employment with Apex, he would not "enter into the employment of, act as a consultant to, or perform any services for any entity that is in competition with the business of the Company or any of its affiliates in any jurisdiction in which the Company or any of its affiliates is engaged."

121. By accepting employment with IQ-EQ, a direct competitor of Apex with an office in the same city out of which the Employee Defendants worked while employed by Apex, the Employee Defendants are in direct and immediate violation of the terms of the non-competition covenant set out in their respective Employment Agreements.

122. In their respective Employment Agreements, each of the Employee Defendants agreed that, for 12 months after the end of their employment with Apex, they would not induce or solicit any Apex employees to terminate their own employment with Apex.

123. Nonetheless, the Employee Defendants acted in concert with one another and with Related to coordinate their departures from Apex and their affiliation with IQ-EQ, Apex's competitor, and induced other employees of Apex to terminate employment with Apex in favor of IQ-EQ as well. In engaging in such conduct, the Employee Defendants violated the employee non-solicitation covenants set out in their respective Employment Agreements.

124. The restrictive covenants in the Employment Agreements are reasonable in scope and duration and are necessary to protect Apex's legitimate business interests in securing its confidential and trade secret information, protecting its goodwill with customers and employees, and its business reputation.

125. Apex has complied with the material terms of each of the Employment Agreements and has performed its obligations thereunder.

126. As a direct and proximate result of the Employee Defendants' respective breaches of the Agreements, Apex has suffered and will continue to suffer damages and irreparable harm.

127. Apex is entitled to damages to be proven at trial, as well as pre- and post-judgment interest, and injunctive relief.

**COUNT TWO**
**TORTIOUS INTERFERENCE WITH EXISTING CONTRACT**
**(RELATED AND KRAUS)**

128. Apex incorporates by reference its allegations set forth in the preceding paragraphs as if fully set forth herein.

129. Apex was a party to the Employment Agreements, which are valid and enforceable contracts.

130. On information and belief, Related and Kraus were aware, or reasonably should have been aware, that the Employee Defendants had Employment Agreements with Apex

containing non-competition and non-solicitation clauses. Such clauses are standard in the financial industry.

131. Related and Kraus willfully and intentionally interfered with the Employment Agreements by inducing the Employee Defendants to breach the Employment Agreements by going to work for a competitor of Apex, in violation of the non-competition covenants of the Employment Agreements.

132. Apex had a reasonable expectation that the Employee Defendants would comply with their Employment Agreements and that Apex would receive the benefit of the bargain embodied in the Employment Agreements.

133. By engaging in the wrongful and unlawful conduct described herein, Related and Kraus tortiously, intentionally, and willfully interfered with Apex's contractual relationships with the Employee Defendants for its own benefit, without right or justification, and at the expense of Apex.

134. As a direct and proximate result of Related's and Kraus's intentional interference with the Employment Agreements, Apex has suffered and will continue to suffer damages and irreparable harm, including damage to the reputation and goodwill of Apex and the loss of customers and employees, for which Apex has no adequate remedy at law.

135. Apex is entitled to injunctive relief restraining Related and Krause from further tortious interference, an award of damages sustained by Apex as a result of Related's and Kraus's actions, punitive damages, and any other available legal and equitable relief.

**COUNT THREE**
**BREACH OF THE MSA**
**(RELATED)**

136. Apex incorporates by reference its allegations set forth in the preceding paragraphs as if fully set forth herein.

137. The MSA is a valid and enforceable contract between Apex and Related.

138. Apex performed its obligations under the MSA by providing services to Related. Apex performed its obligations to Related in good faith and with all due care, skill, and diligence expected of a provider of similar services in the same market.

139. Apex provided services to Related within all identified timeframes in accordance with all specifications.

140. Related breached the MSA by refusing to pay Apex for services rendered.

141. As a direct and proximate result of Related's breach, Apex has suffered damages in the amount of at least $1.84 million, as well as pre- and post-judgment interest.

**COUNT FOUR**
**VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT**
**(EMPLOYEE DEFENDANTS)**

142. Apex incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

143. The Employee Defendants misappropriated Apex's confidential information and trade secrets (the "Apex Trade Secrets") and have used and disclosed that information in connection with their work for Related and at IQ-EQ, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831, *et seq*. ("DTSA").

144. The Apex Trade Secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use. Apex has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

145. The Apex Trade Secrets are related to products or services used in, or intended for use in, interstate commerce.

146. Apex takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of the Apex Trade Secrets.

147. The Employee Defendants took, refused to return, and used and/or disclosed (and likely plan to use and disclose) the Apex Trade Secrets and other valuable business information by improper means in violation of their contractual and other obligations to Apex.

148. The Employee Defendants engaged in this conduct despite acquiring the Apex Trade Secrets under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty the Employee Defendants owed and continue to owe to Apex.

149. Although the Employee Defendants committed to returning the wrongfully appropriated Apex Trade Secrets, to date, they have not done so.

150. The Employee Defendants' foregoing conduct constitutes an actual and threatened misappropriation and misuse of Apex's Trade Secrets in violation of the DTSA.

151. As a direct and proximate result of the Employee Defendants' actual and threatened misappropriation of the Apex Trade Secrets, Apex has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless the Individual Defendants are enjoined from engaging in any further acts of misappropriation, and from continued possession in any form of trade secret information belonging to Apex.

152. As a direct and proximate result of the Employee Defendants' actual and threatened misappropriation, Apex has suffered and/or will suffer damages and is entitled to all damages and remedies permitted under the DTSA.

**COUNT FIVE**
**AIDING AND ABETTING VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT**
**(RELATED AND KRAUS)**

153. Apex incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

154. As stated in Count Four, the Employee Defendants misappropriated the Apex Trade Secrets and, on information and belief, have used disclosed that information in connection with their work for Related and at IQ-EQ, in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831, et seq. ("DTSA").

155. On information and belief, Related and Kraus knew about and encouraged the Employee Defendants to misappropriate and disclose the Apex Trade Secrets in violation of the DTSA.

156. On information and belief, Related and Kraus intended to assist the Employee Defendants in their misappropriation of the Apex Trade Secrets as a means of facilitating Related's and the Employee Defendants' transition from Apex to its direct competitor, IQ-EQ.

157. As a direct and proximate result of the Related's and Kraus's assistance in the Employee Defendants' misappropriation of the Apex Trade Secrets, Apex has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless Related and Kraus are enjoined from engaging in any further acts in aid of misappropriation, and from continued possession in any form of trade secret information belonging to Apex.

158. As a direct and proximate result of the Related's and Kraus's assistance in the Employee Defendants' misappropriation, Apex has suffered and/or will suffer damages and is entitled to all damages and remedies permitted under the DTSA.

**COUNT SIX**
**VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT**
**(EMPLOYEE DEFENDANTS)**

159. Apex incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

160. The Employee Defendants misappropriated the Apex Trade Secrets and, on information and belief, have used and disclosed that information in connection with their work for Related and at IQ-EQ, in violation of the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq*. ("TUTSA").

161. The Apex Trade Secrets are valuable because they are not generally known or readily accessible, through proper means, to others who can profit from their use. Apex has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

162. Apex takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of the Apex Trade Secrets.

163. Upon information and belief, the Employee Defendants took, refused to return, and used and/or disclosed (and likely plans to use and disclose) the Apex Trade Secrets and other valuable business information by improper means in violation of his contractual and other obligations to Apex.

164. The Employee Defendants engaged in this conduct despite acquiring the Apex Trade Secrets under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty the Employee Defendants owed and continue to owe to Apex.

165. Although the Employee Defendants committed to returning the wrongfully appropriated Apex Trade Secrets, to date, they have not done so.

166. The Employee Defendants' foregoing conduct constitutes an actual and threatened misappropriation and misuse of Apex's Trade Secrets in violation of the TUTSA.

167. As a direct and proximate result of the Employee Defendants' actual and threatened misappropriation of the Apex Trade Secrets, Apex has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless the Employee Defendants are enjoined from engaging in any further acts of misappropriation, and from continued possession in any form of trade secret information belonging to Apex.

168. As a direct and proximate result of the Employee Defendants' actual and threatened misappropriation, Apex has suffered and/or will suffer damages and is entitled to all damages and remedies permitted under the TUTSA.

**COUNT SEVEN**
**BREACH OF FIDUCIARY DUTY**
**(EMPLOYEE DEFENDANTS)**

169. Apex incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

170. The Employee Defendants all held positions of trust and confidence with Apex while employed by Apex, and each owed Apex a fiduciary duty.

171. By taking the actions detailed herein, including by misappropriating the Apex Trade Secrets, coordinating the mass exodus of the employees supporting Related, and by conspiring with Related to move its business to Apex's direct competitor, IQ-EQ, the Employee Defendants breached their fiduciary duties owed to Apex.

172. As a proximate result of the Employee Defendants' breaches of their respective fiduciary duties, Apex has suffered and continues to suffer injury.

173. Apex is entitled to an award of damages sustained by Apex as a result of the Employee Defendants' breaches of their respective fiduciary duties, punitive damages for their willful and malicious conduct, and any other available legal and equitable relief.

**COUNT EIGHT**
**BREACH OF DUTY OF LOYALTY**
**(EMPLOYEE DEFENDANTS)**

174. Apex incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

175. The Employee Defendants each had a common law duty of loyalty arising from his relationship as an employee of Apex.

176. By taking the actions detailed herein, including by misappropriating the Apex Trade Secrets, coordinating the mass exodus of the employees supporting Related, and by conspiring with Related to move its business to Apex's direct competitor, IQ-EQ, the Employee Defendants breached their duty of loyalty to Apex and did so to benefit themselves and their new employer.

177. Apex is entitled to an award of damages sustained by Apex as a direct result of the Employee Defendants' breaches of their respective duties of loyalty, punitive damages for their willful and malicious conduct, and any other available legal and equitable relief.

**COUNT NINE**
**UNJUST ENRICHMENT**
**(ALL DEFENDANTS)**

178. Apex incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

179. Apex alleges in the alternative to its breach of contract claims that Apex is entitled to recover under the doctrine of unjust enrichment if the Court determines that either a valid and enforceable contract does not exist, that the existing contracts do not cover the subject matter of this dispute, or that the existing contracts are void, invalid, or unenforceable.

180. As a result of their misconduct detailed herein, Defendants have been unjustly enriched or will be unjustly enriched through:

a. The use of the Apex Trade Secrets wrongfully misappropriated by the Employee Defendants; and

b. The use of and access to Apex's personnel who were induced to and left Apex in violation of their Employment Agreements.

181. Further, Related has been unjustly enriched by Apex's employment of additional personnel to service Related's accounts after its corporate raid of Apex and through retention of the fees that should have been paid to Apex for its services.

182. The enrichment to Defendants came at the expense of Apex, which incurred considerable expense to acquire an interest in SandsPoint, exercise its option to acquire the remainder in SandsPoint, and hired additional staff to service Related.

183. The retention of these benefits by Defendants under the circumstances is inequitable and, therefore, Defendants should be required to disgorge their wrongful gains, to which Defendants knew that they were not entitled.

**COUNT TEN**
**CIVIL CONSPIRACY**
**(ALL DEFENDANTS)**

184. Apex incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

185. Defendants unlawfully and secretly combined and agreed among themselves to take the tortious and improper actions described herein in concert for the purpose of and with the effect of benefitting Related and IQ-EQ to the detriment of Apex.

186. To facilitate their unlawful conspiracy, Defendants deliberately engaged in the various unlawful activities described herein.

187. Defendants designed and carried out this plan knowing that the result would be that Apex would be unfairly and unlawfully crippled in its ability to compete for customers and business.

188. Defendants' conduct was willful and intentional, and Apex has been damaged, and continues to be damaged, by their actions.

189. Apex is entitled to an award of damages sustained by Apex as a direct result of Defendants' unlawful acts, punitive damages for their willful and malicious conduct, and any other available legal and equitable relief.

## APPLICATION FOR TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

190. Apex incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

191. Apex intends to promptly file a motion requesting entry of a temporary restraining order until a date set for hearing (not to exceed fourteen days from the date of the order) and, after notice and a hearing, a preliminary injunction.

192. Upon information and belief, each of the Employee Defendants has misappropriated Apex's confidential and trade secret information or has used or benefitted from the misappropriated confidential and trade secret information. If their conduct is not immediately stopped and is permitted to proceed unabated, the Employee Defendants could continue to disclose and otherwise misuse Apex's confidential and trade secret information, which will cause irreparable harm to Apex for which there is no adequate remedy at law, including, without limitation, loss of business opportunities and loss of goodwill and business reputation. Such harm is not readily reduced to monetary damages.

193. The Employee Defendants are in clear breach of their non-competition obligations under their respective Agreements, as each is currently employed by IQ-EQ, a competitor of Apex. If the Employee Defendants are not barred from continuing to work for IQ-EQ, Apex will suffer irreparable harm from the improper use of its confidential and trade secret information and from the loss of its customer goodwill.

194. Moreover, if the Employee Defendants are not enjoined from continuing to solicit their former Apex colleagues to join them at IQ-EQ, and to further hinder Apex's ability to staff projects, serve clients, and protect its confidential and trade secret information and customer goodwill, Apex will suffer irreparable harm.

195. Further, if the Employee Defendants are not compelled to return the Apex confidential information and trade secrets that they misappropriated, Apex will suffer irreparable harm.

196. There is a substantial likelihood that Apex will prevail on the merits of its claims.

197. Apex has established that, if injunctive relief is not entered, it will suffer irreparable harm and monetary damages will not be sufficient to redress Apex's injuries.

198. The threatened injury to Apex outweighs any possible damage to the Defendants.

199. The public interest would be served by the entry of the requested injunctive relief.

**PRAYER FOR RELIEF**

200. Apex prays that this Court enter judgment against Defendants, jointly and severally, and award Apex the following relief:

a. Grant Apex temporary, preliminary, and permanent injunctive relief (i) prohibiting Defendants (and all those acting in concert with them) from maintaining, disclosing, or otherwise using any Apex Trade Secrets and/or confidential information; and (ii) requiring Defendants to return to Apex all Apex Trade Secrets and confidential information in their possession, custody, or under their control;

b. Grant Apex temporary, preliminary, and permanent injunctive relief compelling the Employee Defendants to abide by the non-competition covenant set out in Section 4(b) of their Employment Agreements;

c. Grant Apex temporary, preliminary, and permanent injunctive relief compelling the Employee Defendants to abide by the employee non-solicitation covenant set out in Section 4(c) of the Employment Agreement executed by each of the Employee Defendants at the outset of employment with Apex and supported by sufficient consideration;

d. Require Defendants, at their own cost, to make available to a third-party forensic expert any and all personal and business USB drives, cell phones, computers, hard drives, tablets, other electronic devices, email accounts, and Cloud-based file management accounts (such as Google Drive) owned or used by Defendants, on which Apex Trade Secrets and/or confidential information resides, has resided, or may reside, for the purpose of determining the extent of their acts in violation of their contractual, statutory, and common law obligations;

e. Award Apex monetary damages to compensate for economic injuries caused as a result of Defendants' conduct;

f. Award Apex treble, exemplary, and/or punitive damages;

g. Award Apex its attorneys' fees and costs incurred in this action; and

h. Grant such other and further relief as the Court deems just and proper.

Date: May 27, 2025

Respectfully submitted,

*/s/ Amy L. Ruhland*

Amy L. Ruhland
Texas Bar No. 24043561
amy.ruhland@pillsburylaw.com

Ryan J. Sullivan
Texas Bar No. 24102548
ryan.sullivan@pillsburylaw.com

Abigail L. Griffith
Texas Bar No. 24113585
abigail.griffith@pillsburylaw.com

PILLSBURY WINTHROP SHAW PITTMAN LLP
401 Congress Ave.
Suite 1700
Austin, TX 78701
(512) 580-9600

*Attorneys for Apex Group Capital Advisors LLC*

**CAUSE NO.** DC-25-08300

| | | |
|---|---|---|
| APEX GROUP CAPITAL ADVISORS LLC F/K/A SANDSPOINT CAPITAL ADVISORS LLC,<br><br>Plaintiff,<br><br>v.<br><br>RELATED FUND MANAGEMENT, LLC; JAMES KRAUS; LUCAS BELINKIE; PRESTON CALLEN; WILLIAM C. CHANEY; and RYAN HOPE<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br><br><br>DALLAS COUNTY, TEXAS<br><br><br><br>191st JUDICIAL DISTRICT |

**<u>VERIFICATION</u>**

I, Maria Von Horvath, Local Managing Director for Apex Group Ltd. ("Apex"), swear and attest that the information contained in Paragraphs 17-54, 69-92, 102-108, and 192-195 of the foregoing Petition is either within my personal knowledge or has been obtained from agents, employees, or officers of Apex Group and is true and correct to the best of my knowledge, information, and belief.

My name is Maria Von Horvath, my date of birth is December 28, 1979, my address is 8750 N. Central Expressway, Dallas, Texas 75231. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on the 23rd day of May, 2025

Signed by:
Maria VonHorvath
CB9529E4CAF6481...
Maria Von Horvath

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kira Hamm on behalf of Amy Ruhland
Bar No. 24043561
kira.hamm@pillsburylaw.com
Envelope ID: 101283420
Filing Code Description: Original Petition
Filing Description:
Status as of 5/29/2025 8:44 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy Ruhland | | amy.ruhland@pillsburylaw.com | 5/27/2025 2:20:30 PM | SENT |
| Kira NHamm | | kira.hamm@pillsburylaw.com | 5/27/2025 2:20:30 PM | SENT |
| Ryan Sullivan | | ryan.sullivan@pillsburylaw.com | 5/27/2025 2:20:30 PM | SENT |
| Abigail Griffith | | abigail.griffith@pillsburylaw.com | 5/27/2025 2:20:30 PM | SENT |
| Lindsey Mitchell | | lindsey.mitchell@pillsburylaw.com | 5/27/2025 2:20:30 PM | SENT |
| Docket Docket | | Docket@Pillsburylaw.com | 5/27/2025 2:20:30 PM | SENT |
| Claudia Jimenez | | claudia.jimenez@pillsburylaw.com | 5/27/2025 2:20:30 PM | SENT |