**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| APEX GROUP CAPITAL ADVISORS LLC F/K/A SANDSPOINT CAPITAL ADVISORS LLC,<br><br>Plaintiff,<br><br>v.<br><br>RELATED FUND MANAGEMENT, LLC; JAMES KRAUS; LUCAS BELINKIE; PRESTON CALLEN; WILLIAM C. CHANEY; and RYAN HOPE,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:25-cv-08892 |

**OMNIBUS REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO AMEND FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT ........ 1

II. ARGUMENT ........ 4

A. APEX CAPITAL HAS ESTABLISHED GOOD CAUSE UNDER RULE 16 ........ 4

B. RULE 15 WEIGHS DECIDEDLY IN FAVOR OF PERMITTING AMENDMENT ........ 7

1. Defendants Have Not Shown Undue Delay ........ 7

2. Defendants Have Not Shown Bad Faith ........ 8

3. Defendants Have Not Shown Undue Prejudice ........ 9

4. Defendants Have Not Shown that Apex Capital's Claims are Futile ........ 11

a. Fraudulent Inducement ........ 11

b. Breach of Contract ........ 13

c. Breach of Implied Covenant of Good Faith and Fair Dealing ........ 14

C. APEX CAPITAL'S CLAIMS AGAINST IQEQ ARE NOT BARRED BY THE RES JUDICATA DOCTRINE ........ 15

1. SAC Counts 12 and 14–16 Are Not Barred by Res Judicata Because the Claims Arose After the First Texas Action Was Commenced ........ 15

2. SAC Counts 1–3 and 13 Are Not Barred by Res Judicata Because They Are Based on Evidence Apex Capital Had No Reasonable Means of Discovering ........ 17

D. APEX CAPITAL'S MOTION IS PROCEDURALLY PROPER ........ 20

III. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*A.V. by Versace, Inc. v. Gianni Versace S.p.A.*,
87 F. Supp. 2d 281 (S.D.N.Y. 2000)....................10

*AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*,
214 A.D.3d 111 (1st Dep't 2023)....................14

*Agerbrink v. Model Serv. LLC*,
155 F. Supp. 3d 448 (S.D.N.Y. 2016)....................8, 9, 10

*Ambac Assurance Corp. v. EMC Mortg. Corp.*,
No. 08 Civ. 9464 (RMB)(THK), 2010 WL 11595698 (S.D.N.Y. Dec. 16, 2010)....................6, 7, 9

*Blake Marine Grp., LLC v. Frenkel & Co.*,
425 F. Supp. 3d 330 (S.D.N.Y. 2019)....................8

*Block v. First Blood Assocs.*,
988 F.2d 344 (2d Cir. 1993)....................2, 8, 9

*Cayuga Nation v. Tanner*,
6 F.4th 361 (2d Cir. 2021)....................16

*In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*,
735 F. Supp. 3d 352 (S.D.N.Y. 2024)....................12

*Chase Manhattan Bank, N.A. v. Celotex Corp.*,
56 F.3d 343 (2d Cir. 1995)....................16

*Cho v. BlackBerry Ltd.*,
991 F.3d 155 (2d Cir. 2021)....................17, 20

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
No. 14-MD-2548 (VEC), 2017 WL 9480384 (S.D.N.Y. June 8, 2017)....................4

*Dalton v. Educ. Testing Serv.*,
87 N.Y.2d 384 (1995)....................14

*Dellutri v. Village of Elmsford*,
895 F. Supp. 2d 555 (S.D.N.Y. 2012)....................16

*Dominguez v. Walsh*,
No. 22-CV-6443 (KMK), 2023 WL 6199861 (S.D.N.Y. Sept. 22, 2023)....................11

*Exxon Mobil Corp. v. Schneiderman*,
316 F. Supp. 3d 679 (S.D.N.Y. 2018)....11

*Foman v. Davis*,
371 U.S. 178 (1962)....7

*Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*,
304 F.R.D. 170 (S.D.N.Y. 2014)....7

*Gache v. Hill Realty Assoc., LLC*,
No. 13–CV–1650 (CS), 2014 WL 5048336 (S.D.N.Y. Sept. 22, 2014)....17

*Gullo v. City of New York*,
540 F. App'x 45 (2d Cir. 2013)....6, 8

*Holmes v. City of New York*,
No. 19 Civ. 1628 (ER), 2020 WL 918611 (S.D.N.Y. Feb. 26, 2020)....19

*Holmes v. Grubman*,
568 F.3d 329 (2d Cir. 2009)....6

*iOptimize Realty, Inc. v. Cox Enters., Inc.*,
No. 21-cv-4179 (NRM) (ST), 2025 WL 2696475 (E.D.N.Y. Sept. 22, 2025)....17, 20

*Kant v. Columbia Univ.*,
No. 08 Civ. 7476(PGG), 2010 WL 807442 (S.D.N.Y. Mar. 9, 2010)....8

*Kassner v. 2nd Ave. Delicatessen, Inc.*,
496 F.3d 229 (2d Cir. 2007)....7

*L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*,
198 F.3d 85 (2d Cir. 1999)....17, 20

*In re Layo*,
460 F.3d 289 (2d Cir. 2006)....20

*Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*,
802 F. Supp. 3d 701 (S.D.N.Y. 2025)....14

*Lucente v. Int'l Bus. Machs. Corp.*,
310 F.3d 243 (2d Cir. 2002)....11

*Martin v. Sprint/United Mgmt. Co.*,
No. 15 Civ. 5237 (PAE), 2016 WL 2757431 (S.D.N.Y. May 12, 2016)....8, 9

*Mason Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc.*,
318 F.R.D. 28 (S.D.N.Y. 2016)....5

*Mohamad v. Rajoub*,
767 F. App'x 91 (2d Cir. 2019) ....................16

*Monahan v. N.Y.C. Dep't of Corrections*,
214 F.3d 275 (2d Cir. 2000)....................9

*Nemaizer v. Baker*,
793 F.2d 58 (2d Cir. 1986)....................16

*Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*,
No. 23-CV-10753 (LAP), 2025 WL 1826583 (S.D.N.Y. July 2, 2025)....................8

*Ningbo Prods. Import & Export Co. v. Eliau*,
No. 11 Civ. 650 (PKC), 2011 WL 5142756 (S.D.N.Y. Oct. 31, 2011)....................20

*On Track Innovations Ltd. v. T-Mobile USA, Inc.*,
No. 12 Civ. 2224(AJN)(JCF), 2014 WL 406497 (S.D.N.Y. Feb. 3, 2014)....................11, 13

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012)....................11

*Perez v. Escobar Constr., Inc.*,
342 F.R.D. 378 (S.D.N.Y. 2022) ....................9

*Rodriguez by Rodriguez v. Abbott Labs.*,
151 F.R.D. 529 (S.D.N.Y. 1993) ....................10

*Ruffolo v. Oppenheimer & Co.*,
987 F.2d 129 (2d Cir. 1993)....................11

*Saabirah El v. City of New York*,
300 F. App'x 103 (2d Cir. 2008) ....................20

*Sanders v. Sanders*,
No. 20-CV-5621 (VEC), 2021 WL 4392053 (S.D.N.Y. Sept. 24, 2021)....................19

*SAT Aero Holdings, Inc. v. Aerolinea del Estado Mexicano, S.A. de C.V.*,
No. 24 CV 2300 (VM), 2025 WL 3012989 (S.D.N.Y. Oct. 28, 2025) ....................12

*SEC v. Rio Tinto plc*,
No. 17cv07994 (AT) (DF), 2020 WL 2504008 (S.D.N.Y. Mar. 9, 2020)....................10

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
341 F.R.D. 542 (S.D.N.Y. 2022) ....................6, 7

*In re SunEdison, Inc.*,
No. 16-10992 (DSJ), 2021 WL 3176070 (Bankr. S.D.N.Y. July 27, 2021)....................10

*TechnoMarine SA v. Giftports, Inc.*,
758 F.3d 493 (2d Cir. 2014)....................16, 17

*Trireme Energy Dev., LLC v. RWE Renewables Ams., LLC*,
No. 24-3190, slip op. (2d Cir. Sept. 1, 2026)....................17

*Waldman v. Village of Kiryas Joel*,
207 F.3d 105 (2d Cir. 2000)....................17

*Woods v. Dunlop Tire Corp.*,
972 F.2d 36 (2d Cir. 1992)....................17

<u>Rules and Regulations</u>

Federal Rules of Civil Procedure
Rule 9....................11, 12
Rule 15....................3, 7, 11
Rule 16....................4, 6, 7
Rule 59....................3, 20
Rule 60....................3, 20

# I. PRELIMINARY STATEMENT

Defendants' central argument that Apex Capital delayed seeking amendment turns the chronology—and the governing standard for amendment—on its head, because Defendants seek to fault Apex Capital for failing to plead claims before the conduct underlying those claims had occurred and before Defendants produced the evidence necessary to uncover them.[1] That evidence was uniquely within Defendants' possession and control, and Defendants did not produce it until *after* the Court's February 9, 2026, deadline to amend had passed.

As set forth in the Motion, Apex Capital's request to amend arises from developments in discovery that fundamentally alter the landscape of this case. While Apex Capital was previously aware that the Former Employees had taken Apex Capital's confidential information and trade secrets, newly discovered evidence now demonstrates that IQEQ directed a "pure lift" or "lift and shift" of Apex Capital's operations required to service the profitable Related account. Specifically, IQEQ actively recruited the key Apex Capital employees responsible for servicing the Related account, facilitated the misappropriation of Apex Capital's trade secret and confidential information, scripted emails for Related to send Apex Capital providing pretext for termination of the MSA, and then pressured Related to terminate the MSA once IQEQ had secured the assets necessary to service the Related account immediately without any disruption. That evidence did not merely provide additional examples of misconduct Apex Capital already understood; it revealed a materially different role for IQEQ and supplied the factual basis for claims Apex Capital could not have pleaded earlier. Apex Capital moved promptly once that evidence emerged.

---

[1] Capitalized terms not defined herein have the meaning as in Apex Capital's Amended Memorandum of Law in Support of Its Motion to Amend First Amended Complaint (Dkt. 162, the "Motion"). The Related Defendants' Opposition to the Motion (Dkt. 180) is referenced herein as the "Related Defendants' Opposition" and the Former Employees' Opposition to the Motion (Dkt. 181) is referenced herein as the "Former Employees' Opposition."

Defendants nonetheless object to Apex Capital's Motion on various grounds, none of which support denial.

*First*, Defendants contend that Apex Capital delayed seeking amendment. That is not true. Critically, the discovery prompting Apex Capital's amendment was in Defendants' exclusive possession and control and not produced until between April and July 2026, *after* the February 9, 2026, deadline to amend in the Court's Civil Management Plan and Scheduling Order (Dkt. 112, the "Scheduling Order"). Defendants do not deny that the specific evidence cited in Apex Capital's Motion was produced on April 24, May 29, and July 17, 2026. Apex Capital promptly filed its motion to amend on July 29, 2026—three months after the April 24 production date and just 12 days after the July 17 production date. That timing reflects diligence, not delay.

*Second*, Defendants claim the amendment is in bad faith because it was purportedly made to "avoid imminent depositions" and "reshape this lawsuit ahead of a motion to dismiss ruling." Related Defendants' Opposition at 2. But it was Defendants—*not* Apex Capital— that proposed adjourning all depositions, and Apex Capital consented. Nor is Apex Capital using the amendment to cure purported deficiencies raised in Defendants' motions to dismiss. Apex Capital's SAC leaves most allegations unchanged and adds no new claims against the current Defendants. The point of amendment was simply to add claims against IQEQ.

*Third*, Defendants contend the amendment is unduly prejudicial because it disrupted depositions. But again, it was Defendants who suggested adjourning the depositions. Defendants identify no other prejudice. Nor can they. Document discovery remains ongoing, no depositions have been taken, and no trial date has been set. And far from prejudicing the parties, allowing amendment will permit these closely intertwined claims to be resolved together instead of through separate actions.

*Fourth,* Defendants challenge the amendment on futility grounds. But Related's futility arguments are based on purported challenges to Apex Capital's claims against the Related Defendants, not the new claims against IQEQ. Under Rule 15, only the purported futility of the new claims against IQEQ is relevant. The Former Employees, in turn, claim futility with respect to three of the claims against IQEQ, but the SAC clearly contains plausible allegations supporting each of those claims.

*Fifth*, Defendants invoke res judicata as a bar, but their argument ignores the temporal and factual distinctions that defeat preclusion. Specifically, SAC Counts 14–16 did not—and could not—exist when Apex Capital filed the First Texas Action because those claims are based on a settlement that did not then exist; and SAC Counts 1–3 and 13 arise from pre-filing misconduct that was concealed and could not have been discovered at the time of the First Texas Action. Those distinctions matter. And Defendants' effort to erase those distinctions by vaguely characterizing every allegation as part of the same overall course of conduct does not pass muster.

*Sixth*, the Related Defendants contend the amendment is an improper attempt to relitigate a final judgment on the merits. But Apex Capital does not seek to reopen the First Texas Action or disturb the dismissal entered there. The stipulation of dismissal with prejudice in the First Texas Action was narrowly limited to those specific causes of action asserted. None of the causes of action dismissed with prejudice in the First Texas Action are being reasserted here.[2] Federal Rules of Civil Procedure 59 and 60 therefore have no application.

The Motion should be granted.

---

[2] In the First Texas Action, Apex Capital asserted claims against IQEQ for: tortious interference with the Former Employees' employment agreements, tortious interference with business relations as related to the Former Employees' solicitation restrictions, unjust enrichment, unfair competition, and conspiracy. The SAC asserts different claims, including statutory and common law misappropriation of trade secret and confidential information, tortious interference with the MSA, aiding and abetting breach of fiduciary duty, fraudulent inducement, and breach of the settlement agreement and the implied covenant of good faith and fair dealing.

## II. ARGUMENT

### A. APEX CAPITAL HAS ESTABLISHED GOOD CAUSE UNDER RULE 16

Apex Capital has amply demonstrated good cause to amend under Federal Rule of Civil Procedure 16(b)(4). It is well established that "[g]ood cause" under Rule 16 "is primarily a question of diligence." *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig*., No. 14-MD-2548 (VEC), 2017 WL 9480384, at *3 (S.D.N.Y. June 8, 2017) (Caproni, J.).

Here, Apex Capital acted diligently—it moved promptly after newly discovered evidence revealed:

- IQEQ had breached the Settlement Agreement;
- IQEQ had fraudulently induced Apex Capital to enter into the Settlement Agreement; and
- IQEQ was not just a potential beneficiary of Defendants' misconduct, but rather an active participant in the coordinated scheme at the heart of this litigation by directing a "pure lift" or "lift and shift" of Apex Capital's operations required to service the profitable Related account.

Specifically, newly discovered evidence demonstrates that IQEQ actively recruited the key Apex Capital employees responsible for servicing the Related account, facilitated the misappropriation of Apex Capital's trade secret and confidential information created over Apex Capital's nine-year relationship with Related, scripted emails for Related to send Apex Capital providing pretext for termination of the MSA, and then pressured Related to terminate the MSA once IQEQ had secured the assets necessary to service the Related account immediately without any disruption.

The above evidence was uniquely in the possession and control of Defendants and not produced by Defendants until between April and July 2026, more specifically, in an April 24 production by Related, and May 29 and July 17, 2026, productions by Chaney. Apex Capital then promptly filed the Motion on July 29, 2026, based on that newly discovered evidence.

Defendants contend that Apex did not diligently move to amend because "Apex has known the core 'theories' and 'facts' underlying its proposed amendment since January 2025, when it first sued IQ-EQ." Related Defendants' Opposition at 8. That clearly is not the case. For instance, with respect to Apex Capital's proposed claims for breach of the Settlement Agreement and breach of the implied covenant of good faith and fair dealing pertaining to the Settlement Agreement (SAC Counts 15–16), the Settlement Agreement did not even exist until *February 2025*. Beckerman Decl. Ex. J. With respect to Apex Capital's claim for fraudulent inducement (SAC Count 14), IQEQ did not even make those fraudulent misrepresentations until *February 2025*. *Id*. With respect to Apex Capital's claim for tortious interference with the MSA (SAC Count 12), Related did not even terminate the MSA until *April 2025*. *Id.* Ex. H. Indeed, IQEQ's email to Related, urging it to "get tough" and "imminently" terminate the MSA was sent on March 13, 2025. *Id*.

The First Texas Action was dismissed on February 19, 2025, so none of the above claims could have been asserted in that action. And those claims were not asserted earlier in this action because Apex Capital did not acquire a sufficiently developed factual basis to assert them until it received discovery in this case between April and July 2026. *See Mason Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 37–38 (S.D.N.Y. 2016) (claims "would have been premature" before discovery, such that "it was proper for Plaintiffs to wait" to seek leave to amend). Once Apex Capital obtained the last of that evidence, it diligently moved to amend 12 days later, on July 29, 2026.

With respect to the misappropriation claims against IQEQ (SAC Counts 1–3) and the aiding and abetting breach of fiduciary duty claim against IQEQ (SAC Count 13), although Apex Capital's earlier pleadings alleged, on information and belief, that the Former Employees used Apex Capital's confidential information in their work at IQEQ, the First Texas Action and Apex

Capital's initial Complaints in this action focused entirely on *the Former Employees'* misconduct and characterized IQEQ merely as the potential passive beneficiary of that misconduct. *See* FAC. But the discovery produced between April and July 2026 demonstrated that IQEQ itself devised a "pure lift"/"lift and shift" strategy to replicate Apex Capital's services, created an Egnyte repository to collect Apex Capital's confidential and trade secret information, and coordinated the data transfer and employee departures. Beckerman Decl. Exs. F–H, M–N. None of that evidence was known to Apex Capital when the Scheduling Order was entered or when the February 9 deadline to amend elapsed.

Defendants' characterization of that evidence as merely additional illustrations of an existing theory ignores the difference between suspecting that a competitor benefited from misconduct and obtaining documentary proof that it helped orchestrate the misconduct from the outset.[3] Indeed, the governing question under Rule 16 is not when Apex Capital first suspected IQEQ's involvement, but rather, when Apex Capital acquired a sufficiently developed factual basis to assert the claims. That happened at the absolute earliest after April 24, 2026, and the evidence continued to develop through July 17, 2026. Even measuring diligence from April 24, 2026, the intervening three months were reasonable given the volume of discovery: Related's first production alone consisted of 17,957 pages. Dkt. 182-4; *see also Ambac Assurance Corp. v. EMC Mortg. Corp.*, No. 08 Civ. 9464 (RMB)(THK), 2010 WL 11595698, at *8 (S.D.N.Y. Dec. 16, 2010) (finding diligence despite six-to-twelve-month delays amid voluminous, ongoing discovery). Apex Capital's prompt motion based on that qualitative change in the factual record establishes good

---

[3] *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009), and *Gullo v. City of New York*, 540 F. App'x 45, 47 (2d Cir. 2013) are distinguishable because the movants had the necessary facts before the deadline but amended only afterward.

cause under Rule 16. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 341 F.R.D. 542, 551 (S.D.N.Y. 2022) (finding good cause based on newly discovered facts).

Defendants also urge the Court to deny amendment under Rule 16 based in part on claimed prejudice. But Rule 16(b) "provides the district courts discretion to ensure that limits on time to amend pleadings do not result in prejudice or hardship to *either side*." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 243–44 (2d Cir. 2007) (emphasis added). That discretion encompasses the authority to weigh prejudice and the other relevant Rule 15(a) factors, even if the movant's diligence is in dispute. *See Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 176 (S.D.N.Y. 2014). As discussed below, those factors independently favor granting leave here.

### B. RULE 15 WEIGHS DECIDEDLY IN FAVOR OF PERMITTING AMENDMENT

Having satisfied Rule 16's good cause requirement, Apex Capital also satisfies Rule 15's more liberal standard. Under Rule 15(a)(2), courts are directed to "freely give leave when justice so requires," and leave should be denied only upon a showing of undue delay, bad faith, undue prejudice, or futility. Fed. R. Civ. P. 15(a)(2); *see, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962). Defendants have made no such showings.

#### 1. Defendants Have Not Shown Undue Delay

For the reasons explained in Section II(A), *supra,* Apex Capital did not delay in moving to amend. Rather, Apex Capital moved promptly after discovery supplied a sufficient factual basis for its proposed claims, and its diligence under Rule 16 necessarily forecloses a finding of undue delay under Rule 15. *See Ambac*, 2010 WL 11595698, at *7.

### 2. Defendants Have Not Shown Bad Faith

The Related Defendants' contention that Apex Capital moved to amend solely to forestall depositions and an adverse ruling on the pending motions to dismiss is contradicted by the record and precisely the type of conclusory allegation of bad faith that courts consistently reject. *See Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 453 (S.D.N.Y. 2016).[4]

*First*, it was Defendants who first proposed adjourning all depositions, *not* Apex Capital. Specifically, during a telephonic meet and confer on July 30, 2026, counsel for the Employee Defendants raised the idea of adjourning all depositions, and Apex Capital consented. Declaration of Brian L. Beckerman, dated September 11, 2026, ¶ 3, filed contemporaneously herewith. The parties then jointly requested the adjournment through a joint letter prepared and filed by counsel for the Employee Defendants. Dkt. 166 (the "Joint Letter"). Up to that point, Apex Capital was fully prepared to proceed with the depositions as scheduled. The Related Defendants' assertion that Apex Capital filed the Motion in bad faith to delay the depositions is flatly false.

*Second*, as explained above, the evidence supporting the proposed amendment emerged through rolling discovery—beginning with the April 24, 2026, production of Related's communications with IQEQ, continuing with the May 29, 2026, production of Chaney's text messages, and culminating in the July 17, 2026, disclosure of Chaney's archived .pst file. Beckerman Decl. ¶¶ 5–11, 14–16. Apex Capital moved to amend less than two weeks after that final disclosure. The fact that discovery crystallized those claims while motions to dismiss remained pending and depositions were scheduled does not suggest gamesmanship; it shows only

---

[4] The Related Defendants' cases do not support bad faith. *Newton v. LVMH Moet Hennessy Louis Vuitton Inc.*, No. 23-CV-10753 (LAP), 2025 WL 1826583, at *5 (S.D.N.Y. July 2, 2025) vacated its bad-faith finding. *Blake Marine Grp., LLC v. Frenkel & Co.*, 425 F. Supp. 3d 330, 335 (S.D.N.Y. 2019) and *Gullo*, 540 F. App'x at 47 addressed only diligence. Finally, *Kant v. Columbia Univ.*, No. 08 Civ. 7476(PGG), 2010 WL 807442, at *7 (S.D.N.Y. Mar. 9, 2010) involved a belated recollection, not newly discovered documents.

that Apex Capital amended in response to what discovery revealed. *See Martin v. Sprint/United Mgmt. Co*., No. 15 Civ. 5237 (PAE), 2016 WL 2757431, at *4 (S.D.N.Y. May 12, 2016); *Agerbrink*, 155 F. Supp. 3d at 453.

Moreover, the narrow scope of Apex Capital's amendment alone demonstrates that Apex Capital is not using the amendment to shore up its claims in response to the pending motions to dismiss. Apex Capital's amendment was narrowly tailored to assert new claims against IQEQ, not to add allegations directed at curing purported deficiencies.

### 3. Defendants Have Not Shown Undue Prejudice

Defendants' assertions of prejudice fare no better. "[O]nly *undue* prejudice warrants denial of leave to amend." *Agerbrink*, 155 F. Supp. 3d at 454 (citations omitted); *see also Ambac*, 2010 WL 11595698, at *7. Defendants bear the burden "of demonstrating that substantial prejudice would result were the proposed amendment to be granted." *Agerbrink*, 155 F. Supp. 3d at 454 (citation omitted); *see also Perez v. Escobar Constr., Inc.*, 342 F.R.D. 378, 382 (S.D.N.Y. 2022). Defendants cannot meet that burden here.

Defendants' prejudice arguments ultimately boil down to grievances about scheduling disruptions and litigation costs that *have already occurred*. But the relevant inquiry is what prejudice *would result* from granting amendment—whether it would require significant additional resources, significantly delay resolution, or impair a party's ability to pursue a timely action elsewhere. *See Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 284 (2d Cir. 2000). Denying Apex Capital's motion would not undo the scheduling changes Defendants identify. *See* Joint Letter. Nor do previously incurred litigation costs establish substantial prejudice. *See Block v. First Blood Assocs.*, 988 F.2d 344, 351 (2d Cir. 1993) (no prejudice based on the "time, effort and money" already expended).

Furthermore, the possibility of additional briefing or discovery is not undue prejudice, particularly where scheduling adjustments can mitigate any incremental burden. *See A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) ("burden of undertaking discovery, standing alone" is not undue prejudice); *In re SunEdison, Inc.*, No. 16-10992 (DSJ), 2021 WL 3176070, at *9 (Bankr. S.D.N.Y. July 27, 2021) (re-briefing a motion to dismiss was "insufficient" to "justify denying leave to amend").

Here, discovery remains ongoing, no depositions have been taken, and no trial date has been set. The relevant discovery from IQEQ also substantially overlaps with discovery already conducted or underway. *See Agerbrink*, 155 F. Supp. 3d at 455. And IQEQ is no stranger to this litigation: it is already participating in discovery and is represented by the same counsel as three existing Defendants. Beckerman Decl. ¶¶ 19, 22. Lastly, while any necessary schedule adjustment can be managed by the Court, requiring Apex Capital to file an entirely separate action against IQEQ would produce duplicative discovery, overlapping motion practice, and a risk of inconsistent rulings. *See Rodriguez by Rodriguez v. Abbott Labs.*, 151 F.R.D. 529, 533 (S.D.N.Y. 1993) ("plaintiff would be unfairly prejudiced by having to litigate in two different forums").

Defendants' reliance on *SEC v. Rio Tinto plc*, No. 17cv07994 (AT) (DF), 2020 WL 2504008 (S.D.N.Y. Mar. 9, 2020), only underscores how far this case is from one involving undue prejudice. There, twenty-three witnesses had already been deposed, and because most resided overseas and could not be compelled to appear at trial, their depositions effectively served as their trial testimony. *Id.* at *13. The resulting burden of renewed depositions was therefore "greater than in most cases." *Id.* Here, by contrast, no depositions have occurred, no summary judgment motions have been filed, and no trial date has been set. Beckerman Decl. ¶ 18. Having shown no cognizable prejudice, let alone *undue* prejudice, Defendants' argument fails.

### 4. Defendants Have Not Shown that Apex Capital's Claims are Futile

The proposed SAC states plausible claims supported by substantial documentary evidence. Motion at 16–24. A motion for leave to amend should not be denied based on futility "unless the proposed amendment is clearly frivolous or facially insufficient." *Dominguez v. Walsh*, No. 22-CV-6443 (KMK), 2023 WL 6199861, at *3 (S.D.N.Y. Sept. 22, 2023). Futility requires that "no colorable grounds exist to support a claim or defense," with all reasonable inferences drawn in Apex Capital's favor. *See On Track Innovations Ltd. v. T-Mobile USA, Inc.*, No. 12 Civ. 2224(AJN)(JCF), 2014 WL 406497, at *4 (S.D.N.Y. Feb. 3, 2014).

The Related Defendants' argument for futility misstates the standard under Rule 15: the relevant inquiry for the Court is whether *the proposed amendment* (i.e., the new claims against IQEQ) would be futile, not whether the existing claims *against RFM and Kraus* can survive a motion to dismiss. *See Dominguez*, 2023 WL 6199861, at *3. The Related Defendants therefore provide no arguments against amendment here on the grounds of claim futility. [5]

The Former Employees, in turn, allege only that three of Apex Capital's claims against IQEQ are futile—fraudulent inducement (Count 14); breach of the Settlement Agreement (Count 15); and breach of the implied covenant of good faith and fair dealing (Count 16). Those arguments are easily discredited.

#### a. *Fraudulent Inducement*

The Former Employees argue that the fraudulent inducement claim fails Rule 9(b) because Apex Capital supposedly does not identify falsity, scienter, or the particular proprietary information at issue. Former Employees' Opposition at 21–22. Not so.

---

[5] The Related Defendants' cases involved attempts to revise or cure *existing* claims. *See Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258–60 (2d Cir. 2002); *Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679, 705 (S.D.N.Y. 2018); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131–32 (2d Cir. 1993).

Apex Capital identifies the alleged misrepresentation with precision: the speaker was IQEQ's Group General Counsel; the statement was made in the February 17, 2025, letter; and IQEQ represented that it had not used Apex Capital proprietary data in discussions with Related and committed to conduct a forensic investigation, to destroy Apex Capital information found on its systems, and to refrain from its commercial use. SAC ¶¶ 141, 258. Apex Capital further alleges the purpose of those statements—to induce dismissal of IQEQ—and Apex Capital's reliance in dismissing its claims. *Id.* ¶¶ 141, 257, 260–62. Those allegations identify the "who, what, when, where, and how" of the alleged fraud.[6] Apex Capital also pleads why the representations were false: Apex Capital alleges that, while IQEQ represented that it would not use Apex Capital proprietary data, IQEQ itself was directing the transfer of Apex Capital's confidential information for use at IQEQ. SAC ¶¶ 145, 259.

The SAC likewise adequately pleads scienter, namely, that IQEQ made representations it knew to be false: The company represented that it had not used Apex Capital's proprietary information while it was participating in the very transfer and use it denied. *Id.* ¶¶ 258–59. At the very least, those allegations support a strong inference that IQEQ knew its representations were false, particularly because IQEQ had an incentive to secure dismissal while the Related transition remained ongoing.

Defendants' argument that Apex Capital must identify the precise Apex Capital document or trade secret IQEQ used to plead fraud with particularity conflates two different questions. Rule 9(b) requires particularity as to the alleged fraudulent statement and the circumstances making it fraudulent; it does not require Apex Capital, before full discovery, to identify every proprietary

---

[6] Defendants' authorities are distinguishable. *SAT Aero Holdings, Inc. v. Aerolinea del Estado Mexicano, S.A. de C.V.*, No. 24 CV 2300 (VM), 2025 WL 3012989, at *7–9 (S.D.N.Y. Oct. 28, 2025), identified no particular speaker or statement and relied on nonperformance and vague motive. *In re Chantix (Varenicline) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 735 F. Supp. 3d 352, 391 (S.D.N.Y. 2024), involved speculative allegations of falsity and scienter.

document that IQEQ allegedly obtained or used. The documents produced in discovery demonstrate that IQEQ created a database for the Former Employees to surreptitiously download material from Apex Capital's platform, and that without doing so, IQEQ could not service the Related account without any disruption. Apex Capital has not been able to obtain discovery into what exactly was downloaded from the Apex Capital platform and uploaded to that link, but the fact that IQEQ was able to service Related without disruption provides the nexus to support a claim for misappropriation.

Finally, the Former Employees point to communications in which IQEQ purportedly instructed Related to request only "Related's data" and argue that those instructions disprove Apex Capital's allegations. Former Employees' Opposition at 22. They do not. What constitutes "Related's data" as compared to Apex Capital data is a fact issue that is hotly contested in this litigation. Under the Defendants' interpretation, every bit of work product created by Apex Capital employees for Related was "Related's data," which is clearly not true. At this stage of the case, factual disputes are to be resolved in Apex Capital's favor, not Defendants'. *See On Track Innovations*, 2014 WL 406497, at *4.

**b. *Breach of Contract***

The Former Employees' assertion that the SAC fails to identify what IQEQ agreed to do—or how it breached those obligations—is refuted by the pleading itself. The SAC identifies the specific commitments IQEQ made as part of that agreement in exchange for Apex Capital's dismissal of the First Texas Action. SAC ¶ 141; Beckerman Decl. Ex. J. The SAC also identifies how IQEQ breached those commitments. Discovery revealed that IQEQ was planning a "lift and shift" of Apex Capital's proprietary database and had created an Egnyte repository to collect Apex Capital's confidential and trade secret information, directly contradicting IQEQ's representation that it had "not made any use of any proprietary Apex [Capital] data in its discussions with Related

regarding additional services." SAC ¶¶ 79, 141; Beckerman Decl. Exs. F, G, J. IQEQ also coordinated the transfer of Apex Capital data outside the terms of the relevant client contracts. Beckerman Decl. Exs. F, M, N. The SAC thus clearly identifies the specific obligations IQEQ undertook and how IQEQ breached those obligations.

**c. *Breach of Implied Covenant of Good Faith and Fair Dealing***

The Former Employees' challenge to the implied covenant claim is even less persuasive. An implied covenant claim is not duplicative when it addresses a course of conduct distinct from the breach of express contractual terms. *See AEA Middle Mkt. Debt Funding LLC v. Marblegate Asset Mgmt., LLC*, 214 A.D.3d 111, 133 (1st Dep't 2023). Count 15 (breach of contract) concerns IQEQ's breach of the specific commitments in the February 17 letter, including IQEQ's promises to conduct a forensic investigation, to destroy Apex Capital proprietary data found on its systems, and to refrain from using that data in discussions with Related. SAC ¶¶ 265–71. Count 16 (for breach of the implied covenant) addresses IQEQ's broader course of conduct in conspiring with Related and the Former Employees to misappropriate Apex Capital's confidential information and trade secrets, thereby "destroying Apex Capital's right to receive the fruits of the agreement resolving the Texas Action." *Id.* ¶ 276. That claim does not add a new contractual term; it invokes the implied duty not to frustrate the purpose of the parties' existing agreement. *See Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995).

In any event, the claims may proceed in the alternative to the extent the parties dispute whether they entered into a binding agreement and the scope of any obligations imposed. *See Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 802 F. Supp. 3d 701 (S.D.N.Y. 2025).

### C. APEX CAPITAL'S CLAIMS AGAINST IQEQ ARE NOT BARRED BY THE RES JUDICATA DOCTRINE

Defendants' res judicata argument fails because it treats every claim concerning IQEQ and the Related transition as if it necessarily arose before January 31, 2025, and could have been asserted in the First Texas Action. But that is not accurate. SAC Counts 12 and 14–16 arose after the First Texas Action and SAC Counts 1–3 and 13 could not have been asserted because they are predicated on evidence which the SAC alleges was concealed and could not reasonably have been discovered at the time of the First Texas Action. Defendants cannot erase those temporal and factual distinctions simply by labeling everything part of the "same operative facts." Former Employees' Opposition at 16–18; Related Defendants' Opposition at 24–26.

#### 1. SAC Counts 12 and 14–16 Are Not Barred by Res Judicata Because the Claims Arose After the First Texas Action Was Commenced

As explained in Section II(A), *supra*, SAC Counts 14–16 did not—and could not—exist when Apex Capital filed the First Texas Action because those claims are based on a settlement that did not then exist. IQEQ represented on February 17, 2025, more than two weeks after the First Texas Action was filed, that it had not used Apex Capital proprietary data in discussions with Related and committed, among other things, to conduct a forensic investigation, destroy and refrain from using Apex Capital's data, disclose third-party sharing, impose restrictions on "bad actors," and comply with client contracts during any transition. SAC ¶¶ 141–42; Beckerman Decl. Ex. J. Apex Capital dismissed IQEQ in reliance on those assurances, and IQEQ subsequently issued its March 27, 2025 report purporting to confirm the February 17 commitments. SAC ¶ 143; Beckerman Decl. Ex. K.

Only later, through discovery in this action, did Apex Capital learn that IQEQ had not honored those commitments. Motion at 1–10. Whatever arguments Defendants may raise about the sufficiency of those claims, res judicata cannot bar claims for fraudulent inducement, breach

of the settlement commitments, and breach of the implied covenant on the theory that Apex Capital should have asserted those claims in a complaint filed before the representations, reliance, agreement, and alleged nonperformance even existed.

Similarly, Apex Capital's claim for tortious interference with the MSA (SAC Count 12) did not—and could not—exist when Apex Capital filed the First Texas Action because Related did not even terminate the MSA until April 2025 (SAC ¶¶ 148–50), and IQEQ's email to Related, urging it to "get tough" and "imminently" terminate the MSA was sent on March 13, 2025 (SAC ¶ 147). Beckerman Decl. Ex. H.

The dismissal of the First Texas Action on February 19, 2025, did not give IQEQ a permanent shield from future liability. Res judicata only bars claims that were—or could have been—resolved in the earlier action; it does not extinguish claims based on conduct that had not yet occurred. Yet that is precisely the prospective effect Defendants ask this Court to give Apex Capital's dismissal of IQEQ.[7] Controlling Second Circuit authority instead draws the relevant temporal line at the filing of the earlier complaint. Because "[t]he scope of the litigation is framed by the complaint at the time it is filed," later facts that independently support a claim are not extinguished merely because they concern the same dispute. *Cayuga Nation v. Tanner*, 6 F.4th 361, 375–77 (2d Cir. 2021) (citation omitted). Likewise, "[a] settlement, just like a judgment, does not ordinarily bar claims that have not yet accrued." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499–504 (2d Cir. 2014). Thus, later "legally significant acts" support new claims even when

[7] Defendants' authorities do not bar later-accruing claims or liability for later conduct. *See Mohamad v. Rajoub*, 767 F. App'x 91, 92–93 (2d Cir. 2019) (summary order); *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995); *Nemaizer v. Baker*, 793 F.2d 58, 60–61 (2d Cir. 1986); *Dellutri v. Village of Elmsford*, 895 F. Supp. 2d 555, 561–62 (S.D.N.Y. 2012).

they continue the same alleged course of misconduct. *Id.* at 501.[8] Defendants therefore cannot avoid the temporal inquiry merely by characterizing the SAC at a high level as involving the same alleged "scheme."

Because SAC Counts 12 and 14–16 are predicated on conduct that post-dates the First Texas Action, the res judicata doctrine cannot apply.

**2. SAC Counts 1–3 and 13 Are Not Barred by Res Judicata Because They Are Based on Evidence Apex Capital Had No Reasonable Means of Discovering**

As for claims involving conduct that predated the January 2025 Complaint, Defendants cannot obtain preclusion based on facts Apex Capital had no reasonable means of discovering. The Second Circuit has long recognized that newly discovered evidence defeats preclusion where it "could not have been discovered with due diligence." *L-Tec Elecs.*, 198 F.3d at 88. The Second Circuit recently reaffirmed that principle, explaining that a plaintiff's inability to access claim-revealing information, together with a defendant's efforts to conceal it—even if those efforts are not independently fraudulent—"cut against preclusion." *Trireme Energy Dev., LLC v. RWE Renewables Ams., LLC*, No. 24-3190, slip op. at 18–20 (2d Cir. Sept. 1, 2026).

That rule applies with particular force with respect to IQEQ's misappropriation claims (SAC Counts 1–3) and claim for aiding and abetting breach of fiduciary duty (SAC Count 13). Although in December 2024, IQEQ set in motion the misappropriation of documents from the Apex Capital platform by creating an IQEQ-controlled Egnyte repository to collect the information

[8] The Former Employees' cases involved additional or newly discovered evidence concerning already-completed conduct, evidence that was reasonably discoverable earlier, or later consequences of preexisting conduct—not materially concealed evidence revealing a previously unknown role or independently actionable post-filing acts. *See Gache v. Hill Realty Assoc., LLC*, No. 13–CV–1650 (CS), 2014 WL 5048336, at *7 n.11 (S.D.N.Y. Sept. 22, 2014); *Waldman v. Village of Kiryas Joel*, 207 F.3d 105, 114 (2d Cir. 2000); *iOptimize Realty, Inc. v. Cox Enters., Inc.*, No. 21-cv-4179 (NRM) (ST), 2025 WL 2696475, at *7–9 & n.7 (E.D.N.Y. Sept. 22, 2025); *Cho v. BlackBerry Ltd.*, 991 F.3d 155, 168–69 (2d Cir. 2021); *L-Tec Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999); *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38–39 (2d Cir. 1992).

(Beckerman Decl. Ex. G), Apex Capital was not aware of those events before the First Texas Action and, in fact, IQEQ actively concealed them.

Rather than advise Apex Capital that IQEQ had established an Egnyte repository to capture documents downloaded from Apex Capital's platform, in February 2025, IQEQ's Group General Counsel, Chris Marsden, promised a "full forensic investigation" into the allegations Apex Capital had raised in its January 2025 Complaint. Beckerman Decl. Ex. J at APEX00190251. IQEQ also represented that, while the investigation was ongoing, it had removed Belinkie and Chaney—the two employees against whom Apex Capital had made the most serious data-misappropriation allegations—from all Related work. *Id*. The letter then set out a series of concrete commitments: IQEQ would destroy any Apex Capital proprietary data found on its systems and refrain from commercial use, disclose any sharing with third parties, bar any employee found to be a "bad actor" from working for Related for at least twelve months, prohibit the four former Apex Capital employees from soliciting Apex Capital personnel for twenty-four months, and ensure that any client-data transition complied with the governing contracts. *Id*. Against that backdrop, Apex Capital had substantial reason to believe that the suspected misconduct was being independently investigated, that safeguards were already in place, and that IQEQ had committed to remedial measures if wrongdoing was found.

IQEQ then affirmatively represented to Apex Capital that the promised investigation had been completed—and that it was exhaustive. In its March 27, 2025, report, IQEQ told Apex Capital that, with assistance from outside counsel and a third-party vendor, it had conducted a "broad, multi-step" forensic review of millions of files and searched forensic images of IQEQ's files, devices, and systems for Apex Capital information. Beckerman Decl. Ex. K at APEX00162442. IQEQ further represented that it had removed any information even arguably containing Apex

Capital material, investigated whether Apex Capital information had been shared with third parties or retained on IQEQ systems, obtained an outside-counsel assessment as to whether the five employees had engaged in "Bad Actor" conduct, sidelined Chaney and Belinkie during the investigation, and secured employee certifications concerning personal devices, nonuse of Apex Capital information, compliance with IQEQ policies, and future non-solicitation of Apex Capital employees. *Id*. Those representations did not put Apex Capital on notice that further investigation was necessary. They conveyed the opposite: that IQEQ had already undertaken precisely the investigation the parties had discussed.

Apex Capital was entitled to take IQEQ at its word, but IQEQ's assurances obscured the very facts Apex Capital needed to uncover the claims now at issue: IQEQ's own role in orchestrating the transfer and use of Apex Capital's templates, work papers, database, and other proprietary information. SAC ¶¶ 79, 93, 101–02, 119–22, 141–47. The July 2026 discovery of a .pst file containing years of Apex Capital emails on Chaney's personal laptop illustrates the point. IQEQ had specifically represented in March 2025 that it was "[o]btaining certifications from each employee that he/she has not retained any Apex Capital Information on his/her personal devices or drives, and will not use Apex [Capital] Information at IQEQ," including a certification from Chaney that any Apex Capital information on his personal computer, Google Drive, or other personal device had been removed. Beckerman Decl. Ex. K at APEX00162442. Yet more than a year later, discovery revealed that Chaney's personal laptop still contained *thousands* of Apex Capital documents.[9] Beckerman Decl. Ex. L.

[9] The Former Employees' reliance on *Sanders* and *Holmes* is misplaced. *Sanders* involved already-decided issues without fraud affecting the prior proceeding. *See Sanders v. Sanders*, No. 20-CV-5621 (VEC), 2021 WL 4392053, at *10–13 (S.D.N.Y. Sept. 24, 2021). *Holmes* recognizes fraudulent withholding as extrinsic fraud—the theory Apex Capital alleges here. *See Holmes v. City of New York*, No. 19 Civ. 1628 (ER), 2020 WL 918611, at *7–8 (S.D.N.Y. Feb. 26, 2020).

Defendants thus seek to fault Apex Capital for failing to discover facts that IQEQ itself undertook to investigate, represented that it *had* investigated, and then failed to disclose. Even Defendants' authorities do not require that result.[10]

### D. APEX CAPITAL'S MOTION IS PROCEDURALLY PROPER

The Related Defendants' argument that the Motion is procedurally improper rests on the mistaken premise that Apex Capital seeks to reopen the First Texas Action or revive claims extinguished there. Related Defendants' Opposition at 24–26. That is incorrect. As explained in Section II(C)(2), *supra*, Apex Capital seeks to assert claims that could not have been raised in the First Texas Action and, thus, are not barred by the res judicata doctrine. The SAC does not seek to alter, vacate, or obtain relief from the judgment in the First Texas Action, so Rules 59(e) and 60(b) are inapplicable. On this basis, the cases cited by the Related Defendants are inapposite.

## III. CONCLUSION

For the foregoing reasons, Apex Capital respectfully requests that the Court grant its Motion.

---

[10] The Former Employees' due diligence cases are distinguishable. *L-Tec Elecs.*, 198 F.3d 85; *In re Layo*, 460 F.3d 289 (2d Cir. 2006); *Cho*, 991 F.3d 155; and *Ningbo Prods. Import & Export Co. v. Eliau*, No. 11 Civ. 650 (PKC), 2011 WL 5142756 (S.D.N.Y. Oct. 31, 2011) involved discoverable information and no active concealment. *Saabirah El v. City of New York*, 300 F. App'x 103 (2d Cir. 2008) and *iOptimize*, 2025 WL 2696475 involved decisions to forgo discovery without allegations of fraud.

Dated: September 11, 2026

Respectfully submitted,

PILLSBURY WINTHROP SHAW
PITTMAN LLP

*/s/ Brian L. Beckerman*
Brian L. Beckerman
Stephanie M. Coughlan
31 West 52nd Street
New York, NY 10019-6131
Tel: 212.858.1000
Fax: 212.858.1500
brian.beckerman@pillsburylaw.com
stephanie.coughlan@pillsburylaw.com

Amy L. Ruhland (admitted *pro hac vice*)
Abigail L. Griffith (admitted *pro hac vice*)
401 W 4th Street, Suite 3200
Austin, TX 78701
(512) 580-9600
amy.ruhland@pillsburylaw.com
abby.griffith@pillsburylaw.com

*Attorneys for Apex Group Capital Advisors LLC*

**WORD COUNT CERTIFICATION**

On September 9, 2026, Apex Capital filed a letter motion, on consent from Defendants, requesting permission from the Court to file a brief not exceeding 6,500 words. *See* Dkt. 183. Pursuant to Local Civil Rule 6.3, I hereby certify that the foregoing Memorandum of Law contains 6,433 words, excluding the portions exempted from the word-count limitation. This word count was calculated using Microsoft Word's word-count function.

*/s/ Brian L. Beckerman*
Brian L. Beckerman